REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  IRELL & MANELLA LLP
   Jonathan S. Kagan (SBN 166039)
2  jkagan@irell.com
   Joshua P. Glucoft (SBN 301249)
3  jglucoft@irell.com
   Casey Curran (SBN 305210)
4  ccurran@irell.com
   Sharon Song (SBN 313535)
5  ssong@irell.com
   1800 Avenue of the Stars, Suite 900
6  Los Angeles, California 90067-4276
   Telephone: (310) 277-1010
7  Facsimile: (310) 203-7199

8  Rebecca L. Carson (SBN 254105)
   rcarson@irell.com
9  Kevin Wang (SBN 318024)
   kwang@irell.com
10 840 Newport Center Drive, Suite 400
   Newport Beach, California 92660-6324
11 Telephone: (949) 760-0991
   Facsimile: (949) 760-5200
12
   *Attorneys for Defendant*
13 JUNIPER NETWORKS, INC.

14
                    **UNITED STATES DISTRICT COURT**
15
                  **NORTHERN DISTRICT OF CALIFORNIA**
16
                      **SAN FRANCISCO DIVISION**
17
   FINJAN, INC.,                    )   Case No. 3:17-cv-05659-WHA
18                                   )
              Plaintiff,             )   **DEFENDANT JUNIPER NETWORKS,**
19                                   )   **INC.'S NOTICE OF MOTION AND**
          vs.                        )   **MOTION TO EXCLUDE THE**
20                                   )   **TESTIMONY OF MR. KEVIN M. ARST;**
   JUNIPER NETWORKS, INC.,           )   **MEMORANDUM OF POINTS &**
21                                   )   **AUTHORITIES IN SUPPORT THEREOF**
              Defendant.             )
22                                   )   Date:      Nov. 29, 2018
                                     )   Time:      8:00 AM
23                                   )   Courtroom: Courtroom 12, 19th Floor
   _____ )   Before:    Hon. William Alsup
24

25

26

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10607865

JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF MR.
KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

## NOTICE OF MOTION AND MOTION

2     TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3     PLEASE TAKE NOTICE THAT pursuant to Federal Rule of Civil Procedure 5.2(d), Civil

4  Local Rules 7-11 and 79-5, and the Court's Scheduling Order governing this motion (Dkt. No. 215),

5  Defendant Juniper Networks, Inc. ("Juniper") respectfully moves the Court for an Order excluding

6  the testimony of Mr. Kevin M. Arst as inadmissible under Federal Rule of Evidence Rule 702.

7     This motion is based upon this Notice of Motion; the accompanying Memorandum of Points

8  and Authorities; the Declaration of Alex Icasiano submitted herewith; such other evidence and

9  arguments as the Court may consider; and all other matters of which the Court may take judicial

10  notice.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10607865                                    - 1 -

JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF
MR. KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...........................................................................................................1

II.     LEGAL STANDARDS ..................................................................................................2

III.    OVERVIEW OF MR. ARST'S DAMAGES OPINION ...............................................3

IV.     ARGUMENT .................................................................................................................5

        A.    Mr. Arst's Damages Theory Defies Basic Economic Principles. ...........................5

        B.    Mr. Arst's Opinion Is Unreliable And Unsupported. ...............................................8

        C.    Mr. Arst Should Not Be Allowed To Taint The Jury By Presenting
              Testimony That Grossly Overstates Information On Accused Units
              And Revenues. ........................................................................................................12

        D.    Mr. Arst Should Not Be Given Leave To Amend .................................................15

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10607865

- i -

JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF
MR. KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014)*, overruled on other grounds by Williamson v.
  Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015)................................................................10

*Apple, Inc. v. Motorola, Inc.*,
  2012 WL 1959560 (N.D. Ill. 2012) (Posner, J. sitting by designation) ......................................12

*Area 55, Inc. v. Amazon.com, Inc*,
  2012 WL 12846975 (S.D. Cal. July 24, 2012)..............................................................................8

*Bloom v. J.P. Morgan Chase & Co.*,
  No. C 09-03418 WHA, 2010 WL 4939951 (N.D. Cal. Nov. 30, 2010) ......................................2

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
  807 F.3d 1283 (Fed. Cir. 2015) ................................................................................................2, 8

*Central Soya Co. v. Geo A Hormel Co.*,
  723 F.2d 1573 (Fed. Cir. 1983) ................................................................................................12

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ................................................................................................................2, 7

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
  2015 WL 4272870 (N.D. Cal. July 24, 2015) ........................................................................6, 15

*Finjan, Inc. v. Sophos, Inc.*,
  2016 WL 4268659 (N.D. Cal. Aug. 15, 2016)........................................................................6, 15

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ..............................................................................................................2, 11

*General Electric Co. v. Joiner*,
  118 S.Ct. 512 (1997) ................................................................................................................10

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
  438 F.3d 1354 (Fed. Cir. 2006) ................................................................................................14

*Homeland Housewares, LLC v. Whirlpool Corp.*,
  865 F.3d 1372 (Fed. Cir. 2017) ................................................................................................14

*Integra Lifesciences I, Ltd. v. Merck KgaA*,
  2000 WL 35717873 (S.D. Cal. Jan. 27, 2000)..............................................................................8

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) ................................................................................................13

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10607865

JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF
MR. KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

**Page(s)**

*Mobil Oil Corp. v. Amoco Chem. Corp.*,
   915 F. Supp. 1333 (D. Del. 1994) ................................................................5

*Monolithic Power Systems, Inc. v. O2 Micro Int'l, Ltd.*,
   476 F. Supp. 2d 1143 (N.D. Cal. 2007) .........................................7, 9, 12

*Network Protection Sci., LLC v. Fortinent, Inc.*,
   2013 WL 5402089 (N.D. Cal. Sept. 26, 2013)...................................15

*Oiness v. Walgreen Co.*,
   88 F.3d 1025 (Fed. Cir. 1996)..............................................................12

*Oracle Am., Inc. v. Google, Inc.*,
   2012 WL 877125 (N.D. Cal. Mar. 15, 2012) .....................................6

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   711 F.3d 1348 (Fed. Cir. 2013)............................................................13

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
   849 F.3d 1360 (Fed. Cir. 2017)............................................................8

*Riles v. Shell Exploration & Prod. Co.*,
   298 F.3d 1302 (Fed. Cir. 2002)............................................................5

*In re Roundup Prod. Liab. Litig.*,
   2018 WL 3368534 (N.D. Cal. July 10, 2018) ..................................10

*Sport Dimension, Inc. v. Coleman Co.*,
   820 F.3d 1316 (Fed. Cir. 2016)............................................................2

*Telcordia Techs., Inc. v. Lucent Techs., Inc.*,
   2007 WL 7076662 (D. Del. Apr. 27, 2007) .....................................14

*Viasat, Inc. v. Space Sys./Loral, Inc.*,
   2014 WL 3896073 (S.D. Cal. Aug. 8, 2014) .....................................8

*XpertUniverse, Inc. v. Cisco Sys., Inc.*,
   2013 WL 936449 (D. Del. Mar. 11, 2013)......................................7, 8

**Other Authorities**

Fed. R. Evid. 702.................................................................1, 2, 10, 15

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10607865

- iii -

JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF
MR. KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

Defendant Juniper Networks, Inc. ("Juniper") moves the Court for an order excluding the

3

testimony of Mr. Kevin M. Arst, Plaintiff Finjan, Inc.'s ("Finjan") damages expert.

4

## I.      INTRODUCTION

5

Finjan alleges that "(1) Juniper's SRX Gateways used in combination with Sky ATP, and

6

(2) Sky ATP alone ('Accused Products')" infringe Claim 10 of the '494 Patent. Dkt. No. 98 (Finjan's

7

MSJ) at 1-2. Juniper's total revenues for the Accused Products during the damages period are under

8

***$1.8 million***. However, for Juniper's alleged infringement of Claim 10, Finjan's damages expert,

9

Kevin M. Arst, proposes a "reasonably royalty" of between ***$60-$70 million***—amounting to a

10

royalty rate of nearly ***4,000.00%***. Mr. Arst does not contend that Juniper's Sky ATP service or the

11

SRX devices used with Sky ATP drive demand for other sales, and also admits that each of those

12

products "has a substantial number of features that contribute to consumer demand." The staggering

13

disconnect between Juniper's accused revenues and Mr. Arst's proposed "reasonable royalty"

14

exposes the unreliability of Mr. Arst's damages opinion. Mr. Arst's opinion is inadmissible under

15

Rule 702 of the Federal Rules of Evidence for multiple reasons:

16    •   Mr. Arst purports to apply a "costing savings" approach, claiming that Juniper "saved"

17        $60-$70 million by using the claimed invention, and would have paid this amount to

18        Finjan as a reasonable royalty. But the notion that Juniper would have agreed to pay

19        Finjan $60-$70 million on sales of $1.8 million defies basic laws of economics.

20    •   Mr. Arst's proposed lump sum—which equates to a royalty rate close to 4,000.00%—is

21        refuted by Finjan's own fact witnesses, who uniformly testified that Finjan takes the same

22        approach in every licensing negotiation: it starts with an 8% royalty rate on gross sales of

23        hardware products, and a 16% royalty rate on gross sales of software products for a

24        portfolio license, and then negotiates down from those rates based on licensee-specific

25        factors. Ex. 6 (Hartstein Dep.) at 43:3-5; Ex. 2 (Garland Dep.) at 116:15-19.

26    •   Mr. Arst's cost savings theory—which blindly relies on the unsupported and unreliable

27        conclusions of Finjan's technical expert, Dr. Cole—rests on misinterpretations of the

28        underlying data and unreasonable assumptions, which leads to a drastic overstatement of

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10607865

- 1 -

JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF
MR. KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

1    the benefits of Claim 10 of the '494 Patent to the Accused Products.

2    • Mr. Arst inflates the accused units and revenues by including in his analysis SRX devices

3    that were never enabled for use in combination with Sky ATP, and SRX devices that are

4    not even compatible for use with Sky ATP.

5    As highlighted by each of the above-stated reasons, Mr. Arst has failed to perform "the key

6    inquiry" for a reasonable royalty analysis—determining "what it would have been worth to

7    [Juniper], as it saw things at the time, to obtain the authority to use the patented technology,

8    considering the benefits it would expect to receive from using the technology and the alternatives it

9    might have pursued." *See Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1304

10   (Fed. Cir. 2015). Mr. Arst's opinion that a license to Claim 10 of the '494 Patent "would have been

11   worth" $60 million or more to Juniper so it could sell accused products that generated less than $1.8

12   million in revenues is economically unsound on its face. Here, "there is simply too great an

13   analytical gap between the data and the opinion proffered" and the Court should preclude Finjan

14   from presenting Mr. Arst's flawed analyses. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

15   **II.    LEGAL STANDARDS**

16   An expert witness may only provide opinion testimony "if (a) the expert's scientific,

17   technical, or other specialized knowledge will help the trier of fact to understand the evidence or to

18   determine a fact issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the

19   product of reliable principles and methods; and (d) the expert has reliably applied the principles and

20   methods to the facts of the case." Fed. R. Evid. 702. "It is the trial court's responsibility to ensure

21   'that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"

22   *Bloom v. J.P. Morgan Chase & Co.*, No. C 09-03418 WHA, 2010 WL 4939951, at *1 (N.D. Cal.

23   Nov. 30, 2010) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). "In

24   making this determination, the judge must make 'a preliminary assessment of whether the reasoning

25   or methodology underlying the testimony is . . . valid' and 'whether that reasoning or methodology

26   properly can be applied to the facts in issue.'" *Id.* (quoting *Daubert*, 509 U.S. at 592–93); *see also*

27   *Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1323 (Fed. Cir. 2016).

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10607865                                         - 2 -

JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF
MR. KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

### III.     OVERVIEW OF MR. ARST'S DAMAGES OPINION

As Finjan stated in its Motion for Summary Judgment, Finjan's allegations of infringement for Claim 10 are limited to "(1) Juniper's SRX Gateways used in combination with Sky ATP and (2) Sky ATP alone." Dkt. No. 98 at 1-2. Juniper's Sky ATP is a cloud-based malware protection service that is offered as an add-on to certain SRX devices. Some SRX models do not work with Sky ATP. Ex. 3 (Sky ATP Supported Platforms Guide) at 2 (showing that only some SRX models support Sky ATP). If a user has a Sky ATP-compatible SRX, that user can use Sky ATP with the SRX if and only if it activates a Sky ATP license from Juniper, which requires the user to register the SRX and create an account. Ex. 4 (Sky ATP Admin Guide) at 15. Absent this license registration, an SRX cannot work "in combination with Sky ATP." Juniper offers free licenses to Sky ATP, as well as paid basic and premium licenses. Dkt. No. 96-3 (Tenorio Decl.) ¶ 3. Each Sky ATP license can be configured with only one corresponding, compatible SRX unit. Icasiano Decl. ¶ 3.

Between September 2015, when Juniper announced the release of Sky ATP, and January 2017, when the '494 Patent expired, Juniper sold ▇ premium Sky ATP licenses to SRX customers located in the Americas, and ▇ customers registered for free Sky ATP licenses. Ex. 5 (Ugone Rpt.) at p. 40 Table 4; Icasiano Decl. ¶ 4. Thus, only ▇ SRX devices were "used in combination with Sky ATP" in the Americas during the damages period. *Id*. During the same period, Juniper received ▇ in revenue for premium Sky ATP licenses and ▇ in total revenue for all ▇ "SRX Gateways" that could have been "used in combination with Sky ATP." Ex. 5 (Ugone Rpt.) at p. 42, Table 5. Mr. Arst ignores these facts, and instead uses in his analysis the sales of ***all SRX devices***—regardless of whether they were ever enabled to be used in combination with Sky ATP, and including SRX models that are ***not even compatible*** for use with Sky ATP. *See* Ex. 1 (Errata to Arst Rpt.) at Suppl. Exs. 1.4 & 1.5.

When Sky ATP receives a file from a compatible, enabled SRX unit, it hashes the file and determines if the system has previously analyzed the file. This takes approximately one second. If the hash returns no results, then the file proceeds through Sky ATP's malware analysis pipeline, which includes an antivirus engine (~5 seconds), static analysis (~30 seconds), and dynamic analysis (sometimes called "sandboxing") (~6-7 minutes). Ex. 4 (Sky ATP Admin Guide) at 9-10. When the

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10607865                                              - 3 -

JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF
MR. KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

1  analysis is complete, Sky ATP determines a threat level verdict score (a score from 1 to 10 indicating

2  the level of threat the file poses), sends that score to the SRX, and stores the score along with the

3  complete analysis results in DynamoDB or Simple Storage Service ("S3"), storage solutions

4  provided by Amazon Web Services ("AWS"). *Id.* at 9-11. If the file has been analyzed before and

5  the hash returns a result, then Sky ATP simply sends the corresponding threat level verdict score to

6  the SRX. *Id.* Juniper uses the AWS cloud server to perform the hash lookup, antivirus scanning,

7  static analysis, and to store the analysis results. Icasiano Decl. ¶ 5. It rents physical servers from

8  iWeb to perform the dynamic analysis. Icasiano Decl. ¶ 6.

9      Relying on Finjan's technical expert, Dr. Cole, Mr. Arst asserts that Juniper would be unable

10  to store any analysis results without infringing Claim 10, and its best non-infringing alternative

11  would have been to re-process files each time they are received. Ex. 1 (Arst Rpt.) at 31. That is, Sky

12  ATP would no longer determine whether it had seen a particular file before (the hash lookup) or

13  store the analysis results in DynamoDB or S3, so every file would proceed through the entire

14  analysis pipeline. In this hypothetical, Mr. Arst asserts, every file received from an SRX would be

15  subject to dynamic analysis, which takes Sky ATP 6-7 additional minutes to complete.

16      Mr. Arst makes two fundamental errors. First, he assumes that all costs from Juniper's AWS

17  invoices are attributable to Sky ATP's dynamic analysis. This is wrong; ███████████████████

18  ████████████████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████████

22  ███████████████████████████████████████████████ *Id.* ¶ 6. Thus, Juniper's AWS

23  costs would not increase if Sky ATP had to perform dynamic analysis on every file received from

24  an SRX, and Mr. Arst and Dr. Cole failed to offer any analysis or evidence that Juniper would face

25  increased processing costs from ████—the service that actually performs dynamic analysis.

26      Mr. Arst purports to calculate the (non-existent) dynamic analysis-related AWS costs

27  Juniper allegedly saved by using the claimed invention based on the total worldwide sales of all

28  SRX devices—the vast majority of which are not accused of infringement, as they are neither used,

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10607865                                    - 4 -

JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF
MR. KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   nor even compatible, with Sky ATP—to determine a "U.S. Apportionment Factor." Ex. 1 (Arst Rpt.)

2   at 31 n.100, Errata Ex. 1.1, Errata Ex. 1.2. He then applies that factor to Juniper's total AWS costs—

3   none of which were for dynamic analysis—to derive so-called "U.S. apportioned Sky ATP AWS

4   costs" totaling ███████ over the damages period. *Id.* at Errata Ex. 1.1, Errata Ex. 1.2

5        Mr. Arst next multiplies that number by a "Cost Savings Factor" of 359 and 419, derived

6   largely from Dr. Cole as follows: According to Dr. Cole, if Juniper were unable to store analysis

7   results, it would have spent an average of 6-7 minutes dynamically analyzing (sandboxing) the files

8   every time they are received instead of being able to look up previously-analyzed files using a

9   hash—which only takes a second. Without explanation or analysis, and even though there is no

10   evidence that Amazon charges by processing time much less by second, Mr. Arst and Dr. Cole

11   speculate that "the number of servers that would be required to process a file for sandboxing would

12   be 360-420 times greater (6-7 minutes * 60 seconds) than what is required to serve the file from the

13   database of results (1 second)." Ex. 1 (Arst Rpt.) at 31. From this, Mr. Arst concludes that his

14   ███████ in U.S. apportioned Sky ATP AWS costs would have been between 359 and 419 times

15   higher (360 seconds minus one second and 420 minus one second) without the use of Claim 10,

16   resulting in a purported $60-$70 million in additional AWS costs Juniper saved. *Id.*

17        Finally, after walking through the *Georgia-Pacific* factors, Mr. Arst concludes that Juniper

18   would have agreed to pay Finjan 100% of this alleged cost saving as a reasonable royalty.

19 **IV.**    **ARGUMENT**

20      **A.**    <u>**Mr. Arst's Damages Theory Defies Basic Economic Principles**</u>.

21        Mr. Arst's damages theory must be excluded because it is economically nonsensical.

22   Mr. Arst postulates that Juniper would have been willing to pay a "reasonable royalty" of $60-$70

23   million to obtain a 14-month license to sell products that generated less than ███████

24   ████████████. A proper reasonable royalty analysis "requires sound economic and factual

25   predicates." *Riles v. Shell Expl. & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002). Mr. Arst's

26   damages theory lacks both and flunks the "reality test." *Mobil Oil Corp. v. Amoco Chem. Corp.*,

27   915 F. Supp. 1333, 1365 (D. Del. 1994) ("The hypothetically negotiated royalty must be

28   reasonable—it must pass a reality test.").

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10607865

- 5 -

JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF
MR. KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    While there may be some instances where a licensee may be willing to pay a royalty that

2 exceeds its revenues—*e.g.*, where the technology at issue will drive sales of other products or where

3 customers would be willing to pay a higher price—Mr. Arst has provided no explanation for why

4 Juniper would agree to take a ███████ million loss on Sky ATP. Indeed, Mr. Arst did not even bother

5 to analyze whether the release of Sky ATP had any meaningful impact on SRX sales, much less on

6 any other Juniper products or services. Ex. 7 (Arst Dep.) at 72:13-20; 73:19-74:2. Mr. Arst also

7 failed to provide any evidence that Juniper's customers would be willing to pay extra to cover the

8 increased costs. *Id.* at 83:2-20. To the contrary, the fact that ███████████████████████

9 ████████████████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████[1] And there is even less demand for the

12 '494 patented technology allegedly incorporated into ████████████████████████████

13 ███: Mr. Arst admits, as he must, that the Accused Products have "a substantial number of features

14 that contribute to consumer demand." Ex. 1 (Arst Rpt.) at 44-45.

15    Further, Mr. Arst fails to provide a satisfactory explanation as to why Finjan would insist on

16 a royalty rate that is orders of magnitude higher than its "standard" rates. Finjan witnesses have

17 emphasized time and again in its past litigations and in this case that Finjan's standard starting

18 position is an 8% royalty rate on infringing hardware and a 16% royalty rate on infringing software.

19 *See, e.g.*, Ex. 8 (*Blue Coat* Trial Tr.) at 256:5-12 (Finjan's CEO Philip Hartstein: "Q. Does Finjan

20 have a starting approach when it reaches out to a potential licensee? A. We do. Our rates are – and

21 these will sound familiar to you – these are 8% for hardware, 16% for software . . . ."); Ex. 9 (*Sophos*

22 Trial Tr.) at 825:4-6 (Finjan's Damages Expert: "I think that the evidence establishes that Finjan

23 has an established licensing rate: 8 percent of total revenues on hardware; 16 percent of total

24 revenues on software."); Ex. 6 (Hartstein Dep.) at 42:25-43:5 ("So in our licensing negotiations, we

25 use 8 and 16 percent as a starting point for defining the value of that license."); *id.*at 83:11-15

26

27    [1] While Juniper recognizes that "[t]he infringer's revenue from the infringement does not
cap the amount of a reasonable royalty," this does not mean that a damages expert can simply
ignore the revenues altogether. *See Oracle Am., Inc. v. Google, Inc.*, 2012 WL 877125, at *4 (N.D.
28 Cal. Mar. 15, 2012).

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10607865    - 6 -

JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF
MR. KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   ("Q. What is the highest royalty rate that Finjan has ever proposed to a potential licensee? A. I

2   would suspect it would not exceed 16 percent."). If Finjan were to propose its standard 8%/16%

3   starting rates here, its damages demand would be reduced from $60-$70 million to ████████

4   Further, a downward departure from Finjan's "standard rates" is justified here, where there is only

5   one patent-at-issue, and that patent was set to expire a mere 14 months after the hypothetical

6   negotiation. ████████████████████████████████████████████████████████████

7   ████████████████████████   In contrast to Finjan's standard *8%/16%* starting points for a

8   *downward* negotiation, Mr. Arst effectively proposes a nearly *4,000.00% royalty rate*.

9        Courts faced with similar economically unsound opinions have excluded them. For example,

10   in *Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.*, 476 F. Supp. 2d 1143 (N.D. Cal. 2007), the

11   court granted the defendant's *Daubert* motion where plaintiff's expert offered a reasonable royalty

12   analysis seeking $149 million in royalties where total sales of accused products was $77.9 million

13   and not all of the products included in the sales base practiced the accused technology. *Id.* at 1154-

14   56. The court found that the plaintiff's expert failed to "account for the law of supply and demand"

15   by assuming that the number of sales made would stay constant despite the higher price that would

16   be necessitated by the proposed royalty. *Id.* at 1155.

17        Similarly, in *XpertUniverse, Inc. v. Cisco Sys., Inc.*, 2013 WL 936449, at *3–4 (D. Del.

18   Mar. 11, 2013), the plaintiff's damages expert opined that defendants should pay a lump sum of

19   $32.5 million where sales of the accused products amounted to around $937,000. *Id.* There were

20   license agreements in the record with a 3-5% royalty rate. *Id.* at *3. "Applying a 3–5% royalty rate

21   to this base [would have] result[ed]'' in total damages between "$38,962 and $64,938." *Id.*

22   However, plaintiff's damages expert "provide[d] no basis for comparison between these amounts

23   [$38,962 - $64,938] and his $32 million amount" and did not "provide any explanation as to how

24   the two running royalty agreements are probative of his $32 million lump sum payment." *Id.* Further,

25   plaintiff's damages expert did not "provide any expectation of how often the patented technology

26   would be used by consumers" and evidence indicated any expected sales would be low. *Id.* The

27   court rejected the plaintiff's explanation that sales of the accused products would lead to "significant

28   convoyed sales," as there was insufficient evidence to support this theory. *Id.* The court thus found

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10607865

- 7 -

JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF
MR. KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

1   that the plaintiff's damages expert's "conclusion: $32 million in a lump sum royalty on $937,000 in

2   sales of accused products simply makes no sense." *Id.* As in *XpertUniverse*, Mr. Arst fails to account

3   for Finjan's own "standard" royalty rate starting points, and fails to provide a basis for his own

4   nearly 4,000.00% rate.

5          Because Finjan bears the burden of proving damages, Mr. Arst was required to provide some

6   justification as to why Juniper would agree to an amount so far in excess of its revenues. *Carnegie*

7   *Mellon*, 807 F.3d at 1304 ("A key inquiry in the analysis is what it would have been worth to the

8   defendant, as it saw things at the time, to obtain the authority to use the patented technology,

9   considering the benefits it would expect to receive from using the technology and the alternatives it

10  might have pursued."); *see also Viasat, Inc. v. Space Sys./Loral, Inc.*, 2014 WL 3896073, at *9 (S.D.

11  Cal. Aug. 8, 2014) (granting new trial where damages expert "offered no reason why [the accused

12  infringer] would have willingly agreed to pay six times more than its anticipated profits on the

13  [accused product]"); *Area 55, Inc. v. Amazon.com, Inc.*, 2012 WL 12846975, at *7 (S.D. Cal.

14  July 24, 2012) (excluding expert whose opinion was "not based on sound economic principles.").

15  Mr. Arst's opinion fails as a matter of fundamental economics and should be excluded in its entirety.

16         **B.     Mr. Arst's Opinion Is Unreliable And Unsupported.**

17         Mr. Arst's "cost savings" approach is riddled with unsupported assumptions and errors,

18  rendering it unreliable and inadmissible. The cost savings approach compares the costs associated

19  with infringement to the costs associated with the next best non-infringing alternative. *Prism Techs.*

20  *LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1376 (Fed. Cir. 2017) ("A price for a hypothetical

21  license may appropriately be based on consideration of the 'costs and availability of non-infringing

22  alternatives' and the potential infringer's 'cost savings.'"); *Integra Lifesciences I, Ltd. v. Merck*

23  *KgaA*, 2000 WL 35717873, at *3 (S.D. Cal. Jan. 27, 2000) ("Inquiry into Defendants' incremental

24  costs of the next best alternative is clearly probative as to Defendants' willingness to enter into

25  licensing negotiations, hypothetical or otherwise.").

26         As an initial matter, Mr. Arst failed to consider the most economically obvious next best

27  alternative. If it truly were the case, as Mr. Arst posits (without support), that Juniper would have

28  incurred an additional $60-$70 million in costs to generate ███████████ in Sky ATP-related

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10607865                                    - 8 -                        JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF
MR. KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

profits without using Claim 10, one alternative at Juniper's disposal would have been to wait 14 months until the '494 patent expired before releasing Sky ATP. No economically rational actor would have done otherwise. The notion that Juniper would have paid Finjan a royalty that would have generated a █████████████ to launch Sky ATP 14 months prior to the expiration of the '494 Patent is economically unreasonable. Yet Mr. Arst never even considered this alternative.

Even on its own terms, Mr. Arst's cost savings analysis fails. To quantify any alleged cost differences between the current Sky ATP system and the alternative proposed by Finjan, one would need to (1) subtract the AWS processing and storage costs associated with the hash lookup and storage of analysis from the AWS invoices, and (2) add any additional ███ processing costs to the ███ invoices. Mr. Arst did neither. Instead, he simply took the entire amount Juniper paid for AWS during the damages period, applied a (flawed) U.S. apportionment factor, and multiplied the result by a "cost savings factor" of 359-419. *See* Ex. 1 (Arst Rpt.) at Supp. Ex. 1.1 and Ex. 1.2; Ex. 7 (Arst Dep.) at 136:21-25. He then awards this entire amount of alleged "cost savings" to Finjan. This theory is based on a string of unsupported assumptions and has no basis in reality.

Mr. Arst's analysis is flawed from the outset because it is based on the wrong invoices. Juniper █████████████ to perform dynamic analysis; it does not perform this task using AWS. Icasiano Decl. ¶¶ 5-6. Thus, to measure any additional costs associated with dynamic processing, the logical starting place would have been Juniper's ███ invoices, █████████ ████████████████████.[2] When asked why he used the AWS invoices instead of the ███ invoices, Mr. Arst had no explanation other than that the ███ invoices were not available. Ex. 7 (Arst Dep.) at 157:6-17. Whether certain information is not available is not an excuse for an expert to rest their analysis on "unreasonable inferences or speculation." *Monolithic*, 476 F. Supp. 2d at 1155 ("If MPS refused to produce information that Mr. Bratic required to determine the reasonable royalty, then O2 Micro needed to get that information . . . .").

Mr. Arst also tries to justify his reliance on the AWS invoices by punting to Dr. Cole. Ex. 7 (Arst Dep.) at 157:13-17. But Dr. Cole provides no evidence to support his conclusory statement

[2] ████████████████████████████████

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations
10607865
- 9 -
JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF
MR. KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

1   that the costs would be the same regardless of whether Juniper uses AWS or ▮▮▮▮ Ex. 10 (Cole

2   Rpt.) ¶ 36. Dr. Cole did not even review either the AWS or the ▮▮▮▮ invoices in forming his

3   opinions. *Id*., *see also id.* at Appendix B (containing no citation to AWS or ▮▮▮▮ invoices). Had he

4   done so, he would have realized that they reflect ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Thus, Dr. Cole's bare conclusion that the AWS

6   invoices may serve as a proxy for the ▮▮▮▮ invoices is nothing more than *ipse dixit*. *General Elec.*,

7   118 S.Ct. at 519; *In re Roundup Prod. Liab. Litig.*, 2018 WL 3368534, at *5 (N.D. Cal. July 10,

8   2018) ("unjustified extrapolations from existing data can require the Court to exclude an expert.").

9   Given this,  Mr. Arst should also be precluded from presenting or relying on Dr. Cole's flawed

10  analysis. *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1325 (Fed. Cir. 2014)*, overruled on other*

11  *grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (excluding expert

12  testimony based on unreliable declaration from another expert).

13          Further, the AWS invoices used in Mr. Arst's analysis include costs associated with many

14  Juniper products and services other than Sky ATP. Icasiano Decl. ¶ 5. Mr. Arst made no effort to

15  isolate the AWS expenses associated with Sky ATP as a result of his unsupported assumption that

16  the invoices included only Sky ATP expenses, and admitted that his analysis would need to be

17  redone if his assumption was incorrect (which it is). Ex. 7 (Arst Dep.) at 290:1-291:4. Nor did

18  Mr. Arst even subtract any storage costs associated with DynamoDB or S3. *Id.* at 187:18-24;

19  183:16-20. Obviously, a non-infringing alternative that did not store profiles would not incur these

20  storage costs. Mr. Arst's fails to account for this in his analysis, and is thus not the "product of

21  reliable principles and methods." Fed. R. Evid. 702.

22          Mr. Arst's "cost factor"—which he admitted he simply took as an input from Dr. Cole—is

23  especially flawed. Ex. 7 (Arst Dep.) at 137:2 - 138:23. Dr. Cole's "cost factor" of 359-419 is nothing

24  more than a simple calculation of the time difference between doing a hash lookup and dynamically

25  processing the file, and a bald conclusion that "the number of servers that would be required to

26  process a file for sandboxing would be 360-420 times greater (6-7 minutes * 60 seconds) than what

27  is required to serve the file from the database of results (1 second)." Ex. 10 (Cole Rpt.) at 13.

28  Dr. Cole provides no evidence or explanation as to how or why the number of seconds it takes to

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10607865

- 10 -

JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF
MR. KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   process a single file could possibly reflect the number of extra servers that Juniper would need

2   process that file. And there is no evidence that Amazon or ████ charge by processing time, much

3   less by second. ████████████████████████████████████████████████████████████████

4   ████████████████████. Icasiano Decl. ¶¶ 5-6. Neither Mr. Arst nor Dr. Cole attempt to quantify

5   the amount of additional data that would need to be processed in their hypothetical scenario, or

6   whether that increase would exceed the capacity of the servers Juniper currently uses.

7        Not only is this "cost factor" facially illogical, it is also based on a number of implicit

8   assumptions that are unsupported (and in most instances contradicted) by the factual record. For

9   example, applying the 359-419 cost factor to the entirety of AWS costs implicitly assumes that every

10  file processed by Sky ATP is subjected to dynamic analysis. This is wrong; only certain file types

11  undergo dynamic analysis. Dkt. No. 96-3 ¶¶ 4-5 (Decl. of Yuly Tenorio). ████████████████████

12  ████████████████████████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████. Consequently, the time saved by storing the

14  analysis results would vary greatly depending on file type, and the maximum time savings that

15  Dr. Cole identifies (359-419) would apply to less than half the files analyzed by Sky ATP.

16       Mr. Arst also assumes that 100% of the files processed by Sky ATP were previously

17  processed. This is also obviously wrong. For those files which are new to Sky ATP, there is no time

18  savings (under both the actual and hypothetical scenarios) because there would be no prior results

19  available, so they must proceed through the entire analysis pipeline. Neither Mr. Arst nor Dr. Cole

20  opine on how many of the files processed by Sky ATP during the relevant time period were "new"

21  versus previously processed, and thus Mr. Arst does not account for this in his analysis.

22       Mr. Arst has presented a cost savings theory which he cannot support with evidence, and

23  which is contradicted by the underlying documents he relies upon in generating his figures. Where,

24  as here, an expert fails to explain how the materials considered lead to their conclusions, "[a] court

25  may conclude that there is simply too great an analytical gap between the data and the opinion

26  proffered." *Gen. Elec. Co.,* 522 U.S. at 146. The Court should exercise its gatekeeping duties here

27  and preclude Finjan's flawed cost savings theory, as it would invite the jury to base its damage

28  award on factual inaccuracy and speculation. *See Monolithic,* 476 F. Supp. 2d at 1154 ("[A]n expert

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10607865

- 11 -

JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF
MR. KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

1    report on damages, including a reasonable royalty analysis, may not rely on unreasonable inferences

2    or resort to 'mere speculation or guess.'") (quoting *Central Soya Co. v. Geo A Hormel Co.*, 723 F.2d

3    1573, 1576 (Fed. Cir. 1983)); *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1033 (Fed. Cir. 1996)

4    ("Without credible economic testimony, this court cannot permit a jury to base its award on

5    speculation."); *Apple, Inc. v. Motorola, Inc.*, 2012 WL 1959560, at *5-*6 (N.D. Ill. 2012) (Posner,

6    J. sitting by designation) (if "an expert witness fails to conduct a responsible inquiry that would

7    have been feasible to conduct, his failure cannot be excused by reference to the principle that

8    speculation is permitted in the calculation of damages; that permission presupposes the exhaustion

9    of feasible means of dispelling uncertainty. Uncertainty is a bad; it is tolerated only when the cost

10   of eliminating it would exceed the benefit.").

11          **C.      Mr. Arst Should Not Be Allowed To Taint The Jury By Presenting Testimony**

12                  **That Grossly Overstates Information On Accused Units And Revenues.**

13          In the event that the Court excludes Mr. Arst's flawed "cost savings" approach (which it

14   should), Mr. Arst is left with no alternative theory to present to the jury and should be precluded

15   from testifying entirely. Indeed, even Mr. Arst's basic calculations concerning Juniper's accused

16   products and revenues suffer from the same overreaching as his cost savings analysis.

17          In his report, Mr. Arst accurately states that "Finjan accuses Juniper's SRX Gateways ***used***

18   ***in connection with*** Sky Advanced Threat Protection ('Sky ATP') security products and Sky ATP

19   security products alone." Arst Rpt at 19 (emphasis added). Finjan's technical expert, Dr. Cole, also

20   confirmed that "[i]t is the SRX Gateways and the Sky ATP that infringe Claim 10. It's not SRX

21   Gateways by themselves." Ex. 11 (Cole Dep.) at 140:11-17; *see also id.* at 141:8-21 (testifying that

22   he did not perform an infringement analysis on SRX alone). In spite of Dr. Cole and Mr. Arst's

23   seeming recognition of which products are accused, Mr. Arst inexplicably assumes that every SRX

24   device sold by Juniper during the damages period is accused of infringing, regardless of whether it

25   was actually used in combination with Sky ATP. The result is a grossly inflated revenue base, which

26   includes over ████████ for products that are not capable of infringing, even under Finjan's own

27   infringement theory.

28          As noted above, not all SRX devices sold by Juniper support Sky ATP. Ex. 3 (Sky ATP

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10607865                                              - 12 -

JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF
MR. KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

1    Supported Platforms Guide) at 2 (identifying subset of SRX models that support Sky ATP). SRX

2    devices that do not support Sky ATP are incapable of operating with Sky ATP. Icasiano Decl. ¶ 3.

3    Moreover, just because an SRX device supports Sky ATP does not mean that it has actually been

4    operated in combination with Sky ATP. Indeed, a supported SRX device can only interface with

5    Sky ATP (i.e., send samples to Sky ATP for analysis) if the customer activates a Sky ATP license

6    by registering their device. Dkt 125-8 (Nagarajan Decl.) ¶ 7; Ex. 4 (Sky ATP Admin Guide) at 15

7    ("Although Juniper Sky ATP is a free add-on to an SRX Series device, you must still enable it prior

8    to using it."). ███████████████████████████████████████████████████████████████

9    ██████████████████████. Ex. 5 (Ugone Rpt) at p. 40 Table 4. ████████████████████

10   ████████████████████████████████████████████████████

11        Mr. Arst inexplicably disregarded this evidence, and instead assumed that all SRX devices

12   were infringing—regardless of whether they even support Sky ATP. Ex. 7 (Arst Dep.) at 28:5-34:16.

13   He then included all of those non-infringing units in his Supplemental Exhibits 1.4 and 1.5, which

14   he contends represent the units and revenues for the accused products. *Id.* at 34:18-37:2.[3] There is

15   no evidence that Mr. Arst performed any analysis whatsoever to try to quantify the number of SRX

16   devices that are even capable of using Sky ATP, much less the number of devices that actually have

17   an activated Sky ATP license.

18        Mr. Arst should not be allowed to taint the jury by presenting inflated unit and revenue

19   information for the Accused Products. *See LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d

20   51, 68 (Fed. Cir. 2012) ("Admission of such overall revenues . . . only serve[s] to make a patentee's

21   proffered damages amount appear modest by comparison, and to artificially inflate the jury's

22   damages calculation beyond that which is 'adequate to compensate for the infringement.'"); *Power*

23   *Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1373-74 (Fed. Cir. 2013)

24   ─────────────────────────────

25        [3] In his original report, Mr. Arst only included Sky ATP, SRX100, SRX1500, SRX300,
     SRX4100, SRX4200, and vSRX. All of these models except SRX100 are at least capable of
26   working with Sky ATP, if the customer activates a license. Curiously, Mr. Arst served an errata on
     November 1, 2018, in which he doubled the accused U.S. units and added over ███████ to the
27   royalty base by including additional SRX units that are incapable of supporting Sky ATP. At his
     deposition, Mr. Arst testified that he submitted the errata after Finjan's corporate executives
28   viewed the original exhibit and asked the question "[w]hy doesn't it contain information for all the
     accused products?" Ex. 7 Arst Dep. at 58:5 – 60:7.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10607865                                    - 13 -

JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF
MR. KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   (abuse of discretion to admit damages expert's testimony because expert could not show the figures

2   he used to estimate the quantity of infringing sales came for a reliable source and made unverified

3   assumptions that every sold non-accused mobile phone came with an infringing charger); *Golden*

4   *Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1372-73 (Fed. Cir. 2006) (district court

5   should have excluded dealer returns of the infringing devices, because they did not represent

6   instances of direct infringement); *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372,

7   1378 (Fed. Cir. 2017) ("[W]e must disregard the testimony of an expert that is plainly inconsistent

8   with the record, or based on an incorrect understanding of the claim[s].").[4]

9       Mr. Arst's improper calculations are similar to the errors made by the expert in *Telcordia*

10  *Techs., Inc. v. Lucent Techs., Inc.*, 2007 WL 7076662, at *1 (D. Del. Apr. 27, 2007). In that case,

11  the patented technology was directed to a synchronous residual time stamping ("SRTS") function,

12  which was provided by outfitting the defendants' boxes with an optional circuit card. *Id*. The

13  plaintiff sought damages on all of the defendants' boxes, even though only a small number of the

14  required circuit cards were sold. *Id*. at *2. The court found that the plaintiff's theory was improper,

15  noting that "devices or boxes sold without the SRTS-capable cards cannot directly infringe, even

16  though they have been adapted for practicing the accused SRTS invention, because they cannot

17  practice the invention without the SRTS-capable card." *Id*. at *3. Here, as in *Telecordia*, Juniper's

18  SRX devices are incapable of infringing Claim 10 unless the customer enables a license to Sky ATP.

19  Thus, as in *Telecordia*, Finjan can only include SRX devices that had an activated license in

20  calculating the alleged accused units and revenue, and not the total number of SRX devices sold.

21      Finjan and Mr. Arst should not be allowed to prejudice the jury by presenting revenue and

22  unit numbers for the Accused Products that do not accurately reflect the scope of Juniper's alleged

23  infringement. Moreover, the fact that Mr. Arst had such a fundamental misunderstanding of the

24  scope of Juniper's alleged infringement permeates his entire opinion, thus rendering it unreliable.

25      This is not the first time Finjan has advanced a damages theory that is based on revenues for

26  

27  [4] Mr. Arst's failure to properly calculate the accused revenues and units is puzzling given
    that the SRX devices which are compatible with Sky ATP are easily ascertained by a quick
    Google search, and that Juniper's public website makes crystal clear that SRX devices can only
28  work with Sky ATP if the customer activates a license. Ex. 4 (Sky ATP Admin Guide) at 15.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF
MR. KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

10607865                          - 14 -

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   non-accused products, and it has apparently not been deterred by prior orders excluding such

2   testimony. In *Finjan, Inc. v. Blue Coat Sys., Inc.*, 2015 WL 4272870, (N.D. Cal. July 24, 2015),

3   Finjan's damages expert included damages on sales of a non-accused product on the theory that the

4   non-accused sales should be considered convoyed sales. *Id.* at *9. The court rejected Finjan's theory

5   finding that (1) convoyed sales could not properly be included in a royalty base and (2) there was

6   no evidence that sales of the non-accused product were driven by sales of the accused product. *Id.*

7   at *9. The court found that "[a]bsent such evidence, including a product that does not practice the

8   patent at issue and indisputably has an independent use would overcompensate [Finjan] for the

9   alleged infringement . . . ." *Id.*[5] Subsequently, in *Finjan, Inc. v. Sophos, Inc.*, 2016 WL 4268659

10  (N.D. Cal. Aug. 15, 2016), Finjan's damages expert mistakenly included revenues from a portion

11  of the sales relating to two non-infringing products. *Id.* at *6. The court found that the expert's

12  inclusion of these sales was improper and could not "justify allowing Finjan to present these figures

13  to the jury." *Id.* at *6. Finjan cannot credibly claim that it is mere coincidence that on at least two

14  prior occasions Finjan has been precluded from recovering damages on non-accused devices, and

15  the Court should similarly preclude Finjan's third attempt.

16        **D.      Mr. Arst Should Not Be Given Leave To Amend**

17        To the extent the Court agrees with Juniper and excludes Finjan's Mr. Arst's testimony,

18  Finjan should not be given leave to redo its damages theory. By the hearing date, trial will be a mere

19  eleven days away, and to permit Finjan to "start over with a new royalty analysis would impose

20  prejudice on [Juniper] as well as disrupt the Court's calendar . . . ." *See Network Prot. Sci., LLC v.*

21  *Fortinent, Inc.*, 2013 WL 5402089, at *8 (N.D. Cal. Sept. 26, 2013). Further, Juniper agrees with

22  this Court's prior statement that "giving [experts] a second bite simply encourages overreaching on

23  the first bite" and this is not an instance "where the expert report can be salvaged with minimal

24  disruption to an orderly trial," as Mr. Arst's analysis is "not even close" to meeting the standards

25  provided by Rule 702. *See id.*

26

27

_____

28        [5] Here, Mr. Arst doesn't even attempt to justify his inclusion of sales of non-accused SRX devices based on a theory of convoyed sales.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10607865                                          - 15 -

JUNIPER'S MOTION TO EXCLUDE THE TESTIMONY OF
MR. KEVIN M. ARST
Case No. 3:17-cv-05659-WHA

1  Dated: November 12, 2018          Respectfully submitted,

2                                     IRELL & MANELLA LLP

3

4                                     By:    *Rebecca L. Carson*
                                            Rebecca L. Carson
5                                            *Attorneys for Defendant*
                                            Juniper Networks, Inc.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations