Pages 1 - 38

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

FINJAN, INC.,                        )
                                     )
            Plaintiff,               )
                                     )
  VS.                                ) NO. C 17-5659 WHA
                                     )
JUNIPER NETWORKS, INC.,              )
                                     )  San Francisco, California
            Defendant.               )
                                     )
_____)

Thursday, November 29, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                     KRAMER LEVIN NAFTALIS & FRANKEL, LLP
                     990 Marsh Road
                     Menlo Park, California  94025
            BY:  **PAUL ANDRE, ESQ.**
                 **LISA KOBIALKA, ESQ.**
                 **HANNAH LEE, ESQ.**
                 **YURIDIA CAIRE, ESQ.**
                 **KRISTOPHER B. KASTENS, ESQ.**

For Defendant:
                     IRELL & MANELLA, LLP
                     840 Newport Center Drive
                     Suite 400
                     Newport Beach, California  92660
            BY:  **REBECCA L. CARSON, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
                 Official Reporter, U.S. District Court

        (Appearances continued, next page)

**APPEARANCES, CONTINUED**:

For Defendant:

> IRELL & MANELLA, LLP
> 1800 Avenue of the Stars
> Suite 900
> Los Angeles, California  90024
> **BY:  CASEY M. CURRAN, ESQ.**
> **JONATHAN S. KAGAN, ESQ.**

| | |
|---|---|
| 1 | **Thursday - November 29, 2018**                    **9:55 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **THE COURT:**  Now we go to Finjan versus Juniper. |
| 4 | **THE CLERK:**  Calling Civil Action 17-5659.  Finjan, |
| 5 | Inc. versus Juniper Networks, Inc. |
| 6 | Counsel, please step forward and state your appearances |
| 7 | for the record. |
| 8 | **MR. ANDRE:**  Good morning, Your Honor, Paul Andre for |
| 9 | Finjan. |
| 10 | And Your Honor, for your trivia question, was it Abraham |
| 11 | Lincoln? |
| 12 | **THE COURT:**  Negative. |
| 13 | **MR. ANDRE:**  Okay.  Point deducted. |
| 14 | **MS. KOBIALKA:**  Good morning, Your Honor.  Lisa |
| 15 | Kobialka from Kramer Levin. |
| 16 | **MS. LEE:**  Good morning, Your Honor.  Hannah Lee from |
| 17 | Kramer Levin, representing the plaintiff Finjan. |
| 18 | **MS. KOBIALKA:**  And Ms. Lee and I will be taking the |
| 19 | lead on the arguments, but we have our colleagues Mr. Kris |
| 20 | Kastens -- |
| 21 | **MR. KASTENS:**  Good morning, Your Honor. |
| 22 | **MS. KOBIALKA:**  -- and Yuridia Caire as well. |
| 23 | **THE COURT:**  Thank you. |
| 24 | Over here? |
| 25 | **MS. CARSON:**  Good morning, Your Honor.  Rebecca |

1    Carson of Irell & Manella on behalf of Juniper Networks.

2             **MS. CURRAN:**  Casey Curran on behalf of Juniper

3    Networks.

4             **MR. KAGAN:**  And Jonathan Kagan of Irell & Manella on

5    behalf of Juniper Networks.

6        And given the interest of time, we are going to try to

7    consolidate things with Ms. Carson.  The whack-a-mole.

8             **THE COURT:**  All right.  The answer is President John

9    Garfield, who was a mathematics professor, teacher, in Ohio.

10   And you'll have to look up all the other details.  He was

11   assassinated shortly after taking office.

12       All right.  So we're going to first take up the issue of

13   the expert report for the plaintiff's case, since that expert

14   would go first.

15       I've got a little more than 30 minutes.  So you get to go

16   first since -- you want to knock that one out, so go ahead.

17   What's your best point?

18            **MS. CARSON:**  Your Honor, our damages analysis is

19   simply not the product of reliable principles or methods.  As

20   an initial matter it doesn't pass the reality test.  Finjan is

21   asking for a royalty of 60 to $70 million on accused revenues

22   of $1.8 million.

23       Now --

24            **THE COURT:**  By the way, I want to stop and say that

25   the order that I will get out at the end will be made publicly

1    available with all the numbers, including the 1.8 and all

2    these other numbers.  I don't think there's enough of a

3    justification to keep any of that from the public.

4        I'll keep it under wraps for one week, if you want to take

5    a writ to the Court of Appeals to see if you can keep it under

6    wraps.  But the idea that you could keep these numbers secret

7    is not good.  This is not a strong enough case for secrecy.  So

8    be thinking about that as we go along here.

9        But that has nothing do with the merits.  All right.

10           **MS. CARSON:**  Understood, Your Honor.

11           **THE COURT:**  What's your -- okay.  But- --

12           **MS. CARSON:**  Mr. Arst does not present any rationale

13    for why Juniper would be willing to pay 60 to $70 million on

14    its economic benefit of $1.8 million.

15           **THE COURT:**  Here's the way I understand it.  This  is

16    your opportunity to fix what's in my mind.

17        So we've got the hardware part and we've got the software

18    part of the accused, and the -- something called SRX is the

19    hardware.

20        Right?

21           **MS. CARSON:**  Correct, Your Honor.

22           **THE COURT:**  And then there is something called Sky --

23           **MS. CARSON:**  Sky ATP.

24           **THE COURT:**  -- that is the procedures that run by the

25    software.  And under claim 10, as it was presented to me in

1    all that work that we went through once before, the theory was

2    that it was a combination of Sky and SRX that met all of the

3    various steps that were required -- there were about four

4    steps -- to constitute infringement.

5         And I ruled in favor of Finjan on everything, except one

6    issue I thought was not clear-cut enough for summary judgment.

7    So that's one of the issues that's going to go to trial, is

8    that claim limitation.

9         So I was somewhat surprised to learn that the theory is

10   not -- is that:  Yes, we're trying to recover on the ones where

11   it is Sky plus SRX, but that turns out to be tiny, and that now

12   the theory is that the SRX, alone, which has a much bigger --

13   because it's a piece of hardware that's usable for other

14   things.  I'm inclined to say that will be thrown into the trash

15   heap of history.  Because that is a trick on the judge, a trick

16   on Juniper, and not rational.

17        I'm sorry I'm getting upset about this, but this is why

18   patent cases have such a bad name.

19        So really, you're the one that has to defend it.  I have

20   gone through in great detail.  My tentative view is to toss

21   that completely out.

22        So you get to go.  Your turn.

23             MS. KOBIALKA:  The only party saying that only SRX by

24   itself infringes claim 10 is Juniper (Indicating).  We've not

25   said that.  We've said it is SRX, with Sky ATP on it, that's

1  one infringement -- that's one system.

2          THE COURT:  That's not -- your guy's using numbers

3  that are SRX only.

4          MS. KOBIALKA:  Well, that's actually not correct.

5          THE COURT:  Well, then, we've been bamboozled.

6          MS. KOBIALKA:  Yes.

7          THE COURT:  We have been bamboozled by Juniper.

8          MS. KOBIALKA:  Yes.  Absolutely.

9          THE COURT:  Then explain to me how we got bamboozled.

10         MS. KOBIALKA:  They made the statement in their reply

11 brief that all we're asserting is SRX, itself.  We've not

12 asserted that.

13     And throughout all of our pretrial filings which we've

14 filed and we have stipulated, the issues here in this case for

15 infringement -- and we are very specific -- is making, using,

16 selling, right, and offering for sale SRX with Sky ATP.

17     And then separately --

18         THE COURT:  That's only $1.8 million worth, right

19 there.

20         MS. KOBIALKA:  It's not.  It's $142 million --

21         THE COURT:  No, I'm telling you the numbers that they

22 have for SRX sold in combination with Sky ATP is $1.8 million,

23 base.

24         MS. KOBIALKA:  And so now you're only looking at part

25 of the infringement case, which is just the selling.  What

1   about they make, use, and offer for sale?  There's lots of

2   benefits in connection with respect to that.

3        We dispute that it's 1.8 --

4        **THE COURT:**  They don't make -- they don't offer --

5   they don't -- they're not selling anything that infringes

6   unless it has Sky ATP as part of it.  It has to be Sky ATP in

7   there, or you lose.  That was your whole theory.  That's what

8   you convinced me on, the first time.  Now you're coming up

9   with a new theory.

10       **MS. KOBIALKA:**  That's incorrect.  Let's look at the

11  statute separately.  And I'm going to be very clear.

12       You're only looking at one component of the infringement

13  statute, which is selling.  And they're saying:  Okay, the

14  value of the selling that component of that infringement is

15  just worth -- they're claim egg it's 1.8.  We're telling you

16  that's incorrect.  There's 142 -- over 142 million -- close to

17  $143 million in sales in which this SRX is sold with Sky ATP.

18  It's sold.  The complete system is sold.

19       Separate and apart from that, we have the fact that

20  Juniper makes and uses and offers for sale.  And there's

21  significant benefits in connection with that infringement.  And

22  that infringement goes to -- and that is detailed in great

23  detail both in Mr. Arst's report as well as Dr. Cole, includes

24  the fact that it's able to have the most up-to-date threat

25  intelligence.

1          So here you have this formerly router company that says:

2     I need to be relevant still in the marketplace, because routers

3     are being commoditized, by moving --

4               THE COURT:  Well, offer for sale is not the same.

5      "Make, use or sell" is what the statute says.

6               MS. KOBIALKA:  And "offer for sale."

7               THE COURT:  Where does it say that?

8               MS. KOBIALKA:  I believe it's in 271 --

9               THE COURT:  Let's look that up right now.

10         That would be only for injunctive relief, in my opinion,

11     if -- an offer for sale.  If it doesn't turn into a sale, how

12     can there be any damages?

13              MS. KOBIALKA:  The benefits that Juniper gets for

14      making and using are significant to Juniper, in and of itself.

15      You can't just look at the revenues.  And that's only a

16      component of the infringement here.

17         They, they build, they operate these systems.  Dr. Cole's

18     explained that.  And in fact, he cites to quite a few

19     documentation specific to Juniper, in which he says (As read):

20              "Showing that the results of Sky ATP are shared

21               throughout Juniper's threat-sharing ecosystem so its

22               threat intelligence is mostly up to date, once it's

23               identified, it's recorded in the look-up cache

24               (Phonetic) and widely propagated to stop similar

25               attacks in the future, the shared environment ensures

```
1              that everyone benefits from near-threat intelligence
2              in near real time."
3       So --
4              THE COURT:  Let's break it down into pieces here.  Do
5  you agree that the combination of sale of ATP -- I'm sorry,
6  Sky and SRX -- is that it -- Sky ATP plus SRX is 1.8 million?
7              MS. KOBIALKA:  No.
8              THE COURT:  You don't agree to that.
9       Is that what your position is?
10              MS. CARSON:  Absolutely.
11              THE COURT:  One of you is not telling me the truth.
12  Do you understand that, both?
13       What am I missing here?  You heard what she said.  What is
14  your response?
15              MS. CARSON:  Your Honor, you're absolutely --
16              THE COURT:  No, I'm not right about anything.  Don't
17  say that I'm right about it.  That's just a lawyer trick.
18  Tell me what you base your 1.8 million on.
19              MS. CARSON:  The $1.8 million is based on the revenue
20  for Sky ATP as well as the revenue for the SRXs where there
21  was an enabled license for Sky ATP.
22       So it's the addition of Sky ATP revenues plus the revenues
23  for this -- SRX devices that were sold that enable the license.
24  That's $1.8 million.
25              THE COURT:  All right.  Hold that thought.
```

1          Is that part right, where the -- using the word "license"

2    in there, is that correct, for the 1.8?

3          **MS. KOBIALKA:**  No.  They're talking about only when

4    it's activated.  They're making this requirement that just

5    because the system can work and can infringe the claim, if the

6    Sky ATP's not activated, then that's --

7          **THE COURT:**  So you're using this trick.  So you have

8    a trick.  You're saying that the embedded firmware inside the

9    SRX that has the capability of engaging with the Sky ATP, that

10   that, alone, would be enough to infringe.

11         Now, that's not the theory you had before.  But -- but I

12   want you to know, I'd reject that theory.  Because the

13   alternative uses, they're legitimate uses for the SRX.

14         Is that true or not?

15         **MS. CARSON:**  Absolutely true.

16         **THE COURT:**  And you sell them all the time, just like

17   you sell used tires all time.  They have alternative uses.

18   They don't have to be used with the Sky ATP.  And just because

19   they could be used, that is not good enough, under the Federal

20   Circuit law.

21         **MS. KOBIALKA:**  But now you're talking about a use.

22         First of all -- let me back up.  The claim is a system

23   claim.  If someone sells you a system that satisfies all the

24   claim element, it infringes.

25         **THE COURT:**  It does, but they're not selling you the

1    system unless you take a license.  Unless you take the

2    license, the SRX, alone, does not and cannot infringe.

3          **MS. KOBIALKA:**  And that is contrary to, then, the

4    determinations that the Federal Circuit made in *Finjan v.*

5    *Secure Computing*, which we have cited in our briefing, which

6    said it doesn't have to be activated; it doesn't have to be

7    turned on.

8        If you go and sell this entire system --

9          **THE COURT:**  But the firmware that's inside the SRX is

10   not enough to do all those other steps.  It still has to be

11   connected to the Sky ATP.

12       Is that part right?

13         **MS. CARSON:**  Absolutely.

14         **THE COURT:**  All right.

15       So what do you say to that?

16         **MS. KOBIALKA:**  It's a system claim.  If you're

17   selling the entire system that's able, that has all of those

18   elements, that's sufficient for sale.

19       For purposes of making and using, which is Juniper -- at

20   issue is Juniper that's doing that infringement -- there are

21   other considerations and there's additional value.

22         **THE COURT:**  All right.  Hang on one second.

23       I am so upset, that I have to step off the bench.  Because

24   somebody is not telling me the truth here.  And I'm going to go

25   take a short break, and I will come back in five minutes.

1          I don't want my court reporter to go away.  I want to talk

2     to my law clerk for a minute.

3          (Recess taken from 10:08 a.m. to 10:13 a.m.)

4          **THE COURT:**  Be seated, please.

5           Now, I'm of the view that the SRX is hardware that has

6     within it firmware, and that firmware, by itself, is enough to

7     interface with the Sky ATP.  But the firmware, itself, will not

8     carry out any of those functions.  The scanning function, for

9     example.

10         So selling the SRX with the firmware in there, it does

11    not, in itself, infringe.  Because it's incapable of

12    infringing.  It doesn't have those scanning steps and storage

13    steps, and -- so that's what this record shows.

14         Now, it is true that 271 says:  Sell, offer to sell,

15    offers -- I'm sorry -- offer to sell, use.  And I want to make

16    sure I understand what your argument is with respect to "offer

17    to sell."

18         By the way, the case in the Federal Circuit is not our

19    case.  The *Finjan* case there was one where everything was

20    embedded in the product.  And all you had to do was flip a

21    switch inside the product, and that would totally enable the

22    infringing product.

23         That is not our case.  SRX does not have that ability.

24    What you have to do in our case is get a license.  And it's the

25    license that adds all the extra layers of -- so that's

1    different than our case.   That's my view.

2       Time is short.   I'm going to give you one last opportunity

3    to persuade me to the contrary, and then we're going to move

4    on.

5          **MS. KOBIALKA:**  So whatever you're looking at, these

6    revenues, you've got to keep in mind that Juniper does give

7    away Sky ATP for free.  So there is definitely value.   When

8    you're giving away something for free, it's not -- when you're

9    a for-profit company, it's not for no reason, whatsoever.

10      And that is because of the information -- the most recent

11   threat information is coming into the databases that are at

12   issue here, and are constantly updating these databases.  Which

13   gives Juniper the ability to say: We have the best, most

14   up-to-date new threat intelligence.

15      As Dr. Cole pointed out in his report, there's at least a

16   million new threats released into the wild every day.  And to

17   ensure that you have the best threat intelligence available,

18   the best malware protection available, you want to make sure

19   that you're able and up to date in your particular database.

20      So there is a component of the revenues that they're

21   getting value out of from the selling side of it that is not

22   captured in whatever we determine the revenues are going to be

23   at issue here.

24      Separate and apart from that, you've got to value what

25   Juniper gets as a result of making, using this system, as well

1    as its ability to offer for sale.  To be a competitive relevant

2    company in the marketplace.

3        Now, by virtue of using this system, which it does, it's

4    able to ensure that it has this best new up-to-date threat

5    intelligence.  By virtue of having the database that is updated

6    constantly, they're able to ensure that they don't have to

7    spend as much of the processing expenses that they would have

8    to earn to grow if they didn't infringe.  If they didn't have

9    the infringing database which is at issue here.

10       So there's significant value and benefits directed to

11   Juniper that's separate and apart from revenue.  And that is

12   based on other components of the 271(a) statute regarding they

13   make, they use, as well as offering for sale.

14       And this is not -- this -- the amount of revenues we're

15   talking about is such a small component of this company that,

16   like I said, has now moved into security to become relevant,

17   having been a router company and turning to security to ensure

18   that into the future, it is worthwhile.  And so the only way

19   they can do that is to make sure they have the best most

20   up-to-date threat intelligence to offer in the marketplace.

21       So those are among the key points.  This is not a

22   methodology challenge.  It's a factual dispute as to whether or

23   not they actually received those benefits.

24            **THE COURT:**  It is a method issue, methodology.

25       What do you say to what I just heard?

1          **MS. CARSON:**  So Your Honor, I think they're

2     deflecting from the issues here.  Because the royalty that has

3     been proposed by both experts is based on the sales of the

4     products.

5          They can talk about threat intelligence sharing,

6     et cetera.  As a factual matter, those things are limited to

7     customers who actually have signed up for a license.  So it's

8     not Juniper's whole --

9          **THE COURT:**  Is the license free?

10          **MS. CARSON:**  So the license is free.  But in order to

11     take advantage of it, the SRX customer has to register for an

12     account.  They have to download a script to run Sky ATP, and

13     then they connect to Sky ATP.

14          There's no dispute that the code that is accused of

15     infringing is not part of the SRX device, as sold.

16          There's also no dispute that the number of customers --

17          **THE COURT:**  What do you say to the argument that:

18     Look, it's an option that's out there, and -- well, first, is

19     this SRX usable for something other than Sky ATP?

20          **MS. CARSON:**  Yes.  Absolutely.

21          **THE COURT:**  Give me an example.

22          **MS. CARSON:**  So the most -- most important use case

23     for SRX is just as a router.  It's a secure router.  And so

24     that's how Juniper markets and sells it.

25          In that case, Sky ATP has no value, whatsoever, to the

1   device because it's not being used as a gateway.   It's being

2   used as a router.

3           THE COURT:   What percentage of SRX sales are as a

4    router?

5           MS. CARSON:   I don't know the precise percentage, but

6    it's the majority of the sales.

7       And what we do know is that only 300 customers either

8   purchased a premium license for Sky ATP or registered and

9   configured their devices to use a free license.   That's less

10  than 1 percent of the SRX devices that were sold during the

11  damages period.

12          THE COURT:   The argument on the other side is that:

13   Okay, maybe some people bought this just as a stand-alone SRX,

14   but they bought it because they knew they would have the

15   option in the future to get the free license if they ever

16   decided they wanted it.   And so that extra cachet what is made

17   the sale possible.

18      What do you say to that?

19          MS. CARSON:   So there's absolutely no evidence of

20   that in the record.   Mr. Arst admitted at his deposition that

21   he did not perform any analysis to determine how many people

22   purchased the SRX because of Sky ATP's availability.

23      And I think the evidence that less than 1 percent of

24   people even signed up for this service, even though it's free,

25   suggests that that is not a factor that is driving the SRX

```
 1   sales.
 2           THE COURT:  All right.  Now we are going to change
 3   subjects.  We're going to go to your report.  And --
 4       MS. KOBIALKA:  Your Honor, may I be heard?  Because
 5   there were a couple of things that are absolutely not
 6   accurate.
 7           THE COURT:  Go ahead.  I'll give you the last word.
 8   Then we're going to move to the other motion.
 9       Go ahead.
10       MS. KOBIALKA:  Our royalty is not based on revenues.
11   Our royalty is based on cost saving.  She said our -- both
12   experts' royalties are based on revenues.
13       We used revenues to determine an apportionment of the cost
14   savings to just U.S.  But we didn't take a revenue number,
15   apportion that, and then apply a royalty rate.  We looked at
16   cost savings that Juniper realizes as a result of the
17   significant benefits that it receives in connection with their
18   infringement.  So that was just one quick point.
19       The second point she said is there's absolutely no
20   evidence in the record about SRX and the significant role it
21   plays in security.  And I can tell you, starting on Page 19
22   through 23 of Mr. Arst's report, he quotes from their 10-K.
23       It says (As read):
24               "The SRX series of both physical and virtual dynamic
25               services gateways provides firewall VPN, performance
```

1          and scalability."

2          And he continues on, page after page, citing about how

3     the advanced malware protection in connection with SRX is so

4     important, and how their virtual SRX firewall delivers all

5     these various security features.

6          In their sheets (Indicating) that are also attached as

7     part of these motions, they talk throughout about how SRX

8     delivers a dynamic anti-malware solution that can adapt to an

9     ever-changing threat landscape.

10         So I want to be clear.  There's a lot of evidence in the

11    record regarding what, in fact, SRX, and what the value is to

12    Juniper on it.

13         And I don't want to conflate making and using --

14         **THE COURT:**  What you're saying, though, is that these

15    sales that would have been made as a router, somehow the fact

16    that they could get a license which would then infringe, that

17    that's enhancing the sales?

18         That, to me, is just illogical.

19         **MS. KOBIALKA:**  So that is the sale -- selling

20    component.  But keep in mind:  Juniper is the infringer.  They

21    make, they use, and offer for sale this system.  And there's

22    significant benefits in connection with that.

23         Juniper doesn't pay itself for utilizing this very

24    valuable technology.  So there's not a revenue --

25         (Simultaneous speakers)

1          **THE COURT:**  Only one percent of their customers even

2   sign up for the license.  And it's free.  So it must be the

3   worst thing since sliced bread.  It's not much of a patent, if

4   no one wants it.

5          **MS. KOBIALKA:**  Well, obviously, we disagree.

6          **THE COURT:**  One percent?

7          **MS. KOBIALKA:**  Oh, no.  Juniper, itself, went out

8   and acquired, for example, Cipher (Phonetic) for tens of

9   millions of dollars, if not $100 million, in order to get the

10   Sky ATP-type technology, to ensure that they have this

11   particular technology.

12      They might not be realizing the revenues at this point.

13   But they definitely see the value in this particular

14   technology.

15      And for --

16          **THE COURT:**  All right, all right.  You had your say.

17   I'm going to --

18          **MS. KOBIALKA:**  All right.

19          **THE COURT:**  We've got to move on.

20          **MS. KOBIALKA:**  All right.  I'll allow my colleague --

21          **THE COURT:**  Now, the other one is yours.  And my

22   initial question concerns the use by Juniper of a trick.

23      I hate to be so cynical about you patent lawyers.  But you

24   patent lawyers are terrible -- no, I take back the word

25   "terrible."

1        It's a terrible process that I have to go through of --

2    you see how long this calendar was today.  And yet, you think

3    that I have hours and hours of time to figure out who's telling

4    me the truth, when I don't.  I don't have that much time.

5        But here's one thing that does seem clear-cut and works

6    against Juniper.  And that is that you laid out non-infringing

7    alternatives in your expert report for the first time.

8        All right.  Now, that might not have been so bad.  But

9    they ask you an interrogatory.  And you blew it off, and said:

10   Oh, we'll answer that at the time of our expert report.

11       Now, in my standing orders, I have a provision that deals

12   with that.  Let's see if I can find it.

13       All right.

14           "Except for good cause..."

15   This is Paragraph 23.

16           "...no items shall be received as case-in-chief

17           evidence if its proponent should have produced it in

18           discovery but did not, regardless of whether any

19           discovery motion was made."

20       Now, they asked you for what your non-infringing

21   alternatives were, and you didn't tell them.  And the first

22   time they learned about it was after all the discovery was

23   over, and it came out in your rebuttal report.

24       To me, that's not fair.  And it violated my rule.

25       You get to explain yourself.  Go ahead.

 1          **MS. CARSON:**  So, Your Honor, they propounded an

 2     interrogatory asking for our position on non-infringing

 3     alternatives.

 4          And we provided them with high-level information that the

 5     non-infringing alternatives included prior-art systems, as well

 6     as modifications that Juniper and Deneers (Phonetic) could

 7     reasonably make --

 8          **THE COURT:**  My law clerk told me you gave them

 9     nothing.  Now, maybe I'm wrong.  Maybe I misunderstood her.

10     But she said: Nothing.  You gave nothing.

11          Show me that interrogatory answer.

12          (Off-the-Record discussion between counsel)

13          **MS. LEE:**  Your Honor --

14          **THE COURT:**  Hand it up to me.

15          **MS. LEE:**  Sure.

16          (Document handed up to the Court)

17          **THE COURT:**  All right.  Which part should I read?

18     Where does it say that?

19          **MS. LEE:**  I believe the response is mainly on the

20     last page of the exhibit, which is --

21          **THE COURT:**  Well, let me -- okay, Juniper

22     Incorporated, object, object, object.  Specifically object,

23     generally object, specially -- more objections.  Specifically

24     object, object.  Premature.  Object, object, object, object.

25          All right.  Finally we get down to:  Finjan's infringement

1    contentions are indecipherable.

2         Well, I don't know what No. 10 said.  You incorporate

3    No. 10 response, so I -- maybe that helps.  But I -- I don't

4    have it right here.

5         Do you have it?

6         All right, here, the final paragraph says (As read):

7              "Additional non-infringing alternatives include, for

8              example, all analogous prior art, including all of

9              the prior art identified in Juniper's Patent Local

10             Rule 3 invalidity contentions, as well all the prior

11             art identified in any -- in invalidity contentions

12             served by third parties, defending against

13             allegations of infringement by Finjan of the claims

14             asserted."

15        So that's all the other cases, I guess, right?  Is that

16   third parties?  Is that what that means?  Other cases?  Or is

17   that third parties in this case?

18             **MS. CARSON:**  That refers to other cases, Your Honor.

19             **THE COURT:**  All right.

20             "...to Finjan related to...to the claims asserted...

21             Additional non-infringing alternatives include, for

22             example, systems and processes within the knowledge

23             or capabilities of Juniper or others in the

24             industry..."

25        That's very -- that's just saying anything -- we'll

1   exercise common sense.

2       All right.  Were the other -- Interrogatory No. 10 any

3   more specific than this?

4           **MS. LEE:**  Your Honor, we weren't able to find

5    anything that discerned the specific detail that we asked for

6    during discovery, that they put forward in the expert reports

7    for the first time.

8           **MS. CARSON:**  So Your Honor, if I may speak to that,

9   Juniper served this interrogatory response.

10      The interrogatory response also notes that some of the

11  information related to non-infringing alternatives is the

12  subject of expert discovery, and would be disclosed during

13  expert discovery.

14      Finjan never --

15          **THE COURT:**  That's -- you know, I practiced for 25

16   years before I got this job.  And that's what they always try

17   to say.

18      And I always said:  No, that's not right.  You've got to

19  disclose it now so we can go take discovery on it.

20      You don't get to -- you don't get to kick the can down the

21  road until the time of the experts.  You should have told them

22  then what your non-infringing alternative theory was going to

23  be.

24          **MS. CARSON:**  So Your Honor --

25          **THE COURT:**  Because it only has relevance to the

 1    hypothetical negotiation.

 2            **MS. CARSON:**  And our non-infringing alternatives are

 3    a response to the non-infringing alternative that was proposed

 4    by Finjan for the first time in its expert report.  It did

 5    not, in its damages contentions, identify any specific

 6    non-infringing alternative, either.

 7         So our non-infringing alternative case is a direct

 8    response to the arguments that were made in its damages report

 9    for the first time, as well.

10            **THE COURT:**  What -- okay.  That's an angle I hadn't

11    thought about.  Tell me what you mean by that.

12         What was said by Finjan on that subject in its report?

13            **MS. CARSON:**  So Finjan's whole damages report is

14    based on a cost-based approach, in which it compares the

15    alleged cost to infringe with the alleged cost of a

16    non-infringing alternative.

17         That non-infringing alternative, the specific alternative

18    that they used for comparison, was not disclosed by Finjan in

19    its damages contentions.  They vaguely said that they would

20    rely on non-infringing alternatives.  But it was, I would say,

21    of the same level of detail that Juniper provided in its

22    response.

23         So this --

24            **THE COURT:**  Wait.

25         Is that true?

1    **MS. LEE:**  Your Honor, I don't believe they asked a

2    specific discovery request as we did, or an interrogatory

3    about whether or not Finjan had a position on whether

4    non-infringing alternatives exist.

5         Notwithstanding that, the burden is on Finjan to prove

6    there's non-infringing alternatives that exist.  The burden in

7    this case is on the defendant.  And so what they're referring

8    to is -- they're misstating the burdens here.

9         And I don't think that has anything to do with the motion

10   of whether Dr. Ugone should be precluded from relying on

11   non-infringing alternatives that were asked for during

12   discovery of Juniper, which was not produced.

13        **THE COURT:**  Did the -- you said that something -- on

14   the Juniper side, you said that the damages -- you said local

15   rules had something that required them to disclose their

16   non-infringing alternatives?

17        Or infringing -- what was that you were referring to?  I'm

18   unfamiliar with that rule.

19        **MS. CARSON:**  So the local patent rules have a

20   disclosure requirement for damages theories.  So in Finjan's

21   disclosure on damages, they do refer to non-infringing

22   alternatives, and the possibility that they may do a

23   cost-based approach based on non-infringing alternatives.

24        However, they did not specifically identify any particular

25   non-infringing alternative.

1      It wasn't until we received the report of Mr. Arst and

2  Dr. Cole that we learned about the specific non-infringing

3  alternative that Finjan intended to advance.

4      And that's the whole basis for their damages theory.

5  Their damages theory is based on a comparison of the supposed

6  costs for alleged infringement versus this non-infringing

7  alternative.

8      Now, Dr. Cole admitted at his deposition that the

9  alternative that they were using is not a commercially viable

10  alternative, which is a problem, in and of itself.  But the

11  alternatives that Juniper proposed in rebuttal were in direct

12  response to the damages theory that was propounded by their

13  experts.

14      **THE COURT:**  Was your expert deposed on those

15  non-infringing alternatives?

16      **MS. CARSON:**  Both experts were, yes, Your Honor.  We

17  have a technical expert that laid out the technical details of

18  the non-infringing alternatives that we proposed in rebuttal

19  to Mr. Arst and Dr. Cole.  And he was deposed.

20      And then our economic expert, Dr. Ugone, also was deposed

21  on his use of those non-infringing alternatives and reliance

22  upon that in his analysis.

23      **THE COURT:**  All right.  I've got time for one more

24  criticism of the Juniper report.  So you pick whatever

25  criticism you wish, and then I need to bring it to an end.

1    I've got a meeting in a few minutes.  And I'm sorry, I just

2     don't have more time this morning.

3              **MS. LEE:**  Okay.  Understood, Your Honor.

4         And just to state one thing on the record just to clarify

5     a point that was made about these alternatives, Finjan's

6     technical expert, Dr. Cole, when he was asked at deposition

7     about alternatives, was referring to Juniper's non-infringing

8     alternatives that they put forward for the first time, not his

9     own affirmative opinions about new alternatives.

10        So I just want to make sure that was clear.

11             **THE COURT:**  No, wait.  No, that's not what counsel

12     said.

13        Counsel said in your report, your damages report, which

14     was based upon cost savings, that -- something like that you

15     came up with a non-infringing alternative that was very

16     expensive, I guess.  And then based upon that, you had ginned

17     up a cost savings.

18        And she then said that in response to that, in your

19     opening report for damages, that her side came up with

20     non-infringing alternatives.

21        Let me -- did I understand you correctly?

22             **MS. CARSON:**  So, you did, Your Honor.  But their

23     expert also did testify that the non-infringing alternative

24     that they proposed was not commercially viable.

25             **THE COURT:**  All right.  But --

1          **MS. CURRAN:**  It's a separate point.

2          **THE COURT:**  Okay, but --

3          **MS. LEE:**  Your Honor, I guess that's the point of it,

4     that it's a separate --

5          **THE COURT:**  You made it sound like -- on the *Finjan*

6     side, you made it sound like they were the first one to bring

7     up the subject of non-infringing alternatives.  The other side

8     did.  So maybe I misunderstood.

9      Say your point again.

10         **MS. LEE:**  Yes.  Your Honor, Dr. Cole was

11    discussing -- he was asked a number of questions at deposition

12    about alternatives.  Some were not --

13         **THE COURT:**  That's your expert, right?

14         **MS. LEE:**  Correct.  Yes.  Dr. Cole is Finjan's

15    expert.  He was asked about alternatives.  He was asked about

16    non-infringing alternatives.  And I just want to make sure

17    that the record is not getting mixed up.

18     There is a damages theory Finjan has that if the

19    infringing method was not performed, there would have to be a

20    cost associated with that alternative approach.

21     Whether or not that can be qualified as infringing or

22    non-infringing I think is not something specifically that

23    Dr. Cole is addressing.  It's, rather, the alternative to doing

24    the -- the way that Juniper infringes would cost X alternative

25    amount.  And that's the cost-savings damages --

1    **THE COURT:**  Well, it doesn't make sense, unless it's

2    a non-infringing alternative.  Because if it's also

3    infringing, then why do it?  It would still get you in

4    trouble.  So it has to be non-infringing.

5    **MS. LEE:**  (Nods head)  This is -- and just to be --

6    **THE COURT:**  And so what they -- I thought you came

7    back with:  Oh, no, we've got much more realistic

8    non-infringing alternatives than that one.

9    Right?

10    **MS. CARSON:**  That's correct, Your Honor.

11    **THE COURT:**  And so --

12    **MS. CARSON:**  And added to that point, I was just

13    saying that even Finjan's own technical expert, Dr. Cole,

14    acknowledged that.

15    **THE COURT:**  All right.  Here's the other thing that I

16    am troubled by on your report.

17    I don't like it when they -- you try to drag out some

18    settlement that Finjan made, and say that's comparable.

19    Because it's not comparable if -- if -- in our case, the jury's

20    going to have to presume and find that invalid- -- that the

21    patent is valid all day long.  And infringed.  Both of those

22    things.  And those are huge assumptions.

23    But a settlement may or may not have taken place after

24    those two things were determined.  And your guy makes no

25    adjustment for those two variables.  That's what bothers me.

1          So it's like cherry-picking -- just like they all do;

2     they're all bought and paid for.

3          But, go ahead.  Does your -- am I correct that your guy

4     makes no adjustment for those considerations?

5          **MS. CARSON:**  No, Your Honor, that's not correct.

6     Dr. Ugone did go through in detail the differences between the

7     licenses in the record and the hypothetical negotiation.

8          In particular --

9          **THE COURT:**  Where does he say the licenses in the

10    record are settlements of lawsuits?

11         Did -- was -- were those settlements after validity and

12    infringement were determined?

13         **MS. CARSON:**  So least one of the settlements that he

14    relies upon was after a jury verdict of infringement

15    invalidity.

16         **THE COURT:**  All right.  That would be a good one,

17    maybe.  But otherwise, was it comparable to our case?

18         **MS. CARSON:**  So the other licenses that he relies on

19    are additional competitors of Juniper in the marketplace.  And

20    he notes that there are differences between those situations,

21    as well as the hypothetical negotiation.  And he does make

22    adjustments.

23         In addition to the difference that you --

24         **THE COURT:**  Does he make adjustments for -- that

25    you've got to presume it's valid, you've got to presume it's

1  infringed, as opposed just your ordinary settlement when none

2  of that takes place?

3       It's just not fair.  It's an apples-and-oranges problem.

4       **MS. CARSON:**  So, Your Honor, he takes into account

5  all of the different factors, and makes adjustments globally.

6  Because there are additional differences.

7       And that is what damages experts do.  They take into

8  account the licenses in the record which are never exactly

9  comparable, and then they make adjustments.

10      There were some adjustments in this case --

11      **THE COURT:**  Give me one example where it was just a

12  plain old settlement.  And then -- I'm going to give you an

13  example.  This is what I would expect.  I'm going to make a

14  caricature.

15      Let's say that there was a settlement for $100.  I know

16 it's too low, but $100.  And no infringement had been found,

17 and no -- no validity had been determined.  Let's say it was

18 part of a package, package deal where $100 is -- I don't know.

19      So I'm going to say:  Okay, since in this case,

20 infringement is an issue, and invalidity -- and those have been

21 resolved against Juniper, then you got to, say, triple it, or

22 make it ten times 100.

23      So the factor goes up by 1,000 -- from 100 to 1,000, on

24 account of invalidity, and then, and then another 1,000 on

25 account of -- so did -- if he just went up by 10 percent,

1   that's ridiculous.

2       So what kind of add-on did he give for the fact that just

3   your ordinary settlement doesn't mean much?

4       **MS. CARSON:**  So Your Honor, the settlements all

5   relate to portfolio-wide licenses, whereas the hypothetical

6   negotiation would have been just one of Finjan's patents.

7       So Dr. Ugone makes adjustments up and down --

8       **THE COURT:**  But how does he then allocate what the

9   portfolio-wide was?  How do we know what it was?

10      Maybe, maybe this one was the gem, the shining star in a

11  constellation of otherwise weak patents, and this was the

12  strong one and should get all the money.

13      Did he do that kind of analysis?

14      **MS. CARSON:**  He did do an analysis where he takes

15  into account the differences.  And I believe the rate that he

16  ends up proposing is higher than what the rate would have

17  been, based on the effective rates of the comparable licenses

18  that he considers.

19      The factual record shows that Finjan has a consistent

20  policy of --

21      **THE COURT:**  Go to -- because time is short.  I'm

22  sorry to cut you off.

23      In the one where there was a jury verdict, was it on this

24  very patent?

25      **MS. CARSON:**  Yes.  I believe this patent at issue.

1           **THE COURT:**  What was the settlement there?  I mean --

2    yeah.  What was the settlement there?

3           **MS. CARSON:**  The effective rate that he calculates is

4    6 percent.

5           **THE COURT:**  Six percent of what?

6           **MS. CARSON:**  Of the revenues for the accused

7    products.

8        And he bases that effective rate on the negotiated --

9           **THE COURT:**  What does that translate to here?

10          **MS. CARSON:**  Six percent of 1.8 million.

11          **THE COURT:**  All right.  Plus the future.  Or is it

12   expired?

13          **MS. CURRAN:**  Patent has expired.

14          **THE COURT:**  Oh.  All right.  Okay.  Well, maybe that

15   one would fly.  I could see that one maybe flying.

16       But I -- just your plain old settlement is -- here's the

17   other thing that I feel is a trick by both sides, where you

18   say: Okay, we're just going to look at it as a check on -- a

19   reality check.

20       That's just a gimmick to lay stuff before the jury.  It's

21   a gimmick.  That's what you lawyers -- you can't otherwise get

22   it into evidence, so you can't otherwise rely -- so you say:

23   Oh, we'll dress it up as a reality check, and then we'll still

24   get to lay it before the jury.

25       I want you to know, I'm not going to buy that.  On both

```
1  sides, it's just a gimmick.  Another way that experts like
2  to -- bought-and-paid-for experts want to lay stuff before the
3  jury.  So it's got to be a methodology -- you've got to have a
4  good methodology to begin with.
5       I think if it's the same patent after verdict, that's
6  pretty good.  That one I think might fly.  But -- why wouldn't
7  that one fly?  Why wouldn't that be a good considerable
8  comparable?  After verdict, everything ruled in favor of
9  Finjan, 6 percent.
10      Why shouldn't we go with that one?
11           MS. LEE:  Your Honor, there are a couple of things
12   with that.
13      The effective rate that he calculated is based on some
14  licensing negotiation email that occurred approximately, I
15  believe, two years before the actual verdict was rendered.
16      And so during that two-year time period, there could have
17  been a whole host of considerations and economic, business,
18  technology could have changed somewhat over that period of
19  time, the market -- in a way that Dr. Ugone and their experts
20  should have addressed all that, which he did not.
21           THE COURT:  So you're saying that maybe that
22   particular infringer, this was almost a non-event for them,
23   and they didn't really have any need for it.
24      So is it -- so do we know the actual circumstances,
25  though?  I mean, it would be helpful to know what the
```

 1  circumstances were.

 2          **MS. LEE:**  Well, the issue, Your Honor, is, is that,

 3  you know, under Rule 26, Dr. Ugone was required to put forward

 4  his analysis of the facts in his report.  And so even if they

 5  could conjure up something now in their brief, or he can do it

 6  on --

 7          **THE COURT:**  You're totally right on that.  What did

 8  he say in his report?

 9          **MS. LEE:**  He simply stated that Finjan and Sophos had

10  entered into an agreement; there was a litigation.  And he

11  found a rate of 4 and 6 percent from an early negotiation

12  document.  And concluded then, based on the fact that there

13  was an overlapping patent, that, you know, this was a

14  comparable agreement.  In addition to the fact that Sophos is

15  a competitor to Juniper.

16      The problem is, as Your Honor noted, is that he works

17  backwards.  He came up with his idea of what he wanted to come

18  up with first, and then tried to cherry-pick licenses that

19  would support that.

20      There are 18 other Finjan licenses that involve the '494

21  patent.  Some are settlements, some are not.  But he had no

22  explanation --

23          **THE COURT:**  Well, which ones do you think are the

24  best ones for you?

25          **MS. LEE:**  Well, Your Honor, the problem is, is that

1    he -- if he was going to look at license agreements, including

2    he looked at Juniper's license agreements, and said some of

3    those are comparable, based on the fact that, according to

4    him, they have similar technologies, if -- if that was his

5    methodology, he should have also looked at the 18 other Finjan

6    patent license agreements that also covered the '494 patent.

7         THE COURT:  Well, maybe that's right.  But what would

8    help me is for you to tell me, what is your top one or two

9    that you think the jury should know about in terms of other

10   settlements or licenses that -- that -- on this very patent.

11        MS. LEE:  Your Honor, I believe that the jury should

12   have information about all of the license agreements, at the

13   very minimum, that lead up to the date of the hypothetical

14   negotiation.

15      A lot of the agreements that Juniper --

16        THE COURT:  What's the best one for you?  Give me the

17   best one for you.  If it's only 7 percent, then maybe you

18   don't have a good case.  But if it's 50 percent, that sounds

19   pretty good.

20        MS. LEE:  Well, Your Honor, by no surprise, we're

21   going to choose the one with the highest amount.

22        THE COURT:  Yeah.  That's what I'm asking.  What was

23   the highest amount?

24        MS. LEE:  Oh, and under confidentiality, I'm not sure

25   that I'm allowed to disclose the name of that party.  We have

1    had issues and motions to seal.

2        But it is in Dr. Ugone's report in Table 7.

3            **THE COURT:**  Well, give me just the name so I can look

4    it up in secrecy.

5            **MS. LEE:**  Sure.  It's with Intel.  There's also a

6    Finjan-Blue Coat agreement as well.  And I believe those two

7    would be particularly probative.  Especially Blue Coat, which

8    proceeded through trial as well.

9            **THE COURT:**  Blue Coat and --

10           **MS. LEE:**  And Intel.

11           **THE COURT:**  All right.  I have to bring it to a

12   close.  I'll get an order out soon.  Not necessarily tomorrow,

13   but probably by Monday.

14       And thank you very much.  All right.

15           **MS. CARSON:**  Thank Your Honor.

16       (Proceedings concluded)

17

18

19

20

21

22

23

24

25

1

2

3

4                    **CERTIFICATE OF REPORTER**

5          I, BELLE BALL, Official Reporter for the United States

6    Court, Northern District of California, hereby certify that the

7    foregoing is a correct transcript from the record of

8    proceedings in the above-entitled matter.

9

10                       *Belle Ball*

11    _____/s/ Belle Ball_____

12              Belle Ball, CSR 8785, CRR, RDR

13                 Friday, November 30, 2018

14

15

16

17

18

19

20

21

22

23

24

25