## IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

1800 AVENUE OF THE STARS, SUITE 900
LOS ANGELES, CA 90067-4276
TELEPHONE (310) 277-1010
FACSIMILE (310) 203-7199

840 NEWPORT CENTER DRIVE, SUITE 400
NEWPORT BEACH, CALIFORNIA 92660-6324

TELEPHONE (949) 760-0991
FACSIMILE (949) 760-5200
WEBSITE: www.irell.com

WRITER'S DIRECT
TELEPHONE (949) 760-5222
RCarson@irell.com

December 4, 2018

Hon. William Alsup
U.S. District Court, Northern District of California

Re:   *Finjan, Inc. v. Juniper Networks, Inc.*, Case No. 3:17-cv-05659-WHA

Dear Judge Alsup:

Juniper Networks writes to renew its request that the Court preclude Finjan's damages expert, Mr. Arst, from providing any testimony at the upcoming trial. In its *Daubert* motion, Juniper moved to exclude Mr. Arst's testimony "in its entirety" (Juniper's *Daubert* Motion Dkt. 230 at 8), and the Court granted Juniper's motion. Order at 6 ("Juniper's motion to exclude Expert Arst's testimony is therefore GRANTED."). The Court agreed with Juniper that Finjan swung for the fences—advancing a damages figure of $60-$70 million on a $1.8 million royalty base—but that Finjan, and Mr. Arst, struck out. Despite the Court's *Daubert* ruling, Finjan still intends to call Mr. Arst to testify at trial. At today's pretrial conference, Finjan identified certain sections of Mr. Arst's report that are allegedly untouched by the Court's *Daubert* ruling. As set forth below, there is no proper basis for Mr. Arst to testify on those sections of his report.[1] Juniper addresses each of those sections in turn, grouping them as appropriate.

### Mr. Arst Should Not Be Permitted To Testify On Section 6 Of His Report

Finjan stated that it intended to offer Mr. Arst to testify based on various subsections in Section 6 of his report (specifically, sections 6.1, 6.1.1, 6.1.2, 6.1.3, 6.2, 6.3, 6.3.1 and 6.4). Yet those portions of Mr. Arst's report merely provide factual background based on numerous ***hearsay sources***. Indeed, Mr. Arst explains:

---

[1] During argument on the parties' motions in *limine*, counsel for Finjan also contended that Mr. Arst did not have an adequate opportunity to consider spreadsheets that reflect the customer names which would allow Finjan to identify the particular SRX devices where a Sky ATP license had been enabled. Finjan's complaints are simply pretext as Mr. Arst testified at deposition that having such information would not have impacted his analysis. Ex. 1 (Arst Depo) at 56:19-57:8 ("Q. You did endeavor to determine how many Sky ATP licenses had been enabled? A. Yes. Again, my understanding is that's not tracked by Juniper and that information is not available. Q. What is that understanding based upon? A. If memory serves, there were some interrogatory responses that related to the absence of information about this subject matter. ***Q. If that information were available to you, would it have impacted your analysis?*** MS. CAIRE:· Objection; form THE WITNESS: ***I don't think so in a material way for the reasons that we've talked about today.***") (emphasis added).

> "In order to provide context for the current dispute, I have provided background information on the relevant parties, the '494 Patent, and Juniper's alleged use of the inventions claimed by the '494 Patent in the sections below."

Arst Report (Dkt. 228-7) at p. 3. Mr. Arst has no personal knowledge of any of these subjects, and if he were allowed to testify on them anyway, he would be a mere conduit for hearsay. For example, Finjan would have Mr. Arst regurgitate statements Finjan made in its 10-K filings to suggest that:

> "Finjan invested heavily in the research and development of its technologies and in protecting its innovations by securing patents covering them.14 Following the development of its technologies, FSL, together with its subsidiaries, provided secure web gateway solutions – including software and hardware – to the enterprise and endpoint markets both directly and through technology partners and/or original equipment manufacturers ("OEMs").15 In 2002, Finjan Software, Inc. ("FSI"), a Delaware corporation, was formed to acquire and hold all of the capital stock of Finjan.16 Thereafter, FSI focused its efforts on research & development and sales & marketing activities in an effort to bolster its position in the security industry and enhance its platform of web / network inspection technologies.

Arst Report at pp. 4-5 (citing Finjan Holdings, Inc. Form 10-K for the fiscal year ending December 31, 2017). Finjan would also apparently have Mr. Arst regurgitate statements in third party industry reports published by IDC reports to push its narrative that it was apparently a "leading innovator":

> *"Finjan Software, the inventor of proactive content behavior inspection, protects organizations using its Next Generation of Vital Security Appliance Series of products that provide day-zero defense against new, previously unknown attacks by leveraging its proprietary application-level behavior blocking technology.*
>
> *:::*
>
> *As a leading innovator in the proactive content security space, Finjan is committed to providing its customers with the most advanced technology solutions to ensure day-zero security. Currently, Finjan has eight technology patents with various others pending. Finjan's Malicious Code Research Center (MCRC) specializes in the discovery and analysis of new vulnerabilities that could be exploited for Internet and email attacks. Using this expertise, MCRC researchers contribute to the development of Finjan's next-generation products to keep Finjan customers protected from the next, yet-to-be-discovered attacks, as well as work with the world's leading software vendors to patch their security holes."*

Arst Report at p. 5 (citing IDC_FINJAN-JN 008896) (italics in report). Finjan also wants Mr. Arst to present hearsay characterizations of the testimony of Finjan's CEO, Mr. Hartstein. For example, it appears Finjan seeks to have Mr. Arst repeat that Finjan's "rates are 8 percent for hardware, 16 percent for software, or *$8 per user.*" Arst Report at 14 (citing testimony of Philip Hartstein). This is entirely inappropriate as Mr. Arst ***does not even offer an expert opinion*** on a reasonably royalty based on a per user rate.

IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

While Federal Rule of Evidence 703 provides that an expert can sometimes disclose otherwise inadmissible facts and data on which the expert relied "in forming an opinion," provided "their probative value in *helping the jury evaluate the opinion* substantially outweighs their prejudicial effect," Finjan would be offering Mr. Arst as a conduit of pure hearsay without tying the hearsay to an actual opinion. Indeed, Mr. Arst *has no damages opinion* in light of the Court's *Daubert* ruling. It would be entirely inappropriate, and well outside the scope of Rule 703, to allow Mr. Arst to serve as a mouthpiece for wide-ranging hearsay untethered to any actual expert opinion.

Mr. Arst's discussion in Section 6.3.1. regarding Juniper products and the allegedly infringing features is similarly untethered to an admissible opinion. In the Court's *Daubert* ruling, the Court explained:

> "Finjan further contends that the revenue base does not capture the benefits Juniper gained from the alleged infringement. That is, according to Finjan, it does not fully reflect the advantages Juniper gained from moving into the security business with its investment in the Sky ATP technology, such as having the most up-to-date threat intelligence. While this might be true, Expert Arst simply asserts this notion in his report ***and does not attempt to quantify these benefits to Juniper outside the cost-savings context.*** Nor does Expert Arst attempt to show that the offer of free Sky ATP licenses drove any SRX unit sales."

Order at 5. (emphasis added). As such, Mr. Arst should be precluded from testifying on Section 6 of his report.

**Mr. Arst Should Not Be Permitted To Testify On Sections 7, 7.1, and 7.2 Of His Report**

Mr. Arst should not be permitted to testify on Sections 7, 7.1, and 7.2 because those sections simply regurgitate legal standards and factual elements. Under **Section 7**, Mr. Arst provides an overview of the legal standards for calculating damages in a patent case under Section 7. The Court will instruct the jury on these legal standards. It would be inappropriate for Mr. Arst do so—particularly given that Mr. Arst does not have an admissible damages opinion, and hence he himself will not be able to apply these legal standards to the facts of this case. **Section 7.1** relates to the date of the hypothetical negotiation. Mr. Arst opines that "I have assumed that the hypothetical negotiation in this matter would have occurred in the period leading up to October 2015…" Arst Report at 29. An assumption is not evidence and masquerading it as an expert opinion is inappropriate. **Section 7.2** is similarly directed to information appropriately suited for jury instructions, such as that "[r]easonable royalties are frequently calculated by multiplying a reasonable royalty rate times a royalty base of alleged infringing commercial activity" and "[r]easonable royalties can also be expressed on a lump-sum basis." *Id.* Again, Mr. Arst will not be able to actually apply these principles at trial.

**Mr. Arst Should Not Be Permitted To Testify On Sections 7.3 and 7.3.3.**

Section 7.3 simply identifies three valuation methodologies—the cost approach, market approach, and income approach. There is no basis for Mr. Arst to testify, generically, regarding these three methodologies. Mr. Arst's cost approach has been excluded by the Court's *Daubert*

Order. Mr. Arst found the market approach even less probative of a reasonable royalty than his excluded cost approach. Arst Report at 34. And Mr. Arst concluded that numerous factors "make it difficult to isolate the economic footprint of the '494 Patent under an Income Approach, and I have therefore not employed the Income Approach in this case." Arst Report. at 44 (Section 7.3.3. Income Approach). *Id.* It makes no sense how this testimony could be useful to the jury.

### Mr. Arst Should Not Be Permitted To Testify On Section 7.5 (*Georgia Pacific* Factors)

Finjan suggested that it would offer Mr. Arst to testify to the "general framework" for the hypothetical negotiation in view of the *Georgia-Pacific* factors. This is sleight of hand because Mr. Arst's opinion is entirely predicated on his excluded cost-savings approach, including his handling of the *Georgia-Pacific* factors. Mr. Arst first came up with a $60-$70 million "baseline" damages amount using his excluded cost-savings approach and only ***then*** analyzed the *Georgia-Pacific* factors to determine if any adjustments were needed to be made to this $60-70 million baseline. Specifically, Mr. Arst explains:

> "As previously discussed, I have concluded that the Cost Approach provides the best available indicator of the economic footprint of the '494 Patent for purposes of evaluating the hypothetical negotiation in this case. Thus, it is my opinion that the hypothetical negotiation in this matter would focus on a quantitative baseline range of approximately $55.5 million - $64.7 million. ***The next step of my analysis was to analyze the Georgia-Pacific factors to evaluate the impact, if any, each factor would have on this baseline range***."

Arst Report at p. 45 (Section 7.5). After Mr. Arst goes through the motions of this *Georgia-Pacific* exercise, he winds up exactly where he started—namely, with his now-excluded $60-70 million damages amount. *See* Arst Report at pp. 45-51 (Section 7.5). So Mr. Arst ultimately makes *no adjustment* to his cost-savings analysis based on the *Georgia-Pacific* factors.

Given that Mr. Arst's cost-savings baseline has been excluded, Mr. Arst's *Georgia-Pacific* analysis is irrelevant. Allowing Finjan to present such testimony would lead to significant jury confusion and prejudice. Mr. Arst no longer has a starting point for his *Georgia-Pacific* analysis. As a result, Mr. Arst's testimony that certain *Georgia-Pacific* factors should lead to an upper adjustment, or a downward adjustment, or (as his opines for nearly all of the factors) no adjustment, would be nonsensical to the jury, because ***Mr. Arst cannot identify a baseline to which such adjustments should be made***. Thus, Mr. Arst should be precluded from testifying on his *Georgia-Pacific* analysis in Section 7.5 of his report.

### Finjan's Inability to Apportion

As noted above, the portions of Mr. Arst's report identified by Finjan at the pre-trial conference do not contain reliable opinions that would be helpful to the jury. Even if the Court were to allow Finjan to present testimony from these sections, however, Finjan still would not be able to meet its burden to establish damages. The Federal Circuit has instructed: "When the accused technology does not make up the whole of the accused product, apportionment is required." *Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018). In this case, there can be no genuine dispute that the accused products incorporate numerous

**IRELL & MANELLA LLP**
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

- 5 -

components and the accused technology does not make up the whole of the accused products. Indeed, Finjan's expert Mr. Arst testifies that the substantial number of features of the SRX and Sky ATP that contribute to consumer demand, both alone and synergistically in combination with one or more of each other and/or other Juniper products and services "make it difficult to isolate the economic footprint of the '494 Patent." *See* Section 7.3.3. of the Expert Report of Kevin M. Arst. In light of this, it would be inappropriate to allow Finjan to present a damages case without apportionment. The problem for Finjan is that Mr. Arst simply does not provide an opinion on how to properly apportion the value of the allegedly infringing features of Sky ATP and Sky ATP used in combination with the SRX. Moreover, Finjan's fact witnesses have no foundation or basis to supply the needed testimony to address the Federal Circuit's mandate to properly apportion the royalty base. Accordingly, Juniper requests that the Court order Finjan to provide a formal offer of proof for its damages claim, including how it intends to present evidence related to apportionment.

Respectfully submitted,

*/s/ Rebecca L. Carson*
Rebecca L. Carson
IRELL & MANELLA LLP
*Attorneys for Defendant*
Juniper Networks, Inc.

10618327                                                        - 5 -