IRELL & MANELLA LLP
Jonathan S. Kagan (SBN 166039)
jkagan@irell.com
Alan Heinrich (SBN 212782)
aheinrich@irell.com
Joshua Glucoft (SBN 301249)
jglucoft@irell.com
Casey Curran (SBN 305210)
ccuran@irell.com
Sharon Song (SBN 313535)
ssong@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone: (310) 277-1010
Facsimile: (310) 203-7199

Rebecca Carson (SBN 254105)
rcarson@irell.com
Kevin Wang (SBN 318024)
kwang@irell.com
840 Newport Center Drive, Suite 400
Newport Beach, California 92660-6324
Telephone: (949) 760-0991
Facsimile: (949) 760-5200

*Attorneys for Defendant*
JUNIPER NETWORKS, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| FINJAN, INC., a Delaware Corporation, | Case No. 3:17-cv-05659-WHA |
| Plaintiff, | **DEFENDANT JUNIPER NETWORKS, INC.'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW** |
| vs. | |
| JUNIPER NETWORKS, INC., a Delaware Corporation, | Judge: Hon. William Alsup |
| Defendant. | |

# NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on December 13, 2018 at the close of Plaintiff Finjan, Inc.'s ("Finjan") case-in-chief, in Courtroom 12 before the Honorable William Alsup, 450 Golden Gate Avenue, San Francisco, California, Defendant Juniper Networks, Inc. ("Juniper") moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. Juniper submits this memorandum in further support of the motion.[1]

This Motion is made on the basis that Finjan failed to provide a legally sufficient evidentiary basis for a reasonable jury to find in favor of Finjan on notice, damages, and infringement. Specifically, the Court should grant judgment as a matter of law in favor of Juniper on the following grounds: (1) Finjan failed to provide Juniper with actual notice of Finjan's infringement claim prior to filing suit, which eliminates Finjan's ability to recover pre-suit damages under 35 U.S.C. § 287; (2) Finjan has not met its burden to establish damages; and (3) no reasonable jury could find that Juniper's Sky ATP alone and SRX devices used in combination with Sky ATP infringe claim 10 of the 494 patent.

This Motion is based on the testimony and evidence admitted at trial, the oral motion for judgment as a matter of law deemed made during trial, the Memorandum of Points and Authorities that follows, all pleadings, exhibits, and records in this action, and such other papers, evidence, and/or argument as may be submitted to the Court in connection with this Motion or that the Court may take notice or otherwise consider.

Dated: December 13, 2018           IRELL & MANELLA LLP

                                   By: */s/ Alan Heinrich*
                                       Alan Heinrich
                                       *Attorneys for Defendant*
                                       JUNIPER NETWORKS, INC.

---

[1] The current motion is brought with respect to deficiencies in Finjan' case-in-chief, and Juniper does not waive other matters on which Juniper may be entitled to JMOL.

**MEMORANDUM OF POINTS AND AUTHORITIES**

Juniper moves for judgment as a matter of law ("JMOL") in its favor pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. For the reasons explained below, no reasonable jury could find in Finjan's favor on notice, damages, or infringement.

**ARGUMENT**

Judgment as a matter of law is appropriate if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). In making this determination, "the court should review all of the evidence in the record, not merely the evidence favorable to the non-moving party." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Rule 50 "allows the trial court to remove . . . issues from the jury's consideration when the facts are sufficiently clear that the law requires a particular result." *Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000) (internal quotations omitted). "The question is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found its verdict." *Cordis Corp. v. Boston Sci. Corp.*, 658 F.3d 1347, 1357 (Fed. Cir. 2011).

**A.    Damages**

Finjan's damages case was an utter failure. In its case-in-chief, Finjan did not present any evidence on: (1) what the appropriate royalty base was for the accused products; (2) how that revenue base should be apportioned; and (3) what a reasonable royalty rate would be.

**1.    No Legally Sufficient Evidence of a Royalty Base**

In its case-in-chief, Finjan's only alleged evidence of a royalty base were Trial Exhibits 490 and 494 and the related deposition testimony of Juniper's Director of Finance, Ms. Gupta. These trial exhibits contain revenue information, but there is zero information in the record linking those revenues to any particular products, let alone the accused products. Finjan also designated portions of Ms. Gupta's deposition testimony that merely consist of her reading the same revenue numbers into the record at Finjan's counsel's direction, without being asked to explain those numbers in any way. In Juniper's counter-designations, Ms. Gupta makes clear that the revenue numbers Finjan's counsel asked her to read are *not* limited to the accused products at issue in this case. Instead, they

include substantial revenues from *SRX devices that were never configured with Sky ATP*, contrary to the Court's *Daubert* Order. Dkt. 283 at 4–5. It would be legal error to permit the jury to use Finjan's manufactured revenue numbers—which are untethered to the actual accused products in this case—in its damages deliberations. *Enplas Display Device Corp. v. Seoul Semiconductor Co.*, — F 3d. —, 2018 WL 6033533, at *10 (Fed. Cir. 2018) (overturning jury's damages award where expert testimony supporting it was "based, in part, on non-infringing sales of non-accused [products]," because "acts that do not constitute patent infringement cannot provide a proper basis for recovery of damages"); *Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.*, 476 F. Supp. 2d 1143, 1154–56 (granting motion to exclude expert opinion where not all of the products included in the expert's sales base practiced the accused technology); *Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13–cv–03999–BLF, 2015 WL 4272870, at *9 (N.D. Cal. July 24, 2015) ("[I]ncluding a product that does not practice the patent at issue and indisputably has an independent use would overcompensate [Finjan] for the alleged infringement . . . ."). Finjan has only itself to blame for the absence of any royalty base evidence at the close of its case in chief, as it refused and continues to refuse to accept the Court's ruling that Finjan is "stuck with the $1.8 million base." *Id.* at 5.

### 2. No Legally Sufficient Evidence of Apportionment

Even if Finjan could point to a proper royalty base for the accused products, that base would still have to be apportioned. "When the accused technology does not make up the whole of the accused product, apportionment is required." *Finjan v. Blue Coat Sys.*, 879 F.3d 1299, 1311-12 (Fed. Cir. 2018) (vacating jury damages award due to lack of apportionment). Here, Finjan has no evidence of apportionment.

Apportionment is clearly required in this case. For example, Finjan has accused SRX devices used in combination with Sky ATP and Sky ATP alone. But both include substantial non-infringing features and functionality. For example, SRX has Next Generation Firewall, AppSecure, Intrusion Prevention, Unified Threat Management, User Firewall, Adaptive Threat Intelligence, and Secure Routing. Ex. 345 at 3. SRX includes features such as antivirus, antispam, enhanced Web filtering, content filtering and "threat protection" for "advanced malware." *Id.* at 2. These are just a small subset of SRX features and functionality that have nothing at all to do with Sky ATP. *Id.*

Sky ATP is a cloud-based anti-malware service that has a number of security analysis features that have nothing to do with Claim 10 and are not accused by Finjan. Finjan only accused certain portions of the "Malware Inspection Pipeline"—namely static and dynamic analysis—along with an "Identified Malware" but never addressed the other components of Sky ATP as shown below. Ex. 382 at 1.



But Sky ATP also includes a multitude of non-infringing features and functionality. For example, it provides security intelligence cloud feeds such as C&C (*i.e.*, command and control), compromised hosts, GeoIP, whitelists, and blacklists. Ex. 78 at 18. Sky ATP further includes additional features that do not perform security analysis at all, such as its service portal (*i.e.*, Web user interface) that acts as a graphics interface for displaying information to customers and also provides a configuration management tool. *Id.*

Finjan was accordingly required to apportion out the value of these non-patented features from its proposed royalty base, but it failed to do so. *Garretson v. Clark*, 111 U.S. 120, 121 (1884) (The patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative.").

Even if the Court were inclined to overlook Finjan's failure of proof on the royalty base in light of the royalty base evidence Juniper put on, Finjan would still have to apportion that base before applying a royalty rate to it. The total accused revenue base at issue here ($1.8 million) would have to be properly apportioned before any royalty rates (such as Finjan's proposed 8% and 16% rates) could apply. *See, e.g.*, *Finjan*, 879 F.3d at 1312. Finjan does not dispute that the accused products incorporate many components and that the accused technology does not make up the whole of the accused products. Finjan therefore has not provided evidence that would permit the jury to determine the apportionment of revenues.

### 3.     No Legally Sufficient Evidence of a Royalty Rate

At trial, Finjan continued to rely on the same rates that the Court already rejected. Specifically, Finjan pointed to (i) an "$8 per user rate"; (ii) rates of "8 percent on hardware" and "16 percent on software;" and (iii) a "$0.32 cents per scan rate." Each is legally improper.

**$8 Per User Rate**: Earlier this year, the Federal Circuit rejected this exact rate and overturned a jury damages verdict in Finjan's favor. *Finjam*, 879 F.3d at 1311. The Federal Circuit ruled that "the $8-per-user fee appears to have been plucked from thin air, and, as such, cannot be the basis for a reasonable royalty calculation." *Id.* at 1312 (emphasis added); *see id.* at 1311 ("the $8-per-user royalty rate employed in Finjan's analysis was unsupported by substantial evidence."). Trial testimony from Finjan's CEO, Mr. Philip Hartstein, confirms that no licensee has accepted a $8 per user rate. Trial Tr. Vol. 2 at 315:25–316:5 ("Q. You don't have any licensees who have actually paid Finjan a per-use rate, correct? A. It does not show up in the license agreements, no. Q. So you don't have any licensees who have actually agreed to pay $8 per user for a license agreement; correct? A. I think that's correct.")

**8% on Hardware/16% on Software**: Mr. Hartstein also testified that Finjan's 8%/16% royalty rates are merely a *starting point* for negotiations. Trial Tr. Vol. 2 at 332:11–15 ("Q. Now, during the negotiation, what happens? What can happen with those rates? A. Uhm, so I mentioned that each negotiation is unique. So every company is its own situation. We use 8 and 16 percent as *the starting point*; right?"). However, Finjan has introduced no evidence on the rate the reasonable parties in this case would actually reach. Consequently, Finjan has failed to provide evidence of a

royalty rate that the jury could reasonably adopt. *See Finjan*, 879 F.3d at 1312 (Fed. Cir. 2018) ("[T]estimony that an 8-16% royalty rate would be the ***current starting point*** in licensing negotiations says little about what the parties ***would have proposed or agreed to*** in a hypothetical arm's length negotiation [at the time of the hypothetical negotiation]." (emphasis added)).

**$0.32 Cents Per Scan Rate**: Finjan's proposed $0.32 per scan rate is devoid of any evidentiary support and thus similarly "plucked from thin air." *See Finjan*, 879 F.3d at 1312. Not only is this $0.32 per scan figure unsupported, here, it would lead to absurd results. Assuming 10 million scans per month, a $0.32 per scan royalty would result in damages of $44.8 million over the course of the damages period (10 million scans x 14 months in damages period x $0.32). There is no evidence in the record that Juniper would have agreed to such an economically preposterous rate, which vastly exceeds Finjan's consistent starting point of 8% on hardware and 16% on software. *See* Trial Tr. Vol. 2 at 314:3–6 (Philip Hartstein: "Q. You're not aware of any instance where Finjan proposed a royalty that exceeded 16 percent of revenues for the accused products; correct?  A. As a proposal? No, I don't think so."). Such an award "defies basic laws of economics" every bit as much as the excluded opinion of Finjan's damages expert, Mr. Arst. *See* Dkt. 283 at 4.  Finjan therefore has not presented evidence of a rate that the jury can use.

### 4. No Evidence of Apportionment

### B. Notice

During summary judgment briefing, Juniper expressly raised Finjan's failure to comply with the marking and notice requirements of 35 U.S.C. § 287, and Juniper explained that this failure precluded Finjan from recovering any damages because the '494 Patent expired before Finjan filed this action.  In particular, Juniper argued Finjan incurred a notice obligation pursuant to § 287 because it and its licensees sold products that embody the '494 Patent but failed to mark those products. Because Finjan failed to mark all or substantially all of the products embodying the '494 Patent, Finjan can collect damages only if it provided Juniper with actual notice of infringement pursuant to § 287.  No reasonable jury could find that Finjan provided the notice required by law. It is undisputed that Finjan did not provide Juniper with written notice. At trial, Finjan relied solely on a call between its licensing executive, John Garland, and Juniper's Director of Litigation, Scott

Garland. But Mr. Garland admitted at trial that he made no mention of Sky ATP on that call. Trial Tr. 586:22-587:1. Actual notice requires the "affirmative communication of a specific charge of infringement by a specific accused product or device." *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994). No reasonable jury could find that Finjan provided that here.

### 1. Constructive Notice

"Pursuant to 35 U.S.C. § 287(a), a patentee who makes or sells a patented article must mark his articles or notify infringers of his patent in order to recover damages." *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1365 (Fed. Cir. 2017). An alleged infringer who disputes a "patentee's compliance with § 287 bears an initial burden of production to articulate the products it believes are unmarked 'patented articles' subject to § 287." *Id.* at 1368. Here, Juniper satisfied its burden of production by serving a notice on Finjan identifying specific unmarked patented articles subject to § 287. Trial Transcript ("Trial Tr.") Vol. 2 at 289:8–23. Finjan now "bears the burden to prove the products identified do not practice the patented invention." *Arctic Cat*, 876 F.3d at 1368.

To satisfy § 287's constructive notice provision, Finjan and its licensees needed to mark ***substantially all*** products embodying the '494 Patent. *See Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998); *Cybiotronics, Ltd. v. Golden Source Elecs. Ltd.*, 130 F. Supp. 2d 1152, 1162 (C.D. Cal. 2001). Further, Finjan must show that with respect to third-party licensees who sell products embodying the '494 Patent, Finjan "made reasonable efforts to ensure compliance with the marking requirements." *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111–12 (Fed. Cir. 1996).

First, Finjan failed to mark substantially all of its own product. Finjan's CEO, Mr. Hartstein, pointed to marking on a web page and on a product advertisement, but this is insufficient as a matter of law. *See Stryker Corp. v. Intermedics Orthopedics*, Inc., 891 F. Supp. 751, 830 (E.D.N.Y. 1995) (Distribution of marking "separately from the [patented] devices themselves . . . is insufficient under the statute, as a matter of law."), *aff'd*, 96 F.3d 1409 (Fed. Cir. 1996); *Acantha LLC v. Depuy Orthopaedics Inc.*, No. 15-C-1257, 2018 WL 1951231, at *4 (E.D. Wis. Apr. 25, 2018) ("Because Acantha has not established that the surgical technique guides were distributed or shipped with the licensed products, it cannot rely on the fact that these guides contain its patent number to show that

it complied with the requirements of § 287(a)."); *Calmar, Inc. v. Emson Research, Inc.*, 850 F. Supp. 861, 868 (C.D. Cal. 1994) (holding that "marking some literature associated with a patented article is insufficient to satisfy the marking requirements of the statute").

Second, Mr. Hartstein acknowledged that Finjan's licensees sold products practicing the '494 patent, which Finjan itself touted in its Patent Office filings as evidence of secondary considerations of non-obviousness. Trial Tr. at 318:11-13 ("But Finjan believes that its licensees are actually using its patents in those products; correct? A. Yes, we believe that."); Trial Ex. 1760 at 54. However, Mr. Hartstein admitted that he was not aware of any efforts by Finjan to monitor whether its licensees are marking their products with Finjan's patents. *See* Trial. Tr. at 265:10–14; 319:8–11. In fact, Mr. Hartstein did not even believe that any of Finjan's licenses had marking provisions. *Id.* at 319:5-11. *U.S. Ethernet Innovations, LLC v. Acer, Inc.*, No. C 10-3724 CW, 2013 WL 4456161, at *7 (N.D. Cal. Aug. 16, 2013) ("3Com failed even to include in the licensing agreement an obligation that IBM itself make efforts to mark any products that it reasonably believed practiced 3Com's patents.8 It instead authorized IBM to practice the patents-in-suit without any requirement that IBM even make a minimal effort to mark them."). Thus no reasonable jury could find that Finjan satisfied § 287's constructive notice provision.

### 2. Actual Notice

Finjan provided no evidence that it gave Juniper written notice of infringement. Without such evidence, Finjan cannot satisfy § 287's actual notice requirements. *See* 2018 N.D. Cal. Model Patent Jury Instruction 5.9 requiring "actual written notice."

Even if oral notice were sufficient, no reasonable jury could find that Finjan provided Juniper with adequate actual notice. As an initial matter, the standard for actual notice is objective and it does not matter what the parties subjectively understood. Specifically, the Federal Circuit has explained that "[t]o serve as actual notice, a letter must be sufficiently specific to support an objective understanding that the recipient may be an infringer." *Funai Elec. Co., Ltd. V. Daewoo Electronics*, 616 F.3d 1357, 1373 (Fed. Cir. 2010). Thus, Mr. Garland's alleged subjective intent of identifying Sky ATP by referring to "advanced malware modules" is not sufficient to satisfy the actual notice requirements as a matter of law.

Moreover, to adequately communicate actual notice, the patentee must provide an identification of specific products. The Federal Circuit has held "[t]he letter must communicate a specific charge of infringement of specific patents by a specific product or group of products." *Funai Elec. Co.*, 616 F.3d at 1373. Here, Mr. Garland only referenced Juniper's SRX Series, and its included Unified Threat Management, web-filtering, and anti-virus modules. Ex. 256 at JNPR-FNJN_29011_00960577-78 (stating that Finjan is focused on the SRX series and that "it looks like some of the modules that are supported in those products and the Next Generation firewall, which is your UTM, your antivirus, and your web filtering are three modules that we think about using three new patents."). Mr. Garland admitted that he did not mention Sky ATP or SRX specifically used in combination with Sky ATP as accused products. Trial Tr. 586:22-587:1; *See* Trial Exs. 256, 257; Trial Tr. Vol. 3 at 588:13–16 (John Garland: "Q. Right. And you now know that you're mistaken and that you did not mention Sky ATP; is that right? A. I only know I'm mistaken because the call - - yeah, the call is recorded and taped and transcribed.").

Any notion that Mr. Garland's single, offhand remark on a phone call that the '494 Patent "reads on your advanced malware modules" provided actual notice of Sky ATP or SRX used in combination with Sky ATP fails as a matter of law. Sky ATP cannot objectively be viewed as an advanced malware module. Trial Ex. 345 at 2 (discussing SRX's on-box "advanced malware" threat protection, which is unrelated to Sky ATP); Coonan Dep. Tr. at 167:13-24 ("Q. Have you heard of Sky ATP referred to as advanced malware? A. No. . . . Q. Have you ever heard of Sky ATP referred to as having advanced malware modules? A. Not – not a module, no, 'cause it's a cloud-based solution."). Moreover, "advanced malware modules" does not identify a specific group of products. At best, "advanced malware modules" refers generally to the market for advanced anti-malware solutions. Identifying a broad market for products does not sufficiently provide actual notice as a matter of law. *See Asyst Technologies, Inc. v. Empak, Inc.*, 2006 WL 3302476 at *4 (N.D. Cal. Nov. 14, 2006) (finding insufficient actual notice as a matter of law despite the patent owner sending letters identifying "the market for SMIF pods" because "[n]either letter identified any particular product of [the defendants]." *Id.*

Thus, there is no legally sufficient evidentiary basis for a reasonable jury to find for Finjan on this issue, and judgment as a matter of law is appropriate.

### C. Infringement

Finjan has failed to put forth a legally sufficient evidentiary basis for a reasonable jury to find infringement because Finjan has not demonstrated that Sky ATP satisfies the "database" element of claim 10. The parties agreed to the following construction of "database": "a collection of interrelated data organized to a database schema to serve one or more applications." However, Finjan has not demonstrated that its own abstract creation, the "ResultsDB Database," is organized according to a database schema. Instead, the evidence showed that Juniper stores the results of its analysis engines, which correspond to the claimed "security profile," in DynamoDB and S3, which are schema-less storage solutions. Trial Ex. 1264 at 2-3. Dr. Cole's testimony does not relate to the *database* schema associated with DynamoDB or S3, rather it relates to the *JSON* schema of the objects stored in DynamoDB and S3; in other words, the databases are (as Amazon makes explicit) schema-less, regardless of whether some of the objects therein (the JSONs) have their own internal JSON schemas. Trial Tr. Vol. 3 at 504:22-25. Further, Dr. Cole's testimony did not establish that the JSON schema was a database for the artificial "ResultsDB Database" of his own creation.

Finjan has also failed to demonstrate that its made-up "ResultsDB Database" is organized according to a "database schema" as Finjan and its own expert defined the term on multiple occasions. Before the PTAB, Finjan argued through its expert that that one of skill in the art would understand that claim 10 requires the use of a "database schema," which it defined as "a description of a database to a database management system (DBMS) *in **the** language* provided by the DBMS." Trial Ex. 1760 at 46; *see also* IPR2015-01892, Paper 27 at 38-39 (same citation to same expert). On one hand, the MySQL database is, as its name suggests and as Dr. Cole admitted, described in Structured Query Language (SQL). On the other hand, the ResultsDB API (*i.e.*, what the Court found be the claimed "database manager") is written in Python, as indicated by the fact that the ResultsDB API code is found in argon\src\rdb\resultsdb.*py* (where ".py" is the Python file extension). Trial Tr. Vol. 3 at (Eric Cole: "Q. The ResultsDB manager that you identified as the infringing database management system is written in python; correct?  A. Yes, that is my

understanding. Q. But for the MySQL database you run queries using the standard query language; correct? A. Yes, for the MySQL database that's run by Amazon, they use MySQL for queries.").

Finally, Finjan failed to prove that the accused system, which is a cloud-based system, was made, used, sold or offered for sale in the United States during the damages period.

**CONCLUSION**

Juniper respectfully requests that the Court grant judgment as a matter of law on notice, damages, and infringement.

Dated:  December 13, 2018                             IRELL & MANELLA LLP

                                                     By: */s/ Alan Heinrich*
                                                         Alan Heinrich
                                                         *Attorneys for Defendant*
                                                         JUNIPER NETWORKS, INC.