PAUL J. ANDRE (State Bar No. 196585)
pandre@kramerlevin.com
LISA KOBIALKA (State Bar No. 191404)
lkobialka@kramerlevin.com
JAMES HANNAH (State Bar No. 237978)
jhannah@kramerlevin.com
KRISTOPHER KASTENS (State Bar No. 254797)
kkastens@kramerlevin.com
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP
990 Marsh Road
Menlo Park, CA  94025
Telephone:  (650) 752-1700
Facsimile:   (650) 752-1800

*Attorneys for Plaintiff*
FINJAN, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| FINJAN, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>JUNIPER NETWORKS, INC., a Delaware Corporation,<br><br>Defendant. | Case No.: 3:17-cv-05659-WHA<br><br>**PLAINTIFF FINJAN, INC.'S OPPOSITION TO JUNIPER'S MOTION FOR JUDGMENT AS A MATTER OF LAW** |

## I. INTRODUCTION

Finjan, Inc. ("Finjan") presented more than sufficient evidence at trial to support its infringement, notice and damages claims, including sworn testimony of Finjan's CEO and Finjan's Director of Business Development, the deposition testimony of several employees of Juniper Networks, Inc. ("Juniper"), the Accused Products' source code, numerous Finjan and Juniper documents, and testimony of highly reputable expert witnesses. Finjan established that it has sufficient facts to support infringement and a jury's award of a reasonable royalty for Juniper's infringement under 35 U.S.C. § 271(a) for Juniper's use, sale, and offer for sale of (1) the SRX with SkyATP and (2) SkyATP by itself ("Accused Products"). When all reasonable inferences are drawn in Finjan's favor, the Court should deny Juniper's motion for judgment as a matter of law ("Motion").[1]

## II. DAMAGES

Finjan presented substantial evidence so the jury can determine a reasonable royalty. In addition to relevant factual information regarding the Accused Products and how they functioned, Finjan had substantial testimony regarding the significant benefits of the patented technology, including the benefits to Juniper. This included the testimony of Finjan's expert witnesses, the inventor of the '494 Patent and Finjan and Juniper's employees. Finjan provided evidence and testimony regarding (1) relevant facts surrounding the hypothetical negotiation, including the considerations of both parties, (2) several different methods to calculate a royalty base, based upon Juniper's use, offer for sale and sales of the Accused Products, (3) different methods to apply a royalty rate, (4) the significant technical advantages and pioneering nature of the patented technology at issue, and (5) factual evidence in Juniper's confidential documents that will permit the fact finder to tie Juniper's infringement to the footprint of the invention, i.e., apportion the royalty base to the footprint of the invention.

---

[1] Finjan incorporates by reference the arguments and evidence set forth in its (i) Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(a) (Dkt. No. 323).

1

FINJAN, INC.'S OPPOSITION TO JUNIPER'S                   Case No.: 3:17-cv-05659-WHA
MOTION FOR JUDGMENT AS A MATTER OF LAW

A.      **Finjan's Apportionment**

Contrary to Juniper's assertions, Finjan presented evidence and testimony regarding "apportionment." Under Federal Circuit precedent, apportionment is not limited to specific methodologies, *i.e.* the jury can apportion either the rate or base, because flexibility is required to determine fact-dependent damages. *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) ("We have held that apportionment can be addressed in a variety of ways, including "by careful selection of the royalty base to reflect the value added by the patented feature [or] ... by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof.")(citing Ericsson, Inc. v. D–Link Sys., Inc., 773 F.3d 1201, 1226 (Fed. Cir. 2014).

Finjan presented several different methods to apportion. For example, Finjan presented Mr. Icasiano's testimony regarding how Juniper's infringement of SkyATP is tied to the footprint of the invention based on how many scans sent to Sky ATP relate to the specific accused functionality of SkyATP, *i.e.* dynamic analysis, through the patent expiration date of January 2017. *See, e.g.,* Ex. 498 at 24:5-33:19 (Testimony of Mr. Icasiano that 40% of SkyATP files are sent for dynamic analysis, i.e., sandboxed); *see also* Trial Exhibit 88 at 514137, 514169 (Juniper presentation showing that over 500,000 files scanned in one week, 31% of those files processed are attributed to the infringing technology and that the components of SkyATP are Cache Lookup, Anti-Virus Scanning, Static Analysis and Dynamic Analysis). Additionally, Dr. Cole testified and identified the specific infringing functionality in SkyATP as Static and Dynamic Analysis. *See* Trial Tr. at 428:11-429:25.

Juniper's assertion that Finjan should have apportioned the components of SkyATP shown at Dkt. 323 at 3 (Juniper's Motion) is misplaced. Finjan's base of 10 million files are sent to Sky ATP. 40% of these files are dynamically analyzed in Sky ATP, according to Mr. Icasiano. As Dr. Cole explained, there is a malware inspection pipeline that analyzes each of the files. *See* Trial Tr. at vol. 3 at 428:11-429:25 (explaining the components of the malware inspection pipeline). The 40% of all files sent to Sky ATP only accounts for a ***portion*** of those files that are scanned ***using the infringing***

*technology*, i.e., the dynamic analysis. It does not include static analysis, which is also infringing. As a result, the 40% apportionment is conservative and does not capture all the infringement.

Juniper's argument that a multitude non-infringing features and functionality are somehow included in Finjan's damages is a red herring. As stated above, Finjan is ***only*** accounting for the 10 million files that are sent to Sky ATP, which Sky ATP scans. Finjan is not including any files that get blocked from the SRX based on C&C, compromised hosts, GeoIP, whitelists and blacklists. Finjan is not capturing files that are blocked. Furthermore, Finjan is not including the web user interface, which utilizes the results database and therefore could be part of the infringing use, but is not captured within the 10 million files that are scanned that makes up the royalty base. Also, Finjan played deposition testimony of Mr. Chandra Nagarajan, who is responsible for the team developing Sky ATP, and identified the sending and scanning of files as the "key component of Sky ATP." Nagarajan Depo. 12:24-13:19.

Finally, the current apportionment is nothing like the Federal Circuit determination in the *Finjan v. Blue Coat* case where the Federal Circuit found that the infringing functionality of DRTR included non-infringing functionality. 879 F.3d 1299, 1310 (Fed. Cir. 2018). Here, Finjan is not seeking to capture all the infringing functionality because it is only seeking to capture the files sent for dynamic analysis. Thus, Finjan has removed all non-infringing functionality and even some infringing functionality (*i.e.*, the static analysis) in its overly aggressive apportionment of 40%. Moreover, Juniper does not claim that the dynamic analysis contains non-patented technology. See Dkt 323 at 3 (identifying alleged non patented features of Sky ATP, not dynamic analysis). Thus, Finjan provided sufficient facts for apportioning Juniper's infringing use of the patented technology for Sky ATP.

With respect to the SRX, the 10 million scans and 40% apportionment only captures Sky ATP, or, at the very least, only captures the files scanning relationship between SRX and Sky ATP. Thus, the jury has sufficient evidence to apportion the infringing revenues of SRX and Sky ATP, including through apportionment of the revenues based on number of files SRX sends to Sky ATP, and the profits gained from those infringing sales.

Finally, Finjan provided sufficient evidence regarding the substantial benefits to Juniper and its customers through the sale, use and offer for sale of the accused products. Finjan's technical experts, Dr. Cole and Dr. Bims, identified the significant benefits and novelty of the patented technology, and Finjan provided the jury with the testimony of Juniper's witnesses regarding its extensive use and need for the patented technology, including the number of customers, the volume of units for the accused products and the extensive use of the infringing technology by Juniper and its customers. Trial Tr. at 225:19-239:5 (Testimony of Dr. Bims) and Trial Exhibit 496 (Nagarajan Testimony identifying need for SkyATP). Given Juniper's substantial benefit received from its infringing use, Finjan further substantiates that Finjan's apportionment is conservative.

### B. Finjan's Royalty Base

Finjan presented testimony and facts regarding how to calculate an appropriate royalty base for the Accused Products, including the revenues and number of units/licenses/enrollments tied to the infringing sales, the use of the patented invention through the number of files processed and number of Juniper's customers for the Accused Products. *See* Trial Exhibits 88, 490, 494, 499 at 23:14-53:08 (Testimony of Ms. Gupta, Juniper's Senior Financial Director regarding the revenues associated with SRX and SkyATP and number of infringing units/enrollments), Exhibit 496 at 53:17-61:10 (Testimony of Mr. Nagarajan, Juniper's Senior Director in the Security Business Group regarding 10 million scans analyzed by SkyATP a month and the number of customers for Sky ATP was between 300-500), Ex. 58 (Sky Advanced Threat Prevention Administration Guide at 116-117 showing between 200-100,000 files processed per day for Premium Licenses and 25-5000 files processed per day with free enrollment), Ex. 498 at 53:09-53:16 (Testimony of Mr. Icasiano, Juniper's Manager of the DevOps team for SkyATP, regarding number of SRX devices with free enrollments); Trial Tr. at 471:19-473:9, 525:9-527:5 (Dr. Cole's Testimony regarding 535,000 files processed in seven days). Thus, contrary to Juniper's claim, Finjan's evidence above provides an identification of several appropriate royalty bases, including (1) for sales, the infringing sales based on the revenues of the Accused Products and (2) for use, the use based on the number of units and enrollments/licenses for of the Accused Products and use based on the number of files processed.

While Juniper questions the veracity of its own witness, it provides no citation for its claim that Ms. Gupta's testimony is not limited to the accused products because she admits that the revenues recited are tied to the Accused Products.  See, e.g. Exhibit 499 at 23:15-21 ("My understanding of this document is that it contains information about SRX units on which the free Sky ATP license was enabled.").  As such, the cases that Juniper cites are irrelevant because Juniper's Senior Financial Director confirmed that the revenues in the record are for the Accused Products and not any non-accused products.

### C. Finjan Presented Substantial Evidence to Support a Royalty Rate

Finjan provided substantial evidence regarding Finjan's licensing practices, Finjan's general approach to licensing and history, Finjan's licensing rates, including the 8 and 16% royalty rates applied total revenues, an $8 per user rate and 32 cents per scan rate, Finjan's licensing discussions with Juniper and the relevant damages period, provisions in Finjan's licenses regarding triggering events for additional royalties, including the testimony of Finjan's CEO.  *See* Trial Tr. at 244:13-333:22.  Juniper's citation to *Finjan v. Blue Coat* is misplaced because that case is nothing like this case.  Here, Finjan's CEO provided substantial evidence that substantiating the economic and technological comparability for using the $8 per user and 32 cents per scan rate.  Trial Tr. (Hartstein) at 269:6-270:13, 271:7-19, 274:23-276:7, 308:15-309:9, 330:21-333:22 (discussing Finjan's 8% on total software sales and 16% on total hardware sales starting points); Trial Tr. (Hartstein) at 270:14-271:6 (describing basis for $8 per user rate); Trial Tr. (Hartstein) at 271:20-273:24 (describing basis of 32 cents per scan rate).

### III. FINJAN PROVIDED NOTICE TO JUNIPER OF ITS INFRINGEMENT

Finjan presented substantial evidence to support that it provided Juniper with notice under 35 U.S.C. § 287.  First, Finjan provided unrebutted testimony from Mr. John Garland confirming that he gave Juniper notice in November 2015 of the '494 Patent and the Accused Products, including Juniper's Sky ATP (which Mr. Garland referred to as Juniper's Advanced Malware module, which was Juniper's description of Sky ATP in its press release Trial Exh. 91), next generation firewall, and SRX Series, and introduced as a trial exhibit a transcript of this recorded call between Finjan and Juniper.

See e.g. Trial Tr. 553:24-554:10; 557:23-24; 559:13-560:13; 567:6-11; 561:21-562:10; Trial Exhibit 256 at John – 10:53 ("Mr. Garland: And there's a newer one, one you haven't seen before. 86777494. Mr. Coonan: Okay. All right. And that's significant because it's – is it – is it a continuation? Mr. Garland: I don't know. I don't know. It's reads on your advanced malware modules."); id. at 5:01 ("Yes, so I mean the products that we're focused on is the – the SRX Series, including the virtual firewall, and – "); id. at John 05:12 ("Because that's what the patents have led us to, I mean there's new security products, and so we don't think -- you know, really with your Junos operating system. But it looks like some of the modules that are supported in those products and the Next Generation firewall, which is your UTM, your antivirus, and your web filtering are three modules that we think about using three new patents."); id. at 3:55 ("Okay. So I mean we have identified patents. We have identified products . . ."); Trial Exhibit 257 (audio recording of call with same testimony). Finjan introduced evidence that Juniper refers to its advanced malware module as Sky ATP, including a Juniper in its press release. Trial Tr. at 551:22-553:19; Trial Ex. 91 ("Juniper Network Unveils Advanced Anti-Malware Cloud Service"). Finjan introduced evidence, including Juniper documents and the testimony of Juniper's engineer, Chandra Nagarajan, that its next generation firewall is Sky ATP. Trial Exhibit 496 (Nagarajan Trial Testimony at 35:20-36:1) ("Q. Why was Sky ATP developed? A. So in the – in the NG firewall, one of the – one of the firewall components of an NG firewall is advanced threat protection. And in order to – to get that functionality in an NG firewall, we started developing Sky ATP."); Trial Exhibit 17.

    Finjan's notice does not need to be written, so long as it otherwise meets the requirements of notifying Juniper that its products infringe the '494 Patent. *See, e.g., Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1376 (Fed. Cir. 2008). The Federal Circuit has explicitly stated that there are no specific form requirements for this notice, and stated that "[a]lthough there are numerous possible variations in form and content, the purpose of the actual notice requirement is met when the recipient is notified, with sufficient specificity, that the patent holder believes that the recipient of the notice may be an infringer." *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1470 (Fed. Cir. 1997); cited by *Mosaid Techs. Inc. v. Samsung Elecs. Co.*, 362 F. Supp. 2d 526, 555–56 (D.N.J. 2005) ("Actual notice

can take many forms, including sending a potential infringer a letter that charges a particular product with infringement of a specific patent or filing a patent infringement action.).

Finjan introduced legally sufficient evidence that it provided constructive notice of the '494 Patent by marking its Vital Security mobile application – which is Finjan's product that practiced the '494 Patent – in October or November 2016.  Finjan introduced the testimony of its CEO, Mr. Philip Harstein, that Finjan marked its Gen3 Vital Security application with the '494 Patent as of its release in October or November 2016.  Trial Tr. at 265:5-8 ("Q. For an earlier version of this mobile application, did Finjan identify the '494 patent in connection with it? A. We did. So specifically I mentioned Vital Security. It was in our Gen3 product that used the '494."); 259:3-261:11; 324:3-15; 265:10-266:2 (website marking).  Finjan also introduced as a trial exhibit a document from the Google Play Store where customers can purchase Finjan's Gen3 Vital Security product that identifies the '494 Patent. Trial Ex. 372; Trial Tr. at 261:4-11 (Q. I'd like you to take a look at what we've marked as Trial Exhibit 372, and it may also be in your book there. Could you just briefly describe what this is? A. Yeah. That is basically the bibliographical information that you would see when you go to the Google Play Store. It has a description of the product. You can see the logo. You can see the name. And in that description you also see the '494 patent listed."); id. at 260:20-266:2.  Juniper produced no evidence whatsoever that Finjan failed to substantially mark all of its own products with the '494 Patent. Juniper produced no evidence at all, let alone legally sufficient evidence, of any Finjan product that embodies the '494 Patent that Finjan failed to mark with the '494 Patent.

Finjan presented legally sufficient evidence that it complied with all statutory marking methods, which includes the America Invents Act amendment that allows virtual marking.  See 35 U.S.C. § 287(a) (setting forth that patentees can give notice to the public by "fixing thereon the word 'patent' or the abbreviation 'pat.', together with the number of patent with an address of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the patented article with the number of the patent."); Public Law 112-29, September 16, 2011 (Leahy-Smith America Invents Act); *Philippi-Hagenbuch, Inc. v. W. Tech. Servs. Int'l, Inc.*, No. 12-1099, 2015 WL 5725248, at *2 (C.D. Ill. Sept. 30, 2015) ("Notice can be either constructive, by marking the

7

FINJAN, INC.'S OPPOSITION TO JUNIPER'S  
MOTION FOR JUDGMENT AS A MATTER OF LAW

Case No.: 3:17-cv-05659-WHA

article with the patent number or the address of a website that provides the patent number, or actual."). Juniper cites inapposite case law that addresses the marking of physical products. *Stryker Corp. v. Intermedics Orthopedics, Inc.*, 891 F. Supp. 751, 820 (E.D.N.Y. 1995), aff'd, 96 F.3d 1409 (Fed. Cir. 1996) (addressing marking of hip implants).

Second, Juniper failed to produce any evidence that Finjan's licensees are required to mark their products with the '494 Patent and did not even enter into evidence a single Finjan license. Finjan presented unrebutted testimony from Mr. Hartstein that none of Finjan's licenses contain a marking requirement. Trial Tr. at 319:5-7 (Q. You don't believe that any of Finjan's licenses have marking provisions; correct? A. That is my understanding, that our agreements do not."). Juniper did not establish that Finjan's licenses mentioned at trial were during the life of the '494 Patent. Juniper did not introduce a single one of Finjan's licenses or provide any testimony regarding the specific requirements of any license. Juniper's citation to a trial exhibit introduced in Finjan's case-in-chief, and not during Mr. Hartstein's direct or cross examination (but rather during the cross-examination of Finjan's infringement expert, Dr. Cole), regarding out-of-court statements made during an IPR proceeding and trial testimony regarding Finjan's belief that its licensees practice any of Finjan's "patents," which Mr. Hartstein testified includes over 18 patents in the United States alone and approximately "less than 50" patents worldwide (Trial Tr. at 330:12-20), is not legally sufficient evidence that would allow a reasonable jury to conclude that Finjan's licensees practiced the '494 Patent during the life of the '494 Patent, were required to mark their products with the '494 Patent or that Finjan failed to provide constructive notice of the '494 Patent. Unlike the facts in *U.S. Ethernet Innovations, LLC v. Acer, Inc.*, where there was disputed evidence that third-parties actually used premade components that practiced the patents, here Juniper produced no evidence that its licensees' products practice the '494 Patent. No. C 10-3724 CW, 2013 WL 4456161, at *5 (N.D. Cal. Aug. 16, 2013) ("[defendants] contend that the evidence shows that IBM did not simply sell the premade components but instead used them to make its Licensed Products and then sold the completed item").

8

FINJAN, INC.'S OPPOSITION TO JUNIPER'S  
MOTION FOR JUDGMENT AS A MATTER OF LAW

Case No.: 3:17-cv-05659-WHA

## IV. LITERAL INFRINGEMENT OF THE '494 PATENT

Finjan presented substantial evidence, including expert testimony from Dr. Cole, Dr. Bims, that Juniper is liable for literal infringement of Claim 10 of U.S. Patent No. 6,154,844 ("'494 Patent"). *See generally* Trial Tr. Trial Tr. 367:14-394:11; 426:16-478:5; and the following Trial Exhibits 1, 52, 57, 65, 74, 78, 79, 88, 92, 94, 99, 382, and 399. Dr. Cole provided testimony and citations to exhibits relating to the technology of the '494 Patent, the technical advantages and benefits to Juniper and its products, the usage and functionality of the Accused Products and confirmed the specifics of how the Accused Products meet the claim limitation, such that the Accused Products have a database, consistent with the parties' agreement of the construction of that term. To support his opinion Dr. Cole relied upon Mr. Nagarajan (Juniper's Senior Director in the Security Business Group), Mr. Icasiano (Juniper's Manager of the DevOps Team for SkyATP), Trial Exhibits 22, 23, his review of Juniper's source code, the '494 Patent, and the Court's claim construction.

Dr. Cole provided substantial evidence that the Accused Products have a database manager under the parties' stipulation of the construction of "database." Both parties agree that the construction of "database" is "a collection of interrelated data organized according to a database schema to serve one or more applications (Dkt. No. 126 at 6). Finjan provided substantial evidence that Juniper's Accused Products include a "database" as used in Claim 10 of the '494 Patent because ResultsDB stores the results of the analysis from static and dynamic analysis. Trial Tr. 367:14-394:11; 426:16-478:5; Trial Ex. 78 at (Page 20); Trial Ex. 94 at (Page 10), (Page 11); Trial Ex. 99 at 115; Trial Ex 92 at (Page 20) (Page 32); Ex 99 (Page 8); Ex 399 at (Page 36); Ex 65 at (Page 1); Ex 99 at 78; Ex 99 at 297. In fact, Juniper's expert witness, Dr. Rubin, admitted that ResultsDB include a schema that is applied to how the data is organized in the ResultsDB. For example, Dr. Rubin also readily admitted that the data stored in the ResultsDB is organized according to a JSON schema. Trial Tr. at 783:21-23. This cannot reasonably be disputed, as this schema is even evident in the source code of the ResultsDB. Trial Ex. 99 at 115; Ex 99 at (Page 8); Ex 99 at 78; Ex 99 at 297. Furthermore, Dr. Rubin also admits that even if only the DynamoDB was considered in insolation, this component of Sky ATP still includes a "key schema" that allows the data to be accessed. Trial Tr. 786:10-16. Dr. Rubin did

FINJAN, INC.'S OPPOSITION TO JUNIPER'S  
MOTION FOR JUDGMENT AS A MATTER OF LAW

Case No.: 3:17-cv-05659-WHA

1 not prove his case otherwise and did not know of, a single Juniper document that described the
2 ResultsDB, or even the DyanmoDB or S3 components, as "schema-less."  Trial Tr. 711:12-798:4.
3 Given this failure of proof, Juniper's motion must be denied.
4       Furthermore, even if the Juniper sub-construction for "database schema" of "a description of a
5 database to a database management system (DBMS) in the language provided by the DMBS" was
6 adopted, Finjan also established that the ResultsDB is organized according to its JSON format.  Trial
7 Tr. 457:6-458:1; 461:21-462:14; 463:10-464:2.  Juniper argument that certain components are
8 "written" in the Python programming language is a complete red herring, as this construction states
9 nothing about the programming language the database must be <u>written</u>.  Instead, this construction only
10 states the "language provided by the DBMS," which can be any language that can be used describing
11 the database to the database manager.  Dr. Cole provided testimony showing that this was met, because
12 Juniper uses its own JSON format as the language to interface with the ResultsDB.  Trial Tr. 457:6-
13 458:1; 461:21-462:14; 463:10-464:2; 486:8-487:8; Trial Ex. 99 at115; Ex 99 (Page 8); Ex 99 at 78; Ex
14 99 at 297; Trial Ex. 65 at (Page 3).  As stated in Juniper's documents, this is a strict schema enforced
15 on the data that is stored in the ResultsDB.  Trial Ex. 65 at (Page 3).  As such, Juniper's argument that
16 Finjan did not provide sufficient evidence that Juniper meets the "database" element in the claim is
17 incorrect.

18 **V.     CONCLUSION**
19       For the foregoing reasons, Finjan respectfully requests that the Court deny Juniper's Motion for
20 Judgment as a Matter of Law at the Close of Finjan's case.
21 ///
22 ///
23 ///

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated:  December 13, 2018 | By:  */s/ Paul J. Andre* |
|  | Paul J. Andre (State Bar No. 196585) |
|  | Lisa Kobialka (State Bar No. 191404) |
|  | James Hannah (State Bar No. 237978) |
|  | Kristopher Kastens (State Bar No. 254797) |
|  | KRAMER LEVIN NAFTALIS |
|  |   & FRANKEL LLP |
|  | 990 Marsh Road |
|  | Menlo Park, CA  94025 |
|  | Telephone:  (650) 752-1700 |
|  | Facsimile:  (650) 752-1800 |
|  | pandre@kramerlevin.com |
|  | lkobialka@kramerlevin.com |
|  | jhannah@kramerlevin.com |
|  | kkastens@kramerlevin.com |
|  |  |
|  | *Attorneys for Plaintiff* |
|  | FINJAN, INC. |

11

FINJAN, INC.'S OPPOSITION TO JUNIPER'S  
MOTION FOR JUDGMENT AS A MATTER OF LAW

Case No.: 3:17-cv-05659-WHA