```
                              Volume 3

                          Pages 398 - 614

                UNITED STATES DISTRICT COURT

               NORTHERN DISTRICT OF CALIFORNIA

          BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

FINJAN, INC.,                  )
                               )
            Plaintiff,         )
                               )
  VS.                          )   No. C 17-5659 WHA
                               )
JUNIPER NETWORKS, INC.,        )
                               )
            Defendant.         )
_____ )   San Francisco, California
                                   Wednesday, December 12, 2018
```

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

```
For Plaintiff:          KRAMER, LEVIN, NAFTALIS & FRANKEL LLP
                        990 Marsh Road
                        Menlo Park, California 94025
                   BY:  PAUL J. ANDRE, ESQ.
                        LISA KOBIALKA, ESQ.
                        JAMES HANNAH, ESQ.
                        KRISTOPHER B. KASTENS, ESQ.

                        KRAMER LEVIN NAFTALIS AND FRANKEL LLP
                        1177 Avenue of the Americas
                        New York, New York 10036
                   BY:  CRISTINA LYNN MARTINEZ, ESQ.


              (Appearances continued on next page)



Reported By:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR
              Official Reporters
```

**<u>APPEARANCES (CONTINUED):</u>**

For Defendant:             IRELL & MANELLA LLP
                      1800 Avenue of the Stars, Suite 900
                      Los Angeles, California 90067-4276
               BY: **JONATHAN S. KAGAN, ESQ.**
                      **ALAN J. HEINRICH, ESQ.**
                      **JOSHUA GLUCOFT, ESQ.**
                      **CASEY CURRAN, ESQ.**

                      IRELL & MANELLA LLP
                      840 Newport Center Drive, Suite 400
                      Newport Beach, California 92660
               BY: **REBECCA CARSON, ESQ.**

**I N D E X**

Wednesday, December 12, 2018 - Volume 3

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **COLE, ERIC (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 426 | 3 |
| Direct Examination resumed by Mr. Andre | 426 | 3 |
| Cross-Examination by Ms. Carson | 483 | 3 |
| Redirect Examination by Mr. Andre | 531 | 3 |
| | | |
| **COONAN, SCOTT JAMES** | | |
| By Videotaped Deposition (not reported) | 538 | 3 |
| | | |
| **GARLAND, JOHN** | | |
| (SWORN) | 547 | 3 |
| Direct Examination by Ms. Kobialka | 547 | 3 |
| Cross-Examination by Mr. Kagan | 568 | 3 |
| Redirect Examination by Ms. Kobialka | 600 | 3 |
| Recross-Examination by Mr. Kagan | 606 | 3 |

<u>**I N D E X**</u>

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 52 | | 458 | 3 |
| 65 | | 462 | 3 |
| 78 | | 427 | 3 |
| 79 | | 434 | 3 |
| 88 | | 471 | 3 |
| 92 | | 454 | 3 |
| 94 | | 437 | 3 |
| 99 | | 451 | 3 |
| 256 | | 538 | 3 |
| 321 | | 569 | 3 |
| 327 | | 585 | 3 |
| 343 | | 598 | 3 |
| 345 | | 591 | 3 |
| 399 | | 461 | 3 |
| 1025 | | 596 | 3 |
| 1179 | | 495 | 3 |
| 1760 | | 515 | 3 |

PROCEEDINGS

1    **<u>Wednesday - December 12, 2018</u>**                    **<u>7:30 a.m.</u>**

2                          **<u>P R O C E E D I N G S</u>**

3                            **---000---**

4         (The following proceedings were held in open court,

5    outside the presence of the jury:)

6              **THE COURT:**  Welcome, everybody.

7              **THE CLERK:**  Please be seated.  Court is now in

8    session.

9              **THE COURT:**  All right.  I have a few things that you

10   bombarded me with, that I need to try to get to you.

11        First, here are Finjan's designations.  I made rulings on

12   the depositions.

13        With respect to the group that was given to me by Juniper,

14   there are two groups, and I made some -- I did not make many

15   rulings.  I made some.  In some cases nothing was even tagged.

16   I couldn't understand what the issue was.

17        And I want you to look at this group again to see if I --

18   what I'm missing on that.

19        All right.  Now, the second group of the Juniper

20   submission on depositions got my blood boiling because -- not

21   every single one, about eight of them, that's the second

22   group -- were depositions in other cases, not this case.

23        Now, I've often allowed depositions in other cases to be

24   read, but because of the objection that was made yesterday or

25   two days ago to the plaintiff wanting to bring -- play a

PROCEEDINGS

1   deposition from another case and Juniper objected, I have some

2   difficulty with the -- you trying to have it both ways.  Now

3   you want to use a deposition from another case.

4      So I'm going to hand these back to you.  And you're going

5   to have to do a full-scale brief that justifies the

6   high-handedness and the big-firm gimmickry of trying to have it

7   both ways.  I'm not going to let you get away with that unless

8   you give me a full-scale brief that explains why you can do it

9   but they cannot do it.

10      **MR. KAGAN:**  Your Honor, we're happy to give you a

11   full-scale brief --

12      **THE COURT:**  Please.

13      **MR. KAGAN:**  -- but can I mention something very

14   briefly?

15      **THE COURT:**  Yeah.

16      **MR. KAGAN:**  The deposition that Finjan wanted to

17   introduce was of their own witness.  So that's obviously

18   hearsay.  The depositions that we are seeking to introduce are

19   of their witnesses.

20      **THE COURT:**  No, they're not.  They're inventors.  Some

21   of those people are just inventors.

22      **MR. KAGAN:**  But they are Finjan witnesses.

23      **THE COURT:**  See, that's the problem.  I don't buy that

24   necessarily.  These people don't work for Finjan anymore.  So

25   you're going to have to give me a good brief that justifies

1   that, instead of big-firm gimmickry.  That's what you're trying

2   to get away with there.  Slick move, but it's not going to fly

3   yet.  I might allow it, but you're going to have to work hard

4   for that one.  Okay.  That's it on that part.

5        Now, the next thing I pulled is from the criminal

6   calendar, home detention.  It looks like I was about to put

7   Mr. Andre in home detention.

8        (Laughter)

9            **MR. ANDRE:**  I would volunteer at this point, Your

10  Honor.  If you want to send me home, I'll let Ms. Kobialka take

11  over.

12           **THE COURT:**  I had another item I wanted to bring up.

13  Oh, I know what it is.

14       Where is that part about the 282?  I thought I had it

15  right on top of my stuff.  Did you pick it up?

16       All right.  Thank you.  I was talking to my law clerk.

17       Now, you're in trouble here a little, Mr. Fin- --

18  Finjan -- Mr. Andre.

19       All right.  Is any member of the press here?  Do you get

20  up this early?  Okay.  I guess not.

21       Whoever's out there, I want you to just -- this is what I

22  have to put up with and I have to work through.  All right.  So

23  there was a motion made yesterday by Mr. Andre to the effect

24  that they didn't comply with 282.

25       All right.  Well, what is 282?  282 says that 30 days

**PROCEEDINGS**

1  before trial you have to give notice of the country, number,

2  date, name of any patentee of any patent, the title, date, and

3  page numbers of any publication to be relied upon as

4  anticipation of the patent-in-suit or -- except in the

5  United States Court of Federal Claims, as showing the state of

6  the art and so forth.

7       So okay.  I like to comply with the law, so -- but then it

8  turns out that there was no 282 notice here at all; right?

9  There was nothing called a 282 notice; right?

10          **MR. ANDRE:**  That's correct, Your Honor.

11          **THE COURT:**  All right.  So, now, it is true, I will

12  just say this, most times the lawyers do put in a 282 notice.

13  But you didn't do it in this case.

14       But, nevertheless, 282 came into existence at a time when

15  the patent lawyers were not so litigious.  And we now have

16  procedures in place that go way beyond what 282 required.  And

17  one of those is our local rules that require disclosure of

18  prior art.

19       And so you did, on the Juniper side -- I think this is

20  correct -- list in your prior art disclosures these items that

21  are -- you're criticized on now.  Is that true?

22          **MR. KAGAN:**  It is true, Your Honor.  But if I may

23  introduce Kevin Wong to answer this.

24          **THE COURT:**  A new lawyer.

25          **MR. KAGAN:**  I can do it, Your Honor.

PROCEEDINGS

1          **THE COURT:**  All right.  You do it.  All right.

2      But then we got to looking and read closer what Mr. Andre

3  was complaining about.  So I said, well, maybe he's got a

4  point, but maybe not.  Let me look.

5      So he says -- let's just start with the very first one.

6  Trial Exhibit 1070.  I'm reading now from exactly what

7  Mr. Andre filed.  Trial Exhibit 1070:

8          "Dynamic detection and classification of a computer

9          viruses" -- no, -- "of computer viruses using general

10         behavior patterns, Morton Swimmer."

11     Then Mr. Andre continues:

12         "This document references September 1995.  There is no

13         evidence that this is the date of publication, and Juniper

14         has not affirmatively asserted the date of publication."

15     Now, I'm going to repeat that last part of the phrase.

16  This is Mr. Andre talking:  "And Juniper has not affirmatively

17  asserted the date of publication."

18     So I said, well, all right, let me -- I said to my law

19  clerk, go dig out the invalidity contentions that -- do we have

20  the invalidity contentions here?

21     And she went and did some homework, and eventually we

22  found -- it took some time.  This is not something we just push

23  a button and there it is.  I got one person.  Look at all the

24  people you have.  I got one person.

25     So she found Defendant Juniper Networks patent LR33

 1   invalidity contentions.  And this is dated in December of

 2   last -- this is odd.  Okay.  Yeah, filed December 11th, 2018.

 3   But seems like this would have been earlier.

 4          MR. KAGAN:  Your Honor, I believe that is the date of

 5   the exhibit as opposed to the date of the disclosure.

 6          THE COURT:  Yes.  The date of the disclosure would

 7   have been earlier, but I'm trying --

 8          MR. ANDRE:  April 23rd, Your Honor.

 9          THE COURT:  All right.  April 23rd.  All right.

10       Anyway, so -- April 23rd.  So I find Morton Swimmer on

11   here.  And here it is.  Couldn't be clearer.

12          "Dynamic detection and classification of computer

13          viruses using general behavior patterns by Swimmer,

14          hereinafter Swimmer."  And then period.

15       And then here's exactly what Juniper says:

16          "Swimmer was published in September 1995 and is thus

17          prior art," blah, blah, blah.

18       I'm going to repeat it:

19          "Swimmer was published in September 1995."

20       Now, compare that to what Mr. Andre said:

21          "There is no evidence that this is the date of

22          publication, and Juniper has not affirmatively asserted

23          the date of publication."

24       Well, that's just as false as the day is long.  You say

25   Juniper has not affirmatively asserted the date of publication,

1   but this document that I read from -- says Swimmer was

2   published in September 1995.

3       Well, when I got to that absolutely false statement by

4   Mr. Andre -- Mr. Andre -- I said this motion is denied.  We

5   don't have time to go through every one of these items.

6   Whenever there is a false statement that bad, I'm going to deny

7   the motion.  So the 282 motion is history, is denied.

8       And, Mr. Andre, you should not have done that to me.

9           MR. ANDRE:  Your Honor, I apologize if that was --

10          THE COURT:  What do you mean "if"?  How did you expect

11  me to -- because I took it that maybe there was a problem here.

12  I spent some time on this.  And it turns out it was just BS.

13  It was just big firm BS.

14          MR. ANDRE:  I apologize, Your Honor, to the Court, for

15  wasting the Court's time on that.  We were under the belief

16  that a formal 282 disclosure was required.  I --

17          THE COURT:  Yeah.  That's a different point.  You made

18  an affirmative factual statement that they had never

19  affirmatively asserted the date of publication.  They did.

20  They did exactly that in their local rule disclosure.  So, you

21  know, too bad for you, but this motion is denied.

22      And then the 282 thing, I'm going to find that they

23  adequately put you on notice of what they were going to be

24  asserting here at trial.

25      And I need the help of the lawyers.

PROCEEDINGS

1      On your side over there, you want to have it both ways.

2      On your side over there, you made a lot of wasted time

3  overnight on your case.

4      All right.  I've now vented.  I'm ready to try to help the

5  lawyers with whatever problems you have this morning.

6      Please, go ahead.

7          MR. ANDRE:  Your Honor, the first thing we want to

8  raise are demonstrative exhibits that were provided to us for

9  Juniper's expert, Dr. Rubin.  They've provided 148 pages of

10  demonstratives.

11          THE COURT:  Were these attached to the report?

12          MR. ANDRE:  They were not.

13          THE COURT:  Okay.  It's out.  O-u-t.  It's out.  No.

14          MR. GLUCOFT:  Your Honor, this is Joshua Glucoft.

15      Every single demonstrative was, in fact, attached to

16  either Dr. Rubin's rebuttal report October 11th or

17  November 7th, which was related to damages.  The only

18  exceptions are excerpts of patents or printed publications that

19  were expressly cited and, in most cases, quoted in his report.

20      And I understand that Your Honor's standing order allows

21  for things that are unequivocally in the expert reports to

22  be --

23          THE COURT:  Well, all right.  Okay.

24          MR. GLUCOFT:  -- in the demonstrative form.

25          THE COURT:  What I heard, is that true?

PROCEEDINGS

1          **MR. ANDRE:**  That's not correct, Your Honor.  So, first

2     of all --

3          **THE COURT:**  Give me one of the -- let's just take one.

4     You say you've got 300.  Give me your best example of something

5     they want to use which was not in any way put into the report.

6          **MR. ANDRE:**  This was the -- they have several

7     statements here.  It says Claim 10 is not inventive.  This is

8     regarding 101.  In their 101 report, they did not attach any

9     demonstratives whatsoever, zero.

10         So what they tried to do is bootstrap demonstratives into

11    their rebuttal, the damages report.  And Your Honor ruled on

12    this already.  I brought this up at the pretrial.

13         And Your Honor said there's no way -- "You can only use

14    demonstratives with the part of Dr. Rubin's testimony that ties

15    exactly to where he disclosed it.  You can't piggyback some

16    later disclosure and then say, oh, well, the judge is going to

17    let it in."

18         **THE COURT:**  Well, look.  What he can -- if he attached

19    it -- look, if -- he's wearing two hats here; right?  He's got

20    two reports?

21         **MR. GLUCOFT:**  Three reports, Your Honor.

22         **THE COURT:**  All right.  When he is testifying on the

23    part of his report to which those exhibits were attached, he

24    can use those demonstratives.

25         But, see, this is another big-firm trick.  What you want

**PROCEEDINGS**

1  to do is you don't want -- you're hoping that you don't even

2  get to -- we don't even get to damages so you don't even have

3  to put that part of your case on.

4      So you want to now use that part of the report for -- and

5  say he can use those demonstratives on some early report.  I'm

6  not going to let you do that.

7      So if he testifies on damages, then he may attach -- he

8  may use anything that was literally attached.  That's okay.

9  That's going to be the ground rule.  That's what I said before.

10          **MR. ANDRE:**  And so, Your Honor, what he did was, on

11  his 101 report, which they have the burden of proof, he didn't

12  attach any demonstratives at all.  But then on his

13  noninfringement report and his damages report, he attached the

14  101 slides from his first report.

15          **THE COURT:**  Well, he can use them on the damages part.

16          **MR. ANDRE:**  But 101 is -- that's --

17          **THE COURT:**  Look --

18          **MR. ANDRE:**  Okay.

19          **THE COURT:**  -- I'm not going to -- it's a big -- I

20  hate to keep saying big-firm trick.  I was with a big --

21  listen, I know all the tricks.  I was with a big firm.  And I

22  don't like them.  And I didn't do them myself, but I know them

23  when I see them.  And we're not going to let you get away with

24  that.

25      It should have been on that opening report.  Except if

1   he -- if we get to the damages part, whatever they were

2   attached to, if he testifies on that segment, then in

3   connection with that testimony he can use those exhibits.

4        **MR. ANDRE:**  And, Your Honor, with respect to the --

5   the majority of the 149 pages of exhibits, they went through

6   and took the prior art and excerpted pieces out of it.  That

7   was not in his report.  And they say that you're --

8        **THE COURT:**  Well, if it's in his report, it's okay.

9        **MR. ANDRE:**  But the demonstrative is not in there.

10       **THE COURT:**  That's all right.  I'm going to let them

11  do that.  If it's in the report, I think that's okay, unless

12  there's -- if it's -- if it's something egregious like they've

13  got a guy driving a stake through the heart of the vampire.

14       (Laughter)

15       **MR. ANDRE:**  They have something similar to that.

16       **THE COURT:**  No, no.  But if it's just quoting from a

17  prior art, I'm going to let them do that.

18       **MR. ANDRE:**  Well, it is a -- it's just not quoting,

19  it's characterizing as well.  But, like I said, Your Honor,

20  we'll cross --

21       **THE COURT:**  I think it's probably okay.

22       **MR. ANDRE:**  Well, okay.  I've been heard.

23       **THE COURT:**  All right.  You're done.

24       Okay.  Anything on your side?

25       **MR. HEINRICH:**  Yes.  So two items.  One is we wanted

1    to know how Your Honor handles Rule 50(a) motions.  They'll be

2    resting today --

3         **THE COURT:**  What is that?  What do you mean by that?

4         **MR. HEINRICH:**  Our JMOL on the issues on which they

5    have the burden after they've rested.

6         **THE COURT:**  I will hear what you have to say, but I

7    can't guarantee you that I'm going to make a ruling.  So you

8    better be prepared to move very promptly with your case.

9         It could be what I'm going to say is start -- I'm not

10   going to let -- I will say this.  The jury will not -- we will

11   not waste their time.

12        If there is, say, 30 minutes left in the day, you have to

13   use that 30 minutes.  And we might argue your motion later, but

14   we're not going to -- you're not going to get away with the

15   jury cools their heels while the lawyers drone on.

16        **MR. HEINRICH:**  We're absolutely ready to just proceed

17   with our case.  I just wanted to ask the Court about the

18   Court's practice in terms of the process.  When they rest,

19   would you like to hear oral an motion?

20        **THE COURT:**  What I might say is all Rule 50 motions

21   are deemed reserved until the jury goes home for the day or

22   maybe until after the trial is over.  We'll just have to see.

23        But I will give you a chance, after the jury has gone home

24   for the day, for sure, to make your main points.  But it'll be

25   like a 5-minute motion.  It's not going to be lawyers drone on.

PROCEEDINGS

1          **MR. HEINRICH:**  That's all I was asking.  I just wanted

2  to know the process.

3          **THE COURT:**  All right.  Can you all see now why it is

4  that the judge takes with a grain of salt what the lawyers tell

5  him?  I hope on both sides you can see that your integrity and

6  credibility means a huge amount.  I have to be able to -- I

7  begin to have doubts that I can rely upon anything.

8      So make your best points, okay.  I'm not criticizing you

9  now.  I'm saying on your Rule 50 motion you should make your

10  best points.

11          **MR. HEINRICH:**  Understood.

12          **THE COURT:**  All right.

13      What do you have to say?

14          **MS. MARTINEZ:**  Good morning, Your Honor.  Cristina

15  Martinez.

16      We have some objections to cross exhibits that were

17  disclosed for our witness, who's going to be testifying today,

18  Mr. John Garland.  Juniper disclosed various license agreements

19  that --

20          **THE COURT:**  Various what?

21          **MS. MARTINEZ:**  License agreements, and negotiations

22  regarding these license agreements.  And our concern is

23  twofold.  First, we have a concern about some confidentiality

24  requirements.  We raised the motion to seal with Your Honor

25  yesterday, which was denied.

PROCEEDINGS

1      But we just wanted to make sure that -- we're not quite

2   sure how Juniper is planning on using the agreements, but there

3   are some --

4          THE COURT:  Well, they're probably going to say

5   there's 2 percent royalty in that document, 5 percent royalty

6   in that document.  But I think that's okay.

7          MS. MARTINEZ:  And it's including mentioning the names

8   of some of the licensees.  We just wanted to flag that issue

9   for the Court.

10         THE COURT:  I think that should -- there is some -- I

11  recognize there is some -- not proprietary; that's too strong a

12  word -- business reason for wanting to keep it secret because

13  every company wants to -- doesn't want its information out

14  there.  But, nevertheless, it's not that big a deal.

15      And here we are in a trial.  We are the United States

16  District Court.  The public has a right to look over our

17  shoulder and see what we're doing.  We are not JAMS.  We are

18  not AAA.  We belong to the people of the United States, not to

19  your -- Finjan and not to Juniper.  We belong to the people of

20  the United States.

21      And you all have brought yourselves in here.  You're the

22  plaintiff.  These are documents that -- so, I'm sorry, they're

23  going to be laid open to the public.

24      All right.  End of that story.  What's next?

25         MS. MARTINEZ:  The second point, Your Honor, is

**PROCEEDINGS**

1    several of the licenses that they've disclosed and the

2    negotiations relate to licenses that the Court found -- did not

3    allow their expert to rely upon.

4        In the *Daubert* order, the Court found that only two

5    license agreements were comparable for purposes of establishing

6    a reasonable royalty.

7            **THE COURT:**  I don't remember it.  If that's what I

8    said, then you should only -- you shouldn't be using them on

9    cross-examination, something that I said was not a comparable.

10           **MR. KAGAN:**  Well, Your Honor, with Mr. Garland we're

11   not going to be using those licenses to show the value or the

12   amounts of the licenses where the Court's excluded it.

13       We are going to be using those licenses to show that

14   Finjan has licensees who are practicing the patents, who are

15   not marking, which is a completely different issue than the

16   values of the license.

17           **THE COURT:**  All right.  What do you say to that?

18   That's a fair point.  What's wrong with that?

19           **MS. MARTINEZ:**  I think now that we have a little

20   clarification about how they're being used, the concern that we

21   had was that they would be introducing information about the

22   amount of these licenses, and so forth, without an

23   opportunity -- without establishing that technical and economic

24   comparability and suggesting to the jury that the -- that they

25   can look at these licenses and have it inform their analysis of

PROCEEDINGS

 1   the appropriate damages.

 2          **THE COURT:**  How about this.  When you get to one of

 3   those, don't introduce it in evidence.  Just show it to the

 4   witness and say, Isn't it true that you entered into a license

 5   agreement with Intel, and you didn't require marking and they

 6   never marked?"

 7          And then -- and if it turns out the witness gives you a

 8   runaround, then I'll let it come into evidence, the whole thing

 9   come into evidence.  And then I'll give an instruction that

10   it's limited only to the marking issue.

11          I have to see how it plays out.  I'm giving you some

12   general guidelines.  I don't know the documents well enough,

13   and I haven't seen how evasive the witness is going to be.  So

14   we'll just have to play it by ear.

15          **MS. MARTINEZ:**  Understood.  Thank you, Your Honor.

16          **MR. KAGAN:**  Thank you, Your Honor.

17          **MR. HEINRICH:**  And I have one more process question

18   for the Court.

19          **THE COURT:**  Yeah.

20          **MR. HEINRICH:**  So the Court overruled our objections

21   to Ms. Gupta's deposition testimony on financial issues.  She

22   was asked a number of questions about revenues that were

23   attributable solely to SRX alone, not used in combination with

24   Sky ATP.

25          And there were two --

PROCEEDINGS

1          THE COURT:  So what?  If you're trying to go back and

2     revisit something, I'm not going to do it.

3          MR. HEINRICH:  So I have -- it's a process question.

4     There were two exhibits that were used in her deposition.

5     These were exhibits that Finjan's counsel created from our

6     spreadsheet.

7          THE COURT:  Yeah.

8          MR. HEINRICH:  And to preserve our objections to these

9     exhibits, these are Trial Exhibits 490 and 494, can we just

10    state our objections on the record here, or do we need to

11    object during the deposition play?

12         THE COURT:  I don't care.  Now is good enough.

13         MR. HEINRICH:  Okay.  Great.  So we do object to 490

14    and 494.

15         THE COURT:  Are those the trial numbers or the depo

16    exhibit --

17         MR. HEINRICH:  Trial exhibit numbers.

18         THE COURT:  All right.  You can do that now.

19         MR. HEINRICH:  We object on relevance and 403 grounds.

20         THE COURT:  Okay.  Thank you for that.

21      What do you have?

22         MR. KASTENS:  Kristopher Kastens, Your Honor.

23      This is related to the license issues that were just

24    discussed.

25         THE COURT:  Is this double teaming?

PROCEEDINGS

```
1          MR. KASTENS:  No.  I'm sorry.  It's with a different

2     witness.

3          THE COURT:  You're the second guy to come up.

4          MR. KASTENS:  With one of their fact witnesses they

5     disclosed a bunch of licenses that were excluded from their

6     expert -- being used by their expert as comparable licenses.

7          We would just like an understanding of whether they can

8     introduce those through a fact witness even though --

9          THE COURT:  Well, that's what she just asked me.

10          MR. KASTENS:  Your Honor, it's just --

11          THE COURT:  And I said if it was for marking, it was

12     okay.

13          MR. KASTENS:  Well, these are their licenses.  These

14     aren't Finjan's.

15          THE COURT:  Oh, these are their licenses?

16          MR. KASTENS:  Yes, Your Honor.

17          THE COURT:  All right.  That's a different point.

18          Okay.  What do you say to that?

19          MS. CARSON:  Sure, Your Honor.  So one of the reasons

20     that we -- reasons that we included those licenses, Finjan has

21     alleged that Juniper did not engage in good faith with it and

22     that it does not take nonpracticing entities seriously.

23          So those licenses, in part, show that Juniper does, in

24     fact, engage with nonpracticing entities and has actually taken

25     many licenses with non- --
```

PROCEEDINGS

1          THE COURT:  Why can't one of your witnesses just say

2     that --

3          MS. CARSON:  We may be able to accomplish it that

4     way --

5          THE COURT:  -- instead of putting all that paperwork

6     in?

7          MS. CARSON:  Yeah.  It really depends on how the

8     evidence comes in and whatnot.

9          THE COURT:  Well, but I don't want those coming into

10    evidence if they've got numbers in there that I've already

11    ruled out are irrelevant.

12         MS. CARSON:  Understood, Your Honor.

13         THE COURT:  You'd have to redact that and say, you

14    know, big blank.  All right.

15         MS. CARSON:  Understood.

16         MR. KASTENS:  Thank you, Your Honor.

17         THE COURT:  All right.  So.

18         MR. HANNAH:  Your Honor, can I do one more?

19         THE COURT:  How many of these are there?

20         MR. HANNAH:  Well, Your Honor, I think this is simple.

21    This is their first fact witness.  He has some demonstratives

22    in there.  And I can just hand this -- if I can just hand this.

23         THE COURT:  This is your fact witness?

24         MR. HANNAH:  No, their fact witness.  Their first

25    witness, Mr. Bushong.

1        **THE COURT:**  Why does a fact witness have

2    demonstratives?

3        **MR. HANNAH:**  Oh.  That's one of our first issues.  And

4    then the other issue is --

5        **THE COURT:**  Who is the witness going to be?

6        **MS. KOBIALKA:**  Mr. Bushong.

7        **THE COURT:**  All right.

8        **MR. HANNAH:**  So they have all of these demonstratives

9    in here that are talking about projected Sky ATP revenues and

10   margins.

11       As you can see, these are pulled out of thin air.  He

12   wasn't at the company at the time in 2015 when, apparently,

13   these projections were made.

14       **THE COURT:**  Why would this be demonstrative?

15       **MS. CARSON:**  So it's an excerpt from a larger

16   spreadsheet that is an electronic document.  So it's an

17   exhibit, an excerpt from an exhibit that we --

18       **THE COURT:**  Was it previously produced?

19       **MS. CARSON:**  It was, Your Honor.

20       **THE COURT:**  So all this information was previously

21   produced?

22       **MS. CARSON:**  Yes.

23       **THE COURT:**  What's wrong with that?

24       Is it going to otherwise be in evidence, the big document?

25       **MR. HANNAH:**  No, Your Honor.  So that's the issue, is

PROCEEDINGS

 1   the 11- -- Trial Exhibit 1170, it's an electronic spreadsheet.

 2   It's huge.  And they try --

 3        THE COURT:  Is this information in there?

 4        MR. HANNAH:  This is a snippet.  This is not the

 5   complete information.

 6        THE COURT:  No, no.  My point is, is all of this

 7   information in that gigantic trial exhibit?

 8        MR. HANNAH:  That information is in the exhibit.

 9        THE COURT:  Well, what's wrong -- they want to -- they

10   want to make it convenient to the jury to zero in on something

11   that's otherwise going to be in evidence anyway.

12        MR. HANNAH:  Well, Your Honor, that spreadsheet has

13   the actual numbers, not these projected -- these projected

14   rates.

15        THE COURT:  No, no.  You told me that these exact

16   numbers were in there.

17        MS. CARSON:  That's correct, Your Honor.

18        MR. HANNAH:  So, Your Honor, it actually cuts off --

19   as you can see, it goes to 2017.  The spreadsheet goes to 2018.

20   So they cut off certain quarters and certain -- so they dice up

21   this -- this spreadsheet that was produced.  I don't think it's

22   appropriate for a fact witness.

23        THE COURT:  Is this massaged in any way?

24        MS. CARSON:  It is an excerpt that focuses on the

25   damages period because --

PROCEEDINGS

1          THE COURT:  If I went and looked at the spreadsheet

2    that's in the long exhibit, electronic exhibit, would the

3    numbers appear exactly this way?

4          MS. CARSON:  Yes, Your Honor.

5          THE COURT:  One of you is not telling me the truth.

6          MR. HANNAH:  Your Honor, it has -- she just said.  So

7    ask her, does 2017 -- is Quarter 2 from 2017 in the exhibit, in

8    1170?

9          THE COURT:  Answer that question.

10         MS. CARSON:  There is additional information in the

11   exhibit.  We've excerpted the part that's relevant to this

12   case, which is the time period from when Sky ATP was launched

13   through Q1 of 2017 when the patent expired.

14         THE COURT:  Is this in any way where you've collapsed

15   columns into one column?  In other words, is this in any way

16   different from what's in the computer?

17         MS. CARSON:  The spreadsheet part is not.  The

18   annotations we have added, that add up the columns.  So the

19   1.1 million, that adds up -- do you see the annotation?

20         THE COURT:  So the big numbers are all added, but this

21   information is exactly the way it appears even though it's just

22   an excerpt?

23         MS. CARSON:  That's correct, Your Honor.

24         THE COURT:  Well, if that's true, it's okay.  I would

25   allow that.  And it's not going to come into evidence, just a

1    demonstrative; right?

2          **MS. CARSON:**  That's correct, Your Honor.  We will put

3    the full exhibit into evidence.

4          **MR. HANNAH:**  That's our other issue, Your Honor.  They

5    want to put in the -- they want to put in an electronic

6    spreadsheet and send that back to the jury.  I don't think

7    that's appropriate.

8          **THE COURT:**  Well, now you're trying to keep them from

9    putting in anything.

10         **MR. HANNAH:**  They should have used their PDFs that

11   they have of the spreadsheet, that were produced and used

12   during deposition.  Their expert uses it.

13         **THE COURT:**  I'm going to let them view the

14   electronic -- we have electronic reading equipment.  The jury

15   can enjoy themselves by going through that thing.

16      No.  You can put it into evidence if you've got a proper

17   foundation laid.  And you can use this based on your

18   representation.  Please, it better be true.

19      And you can cross-examine all day long.  If you show me

20   that they have -- what she said was not true, then she'll be in

21   trouble.  But I'm taking her word for it for now.

22         **MR. HANNAH:**  Right, Your Honor.  And then that would

23   be the -- if the entire spreadsheet is going to go back into

24   evidence, that's fine.  We just don't want excerpts.

25         **THE COURT:**  Well, yeah, the whole --

PROCEEDINGS

1          **MR. HANNAH:**  The whole --

2          **THE COURT:**  Whatever that trial exhibit is, is going

3     to go back there, and the jury can stick it in the computer and

4     say, look at this --

5          **MR. HANNAH:**  Run some scripts.

6          **THE COURT:**  -- quarter number 2 of 2014 --

7          **MR. HANNAH:**  Do some pivot tables --

8          **THE COURT:**  -- look at this.

9          **MR. HANNAH:**  -- yeah.

10        All right, Your Honor.  Thank you.

11         **THE COURT:**  Thanks.  All right.  Let's bring in our

12    jury.

13        Who is our witness on the stand?  Dr. Cole.

14         **MR. ANDRE:**  We have Dr. Cole.  Would you like him to

15    come up now?

16         **THE COURT:**  Yes.  Come on up here and let's get

17    started.

18        Bring in our jury.

19         **THE CLERK:**  Mr. Cole, when you take the stand, please

20    remember you're still under oath.  Thank you.

21         **THE WITNESS:**  Good morning, Your Honor.

22         **THE COURT:**  Good morning.

23        Are you going to finish your case today?

24         **MR. ANDRE:**  Yes.

25        (Jury enters at 8:01 a.m.)

1              THE COURT:  Thank you.  Welcome back.  Have a seat.

2        And how is everybody health-wise?  Your health holding

3   out?  Washing your hands so you won't get the flu or something?

4   Got your notepads ready.  You look like you're ready to go.

5        You will remember that Dr. Cole was on the stand for some

6   time yesterday.  And we have some more questions by Mr. Andre,

7   then we'll get to the cross-examination.

8        And so, Mr. Andre, the floor is all yours.

9              MR. ANDRE:  Thank you, Your Honor.

10       May it please the Court.

11                        **ERIC COLE**,

12   called as a witness for the Plaintiff, having been previously

13   duly sworn, testified as follows:

14                **DIRECT EXAMINATION (RESUMED)**

15   BY MR. ANDRE:

16   **Q.**   Good morning Dr. Cole.

17   **A.**   Good morning.

18   **Q.**   So, Dr. Cole, your energy is going to be really tough at

19   8 o'clock in the morning, but that full energy -- just don't

20   blow the ears off of the court reporter here.

21   **A.**   When I get to talk cybersecurity and databases, I get a

22   little excited.

23             THE COURT:  You need a cup of coffee.

24        (Laughter.)

25

1    BY MR. ANDRE:

2    Q.   So yesterday we were talking about how the Sky ATP product

3    processes, files that come in from the Internet.  Do you recall

4    that?

5    A.   Yes, I do.  Talking about that downloadables and how it

6    creates the security profile.

7    Q.   Let's talk a little bit about how once the files get to

8    the Sky ATP, how the scanning process works.

9         And you have your exhibit book up there.  Turn to Exhibit

10   78, Trial Exhibit 78.

11        Is this one of the documents you relied upon in forming

12   your opinion?

13   A.   Yes, it is.

14        MR. ANDRE:  Your Honor, I would like to move and

15   publish Exhibit 78 for the record.

16        THE COURT:  All right.

17        MS. CARSON:  No objection, Your Honor.

18        THE COURT:  I'm sorry, I didn't hear.

19        MS. CARSON:  No objection.

20        THE COURT:  78.  Okay.  That's in.

21        Go ahead.

22        (Trial Exhibit 78 received in evidence.)

23   BY MR. ANDRE:

24   Q.   Dr. Cole --

25        MR. ANDRE:  Could we get that published?  Thank you.

1        (Document displayed.)

2    **BY MR. ANDRE**

3    **Q.**   -- what is this document?

4    **A.**   This is a Juniper document that talks about Sky ATP, the

5    Sky Advanced Threat Prevention guide that goes over how the

6    product works and how it operates.

7    **Q.**   If we turn to page 19 of this document, you'll see a

8    section about the middle way through, it says, "How malware is

9    analyzed and detected."  Do you see that?

10   **A.**   Yes.

11   **Q.**   Could you describe, at a high level, to the jury how

12   malware is analyzed and detected by the Sky ATP?

13   **A.**   So at the end of the day yesterday we had the animation

14   where we showed that a user or a group of users would request a

15   downloadable; it would be intercepted by SRX, go out to the

16   Internet, come back.  And that downloadable would get past the

17   Sky ATP and it would do processing.

18        This is a little more detail of how the processing works.

19   So what will happen is, when Sky ATP receives that downloadable

20   from a potentially harmful website, the first thing it's going

21   to do is look up in a database, known as cache, to be able to

22   see has it analyzed this downloadable before?

23        And in order for that caching to work, that information

24   has to be stored in a database with a structure or a schema so

25   the cache can very quickly be able to look it up, see if it has

COLE - DIRECT / ANDRE

1    a verdict on it and return that verdict.

2        If there isn't an entry in the database, that means that

3    Sky ATP has not seen this downloadable before.  This is a new

4    downloadable.  And then it's going to go through a process

5    where it's going to do the old antivirus scanning.  Then it's

6    going to focus in on generating the security profile, which is

7    done in two steps.  You have a static analysis and a dynamic

8    analysis.

9        The static analysis is going to go in and look through the

10   actual code.  It's not going to run it.  It's just going to

11   look through the source code, like JavaScript -- you might have

12   heard of that -- and go in and see is there any suspicious

13   operations?

14       Then it's going to go and run it in what we called a

15   sandboxed environment.  That's dynamic analysis.  That's where

16   it actually executes the executable in a controlled environment

17   so it can watch and look at how the executable is behaving.

18   And then that's also used to create the security profile.

19       Once it has that security profile from both static and

20   dynamic, it's then put back in that caching database.  So now

21   if somebody else out there in the world gets hit with that same

22   downloadable, it can now look it up in that structured database

23   very easily and very quickly in order to return a verdict a lot

24   quicker as opposed to having to go in and rerun that static and

25   dynamic analysis each time.

1   Q.   If you go to the next page of Exhibit 78, page 20, you'll

2   see the section you just talked about lined out in detail.

3   This is page 20 of Exhibit 78.

4       And the first one talks about cache lookup.  Do you see

5   that?

6   A.   Yes.

7   Q.   So would you read that first sentence into the record and

8   elaborate on what that is referring to.

9   A.   "When a file is analyzed, a file hash is generated" -- A

10  file hash is just a unique identifier of that file.  You can

11  think of it like a fingerprint of a human, a quick way to be

12  able to identify that file. -- "and the results of the

13  analysis" -- and the results of the analysis is the security

14  profile, so it's saying we're taking the security profile and

15  the unique identifier of the downloadable and are storing it in

16  a database.  So Juniper's documents are stating that they're

17  taking that file and that security profile and they're storing

18  it in that database.

19      And the whole idea of the database is so now when somebody

20  else gets hit with that same downloadable, it can look it up

21  very quickly to be able to make a determination, which means

22  that database, in order for this product to work and in order

23  for it to function, is going to have to have a structure and a

24  schema so this way it can easily look up that information.

25      If this data was just all organized and there was no

1  structure or no organization to it, there's no way you would be

2  able to quickly look it up, and there's no way the system would

3  be work properly.

4       So that's why they're using a very structured database

5  with a schema to be able to very quickly look up that

6  information.  And that's the whole method of how the system

7  functions when it's looking at a downloadable that it's seen

8  before.

9  **Q.**   We'll skip the antivirus section.  That's the old stuff.

10      So let's just get to the -- the next step is the static

11  analysis.  And the first sentence reads:  "Static analysis

12  examines the file without actually running them."

13      Could you just describe, very briefly, what that's

14  referring to?

15  **A.**   So a lot of the code that you're going to get from

16  downloadables or websites is what we call interpretive

17  languages.  That's something like a JavaScript.  Well, you can

18  actually go in and you can actually see the JavaScript on your

19  system.

20      Once again, I know you can't do any research until after

21  the case is over, but after the case is over, if you're surfing

22  a website in your browser, you could just hit F12 and you can

23  actually see that actual code.  So if you want to observe that,

24  you'd be able to see it.

25      And that's what static analysis is doing.  It's taking

1  that code and just looking through it and saying, Is there

2  anything suspicious?  Are there any suspicious operations here

3  that we need to be aware of that we can use to build that

4  security profile?

5  **Q.**    And then the last section, the dynamic analysis, could you

6  just describe that first sentence, "The majority of time spent

7  inspecting a file is in dynamic analysis."  What that's

8  referring to?

9  **A.**    Today's attackers are very clever.  They don't want to get

10  caught.  So we sort of have this constant game.  And, to me,

11  that's what makes cybersecurity so challenging is, we're going

12  to figure out a way to detect the adversary, and then they're

13  going to figure a way around it, and then we're going to detect

14  the way around it.

15       So a lot of times, just by looking at the static code,

16  they do things called obfuscation, where they hide what they're

17  really doing.  So the only way we can really see what the code

18  is doing is actually running it, actually running it in what we

19  call a sandbox environment.

20       So now we can observe the actual execution of the code,

21  look at everything that's happening, and see if there's any

22  suspicious things that might be going on when the code actually

23  runs.  And that's called dynamic analysis.

24       So both the static analysis and the dynamic analysis

25  perform that security profile.  And then, to make it easy to

1    look up if somebody else uses that same downloadable, Juniper

2    puts it in a structured database with a schema so they can

3    quickly look up the information to make it go quicker in the

4    future.

5    Q.    And just to run over those two steps, you prepared an

6    animation just to give it a visual.

7          Could you describe the animation for the static analysis

8    as it's running here?

9    A.    Absolutely.  So in this case Sky ATP goes out and receives

10   a downloadable from SRX.  And it's scanning it, looking at the

11   static code, saying are there any suspicious operations?

12         It's then going in and listing those suspicious operations

13   that create the security profile.  And then, to make it easy to

14   reference in the future -- so, now, if this piece of

15   downloadable comes in again, it doesn't have to do that

16   analysis -- it stores it in a structured database so it can

17   easily look it up to be able to make a determination.

18   Q.    And on the next slide is the dynamic analysis in the

19   sandbox.  Could you briefly describe that in the graphic?

20   A.    In this case we receive the downloadable and we run it in

21   what we call a virtual machine or a sandboxed environment where

22   it's going to detonate or run the actual executable.

23         It's going to watch those behavioral patterns, and it's

24   going to, once again, list those operations.  And then, based

25   on the suspicious operations from the static analysis and the

1    dynamic analysis, it creates a security profile.

2        And now, so it doesn't have to do all that work every time

3    for that same downloadable over and over again, it's going to

4    store it in a database that's very structured, very easy to

5    find, so it can look the information up very, very quickly

6    according to that schema and be able to make a future

7    determination a lot quicker and a lot faster.

8    Q.   If we go to Trial Exhibit 79 in your book, is that an

9    exhibit that you relied upon in forming your opinion?

10   A.   Yes, it is.

11       **MR. ANDRE:**  Your Honor, I'd like to move and publish

12   Exhibit 79.

13       **MS. CARSON:**  No objection, Your Honor.

14       **THE COURT:**  Thank you.  Received.

15      (Trial Exhibit 79 received in evidence.)

16      (Document displayed.)

17   **BY MR. ANDRE:**

18   Q.   What is Exhibit 79?

19   A.   This is a presentation from Juniper in which they're

20   talking about Sky ATP, the advanced threat.

21       You'll notice in some of their documentation they call ATP

22   "advanced threat prevention" and sometimes they call it

23   "advanced threat protection."  But in both cases this is the

24   core component of their security, that cloud service that's

25   going to do all that analysis and support all their products.

```
 1   And this is basically talking about how with Sky ATP Juniper

 2   Sky is now the limit.

 3   Q.   Turn to page 13 of this document.  There's a slide that

 4   says "The Verdict Chain."

 5        Could you describe how much time each one of those steps

 6   takes and why that's relevant.

 7   A.   This is a very important slide because this shows the

 8   value of the Finjan invention.

 9              MS. CARSON:  Objection, Your Honor.

10              THE COURT:  What's the objection?

11              MS. CARSON:  This testimony was excluded.

12              THE COURT:  Okay.  Is that true?

13              MR. ANDRE:  No, Your Honor.  Not that I know of.

14              THE COURT:  I don't remember.  Show me the ruling.

15              MS. CARSON:  This was our motion in limine on

16   Dr. Cole's cost analysis.

17              MR. ANDRE:  We're not putting that in, Your Honor.

18              THE COURT:  Well, I'll hear the testimony, and then I

19   may have to come back and tell you to disregard it.  Let's go

20   ahead and hear the testimony, and then we'll deal with it at

21   the next break.

22   BY MR. ANDRE:

23   Q.   Let's just talk about how much time it takes, and just

24   leave it at that.  Does that sound good?

25   A.   Yes.
```

1    Q.   Okay.  Fair enough.

2    A.   So what this is showing is each of those different methods

3    take more and more time because they require more and more

4    analysis.

5         So the cache lookup is very quick.  Looking it up in a

6    database is very quick and very fast.  And that's the value of

7    the Finjan invention.  And then as you start going in and doing

8    your static analysis, it jumps up to 30 seconds.

9         And then when you have to do the dynamic analysis, which

10   provides the most value but also takes the longest amount of

11   time, seven minutes, the time increases dramatically.

12        So the idea of the Finjan invention is --

13             MR. ANDRE:  Dr. Cole, I just want to know the time.

14             THE WITNESS:  Okay.

15             MR. ANDRE:  Your Honor, I'm sorry to interrupt the

16   witness.  Is that okay?

17             THE COURT:  That's okay.

18             MR. ANDRE:  All right.  Thank you.

19   BY MR. ANDRE::

20   Q.   So the time is really what we're focusing on here.

21        So the amount of time it takes to run the dynamic analysis

22   is considerably more than the cache lookup, apparently?

23   A.   Exactly.  So you would prefer to only have to run the

24   dynamic analysis once when you see the downloadable the first

25   time.  And then store that information in a database, as

1    opposed to having to rerun static -- sorry, dynamic analysis

2    every single time, storing it in the database where the schema

3    makes it much quicker and much faster to be able to look it up.

4    **Q.**    So, Dr. Cole, going back to the Finjan -- the Claim 10,

5    you've talked about how the flow works and how the security

6    profile is generated.

7         The last step here is talking about the database manager.

8    I want to talk about that now.  Is that okay?

9    **A.**    Yes.

10   **Q.**    Okay.  I would like you to look at Exhibit 94 in your

11   book.  Is this a document you relied upon in forming your

12   opinion?

13   **A.**    Yes, I did.

14        **MR. ANDRE:**  Your Honor, I'd like to move Exhibit 94

15   into evidence and publish it to the jury.

16        **THE COURT:**  Received.

17       (Trial Exhibit 94 received in evidence.)

18       (Document displayed.)

19   **BY MR. ANDRE::**

20   **Q.**    What is this document?

21   **A.**    This is an internal Juniper document.  You can see that

22   it's highly confidential, so this is an internal proprietary

23   document for Juniper.

24        And from yesterday, if you remember, "Argon" is the

25   internal codeword that Juniper uses to refer to Sky ATP.  So if

1  you just want to think in your mind, whenever you see Argon,

2  Sky ATP, they're synonymous, then we'll be in good shape.

3     So this is talking about Sky ATP, and this is how Juniper

4  views it internally.

5  **Q.**  And the Court had interpreted what a database manager is

6  as a program or programs that control a database so that the

7  information is contained, can be stored retrieved, updated, and

8  sorted.

9     Did you use that definition in looking at this document,

10  the Court's?

11  **A.**  Yes, I did.  I used that Court construction that a

12  database manager is in place to manage a database.

13     **THE COURT:**  All right.  I need to explain a procedural

14  thing, but it's fundamental to these patent cases.

15     You remember in that patent, the claims at the end, we're

16  dealing with Claim 10, but remember there were 18 of them

17  altogether.  When you look at the end, there are these claims.

18     If it were a simpler case, it would be talking about

19  bread, and then the claim "sliced bread" is our invention.

20  Sliced bread.

21     Well, in this one there are several elements to Claim 10,

22  and all of them have been satisfied in this case, with the

23  exception of the last one, which is for you to decide.  But

24  it's still my job to, under Supreme Court law, to decide what

25  the claims mean.  So at the end of the case, when we send you

 1   into the jury room, I'm going to tell you the, let's say, legal

 2   meaning of these various words.

 3        The one that you, again, have to wrestle over is whether

 4   or not the database element or word, really, is met.  That's in

 5   the last limitation.

 6        And so -- and that last one also has a thing called

 7   database manager, which I've already -- and what Mr. Andre just

 8   read out loud was the ruling that I made on what database

 9   manager means.

10        And so the witness is appropriately saying that he used my

11   definition, because it is my job, according to the Supreme

12   Court -- it used to be the jury's job, but the Supreme Court,

13   in the '90s, changed that, so now it's the judge's job.

14        So I have done my job, and I'm going to tell you what

15   database manager means and also what database means.  And the

16   lawyers already know what that's going to be.

17        So it's important that you understand this division of

18   labor.  I tell you what it means, and then you've got to figure

19   out if the database is there or not.  On the infringement

20   issue, that's all it comes down to:  Is the database there in

21   the accused product or not?  The jury gets to decide that.

22        All right.  Thank you for letting me interrupt, but I

23   think it's worth it to the jury in understanding that role.

24   And in this case, when he read out loud what I had done -- and

25   I told you not one word is ever evidence, that's true, but in

1  this case he's right.

2      (Laughter)

3          THE COURT:  That is what I described.  That is what I

4  defined that term to mean.  So Mr. Andre gets an A-plus because

5  he quoted me correctly.

6      All right.  Thank you.  Go ahead.

7          MR. ANDRE:  I appreciate that, Your Honor.

8  BY MR. ANDRE::

9  Q.   So if we go to page 10 of Exhibit 94, there's a slide here

10 entitled "ResultsDB Architecture."  Do you see that?

11 A.   Yes, I do.

12 Q.   Now, what has been determined to be the database manager

13 in this slide?

14 A.   It has already been determined that the Results Database

15 API, application programming interface, this is something that

16 interfaces with another component like a database, that the

17 ResultsDB API is the database manager.

18 Q.   Now, what is all that stuff to the right side of the

19 database manager?

20 A.   So as we go through the claims, you'll see there's

21 something that Juniper defined called a Results Database.  So

22 this is the architecture.  And the Results Database

23 architecture is showing the Results Database manager on the

24 left-hand side.

25      And then Juniper needed to create a database structure so

COLE - DIRECT / ANDRE

1   they could store all those security profiles and be able to

2   very easily be able to go in and reference them.  And that's

3   called your Results Database.

4       And you'll see that this is not a term I made up.  I was

5   flattered in the opening remarks that they were calling this

6   the Dr. Cole database.  But this is actually the Results

7   Database.

8       You will see testimony, you will see documents, you will

9   see source code where Juniper refers to this as the Results

10  Database.  And the thing that's important is Juniper designed

11  the Results Database.  That's software.  That's what holds the

12  information.

13      Now, what many companies do today is they don't want to

14  have to run servers.  They don't want to have to go in and have

15  a big infrastructure in a data center, so they use a third

16  party like Amazon in order to house their structure.

17      So when you hear terms like "S3" and "DynamoDB" and

18  "MySQL," that's all just the Amazon servers.  Those are the

19  Amazon servers that house the Results Database that was created

20  by Juniper, that's managed by the Results Database API that has

21  already been determined to be the database manager.

22  Q.   So let me take a step back.

23      Talking about the Amazon servers, sort of referred to as

24  AWS, could you describe -- is that the cloud?  What is that?

25  A.   Yes.  So the Amazon we were talking about, the same

1    company, Amazon, that you might have bought holiday gifts from,

2    the beast that Jeff Bezo is building to take over the world,

3    right?  Amazon.

4         And Amazon recognized that, okay, selling products --

5              THE COURT:  He will not take over the United States

6    District Court.

7         (Laughter)

8              THE COURT:  Except us out of that part.  And our jury.

9              THE WITNESS:  And our jury, yes.

10             THE COURT:  Go ahead.

11             THE WITNESS:  So Amazon is very forward thinking.  And

12   they said, listen, companies in the future are not going to

13   want to run their own servers.  They're not going to want to

14   run their own data centers.

15        So Amazon created what was called AWS, Amazon Web

16   Services, that basically houses servers for other companies.

17   So your bank that you're going in doing your online banking,

18   they might be using Amazon servers and infrastructure like

19   Dynamo and S3.

20        And that's what Juniper decided to do.  Juniper decided it

21   was better to go out to Amazon servers and use their base

22   infrastructure, which is known as Dynamo and S3.  But Dynamo

23   and S3, that's Amazon.  That's not owned by Juniper; that's

24   Amazon.

25        But in order to have their data stored and be able to be

1   accessible by their system, they had to create ResultsDB,

2   Results Database, that sits on the Amazon infrastructure in

3   order to be able to support Sky ATP.

4   **BY MR. ANDRE::**

5   **Q.**   And you mentioned the opening slide.

6          **MR. ANDRE:**   Could I go to the ELMO real quick?

7          **THE CLERK:**   Sure.

8      (Document displayed.)

9   **BY MR. ANDRE::**

10  **Q.**   So this was a slide that was shown in the opening by

11  Juniper's counsel.  It says "Dr. Cole's database."

12     Did you actually design that database?

13  **A.**   No.  I did not design or build or have any involvement

14  with that database.

15     What you will actually see over the course of the next 15

16  to 20 minutes is I will show you internal documents where

17  Juniper refers to what they're calling the Dr. Cole database,

18  that Juniper internally is referring to that as the Results

19  Database.

20     I will show you deposition testimony of their own

21  engineers in which they refer to this as the Dynamo database.

22     And then I'll actually show you source code where the

23  source code actually says "DynamoDB," and the programmers

24  actually write in the source code "database" and "schema."

25     So this is Juniper's database.  And, like I said, I take

1   the analysis very seriously.  So we will show you internal

2   documents, deposition testimony, source code that all support

3   that this box is actually what Juniper refers to as the -- as

4   the Results Database.

5   **Q.**   Thank you.

6           **MR. ANDRE:**   Could we go back.

7   **BY MR. ANDRE:**

8   **Q.**   All right.  Well, let's get to the database.  I showed in

9   my opening statement Claim 10 with several boxes checked.

10      And your job here today is just to see if you can check

11  that last box.  Is that your understanding?

12  **A.**   That is my understanding.

13      So all the boxes that are currently checked -- a system

14  for managing a downloadable, a receiver for receiving an

15  incoming downloadable, a downloadable scanner coupled with said

16  receiver for deriving security profile data for the

17  downloadable, including a list of suspicious computer

18  operations that may be attempted by the downloadable, and a

19  database manager coupled with said downloadable scanner for

20  storing the downloadable security profile data, all of that has

21  already been proven.  So we don't have to prove any of that.

22      What I need to do today is just prove that last element.

23  I just need to be able to show you that there is a database

24  that's called "Results Database" that Juniper uses to store its

25  information for that system to run.

1      And if we even step back for a second, the system wouldn't

2   work without a database.  If you went in and you had caching

3   and you had all this random data, you just had this data all

4   over the place, there was no structure to it, there was no

5   organization to it, there would be no way the system could look

6   it up in a second.  There would be no way for it to be able to

7   look up their security profiles and make a determination.

8      The only way the system would work is if there was a

9   structured database in which they could quickly look up the

10  information.

11     So just from a logical perspective, it needs to exist.

12  But I'm going to go in and show you all the documents, all the

13  source code, and all the deposition testimony to show you there

14  is an actual database called ResultsDB, or Results Database.

15  **Q.**   And let's go to the construction of "database."

16     Now, this was a construction that was agreed to by Finjan

17  and Juniper; correct?

18     This was a stipulated construction or stipulated

19  interpretation of what "database" is?

20  **A.**   Yes.  So this was the definition, and I agree with it.

21  And it's the definition I used in my analysis, that a database

22  is a collection of interrelated data that's organized according

23  to a database schema to serve one or more applications.

24     So many of you, if you do online banking, when you go into

25  your online bank and you log in and your information is

1   displayed, that's all stored in a database.  It has your first

2   name, your last name, your address, and other information.  And

3   that allows them to go in and be able to access your

4   information.

5        So just like your bank would create a database to store

6   your information, you would have Juniper create ResultsDB to

7   store the results of the system operations.

8   **Q.**   Let me take a step back first and go through this,

9   interpretate this stipulated-to construction.

10  **A.**   Okay.

11  **Q.**   Is this a -- an extraordinary construction of "database,"

12  or is this kind of a generic construction of "database"?

13  **A.**   First, I want to apologize.  I sometimes get too excited

14  and get ahead of myself, so I'll try to follow.

15       Yes, this is a very standard definition, very traditional

16  definition.  This is what you would see in any computer

17  dictionary or any textbook on databases in a college.

18  **Q.**   And did this definition come from the IBM Dictionary for

19  "database"?

20  **A.**   Yes, so this definition came from the IBM Dictionary.  So

21  very standard, very traditional definition that's used in the

22  industry.

23  **Q.**   And we'll go through the construction as we go through the

24  database.  Is that okay?

25  **A.**   Yes.

1    **Q.**   Okay.  Well, let's ask the $64,000 question:  Does Juniper

2    use a database?

3    **A.**   Absolutely.  They absolutely use a database.

4            **MR. ANDRE:**  Let's go back to Exhibit 78.  It's already

5    in evidence.  Publish that.

6        (Document displayed.)

7    **BY MR. ANDRE:**

8    **Q.**   Go to page 20 of this document.  It will be on your

9    screen.  The very first sentence under the cache lookup, it

10   says, "When a file is analyzed, a file hash is generated and

11   the results of the analysis are stored in a database."

12       How did that inform your opinion that Juniper uses a

13   database?

14   **A.**   This makes it crystal clear.  Remember, this is a Juniper

15   document, written by Juniper, in which they say when a file is

16   analyzed, a downloadable is analyzed, a hash is generated,

17   which is a unique identifier.  And the results of the analysis,

18   which is the security profile, are stored in a database.

19       So, to me, this one piece of evidence clearly shows that

20   there is a database.  Juniper acknowledges that there's a

21   database and it stores the security profile.

22       Now, technically, we could stop here, but we're not.

23   We're going to continue to show you more evidence to support

24   that.  But right here Juniper is clearly saying that Sky ATP

25   stores the security profile in a database.

1    **Q.**   Go back to Exhibit 94, which we just looked at earlier,

2    the architecture document.  And go to page 10.

3        (Document displayed.)

4    **Q.**   And just to be crystal clear, is everything on the

5    right-hand side of the ResultsDB API, the database that you're

6    talking about, the Results Database?

7    **A.**   Yes, it is.  So as you can see, this is the results -- DB

8    is database -- so Results Database architecture, where this is

9    showing the database manager on the left-hand side.

10       And then, in order to be able to allow those downloadables

11   to be looked up in that security profile, Juniper had to go in

12   and create a database with a schema called ResultsDB, that sits

13   on top of the Amazon servers, which are your Dynamo and your

14   S3.  So ResultsDB is the database that sits on top of the

15   Amazon servers.

16   **Q.**   Dr. Cole, you're aware that Juniper is taking a position

17   here that the Results Database is not a database, it's just an

18   interface.  Have you heard that position?

19   **A.**   Yes, I did hear that position.  And based on the

20   documents, the deposition testimony, and the source code, I do

21   not agree with that position.

22       And you will see already, we showed you a Juniper

23   document, we'll continue to show you additional information

24   where Juniper clearly states ResultsDB is a database with a

25   schema.

1   Q.   Go to the next page of this architecture document.  You'll

2   see something that says "Speaker Notes for Slide 6."  Do you

3   see that?

4   A.   Yes.

5   Q.   Just read the first sentence to the jury and give us your

6   expert opinion as to what the speaker is talking about here.

7   A.   Once again, these are the notes that were written by

8   Juniper's internal folks when they put together this

9   presentation.

10      And they state, "It is difficult to find one database that

11  could satisfy many different storage needs in one stop,

12  especially if the needs are very different."

13  Q.   And if you go down, there's a series of numbers.  The next

14  sentence says, "So we built a hybrid solution on top of AWS

15  existing storage services."

16      Do you see that?

17  A.   Yes.  So this sentence is 100 percent consistent with what

18  I've been saying, is that Juniper had to create a ResultsDB.

19  That's the hybrid solution.  So the hybrid solution is Results

20  Database that sits on top of AWS -- that's Amazon Web

21  Services -- that's the S3 and DynamoDB, in order to be able to

22  support the solution.

23      So they had to create the ResultsDB that sits on top of

24  the Dynamo and S3 Amazon Services in order to support the

25  system.

1   Q.   And did you rely on the deposition testimony of Juniper's

2   engineers in coming to your opinion?

3   A.   Yes, I did.  That was one of many pieces of information I

4   relied on in drawing my conclusion.

5   Q.   Now I want to show you a clip of the deposition we played

6   for the jury yesterday from Mr. Nagarajan.

7        Could you describe how this deposition testimony informed

8   your opinion as to whether or not they use a database -- or

9   Results Database is a database.

10  A.   So here he is asked:

11           "What is the Results Database?"

12       And he says:

13           "I'll repeat.  So the Results Database, whatever you

14       see in the code, is just your DynamoDB, which has a key.

15       And you can directly link to the JSON file, which has all

16       the behaviors of the adapters."

17       Now, "adapters" is another word for the static and dynamic

18  analysis.  They just refer to the adapters as what generates

19  that security profile and that the JSON profile is stored in

20  S3.

21       So this, I'm getting a little ahead of myself, but that's

22  referring to the schema, which we'll get to in a few slides.

23       But it says:

24           "So the Results Database is a combination of the

25       Amazon Services, DynamoDB and S3?"

COLE - DIRECT / ANDRE

1        And he says:

2            "Yes, it's a combination of the DynamoDB and the

3        information in S3."

4        So their own engineers are saying that Results Database --

5    he did not say there is no Results Database.  He said the

6    Results Database sits on top of the Amazon Services, which are

7    the S3 and the Dynamo.

8    Q.   If we go to Exhibit 99, this is the source code you

9    referred to earlier.

10       Did you rely on the Juniper source code in forming your

11   opinion?

12   A.   Yes, I did.

13           MR. ANDRE:  Your Honor, I'd like to move Exhibit 99

14   into evidence and publish selected pages for the jury.

15           THE COURT:  99?

16           MR. ANDRE:  Yes.

17           THE COURT:  Any objection?

18           MS. CARSON:  No objection, Your Honor.

19           THE COURT:  Thank you.  Received in evidence.

20       (Trial Exhibit 99 received in evidence.)

21       (Document displayed.)

22   BY MR. ANDRE::

23   Q.   Dr. Cole, give a very brief explanation.  What is source

24   code?

25   A.   I know several of you are familiar with source code, so I

1    apologize for the explanation.  You could probably do a better

2    job than I can in explaining it.

3        But source code is what the developers use to write the

4    actual product.  So when you're actually going to have a

5    product, whether it's Word, whether it's Sky ATP, you're going

6    to have developers write the code, that source code.  That gets

7    compiled, and that becomes the actual executable of the

8    product.

9        So source code is also a really good piece of evidence

10   because it not only shows what the code is actually doing, but

11   source code often has comments and other information to let you

12   inside the mind of the developers to see what comments and what

13   they were thinking when they actually wrote the source code.

14   **Q.**   So if we go to page 115 of the source code, can you

15   describe to the jury what is -- what part of the source code is

16   on page 115?

17   **A.**   So if we go to the very top, that basically shows you the

18   directory structure.  Now, as part of this case, I'm given

19   access to Juniper source code to review, so this is from a

20   source code computer.

21       So the first several directory structures -- user review

22   or desktop review -- that was just set up by Juniper so we

23   could get access to that.

24       But the first part is "Argon."  Argon is Sky ATP.  So we

25   are in the directory, this is the source code for Sky ATP.

1    And then a subdirectory under Argon is "source."  And then

2    you have "rdb," which is Results Database.  So this is now the

3    directory for the Results Database.  And you actually have a

4    piece of source code called "the results database."

5    And ".py," that's Python.  That's just a programming

6    language.  So that's just giving you which language it's

7    written in.  So this is going to be the Results Database source

8    code for the Results Database.

9    **Q.**   If you go down to the first few lines, lines 179 -- 178

10   through 182, or thereabouts, can you describe what that's

11   referring to?

12   **A.**   So the beginning is a definition where it's basically

13   referring to an object "get full object."  So it's getting the

14   full object.  And what's very important here is, if you look at

15   the statement below it, this is getting the full object from

16   the database.

17   And in this case, the database it's referring to is

18   Results Database because that's the source code.  So even in

19   the source code it is showing us that Juniper is recognizing

20   that there is a Results Database and that this is actually a

21   database that stores the security profiles.

22   **Q.**   If you go down to the same page, page 115 of the source

23   code, down to lines 214 through 223, thereabouts, could you

24   describe what that is describing to the jury?

25   **A.**   So this definition is adding results.  So this is their

1    results of the static and dynamic analysis that forms the

2    security profiles.

3         And remember the adapters are what they referred to as

4    static and dynamic.  So they're saying that we're taking the

5    results from an adaptor.  So we're taking the results from the

6    static analysis and taking the results from the dynamic

7    analysis, and we're going in and storing that in the database,

8    so we now have the security profile so we can look up

9    information a lot quicker.

10        And here you can start to see -- and I'll give you some

11   additional evidence, but here you can start to see some of the

12   schema where you have the sample ID, the adapter ID, and the

13   scan results all structured in that database that Juniper uses.

14   **Q.**   Let's go to Trial Exhibit 92.  Look at that in your book

15   and let us know, is that something you relied upon in forming

16   your opinion?

17   **A.**   Yes, I did.

18        **MR. ANDRE:**  Your Honor, I'd like to move Exhibit 92

19   into evidence.

20        **MS. CARSON:**  No objection.

21        **MR. ANDRE:**  Publish it.

22        **THE COURT:**  Thank you.  In evidence.

23        (Trial Exhibit 92 received in evidence.)

24        (Document displayed.)

25

1    BY MR. ANDRE::

2    **Q.**    What is Exhibit 92?

3    **A.**    Exhibit 92 is a detailed test plan that Juniper uses in

4    order to test Sky ATP.

5          When you build these products and you go in and have

6    something as complex as Sky ATP, you want to make sure

7    everything is working correctly.  So you build out -- this is a

8    fairly thick document, and you want to build out a very

9    detailed test plan to make sure all the components are

10   functioning and working correctly.

11   **Q.**    And go to page 20 of this document.  There's several

12   columns there.  Go down to column 19 and just describe what's

13   being shown there.

14   **A.**    So one of the tests that they say we need to make sure is

15   working is verify that the hash lookup adapter results are

16   stored in the ResultsDB.

17         And, once again, the adapter results are the suspicious

18   operations that form the security profile.  And they want to

19   make sure that the security profile is stored in the Results

20   Database.

21   **Q.**    Can you store results in a interface?  Strike that.

22         How did it form your opinion whether or not the Results

23   Database is actually a database?

24   **A.**    So there's two pieces.  There was the database manager,

25   which is the results API.  You don't store information in that.

1    That's just a application program interface to interface back.

2        In order to actually store information, it has to be

3    stored in an actual database.  And you'll notice when we look

4    at the Results Database architecture, there's actually a

5    separate API and there's a ResultsDB.

6        This is not the API.  It doesn't say ResultsDB API.  That

7    wouldn't make any sense.  This is saying the results are

8    actually stored in the Results Database.

9    **Q.**   If you go to page 32 of Exhibit 92, down to column 31,

10   could you describe what that is referring to.

11   **A.**   As we mentioned, when a new downloadable comes into Sky

12   ATP, you want to check in the database to look at the score to

13   determine a verdict to see whether this downloadable is good or

14   whether it's malicious.

15       So this test is saying verify that the score is inserted

16   and that the ResultsDB is correct, which can be used by the

17   verdict engine.

18       So, once again, this test is confirming that they are

19   confirming and validating that the information is in a Results

20   Database, a Results Database, and that that verdict can be

21   pulled from the Results Database.  Which, as you'll see, in

22   order to be able to pull and access information from that

23   Results Database, it has to have a structure.  And it has to

24   have a schema in order to do that.

25   **Q.**   If we go back to Exhibit 99, the source code, and turn to

1    page 8, this is a different piece of the source code.  Could

2    you describe to the jury what we're looking at here.

3    **A.**   If we can go to the top, because this actually -- it's

4    still in the Sky ATP area, but now we're looking at the Web API

5    or the application programming interface for the client.

6    **Q.**   And if we go down to lines 44 -- 444 through 464, and

7    describe how that informs your opinion regarding the Results

8    Database.

9    **A.**   So here we're going in and we're pulling records from the

10   Results Database.  And here it's saying that the -- returning

11   the JSON results data for all provided sample IDs.

12        JSON is just JavaScript Object Notation.  It's just a way

13   that you can go in and describe code and describe a schema in a

14   database.

15        And then it's going in and, if you go under "return," it's

16   saying all of the info from the Results Database for all

17   provided sample IDs as a nested dictionary.  And that SHA256,

18   that's the hash key.

19        So if you remember when we looked at the definition, it

20   said it stores a hash of the downloadable, that's what the

21   SHA256 is.  It's just a hash.  And then it's saying that it's

22   storing all the results, which is the security profile in the

23   database.

24        So even in the source code it's showing we have the

25   downloadable, we have the security profile, and it's stored in

 1  the Results Database.

 2  **Q.**   Let's go back to the definition of database and just kind

 3  of take this piece by piece.

 4       The first part is a collection of interrelated data.  Do

 5  you see that?

 6  **A.**   Yes, I do.

 7  **Q.**   And does Results Database have a collection of

 8  interrelated data?

 9  **A.**   Absolutely.  The different security operations that come

10  from the static and the dynamic analysis that create the

11  security profile is interrelated data.

12  **Q.**   If we go to Exhibit 52.  Look in your book there.  Can you

13  tell us if that's a document you relied upon in forming your

14  opinion?

15  **A.**   Yes, it is.

16       **MR. ANDRE:**  Your Honor, I'd like to move Exhibit 52

17  into evidence.

18       **MS. CARSON:**  No objection, Your Honor.

19       **THE COURT:**  Thank you.  It's in evidence.

20       (Trial Exhibit 52 received in evidence.)

21       (Document displayed.)

22  **BY MR. ANDRE:**

23  **Q.**   What is this document?

24  **A.**   This document is showing the Sky ATP analysis pipeline.

25  It's basically showing the process that it goes through to

1    create that interrelated data.  So you have your basic

2    anti-virus.  That's the old traditional way of looking for a

3    signature.

4        You then have the two pieces that form the security

5    profile, your static analysis and your dynamic analysis, which

6    is known as sandboxing.  And that information is interrelated

7    information about the suspicious operations that's stored in

8    the database.

9    **Q.**  If we go to page 8 of this document, could you describe --

10   where it says the adapter results, in the bottom part, describe

11   how that informs your opinion as to the interrelated data.

12   **A.**  This further supports that.  The adapter results are the

13   results of the analysis.

14       So, once again, you can see you have your anti-virus on

15   the left.  You then have two types, you have fast static

16   analysis and slow static analysis.  And then you have your

17   dynamic analysis.

18       And all of this is interrelated information about the

19   downloadable that contains different suspicious operations that

20   are formed in the security profile that's stored in the

21   database.

22       So the Results Database is storing interrelated

23   information about the downloadable.

24   **Q.**  Go back to the construction database again.  It says the

25   data is organized according to a data schema.  Do you see that?

1  **A.**    Yes.

2  **Q.**    And that's a big point of contention in this case?

3  **A.**    That is a big point of contention of whether there is a

4  schema or a structure to the database.

5  **Q.**    And what's your opinion?  Is there a schema?

6  **A.**    There is absolutely a schema.

7      Not only will I show you all the evidence to support that,

8  but, as I mentioned, if there wasn't a schema the system

9  wouldn't work.

10     If the idea is that you have thousands and hundreds of

11  thousands of downloadables and you have all these suspicious

12  operations, and they're just randomly stored in this big duffle

13  bag and there's no organization or no structure, how would the

14  system ever find it?  How would the system ever be able to look

15  up a specific downloadable to make a quick decision?

16     The only way this system can work is if there is a

17  structure and schema to that database so you can very quickly

18  look up a hash, pull out the security profile and the verdict

19  and make a decision very, very quickly.

20     So just by looking at the functioning of the system, it

21  absolutely has to have a schema to the database in order for

22  those lookups in order for the function to work correctly.

23  **Q.**    Go to Exhibit 399 in your book, and let me know if that's

24  a document you relied upon in forming your opinion.

25  **A.**    Yes, it is.

1          **MR. ANDRE:**  Your Honor, I'd like to move Exhibit 399

2  into evidence.

3          **MS. CARSON:**  No objection, Your Honor.

4          **THE COURT:**  Thank you.  Received.

5      (Trial Exhibit 399 received in evidence.)

6      (Document displayed.)

7  **BY MR. ANDRE:**

8  **Q.**    What is Exhibit 399, Dr. Cole?

9  **A.**    This is a internal Juniper document that talks about how

10  Argon, which is Sky ATP, how it works and how it's structured.

11  **Q.**    If we go to page 36 of this document, and the first -- top

12  half of the page, it says, "In Argon a schema is a format in

13  which the results are stored in our database."

14      Could you tell the jury how that informed your opinion as

15  to whether or not the Results Database uses a schema.

16  **A.**    This is Juniper's own document.  And they are clearly

17  stating that in Argon a schema is the format in which the

18  results are stored in our database.

19      And then if you even read further, it then says, "The base

20  adapter enforces a general JSON schema."

21      So in Juniper's own documents, they're clearly stating

22  that Sky ATP/Argon has a schema that stores that information in

23  the Results Database.

24  **Q.**    The second sentence says, "This helps us to index our

25  results as well as fetch them with ease."

1        What's that referring to?

2   **A.**   This is referring to what I said, that the system wouldn't

3   work without that.  The whole reason they have a database is so

4   they have a schema so they can look up the downloadables very

5   quickly.

6        This allows, when a downloadable comes in that it's seen

7   before, it can very quickly index it, see where it's in this

8   big database, and be able to return a verdict very quickly.

9        If there was no schema and there was no index, there would

10  be no way for Sky ATP to actually be able to look up previous

11  downloadables, and they would have to spend that seven minutes

12  of dynamic analysis for new malware every single time.

13       So the whole idea of the database is to have the schema

14  for a quick, efficient lookup using the index.

15  **Q.**   Go to Exhibit 65 in your book.  Is that a document you

16  relied upon in forming your opinion?

17  **A.**   Yes, it is.

18       **MR. ANDRE:**  Your Honor, I'd like to move Exhibit 65

19  into evidence.

20       **MS. CARSON:**  No objection, Your Honor.

21       **THE COURT:**  Thank you.  Received.

22       (Trial Exhibit 65 received in evidence.)

23       (Document displayed.)

24  **BY MR. ANDRE:**

25  **Q.**   What is Exhibit 65, Dr. Cole?

1  **A.**   This is an internal Juniper document where the title is,

2  "The Schema Validation in Argon."

3       So this document basically goes through the entire schema

4  that's in Sky ATP to store the information in Results Database.

5  **Q.**   If we go to page 3 of this document, this is page 3 of

6  Exhibit 65.   There's a lot there, but there's a section called

7  "Schema Validation and Results Database."

8       Do you see that?

9  **A.**   Yes.

10 **Q.**   How did that inform your opinion as to whether or not the

11 Results Database is organized according to a database schema?

12 **A.**   So if we highlight that first sentence, "The format of the

13 JSON data for records stored" -- so records stored -- "in the

14 ResultsDB adhere to a strict schema."

15      So this, once again, sort of ties everything I've been

16 saying where the information is stored in Results Database.

17 That's clearly stated.   And that Results Database adheres to a

18 strict schema so it can look up that information very quickly

19 and very fast.

20 **Q.**   If we go back to the source code, Exhibit 99, and go to

21 page 78.   And could you tell the jury what section of source

22 code this is referring to.

23 **A.**   So this is under Argon/Sky ATP.   This is the source code

24 under Results Database.   And this actual source code file is

25 called "main_schema."   So this is the main schema.   This is a

1    file that the developers wrote that highlights the schema for

2    the Results Database.

3    **Q.**   Now, you've heard in this case that -- the term

4    schema-less.  Do you know what that means?

5    **A.**   Yes, I do.

6    **Q.**   What is schema-less?

7    **A.**   What schema-less is saying is that with a database you

8    have a schema, but with schema-less every attribute does not

9    have to be filled in for every field.

10        So, in essence, if you've ever gone to a website and it

11   asks you for your first name, your last name, your phone

12   number, your address, your email, and you have to fill in every

13   single one of those fields, it will not let you leave it out.

14        If you don't put in your phone number, if you don't put in

15   your zip, if you don't put in your email, it will not allow it.

16   That's what we call a very strict schema, because every field

17   has to be filled in for every single user.

18        But you'll notice in some of these websites you go to it's

19   optional.  So I might decide to put in my first name and my

20   address but not my last name.  And Mr. Andre might decide to

21   just put in his email and phone number and nothing else.

22        So, now, when you look at that database, some of the

23   attributes are filled in and some of the attributes are not

24   filled in.  And if you look at the actual definition and look

25   at all of Amazon's documents, that's what they're referring to

1    as schema-less.

2        Because they are providing the hardware, they want to have

3    something fairly flexible.  They want to have flexible

4    databases that, if you want to put in some of the attributes or

5    not all of the attributes, you can.

6        But even in schema-less and you go through the Amazon

7    documents, there's still a schema.  There still has to be a

8    general structure and schema, it just means it's not strictly

9    enforced and each attribute does not need to be filled in.

10   **Q.**   If we go to the source code on page 297, could you

11   describe what section of the source code we're looking at here?

12   **A.**   So this is, once again, under Sky ATP source code, under

13   the results/database/rdp.  You now have your database data.

14   And here's where you're going in and creating tables.  This is

15   where Juniper's code is creating tables or structure on top of

16   the Amazon cloud infrastructure.

17   **Q.**   If you look at the first line, under the line 1, it says,

18   "Create necessary DynamoDB tables."  Do you see that?

19   **A.**   Yes.

20   **Q.**   If we go down to line 33 through 36 of the code, what is

21   that -- how does that inform your opinion whether or not the

22   DynamoDB is using a schema?

23   **A.**   So here you can see this is Juniper's code where it's

24   creating a main table, and it's creating that main table on top

25   of DynamoDB connection.  And you can see when it's creating at

1    the bottom "table.create," it's creating the table name with a

2    schema.

3        So the actual Juniper code is creating a schema in the

4    form of a table on top of the DynamoDB in order to be able to

5    reference and store that information.

6    Q.   So where it says "schema equals," that second line, line

7    34, is that the schema you're referring to?  Line 34.

8    A.   Yes.  So there's a data structure called schema.  So what

9    it's doing is, when it's creating that table within the Amazon

10   servers, it has a set schema that it's using to create on top

11   of that so that information can easily be referenced and easily

12   be used by the Sky ATP system.

13   Q.   Let's go back to the construction of "database" one last

14   time.  And it is "to serve one or more applications."

15       Is the database -- the Results Database, does it serve one

16   or more applications?

17   A.   Yes.  It's absolutely serving one or more applications in

18   the form of the adapters.

19       So the static analysis is going in and feeding the

20   database.  The dynamic analysis is feeding that database.  So

21   that's one or more applications that are actually feeding the

22   security profile into the database.

23   Q.   Now, if you could go through an animation that just kind

24   of summarizes what you just talked about here with regard to

25   the Results Database.

COLE - DIRECT / ANDRE

1    **A.**    So a user or groups of users make requests to SRX.   A

2    downloadable comes in from the Internet.   It goes to Sky ATP,

3    where it performs analysis.

4         That file is going to have static analysis performed

5    that's going to create suspicious operations.   That's

6    information stored in the Results Database.   It has the Results

7    Database API, which is the manager.

8         You then have the Results Database that was created by

9    Juniper, that's going to store that information in the physical

10   servers at Amazon, which those physical servers are going to be

11   the MySQL, the DynamoDB, and the S3.

12        And if you remember from what we've seen in the documents

13   that Juniper needed to create the Results Database in order to

14   support their system because the underlying databases at Amazon

15   did not provide the structure that they needed.

16   **Q.**   If we go back to the check boxes, have you formed an

17   opinion whether or not the Juniper Sky ATP, by itself or with

18   the SRX product, has a database as that term has been

19   construed?

20   **A.**   It absolutely has a database that aligns directly with the

21   Court's construction of what a database is.

22        And I went through and showed you documents, deposition

23   testimony, and source code to be able to support that it's a

24   database with interrelated data that has a schema that supports

25   multiple applications.

1    **Q.**   Can we check that box, that last box?

2    **A.**   We can check that box.

3    **Q.**   All right.  Thank you.

4         I want to talk now a little bit about the technical

5    benefits that can be conferred by using the '494 patented

6    invention.

7         How does Juniper benefit from the technology of the '494

8    patent?

9         Let me show you what's already been marked into evidence,

10   Exhibit 79.

11        (Document displayed.)

12   **Q.**   If we go to page 2 of this document, there's a slide that

13   says "An Evolving Threat Landscape."

14        Do you see that?

15   **A.**   Yes.

16   **Q.**   How does the '494 patent help deal with the evolving

17   threat landscape?

18   **A.**   With the new threat landscape, attackers don't want to get

19   caught so they're always trying new tricks and new methods.

20        For example, one of the ones we've seen a lot over the

21   last few weeks is you would go to one of your social media

22   pages and you'd see a great ad for a gift for 50 percent off.

23   But when you click on it, it's actually malicious.  They're

24   tricking you into inadvertently downloading something that's

25   malicious.

COLE - DIRECT / ANDRE

1       So, in order to keep up with that, we need to have a
2   system in '494 that can receive those downloadables, look for
3   suspicious operations, create a security profile.
4       And one of the big benefits of '494 is to store it in a
5   database, because you don't want to have to go in and every
6   single time reanalyze because as you sort it could take up to
7   seven minutes to analyze a downloadable to look for malicious
8   code.
9       So what you want to be able to do is you want to be able
10  to scan it once, put it in a database, in a Sky service, and
11  then be able to support everybody around the world.
12      So now anybody else that gets a downloadable, we can look
13  it up in the database, look up the structure, make a
14  determination, and protect your system and protect your
15  organization.
16  Q.   If we go to page 4 of this document, there's a slide that
17  is entitled "Sky Advance Threat Prevention to the Rescue."  Do
18  you see that?
19  A.   Yes.
20  Q.   How does Juniper use the Sky Advanced Threat Prevention to
21  serve the benefits you just talked about?
22  A.   Sky ATP is a cloud-based solution that allows
23  downloadables to be scanned and stored in a database.  So now
24  when anybody else tries to go in and access that, they can be
25  protected.

1    So this is something I've seen at McAfee, and many other

2    security vendors do, is we want to be able to analyze malware

3    once and share it with the world.

4    So what Juniper does is they use Sky ATP to store that

5    information in a database, so now once they go in and analyze

6    it once, they can then send that verdict to any other system or

7    any other customer.

8    **Q.**   And going back to the deposition of Mr. Nagarajan, could

9    you describe how this piece of his testimony informed your

10   opinion as to how Juniper benefits from the technical

11   advantages using the '494 patent.

12   **A.**   So he was asked:

13         "You also mentioned that Sky ATP also saves on

14         resources."

15         "Sky -- yeah, Sky ATP saves on resources because we

16         don't analyze the files, the same files, a second time.

17         "Is there any other cost benefit from Sky ATP?"

18   And then he confirms what I just said is:

19         "And we also share the resources for multiple

20         customers."

21   **Q.**   And how did that inform your opinion as to how Juniper

22   benefits from the technology described in the '494 patent?

23   **A.**   Juniper would benefit from that technology because now the

24   information can be analyzed once, stored in a database, looked

25   up very quickly, and now be able to support hundreds of

```
 1   thousands of customers very quickly without having to go in and
 2   redo that timely dynamic analysis each time.
 3   Q.   If we go to Exhibit 88, I believe --
 4            MR. ANDRE:  Is that in evidence already?
 5            THE CLERK:  Let me look.
 6            THE COURT:  88.  Not yet.
 7            MR. ANDRE:  Thank you.
 8   BY MR. ANDRE:
 9   Q.   If you look in your book, did you rely on Exhibit 88 in
10   forming your opinion?
11   A.   Yes, I did.
12            MR. ANDRE:  Your Honor, I'd like to move Exhibit 88
13   into evidence.
14            MS. CARSON:  No objection, Your Honor.
15            THE COURT:  Thank you.  In evidence.
16        (Trial Exhibit 88 received in evidence.)
17        (Document displayed.)
18   BY MR. ANDRE:
19   Q.   What is Exhibit 88?
20   A.   This is a Juniper presentation where they're talking about
21   Sky Advanced Threat Prevention and some of the benefits it
22   provides.
23   Q.   If you turn to page 18 of this document, there are various
24   platforms on the left-hand side for the Sky ATP highlights.
25        Do you see the SRX platforms?
```

COLE - DIRECT / ANDRE

 1  **A.**   Yes, I do.

 2  **Q.**   Did you look at the various platforms in which Sky ATP

 3  could be used by Juniper?

 4  **A.**   Yes, I did.  I submitted, actually, a very thick, detailed

 5  report that does a lot of analysis of everything that we've

 6  covered.  And in that, I went through the different models of

 7  SRX that are supported by Sky ATP.

 8  **Q.**   And if you look to the column on the right-hand side, you

 9  see that there is a -- no license required, available to all

10  customers with valid support contracts.  Do you see that?  The

11  free version of Sky ATP?

12  **A.**   Yes, I do.

13  **Q.**   Does that provide value to any SRX that wants to use it?

14  **A.**   Yes.  So because that's free, you don't have to pay,

15  anyone that has an SRX could potentially get that benefit of

16  this service so they can go in and be able to learn from

17  previous customers of what downloadables might be malicious or

18  might be okay.

19  **Q.**   And just to give the jury a context of how -- what we're

20  talking about, the magnitude of files that go through these

21  systems, could you turn to page 64.

22      This is a case saying, "Malware Detection at Scale."  It

23  says, "Sky ATP deployed in TAP mode on SRX5600 by ISP in North

24  America primarily serving educational institutions.

25      Do you see that?

1    **A.**    Yes.

2    **Q.**    What is ISP, first?

3    **A.**    ISP is Internet Service Provider.  So at your company or

4    at your home, if you have Internet, you would be going through

5    an ISP that basically connects you to the Internet so you can

6    access resources, access websites, and check email.

7    **Q.**    So this is for a 7-day period, there were 535,302 files

8    processed.  Do you see that?

9    **A.**    Yes, I do.

10   **Q.**    Is that fairly normal, in your experience in the industry,

11   having that volume of files in seven days?

12         **MS. CARSON:**  Objection, Your Honor.

13         **THE COURT:**  What's the objection?

14         **MS. CARSON:**  Outside the scope of the report.

15         **THE COURT:**  Is this in the report?

16         **MS. CARSON:**  Also foundation.

17         **THE COURT:**  Is this in the report?

18         **MR. ANDRE:**  He talked about the advantages of using

19   this, and the magnitude.

20         **THE COURT:**  Is this exact stuff in the report?

21         **MR. ANDRE:**  Yeah, this document is in his report.

22         **THE COURT:**  It's in the report, he says.

23         **MS. CARSON:**  Could you provide the citation?

24         **MR. ANDRE:**  I believe it's paragraph 17 and 35.

25         **MS. CARSON:**  Could you repeat that?

1          **MR. ANDRE:**  17 and 35.  The document cited in

2    paragraph 35, by Bates numbers, and paragraph 17 talks about

3    the advantages of not having to rescan twice.

4          **MS. CARSON:**  Your Honor, those paragraphs don't talk

5    about the testimony.

6          **THE COURT:**  Is this very document in the report or

7    cited in the report?

8          **MS. CARSON:**  He cited this document but not for the

9    testimony that's being elicited.

10         **THE COURT:**  May I see the -- may I see the -- where

11   the testimony you're about to elicit is in the report.  It's

12   not enough just to say --

13         **MR. ANDRE:**  It starts on -- well, it starts on this

14   page, Your Honor, paragraph 35 and 36.

15         **THE COURT:**  Okay.  Let me see it.

16         **MS. CARSON:**  Your Honor, I note that paragraph --

17   portions of paragraph 35 and paragraph 36 have been excluded.

18         **THE COURT:**  Did I exclude that?  Is that right?

19         **MR. ANDRE:**  I don't think --

20         **MS. CARSON:**  They are the paragraphs that were the

21   subject of our motion in limine that was mooted by your prior

22   ruling on a different motion.

23         **THE COURT:**  Okay.

24         **MR. ANDRE:**  Your Honor, I tell you what, this is -- it

25   was to try to help the jury get scale.  It's not imperative for

1    me to go down this line.  I'll just withdraw the question and

2    move on.

3             THE COURT:  Okay.

4             MR. ANDRE:  I'm on the clock.

5             THE COURT:  You are.  How much longer do you have?

6             MR. ANDRE:  I have about two more minutes.

7             THE COURT:  All right.  Then we'll finish your direct

8    and then we'll take a break.

9             MR. ANDRE:  Okay.  Sounds good.

10        Can we go to Exhibit 78, which is in evidence.

11        (Document displayed.)

12   BY MR. ANDRE:

13   Q.    There is the Sky ATP guide.  Do you recall that?

14   A.    Yes.  Yes, I do.

15   Q.    Okay.  If you go to page 32 of this document.

16        I'm sorry, go to page 17 first.  I'm sorry.  Talks about

17   Sky ATP features.  Talks about how the Sky ATP -- Sky Advanced

18   Threat Prevention is a cloud-based solution, cloud environments

19   are flexible and scalable and a shared environment ensures that

20   everyone benefits from new threat intelligence in near time.

21        Do you see that?

22   A.    Yes, I do.

23   Q.    How did it inform your opinions of the technical benefits

24   obtained by using the '494 patent?

25   A.    By using the '494 patent, now you can go in and scan a

1  downloadable once, store it in a database.  And now everyone

2  can get that benefit of the analysis without having to rescan

3  it over and over and over again.

4      So this actually protects large numbers of companies and

5  users because now only one person has to see the downloadable

6  and then everyone shares the benefit, because in the Sky ATP

7  database that's pushed out across the different SRX systems.

8  **Q.**  And if you look at page 32 of this document, you'll see

9  that there are some scan limits to the SRX -- the SRX model and

10  Sky ATP.

11      Does that influence your opinion as to whether or not

12  there are technical benefits of using the '494 patent?

13  **A.**  Yes.  The SRX appliances get the benefit.  Even if they

14  don't pay, it's free.  And then if they want to get additional

15  scanning capability, there's also a pay option, what they call

16  a premium option, where you can pay for that.  But they

17  absolutely get the benefits of utilizing that database.

18      **THE COURT:**  I'm sorry, I want to make sure I

19  understand that part.

20      If someone has a free setup, which part of the system

21  benefits do -- does that user get?

22      Let's assume they fill out whatever forms they've got to

23  do to get the free service.  What -- what do they get for that?

24      **THE WITNESS:**  They get the benefit of the full system.

25  The only difference between free and premium are the number of

COLE - DIRECT / ANDRE

 1  scans you get.

 2       So, for example, with the SRX 1500, if I had a free

 3  license, I'd only get 2500.  And if I had a premium license,

 4  I'd get 10,000.  So they get the same exact benefit and the

 5  same exact service, they just put a limit on the number of

 6  scans.

 7       THE COURT:  And when you say "scans," you mean

 8  original scans that no one has ever scanned before, or do you

 9  mean 2500 even just -- even when it has -- that particular

10  malware has already been identified, does that count as a scan?

11       THE WITNESS:  Yes.  So it's any file submitted.

12       And if we look at the first sentence, it says there's a

13  limit to the number of files which can be submitted.  So

14  whether it's seen it or not, that counts as a submitted file.

15       THE COURT:  All right.  So if I was doing a freebie

16  and I got over my limit, then the malware would get in my

17  machine if -- how would that part work?  It would just reject?

18       So if I go over my limit, what would happen?

19       THE WITNESS:  If you would go over the limit, then it

20  would no longer be able to get the benefits of Sky ATP.  It

21  would just use the information on the SRX appliance.

22       THE COURT:  What info is that?  I thought it was all

23  in the cloud somehow.  So what would be on the SRX itself?

24       THE WITNESS:  The SRX does some basic filtering and

25  firewalling.  So you would still get some of that basic

1   protection, but you wouldn't get the full benefit of the scans

2   and the realtime analysis in the database from Sky ATP.

3        **THE COURT:**  Okay.  All right.

4      Next question.

5        **MR. ANDRE:**  That's all I have, Your Honor.

6        **THE COURT:**  All right.  We'll take our break.

7      It's not fair, I'm not going to charge you for the couple

8   of minutes I just took, but we're going to take a break,

9   15-minute break.

10     Please don't talk about the case yet.  In due course

11  you'll have to talk about it, but talk about something else for

12  now.  Thank you.  Go back into the jury room and enjoy

13  yourselves.

14     (Jury out at 9:13 a.m.)

15       **THE COURT:**  All right.  Be seated.

16     Anything the lawyers have for me?

17       **MR. ANDRE:**  Nothing.  Nothing for Finjan, Your Honor.

18       **THE COURT:**  One very brief thing.  A word to the wise.

19     Who's doing the cross?

20       **MS. CARSON:**  I am, Your Honor.

21       **THE COURT:**  Ms. Carson, I can tell you went to the

22  same cross-examination school that I went to when I was your

23  age.  And I learned the same habit that you have, which is, I

24  was drilled and drilled and drilled:  You've got to ask a

25  leading question on cross-examination.

PROCEEDINGS

1       But when it's a negative question like "You don't know the

2   answer to this; correct?" and the witness says "Yes," does that

3   mean, the yes part, I do know that, or yes, it's correct?

4   There's an inherent problem.  That's what I mean by the double

5   negative.

6       It's just easier to say, Do you know the answer to this?

7   And the witness will have to say no.

8       Now, I want to say to the witness, you are a good witness,

9   but if you don't answer her question, I'm going to jump in --

10          **THE WITNESS:**  Okay.

11          **THE COURT:**  -- and make you answer the questions.

12      So expert witnesses are paid a lot of money, and they're

13  going to answer the question anyway.  And I make sure that

14  she's going to get her shot at you.

15      Now, Ms. Carson, you've got to ask good questions though.

16  If the questions are not concise enough, then I'm not going to

17  jump in.  It's got to be good questions, but I will make sure

18  the witness answers it.

19      This is -- who is that guy right beside you?

20          **MR. HEINRICH:**  Mr. Heinrich.

21          **THE COURT:**  Yes.  He had the same -- he went to that

22  same school.

23      (Laughter)

24          **THE COURT:**  And he self-corrected after I told him to,

25  and his questions were better.

1        This is just a word to the wise of how to frame your

2   questions.

3              **MS. CARSON:**  I will do my best.

4          **THE COURT:**  Here you are up against a World Series

5   class expert, so you'll do a good job.

6        We're going to take our 15-minute break.  Thank you.

7              **MR. ANDRE:**  Thank you, Your Honor.

8                        (Recess taken at 9:16 a.m.)

9                  (Proceedings resumed at 9:33 a.m.)

10       (The following proceedings were held in open court,

11  outside the presence of the jury:)

12             **THE CLERK:**  Please come to order.

13       Would you like me to get the jury, Judge?

14             **THE COURT:**  Yes.  All ready?  Can you bring in the

15  jury.  Yes, let's bring in the jury.

16       Give me just a second.  Be seated, everyone.

17       I've got a question about the lawyers.  And I'm not

18  holding you to any of this.  What are the chances that the case

19  can go to the jury by about noon on Friday?  Zero?

20       In other words, you wouldn't be able to use -- I can just

21  see a defendant in your circumstances might decide not to use

22  all your time in order to get the case to the jury by Friday,

23  which would be great because we can get the case over this

24  week, but -- maybe.  But if we're going to even angle for that,

25  I've got to tell them that they may need to stay on Friday.

PROCEEDINGS

1            **MR. KAGAN:**  Well, Your Honor, maybe we can get a time

2     count for the Court.  I think, under the current limits,

3     both -- I know both parties --

4            **THE COURT:**  They're going to rest today.

5            **MR. KAGAN:**  I think we may be able to get to the jury

6     by Friday, Your Honor.  I think there's a good chance we can

7     get to the jury by Friday.

8            **THE COURT:**  At least one out of three?

9            **MR. KAGAN:**  At least one out of three.

10           **THE COURT:**  All right.

11           **MR. KAGAN:**  But if our time count is very different

12    from the Court's, then --

13           **THE COURT:**  Mine is the one that counts.

14        (Laughter)

15           **MR. KAGAN:**  Exactly, Your Honor.

16           **THE COURT:**  So I'll let you see what I've got.

17           **MR. KAGAN:**  Okay.

18           **THE COURT:**  But there's no way -- you have enough

19    time.  We would -- we would be here past noon on Friday if

20    everybody uses all their time as I count it up.

21        That's enough.  I don't want to delay the jury.  Let's

22    bring in the jury.

23        (Jury enters at 9:35 a.m.)

24           **THE COURT:**  Thank you.  Be seated.

25        And, Ms. Carson, bear with me a second.

**PROCEEDINGS**

1    I want to give you a heads-up on the timing.  Most likely

2    this case is going to go into next week.  However, there is a

3    chance that's worth considering that it will be done on Friday

4    of this week.

5    And -- but in order to even make that work, you all would

6    have to be willing to stay on Friday afternoon past

7    1:00 o'clock, probably as late as 5:00 or 6:00 o'clock in order

8    to make that happen.

9    And because you have been relying on the 1:00 o'clock

10   thing, I did tell you that once you began to deliberate then

11   you would set your own schedule.

12   But I wouldn't want you, the jury, to lose the opportunity

13   to wind up the case this week merely because I didn't give you

14   a heads-up on the possibility.

15   So all I'm saying is be thinking in your mind about could

16   you be available on Friday afternoon until as late as 4:00 or

17   5:00 o'clock.  If the answer is no, you can't or no, you don't

18   want to do that, that's great.  You're the decision-maker, and

19   we will conform to your wishes.  So just be mindful that that

20   is a -- I'm going to say a small but plausible possibility.

21   Okay.  We're now going to turn to the cross-examination.

22   Remember what I told you about leading questions?  It's okay

23   for Ms. Carson here to ask leading questions because she's on

24   the other side.

25   Ms. Carson, the floor is yours.

1           **MS. CARSON:**  Good morning, ladies and gentlemen.

2      Once again, I'm Rebecca Carson.  I represent Juniper.

3                       <u>**CROSS-EXAMINATION**</u>

4  **BY MS. CARSON**

5  **Q.**   Good morning, Dr. Cole.

6  **A.**   Good morning.

7  **Q.**   You are Finjan's paid expert on the issue of infringement;

8  correct?

9  **A.**   That is correct.

10 **Q.**   Okay.  I want to start by diving right in to your

11 infringement theory.

12          **MS. CARSON:**  If we could pull up the language of

13 Claim 10 on the screen.

14      (Document displayed.)

15 **BY MS. CARSON:**

16 **Q.**   This is the language of Claim 10; correct?

17          **THE COURT:**  Mine has got a big blue box in the middle.

18 Can we get rid of that?  Something out of range.  "Video input

19 out of range."

20          **THE CLERK:**  Sure.  Hold on.

21          **THE COURT:**  Is that our fault?

22          **THE CLERK:**  Hold on.

23          **THE COURT:**  Is that box in the middle coming from --

24 is that coming from the --

25          **THE CLERK:**  Hold on, Judge.

1          THE COURT:  -- the ELMO?  So I see it on that one.

2      Does the jury -- in the jury box, can you get a clear

3  picture or do you get that --

4          JUROR NUMBER 1:  With video input box?

5          THE COURT:  Yes.

6          JUROR NUMBER 1:  We have it too.

7          THE COURT:  So they're getting the same interference.

8          JUROR NUMBER 6:  Press the lift button on these

9  monitors, and that clears it out.

10         THE CLERK:  Got it.

11         MS. CARSON:  All good?

12         THE COURT:  Wait, wait.  Who was that, that figured

13  that out?

14     (Juror raises hand.)

15         THE COURT:  That's very good.

16         MS. CARSON:  Thank you.

17         THE COURT:  I'm going to get you into our IT

18  department.

19     Okay.  Are you ready?

20         MS. CARSON:  Yes.

21         THE COURT:  I'm not going to count that time against

22  you, Ms. Carson.

23         MS. CARSON:  I appreciate that, Your Honor.

24         THE COURT:  All right.  So you go ahead and start now.

25  BY MS. CARSON:

1   **Q.**   Okay.  So is this the language of Claim 10?

2   **A.**   Yes, it is.

3   **Q.**   Okay.  And earlier you told the jury that you only need to

4   prove that Juniper has a database in order for its products to

5   meet this claim; correct?

6   **A.**   That is my understanding, that all the other elements have

7   been proven and we just have to prove a database.

8   **Q.**   But that's not quite exactly right.  You actually have to

9   show that Juniper meets the other requirements related to the

10  database; correct?

11      So it's not enough, sir, for Juniper just to have a

12  database in its product; correct?

13      **THE COURT:**  Well, wait a minute.  I don't understand

14  where you're going.  We've already determined that every single

15  element is there.  You've either conceded it or we found it.

16      But there was a question of fact on the issue of the

17  database.  So what point are you trying to make?

18      **MS. CARSON:**  I'm trying to make the point, Your Honor,

19  that the claim requires that you store particular information

20  in the database.  So it's not sufficient that you simply have a

21  database in the product.  It still has to be used to store the

22  downloadable security profile data.

23      **THE COURT:**  All right.  So you're saying it's not

24  enough to have the database.  The database has to be used for

25  storing the downloadable security data profile.  Is that your

1    point?

2              MS. CARSON:  That's it, Your Honor.

3              THE COURT:  All right.  Do you agree with that point?

4              THE WITNESS:  Yes, I do.  And that's why during my

5    direct I kept emphasizing that the security profile, which is

6    the suspicious operations, is stored in the Results Database.

7    BY MS. CARSON:

8    Q.   And the thing that you pointed to in your infringement

9    theory for the security profile was the full JSON adapter

10   results; correct?  Yes or no.

11   A.   Could you define what you mean by "full JSON adapter

12   results"?

13   Q.   When you were identifying the downloadable security

14   profile data, which must include a list of suspicious

15   operations, the thing that you pointed to in your infringement

16   theory was the full adapter results that are stored in a JSON

17   file; correct?

18   A.   Once again, I'm not sure the -- we're referring to the

19   static and dynamic analysis.  The static and dynamic analysis

20   that goes in and looks for those suspicious operations, that

21   creates the security profile, and that's what's stored in the

22   ResultsDB.

23   Q.   And the result of the static and dynamic analysis that are

24   output, that is put into a JSON file; correct?

25   A.   The schema for the Results Database is specified in the

1  JSON file.  And then ResultsDB specifies that database that

2  stores the results.  And then the physical storage is on the

3  Amazon servers in the S3 and Dynamo database.

4  **Q.**  Do you know the format of the file that gets output from

5  the static analyzer in the Juniper system?

6      That's a JSON file; correct?

7  **A.**  The output from the static analysis, yes, that's the

8  format.

9  **Q.**  And that is the file that contains the list of suspicious

10  operations in your infringement theory; correct?

11  **A.**  That's the output from that, but then, as you saw, Results

12  Database has its schema and has a structure that then stores

13  those suspicious operations within that ResultsDB that forms

14  the security profile.

15  **Q.**  And I just want to make sure we're all clear before we get

16  to the database part.  I just want to make sure everyone is

17  clear about what exactly you are pointing to in your

18  infringement theory for the security profile data that includes

19  a list of suspicious operations.

20      And that is the JSON file that is output by the adapters

21  in the Sky ATP system; correct?

22  **A.**  That is part of the information.  But it's the -- when the

23  static analysis runs and the dynamic analysis runs, you have

24  those suspicious operations that are identified.  And there's a

25  set schema of how that information is stored that's stored

1   within ResultsDB.

2       And then when Sky ATP gets a new downloadable, it actually

3   uses that schema structure in the ResultsDB to actually look up

4   that information and return a verdict.

5       **THE COURT:**  Well, I think you're not quite answering

6   her question.  Let me interrupt for a second.

7       The claim language does require that the downloadable

8   security profile data be stored in the database.  And up above

9   there, in the second limitation, it calls out a list of

10  suspicious computer operations as being part of the security

11  profile data.

12      So I think what Ms. Carson is asking you is:  When the

13  analysis is done in the Sky ATP, and the -- the suspicious

14  computer operations are identified, what is the precise

15  sequence of steps for the suspicious computer operations that

16  leads them to the database?

17      I think that's what you're asking.

18      **MS. CARSON:**  Not quite.

19      **THE COURT:**  All right.  Then you ask it your way.

20      (Laughter)

21      **THE COURT:**  But you two are not answering each other's

22  questions.  You've got to ask a precise enough question that --

23  so that we know what you're trying to get at.

24      All right.  Start over.  Do it again.

25

**BY MS. CARSON:**

**Q.**   So the claim requires that you have a security profile

that includes a list of suspicious operations; correct?

**A.**   Correct.

**Q.**   Okay.  And the list of suspicious operations that you

pointed to in your infringement theory was the full adapter

results that result from the static and dynamic analysis in Sky

ATP; correct?

**A.**   Yes.  That forms the key components of the security

profile that has the suspicious operations.

**Q.**   Okay.  And that is -- Juniper uses the JSON file in order

to have a report of those results; correct?

**A.**   That is part of the information that passes in a JSON

file.  But it also passes those suspicious operations that then

go to the database manager that are then stored in the

database.

**Q.**   You talked to us this morning a lot about a verdict.  Do

you recall that?

**A.**   Yes, I did.

**Q.**   A verdict is an integer from 1 to 10; correct?

**A.**   Yes.  And it's derived from the security profile that's

stored within the database.

**Q.**   But the verdict itself does not contain a list of

suspicious operations, because it's just a number.  Fair?

**A.**   I would not agree with that because you're basically going

1    in and looking at the suspicious operations, and that's how the

2    verdict is derived.

3        So the verdict indicates the suspicious operations and

4    information that are in that security profile.

5    **Q.**   The verdict itself is just a number; correct?

6    **A.**   Yes, it's a number that contains and is based off of all

7    of the suspicious operations.  It's not just a random number

8    that's picked out.  I'm not just saying 3 or 6.  It's looking

9    at the suspicious operations in the security profile, and

10   that's how that number is derived.  So that number has special

11   meaning based on the security operations and the security

12   profile.

13   **Q.**   In your infringement theory, you didn't specifically

14   identify the verdict as meeting the downloadable security

15   profile data limitation; correct?

16   **A.**   I would have to go back and check my report because I have

17   a lot of infringing theories.  It was a really thick report,

18   but that is definitely one of the components.

19       But in order to show that Juniper's products infringe on

20   the '494, we were able to show that the output from the

21   adapters have suspicious operations, is a security profile, and

22   is stored within that database.

23   **Q.**   And you didn't specifically point to the verdict as

24   satisfying the downloadable security profile data limitations;

25   yes or no?

COLE - CROSS / CARSON

**A.**   It was a thick report.  I do not recall offhand.  I know that was implied, but I don't remember the exact wording of my report.

      **MS. CARSON:**  I'd like to read from your deposition, June 21st, 2018, page 203, lines 1 to 5.

      **THE COURT:**  All right.  Read -- say "question" and read it, answer -- then say "answer" and read it.  Read it exactly.

            **MR. ANDRE:**  The page number?

      **MS. CARSON:**  Page 203, lines 1 through 5.

      **THE COURT:**  Go ahead.

      **MS. CARSON:**  (As read:)

   "**Q.**  Are you pointing to the verdict in your infringement
      analysis as satisfying the claim element of a list of
      suspicious computer operations?
   "**A.**  I don't believe I did.  If you can point to where I
      stated -- stated that."

      **THE WITNESS:**  Okay.  That seems to -- thank you for my clarification.  That might not have been specifically in the report, but, once again, that doesn't state whether it was not in the report.

      But, in my opinion, I just have to show that there are suspicious operations in the database, which I believe, based on the evidence we went through this morning, we clearly show that.

BY MS. CARSON:

Q.   But you did not rely on the verdict to establish that point; correct?

In your report, you did not rely on the verdict to establish the element of a downloadable security profile data that includes a list of suspicious operations; correct?

A.   Not direct.  But, like I said, it was a thick report, and I didn't memorize it.  And it could be mentioned throughout the report as supporting evidence.

Q.   Now, you talked a lot about the cache lookup feature in Juniper's products; correct?

A.   That is correct.

Q.   And the cache lookup is used when a file has previously been analyzed by Sky ATP; correct?

A.   That is correct.

Q.   The cache lookup uses just the verdict; correct?

A.   I believe the cache lookup uses a hash of the downloadable to look up in the database schema to see if there's an entry in there.  And then it utilizes the information from the security profile to then return a verdict back to the client.

Like I said, it's not a random number.  That number is derived from the security profile that's in the database.

Q.   The only thing that gets sent back to SRX is the verdict; correct?

A.   Yes, that's what gets sent back to SRX, so we can make a

1  block with a sign.  But it's not a random number.  It utilizes

2  the suspicious operations in the database in order to

3  determine --

4       THE COURT:  You've got to be fair to the questioner

5  here, and you're not, I don't think.

6       She's trying to establish -- your point is that, in order

7  to get to the verdict, you consider the list of suspicious

8  operations.  Okay.

9       But what she's trying to establish is, eventually there is

10  a verdict that's 0 to 10.  And whenever the cache thing is

11  consulted, the only info that comes back is the verdict.  Could

12  be number 7, for example.

13       Do you agree that that's right?

14       THE WITNESS:  Yes.

15       THE COURT:  Okay.  Is that your point?

16       MS. CARSON:  Yes, Your Honor.  Thank you.

17       THE COURT:  Okay.  Let's move on.

18  BY MS. CARSON:

19  Q.   Okay.  So I want to move on and talk a little bit about

20  your theory as it relates to the database.

21       So in your opinion -- it's your opinion that ResultsDB is

22  both the database manager and the database; correct?

23  A.   That is not correct.

24  Q.   Okay.  I'd like to play a clip from your deposition,

25  June 21st, 2018, page 232, lines 22 -- sorry.

1        Page 232, line 22, to page 233, line 7.

2            MR. ANDRE:  Objection, Your Honor, if that's the right

3    quote.

4            MS. CARSON:  I apologize.  Page 231, line 22, to 232,

5    line 7.

6            THE COURT:  Go ahead.  Play the tape.

7        (Video played, not reported)

8            MS. CARSON:  May I approach with some exhibits, Your

9    Honor?

10           THE COURT:  All right.  Please do.

11           THE WITNESS:  Thank you.

12           MS. CARSON:  You're welcome.

13   BY MS. CARSON:

14   Q.   Could you please take a look at Exhibit 79 in your binder.

15   And, in particular, I'd like you to turn to page 10.

16       Are you there?

17   A.   Yes, I am.

18   Q.   This is a diagram that you annotated for me at your

19   deposition; correct?

20   A.   That is correct.  I think it was the second deposition,

21   not the first one that you just played.  We actually had two

22   depositions in this case.

23           MS. CARSON:  Okay.  Could we publish page 10.

24       Your Honor, I move to admit Exhibit 1179.

25           THE COURT:  1179?  Any objection?

COLE - CROSS / CARSON

 1          Hearing none, received in evidence.

 2              **MR. ANDRE:**  I was just looking at it, Your Honor.

 3   This is a Juniper document that the witness wrote on.  So it's

 4   not a document kept by Juniper in the normal course of

 5   business.  It's been altered based on counsel's direction, so I

 6   don't think it's an appropriate exhibit.

 7              **THE COURT:**  Let me see it first.  Hand it up to me.

 8          Is this something he relied on in his report?

 9          **MS. CARSON:**  It's a document he relied on in his

10   report.  And I questioned the witness at his deposition, and he

11   made some annotations on it for me.  And he just testified to

12   that.

13              **THE COURT:**  I will allow Counsel to use this.

14   Objection overruled.

15          What is it, 1179?

16              **MS. CARSON:**  That's correct, Your Honor.

17              **THE COURT:**  All right.  Received in evidence.

18          (Trial Exhibit 1179 received in evidence.)

19          (Document displayed.)

20   **BY MS. CARSON:**

21   **Q.**    Now, Dr. Cole, the hand-drawn box on the left side of the

22   diagram is labeled with the words "database manager"; correct?

23   **A.**    Yes, the left-hand side that says "ResultsDB API" is

24   labeled "database manager."

25   **Q.**    And that's the component that you've identified as meeting

1  the database manager element from Claim 10; correct?

2  **A.**   It was my understanding that was already decided, that

3  there was a database manager and that that was ResultsDB API.

4  But I do agree with that finding.

5  **Q.**   And you agree ResultsDB API is not a database; correct?

6  **A.**   The API shows that it's an application programming

7  interface.  So that manages the database and, thus, why it's

8  called a database manager.

9  **Q.**   Now, the hand-drawn box on the right side of the diagram,

10  you labeled that with the term "database"; right?

11  **A.**   That is correct.

12  **Q.**   And that entire box is what you are pointing to for the

13  database in your infringement theory; right?

14  **A.**   Yes.  That's what I referred to as ResultsDB, which was

15  created by Juniper, in all the documents we showed.

16      And then what I circled, which is DynamoDB, S3, and MySQL,

17  that's the hardware at Amazon that actually stores the Results

18  Database.

19  **Q.**   And just to orient everyone, you referred to DynamoDB.

20  That's this box in the upper left corner; correct?

21  **A.**   Are you asking me if that box says DynamoDB?

22  **Q.**   Yes.  I'm just asking you to confirm that, when you

23  referred to DynamoDB, that's represented on the diagram in the

24  upper left corner; correct?

25  **A.**   Yes.

1   Q.   Okay.  And then S3 is another storage component.  It's

2   identified sort of midway through, on the right side of the

3   box, the big box that you drew; is that correct?

4   A.   Yes.  Those are Amazon components, not Juniper components.

5   Q.   Okay.  And then there's a few boxes here below S3 that are

6   labeled "RDS."  Do you see that?

7   A.   Yes.

8   Q.   And that's sometimes also referred to as MySQL, the MySQL

9   storage component; correct?

10  A.   That is correct.  Those are the three components of

11  Amazon, is DynamoDB, S3, and MySQL.

12  Q.   And you'd agree that each of these storage components --

13  MySQL, DynamoDB, and S3 -- are used for different purposes in

14  the Juniper system; fair?

15  A.   Yes, at a high level they're using those differently.  And

16  that's why we showed that evidence where Juniper said they

17  needed to build ResultsDB to sit on top.

18  Q.   So it's your opinion that Juniper created a database

19  separate and apart from these DynamoDB, S3, and MySQL

20  components that are pictured here.  That's your opinion?

21  A.   No, it is not.  My opinion is that they had to create a

22  structure in order to store the information to allow it to be

23  looked up, called ResultsDB.  And ResultsDB utilizes the

24  physical servers at Amazon to store that information, which are

25  DynamoDB, S3, and MySQL.

COLE - CROSS / CARSON

1  Q.  So I just want to confirm it's your opinion that Juniper
2  has used programming to create a database that's separate and
3  apart from MySQL, DynamoDB, and S3.  That's your testimony?
4  A.  No, I do not believe that's what I'm saying.  I'm not
5  saying they are separate.
6      I am saying that, through the source code that I showed
7  you, ResultsDB and all the documents, they created ResultsDB to
8  have the structure that was needed in order to allow the
9  adapters to interface with that database.
10     And that ResultsDB uses the physical storage of Amazon, so
11  they are related.  So I guess I'm saying no, because you want
12  to keep saying they're separate.  But there is a relationship
13  between them.  ResultsDB was created by Juniper.  We showed the
14  source code.  And then they run on the Amazon servers.
15  Q.  So I'd like to play from your deposition, June 21st, 2018,
16  page 228, lines 12 to 21.
17     (Video played, not reported.)
18  BY MS. CARSON
19  Q.  Now, sir, when you used the term "ResultsDB database,"
20  you're referring to the collection of the different storage
21  solutions, MySQL, DynamoDB, and S3; correct?
22  A.  Correct.  I'm actually using Juniper's definition of
23  Results Database based on their documents.
24     And we showed you the deposition testimony where Juniper's
25  own engineer said Results Database composes those Juniper --

1   sorry, Amazon databases.

2   **Q.**   So going back to the diagram that you annotated at your

3   deposition, when you're looking at the infringement piece, it's

4   everything within this big box that you've drawn, not one of

5   the pieces in it; fair?

6   **A.**   I apologize.  I don't understand the question.

7   **Q.**   Your infringement theory relies on the entire collection

8   of everything that's in this box, not on a particular component

9   within the box; correct?

10          **THE COURT:**  That's unclear.  You mean for the word

11  "database" that it relies?  Your question didn't even use the

12  word "database."  So rephrase the question.

13          **MS. CARSON:**  I'll clarify, Your Honor.

14  **BY MS. CARSON:**

15  **Q.**   When you're looking at the database element of the claim,

16  it's your opinion that it's everything within this box that

17  you've drawn, not just one of the three pieces of it; fair?

18  **A.**   Its Results Database is the infringing database.  And if

19  you notice the title, it says "Results Database Architecture."

20  And that is code and a system created by Juniper.  And

21  ResultsDB utilizes the Amazon servers that are run and

22  controlled by Amazon, which are in that box.

23          **THE COURT:**  Wait.  Okay.  She -- I want you to answer

24  either yes or no to her question, and then you can give an

25  explanation.

 1          Now, I didn't get it right the last time, so I'm going to

 2     ask your question again, and maybe I get it wrong again.

 3          What I think Ms. Carson is asking you is:  Everything in

 4     that box, that is labeled "database" on the diagram, is what

 5     you call the database for purposes of the Claim 10; is that

 6     correct?

 7          Is that your question?

 8               **MS. CARSON:**  Yes.

 9               **THE COURT:**  And you can say yes and you can say no,

10     but one of those two, plus whatever explanation you want to

11     give.

12               **THE WITNESS:**  Yes.  And that's what we're referring to

13     as the Results Database.

14          So remember the Results Database is software that was

15     created by Juniper.  We showed you all the source code and the

16     documents.  And then that sits on top of the physical servers

17     at Amazon, which are in the box.  So it utilizes Dynamo, S3,

18     and MySQL, the physical servers in Amazon.

19     **BY MS. CARSON:**

20     **Q.**   And, in fact, sir, you did not analyze whether MySQL

21     independently would infringe the database element of Claim 10;

22     correct?

23     **A.**   I believe that is correct.  I focused on ResultsDB as the

24     infringing database.

25     **Q.**   And you also didn't analyze whether DynamoDB independently

1   would infringe the database element of Claim 10; correct?

2   **A.**   I'm pausing because I believe in my report that I actually

3   did talk about the individual databases and that they do

4   infringe.

5        But here at trial what I presented this morning was

6   focused on ResultsDB.

7   **Q.**   Okay.  Well, let's go back to your deposition, sir.  Let's

8   go back to your June 21st, 2018, deposition, at page 259, lines

9   12 to 18.

10            **MS. CARSON:**   And I'd like to play that for the jury.

11            **THE COURT:**   Please play it.

12        (Video played, not reported.)

13  **BY MS. CARSON:**

14  **Q.**   Okay.  Let's talk a little bit more about JSON.

15  **A.**   Great.

16  **Q.**   JSON stands for JavaScript Object Notation; right?

17  **A.**   That is correct.

18  **Q.**   And JSON is a text-based data interchange format; correct?

19  **A.**   Yes, that's a high-level explanation of it, as in this

20  case it could be used to specify a schema and other purposes.

21  But I would agree with that high-level definition.

22  **Q.**   The JSON format is language independent; correct?

23  **A.**   I believe that is correct.

24  **Q.**   And a JSON file is a JavaScript file; correct?

25  **A.**   Based on the acronym standing for JavaScript Object

COLE - CROSS / CARSON

1    Notation, I would agree with that.

2    **Q.**   And as we discussed a bit earlier, the adapters in Sky ATP

3    create JSON files that report the results of the analysis that

4    they perform; correct?

5    **A.**   Yes.  That is the format that's used to store the

6    suspicious operations that come out of the static and dynamic

7    analysis that create the security profile that's stored in the

8    Results Database.

9    **Q.**   A JSON file could have a schema without ever being stored

10   in a database; correct?

11   **A.**   I apologize.  I don't understand the question.

12   **Q.**   There could be a JSON for the file -- strike that.

13        There could be a schema for the JSON file without it ever

14   being stored in a database; correct?

15   **A.**   I guess you could technically have a JSON file that

16   specifies a schema.

17   **Q.**   And you wouldn't have to store that in a database;

18   correct?

19   **A.**   In -- are you asking in general or this specific case?

20   **Q.**   I'm just asking in general.

21        It's possible to have a JSON file that has a file schema

22   that doesn't get stored in a database; correct?

23   **A.**   Yes, if you're asking outside the scope of this case in

24   general, that could possibly exist.

25        In this case we showed you all the documents where the

1   JSON is clearly the schema for the Results Database and

2   multiple pieces of Juniper evidence that show that.  So in this

3   particular case, the JSON is the schema for the database.

4   **Q.**   You'd agree with me, sir, that all schemas are not

5   database schemas; correct?

6        You could have a file schema, for example, and that

7   doesn't necessarily mean it's a database schema; correct?

8   **A.**   Yes.  So if we're talking just general databases, then

9   that is possible.  It's not specific to this case, but, in

10  general, that could exist outside.

11  **Q.**   With respect to your analysis in this case, you did not

12  determine whether all the JSON files that are stored in

13  DynamoDB or S3 have the same schema; correct?

14  **A.**   Can you repeat that question one more time?

15       **THE COURT:**  Can you use -- say it without putting in

16  the word "not."  Just say, Did you determine?

17  **BY MS. CARSON:**

18  **Q.**   Did you determine, in your analysis with respect to this

19  case, whether all the JSON files stored in DynamoDB and S3 have

20  the same file schema?

21  **A.**   I do not believe I did that, because it's the Results

22  Database that is the infringing database.  And as you saw all

23  of Juniper's documents, that goes in and shows there's a

24  schema.  I wasn't focused on --

25       **THE COURT:**  You know, listen.  You're not being fair.

COLE - CROSS / CARSON

1   You answered the question no, you didn't do that.  The way this

2   works, she's entitled to make her points.  And every time she

3   tries to get a point out of you, you answer it, maybe, but then

4   you make a speech, a counter rebuttal.  That's not the way this

5   works.

6        She's entitled to get her answer, and then we move on.  So

7   just answer her question and not make a counter speech, please.

8            THE WITNESS:  Okay.

9            THE COURT:  Go ahead, Ms. Carson.

10           MS. CARSON:  Thank you, Your Honor.

11  BY MS. CARSON:

12  Q.   Now, when you were performing your infringement analysis,

13  you understood that the agreed construction of "database" is a

14  collection of interrelated data organized according to a

15  database schema to serve one or more applications; correct?

16  A.   Yes.

17  Q.   And so in order to demonstrate infringement, you'd agree

18  that you need to show that the data stored in this thing that

19  you called ResultsDB database is organized according to a

20  database schema; fair?

21  A.   Yes.

22  Q.   And it's your position that the database schema for the

23  thing that you've identified as ResultsDB database is the JSON

24  schema; right?

25  A.   That is correct.

**COLE - CROSS / CARSON**

1  **Q.**   It's your opinion that all of the data stored in the

2  ResultsDB database is structured according to a JSON schema;

3  right?

4  **A.**   Could you repeat that question one more time?

5  **Q.**   It's your opinion that all of the data stored in the

6  ResultsDB database is structured according to a JSON schema;

7  correct?

8  **A.**   I would say no, because I'm careful with the word "all."

9  But there is a schema for the Results Database.

10 **Q.**   I would like to read a sentence from your report at

11 paragraph 87.

12        **THE COURT:**  Read it exactly and no modifications.

13        **MS. CARSON:**  (As read:)

14        "Further, all of the data stored in the ResultsDB

15     database is structured according to a JavaScript Object

16     Notation, paren, quote, JSON, end quote, paren, schema,

17     which sets forth the structure of the data in the

18     ResultsDB."

19 **BY MS. CARSON:**

20 **Q.**   It's your position --

21        **THE COURT:**  Wait, wait.  You need to ask, Was that in

22 your report?

23 **BY MS. CARSON:**

24 **Q.**   Was that in your report, sir?

25        **THE COURT:**  It's either a yes or a no.

COLE - CROSS / CARSON

1           **MR. ANDRE:**  Your Honor?

2           **THE COURT:**  What?

3           **MR. ANDRE:**  May I object and hand him a copy of his

4    report so he can verify --

5           **THE COURT:**  Well, if he doesn't remember, of course,

6    that's fair.  We can't ask him to remember every detail.

7        Just do this, Ms. Carson.  Do you have that right in front

8    of you?

9           **MS. CARSON:**  He has a copy of his report.

10          **THE COURT:**  Walk up there.  Do this.  We're going to

11   do it the old-fashioned way.

12       Ms. Carson, walk up there, stand beside the witness, open

13   it to the page.  You got it?

14          **MS. CARSON:**  Getting there.

15          **THE COURT:**  All right.  You just stand right there for

16   a second.  Got it?

17       All right.  You got it?

18          **MS. CARSON:**  I do.

19          **THE COURT:**  Point your finger to the sentence and read

20   it out loud yourself.

21   **BY MS. CARSON:**

22   **Q.**   Sir, this states (reading):

23          "Further, all of the data stored in the ResultsDB

24       database is structured according to a JavaScript object

25       notation ('JSON') schema which sets forth the structure of

COLE - CROSS / CARSON

1           the data in the ResultsDB."

2               THE COURT:  And then you say, "That's what your report

3       said, isn't it?"

4       BY MS. CARSON:

5       Q.   That's what your report said, isn't it?

6       A.   Yes, it is.

7               THE COURT:  All right.  That's the old-fashioned way.

8           All right.  Go ahead.

9       BY MS. CARSON:

10      Q.   It's also your position, sir, that the JSON schema is

11      enforced on all the data that is stored in the ResultsDB

12      database; correct?

13      A.   Yes, that is correct.

14      Q.   Now, the thing that you identify as the ResultsDB database

15      stores both JSON files as well as other types of data, such as

16      hashes and metadata and samples; right?

17      A.   Yes.

18      Q.   But it's your position that the ResultsDB manager enforces

19      the JSON schema on all data that gets stored in the ResultsDB

20      database, not just the JSON files that got stored in the

21      Results --

22              THE COURT:  Read that again.  You said it fine, but

23      there was a lot of info there.  Read it again more slowly so

24      that I can get it and the jury can get it.  Go ahead.

25              MS. CARSON:  Sure.

1   Q.   It's your position, sir, that the ResultsDB manager

2   enforces the JSON schema on all data that gets stored in the

3   ResultsDB database, not just the JSON files; correct?

4   A.   Could you just do it one more time?  There was a lot

5   there.

6   Q.   It's your position, sir, that the ResultsDB manager, which

7   is the ResultsDB API, enforces the JSON schema on all data that

8   gets stored in the ResultsDB database, not just the JSON files?

9   A.   Yes.

10   Q.   For example, it's your position that the sample ID, or

11   what you referred to earlier as the hash, that gets stored in

12   MySQL database adheres to the JSON schema that you've

13   identified; correct?

14   A.   Yes.  But you're referring to MySQL now, which is the

15   Amazon system, not ResultsDB.

16   Q.   Now, you testified a bit earlier about Juniper source

17   code?

18   A.   Yes.

19   Q.   And one of the files you identified was the main schema

20   file.  Do you recall that?

21   A.   Yes, I do.

22   Q.   And it was your testimony that that's the source code file

23   that describes the JSON schema that you've identified; right?

24   A.   One of the many source code files.

25   Q.   It's your position that this file sets forth the structure

COLE - CROSS / CARSON

1   for the entire ResultsDB database that you've been referring

2   to, which includes MySQL, DynamoDB, and S3; correct?

3   A.   Sorry.  Which source code file are you referring to?

4   Q.   The main schema file that you identified in your testimony

5   earlier.

6   A.   Could you repeat the question now that I know which file?

7   Q.   It's your position that the main schema source code file

8   sets forth the structure for the entire ResultsDB database that

9   you've been referring to, which includes MySQL, DynamoDB, and

10  S3; correct?

11  A.   No, I would not say "entire."  There's many, many pieces

12  of source code and that's one of the pieces of source code that

13  defines that.

14       MS. CARSON:  Let's play from your deposition, your

15  November 14th, 2018, deposition, page 223, line 24, to

16  page 224, line 8.

17            (Video was played but not reported.)

18  BY MS. CARSON:

19  Q.   And it's your position that this file also includes the

20  subschemas of MySQL, DynamoDB, and S3; right?

21  A.   Yes, but it's one of several source code files, not the

22  only one.

23  Q.   But it's your testimony that it does, indeed, include the

24  subschemas for MySQL, DynamoDB, and S3; right?

25  A.   Like I said, I believe it contains some of that

1   information but not all of that information.

2   **Q.**   So I think we agreed earlier that the agreed construction

3   of database was a collection of interrelated data stored

4   according to a database schema to serve one or more

5   applications; correct?

6   **A.**   Yes.

7   **Q.**   And you interpreted "database schema" as anything that

8   sets forth the structure of the data for the database; correct?

9   **A.**   No.  I would disagree with the word "anything."  The

10  database schema is the structure for how the information is

11  stored within a database.

12      **MS. CARSON:**  Let's play from your deposition

13  November 14th, 2018, page 181, line 22, through page 182,

14  line 8.

15          (Video was played but not reported.)

16  **BY MS. CARSON:**

17  **Q.**   Now, sir, you were hired by Finjan as a paid expert in

18  this case; correct?

19  **A.**   That is correct.

20  **Q.**   And you've worked with Finjan on several other lawsuits in

21  addition to the current case; correct?

22  **A.**   That is also correct.

23  **Q.**   You've testified for Finjan in at least four prior trials;

24  right?

25  **A.**   I believe that to be correct.  It would be between three

1   to four.

2   **Q.**  And Finjan has paid you hundreds of thousands of dollars

3   for your work as an expert witness in these cases; correct?

4   **A.**  I would have to check with my Accounting Department, but

5   that would not surprise me.

6   **Q.**  Now, in each of these instances, you served as Finjan's

7   infringement expert; right?

8   **A.**  I believe that to be correct.

9   **Q.**  You understand that in some of those other cases, the

10  defendants challenged the validity of Finjan's patents before

11  the United States Patent Office; right?

12     **MR. ANDRE:**  Objection, Your Honor.  Outside the scope

13  and irrelevant.

14     **THE COURT:**  Well, outside the scope, I'm not -- I

15  mean, she's entitled to go -- what do you mean "outside the

16  scope"?

17     **MR. ANDRE:**  She's talking about validity issues and

18  talking about relationship to validity, and we didn't talk

19  anything about validity.  Validity is not in this case.

20     **THE COURT:**  Well, where is this going?

21     **MS. CARSON:**  This goes to the claim construction that

22  he applied for database schema, which is inconsistent.

23     **THE COURT:**  All right.  I understand the issue.  The

24  objection is overruled.

25

1    BY MS. CARSON:

2    Q.    So you understand, sir, in those other cases there were

3    other defendants who challenged validity of Finjan's patents

4    before the United States Patent Office; right?

5    A.    Sorry.  What was the question?

6    Q.    You understand that in some of the other cases, defendants

7    have challenged the validity of the '494 patent --

8    A.    Yes.

9    Q.    -- before the United States Patent Office?

10    A.    Sorry.  Yes.

11    Q.    Now, in those proceedings before the Patent Office, Finjan

12    didn't use you as an expert; right?

13    A.    That is correct.

14    Q.    So you weren't the one offering your expert opinions to

15    defend the patents in those validity proceedings, were you?

16    A.    No, I was not.

17    Q.    And instead Finjan hired a different expert named

18    Dr. Medvidovic; right?

19              THE COURT:  Spell that, please.

20              MS. CARSON:  M-E-D-V-I-D-O-V-I-C.

21              THE COURT:  All right.  Please, do you know?  Is that

22    correct?

23              THE WITNESS:  That sounds correct.  I don't know the

24    spelling.

25              THE COURT:  Okay.  No, but do you know that they hired

1    him for validity before the Patent Office?  Is that part

2    something you can tell us occurred?

3              THE WITNESS:  Yes, that is my understanding.

4              THE COURT:  All right.  Go ahead.

5    BY MS. CARSON:

6    Q.   And in trying to save Finjan's patents before the

7    United States Patent Office, Dr. Medvidovic came up with a

8    different meaning of "database schema" than you did, didn't he?

9              MR. ANDRE:  Objection, Your Honor.

10             THE COURT:  Overruled.

11             THE WITNESS:  Sorry.  Could you repeat the question?

12   BY MS. CARSON:

13   Q.   In trying to save Finjan's patents before the

14   United States Patent Office, Dr. Medvidovic came up with a

15   different meaning of "database schema" than you did?

16   A.   I would have to go back to check.  I don't have that

17   memorized, but I believe that could be true.

18   Q.   Well, let's take a look.  So if you could turn to

19   Exhibit 1760 in your binder.

20   A.   (Witness examines document.)  1716?

21   Q.   1760.

22   A.   Oh, '60.  Thank you.

23   Q.   Do you recognize what this is?

24   A.   Yes.

25   Q.   This is Finjan's patent owner response in the validity

1  proceedings before the United States Patent Office; correct?

2  **A.**   That looks to be correct.

3          **MS. CARSON:**  Your Honor, I --

4          **THE COURT:**  Wait.  On what patent?

5          **MS. CARSON:**  On the '494 patent.

6          **THE COURT:**  Is that correct, on the '494?

7          **THE WITNESS:**  (Witness examines document.)  Yes, that

8  is for the '494.

9          **THE COURT:**  All right.

10 **BY MS. CARSON:**

11 **Q.**   And this is part of the prosecution history of the '494

12 patent; correct?

13 **A.**   (Witness examines document.)  Yes, that looks to be

14 correct.

15         **MS. CARSON:**  Your Honor, I move to admit Exhibit 1760.

16         **THE COURT:**  1760.

17         **MR. ANDRE:**  Objection, Your Honor.

18         **THE COURT:**  Is this the objection you made before?

19         **MR. ANDRE:**  No, Your Honor.  This is a patent owner's

20 statement in a case involving *Palo Alto Networks v. Finjan* in

21 an IPR proceeding.

22         **THE COURT:**  But is it a statement by Finjan?

23         **MR. ANDRE:**  It is a patent owner's statement, that's

24 correct.

25         **THE COURT:**  Well, then it is an admission against

 1   interest under the -- it's not a hearsay problem.  It's been

 2   authenticated.  1760 is received in evidence.

 3        (Trial Exhibit 1760 received in evidence)

 4   **BY MS. CARSON:**

 5   **Q.**   Could you turn to page 35, sir?

 6   **A.**   (Witness examines document.)  Sorry.  Which page numbering

 7   are you using?

 8   **Q.**   Page 35, please.

 9   **A.**   Yeah.  There's two different.  Are you using the report

10   page number or the exhibit page number?

11   **Q.**   The page number of the brief.  It's exhibit page number

12   1760-46.

13   **A.**   Thank you.

14   **Q.**   Are you with me?

15   **A.**   Yes, I am.

16   **Q.**   Okay.  And do you see sort of midway through the page

17   there's a statement here that says (reading):

18        "As Dr. Medvidovic explains, a person skilled in the

19        art at the time would understand a database schema to be a

20        description of a database to a database management system

21        (DBMS) in the language provided by the DBMS"?

22        Do you see that, sir?

23   **A.**   I do see that.

24   **Q.**   Now, in Sky ATP, there are multiple languages used;

25   correct?

1   **A.**   Yes, that is true.

2   **Q.**   For example, the ResultsDB manager that you identified as

3   the infringing database management system is written in Python;

4   correct?

5   **A.**   Could you repeat the question?

6   **Q.**   The ResultsDB manager that you identified as the

7   infringing database management system is written in Python;

8   correct?

9   **A.**   Yes, that is my understanding.

10  **Q.**   But for the MySQL database, you run queries using the

11  standard query language; correct?

12  **A.**   Yes.   For the MySQL database that's run by Amazon, they

13  use MySQL for queries.

14  **Q.**   And you don't even know what language S3 or DynamoDB is

15  written in; correct?

16  **A.**   I do not recall those offhand.

17  **Q.**   And that's because you weren't applying the same

18  construction of database schema in your analysis that Finjan's

19  expert Dr. Medvidovic applied to try to save the patent in the

20  Patent Office; isn't that right?

21  **A.**   That is correct.   My understanding is that there was a

22  ruling by the Court after this that came up with a new

23  definition of "database schema" that I utilized.

24          **MS. CARSON:**   Objection, Your Honor.   I move to strike

25  that.

COLE - CROSS / CARSON

 1          **THE COURT:**  Are you talking about me?  By me the Court

 2    or some other Court?

 3          **THE WITNESS:**  My understanding was the Court that

 4    ruled on this IPR came up with a new definition of "database

 5    schema" that was aligned with the construction that I used.

 6          **THE COURT:**  Well, I don't know.  Okay.  But you did

 7    ask.  He's responded to your question so --

 8    **BY MS. CARSON:**

 9    **Q.**  Sir --

10          **THE COURT:**  -- he is agreeing that he did not use

11    Medvidovic's approach -- right? -- but that you say that you

12    did use the approach that the Patent Office came up with?  I

13    don't know if that's true or not, but that's what you're

14    saying; right?

15          **THE WITNESS:**  Yes.

16          **THE COURT:**  All right.  Okay.  Go ahead.

17    **BY MS. CARSON:**

18    **Q.**  Sir, you don't cite that in your report anywhere; correct?

19          **THE COURT:**  Cite what?

20          **MS. CARSON:**  The supposed ruling of a different

21    finding of the meaning of "database schema."

22          **THE WITNESS:**  No, but I don't cite this either in my

23    report so I'm trying to be responsive to your question.

24    **BY MS. CARSON:**

25    **Q.**  Okay.  I want to switch gears a bit now.  Yesterday you

 1  were discussing a bit about what you believed was innovative

 2  about Claim 10 of the '494 patent.  Do you recall that?

 3  A.   Yes, I do recall that.

 4  Q.   And I think if you recall, your counsel put up the claim

 5  language of Claim 10, and you drew some circles around some

 6  elements.  It was a little hard to tell which ones you were

 7  drawing around because it was a little squiggly, but if we

 8  could pull up our demonstrative here.

 9      I believe the elements you were focused on or that you

10  said were highlighted were the downloadable, the security

11  profile data, and the database.  Do I have that right?

12  A.   (Witness examines document.)  Yes.  Those are three.  I

13  mean, it's the whole -- when you look at innovation, you look

14  at the whole patent.  You don't tend to pull words out, but

15  those are three key phrases that make up the entire patent.

16  Q.   And this was what you referred to when you were speaking

17  to the ladies and gentlemen of the jury as the highlights of

18  Claim 10; correct?

19  A.   Yes, I believe that is correct.

20  Q.   Okay.  So I want to go to our next slide here and take a

21  closer look at Claim 10.  And if we could highlight the

22  downloadables as well.

23      The next slide.

24      Okay.  So these are the highlights that you identified,

25  and now I want to compare this to Claim 1.

1          **THE COURT:**  Wait a minute.

2          **MR. ANDRE:**  Your Honor, I have an objection to this

3    line of questioning.  This involves an issue that you've

4    already ruled on in the *motions in limine* regarding the IPR

5    proceedings and the final written decision in the IPR

6    proceedings.

7          **THE COURT:**  I don't remember what you're talking

8    about.  I'm sorry.  There have been -- the jury probably thinks

9    that I'm losing my mind in my old age.

10        You need to know how many motions these lawyers made

11   before the trial, and the idea that I can remember the rulings

12   on every single one of them, no.  Maybe 30 years ago I could

13   have.

14        But, I'm sorry, we'll have to take it up at the next

15   break; and if it turns out that Ms. Carson is violating a

16   ruling that I made, then we will have to explain to the jury to

17   disregard some testimony, but we'll take it up at the next

18   break.

19        Are you violating a ruling?

20        **MS. CARSON:**  No, Your Honor.

21        **THE COURT:**  All right.  I'll take your word for it for

22   the moment.

23        All right.  So go ahead and make your point.

24        **MS. CARSON:**  All right.  So let's pull up the language

25   of Claim 1.

COLE - CROSS / CARSON

1  **Q.**   Now, sir, all of the highlights that you identified from

2  Claim 10 appear in Claim 1 as well; correct?

3  **A.**   (Witness examines document.)  Yes.  It looks like that's

4  the case.

5  **Q.**   And you're aware, sir, that the United States

6  Patent Office has found that Claim 1 is invalid; correct?

7  **A.**   Yes, that was my understanding.

8  **Q.**   So each of the elements that you identified to the jury as

9  being a highlight of Claim 10 was included in the now

10  invalidated Claim 1; correct?

11  **A.**   Yes.  It looks like that's the case, but I want to

12  emphasize what I said earlier, that you have to look at the

13  entire claim and I was just putting some keywords together

14  yesterday.  That is not the entire claim language.

15  **Q.**   Okay.  Now while we have the claim language up here, I

16  just want to clarify one more thing.

17        So yesterday when you were describing Claim 10, I think a

18  couple times you mentioned that it covers determining a

19  verdict.  Do you recall providing that testimony?

20  **A.**   You would have to provide some more context.  I've been

21  talking for a while up here so you might need to give a little

22  more context.

23  **Q.**   You would agree, sir, that --

24        **THE COURT:**  Why don't you just read back his

25  testimony?  Just read his testimony from yesterday.  You have

1    it somewhere.  And then you don't even have to ask him if he

2    remembers it.  It will just be part of the public record.  So

3    just read the comment that came from yesterday, and then ask

4    your follow-up question.

5                    (Pause in proceedings.)

6           THE COURT:  If that's going to take too long to find,

7    then --

8           MS. CARSON:  I've got it, I think.  I just had the

9    wrong one.

10   Q.   Okay.  So from page 393, lines 11 through 15 --

11          THE COURT:  All right.  Just read it exactly.

12   BY MS. CARSON:

13   Q.   -- you state (reading):

14          "If you remember the claim language, in my opinion,

15       this is very similar to the claim language.  It talks

16       about receiving a downloadable.  It talks about going in

17       and looking for suspicious operations and creating a

18       security profile and then providing a verdict back."

19       Now, Claim 10 doesn't talk about a verdict; correct?

20   A.   That is correct.

21   Q.   So you added the concept of a verdict to Claim 10 when you

22   were discussing Claim 10; correct?

23   A.   I don't add to the claim language so, no.  I don't know

24   what the question was that you just read from so I don't know

25   what I was responding to, but I was describing how the overall

1  system works yesterday.  But I used the claim language exactly

2  as is so I was not changing the claim language.

3  **Q.**   The '494 patent does not use the term "verdict"; correct?

4  **A.**   Could we narrow it to Claim 10 doesn't use the word

5  "verdict"?  Because the patent is a big patent.  So I would

6  have to go back and review if you want me to check a specific

7  word.

8  **Q.**   Claim 10 does not use the term "verdict"; correct?

9  **A.**   Correct.

10 **Q.**   Now, the claim element we're focused on at this trial is

11 the database element; correct?

12 **A.**   That is correct.

13 **Q.**   And you testified yesterday that the innovative component

14 of the system is that you store the security profile in a

15 database; correct?

16 **A.**   That was one of the items that I highlighted.

17 **Q.**   Databases were available prior to the '494 patent;

18 correct?

19 **A.**   Yes.  General databases were available but not in the

20 unique way that Finjan was using it.

21 **Q.**   Database managers also existed prior to the '494 patent;

22 correct?

23 **A.**   Yes.  General database managers existed but not in the

24 unique way that was being used in the Finjan patent.

25 **Q.**   I want to focus now on your testimony about the alleged

1  importance of this technology to Juniper.

2      Now, sir, you would agree that it's important to consider

3  all relevant evidence in forming your opinions; right?

4  **A.**   Yes.

5  **Q.**   And you'd agree that it's important to do a thorough

6  investigation before you form your opinions; correct?

7  **A.**   Yes.  I look at all the evidence, the deposition

8  testimony, the source code, to form my opinion.

9  **Q.**   And you testified yesterday that Sky ATP is critical to

10 Juniper's business; correct?

11 **A.**   I believe that to be correct.

12 **Q.**   In fact, you testified that Juniper needed Sky ATP so that

13 it could keep selling its routers and switches; right?

14 **A.**   Yes.

15 **Q.**   You understand, sir, that Sky ATP cannot be deployed in

16 combination with any Juniper product other than SRX; right?

17 **A.**   My understanding is that -- so -- sorry -- to answer, no,

18 that's not my complete understanding; that Sky ATP not only

19 supports SRX but also shows customers that Juniper is in

20 security and does analyze and understand realtime threats.

21 **Q.**   So that wasn't my question, sir.  My question was whether

22 it's your understanding that Sky ATP can only be deployed in

23 combination with the SRX; it can't be deployed with other

24 Juniper products.

25 **A.**   Can you define "deployed"?

COLE - CROSS / CARSON

1    Q.   Other Juniper products besides the SRX cannot be used in

2    combination with Sky ATP; correct?

3    A.   Yes, directly utilized.  But, like I said, infrastructure

4    companies need to show that they're focused on security so I

5    believe it indirectly supports the other products.

6    Q.   Now, in forming your opinions, you didn't figure out what

7    percentage of SRX customers actually use Sky ATP; right?

8    A.   No.  That was not part of my assignment.  I was focused on

9    infringement.

10   Q.   And, in fact, you didn't even ask for that information;

11   correct?

12   A.   That is correct, because I was focused on infringement.

13   Q.   And you also did not perform any analysis to determine

14   what percentage of Juniper's customers for the SRX were

15   motivated to purchase the SRX because of the availability of

16   Sky ATP; right?

17   A.   That is correct.

18   Q.   Now, you also mentioned yesterday, I think on the little

19   diagram where it shows the computer and then the SRX and then

20   going up into the cloud, you made a reference to the fact that

21   the computer could represent multiple users.  Do you recall

22   that?

23   A.   Yes, I do recall that.

24   Q.   You didn't perform any analysis to determine how many

25   users are actually protected by SRX devices that are actually

1  deployed in combination with Sky ATP; is that right?

2  **A.**   Could you repeat that question?  There were a lot of

3  disclaimers in there.

4  **Q.**   You didn't perform any analysis to determine how many

5  users are actually protected by SRX devices that are deployed

6  in a combination with Sky ATP; correct?

7  **A.**   Yes, that is correct, but I do know that SRX are applied

8  on enterprises that have many users sitting behind the SRX.

9  **Q.**   And you recall earlier this morning there was a slide

10  where it was discussing the number of scans that are completed

11  for a particular SRX unit?  Do you recall that?

12  **A.**   Yes, I remember the slide; but if you want me to remember

13  the numbers, I would need to see it again.

14  **Q.**   We don't need to talk about the numbers.  Hopefully you'll

15  remember this.  We can pull it up if needed.

16      But the slide was related to the numbers for March of

17  2017.  Do you recall that?

18  **A.**   I know it was a seven-week [sic] period.  I don't remember

19  the exact date, but I know it was in 2017.

20  **Q.**   Do you -- okay.  Let's pull it up.

21  **A.**   Can we just pull it up?  Thank you.

22          **MS. CARSON:**  Exhibit 88, page 64, please.

23       **MR. ANDRE:**  Your Honor, Ms. Carson objected to me

24  asking questions on that and I withdrew that question.  I don't

25  object if I can redirect on it.

COLE - CROSS / CARSON

1          THE COURT:  Is that true, that the other side tried to

2     use this and you didn't want him to?

3          MS. CARSON:  I objected to him providing testimony

4     outside the scope of what's actually on the document.  The

5     questions that were being elicited were not included in the

6     report.

7          I simply want to make the point that this is for March of

8     2017, which is right on the face of the document and he

9     testified to it earlier.

10         THE COURT:  Was there any testimony about this

11    document, Mr. Andre?

12         MR. ANDRE:  There was testimony about the document.

13    Then when I got to this page, Ms. Carson objected and I said

14    "Well, I'm running short of time," so I withdrew my question

15    with respect to that page.

16         THE COURT:  I thought -- was it shown to the jury?

17         MS. CARSON:  It was shown to the jury, Your Honor.

18         THE COURT:  All right.  Go ahead and make your point.

19    Overruled.

20    BY MS. CARSON:

21    Q.   This analysis is for the seven-day period in March 2017;

22    correct?

23    A.   Yes, that is correct.

24    Q.   The '494 patent expired in January of 2017; correct?

25    A.   That is correct.

COLE - CROSS / CARSON

1   **Q.**   So this is outside the damages period for this case;

2   correct?

3   **A.**   Yes, that specific date would be, but the relative number

4   of threats are pretty similar and pretty standard so it's a

5   representation.

6   **Q.**   Okay.  We can take that down, please.

7        Now, I just want to clarify one additional point.  I think

8   we're all clear on this, but your theory is not that the SRX

9   alone infringes Claim 10; correct?

10  **A.**   Yes, that is correct.  It's SRX and ATP, Sky ATP, and then

11  Sky ATP by itself.

12  **Q.**   And an SRX can't even connect to Sky ATP until the

13  customer gets a license or enables the software to interface

14  with Sky ATP; correct?

15  **A.**   Yes, that is my understanding, but it's also my

16  understanding that the actual source code for that is present

17  on the SRX box whether it's activated or not.

18  **Q.**   Now, sir, earlier this morning you were talking about the

19  different Sky ATP license types.  Do you recall that?

20  **A.**   Yes.  I believe there was one slide.  Was that the free

21  versus premium?

22  **Q.**   Yeah.

23  **A.**   Yes.

24  **Q.**   And Your Honor asked you the question as to whether the

25  only difference between the free version and the premium

1  version was the number of files that could be processed.  Do

2  you recall that?

3  **A.**   Yes.

4  **Q.**   And you testified to Your Honor that, indeed, that was the

5  only difference.  Do you remember that?

6  **A.**   Yes.  That was my understanding in looking at the

7  material.

8  **Q.**   That wasn't true, sir, was it?

9  **A.**   From looking at the material, I do believe that to be

10  true.

11        **MS. CARSON:**  May I approach, Your Honor?

12        **THE COURT:**  Sure.

13  **BY MS. CARSON:**

14  **Q.**   This is Trial Exhibit 182.  Have you seen this, sir?

15  **A.**   (Witness examines document.)  Yes.  This looks like a

16  licensing technical document.

17        **MS. CARSON:**  Your Honor, I move to admit Trial

18  Exhibit 182.

19        **MR. ANDRE:**  Objection.  Lacks foundation.  I don't

20  know if he's ever seen this document until today.

21        **THE COURT:**  Sustained so far.

22  **BY MS. CARSON:**

23  **Q.**   Sir, this identifies a number of additional differences

24  between the free model and --

25        **THE COURT:**  Well, wait.  It's not in evidence.  You

COLE - CROSS / CARSON

```
 1   can't testify about it.  There are other ways to get the
 2   document in evidence if he can't do it.
 3   BY MS. CARSON:
 4   Q.  Sir, does this --
 5             THE COURT:  But you can't just start blurting things
 6   out to the jury.
 7   BY MS. CARSON:
 8   Q.  Sir, does this refresh your recollection as to whether
 9   there are additional differences between the licensed models?
10   A.  No.  I wouldn't say it recollects my memory because I
11   don't remember seeing this, but my understanding with the
12   documents that I saw was that my answer was accurate to the
13   judge.
14             THE COURT:  Well, to be technically correct, that's
15   not the way refreshing memory works; but, Ms. Carson, he didn't
16   say that he had a failure of recollection so there's no point
17   in trying to -- but anything, whether -- you know, the scent of
18   someone's perfume from 50 years ago can refresh your
19   recollection.  A document you've never seen before can refresh
20   your recollection.  Anything is conceivably possible to refresh
21   recollection.  So the fact that you haven't seen it before
22   doesn't matter.  It might refresh your memory.
23             But the problem more fundamentally, Ms. Carson, is that he
24   didn't say he couldn't remember.  He just said -- he said that
25   his testimony was what he thought was true.  So this is not a
```

 1   proper way to try to refresh his memory.

 2          **MS. CARSON:**  I'll ask a different question,

 3   Your Honor.

 4          **THE COURT:**  What?

 5          **MS. CARSON:**  I'll ask a different question,

 6   Your Honor.

 7          **THE COURT:**  Thank you.

 8   **BY MS. CARSON:**

 9   **Q.**   Do you stand by your testimony, sir, that the only

10   difference between the free version of Sky ATP and the premium

11   version is the number of files that are analyzed?

12   **A.**   Well, you just gave me a new document that presented new

13   information that I haven't seen, so I would need time to

14   analyze the evidence to be able to answer that.

15          **THE COURT:**  Well, is the answer you don't stand by it

16   or you do?  I mean, I think she's asked a fair question.  I

17   mean, you can take it back if you want and say, "Well, maybe I

18   spoke too soon.  I don't want to go that far," but you did give

19   a pretty categorical answer.  You did give a categorical answer

20   before; and whether or not that causes you to question it or

21   not, do you still stand by that statement earlier?

22          **THE WITNESS:**  Right now, yes.  If I had five or ten

23   minutes to review this, then that might be different; but right

24   now, I stand by my answer.

25          **THE COURT:**  All right.

1          **MS. CARSON:**  Nothing further, Your Honor.

2          **THE COURT:**  Okay.  We're not quite ready to take a

3     break unless a member of the jury needs it.

4          No?  Okay.  Let's go now to redirect.

5                      **<u>REDIRECT EXAMINATION</u>**

6     BY MR. ANDRE:

7     **Q.**   Dr. Cole, you were asked a question about whether you had

8     done any analysis on the three components of the Results

9     Database, the MySQL, the DynamoDB, and S3.  Do you recall that?

10    And you answered that you thought you had done some.  Do you

11    recall that?

12    **A.**   Yes, I do.

13    **Q.**   And Ms. Carson played a clip from your deposition in which

14    the question was (reading):

15          "Have you done any analysis to determine whether any

16          of these components -- the MySQL database, the DynamoDB,

17          and S3 -- independently would infringe Claim 10?"

18          And you said, "That analysis was not performed."

19          Do you recall that, that she played you that clip?

20    **A.**   I do remember that clip.

21    **Q.**   And that was from the June 21st deposition you took;

22    right?

23    **A.**   That is correct.

24    **Q.**   And your expert report in this case was done several

25    months later; right?  It was done in September.  She tricked

COLE - REDIRECT / ANDRE

1  you, didn't she?

2       THE COURT:  Well, wait a minute.  What do you mean she

3  tricked him?

4       MR. ANDRE:  Well, he had done an analysis in his

5  expert report in September but in an earlier deposition that

6  she impeached him with he said he hadn't done it at that time.

7  So she asked him a question and said, "Have you done this

8  analysis?"  He says, "I think I did."  It's in his expert

9  report, but she played him a deposition months before his

10 expert report.

11      THE COURT:  Well, why was he even deposed if he had

12 hadn't done his report yet?

13      MR. ANDRE:  There were declarations that were filed,

14 Your Honor, in summary judgment; and after the summary judgment

15 declaration, he filed an expert report and he did the analysis.

16      THE COURT:  Oh, I see.  All right.

17      MR. ANDRE:  So that's what I'm saying.

18      THE COURT:  All right.  So your point is the question

19 from the deposition that was played or asked was with respect

20 to an earlier event, namely, the affidavit under oath that the

21 witness had given, but that the report itself came later?

22      MR. ANDRE:  And he had done the analysis.

23      THE COURT:  All right.  Okay.

24    Is that true?  I don't know.  You have to -- don't just

25 take our word for it.  Is that true?

 1           **THE WITNESS:**  Yes, that is true.  And I didn't defend

 2    because I was trying to honor your request of not giving

 3    detailed answers before.

 4           **THE COURT:**  All right.  Now, go to your next point.

 5    **BY MR. ANDRE:**

 6    **Q.**   So in your expert --

 7           **THE COURT:**  Well, I don't know about the word "trick."

 8    Okay.  You've made a point.

 9        Is that it?

10           **MR. ANDRE:**  No.  A couple more.

11    **Q.**   And as far as the claim construction goes, you said you

12    relied on the findings of the Patent Office for what the

13    database schema means, correct, and not Dr. Medvidovic?

14           **THE COURT:**  Well, no, no, no.  He didn't quite say

15    that.  He said that, but he also admitted it was not in his

16    report so it's kind of hard to say he relied on it, but you --

17        All right.  Go ahead.

18    **BY MR. ANDRE:**

19    **Q.**   Did you rely upon the findings of the Patent Office as to

20    what the database schema meant and not Dr. Medvidovic?

21    **A.**   Yes, I did.

22    **Q.**   Okay.  And Ms. Carson also showed you a comparison of

23    Claim 1 as compared to Claim 10 of the '494 patent.  Do you

24    recall that?

25    **A.**   Yes, I do.

1   **Q.**   And she said that the Patent Office had found Claim 1

2   invalid.  Do you recall that?

3   **A.**   Yes, I do.

4   **Q.**   Do you know how many times the Patent Office found

5   Claim 10 valid?

6   **A.**   I know it was many, many times.  I don't know the exact

7   number but I know it was many, many, many times.

8          **MR. ANDRE:**  I don't have any further questions,

9   Your Honor.

10         **THE COURT:**  Anything more?

11         **MS. CARSON:**  Nothing further, Your Honor.

12         **THE COURT:**  Okay.  May the witness now be excused or

13  is he going to possibly come back?

14         **MR. ANDRE:**  He may be excused, Your Honor.

15         **THE COURT:**  Can we excuse the witness?

16         **MS. CARSON:**  Yes, Your Honor.

17         **THE COURT:**  Okay.  Dr. Cole, thank you.

18         **THE WITNESS:**  Thank you, Your Honor.

19         **THE COURT:**  You're free to go.  You don't have to

20  stay.  You're free to stay if you wish.  You're not going to be

21  re-called, but have a good day.

22         **THE WITNESS:**  Thank you.

23                     (Witness excused.)

24         **THE COURT:**  All right.  Before we go to the next

25  witness, let me just -- one thing that might be a small

**PROCEEDINGS**

1    tutorial that will take 45 seconds by me to help you understand

2    something about how these claims work.

3        When the Patent Office issues a claim kind of like in the

4    one we have here where it says you have to have the elements A,

5    B, C, and D, then in order to prove infringement, every single

6    one of those has to be proven to be found in the accused

7    device.

8        So if you had, for example, a car -- you had a claim on a

9    car with a radio, which would have to have been many decades

10   go, then it wouldn't be good enough to have a car and it

11   wouldn't be good enough to have a radio.  There would have to

12   be the car and the radio.  All right.  So you see that.

13       Now, I think you've already gotten that part, but here's

14   the more interesting part.  You've heard this thing about

15   validity.  In order to get a claim issued out of the

16   Patent Office, you cannot get a claim or a patent issued by the

17   Patent Office, or you shouldn't be able to anyway, on something

18   that is already existing in the existing art.

19       So, for example, if someone asked for a -- Apple applied

20   for a claim in the Patent Office on A, B, C, and D and then the

21   Patent Office determined somehow that that already existed in

22   the prior art as A, B, C, and D, or something so very close to

23   it that it would be obvious, then the PTO, the Patent Office,

24   is supposed to deny the patent.

25       And as you saw in the video, sometimes because the rest of

**PROCEEDINGS**

 1   the world doesn't get their day in court with the

 2   Patent Office, that's why we have to litigate these issues

 3   ourselves in most patent cases.  You don't have that issue.

 4        So in the Patent Office sometimes a claim gets denied

 5   because those elements are already in the prior art, together

 6   that combination of elements is already in the prior art.

 7        But another claim might get allowed because in addition to

 8   those combination that's already in the prior art, there is a

 9   new element that is not in the prior art in that combination.

10        So that's a little background for you that might help

11   explain some of the back and forth that you've heard today

12   about the various claims.

13        All right.  Now we go to your next witness.

14        MR. ANDRE:  Your Honor, we have a videotaped

15   deposition to be played.  It's about 15 minutes.  I don't know

16   if you want to do it before or after the break.

17        THE COURT:  Well, let's do it now and then we'll take

18   the break.

19        MR. ANDRE:  And there will be an exhibit referred to

20   in here.  It's Deposition Exhibit Number 7.  It's Trial

21   Exhibit 256.  This is the transcript of the telephone call that

22   I'd like to move into evidence.

23        THE COURT:  Whose deposition is this?

24        MR. ANDRE:  This is the deposition of Scott Coonan.

25        THE COURT:  All right.  Are you proposing to play that

PROCEEDINGS

 1  entire tape?

 2          **MR. ANDRE:**  It's 15 minutes -- according to the clip

 3  report, 15 minutes and 12 seconds.

 4          **THE COURT:**  Of the recording of the phone call?

 5          **MR. ANDRE:**  No, no.  This is his videotaped

 6  deposition.

 7          **THE COURT:**  All right.  You can do that.  And when we

 8  get to the entire recording, we may want to -- I'm going to let

 9  it in but it's so long, I wish you could each agree on the

10  pieces that you want in.

11          **MR. ANDRE:**  Yeah.  Your Honor, with our next witness,

12  the live witness, we're just going to play a couple small clips

13  of the audio recording; but we have the transcript, which is

14  Trial Exhibit 256, which is the entire transcript, that we

15  would like to submit to the jury.

16          **THE COURT:**  All right.  Maybe.

17      So yes?

18          **MR. KAGAN:**  Your Honor, our understanding is the full

19  clip is actually much longer than -- the depo play is more than

20  15 minutes, I believe.

21          **THE COURT:**  Did I cut out a lot?

22          **MR. ANDRE:**  You did, Your Honor.

23          **THE COURT:**  Well, the jury will be glad to hear that.

24  So, yes, I go through these and I said, "This is not relevant

25  enough," so I cut out a lot.  I don't know which one of you two

PROCEEDINGS

1   wanted it, but I cut out a lot of it to get to the point.

2       So let's do the 15.  I want to do the 15 minutes now so

3   that -- I'm just wasting the jury's time up here talking so

4   please start playing the tape.

5           MR. ANDRE:  And, Your Honor, may we admit Exhibit 256

6   in evidence?

7           THE COURT:  Which one is that?

8           MR. ANDRE:  That's the transcript of the phone call.

9           THE COURT:  Any objection?

10          MR. KAGAN:  Your Honor, I think what Your Honor

11  suggested makes more sense, which is maybe we can agree -- each

12  agree on which portions of the tape.

13          THE COURT:  Well, I'm going to allow it all into

14  evidence and then y'all can take excerpts from it.  It's not

15  worth the time to fight over that.

16      (Trial Exhibit 256 received in evidence)

17          THE COURT:  All right.  Let's play the tape.

18                          **SCOTT JAMES COONAN,**

19  called as a witness for the Plaintiff, having been duly sworn,

20  was examined and testified through Videotaped Deposition.

21          THE COURT:  All right.  We're going to take -- it was

22  17 minutes.  We will divide that up while the jury takes their

23  next break.

24      Please remember the admonition.  15 minutes.  Thank you.

25      (Proceedings were heard out of the presence of the jury:)

1          **THE COURT:**  Okay.  Please be seated.

2      How do I divide that 15 minutes up?

3          **MR. ANDRE:**  Did you say 15 or 17?

4          **THE COURT:**  17.  I'm sorry.

5          **MR. ANDRE:**  Ten and seven, Your Honor.  Ten to Finjan.

6          **THE COURT:**  Ten to you, seven over there.  Okay.

7      All right.  Are you going to rest today?

8          **MR. ANDRE:**  Yes, Your Honor.

9          **THE COURT:**  How much more do you have?

10         **MR. ANDRE:**  We have one live witness.  Mr. Garland is

11     taking the stand next, and then we're going to finish up with a

12     couple of video clips that probably total maybe, 20, 30

13     minutes.  I haven't seen the new clip reports after

14     Your Honor --

15         **THE COURT:**  What?  The entire thing is going to be 20

16     to 30 minutes?

17         **MR. ANDRE:**  The two clips, yeah.

18         **THE COURT:**  How about Garland?  How long is he going

19     to be?

20         **MR. ANDRE:**  With cross and everything, probably 30

21     minutes I'm guessing.

22         **THE COURT:**  All right.  Well, then, be ready to start

23     with your case on the defense side, and we will probably

24     reserve the Rule 50 until after the jury leaves for the day.

25     All right?

PROCEEDINGS

1        **MR. ANDRE:**  Yes, Your Honor.

2        **THE COURT:**  So -- yes?  Anything the lawyers need me

3   for or can I take a break too?

4        **MR. ANDRE:**  Nothing from plaintiff, Your Honor.

5        **THE COURT:**  All right.  So let me just give you the

6   time so far.  Plaintiff has used 282 minutes of your 390.  The

7   other side has used 145.

8      When 390 comes, be aware.

9        **MR. ANDRE:**  Your Honor, I was going to mention this

10  morning that -- not this clerk but the previous one, we've been

11  timing it different.  We had 25 minutes less yesterday, but I

12  know your time rules so we'll live with your time.

13       **THE COURT:**  Well, here.  I'm going to -- don't look at

14  any of my other notes on here, but you can look at this one

15  page and this one page breaks it down exactly.  So you-all can

16  tell me if I made a mistake.  I'm happy to correct it.  All

17  right?

18       **MR. ANDRE:**  I'll compare it to the clerk's note as

19  well.

20       **THE COURT:**  You mean you were saying my clerk?

21       **MR. ANDRE:**  Not clerk.  The -- we'll just take a

22  picture of it.

23       **THE COURT:**  I'm telling you my notes govern over the

24  clerk.

25       **THE CLERK:**  He's the master timekeeper.

PROCEEDINGS

1      **MR. ANDRE:**  I imagine yours does, sir.

2      **THE COURT:**  I keep exact notes.

3      **MR. ANDRE:**  Okay.  I will --

4      **THE COURT:**  But if I -- one time in many years I did

5   make a mistake.  It was about 40 minutes off, and I corrected

6   it.  So if you can show me that I made a mistake, then I'm

7   happy to adjust.

8      **MR. ANDRE:**  Okay.  Your Honor.

9      **THE COURT:**  All right.  Thank you.

10      **MR. ANDRE:**  We'll hand this back up to you.

11            (Recess taken at 11:16 a.m.)

12            (Proceedings resumed at 11:30 a.m.)

13      (Proceedings were heard out of the presence of the jury:)

14      **THE COURT:**  Okay.  Be seated, please.

15      I've got a question for you just so I can -- I don't want

16   to go into more than one minute per side, but from Ms. Carson's

17   cross-examination of Dr. Cole, I began to get the impression,

18   but she never asked the question, that the Juniper system does

19   not at any time store a list of suspicious operations in the

20   database.  But she didn't actually ask that question, but is

21   that where we're headed?

22      **MR. KAGAN:**  Well, I think that's the ultimate

23   question, Your Honor.  We do store what has been deemed the

24   security profile, which includes a list of suspicious

25   operations, in DynamoDB or S3, and the question is on whether

1   those are databases.  There's no dispute -- or there's no issue

2   about MySQL, which is -- there's three different sources.

3         THE COURT:  No.  See, now, you're being evasive.  Take

4   the three databases from Amazon.

5         MR. KAGAN:  Yes.

6         THE COURT:  Which ones of them store a list of

7   suspicious operations?

8         MR. KAGAN:  DynamoDB and S3 could be alleged to.

9   Those are what's at issue.

10        THE COURT:  All right.  And how about the third one?

11        MR. KAGAN:  There's no -- nothing is stored in there.

12        THE COURT:  Nothing is stored in there?

13        MR. KAGAN:  That relates to the security profile.

14        THE COURT:  I thought where you were headed -- okay, I

15  was wrong -- was that all that gets stored is the hash number

16  and the verdict and nothing else, in which case there would be

17  an issue that the list of suspicious activities is not stored.

18  However, you're not telling me that's where you're headed with

19  that point.

20     All right.  Okay.  We don't need to get into it more.  If

21  it was that clear-cut, you would have told me that.

22     So we'll bring the jury back and resume.

23        MR. KAGAN:  Your Honor, can I have one question?

24        THE COURT:  Yes.

25        MR. KAGAN:  So we just saw how Your Honor had ruled on

PROCEEDINGS

1    the objections to the Coonan designations.  Our side just

2    hadn't seen it before because they came in.  But just my

3    understanding is those rulings would be consistent when it

4    comes to if they want to play portions of the tape, the

5    transcript that relate to topics relating to the joint defense

6    group?  Your Honor ruled that's out on the depo play so I --

7             THE COURT:  I ruled it out on the depo part.  Is that

8    also in the transcript of the recording?

9             MR. KAGAN:  Yes, Your Honor.  It's the same issue.

10   So --

11            THE COURT:  Well, what do you mean the same?

12            MR. KAGAN:  Yes.  Yes, it is.

13            THE COURT:  Well, why is that relevant?

14            MR. ANDRE:  Well, Your Honor, it does go to the good

15   faith negotiations.  I stood up here in my opening statement --

16            THE COURT:  Who cares if it's good faith or not?

17   That's not the test.

18            MR. ANDRE:  Well, as you said yesterday to the jury,

19   the hypothetical negotiation is you have these people who are

20   going to be reasonable.

21            THE COURT:  Yeah.

22            MR. ANDRE:  Reasonable.

23            THE COURT:  Yeah.  By definition, neither of you fall

24   into that category.  I can tell you now I certify you both as

25   not reasonable, but that is not what the test is.  It doesn't

**PROCEEDINGS**

1   matter whether they were in bad faith or not.  It would for

2   willfulness, but that's not on the table, is it?

3           **MR. ANDRE:**  That's not on the table, Your Honor.

4           **THE COURT:**  All right.  So --

5           **MR. ANDRE:**  The issue that comes in is it does go

6   towards the actual notice as well because it is something that

7   what we're having in this case is that Mr. Coonan has had a

8   self-serving recording, didn't tell the other side he was

9   recording it; and then he comes up here and says, "Even though

10  you were talking about malicious malware modules, which is

11  right on the press release, I'm not thinking that covers

12  Sky ATP."

13      So if you go in there and say that the posture of

14  negotiations are such that they're gearing up in 2015 to go to

15  litigation, that's the posture of this case.  In 2015 he

16  already contacted the joint defense group.  He said he's going

17  to drain the company and --

18          **THE COURT:**  Well, I don't know about the drain.  The

19  "drain the company" might come in, but I thought that was just

20  one line somewhere; but the joint defense part, no, I don't

21  think that should come in.

22          **MR. KAGAN:**  Your Honor, just for clarification, the

23  joint -- and we may want to look at this.  The drain comment

24  from Mr. Coonan is not that Juniper would drain Finjan.  He

25  thought that Finjan litigating against a joint defense group of

PROCEEDINGS

 1   which Juniper was not a member might drain their resources, but

 2   there is no comment --

 3          THE COURT:  I didn't realize it comes up that way.  Is

 4   that the way it comes up?

 5          MR. ANDRE:  It does, but, Your Honor --

 6          THE COURT:  Now, why -- I don't think that's relevant

 7   enough to come into evidence.  I don't think that -- you should

 8   redact everything about drain and redact everything about the

 9   joint defense part and just get into the notice issue.

10          MR. ANDRE:  That's fair enough, Your Honor.

11      I mean, I guess the issue I'm having with the ruling is

12   they've made it very clear that Finjan is involved in a lot of

13   litigation.  They made this front and center.  We didn't bring

14   it up.  We didn't want to talk about it.  They've made it front

15   and center.  And this individual gets in and is threatening

16   Finjan saying "There's an incredible unified defense group and

17   we're going to drain you.  So take a zero license, zero upfront

18   license."

19      So they've made litigation a centerpiece.  They've talked

20   about how many times cases -- you know, how many different

21   cases.  They talk to Mr. Hartstein as CEO, "How much money do

22   you make, Mr. Hartstein?"

23          THE COURT:  Under Rule 403 it's not relevant enough to

24   the issues the jury has got to decide.  It's a distraction.

25   So, no, we're not going to -- I'm sorry.  It's a great

PROCEEDINGS

1    atmospheric because it makes it easy to say they've got this

2    cabal and they're going to squash the poor patent owner and the

3    big companies.  Yes, you could win the case just on that with a

4    lot of juries, but that's not what -- that's not our issues.

5         No.  That part is out.  So don't -- so go redact all of

6    those parts.

7              MR. KAGAN:  Thank you, Your Honor.

8              MS. KOBIALKA:  Can I have 20 seconds just to talk to

9    the witness so he knows that's out, please?

10             THE COURT:  Yeah, you can do that.

11             MS. KOBIALKA:  All right.  Thank you.

12             THE COURT:  All right.  But meanwhile bring the jury

13   in and have them seated.

14        (Proceedings were heard in the presence of the jury:)

15             THE COURT:  All right.  Great.  Welcome back.

16        Are we ready?

17             MS. KOBIALKA:  Yes, Your Honor.

18             THE COURT:  All right.

19             MS. KOBIALKA:  Lisa Kobialka on behalf of Finjan.

20   Finjan would like to call John Garland.

21             THE COURT:  Mr. Garland.

22             THE CLERK:  Mr. Garland, please come forward.

23             THE COURT:  Welcome, sir.  Please stand somewhere in

24   there and the clerk will swear you in.

25             THE CLERK:  Raise your right hand.

1                          <u>**JOHN GARLAND**</u>,

2    called as a witness for the Plaintiff, having been duly sworn,

3    testified as follows:

4                    **THE WITNESS:**  I do.

5                    **THE CLERK:**  Please have a seat.

6         I ask you to state your name.  Spell your last name for

7    the record.

8                    **THE WITNESS:**  John Garland, G-A-R-L-A-N-D.

9                    **THE COURT:**  Mr. Garland, it moves all around.

10                   **THE WITNESS:**  Okay.  Thank you.

11                   **THE COURT:**  So just get comfortable and fix it so that

12   it catches your voice.

13                   **THE WITNESS:**  Okay.  Thank you.

14                   **THE COURT:**  That's very good.  Thank you.

15                   **THE WITNESS:**  Thank you, Your Honor.

16                   **THE COURT:**  Go ahead, Counsel.

17                   **MS. KOBIALKA:**  May I approach?

18                   **THE COURT:**  Please do that.  Yes, you can.

19                        <u>**DIRECT EXAMINATION**</u>

20   BY MS. KOBIALKA:

21   **Q.**   Mr. Garland, what's your title?

22   **A.**   I'm the director of business development.

23   **Q.**   And that's at Finjan?

24   **A.**   Yes.

25   **Q.**   And what are your responsibilities?

**A.**    I lead and handle all patent and technology licensing

negotiations.

**Q.**    How long have you worked with Finjan?

**A.**    I started working with Finjan in August of 2015.

**Q.**    Before we get into that, could you just briefly give an

overview of your background?

**A.**    Sure.  I started as an engineer out of college with AT&T

in semiconductors.  These were chips that were designed into

communication systems.  I later get an MBA and move into a

product marketing position.

In 1993, I joined AT&T's Intellectual Property Division

where I'm responsible for semiconductor licensing in

North America, and then eventually it becomes semiconductor

licensing worldwide.

In 1999, I advance to a senior director of worldwide

licensing for Lucent Technologies.  Lucent is a spinout of

AT&T.  It's their Network Equipment Division.

At Lucent Technologies, I was responsible for 13 licensing

managers, including an office in Paris, France, and Tokyo,

Japan.  We were doing deals with companies such as Intel, AMD,

LSI, Cypress Semiconductor.  In Asia we were doing deals with

Sony, Panasonic, Sanyo, Sharp; in Europe, companies such as

Thompson, Siemens, Phillips.

I leave Lucent Technologies in 2001 and started an IP

consulting company called Think Fire where we focused on

GARLAND - DIRECT / KOBIALKA

1   providing IP strategy and licensing services and assistance for

2   Fortune 100 high-tech companies.  Clients of ours consisted of

3   Hewlett Packard, Sun Microsystems, Xerox Palo Alto Research

4   Center or PARC, P-A-R-C.  Nokia was a client in Finland.

5   Hitachi in Japan was a client.  Just to give you an example of

6   the types of companies that we were dealing with.

7        I leave Think Fire in 2008, join an IP equity fund, work

8   with another telecommunication-based intellectual property

9   company.

10        And then in 2015, you know, I had the opportunity to work

11   with, you know, an innovative cybersecurity company, Finjan,

12   and so I joined Finjan.

13   Q.   And so have you been in the room negotiating with a lot of

14   big companies on patent licenses?

15   A.   Yes, for sure.

16   Q.   Okay.  And how many years have you done this?

17   A.   So I'm at 25 years now.

18   Q.   Could you estimate roughly how many license agreements

19   you've worked on over that time frame?

20   A.   I stopped counting, but it's approaching 100 or over 100.

21   Q.   So I'm not sure everyone's familiar with your line of

22   work.  Could you just describe at a high level what do you do?

23   A.   Okay.  I mean, so patent licensing -- companies invest in

24   research and development millions, tens of millions, hundreds

25   of millions, billions of dollars to develop products and

GARLAND - DIRECT / KOBIALKA

```
 1   services; and one of the by-products of that investment and
 2   research in creating new and interesting products and services
 3   is you create and invent and you capture these inventions and
 4   file for patents not only in the U.S. but around the world.
 5   And over a concerted effort of research and development in a
 6   field for one, three, five, seven, nine, ten years, you develop
 7   a patent portfolio.
 8       Where I get involved is when my company, you know,
 9   realizes that other companies have adopted our patented
10   technologies.  So I get involved, we research that, and we
11   reach out and contact those companies through letter, e-mail,
12   phone, and start a negotiation.
13       And the negotiation usually involves an exchange of
14   information, our technical information and analysis, their
15   feedback, and we try to move that negotiation into business
16   discussions and at that point the parties start to coalesce.
17   And if we're getting towards an agreement, we sign a contract
18   or a license agreement.
19   Q.   So is your involvement really just as a business
20   negotiator?
21   A.   Yes.  I mean, the field is obviously a technical field,
22   legal field, but there's also a business aspect to it.  So even
23   though I'm not a lawyer, I focus on the business side of the
24   transaction.
25   Q.   Okay.  I'd like to turn to now your experience at Finjan
```

GARLAND - DIRECT / KOBIALKA

1    and contact with Juniper.  What is your understanding of

2    Finjan's contact with Juniper regarding the '494 patent or any

3    other patents?

4    **A.**   Okay.  So I inherited the Juniper negotiation in August of

5    2015.  My predecessor was a man named Ivan Chaperot.  And

6    looking over the correspondence, Mr. Chaperot had contacted

7    Juniper in June of 2014 and then identified two patents in

8    particular, the '968 and the '154, and how they related to the

9    Juniper SRX series products.

10   **Q.**  And before you made any contact with Juniper, did you do

11   any kind of research or something to get up to speed?

12   **A.**   Yes.  So obviously I familiarized myself with some of the

13   correspondence back and forth between Finjan and Juniper; and

14   then, you know, I have a telecommunications background so --

15   but I had not negotiated a patent license agreement before with

16   Juniper.

17       And it had been some years since I had looked at Juniper.

18   I was obviously familiar with the company.  So I just started

19   to familiarize myself with the product offering, their

20   financials, their SEC filings, their investor presentations,

21   their website, their product offering.

22   **Q.**  And did you review any press releases about new product

23   offerings?

24   **A.**   Yes.  We look at the news and new information that's

25   coming from companies such as Juniper.

1  **Q.**   I'd like to show you Trial Exhibit 91, which is already in

2  evidence.

3          **MS. KOBIALKA:**   Can that be published to the jury?

4          **THE COURT:**   Sure.

5          **MS. KOBIALKA:**   And maybe if we can just blow up the

6  first paragraph with the title.

7  **Q.**   Was this one of the press releases that you reviewed as

8  part of your due diligence?

9  **A.**   Yes.

10  **Q.**   And can you just tell me sort of the most important things

11  that jump out at you in terms of this part -- the first portion

12  here?

13  **A.**   Yeah.   So, you know, in the title you see that

14  Juniper Networks is unveiling an advanced anti-malware cloud

15  service.

16  **Q.**   Okay.   And what did you understand that to be?

17  **A.**   This is, you know, Juniper introducing a cloud-based

18  malware solution.

19  **Q.**   Okay.   And what's the date of this publication?

20  **A.**   The date of this publication is September 29th, 2015.

21  **Q.**   Okay.   And if we could maybe take a look at the first

22  sentence there (reading):

23          "The industry leader in network innovation today

24          announced advanced anti-malware with zero-day threat

25          protection from the cloud."

1          Do you remember reading that?

2     **A.**   Yeah.  So when we see words like "advanced anti-malware

3     with zero-day threat protection from the cloud," that's highly

4     relevant to Finjan.  Our patented technologies are directed to

5     that -- those services.

6     **Q.**   And does it later go on and identify what, I guess, seems

7     to be the marketing name in that?

8     **A.**   Yes.  If you read further down in the press release,

9     Juniper Networks Sky Advanced Threat Prevention or Sky ATP.

10    **Q.**   Okay.  And anything else in this paragraph that jumped out

11    at you, if you can recall?

12    **A.**   Yeah.  If you look at the -- so I mentioned that Juniper

13    and Finjan were talking about the SRX series.  So if you look

14    down at the bottom of the press release, at least the first

15    paragraph, it says (reading):

16          "Intelligence from the cloud that is automatically

17       distributed across SRX firewalls within the enterprise."

18          And so this is a flag for us because we already know we're

19    talking to Juniper about the SRX firewalls.

20    **Q.**   Okay.  All right.  So at some point did you reach out to

21    Juniper?

22    **A.**   Yeah.  So I introduced myself to Juniper and then reached

23    out in a series of e-mails.

24    **Q.**   And at some point did you set up a call?

25    **A.**   Yeah.  So I end up contacting Scott Coonan.  We set up a

GARLAND - DIRECT / KOBIALKA

1   call in November 2015.

2   Q.   And what was the purpose of you setting up this call?

3   A.   So the purpose of the call, one, is to introduce myself to

4   Mr. Coonan.  The primary purpose of the call is, you know,

5   Finjan had done further analysis with regard to existing and

6   new products from Juniper, and we had identified additional

7   patents that we thought were being utilized in Juniper's

8   products and services.

9   Q.   And what was the additional patent?

10  A.   That would be the '494.

11  Q.   And what was the additional products?

12  A.   That would be Sky ATP.

13  Q.   The advanced anti-malware cloud service?

14  A.   Yeah, the advanced anti-malware.

15  Q.   Now, did you actually have that call with Mr. Coonan?

16  A.   Yes, we did have a call.

17  Q.   And was that the first time you ever spoke to him?

18  A.   Yes, it was.

19  Q.   Did you have any other conversations with him?

20  A.   No.

21  Q.   And on that call, did you talk with him about specific

22  patents and products?

23  A.   Yes.  We talked about specific patents.  We talked about

24  obviously the '968 and '154, but we also introduced the '494 to

25  Mr. Coonan.  The products we talked about were the advanced

1    malware, Sky ATP product that had recently been announced.   We

2    talked about their SRX series gateways and their next

3    generation firewall and virus -- oh, my gosh.

4    **Q.**   Okay.   Next generation firewall?

5    **A.**   Next generation firewall devices and --

6    **Q.**   We can look to the transcript.

7    **A.**   Yeah.

8    **Q.**   Now, do you recall whether or not you used the exact words

9    "Sky ATP" or you just referred to advanced anti-malware?

10   **A.**   I referred to it as the advanced malware.

11   **Q.**   And you got that from the press release which we're

12   looking at here, Trial Exhibit 91?

13   **A.**   Yes.

14   **Q.**   Okay.   Now, how would you describe the call just looking

15   back, a summary of the call?

16   **A.**   It's a strange call.   After I introduce myself and -- I'm

17   trying to agree to a process with Juniper.   I had seen the

18   correspondence back and forth, and the companies you can tell

19   aren't really on the same page in terms of how they want to

20   address this issue with the patent licensing negotiation.

21        And I sort of feel early in the call that I kind of get

22   off on the left foot with Mr. Coonan, and I'm -- and I have a

23   hard time.   As a matter of fact, I don't think I ever recover.

24        And it's early in the call where I'm starting to sense

25   just a lot of bias and resistance from Mr. Coonan and Juniper

GARLAND - DIRECT / KOBIALKA

1    and, in some respects, some disrespect towards Finjan.

2    **Q.**   Did you ever mention that you wanted to send any analysis

3    that Finjan had done on the '494 patent related to Juniper's

4    new products?

5    **A.**   Yeah.  So, you know, as I said, the purpose of the call is

6    to arrange a meeting and we have new analysis that we wanted to

7    share with Juniper.  And typically the way we would do that is

8    we would arrange a meeting and we would either host or we'd be

9    happy to go to their offices.  We're about 8 miles away from

10   each other.  And we would present the information.  That's just

11   the way we've done it with other companies in the cybersecurity

12   space.

13       And we had sent them a claim chart prior for the '968, and

14   you could just tell from the correspondence that it wasn't

15   really a forthright exchange over that patent.

16       And so, you know, Mr. Coonan was requesting that, you

17   know, Finjan mail him the claim chart.  And I was just trying

18   to understand what happens if I mail you the claim chart.  My

19   preference would be to clearly meet with Finjan -- Finjan meet

20   with Juniper and present the claim charts in person and answer

21   and address any and all questions they have.

22   **Q.**   Okay.

23   **A.**   And -- go ahead.

24   **Q.**   I just want -- did he suggest he was going to use it

25   against you rather than share information if you provided it?

1          **MR. KAGAN:**  Objection, Your Honor.

2          **THE COURT:**  The objection is what?

3          **MR. KAGAN:**  We believe that we're getting into a topic

4    that we had discussed earlier at the break.

5          **THE COURT:**  Well, we're not there yet, but it is

6    leading so sustained on that ground.

7    **BY MS. KOBIALKA:**

8    **Q.**   What was the reason that you didn't provide the claim

9    chart?  Just generally at a high level.

10   **A.**   Yeah.  So I think that either the -- if I sent the claim

11   chart -- so we were role playing, and I said -- you know, my

12   preference, as I stated, was to actually have the meeting and

13   present it.  But if we sent the claim chart, I was asking what

14   the next step was, what happens if I mail you the claim chart;

15   and the comment was made is that it would be shared.

16   **Q.**   Okay.  Now, how long was this call?

17   **A.**   The call -- I can't remember if the call was scheduled for

18   a half hour or an hour, but it goes about a half hour.

19   **Q.**   Now, at some point did you learn that Mr. Coonan recorded

20   the call?

21   **A.**   Yeah.  I only learned about that because of this

22   litigation in the last few months.

23   **Q.**   So he didn't tell you that he was going to be recording?

24   **A.**   No.  I didn't know the call was being recorded.

25   **Q.**   Has that -- I mean, what was your reaction when you

1    learned that?

2    **A.**   I mean, shock, betrayal.  It's underhanded, sneaky.

3    There's a lot of words that kind of come to mind.  It's also --

4    you know, in thinking about it, I'm not really sure what the

5    purpose is of recording the call.  You know, this is just a

6    simple call where we have an updated analysis and we want to

7    schedule a meeting so the topic is rather simple and, you know,

8    it's not offensive.  And so -- but, yeah, I think this is

9    strange.  This has not occurred with me before.

10   **Q.**   In your negotiations in the past, is this something that

11   people do?

12   **A.**   No.  This has -- this has never occurred and obviously I

13   work for a lot of companies and work with a lot of companies,

14   and it's never been suggested to me or we've never discussed,

15   you know, should we record the call, should we record the

16   meeting.

17       These are meetings that take place.  Patent licensing you

18   meet, companies meet, and they debate and they discuss and they

19   share information and you try to get to a common ground.  It

20   doesn't require any taping or recording of anything.

21   **Q.**   Okay.  I'd like you to take a look at Trial Exhibit 256.

22   It's already in evidence.

23           **MS. KOBIALKA:**  And at this time, Your Honor, I would

24   like to move in Trial Exhibit 257, which is the audio

25   recording.  I'm going to play two short clips from that.

GARLAND - DIRECT / KOBIALKA

1      THE COURT:  All right.  The audio recording has to be

2   adjusted as we discussed at the break, but you can play the

3   other parts to the jury now if you wish.

4      MS. KOBIALKA:  Okay.  So let me -- I'll just show a

5   few parts first.

6      MR. KAGAN:  Your Honor, could we, before she plays the

7   portions, get the times so we can make sure it's in compliance

8   with what your --

9      THE COURT:  All right.  Give us the --

10      MS. KOBIALKA:  So I'm not there yet.  I will give it

11   to you in advance so you can look.  It is 20:46 through 21:07

12   and 33:54.

13   Q.   I'd like to show the portions of the transcript, though,

14   that we've just discussed just to confirm.  So if we could take

15   a look at 4:47 through 5:55 of this transcript, which we've

16   marked as 2:56.

17   A.   Okay.

18   Q.   Okay.  And can you just sort of describe here what's going

19   on?

20   A.   Yeah.  So at this part of the call I'm through the

21   introduction and I'm trying to agree to a process, and I'm

22   relaying to Mr. Coonan that there's new information that we

23   have.  There's new patents, different patents, and different

24   products than have been discussed previously.

25   Q.   And he responds "The products are probably not that

GARLAND - DIRECT / KOBIALKA

1   different."  Do you see that?

2   **A.**   Yeah.  He describes -- yeah, so he's aware of the

3   products.  He says, "The products are probably not that

4   different."

5       I start naming some of the products, the SRX series

6   including the firewall, virtual firewall.  I get interrupted.

7   You know, there's a question, "Why did you focus on that?"  The

8   patents lead us to the products.  We don't select the products.

9   The patents direct us to the products.

10      And you could see I talk about in this -- continuing on

11  that the patents have led to us.  I mean, there's new security

12  products, and what I'm referring to is the advanced malware

13  cloud-based solution.

14  **Q.**   Okay.  And in this clip there he's asking "How did you get

15  to that?"  You say "Claim charts"; right?

16  **A.**   Oh, yes.

17  **Q.**   What's a claim chart, just very briefly?

18  **A.**   Okay.  So a claim chart is a tool we use in patent

19  licensing where it consists of two columns.  So on the left,

20  I'm going to use my left unfortunately, but on the left is the

21  claim and you list the different elements that make up the

22  invention; and on the right you correspondingly identify how

23  each of those elements are used in the product or service.  And

24  so it's just a direct mapping of how the patent is being used

25  in the product.

1   Q.   Okay.  And is that the analysis that you were referring to

2   you wanted to provide?

3   A.   Yes.  We had three new claim charts that we wanted to

4   share, and we had three in process that we were of high

5   confidence that Juniper was using but they were just not

6   completed at this time.

7   Q.   And you confirmed to him that there were engineers here in

8   this part?

9   A.   Yeah.  So we talk about -- yeah.  There's a lot of

10  questions here about how we got to the information, and these

11  are fair questions.  What do we use?  We use product

12  information.  How do you get there?  We have engineers.

13       You know, there's a question here, "So you have

14  engineers?"  You can't hear the tone here, but it's like "You

15  have engineers?"  So you start to sense -- so I'm starting to

16  sense there's some disruption in this call and some bias.  And,

17  of course, we have engineers.

18  Q.   So do you try to, then, pick up the discussion that you

19  were trying to complete here about the patent and new products?

20  A.   Yeah.  So it just continues on.  I mean, you know --

21  Q.   So why don't we show that.  So we do 10:53 through

22  11:48 on this Exhibit 256.

23  A.   Yes.  So, I mean, what I was going to say it continues on.

24  I'm trying to explain the analysis and the patents and what

25  we've prepared.  And so here at 10:53, we're now almost 11

GARLAND - DIRECT / KOBIALKA

1  minutes into the call, you know, I'm explaining to Mr. Coonan

2  the new patent, which is the 8,677,494.  It's been referred to

3  as the '494.

4  **Q.**   Okay.  And can you continue just describing what the call

5  was?

6  **A.**   Okay.  So, yes, so then Scott asks, "What's the

7  significance?  Is it a continuation?"  It is a continuation but

8  that's not the significance.  The significance is that that

9  patent reads on the advanced malware module that we just talked

10  about in the September press release.

11 **Q.**   And what was his response?

12 **A.**   So it's another denigrating comment about our engineers,

13 "Because your engineers who don't invent the product or the

14 patents or the inventions say so?"

15      And you can tell at this point I'm frustrated.  And, you

16 know, I'm just asking him to stop.  I mean, this -- you know,

17 Finjan is reaching out to Juniper because we have a legitimate

18 belief that they're utilizing our patented inventions.  We just

19 want to have a meeting.

20      And, you know, his answer, because he's got me to break or

21 lose my cool a little bit, is, "I think it's funny," and then

22 it actually goes into a laugh and he's mocking me, mocking

23 Finjan.

24 **Q.**   All right.  So now I'd like to play a clip and ask you a

25 few questions.  So the first clip is at page 10 of this

 1   exhibit 20:46 through 21:07.

 2                  (Audio was played but not reported.)

 3           MR. KAGAN:  Your Honor, I have an objection.

 4           THE COURT:  What?

 5           MR. KAGAN:  This is direct -- we think this gets into

 6   the area that we discussed.

 7           THE COURT:  Does it?

 8           MS. KOBIALKA:  No.  I mean --

 9           THE COURT:  Is it on the screen?

10           MS. KOBIALKA:  It's on the screen.

11                  (Pause in proceedings.)

12           THE COURT:  I just don't think this proves much so I'm

13   going to -- I don't think we should be showing it to -- taking

14   up time with this.

15       He didn't like the other guy and that guy didn't like him.

16   Welcome to American business.  So I don't see the point.  This

17   is not proving anything about infringement.  What does it

18   prove?

19           MS. KOBIALKA:  This is to go to the actual notice.

20   The response --

21           THE COURT:  This is not giving any notice.

22           MS. KOBIALKA:  Your Honor, this is all part of the

23   same conversation in which notice --

24           THE COURT:  There are parts in this conversation where

25   he calls out Claim 10 and that is very relevant.  Maybe it's

1   not quite enough but maybe it is enough, and that's for the

2   jury to decide.  But this meanness between the two of them is

3   not going to prove much.

4        I'm sustaining the objection.

5             MS. KOBIALKA:  Well, Your Honor, I wanted to play one

6   other clip.

7             THE COURT:  All right.  Let's see what it is.

8             MR. KAGAN:  Your Honor, at this time can we have some

9   notice that was published to the jury because we were not given

10  the notice ahead of time?  Please just give us the notice

11  before you publish it to the jury.

12            MS. KOBIALKA:  So 33 --

13            THE COURT:  All right.  Let him know what the page

14  numbers are, please.

15            MS. KOBIALKA:  So it's just 33:54.  I identified it

16  previously.

17            MR. KAGAN:  What's the ending time?

18            MS. KOBIALKA:  It's just 33:54.

19            THE COURT:  Can you put it on the screen for me to

20  see?

21            MR. KAGAN:  Yeah.  Your Honor, it's similar to what we

22  talked about, but publishing it to Your Honor and just letting

23  you make the call would be the easiest thing.

24            THE COURT:  Tana, can you put it up to me?

25            MS. KOBIALKA:  Your Honor, I'm happy to give it to

1   you.  It's highlighted at the bottom.

2            THE COURT:  Yeah.  That's fine.

3                     (Pause in proceedings.)

4            THE COURT:  Who is Scott now?  Is this Scott?

5            MS. KOBIALKA:  No.  This is Mr. John Garland.

6            THE COURT:  Okay.  He's John.  All right.

7                     (Pause in proceedings.)

8            THE COURT:  It's excluded under Rule 403.

9   BY MS. KOBIALKA:

10  Q.   Has anyone ever given you -- well, when you usually offer

11  to provide a claim chart in your negotiations, what is the

12  typical response?

13  A.   So there's a couple scenarios.  So the one -- one response

14  is that we just present the information in a conference room.

15  That's the preferred.

16       The second response is when I provide you a claim chart, I

17  just want to know what you're going to do with it.  And usually

18  the answer is, "I'm going to -- you know, I'm just looking to

19  validate that we do good and thorough analysis.  So I'm just

20  going to look at the claim chart.  I'll meet with my team, my

21  engineering team.  We'll look exactly how Finjan is applying

22  its patents to our products and services, and then call me in

23  two or three weeks and we can see if we can schedule a week."

24  And that's the typical solution.

25       But what's expressed here is that there's a desire to

 1  share it.  And when I say "share it" --

 2  **Q.**  So I want to stop there.  I just wanted to know what the

 3  typical response was.

 4      Now, at any point during the call, did Mr. Coonan ask you

 5  what you meant by "advanced malware"?

 6  **A.**  No.  As I said, the call is -- as I said, I felt like I

 7  got off on the left foot and never recover, but -- and so

 8  there's a lot of alarms going off in my head throughout this

 9  call and some of the things that transpire on the call.  But,

10  no, I'm not left at the end of that call that there's any

11  confusion about either the Finjan patents or the products that

12  we've talked about.

13  **Q.**  And so was it your understanding that he understood who

14  Finjan was?

15      **THE COURT:**  How would he know?  That's just

16  speculation.

17      **MS. KOBIALKA:**  Well --

18      **THE COURT:**  His understanding that the other guy

19  understood?  You can get into what was said.  That's legit.

20  But to say was it your understanding that the other guy

21  understood, that's too much speculation.

22      Sustained.  I'm sustaining my own objection.

23      **MS. KOBIALKA:**  All right.  Well, Your Honor, you

24  excluded the basis for which he can explain why he understood

25  that.  This is the whole problem.  This all goes to the actual

1  notice.

2          **THE COURT:**  No.  There are parts of that call that you

3  can legitimately get into that go to notice.  I disagree with

4  you.

5  **BY MS. KOBIALKA:**

6  **Q.**  During the call, did you understand that Juniper was

7  tracking Finjan and its patents?

8  **A.**  Yes, absolutely.

9  **Q.**  And was that based on statements that he made during the

10  call to you?

11  **A.**  Yes, absolutely.

12  **Q.**  Okay.  Now, is it Finjan's preference to negotiate a

13  license?

14  **A.**  Yes.  Every contact -- every company we contact the desire

15  is to solve the solution in a conference room.  This is the

16  first time I've ever testified in court.  So, you know, if you

17  ask me "Where would you rather be today," I would rather be in

18  a conference room somewhere negotiating a patent license.

19  **Q.**  So I didn't hear.  Did you say this is the first time

20  you've ever --

21  **A.**  Yeah.  This is the first time I've ever testified in

22  court.

23  **Q.**  Okay.  And have you personally negotiated Finjan licenses

24  just in a conference room, not necessarily ever having to deal

25  with any litigation?

GARLAND - CROSS / KAGAN

1    **A.**    Yes.   We've been -- you know, in the process I described,

2    we've been able to contact companies, engage with companies,

3    have meetings with companies, and get all the way to a signed

4    license agreement without litigation.

5    **Q.**   And how many have you personally done for Finjan?

6    **A.**   I saw five, completed six.

7           **MS. KOBIALKA:**   I have no further questions at this

8    time.

9           **THE COURT:**   All right.   Thank you.

10    Cross-examination.

11          **MR. KAGAN:**   Thank you, Your Honor.

12    May I give some documents to the witness?

13          **THE COURT:**   Sure.

14                        <u>**CROSS-EXAMINATION**</u>

15    BY MR. KAGAN:

16    **Q.**   So, Mr. Garland, you started at Finjan in 2015; right?

17    **A.**   Correct.

18    **Q.**   But with regard to Juniper, you had studied the prior

19    correspondence between Juniper and Finjan; is that correct?

20    **A.**   Correct.

21    **Q.**   And Ivan Chaperot was your predecessor in terms of dealing

22    with Juniper; is that correct?

23    **A.**   That's correct.

24    **Q.**   And Mr. Chaperot first approached Juniper in about 2014;

25    is that correct?

 1   **A.**   That's correct.

 2   **Q.**   If you could take a look at Exhibit 321 in the binder,

 3   please.

 4   **A.**   All right.

 5   **Q.**   Do you recognize that document?

 6   **A.**   (Witness examines document.)   Yes.

 7   **Q.**   It's a document from Finjan's files; is that right?   An

 8   e-mail from Finjan?

 9   **A.**   Yes.   It's an e-mail from Mr. Chaperot to Scott Coonan.

10        **MR. KAGAN:**   I ask that that be moved into evidence,

11   Your Honor.

12        **THE COURT:**   Any objection?

13        **MS. KOBIALKA:**   No objection.

14        **THE COURT:**   321 in evidence.

15   (Trial Exhibit 321 received in evidence)

16   **BY MR. KAGAN:**

17   **Q.**   And to help us, I'm going to try to put some of these

18   things on a timeline which way or may not work with the video,

19   but --

20        **THE COURT:**   I'm sorry.   What do you mean?

21        **MR. KAGAN:**   I'm going to try and put some of the

22   documents on the video so we can create a timeline, but I'm

23   having -- I don't think they're up on my screen at least.

24        **THE COURT:**   Tana is happy to help if we need.

25        **THE CLERK:**   Is it there now?

1          MR. KAGAN:  It just popped up.

2          THE CLERK:  Yeah.  I just hadn't switched it over.  It

3   was my fault.

4          MR. KAGAN:  It was my fault for not asking.  I'm

5   sorry.

6   Q.   So this is about the time that, July of 2014, that 321 was

7   sent; is that right?  You can look at the document, sir.

8   A.   Yeah.  I mean, my recall is June, but...

9   Q.   It's an e-mail thread that spans --

10  A.   Right.  I know.

11  Q.   -- June to July; is that fair?

12  A.   (Witness examines document.)  I just like to be accurate.

13  Q.   And attached to this document are the claim charts that

14  you had mentioned; is that correct?

15  A.   I see that.  I just don't see which e-mail.  Oh, there it

16  is.

17       (Witness examines document.)  Okay.  It looks like June

18  but, yeah.

19  Q.   Okay.  Well, you see in that time period and there was a

20  claim chart that was sent to Juniper; is that right?

21  A.   Yes.

22  Q.   And this is an image of the claim chart.

23          MR. KAGAN:  Is this -- it's a little garbled on my

24  screen.  Is it --

25          A JUROR:  It's fine.

GARLAND - CROSS / KAGAN

1           MR. KAGAN:  -- appearing good for the jury?

2    Q.   This is what you're describing as a claim chart; is that

3    right?

4    A.   Yes.

5    Q.   And on the left is the language of the patent; right?

6    A.   That's correct.

7    Q.   And on the right is information about Juniper's products;

8    is that right?

9    A.   That's correct.

10   Q.   And there's nothing confidential about any of that

11   information; is that right?

12   A.   You mean the patent or the products?

13   Q.   Yes.

14   A.   The patent is public and the products are public.

15   Q.   That's the only information that's on this claim chart;

16   right?

17   A.   I believe so.

18           THE COURT:  Let me just clarify for which patent this

19   is.

20           MR. KAGAN:  I was just about to get there.

21   Q.   This patent is the '968 patent; is that right?

22   A.   Yeah, that's correct.

23   Q.   And so that's a patent that Finjan has never sued Juniper

24   on; is that right?

25   A.   I don't know that.

1  Q.   Certainly not a patent --

2         THE COURT:   I'll just tell the jury it's not an issue

3  for our trial here.  We're dealing with '494 and nothing else.

4         Okay.  Let's go on.

5  BY MR. KAGAN:

6  Q.   You mentioned there's a meeting -- strike that.

7         Are you aware that there was a meeting in late 2014 or

8  early 2015 between Mr. Coonan and representatives from Finjan?

9  A.   Yes.

10 Q.   And you were not at that meeting personally; right?

11 A.   That's correct.

12 Q.   The attendees besides Mr. Coonan were Julie Mar-Spinola;

13 is that right?

14 A.   Yes.

15 Q.   She's the general counsel at Finjan?

16 A.   She's the IP officer.

17 Q.   And Ivan Chaperot, your predecessor; is that right?

18 A.   That's correct.

19 Q.   And at this meeting -- well, strike that.

20        Were you aware that before this meeting had taken place,

21 Juniper had been involved in a lawsuit with a company called

22 Palo Alto Networks?

23 A.   I don't recall that.

24 Q.   Do you recall learning at some point there was a

25 discussion of Palo Alto Networks at the meeting?

GARLAND - CROSS / KAGAN

1  **A.**   Yes.

2  **Q.**   And do you recall in that discussion it was mentioned that

3  Juniper had had some litigation against Palo Alto Networks?

4         **MS. KOBIALKA:**   Objection, Your Honor.   This goes

5  directly to the stuff --

6         **THE COURT:**   You're opening the door.

7         **MS. KOBIALKA:**   Yes.

8         **THE COURT:**   You're opening the door to the very stuff

9  that you wanted to keep out.

10        **MR. KAGAN:**   Your Honor --

11 **Q.**   Do you recall at this meeting that Mr. Coonan proposed an

12 arrangement with Finjan?

13        **MS. KOBIALKA:**   Same objection, Your Honor.

14        **THE COURT:**   I want to hear the question first.

15    Go ahead.

16 **BY MR. KAGAN:**

17 **Q.**   Do you recall at this meeting that Mr. Coonan proposed an

18 arrangement between Finjan and Juniper where they would

19 cooperate against a common enemy instead of fighting with each

20 other?

21        **MS. KOBIALKA:**   Objection, Your Honor.   This goes

22 directly to what you just excluded.

23        **THE COURT:**   Just a minute.   You're saying that Coonan

24 proposed an arrangement with Finjan.   But who is the "they"

25 that would be the common enemy?   Your question is ambiguous.

1   It would be Finjan and Juniper would ally together against

2   Palo Alto?

3           MR. KAGAN:  Essentially, Your Honor.

4           MS. KOBIALKA:  And I also object to the form of the

5   question.  He wasn't at the meeting.

6           THE COURT:  Were you even at the meeting?

7           THE WITNESS:  No, I was not at the meeting.  This is

8   eight months or so before I joined Finjan.

9           THE COURT:  Well, how would he know?

10          MR. KAGAN:  Your Honor, he would not know.  I'm trying

11  to ascertain --

12          THE COURT:  Did you ever hear of such a thing within

13  the company?  Did you ever hear of such a proposal?

14          THE WITNESS:  Yes.

15          THE COURT:  You did?

16          THE WITNESS:  Yes.

17          THE COURT:  All right.  Well, then I'm going to allow

18  you to ask the question but there's a serious problem that that

19  will allow the other side to go back into the stuff that you

20  objected to because -- so --

21          MR. KAGAN:  That's -- I'm going to stay away from it,

22  Your Honor.  I don't want this thing to go any longer than it

23  has to.

24          THE COURT:  Well, no.  You've already opened the door

25  part of the way.  What do you mean you're going to stay away

 1   from it?

 2        MR. KAGAN:  We don't need to get into the substance of

 3   it.  The only point of this --

 4        THE COURT:  No, no.  Now you're talking about it in

 5   front of the jury.

 6      Now, are you withdrawing the question or not?

 7        MR. KAGAN:  I'll withdraw the question, and I will

 8   rephrase the question as follows:

 9   Q.  Are you aware that Mr. Coonan made an offer to cooperate

10   with Finjan?

11        MS. KOBIALKA:  Objection.  This goes directly --

12        THE COURT:  All right.  Okay.  First I need to say to

13   the jury you remember earlier I expunged something from your

14   memory?  That's hard to do.  But you need to forgot all of

15   these comments that have been made by counsel and the testimony

16   by the witness that he had heard such a thing had happened

17   because if that gets in your brain, then I may have to allow

18   the other side to go back and fill in other parts of the story,

19   which, in my judgment, doesn't have much to do with this case.

20      But counsel has already blurted it out.  So, first, I want

21   you to expunge it and disregard it; but now I'm going to allow

22   counsel to ask the follow-up question and it may still have the

23   same problem, but I will --

24      Go ahead.  Ask that question.

25        MR. KAGAN:  All right.

1    BY MR. KAGAN:

2    Q.   Are you aware that at this meeting Mr. Coonan made an

3    offer to help cooperate with Finjan on a matter?

4    A.   I mean, I wasn't at the meeting so I just have a summary,

5    verbal summary, of what occurred at the meeting.

6    Q.   Right.  But you had that summary with Julie Mar-Spinola;

7    is that correct?

8    A.   That's correct.

9    Q.   And she was at that meeting; right?

10   A.   Correct.

11   Q.   And she told you that Finjan was not interested in the

12   offer; is that correct?

13         MS. KOBIALKA:  Objection, Your Honor.  This is really

14   starting to open the door to directly issues --

15         THE COURT:  All right.  You may -- no.  I'm going to

16   let counsel -- he can ask the question, and it may be that it

17   does open the door, but that's not -- at this point we're maybe

18   into it.

19       Okay.  Answer that question.

20         THE WITNESS:  Can I just have the question again,

21   please?

22   BY MR. KAGAN:

23   Q.   The question is that you're aware that Finjan had said it

24   was not interested in the offer; is that right?

25   A.   The offer is made and Finjan rejects the offer, correct.

GARLAND - CROSS / KAGAN

1   Q.   Okay.  And you mentioned you had a phone call with

2   Mr. Coonan in around November of 2015; is that right?

3   A.   That's correct.

4   Q.   And shortly before this phone call, you had an e-mail

5   exchange with someone from Juniper named Meredith McKenzie; is

6   that right?

7   A.   I don't know.  I think so.

8   Q.   You don't know?

9   A.   I believe so but, yeah.

10  Q.   Okay.  You know who Meredith McKenzie is; right?

11  A.   Yeah, I know who Meredith is.

12  Q.   And she is Mr. Coonan's supervisor; right?

13  A.   Right.

14  Q.   He reports to her; right?

15  A.   Yeah.

16  Q.   I'd like you to take a look at Exhibit 71, please.

17  A.   (Witness examines document.)  71?

18  Q.   71.  Is it not in your binder?

19       MR. KAGAN:  May I assist, Your Honor?

20       THE COURT:  Sure.

21            (Pause in proceedings.)

22  BY MR. KAGAN:

23  Q.   I apologize.

24  A.   Thank you.

25       THE COURT:  I need to say while he's reading the

GARLAND - CROSS / KAGAN

1    document, I'll give a heads-up to the jury, this thing on the

2    screen is not going to be in evidence.  It's just an

3    illustrative deal that counsel has put up there to help, I

4    guess, track testimony.

5        It's allowed from time to time while the witness is on the

6    stand, but it will not be in the jury room.  So if you feel

7    there's something on there that you want to remember, be sure

8    to take a note.

9        All right.  What's the question?

10   **BY MR. KAGAN:**

11   **Q.**  So you did have e-mail correspondence with Mr. Coonan's

12   supervisor shortly before your November 2015 call; is that

13   right, Mr. Garland?

14   **A.**  That's correct.

15   **Q.**  And in that e-mail with McKenzie, you told Ms. McKenzie

16   that Scott -- you see you're referring to Scott in the e-mail?

17   **A.**  Yes.

18   **Q.**  You're referring to Mr. Coonan; right?

19   **A.**  Yes.

20   **Q.**  You said that he had reneged on an offer --

21   **A.**  Yes.

22   **Q.**  -- to assist on a litigation matter?  Do you see that?

23   **A.**  I do see it.

24   **Q.**  And that statement is not true; is it?

25   **A.**  No.  I was mistaken.  At that time I thought that was the

1    case; but Ms. Mar-Spinola, who sees this e-mail, informed me

2    that that's not what occurred at the meeting.

3    **Q.**   So when you went -- so you have a call scheduled with

4    Mr. Coonan.

5    **A.**   Correct.

6    **Q.**   Shortly before the call, you contact his supervisor;

7    right?

8    **A.**   Okay.

9    **Q.**   And you say something that is not true about Mr. Coonan;

10   right?

11   **A.**   Yeah.  It's an accident, yeah.  It's a mistake.

12   **Q.**   And it's not a flattering mistake for Mr. Coonan, is it?

13   **A.**   I don't know.

14   **Q.**   Saying that he reneged on an offer that he made to Finjan,

15   you think that's somehow a positive statement about Mr. Coonan

16   that you're making to his supervisor?

17   **A.**   No.  I don't have direct knowledge on this -- right? -- so

18   I was under the impression that that's what occurred and it's

19   later corrected.

20   **Q.**   Did you tell Mr. Coonan, you're going to have a call with

21   him, did you call him up beforehand and say, "Listen,

22   Mr. Coonan, I heard you may have reneged on a deal.  Is that

23   true?"

24   **A.**   No, but in the call -- it comes up in the call.  There's a

25   part of the call that I have with Mr. Coonan -- first of all,

1    Mr. Coonan never asked me this on the call, but there is a

2    talk -- as I mentioned, on the call there's a lot of dialogue

3    back and forth and resistance; and, you know, Mr. Coonan -- I

4    asked him if he's -- you know, he basically states he made this

5    offer, and I say we rejected it.  And I was trying to figure

6    out is that why there's bias.

7         So between November 12th and the call on November 23rd,

8    I'm aware now that there was an offer made and rejected.  There

9    is no renege.  And it comes up in the call and we talk about

10   it.

11   **Q.**   So you had talked to Mr. Coonan before the call and said,

12   "Listen, I called your boss and I made a false statement about

13   you"?  You told that to Mr. Coonan before the call?

14   **A.**   I didn't say that, no.

15   **Q.**   That's right.  So you on November 12th, two weeks before

16   the call, you contact Mr. Coonan's supervisor and you say

17   disparaging things about him; isn't that right?

18   **A.**   This is -- this is my understanding at the time as of

19   November 12th.

20   **Q.**   I'm not asking for your understanding.

21        **THE COURT:**  Just answer the question.  Listen, he's

22   cross-examining you and asked a direct question and you've got

23   to give a direct answer.  He said:  Did you say something

24   disparaging to Coonan's boss about Coonan?

25        Now maybe you don't think saying he reneged on a deal is

1  disparaging.  If that's your view, just tell us that.  But

2  counsel is asking you whether you said something disparaging to

3  Coonan's boss about Coonan.  You can say yes or no.

4       **THE WITNESS:**  The hard part here is I don't have

5  direct knowledge, I don't have firsthand knowledge of this.  So

6  it's really knowledge to me that I find out is incorrect.

7       So when I'm presenting the information, I think it's true

8  and factual on November 12th, but I'm corrected between the

9  time of the call -- between the time of this e-mail and the

10  call on November 23rd.

11  **BY MR. KAGAN:**

12  **Q.**  When were you corrected in your understanding?

13  **A.**  Very close to when it was mailed.

14  **Q.**  So then did you e-mail back to Mr. Coonan's boss and say,

15  "Listen, I'm sorry.  I got it wrong.  I made this false

16  statement about a man who reports to you"?

17  **A.**  I don't recall doing that, no.

18  **Q.**  Did you ever inform Mr. Coonan, "Listen, I made a false

19  statement to your boss about you.  I got it wrong.  I'm sorry"?

20  **A.**  No, I don't recall saying that to him.

21  **Q.**  So going into this call on November 24th, you made a false

22  statement to Mr. Coonan's boss about Mr. Coonan; right?

23  **A.**  Later -- at the time I write it, I think it's true but

24  later it's false.

25  **Q.**  I'm not asking you --

1           THE COURT:  Wait.  There's a little bit of -- in

2     fairness to the witness, the word "false" is argumentative.  It

3     would be better to say "an inaccurate disparaging comment."

4     Say that.

5     BY MR. KAGAN:

6     Q.    So before going into the call on November 24th with

7     Mr. Coonan, you have made an inaccurate disparaging comment to

8     Mr. Coonan's supervisor about him; is that right?

9     A.    Yes.

10    Q.    And you learned that that statement was, in fact,

11    inaccurate; is that right?

12    A.    Yes.

13    Q.    And you never bothered to contact Mr. Coonan's supervisor

14    to explain what you had done; is that right?

15    A.    Well, I don't know.  There's further correspondence.  You

16    know, the e-mail chain doesn't end here.  I reach out to

17    Mr. Coonan directly to arrange the call.

18    Q.    Okay.  So when you reached out to Mr. Coonan directly, did

19    you explain to Mr. Coonan that you had made a disparaging and

20    inaccurate statement about him to his supervisor?

21    A.    I don't -- I don't explain to Mr. Coonan I made this

22    mistake and I'm not asked about it.

23    Q.    So you think that Mr. Coonan should ask you at the

24    beginning of this call, "I just want to know, have you talked

25    to my boss and made any false statements about me?"

GARLAND - CROSS / KAGAN

1  **A.**   No.  I didn't -- no, that's -- that's not accurate.  What

2  I'm basically saying is it's sent and this exact offer is

3  discussed on November 23rd, and at that point I tell him I know

4  the offer was made and was rejected.

5  **Q.**   Sir --

6  **A.**   And, you know, Mr. Coonan isn't -- there's not much

7  questioning coming back to me from Mr. Coonan on this.

8  **Q.**   Sir, you said in your 25 years of being involved in

9  licensing negotiations you've never had an occasion where

10 somebody you've been involved with has recorded a call with

11 you; is that right?

12 **A.**   That's correct.

13 **Q.**   So how many times have you been involved in situations

14 where going into a call with someone you've made an inaccurate

15 and disparaging statement about them to their supervisor?

16 **A.**   Would you repeat the question?

17 **Q.**   Yes.  In your 25-year career, how many times have you gone

18 into a call with a potential license partner and made a false

19 and disparaging comment about them to their supervisor?

20 **A.**   Just once.

21 **Q.**   Now let's talk about what was discussed on that call on

22 November 24th.  All right, Mr. Garland?

23 **A.**   Okay.

24 **Q.**   And this goes to the issue of notice.  And you're familiar

25 with the concept of notice in patent law; is that right?

GARLAND - CROSS / KAGAN

1    **A.**    I'm not a lawyer, but I have a general understanding of

2    notice, yes.

3    **Q.**    So you discussed the '494 patent on the call with

4    Mr. Coonan; right?

5    **A.**    That's correct.

6    **Q.**    That was the first time that Finjan had ever disclosed the

7    '494 patent to Mr. -- to anyone at Juniper; is that right?

8    **A.**    That's correct.

9    **Q.**    Now let's talk about the other side of the notice, which

10   is the products.  So you mentioned that Finjan had been

11   discussing the SRX products with Juniper before your

12   involvement; is that right?

13   **A.**    That's correct.

14   **Q.**    Okay.  And you're aware that Finjan is not accusing the

15   SRX products by themselves of infringing the '494 patent; is

16   that correct?

17   **A.**    That's correct.

18   **Q.**    The key element here is the product called Sky ATP; is

19   that right?

20   **A.**    That's correct.

21   **Q.**    So will you take a look at -- do you have Exhibit 327 in

22   your binder?

23   **A.**    Yes.

24   **Q.**    Okay.  If you take a look at that, please.

25   **A.**    (Witness examines document.)  Okay.

1    Q.   This is another -- or strike that.

2         Did you send this letter or e-mail?

3    A.   (Witness examines document.)  Yes.

4         MR. KAGAN:  Your Honor, I ask that 327 be admitted

5    into evidence.

6         THE COURT:  Any objection?

7         MS. KOBIALKA:  No objection.

8         THE COURT:  Thank you.  In evidence.

9         (Trial Exhibit 327 received in evidence)

10   BY MR. KAGAN:

11   Q.   This is the piece of correspondence you sent to

12   Ms. McKenzie; is that correct?

13   A.   Excuse me?

14   Q.   You sent this -- this includes an e-mail that you sent to

15   Ms. McKenzie; is that correct?

16   A.   (Witness examines document.)  Yes.

17   Q.   Okay.  And in the e-mail you informed her that you thought

18   there were certain Juniper products that were using Finjan's

19   inventions; is that right?

20   A.   Yes.

21   Q.   And you identified SRX security products; is that right?

22   Or SRX security product singular; is that correct?

23   A.   Yes.

24   Q.   No mention of Sky ATP; right?

25   A.   No, there's no mention of Sky ATP.

1   **Q.**   Or any of Juniper's cloud-based solutions; is that right?

2   **A.**   No.

3   **Q.**   And you never mentioned on your call with Mr. Coonan

4   Sky ATP; is that correct?

5   **A.**   No.  I mentioned the advanced malware module.

6   **Q.**   Right.  You never mentioned anything about a cloud-based

7   solution; right?

8   **A.**   I don't remember.  In the transcript it doesn't look like

9   the word "cloud" is in there.

10   **Q.**   And you've reviewed the transcript; right?

11   **A.**   Correct.

12   **Q.**   And you know that's an important issue in this case;

13   right?

14   **A.**   Yes.

15   **Q.**   So I'm assuming if you're reading the transcript and all

16   of a sudden you saw the word "cloud," that's the type of thing

17   that you might have remembered; right?

18   **A.**   I don't know.  I just know it's not in the transcript.

19   **Q.**   Right.  And you don't have some other memory of it being

20   on the call; right?

21   **A.**   No.

22   **Q.**   And no mention of Sky ATP; right?

23   **A.**   No.

24   **Q.**   When I say "right" --

25   **A.**   Yes.  Yes.

GARLAND - CROSS / KAGAN

1    Q.   Thank you.

2         Now, sir, are you aware of whether Finjan has taken the

3    position in this lawsuit that Finjan did actually provide

4    Juniper with notice about Sky ATP?

5    A.   Yes.

6    Q.   And what is Finjan's position?

7    A.   That there was notice given to Mr. Coonan on the call.

8    Q.   And, sir, in fact, you personally said that you discussed

9    Sky ATP on this call with Mr. Coonan, didn't you?

10   A.   I was doing that on recall, yes.

11   Q.   I'm sorry, what?

12   A.   I was doing that on recall, on recollection, yes.

13   Q.   And this was in a deposition that you said this; is that

14   right?

15   A.   That's right.

16   Q.   So you went into a deposition, you raised your hand, swore

17   to tell the truth; right?

18   A.   Yes.

19   Q.   And when asked the question about whether you discussed

20   Sky ATP on this call with Mr. Coonan, you said that you did; is

21   that correct?

22   A.   My recollection was I did because the advanced malware

23   module to me is Sky ATP.

24   Q.   I understand that.  So that was your recollection -- you

25   didn't say, "I don't recollect" or "I'm not sure."  You said "I

1   actually discussed Sky ATP on that call," didn't you?

2   **A.**   That's because they're equivalent to me.  The advanced

3   malware module is Sky ATP.

4   **Q.**   So in your mind, an advanced malware module is identical

5   to Sky ATP?

6   **A.**   No.  I just know that in that call in preparing for it,

7   that's exactly what I meant in the call.

8   **Q.**   When you were deposed, sir, and you were asked about

9   whether you mentioned Sky ATP, did you say "I didn't mention

10  Sky ATP but I did talk about the advanced malware module"?

11  **A.**   I believe I mentioned Sky ATP.  I -- you know, I'm trying

12  to remember a call from two and a half years ago.

13  **Q.**   Right.  And you now know that you're mistaken and that you

14  did not mention Sky ATP; is that right?

15  **A.**   I only know I'm mistaken because the call -- yeah, the

16  call is recorded and taped and transcribed.

17  **Q.**   That's right.  So if the call hadn't been taped and

18  transcribed and recorded, then you would still be here saying

19  that you had mentioned Sky ATP in that call with Mr. Coonan;

20  isn't that right?

21  **A.**   That's correct, but to me it's equivalent to advanced

22  malware module.

23  **Q.**   I understand that's your position.  I'm asking you about

24  whether you mentioned Sky ATP, and you swore and you took an

25  oath and you said you had.  That's correct, isn't it?

1   **A.**   I believe -- I believed I had, yes.

2   **Q.**   That's right.  And if we did not have that transcript,

3   that is still the testimony you would be giving today; isn't

4   that right?

5   **A.**   That's correct.

6   **Q.**   So the transcript actually lets us know what was actually

7   discussed on this call and lets us know that you did not

8   mention Sky ATP on that call; isn't that right?

9   **A.**   Again, I think advanced malware module in my mind is

10   Sky ATP.

11   **Q.**   Sir, I'm not asking you about what you think.  I'm asking

12   you about what you said.  You said you discussed Sky ATP.  And

13   if we did not have that transcript, that is still what you

14   would be telling the ladies and gentleman of this jury; isn't

15   that correct?

16   **A.**   In preparation for that call, that was my understanding,

17   advanced malware module is Sky ATP.

18   **Q.**   Sir, that's not what I'm asking.  Do I have to ask the

19   question again?

20   **A.**   Can you just repeat the question?

21        **MS. KOBIALKA:**  Objection, Your Honor.  This is getting

22   repetitive.

23        **THE COURT:**  I think you've gone over this enough and

24   made your point.  Let's move on.

25        **MR. KAGAN:**  Okay.

1   Q.   So, sir, you reviewed information about Juniper's products

2   and product lines in preparation for your negotiations with

3   Juniper; is that right?

4   A.   That's correct.

5   Q.   I'm going to ask you to look at Exhibit 345.

6   A.   Okay.

7   Q.   Without describing it, it has a document number at the

8   bottom indicating it came from Finjan's files.  Do you see

9   that?

10  A.   I see that.

11  Q.   Okay.  Is this the type of document that you reviewed in

12  preparing for your negotiations with Juniper?

13  A.   (Witness examines document.)  I never got to a negotiation

14  with Juniper, but there's a team of people that are doing this

15  analysis.

16  Q.   Is this the type of document that -- this is a publicly

17  available document about Juniper and its products; right?

18  A.   Yes.

19  Q.   And this is the type of document that you or your team

20  look at when preparing for discussions; is that right?

21  A.   That's correct.

22       MR. KAGAN:   Okay.  I'd like to move 345 into evidence,

23  Your Honor.

24       MS. KOBIALKA:   No objection.

25       THE COURT:   What?

1        **MS. KOBIALKA:**  No objection.

2        **THE COURT:**  Oh.  Thank you.  345 in evidence.

3    (Trial Exhibit 345 received in evidence)

4        **THE WITNESS:**  I do notice that this document is dated

5    2017.

6    **BY MR. KAGAN:**

7    **Q.**  I did notice that.  I'm not sure --

8    **A.**  So I don't think -- you know, what are we submitting it

9    as?

10   **Q.**  Well, this is back -- we'll get to the question.

11       This describes generally the functions and features of the

12   various Juniper products, SRX products; right?

13   **A.**  This is a data sheet on an SRX series service product, a

14   specific model number, yes.

15   **Q.**  And as far as you know, the particular features and

16   functionality hasn't changed for a model from 2016 to 2017, has

17   it?

18       **MS. KOBIALKA:**  Objection, Your Honor.

19       **THE WITNESS:**  How would I know that?

20       **THE COURT:**  That's not good enough.

21       **MR. KAGAN:**  Okay.

22       **THE COURT:**  You shouldn't be using a later document

23   with him.  He's not in a position to say they're equivalent,

24   so -- let's not go there.

25

1   BY MR. KAGAN:

2   Q.   Let's not go into any historical information, but in your

3   call with Mr. Coonan, you had discussed certain products; is

4   that right?

5   A.   Yes.

6   Q.   And the products were SRX products; right?

7   A.   Yes, SRX series, gateways, firewall -- "virtual firewall"

8   is the word that escaped me earlier -- yes.

9   Q.   And there were a couple of modules in particular that you

10  had discussed on this call; is that right?

11  A.   Yes.  I'm getting interrupted but, yes, I talk about some

12  modules.

13  Q.   So three of the modules that you describe on the call --

14  and you can look -- to refresh your recollection, you can look

15  at the transcript if you want or you may have remembered them

16  in preparing for today's testimony.  But you discuss the UTM,

17  antivirus, and advanced web filtering; is that right?

18         MS. KOBIALKA:   Objection, Your Honor.  He's showing a

19  document that came into existence two years or three years

20  after the call and he's tying it to the call.

21         THE COURT:   I think that's a problem.  So let's take

22  that down off the screen.

23  BY MR. KAGAN:

24  Q.   Let me ask this question.  You referred to three

25  modules -- ATM [sic], antivirus, and web filtering -- correct,

1  on the call?

2  **A.**   No.   That's not correct.   I didn't say ATM.

3  **Q.**   I'm sorry.   UTM.

4  **A.**   It's UTM.

5  **Q.**   And you understand those all to be modules that relate to

6  the SRX series; is that right?

7  **A.**   Yes, but there's multiple patents in this discussion,

8  right.

9  **Q.**   Sure.   And you said that your understanding is that

10  advanced malware is equivalent to Sky ATP; is that right?

11  **A.**   In preparation for that call, I knew that we had a '494

12  patent and claim chart and it was mapped to Sky ATP.

13  **Q.**   Okay.   But I believe you testified here that in your mind,

14  advanced malware was the same as Sky ATP; is that right?

15  **A.**   Yeah.   Because of the press release and what we had

16  reviewed in preparation for the call, yes.

17  **Q.**   Okay.   Did you during the call explain to Mr. Coonan that

18  in your mind advanced malware was the same thing as Sky ATP?

19  **A.**   I don't explain that.   I'm not asked about it.

20  **Q.**   Okay.   And are you aware that, in fact, Juniper's products

21  use advanced malware to refer to other products as well?

22  **A.**   No.   I'm using it in relation to Sky ATP on that call.

23  **Q.**   Sir, I understand that's how you're using it.   I'm asking

24  you whether you understand that Juniper uses those phrases to

25  refer to other products other than Sky ATP.

GARLAND - CROSS / KAGAN

1    **A.**    No, I'm not aware.

2    **Q.**    So if we could put...

3                            (Pause in proceedings.)

4    **BY MR. KAGAN:**

5    **Q.**    So let's put the screen back on -- the document back on

6    the screen.  I'm just going to ask you, sir, in this document,

7    which is from 2017, had you seen or were you aware that in

8    referring to, for example, the SRX 550 series, that Juniper

9    uses advanced malware to refer to a module of that product?

10            **MS. KOBIALKA:**  Objection, Your Honor.  This is, A,

11   outside the scope.  He's referring to a 2017 document and

12   Mr. Garland's is about a 2015 phone call.

13            **THE COURT:**  Well, but is that document -- was that in

14   evidence already?

15            **MR. KAGAN:**  It's in evidence, Your Honor.

16            **MS. KOBIALKA:**  I didn't object to it being admitted,

17   but I didn't know that he was going to try to go outside the

18   scope of the direct and then he's asking questions about a 2017

19   document.  This witness --

20            **THE COURT:**  I think that's a fair point.  Sustained.

21            **MR. KAGAN:**  Okay.

22   **Q.**    So we take a look at Exhibit 1025, please.

23   **A.**    (Witness examines document.)  Okay.

24   **Q.**    That's a letter that Mr. Coonan sent to your predecessor,

25   Ivan Chaperot; is that right?

 1   **A.**   Correct.

 2   **Q.**   That's in response to the claim charts that Mr. Chaperot

 3   had sent him?

 4   **A.**   Yes.

 5   **Q.**   In this response Mr. Coonan is saying "Here's some other

 6   patents that you should be concerned about if you're going to

 7   be accusing our product of infringing that patent"; is that

 8   right?

 9   **A.**   (Witness examines document.)

10          **MS. KOBIALKA:**  Objection, Your Honor.  This is going

11   to other patents, other issues that are not at issue in this

12   case.  I'm happy to show you the exhibit.

13          **THE COURT:**  Can I see it, please?  This is 1020 what?

14          **MR. KAGAN:**  1025, Your Honor.

15                  (Pause in proceedings.)

16          **THE COURT:**  Is '968 the patent, though, that the claim

17   chart --

18          **MR. KAGAN:**  Yes.

19          **THE COURT:**  -- was about?

20          **MR. KAGAN:**  Yes, Your Honor.  We really want to show

21   that Juniper is diligently responding when it receives a claim

22   chart.

23                  (Pause in proceedings.)

24          **THE COURT:**  In light of the way in which Mr. Coonan

25   has been portrayed by Finjan, this is a relevant and there's

GARLAND - CROSS / KAGAN

1   nothing wrong with this document.  1025 is received in

2   evidence.

3         (Trial Exhibit 1025 received in evidence)

4         **MR. KAGAN:**  Thank you, Your Honor.

5   **Q.**   Typically when you approach a patent -- a potential

6   licensee about patents with a claim chart, they will respond in

7   some way; right, Mr. Garland?

8   **A.**   Sometimes, yes.  Usually.

9   **Q.**   And their response can include, for example, patents that

10  they believe may be relevant to the analysis and negotiation;

11  is that correct?

12  **A.**   And prior art, yes.

13  **Q.**   This is prior art that Mr. Coonan was pointing out; is

14  that correct?

15  **A.**   He lists 10 patent numbers here, yes.  There's follow-up

16  correspondence from Mr. Chaperot asking for analysis regarding

17  these 10 patents.  All Mr. Chaperot receives are 10 patents,

18  seven digits each, without any explanation of how it relates to

19  the '968 patent.

20        And so this is a little bit of what I covered in my

21  description where when I -- in terms of getting ready for the

22  call with Mr. Coonan, that this is typically not how it's done.

23  I mean, a letter is fine but there's usually there's a

24  follow-on where there's some discussion about the patents or

25  why these 10 patents are chosen and why they think, you know,

 1   the other company feels the '968 is invalid.  It's usually not

 2   just sent as one piece of paper with no follow-up.  There is a

 3   request for follow-up and that follow-up does not occur.

 4   Q.   Right.  And Mr. Chaperot left the company shortly after --

 5   sometime after these communications occur?

 6   A.   He leaves three months later, but he has time to respond

 7   to this letter.

 8   Q.   And there was some further correspondence on that letter,

 9   wasn't there?

10   A.   Yes, there was.

11   Q.   Okay.  So I want to talk to you about --

12   A.   Can we go back there?  I just want to make sure I didn't

13   make a mistake.  You said there was further correspondence on

14   this letter but from who?  I'm suggesting the correspondence is

15   from Finjan.  I just want to be clear on that.

16   Q.   Thank you, Mr. Garland.

17        Sir, when it comes to the licensing discussions with

18   potential targets, Finjan has a consistent policy that it uses;

19   is that correct?

20             MS. KOBIALKA:  Objection, Your Honor.  This is outside

21   the scope.  We didn't get into this at all.  All we did was

22   notice.

23             MR. KAGAN:  Your Honor --

24             THE COURT:  That's true.

25             MR. KAGAN:  -- it is true.  I will -- we have

1  additional testimony that we can get from Mr. Garland, which I

2  believe would be --

3          THE COURT:  Well, then you can re-call him in your

4  case-in-chief.

5          MR. KAGAN:  We will re-call him in our case-in-chief.

6      There's just one other -- my colleague has informed me

7  that I failed to move one exhibit into evidence, and perhaps

8  I'll do that and then we'll call Mr. Garland back.

9          THE COURT:  You'll have to call him back because

10 there's an objection to scope of the direct.

11         MR. KAGAN:  Okay.

12 Q.   So, Mr. Garland, will you please take a look at

13 Exhibit 343?

14 A.   (Witness examines document.)  Okay.

15 Q.   Do you see that?

16 A.   Yes.

17 Q.   That is an e-mail from you; is that right?

18 A.   Yes.

19         MR. KAGAN:  I'd like to move that into evidence,

20 Your Honor.

21         MS. KOBIALKA:  No objection.

22         THE COURT:  All right.  343 in.

23     (Trial Exhibit 343 received in evidence)

24 BY MR. KAGAN:

25 Q.   This is another e-mail from you addressed to Ms. McKenzie;

GARLAND - CROSS / KAGAN

1     is that correct?

2     **A.**   Yes.

3     **Q.**   And this describes your phone call with Mr. Coonan on

4     November 24th; is that right?

5     **A.**   (Witness examines document.)  It refers to it, yes.

6     **Q.**   And it discusses the goal of the call; is that right?

7     **A.**   Yes.

8     **Q.**   And it says that you want to discuss, quote, "the current

9     and ongoing use of Finjan patents by Juniper's SRX series

10    services gateways next generation anti-threat firewall"; is

11    that correct?

12    **A.**   That's correct.

13    **Q.**   So, again, no mention at all of Sky ATP; is that right?

14    **A.**   There's no mention of Sky ATP, but it's an integrated

15    solution offered with the SRX firewall.

16    **Q.**   So the fact that Sky ATP is offered or made available to

17    users of the SRX firewall in your mind means that you're

18    providing notice about Sky ATP when you mention the SRX?

19    **A.**   I'm just relaying what's here.  I don't -- I'm answering

20    the question.

21           **THE COURT:**  I think it's -- this is argumentative.

22           **MR. KAGAN:**  Okay.  Thank you, Your Honor.

23           **THE COURT:**  You're done?

24           **MR. KAGAN:**  We've done the notice.

25           **THE COURT:**  Have you got more?

1    All right.  Okay.  So it's now back -- we've got 12

2    minutes.

3                      **REDIRECT EXAMINATION**

4    BY MS. KOBIALKA:

5    Q.   I'm going to try and do this in 12 minutes.

6    A.   Okay.

7    Q.   So you were asked about I think it was one of your first

8    e-mails to Ms. McKenzie; is that right?

9    A.   Yeah.

10   Q.   In that e-mail, what was your goal in terms of trying to

11   restart the discussions?

12   A.   Yeah, I mean, there had been a delay in the discussions.

13   There was no direct interaction after we had shared the '968

14   claim chart.  There was no ability to discuss the '968 claim

15   chart and what Juniper felt or believed about it other than

16   that one letter.

17        And so there's correspondence to see if we can get the

18   parties engaged and try to find a path forward where the

19   companies can really exchange information regarding the

20   analysis.

21   Q.   So is it fair you were just trying to restate what you

22   understood had happened?

23   A.   Yes.

24   Q.   And you were asked whether or not you sent disparaging

25   untruthful statements.  Were you trying to disparage

**GARLAND - REDIRECT / KOBIALKA**

1  Mr. Coonan?

2  **A.**   No.  You know, as I stated, at that time that's what I

3  thought had occurred and I put it in the e-mail.  I hadn't met

4  Mr. Coonan.  I didn't know Mr. Coonan.  And so, yeah, I'm later

5  informed that it's incorrect; but, no, I didn't send it to be

6  harmful.

7  **Q.**   Okay.  And that was all -- you discussed it on the call

8  when you actually talked to Mr. Coonan -- what? -- a week or

9  two later; right?

10 **A.**   Yeah.  It comes up in that call.  And, you know, it's

11 difficult.  I just started with Finjan and there's a lot of

12 negotiations I'm inheriting.  And I think he even says "You're

13 aware of the meeting?"  And at first I say, "No.  I'm not aware

14 of the meeting."

15     And, again, I'm absorbing a lot of information.  And then

16 as he's talking about the meeting and about the offer, I

17 realize that I do know about this meeting.  I know there was an

18 offer made and I know it was rejected.

19     So at this point, that's what I was saying, between the

20 time of the e-mail of November 12th and the call on

21 November 23rd, you know, I've realized I was mistaken.

22         **MS. KOBIALKA:**  And, Your Honor, I think they opened

23 the door to what I was trying to get in earlier.  I want to ask

24 those questions of this witness regarding what was the offer

25 and what happened.

1      THE COURT:  Well, what do you mean "what was the

2  offer"?

3      MS. KOBIALKA:  This offer that we keep running around

4  in circles about.

5      THE COURT:  All right.  You can ask -- let's take it

6  one step at a time.

7      MS. KOBIALKA:  Okay.

8      THE COURT:  You can ask what was the offer that he

9  understood was made to Finjan.

10  BY MS. KOBIALKA:

11  Q.   So, Mr. Garland, could you please identify what your

12  understanding was of what Mr. Coonan's offer was to Finjan?

13  A.   Mr. Coonan was offering to share insight into Palo Alto

14  Networks litigation strategy in exchange for a free license to

15  Finjan's patent portfolio so --

16  Q.   I'm sorry.  I didn't mean to interrupt you.

17  A.   I was just saying some knowledge or information in

18  exchange for a free patent license.

19  Q.   And what was Finjan's response?

20  A.   It was rejected outright.

21      MR. KAGAN:  Objection.  I think to the extent there

22  was any open door, we've now covered it completely.  We have

23  the offer and we have the rejection.

24      THE COURT:  All right.  But the answer will stand, the

25  last answer.

1          **MR. KAGAN:**  Yes.

2          **THE COURT:**  Yes, all right.

3      Okay.  So what's your next question?

4  **BY MS. KOBIALKA:**

5  **Q.**  Okay.  So you were asked about some other correspondence.

6      Could we have the Elmo, please?

7      And I want to make sure we get this timeline right because

8  I think it may not be clear.

9      So you recall Trial Exhibit 91 in your binder there, the

10 press release.  What is the date of that press release?

11 **A.**  (Witness examines document.)  The press release is

12 September 29th, 2015.

13         **A JUROR:**  We can't see your notes.  Can you push it

14 down a little bit?

15                    (Pause in proceedings.)

16         **MS. KOBIALKA:**  This is why I don't take pictures.

17 **Q.**  Okay.  And then you were asked about Exhibit I think it's

18 327.  It's an e-mail dated October 15th, 2015; right?

19 **A.**  That's correct.

20 **Q.**  And then you end up having the call in November, right,

21 the end of November 2015?

22 **A.**  That's correct, November 23rd.

23 **Q.**  Is it 23rd or 24th?  Something like that; right?

24 **A.**  23rd, I believe, yeah.

25 **Q.**  Okay.

 1   **A.**    It may be the 24th.  Yeah, the 24th.

 2   **Q.**    Something like that.  Okay.

 3        All right.  So what is Finjan's process after it learns

 4   about a new release of a product?  Does it magically just

 5   create claim charts right away?

 6             **MR. KAGAN:**  Your Honor, leading.

 7             **THE COURT:**  No, it's not.  It's preliminary enough.

 8        Go ahead.  Answer the question.

 9             **THE WITNESS:**  I mean, you know, we -- you know, in

10   preparation for Juniper, yeah, we looked at new products and we

11   developed claim charts against the Sky ATP.

12   **BY MS. KOBIALKA:**

13   **Q.**    So by October 15th, 2015, is it possible that you hadn't

14   finished doing the internal analysis?

15             **THE COURT:**  Wait a minute.  That just calls for

16   speculation.

17             **MS. KOBIALKA:**  Well, okay.

18             **THE COURT:**  Plus it's leading the witness.  Please.

19             **MS. KOBIALKA:**  Fair enough.

20   **Q.**    At what point did you have the claim chart for the '494

21   patent on the new products that you testified to earlier?

22   **A.**    I know I had seen it before the call and I know that there

23   was three others that were in the preliminary state where they

24   were still being developed.  There was six total.  So we had

25   the '968 and the '154 and the '494 were complete by the time I

 1   had the call, but three others were pending still and still in

 2   draft form.

 3   Q.   Okay.  And so by October 15th, 2015, do you know one way

 4   or the other whether the '494 claim chart that was done for

 5   Sky ATP was completed?

 6   A.   Sitting here today, I can't tell you if it was completed.

 7   Q.   Have you ever had in your 25 years of experience someone

 8   offer confidential information from a litigation in exchange

 9   for a patent license?

10          MR. KAGAN:  Objection, Your Honor.

11          THE COURT:  He never testified that it was

12   confidential.

13          MS. KOBIALKA:  All right.

14          THE COURT:  And so that part of the question is

15   objection sustained.

16          MS. KOBIALKA:  I'll reask it.

17   Q.   Have you ever had anyone in your 25 years of experience

18   offer information from a litigation in exchange for a patent

19   license?

20   A.   No.

21          MS. KOBIALKA:  I have no further questions.

22          THE COURT:  All right.

23          MR. KAGAN:  I do have two questions, Your Honor.

24          THE COURT:  Go ahead.  You've got three minutes.

25          MR. KAGAN:  I think it's a little incomplete on a

```
 1   couple things.

 2        Could we get this up, please?

 3             THE CLERK:  It's still up.

 4             MR. KAGAN:  Oh, okay.  Sorry.

 5             MS. KOBIALKA:  I'm going to object to marking on my

 6   demonstrative.

 7             THE COURT:  Use a different -- no, it's okay.

 8             MR. KAGAN:  I'll use a different pen.

 9             THE COURT:  You can use a different pen.  It's

10   perfectly okay for one lawyer to mark over the other side's

11   demonstrative.  It happens all the time, but use a different

12   color ink so it will be clear who marked up the other side's.

13             MR. KAGAN:  I'll use a small pen, Your Honor.

14                        RECROSS-EXAMINATION

15   BY MR. KAGAN:

16   Q.   So, Mr. Garland, you testified you didn't know by this

17   April 15th e-mail whether or not the claim charts --

18             THE COURT:  Wait a minute.  That's still blue.

19             MR. KAGAN:  Sorry.  Sorry.

20             THE COURT:  Give him green or some other color.  Red

21   will work.  All right.

22   BY MR. KAGAN:

23   Q.   You did not know whether the claim chart was completed for

24   Sky ATP by the time of the October 15th e-mail; is that right?

25             THE COURT:  That's what you said.  I remember.
```

1               THE WITNESS:  Yeah, that's correct.

2   BY MR. KAGAN:

3   Q.   But by the time of this call on November 23rd-24th, that

4   claim chart had been completed; right?

5   A.   Yes.

6   Q.   Okay.  And then we looked at Exhibit 343, which was

7   another e-mail from February 2nd.  Do you recall that?

8   A.   What is this?

9   Q.   You can look at Exhibit 343.  That's an e-mail that you

10  and I looked at before that you had sent to Ms. McKenzie.

11  A.   Yes.

12  Q.   And the claim charts had been completed by then as well;

13  right?  I'm sorry.  2016.  2016.

14  A.   Yes.

15  Q.   So not -- but you didn't mention the Sky ATP on the

16  October 15th call because you didn't have the -- possibly you

17  didn't have the claim charts done; right?

18              THE COURT:  That's calling for speculation.

19              MR. KAGAN:  Okay.

20              THE COURT:  Can I ask a question that the jury I'm

21  sure is thinking but no one is asking?

22       In the call on November 23 or 24, or at any time leading

23  up to that call, had you given the claim chart on the '494,

24  Claim 10, to Juniper?

25              THE WITNESS:  No, we had not because they indicated

 1    they were going to share it.  It wasn't -- they weren't going

 2    to analyze it.  They were going to share it.  When I say "share

 3    it," I mean share it with other companies outside of Juniper.

 4         THE COURT:  Well, all right.  But you didn't give it

 5    to them?

 6         THE WITNESS:  I purposely didn't give it to them

 7    because how they were going to use it, that's correct.

 8         THE COURT:  Well, all right.  Well, whether -- that's

 9    a different question whether or not they were going to share it

10    or whatever.

11        All right.  Did you ever give it to them, the claim chart

12    on Claim 10 for the '494?

13         THE WITNESS:  No.

14         THE COURT:  Okay.  All right.  You have about one more

15    minute.  Go ahead.

16         MR. KAGAN:  Nothing further.

17         THE COURT:  All right.  Anything in the one minute

18    remaining?

19         MS. KOBIALKA:  No.

20         THE COURT:  All right.  May the witness be excused and

21    discharged?

22         MR. KAGAN:  Yes, Your Honor.  Well, subject to re-call

23    during our case-in-chief.

24         THE COURT:  Well, okay.  You can't go away.  Tomorrow

25    at 7:30 you've got to be cooling your heels in the hallway --

PROCEEDINGS

1          THE WITNESS:  Okay.

2          THE COURT:  -- which I'm sorry to say is because they

3     are going to call you back to give more testimony in their case

4     on account of the scope of the examination objection, which was

5     a proper examination -- I mean, objection.  So you need to be

6     here at 7:30 in the morning, but for now you're free to go.

7     Thank you.

8          THE WITNESS:  Okay, thank you, Your Honor.

9        Just leave these?

10         THE COURT:  Just leave them there.

11             (Witness excused subject to re-call.)

12         THE COURT:  Okay.  I had hoped and they told me that

13    the plaintiff would rest today.

14       How many minutes away from resting are you?

15         MR. ANDRE:  Your Honor, we have just a couple

16    videotape depositions.  One is about 10 minutes and the other

17    is about 25 minutes.  So 35 minutes.

18         THE COURT:  All right.  So we are about an hour behind

19    where I thought we would be when I told you that we might

20    finish the case on Friday.  There's still an outside chance so

21    don't give up too much hope on that.

22         We're going to get to the defense case tomorrow.  And I've

23    been keeping track.  The lawyers have used up most of their

24    time.  In fact, one side has used almost all of their time.  So

25    we're moving right along, and we will see you here tomorrow.

1    Don't talk about the case.  We'll see you here at 7:45.

2        I want to thank you for being here so punctually.  Really,

3    it's great.  You are doing a great job over there on

4    everything, taking good notes and paying attention.  Thank you

5    for that.

6        See you tomorrow.

7        (Proceedings were heard out of the presence of the jury:)

8        **THE COURT:**  All right.  Be seated.

9        The way this will come down tomorrow is you put on the

10   rest of your case.  Now, you need to know you've used -- let's

11   just see what it is.  I think it's 318 minutes.  So that means

12   you have 390 total.  You better be very careful.  You have gone

13   into a lot of extraneous material that in my judgment you

14   should not have.  So don't ask for more time.  Be very

15   economical on the time you have left.

16       On the other side, you have now gotten up to -- I'd have

17   to do the math here.  Let me do it.

18                   (Pause in proceedings.)

19       **THE COURT:**  You've used looks like 189 minutes of your

20   390.  So you are about at the halfway point.  So don't -- on

21   your side don't ask for more.

22       I think at the rate this is going we conceivably could

23   finish the evidence by noon on Friday.  If the jury wants to

24   have the arguments on Friday, we're going to have them on

25   Friday.  Don't try to talk me out of that because they can get

PROCEEDINGS

 1   this case over and get a verdict; but if they can't, then we'll

 2   see.

 3       All right.  That's all I got.  Anything you want to bring

 4   up with me?

 5           MR. ANDRE:  Your Honor, I just want to note just for

 6   the record, and I'm not asking for any kind of relief at this

 7   point, but you sustained objections today not allowing us to

 8   pursue the issues of the joint defense group and why

 9   Mr. Garland did not share the '494 claim charts with Juniper;

10   and the reason he did not share it, and you can see that in the

11   transcript of the phone call and he would be willing to testify

12   to it, was because they said if they got the claim charts, they

13   were going to give it to all the joint defense group, all of

14   Finjan's enemies out there.  And so he didn't give them the

15   charts, and that's a whole joint defense group conversation he

16   had there.

17       So the basis for not giving that was because it was going

18   to be shared with other people but used against Finjan in other

19   litigations.

20       And so I just want --

21           THE COURT:  Well, he did testify twice that Coonan

22   said he would share them.  So there's enough in the record for

23   you to make that point.

24           MR. ANDRE:  If I can make that point, Your Honor,

25   then --

1          **THE COURT:**  You can say that he said he would share

2    them.  I am not -- he didn't say he would share it to the joint

3    defense group.  He didn't go that far, but he did say he would

4    share them.  That part he managed to get that testimony in.

5          But, you know, there is no right to have a claim chart

6    kept secret.  Where did that -- see, Finjan just doesn't want

7    the rest of the world to know that it may be taking an

8    inconsistent position.  I've seen this -- I've been to this

9    rodeo.  I know that's what's going on.

10          That is not a legitimate reason for trying to keep what's

11    publicly available information -- to say "I'm not going to give

12    you a claim chart because you might" -- well, that's your

13    choice.

14          I don't think it's a legitimate argument anyway, but I'm

15    going to let you make it.  You can make it, "He said he would

16    share it and that's why I didn't give it to him," but to me

17    that's not a good reason.

18          To me, if I had been the lawyer for Finjan, I'd have said,

19    "Here is our claim chart.  God bless you.  Our public -- this

20    is all public.  We think you infringe all day long and share it

21    all day long if you wish."  That's what I would have done, but

22    because there's this history of making so many inconsistent

23    statements like you did in the IPR, then that is a problem.

24          **MR. ANDRE:**  Your Honor, let me just stress that we did

25    give them a claim chart, the '968.

PROCEEDINGS

1          **THE COURT:**  Yes.

2          **MR. ANDRE:**  So we're willing to give claim charts.

3   And when things start going south and start being threatened to

4   share with our enemies, that's just a different story.

5          **THE COURT:**  No, it's not a different story.  You could

6   have taken the risk.  You don't want to give them a claim

7   chart -- he's being honest with you.  He's saying "I'm going to

8   share it."

9          And, yet, if you decide you don't want to give him a claim

10  chart because you don't want people to know your secret

11  strategy, well, you know, that's a choice you've got to make.

12  But the bottom line is you didn't give them a claim chart and

13  now you've got a notice problem.

14         So, I'm sorry, I'm not very sympathetic to Finjan's

15  position on this.  By the way, it's going to be for the jury,

16  not for me; but I am not sympathetic to your argument that

17  you -- your excuse for not sending a claim chart.

18         **MR. ANDRE:**  I appreciate that, Your Honor.  I just

19  wanted to make the record so we can preserve it.  Thank you.

20         **THE COURT:**  All right.

21         **MR. KAGAN:**  Nothing, Your Honor.

22         **THE COURT:**  All right.  The way it will come down,

23  they will finish their case.  The Rule 50 will be preserved and

24  you'll start immediately with your defense because we're not

25  going to waste the jury's time on Rule 50, and so you just have

PROCEEDINGS

1    to forage ahead.  All right?

2              **MR. KAGAN:**  Yes, Your Honor.

3              **THE COURT:**  And time on the plaintiff's side is

4    getting short.  So you should marshal your resources and be

5    thinking what is the minimum cross-examination I need, and do

6    you really even need this other stuff that you were going to

7    put in tomorrow.  I don't know.  I don't know.

8         All right.  I've got to go do some other homework, and

9    I'll see you all here at 7:30 in the morning.  Thank you.

10        (At 1:05 p.m. the proceedings were adjourned, to

11   recommence on Thursday, December 12, 2018.)

12                        -  -  -  -

13                 CERTIFICATE OF REPORTERS

14        We certify that the foregoing is a correct transcript

15   from the record of proceedings in the above-entitled matter.

16   DATE:   Wednesday, December 12, 2018

17

18

19

20   _____

21        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

22

23

24   _____

25        Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
                U.S. Court Reporter