IRELL & MANELLA LLP
Jonathan S. Kagan (SBN 166039)
jkagan@irell.com
Alan Heinrich (SBN 212782)
aheinrich@irell.com
Joshua Glucoft (SBN 301249)
jglucoft@irell.com
Casey Curran (SBN 305210)
ccuran@irell.com
Sharon Song (SBN 313535)
ssong@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone: (310) 277-1010
Facsimile: (310) 203-7199

Rebecca Carson (SBN 254105)
rcarson@irell.com
Kevin Wang (SBN 318024)
kwang@irell.com
840 Newport Center Drive, Suite 400
Newport Beach, California 92660-6324
Telephone: (949) 760-0991
Facsimile: (949) 760-5200

*Attorneys for Defendant*
JUNIPER NETWORKS, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| FINJAN, INC., a Delaware Corporation,<br><br>  Plaintiff,<br><br>  vs.<br><br>JUNIPER NETWORKS, INC., a Delaware Corporation,<br><br>  Defendant. | Case No. 3:17-cv-05659-WHA<br><br>**JUNIPER NETWORKS, INC.'S OPPOSITION TO FINJAN, INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW (DKT. NO. 353)**<br><br>Judge: Hon. William Alsup |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ....................................................................................................... 1

II.     FINJAN IS NOT ENTITLED TO JMOL OF INFRINGEMENT ...................................... 1

        A.      Legal Standard ............................................................................................. 1

        B.      Substantial Evidence Supports The Jury Verdict Of Non-
                Infringement. ............................................................................................... 2

                1.      Finjan Mischaracterizes The Trial Record And Misapplies
                        The Law ............................................................................................ 2

                2.      There Is Substantial Evidence That Juniper Does Not Store
                        Security Profile Data In A "Database" As Construed ........................ 3

                3.      The Jury Was Justified In Rejecting Cole's Testimony As
                        Not Credible .................................................................................... 6

III.    Finjan Is Not Entitled To A New Trial Under Rule 59 ....................................... 12

        A.      Legal Standard ........................................................................................... 12

        B.      Dr. Rubin's Testimony On The "Database" Limitation Was
                Appropriate ............................................................................................... 12

        C.      Evidence Regarding The PTAB's Obviousness Finding Regarding
                Claim 1 Was Relevant To Juniper's § 101 Defense ..................................... 12

        D.      Finjan's Allegations That Juniper Withheld And Misrepresented
                Damages For The Accused Products Are Baseless ....................................... 14

                1.      Juniper Timely Produced Accurate And Complete Revenue
                        Information For The Accused Products. ........................................... 15

                2.      Juniper's Representations Concerning Damages Were
                        Accurate. ........................................................................................ 17

        E.      Finjan Misrepresents The Court's *Daubert* Order. .................................. 21

        F.      Finjan's Request For An Interlocutory Appeal Is Premature. ...................... 23

        G.      Juniper Does Not Oppose Finjan's Request To Stay This Case As
                To The '844, '926, '154, '633 And '731 Patents. ......................................... 25

IV.     CONCLUSION ........................................................................................................ 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*ADC Telecomms., Inc. v. Switchcraft, Inc.*,

5

    281 F. App'x 989 (Fed. Cir. 2008)........................................................................................15

6

*AVM Techs., LLC v. Intel Corp.*,

    334 F.Supp.3d 623 (D. Del. 2018) .....................................................................................15

7

*Bayer AG v. Sony Elecs., Inc.*,

8

    229 F. Supp. 2d 332 (D. Del. 2002), *aff'd*, 83 F. App'x 334 (Fed. Cir. 2003) ...........................8

9

*Castillo v. City & Cty. of S.F.*,

    2006 WL 1305214 (N.D. Cal. May 11, 2006) (Alsup, J.), *aff'd*, 283 F. App'x

10

    536 (9th Cir. 2008)............................................................................................................12

11

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,

12

    717 F.3d 1336 (Fed. Cir. 2013)..........................................................................................22

13

*Finjan, Inc. v. Blue Coat Sys., Inc.*,

    No. 13-cv-03999-BLF, 2014 WL 5361976 (N.D. Cal. Oct. 20, 2014)....................................25

14

*Finjan, Inc. v. ESET, LLC et al.*,

15

    No. 3:17-cv-00183 (S.D. Cal Oct. 9, 2017) .........................................................................25

16

*Finjan, Inc. v. Secure Computing Corp.*,

17

    626 F.3d 1197 (Fed. Cir. 2010)..........................................................................................23

18

*G. David Jang, M.D. v. Bos. Sci. Corp.*,

    872 F.3d 1275 (Fed. Cir. 2017)............................................................................................2

19

*HTC Corp. v. IPCom GMBH & Co., KG*,

20

    285 F.R.D. 130 (D.D.C. 2012) ...........................................................................................24

21

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,

22

    751 F.3d 1327 (Fed. Cir. 2014)............................................................................................3

23

*Jang v. Bos. Sci. Corp.*,

    767 F.3d 1334 (Fed. Cir. 2014)..........................................................................................24

24

*In re Katz Interactive Call Processing Patent Litig.*,

25

    2009 WL 1351043 (C.D. Cal. May 1, 2009)........................................................................20

26

*Key Pharm. v. Hercon Labs. Corp.*,

27

    161 F.3d 709 (Fed. Cir. 1998).............................................................................................6

28

*Medeva Pharma Suisse A.G. v. Par Pharm., Inc.*,

    430 F. App'x. 878 (Fed. Cir. 2011).....................................................................................24

*Monsanto Co. v. Ralph*,
  382 F.3d 1374 (Fed. Cir. 2004) ........................................................................................22

*Motorola Inc. v. J.B. Rogers Mech. Contractors*,
  177 F. App'x 754 (9th Cir. 2006) ....................................................................................13

*Nazomi Comm'cns, Inc. v. Nokia Corp.*,
  739 F.3d 1339 (Fed. Cir. 2014) ......................................................................................23

*Pena v. Meeker*,
  2014 WL 4684800 (N.D. Cal. Sept. 18, 2014) ...............................................................12

*Prism Techs. LLC v. AT&T Mobility, LLC*,
  2014 WL 4843874 (D. Neb. Sept. 29, 2014) .....................................................................6

*Promega Corp. v. Life Techs. Corp.*,
  875 F.3d 651 (Fed. Cir. 2017) ........................................................................................25

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ......................................................................................................2, 3

*Sears, Roebuck & Co. v. Stiffel Co.*,
  376 U.S. 225 (1964) ........................................................................................................20

*Sentilles v. Inter-Caribbean Shipping Corp.*,
  361 U.S. 107 (1959) ........................................................................................................12

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
  655 F.3d 1364 (Fed. Cir. 2011) ........................................................................................8

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
  247 F.3d 1316 (Fed. Cir. 2001) ......................................................................................23

*Transamerica Life Ins. Co. v. Lincoln Nat. Life Ins. Co.*,
  597 F. Supp. 2d 897 (N.D. Iowa 2009) .......................................................................6, 13

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*,
  699 F.3d 1340 (Fed. Cir. 2012) ................................................................................14, 15

*TVIIM, LLC v. McAfee, Inc.*,
  851 F.3d 1356 (Fed. Cir. 2017) ........................................................................................3

*United States v. 4.0 Acres of Land*,
  175 F.3d 1133 (9th Cir. 1999) ........................................................................................12

*Wi-Lan, Inc. v. Apple, Inc.*,
  811 F.3d 455 (Fed. Cir. 2016) ..........................................................................................2

**Statutes**

35 U.S.C. § 101 ........................................................................................ *passim*

35 U.S.C. § 102 ....................................................................................................14

35 U.S.C. § 103 ....................................................................................................14

**Rules**

Fed. R. Civ. P. 30(b)(6) ........................................................................................19

Fed. R. Civ. P. 50(a) ............................................................................2, 22, 23, 24

Fed. R. Civ. P. 54(b) ....................................................................................1, 24

Fed. R. Civ. P. 59 ................................................................................................12

Local Rule 3-4 ....................................................................................................16

## I.      INTRODUCTION

Finjan's request for a judgment as a matter of law ("JMOL") on the issue of infringement is baseless. Finjan's motion is based on an apparent misunderstanding of the legal standard for obtaining JMOL, as well as a willful ignorance of the substantial evidence presented by Juniper to support the jury's finding that the accused Juniper products do not satisfy the "database" limitation. Rather than crediting the evidence presented by Juniper—as required on a JMOL—Finjan instead argues that the jury should have accepted the testimony of Finjan's technical expert instead of accepting the testimony of Juniper's technical expert. This is not a proper basis for obtaining a JMOL, and the Court should therefore reject Finjan's attempt to reverse the jury's sound verdict.

Finjan's request for a new trial is similarly flawed. Finjan first claims that it should be granted a new trial on infringement because Juniper supposedly applied an incorrect construction of "database." But Juniper and its expert properly applied the very construction to which the parties agreed, and Finjan waived any argument that "database" needed any further construction by failing to raise the issue with the Court—and in fact opposing Juniper's request for further construction of "database." Finjan next claims that it was an error to allow Juniper to introduce evidence concerning the PTAB's decision to invalidate Claim 1. But this evidence was relevant to Juniper's § 101 defense, and Finjan provides no explanation for why allowing Juniper to introduce legitimate evidence concerning its § 101 *invalidity* defense would somehow entitle it to a new trial on *infringement*. Finjan's only other purported grounds for requesting a new trial pertain to damages-related issues that are moot in view of the jury's finding of no infringement. Even if they were not moot, however, Finjan's arguments rely on misrepresentations of the factual record and a complete mischaracterization of the Court's *Daubert* ruling.

## II.     FINJAN IS NOT ENTITLED TO JMOL OF INFRINGEMENT

### A.      Legal Standard.

Judgment as a matter of law ("JMOL") is improper unless "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). A court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530

1    U.S. 133, 150 (2000). "Credibility determinations, the weighing of the evidence, and the drawing

2    of legitimate inferences from the facts are jury functions, not those of a judge." *Id.*

3            **B.**      **Substantial Evidence Supports The Jury Verdict Of Non-Infringement.**

4              **1.**      **Finjan Mischaracterizes The Trial Record And Misapplies The Law.**

5          Finjan's entire motion is based on a false premise: that it presented "***unrefuted*** evidence"

6    that Juniper's accused products store "Downloadable security profile data in a database" as required

7    by Claim 10 of the '494 Patent. Dkt. No. 353 at 3; *id.* at 5 ("unrefuted evidence"), 6 (same), 7 (same).

8    In fact, this was the one disputed infringement issue at trial, so much of the evidence from both

9    parties addressed this issue. Indeed, Juniper's technical expert, Dr. Rubin, expressly refuted Finjan's

10   infringement theory and explained in detail (including with citations to Juniper source code), how

11   Juniper's Sky ATP does ***not*** store downloadable security profile data in a "database" under the

12   agreed construction for that term. Trial Tr. 717:14-718:14, 733:1-760:16, 763:13-770:23.

13         Finjan tries to brush aside Dr. Rubin's testimony, arguing that "Juniper's expert relied on

14   nearly no evidence to support Juniper's position" on non-infringement. Dkt. No. 353 at 4. Finjan

15   ignores the fact that ***Dr. Rubin's testimony is itself evidence.*** *G. David Jang, M.D. v. Bos. Sci.*

16   *Corp.*, 872 F.3d 1275, 1283-84 (Fed. Cir. 2017) (testimony of accused infringer's technical expert

17   constituted substantial evidence supporting jury verdict of non-infringement); *Wi-Lan, Inc. v. Apple,*

18   *Inc.*, 811 F.3d 455, 463 (Fed. Cir. 2016) (same). The testimony of Dr. Rubin, who spent "a

19   significant amount of time reviewing the source code for Sky ATP," Trial Tr. 733:3-20, along with

20   the other evidence of non-infringement in the record, more than suffices to support the jury verdict

21   of non-infringement.

22         Having ignored the most obvious evidence of non-infringement Juniper presented at trial,

23   Finjan then compounds its legal error by arguing for JMOL based on a rehash of the infringement

24   theory advanced by its own expert witness, Dr. Cole—a theory that the jury squarely rejected. Dkt.

25   No. 353 at 5-7. On JMOL, the Court must uphold the jury's verdict so long as it is supported by

26   substantial evidence, "even if it is also possible to draw a contrary conclusion." *TVIIM, LLC v.*

27   *McAfee, Inc.*, 851 F.3d 1356, 1362 (Fed. Cir. 2017); *Reeves*, 530 U.S. at 150 (court "must draw all

28   reasonable inferences in favor of [the prevailing party], and it may not make credibility

1   determinations or weigh the evidence.").

2       As discussed in more detail below, the parties presented the jury with two very different

3   theories regarding the parties' core infringement dispute. Dr. Rubin analyzed each of the Amazon

4   storage solutions Juniper uses in Sky ATP and explained how none of them ***both*** (1) stores a

5   downloadable security profile, including a list of suspicious computer operations, ***and also***

6   (2) satisfies the agreed construction for "database," which is "a collection of interrelated data

7   organized according to a database schema to serve one or more applications." Trial Tr. 750:3-

8   755:19; 963:22-24 (Jury Charge). As a result, Dr. Rubin concluded that Juniper does not store a

9   "downloadable security profile" in a "database" as Claim 10 requires. *Id.*, 755:12-19. Dr. Cole, on

10  the other hand, did not separately analyze each storage solution to determine whether any one

11  satisfied all elements of the claim; he simply lumped them all together and argued that, collectively,

12  they satisfied all elements of the claim. Trial Ex. 1179; Trial Tr. 758:7-22. Given these two divergent

13  theories, the jury had to decide which expert proposed the more credible and persuasive approach

14  for assessing infringement. For JMOL purposes, the "jury had the right to rely upon [Dr. Rubin's]

15  testimony and to reject any testimony proffered by [Finjan] to the contrary." *InTouch Techs., Inc. v.*

16  *VGO Commc'ns, Inc.*, 751 F.3d 1327, 1343 (Fed. Cir. 2014) (affirming denial of JMOL of

17  infringement; courts "do not decide what evidence seems more persuasive," but only "whether there

18  was substantial evidence upon which the jury could predicate its non-infringement judgment").

19          **2.     There Is Substantial Evidence That Juniper Does Not Store Security
                     Profile Data In A "Database" As Construed**
20

21      Dr. Rubin's opinion was well reasoned and well supported. He explained Sky ATP does not

22  store a "downloadable security profile," including a "list of suspicious computer operations," in a

23  "database." Trial Tr. 742:1-758:4. He based his opinion on the agreed construction for "database":

24  "a collection of interrelated data organized according to a ***database schema*** to serve one or more

25  applications." Trial Tr. 963:22-24 (Jury Charge).

26      Dr. Rubin explained the distinction between a database with a "database schema" and

27  "schema-less" databases (i.e., a storage solution that does not meet the agreed construction of

28  "database"). Trial Tr. 742:1-749:24. He testified that a database with a "database schema" has a set

of pre-defined fields. *Id.*, 742:1-743:4. He gave the example of a database for students in a school, with predefined fields of "name," "gender," "age" and "GPA." *Id.* These fields provide a "very strict structure for that database." *Id*. For example, one could not simply enter the country of birth for a given student in this database "because there's no field for that." *Id.* In contrast, a "schema-less" database does not have pre-defined fields. One can associate whatever information one wants, in any format, with a key, and include it in the database. *Id.*, 745:1-746:13. Using this example, if the student database were schema-less, one could include country of birth for a student because "there's no schema. It's schema-less. So I can put whatever I want whenever I want into it." *Id.*[1]

Dr. Rubin further explained the pros and cons of each type of database. Database schemas provide "efficiencies for querying." *Id.*, 742:20-743:4 ("You want to ask the question 'Show me all the students who are 18 years old and who are GPA of 3.5 or better.' In a database with a schema you can create a query exactly like the one I just described and immediately it will spit out all the students that meet that. That's very powerful. Okay? And that is why you have a schema in a database."). Schema-less databases, in contrast, are designed for storing large amounts of data that do not need to be frequently accessed: "databases that are schema-less are intentionally designed for applications where you're not going to need to get to the data very often. It's more important to be able to store it quickly than it is to retrieve it quickly, and that's why these databases came around." *Id.*, 748:2-6; 752:14-753:15.[2]

As Dr. Rubin testified, and Dr. Cole agreed, Juniper uses three different Amazon storage solutions in Sky ATP: DynamoDB, S3, and MySQL. *Id.*, 750:3-755:19; 776:25-777:5; Trial Ex. 94-10; Trial Tr. 467:9-11 (admitting that Sky ATP uses "MySQL, the DynamoDB, and the S3"). Dr. Rubin explained that DynamoDB and S3 are both schema-less, and thus do not satisfy the agreed

---

[1] Dr. Cole, in contrast, claimed that a schema-less database is a database in which the user does not have to fill in information for every field. Trial Tr. 464:3-465:9. The jury was free to believe Dr. Rubin that Dr. Cole's testimony on this issue was "not true." *Id.*, 745:1-6.

[2] In its JMOL motion, Finjan complains that Dr. Rubin's understanding of "database schema" was inconsistent with the PTAB's understanding in an IPR proceeding. Dkt. No. 353 at 9. But the PTAB document on which Finjan relies (Trial Ex. 122) was not admitted into evidence at trial. Notably, Finjan did not attempt to cross examine Dr. Rubin on any alleged inconsistencies between his understanding and the PTAB's. Finjan's attorney argument concerning a document that was not in evidence or even discussed at trial is not a proper basis for JMOL.

- 4 -

1   "database" construction "database." Trial Tr. 750:3-753:15. His opinion was based on his review of

2   Juniper's source code, Amazon's own documentation, and his experience working with these

3   Amazon storage solutions. *Id.*, 733:3-20; 750:3-755:19; 785:11.

4       For example, Amazon touts that DynamoDB is "schema-less," so "the data items in a table

5   need not have the same attributes or even the same number of attributes." Trial Ex. 1264-4[3]; Trial

6   Tr. 750:20-753:15. S3 has even less structure, storing data as "unstructured blobs." Trial Ex. 1264-

7   3. Testimony from Juniper engineer Chandra Nagarajan further confirmed that these Amazon

8   storage solutions are schema-less. *See, e.g.*, Nagarajan Tr. at 41:4-24 ("the database should qualify

9   is a – is a schema LS [SIC-- schema-less] database, not a relational database where the data is

10  structured. It's really an unstructured schema [less] database. Q. What do you mean by unstructured?

11  A: So there are – there are a couple of database kinds. … All those are very predefined. So – that is

12  what I would call a schema-based database. Right? In *a schema [less] database like the one we use*

13  – … you can add a data at any point of time without impacting the previous data stored").

14      MySQL, on the other hand, has a database schema, but Sky ATP does not use MySQL to

15  store a "list of suspicious computer operations," or anything else that could constitute a

16  "downloadable security profile" as required by Claim 10. Trial Tr. 753:16-754:25. As a result,

17  MySQL also does not meet the "database" requirements of Claim 10.

18      Finjan contends that it is entitled to JMOL on the ground that Dr. Rubin "argued an improper

19  claim construction," Dkt. No. 353 at 12, but the trial record refutes Finjan's claim. Dr. Rubin

20  expressly applied the parties' agreed claim construction for "database." Trial Tr. 741:17-25. Finjan's

21  real complaint appears to lie with Dr. Rubin's understanding of the term "database schema" that was

22  part of that agreed construction. But Finjan cannot now complain about potential ambiguities about

23  the term "database schema," as Juniper filed a motion seeking further construction and clarification

24  of this term before trial, and Finjan opposed, arguing that no further guidance from the Court was

25  necessary for the jury to render its verdict. *See* Dkt. No. 275 at 5; *Key Pharm. v. Hercon Labs. Corp.*,

26

27      [3] Dr. Rubin further testified that Trial Ex. 1264 is the type of document that persons of skill in this field rely on, notwithstanding Finjan's attempt to describe it as a "non-technical document." Trial Tr. 785:2-11. Finjan identifies no proper legal basis for ignoring this Amazon document, which was admitted without objection, and plainly supports the jury verdict of non-infringement.

28

1   161 F.3d 709, 715 (Fed. Cir. 1998) (holding that "doctrines of estoppel, waiver, invited error, or the

2   like would prohibit a party from asserting as 'error' a position that it had advocated at the trial.").

3   As a result, it was proper for Dr. Rubin to present the jury with his understanding of the term (subject

4   to cross-examination). *See Prism Techs. LLC v. AT&T Mobility, LLC*, 2014 WL 4843874, at *3 (D.

5   Neb. Sept. 29, 2014) ("The Court is mindful that experts are permitted to reasonably disagree as to

6   the interpretation and application of the Court's Markman order."); *Transamerica Life Ins. Co. v.*

7   *Lincoln Nat. Life Ins. Co.*, 597 F. Supp. 2d 897, 910 (N.D. Iowa 2009) ("[T]he parties may

8   reasonably disagree about the interpretation and application of the court's claim constructions….").[4]

9          **3.**      **The Jury Was Justified In Rejecting Cole's Testimony As Not Credible**

10        The jury also had ample basis on which to reject Dr. Cole's infringement theory as not

11   credible. Dr. Cole did not contend that any of the three storage solutions used in Sky ATP satisfied

12   the limitations of a "database" as used in Claim 10. Trial Tr. 500:20-501:6 (admitting he did not

13   analyze whether Sky ATP's individual storage solutions independently met "database" element of

14   Claim 10). Instead, Dr. Cole lumped all of those storage solutions together and artificially drew a

15   box around them which he called the "ResultsDB" database (as depicted below), arguing that this

16   artificial "database" infringed:



24   Trial Ex. 1179-10 (showing Dr. Cole's annotations at deposition).

25        But as even Dr. Cole (at times) acknowledged, "ResultsDB" is an **A**pplication **P**rogramming

---

27       **4** Finjan also takes issue with Dr. Rubin's application of Finjan's expert's definition of "database schema" in an IPR proceeding. Dkt. No. 353 at 13. But Finjan did not even object to Dr. Rubin's testimony on this issue. Trial Tr. 768:2-769:21. Dr. Rubin also testified that his non-infringement opinion did not depend on Finjan's IPR definition for this term. Trial Tr. 794:14-22.

1    *I*nterface (API)—it is not itself a database." *Id.*; Trial Tr. 440:14-17 ("the Results Database API,

2    application programming interface, this is something that interfaces with another component"). As

3    Dr. Cole also acknowledged, no Sky ATP data is physically stored in a "ResultsDB database"; rather,

4    data is stored in MySQL, DynamoDB, or S3. *Id.*, 467:9-11.

5        While Finjan points to documents in which Juniper refers loosely to a "database" or uses the

6    term "ResultsDB," Dkt. No. 353 at 5-6, Juniper engineer Chandra Nagarajan explained that "internal

7    to the team, we refer to it as a results database," but "*the way it works is we're using the*

8    *DynamoDB" and "S3."* Nagarajan Tr. 24:18-25:6. Further, contrary to Finjan's misrepresentation,

9    Dr. Rubin's opinion was not that Juniper engineers "did not know what they meant when they

10   reference ResultsDB in their source code." Dkt. No. 353 at 7. Instead, as Dr. Rubin testified, his

11   opinion was that there was no evidence that the Juniper engineers were "applying ***the claim***

12   ***construction in this case when*** [***they***] ***said***" the word "database." Trial Tr. 778:10-21. The jury was

13   not required to follow Finjan's lead in lumping these storage components together, and was well

14   within its discretion to consider each component individually as Dr. Rubin testified and explained.

15   The fact that Juniper personnel would, for convenience, occasionally refer to the separate storage

16   components altogether as ResultsDB does not render the jury's verdict unsupported by substantial

17   evidence. *Bayer AG v. Sony Elecs., Inc.*, 229 F. Supp. 2d 332, 349 (D. Del. 2002), *aff'd,* 83 F. App'x

18   334 (Fed. Cir. 2003) (finding no infringement of the claims dependent on the limitation "core,"

19   despite the alleged infringer's use of the word "cores" to describe components of the accused

20   products, because the described "cores" did not "satisfy the number of 'cores' in [the asserted

21   claims], as that term is construed by the Court").

22       Finjan claims that Dr. Rubin took the position that "the ResultsDB is not a database *because*

23   *it is a combination of three storage components*." Dkt. No. 353 at 8. This is not true; Dr. Rubin

24   explained that DynamoDB, S3, and MySQL "are three different, separate storage solutions. They

25   have different purposes. They are communicated with in different programming languages, and so

26   you can't just draw a box and say, 'This is a database.'" Trial Tr. 759:3-6. Dr. Rubin further

27   explained that none of those storage solutions both "has a schema and stores a list of suspicious

28   computer operations," as Claim 10 requires. *Id.*, 755:17-19. In other words, Dr. Rubin opined that

what Dr. Cole called "ResultsDB database" is not an actual database, and that Dr. Cole cannot create a database by drawing an arbitrary box around three fundamentally different storage solutions. The jury was free to credit Dr. Rubin's testimony on this issue and reject Dr. Cole's. *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1378 (Fed. Cir. 2011) ("The jury is entitled to credit or discredit testimony before it. In this situation, where expert testimony was needed to establish infringement, it was not unreasonable for the jury to discredit the testimony of [patentee's] expert and find that the [defendant's] patents were not infringed.").

For the same reasons, Finjan's argument that the term "a database" in Claim 10 means "one or more" is a red herring. Dkt. No. 353 at 8-9. Dr. Rubin explained that there are *no databases* in Sky ATP—not a single database, and not multiple databases—that meet the requirements of Claim 10 (i.e., that have a "database schema" and store the claimed "security profile data"). Trial Tr. 750:3-755:19.

It was also reasonable for the jury to reject Dr. Cole's theory that his artificial "ResultsDB database" was "organized according to a ***database schema***," as required by the stipulated construction of the term "database." Dr. Cole pointed to the "JSON" format as the alleged "database schema" for his "ResultsDB." *Id.*, 504:22-25 ("Q. And it's your position that the database schema for the thing that you've identified as ResultsDB database is the JSON schema; right? A. That is correct."). But as Dr. Rubin explained, JSON is a text format; it is *not* a "database schema." *Id.*, 759:18-760:16; 763:13-765:19. Finjan claims that "Dr. Rubin provided no basis to support" this opinion. Dkt. No. 353 at 10. This is wrong; Dr. Rubin's opinion was supported by the Internet Engineering Task Force's definitive standards document on the JSON format. Trial Ex. 1248; Trial Tr. 759:18-760:16. This document expressly states that "JSON is a ***text format***." Trial Ex. 1248-3; Trial Tr. 763:16-23. As Dr. Rubin explained, "[t]his is different from a database schema, which defines how you put data into a database. A JSON schema defines how you put text into a JSON object." *Id.*, 764:2-4.

Finjan tries to undermine Dr. Rubin's testimony by pointing to documents that use the terms "schema" or "JSON schema." But as even Dr. Cole admitted, not all schemas are database schemas. *Id.*, 503:4-10 ("Q. You'd agree with me, sir, that all schemas are not database schemas; correct?

- 8 -

1   You could have a file schema, for example, and that doesn't necessarily mean it's a database schema;

2   correct? A. Yes."); *id.*, 763:25-764:1 ("The word 'schema' just has to do with having rules for how

3   you put things together.").

4          Dr. Cole's theory that the "JSON schema" is the "database schema" for his "ResultsDB

5   database" is further undermined by the fact that MySQL—which is one of the storage components

6   Dr. Cole lumps together into his artificial database—does not use the JSON format at all. Dr. Rubin

7   testified that "[n]othing that's stored in the MySQL database is of a JSON format,"—a fact he

8   demonstrated using Juniper source code. *Id.*, 765:4-19. Dr. Cole did not and could not explain how

9   JSON could possibly be the "database schema" for his artificial database that includes MySQL,

10  given that MySQL itself does not even use the JSON format. *See id.*, 759:12-17 ("I mean, [Dr.

11  Cole's theory] is actually kind of ridiculous because you've got these different storage solutions,

12  two of which are schema-less and one of which doesn't have any list of security operations. And so

13  they use different languages so you couldn't possibly have a schema for three things that are so

14  different.").

15         No doubt aware of the deficiencies in Dr. Cole's identification of the "JSON" format as the

16  required database schema, Finjan now argues—for the first time—that a "key schema" and a

17  "MySQL schema" could each be considered as alternative candidates for the "database schema."

18  Dkt. No. 353 at 9-11. But Dr. Cole did not even mention these schemas at trial, much less contend

19  that either was the "database schema" for his "ResultsDB database." Instead, Dr. Cole confirmed

20  that he relied solely on the "JSON schema" as his purported "database schema." Trial Tr. 504:22-

21  25. Finjan's attempt to raise a new infringement theory for the first time on JMOL is inappropriate;

22  Finjan did not even attempt to rebut Dr. Rubin's testimony at trial that a key schema is not a

23  "database schema." *Id.*, 786:10-19; *see id.*, 745:15 ("In a schema-less database, you have keys.");

24  *id.*, 746:12-13 (same).

25         Finjan's reliance on the "MySQL schema" in its JMOL motion is particularly puzzling.

26  Finjan claims that "Dr. Rubin admitted that the MySQL database in the ResultsDB meets every

27  requirement of the agreed construction of 'database,' including that it has a database schema."

28  Dkt. No. 353 at 11, citing Dr. Rubin's testimony at lines 16-21 of page 753 of the trial transcript.

- 9 -

1   But Finjan fails to cite the very next question and answer, in which Dr. Rubin testified that the results

2   from the analysis engines are ***not*** stored, as required by Claim 10: "Q. Does MySQL [in] Juniper

3   Sky ATP store the results of these analysis engines? A. It doesn't store the results." Trial Tr. 753:22-

4   24. Finjan points to the results of the analysis engines as the claimed "security profile data, []

5   including a list of suspicious computer operations," which Claim 10 requires storing in a "database."

6   In Sky ATP, that security profile, including a list of suspicious computer operations, is not stored in

7   MySQL. Dr. Rubin confirmed this again in response to the Court's questions on the very next page

8   of the trial transcript:

9           THE COURT: But does the stuff – the info stored in that one, MySQL, does it have
            either the verdict or the list of suspicious operations? THE WITNESS: It does not.
10          THE COURT: All right. THE WITNESS: It doesn't have either of those.

11  Trial Tr. 754:20-25. As a result, it is immaterial that MySQL uses a database schema, ***because it***

12  ***does not store the security profile data required by Claim 10***. Finjan did not dispute this at trial.

13          Finally, Dr. Cole attempted to mislead the jury by repeatedly arguing that Juniper ***must*** use

14  a database having a database schema to store security profiles, because Juniper must quickly look

15  up those security profiles when a downloadable is received by Sky ATP. For example, Dr. Cole

16  testified: "So both the static analysis and the dynamic analysis perform that security profile. And

17  then, to make it easy to look up if somebody else uses that same downloadable, Juniper puts it in a

18  structured database with a schema so they can quickly look up the information to make it go quicker

19  in the future." *Id.*, 432:24-433:4; *id.*, 429:19-23 (testifying that "security profile" is stored in a

20  "caching database" so "if somebody else out there in the world gets hit with that same downloadable,

21  it can now look it up in that structured database very easily and very quickly"); *id.*, 430:9-431:8

22  (testifying that Juniper stores the "security profile" for a downloadable in a database that "is going

23  to have to have a structure and a schema" because without a schema, "there's no way you would be

24  able to quickly look it up, and there's no way the system would work properly" when the same

25  downloadable is seen again).

26          The problem for Dr. Cole and Finjan is that this testimony was false. As Dr. Rubin testified,

27  when a downloadable is received by Sky ATP, only the verdict for that downloadable is looked

28  up—not the security profile, with a list of suspicious computer operations. *Id.*, 736:20-2; 757:7-9.

1  Dr. Rubin explained that this made perfect technological sense, because security profiles in Sky

2  ATP contain "very very large" amounts of heterogeneous data. *Id.*, 739:12-24; 740:16-24; 755:24-

3  756:3. Dr. Rubin even showed the jury the Juniper source code showing that only the verdict, not

4  the security profile, is looked up when a downloadable is received by Sky ATP. *Id.*, 766:24-768:1.

5  A verdict is just an integer between 1 and 10; it does not include a list of suspicious computer

6  operations, and hence is not the claimed "security profile" that must be stored in a database to

7  infringe Claim 10. *Id.*, 735:16-736:24. As a result, the explanation Dr. Cole provided the jury as to

8  *why* Juniper would store security profiles in a database with a schema—for quick access upon receipt

9  of a downloadable—was false.

10  There were numerous other instances at trial where Dr. Cole demonstrated he simply did not

11  understand how the accused products operated. For example, Dr. Cole thoroughly misunderstood

12  the differences between the free and premium Sky ATP licenses. On direct examination, Dr. Cole

13  provided definitive and unqualified testimony that "[t]he **only** difference between free and premium

14  are the number of scans you get" in response to a question by the Court. *See id.*, 476:25-477:1

15  (emphasis added). When confronted with evidence that his testimony was wrong, Dr. Cole did not

16  correct or qualify his testimony. Instead, he acknowledged that he was willing to give categorical

17  opinions on a material issue without having seen all the evidence. *Id.*, 530:9-25 ("Q. Do you stand

18  by your testimony, sir, that the only difference between the free version of Sky ATP and the

19  premium version is the number of files that are analyzed? … [A.] Right now, yes. If I had five or

20  ten minutes to review this, then that might be different; but right now, I stand by my answer."),

21  Juniper later introduced compelling evidence that Dr. Cole's testimony was wrong. *Id.*, 686:25-

22  688:9; Trial Ex. 182 (Sky ATP technical document listing differences in functionality between the

23  free model and paid-for models).

24  In view of these multiple instances where Dr. Cole provided inaccurate testimony on

25  material points, the jury was free to discredit the remainder of Dr. Cole's testimony. *Id.*, 904:14-16

26  (jury "may reject the entire testimony of a witness who willfully has testified falsely on a material

27  point.").

28

1    **III.    FINJAN IS NOT ENTITLED TO A NEW TRIAL UNDER RULE 59**

2        **A.    Legal Standard.**

3        The decision "to grant a new trial under Federal Rule of Civil Procedure 59 is made in the

4    discretion of the trial court." *Castillo v. City & Cty. of S.F.*, 2006 WL 1305214, at *1 (N.D. Cal. May

5    11, 2006) (Alsup, J.), *aff'd*, 283 F. App'x 536 (9th Cir. 2008). A new trial may be granted where

6    "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false,

7    or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *United States v. 4.0*

8    *Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999). A new trial is not permitted merely because

9    "the jury could have drawn different inferences or conclusions or because judges feel that other

10   results are more reasonable." *Castillo*, 2006 WL 1305214 at *1 (quoting *Sentilles v. Inter-Caribbean*

11   *Shipping Corp.*, 361 U.S. 107, 110 (1959)).

12       **B.    Dr. Rubin's Testimony On The "Database" Limitation Was Appropriate.**

13       Finjan first argues that it is entitled to a new trial because the jury allegedly was "prejudiced

14   based on improper claim construction arguments." Dkt. No. 353 at 14.[5] But as discussed above,

15   Juniper's expert Dr. Rubin applied the parties' agreed construction. To the extent that Finjan

16   disagreed with Dr. Rubin's understanding of that construction—including the meaning of "database

17   schema"—it was free to cross-examine Dr. Rubin on this issue. Finjan cites no case to support its

18   argument that this would warrant a new trial. Instead, courts routinely find that it is appropriate for

19   experts to opine about the interpretation and application of a claim construction. *See Transamerica*

20   *Life Ins. Co.*, 597 F. Supp. 2d at 910 ("parties may reasonably disagree about the interpretation and

21   application of the court's claim constructions….").

22       **C.    Evidence Regarding The PTAB's Obviousness Finding Regarding Claim 1**
             **Was Relevant To Juniper's § 101 Defense.**

23

24       Finjan next claims that the Court should grant it a new trial on infringement because Juniper

25

26 ───────────────
        [5] In the introduction to this section, Finjan notes that a basis for its motion is that "it was an
27   error not to instruct the jury on the construction of 'database schema.'" Dkt. No. 353 at 13:27-14:1.
     But Finjan does not provide any explanation or argument to support this purported reason. Moreover,
28   Finjan specifically opposed Juniper's request that the Court further define "database schema." Dkt.
     No. 268 at 1. Therefore, it cannot now request a new trial on this basis.

1    should not have been allowed to present evidence, in connection with its defense under 35 U.S.C.

2    § 101, that the PTAB invalidated Claim 1 of the '494 Patent on prior art grounds. Dkt. No. 353 at

3    15. Finjan's argument is meritless.

4          As an initial matter, Finjan did not object during Dr. Rubin's testimony on *invalidity under*

5    *§ 101*, which Finjan is now pointing to as warranting a new trial on *infringement*. *See, e.g.*, Trial Tr.

6    718:24-720:20, 721:13-722:5. Finjan has thus waived any objection to this testimony. *Motorola Inc.*

7    *v. J.B. Rogers Mech. Contractors*, 177 F. App'x 754, 757 (9th Cir. 2006) (defendant waived

8    objections to witness's testimony that he failed to make at trial). Finjan's current objection to this

9    testimony, moreover, makes no sense. Finjan argues that the PTAB's invalidation of Claim 1 "was

10   irrelevant to whether the Accused Products infringe Claim 10." Dkt. No. 353 at 15. Juniper agrees.

11   In fact, Finjan does not cite a single statement by a Juniper witness or counsel suggesting that the

12   PTAB's invalidation of Claim 1 had any bearing on any infringement issue before the jury. Rather,

13   arguments about the invalidation of Claim 1 related to the validity of Claim 10 under Juniper's § 101

14   defense—an issue to which this evidence is clearly relevant. Thus, even if it was error for the Court

15   to consider this evidence for § 101 purposes—which it was not—this would not be a proper basis

16   for granting a new trial on infringement. *See Transocean Offshore Deepwater Drilling, Inc. v.*

17   *Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1359 (Fed. Cir. 2012) (denying request for a new trial

18   despite error on the record because "[t]here is no reason to think that because the jury erred on one

19   such fact finding, the other, unrelated fact findings are somehow tainted.").

20         At the pretrial conference, the Court explained that even though the Court would ultimately

21   decide the § 101 issue, the parties would present evidence relevant to the "inventive concept" issue

22   during the jury trial. Dkt. No. 300 (Pretrial Hearing Tr.) at 45:21-23. Finjan made no objection to

23   the jury hearing evidence on § 101. *Id.* at 45-46. While Finjan is correct that the standards for novelty

24   under § 102 or § 103 and innovativeness under § 101 are different, the evidence about which Finjan

25   now complains is directly relevant to the § 101 arguments presented in this case. Indeed, the Court

26   explained that the issue of whether Claim 10 is "close to the prior art" is relevant to the issue of

27   whether it includes an inventive concept for purposes of § 101. *Id.* at 90:3-15. This is particularly

28   true here, where Finjan's own technical expert, Dr. Cole, testified that each of the elements he

1   identified as the "innovative component" or "highlights" of Claim 10 were also included in Claim

2   1. Trial Tr. 379:10-380:11; 517:25-520:14. Given this testimony, the PTAB's finding that each of

3   the "highlights" identified by Dr. Cole was obvious in view of the prior art is probative evidence

4   that Claim 10 lacks any "innovative concept." Dr. Rubin's testimony was directly responsive on this

5   point, as he (1) explained that all of the elements of Claim 1 were known in the art, and thus found

6   to be obvious, *id.*, 719:1-4, (2) showed that Claim 1 and Claim 10 have the same functions and are

7   virtually identical, *id.*, 721:13-722:5, and (3) demonstrated that the additional components in Claim

8   10 for performing the functions recited in both Claim 1 and 10 were not inventive because

9   "[e]verything about them was well-understood, routine, and conventional in the art," *id.*, 722:6-11.

10      Finjan also claims that "the jury had no understanding that Claim 1 was found anticipated

11   under a separate statute (35 U.S.C. § 102) or that the PTAB's decision on Claim 1 is still on appeal."

12   Dkt. No 353 at 15. But this point is irrelevant, as the Court, not the jury, will decide Juniper's § 101

13   defense. In addition, Finjan's own technical expert, Dr. Orso, explained to the jury that the PTAB's

14   analysis was based on an obviousness determination, which is distinct from a § 101 analysis. Trial

15   Tr. 882:10-885:2. .

16      **D.      Finjan's Allegations That Juniper Withheld And Misrepresented Damages
                  For The Accused Products Are Baseless.**

17

18      Finjan next asserts that it should be entitled to a new trial because Juniper purportedly

19   misrepresented and withheld evidence relevant to Finjan's damages case. As demonstrated below,

20   the only party to make material misrepresentations with regard to this topic is Finjan. In any event,

21   Finjan fails to provide any explanation as to how its complaints about Juniper's ***damages*** evidence—

22   which are not relevant to the issue of infringement—would somehow warrant the new trial on

23   ***infringement*** that it is seeking. *See, e.g.*, *Transocean Offshore Deepwater Drilling*, 699 F.3d at 1359.

24   To the extent Finjan is requesting a new trial on damages, such a request is moot because the jury

25   determined that there was no infringement. *See AVM Techs., LLC v. Intel Corp.*, 334 F.Supp.3d 623,

26   634 (D. Del. 2018) ("Because I deny Plaintiff's Motion for a New Trial on infringement in full,

27   Plaintiff's request for a new trial on damages is moot.") (citations omitted); *see also ADC*

28   *Telecomms., Inc. v. Switchcraft, Inc.*, 281 F. App'x 989, 993 (Fed. Cir. 2008).

**1. Juniper Timely Produced Accurate And Complete Revenue Information For The Accused Products.**

Finjan's primary complaint concerns an updated financial spreadsheet that Juniper produced on September 7, 2018. Dkt. No. 353 at 16-17. Despite Finjan's allegations to the contrary, Juniper promptly produced this financial information as soon as it became apparent that it was relevant.

When Finjan served its infringement contentions for this case on March 8, 2018, it identified the accused products as SRX, Sky ATP, ATP Appliance and Space Security Director. Ex. 1 (Finjan's Infringement Contentions); *see also* Ex. 2 (Finjan RFP No. 20) (served on February 23, 2018, seeking "Documents, communications, or things sufficient to show any sales or revenue generated *from each of the Accused Instrumentalities* from the year 2012 to the present" and defining "Accused Instrumentalities" as including SRX Gateways, Sky ATP, ATP Appliance, Space Security Director, and Contrail). Consistent with its obligations under Local Rule 3-4, Juniper produced a financial spreadsheet on April 23, 2018 that included Juniper's revenues for all SRX devices and Sky ATP licenses. Curran Decl. ¶ 2. Because Finjan was accusing all SRX devices of infringing its patents, pinpointing the revenues associated with the particular SRX devices used in combination with Sky ATP (i.e., a small subset of all SRX devices) was not relevant at that time.

On June 7, 2018, the parties filed early motions for summary judgment pursuant to the Court's "Patent Showdown" procedure. Juniper moved for summary judgment that neither the SRX alone, nor Sky ATP alone, nor the SRX in combination with Sky ATP infringe Claim 1 of the '780 Patent. Dkt. No. 96 at 18-23. Finjan, on the other hand, moved for summary judgment that SRX used in combination with Sky ATP and Sky ATP alone infringe Claim 10 of the '494 Patent. Finjan did not move on any damages issues, and took the position that it was not necessary to expedite discovery on damages issues because it believed the showdown proceedings were limited to liability issues. Ex. 3 (3/30/18 Kastens Email).

On August 9, 2018, the Court granted Juniper's motion for summary judgment. Dkt. No. 177 at 10. Then on August 24, 2018, the Court granted in part Finjan's motion for summary judgment on Claim 10 of the '494 Patent, and ruled that a trial would be held to decide (1) whether SRX used in combination with Sky ATP and Sky ATP alone satisfied the "database" limitation, (2) Juniper's

- 15 -

1    § 101 defense, (3) Juniper's § 287 defense, and (4) damages for Claim 10 of the '494 Patent.

2        As a result of the Court's August 24 Order, it became clear that the revenues for only those

3    SRX used in combination with Sky ATP—as opposed to all SRX's, as originally accused by

4    Finjan—would be relevant to the upcoming trial. Curran Decl. ¶ 3. Juniper therefore began the

5    process of creating an updated version of the previously-produced financial spreadsheet that would

6    allow for the isolation of SRX units that were used in combination with Sky ATP. *Id.* ¶ 3. On

7    August 31, 2018, the Court issued an order scheduling the trial for December 10, 2018, thus

8    triggering a September 11, 2018 deadline for opening expert reports under the Federal Rules.[6]

9        Given this new deadline, Juniper expedited its efforts and supplemented its damages

10   production on September 7, 2018—just one week after the Court's order setting the trial. The

11   supplemental production included two financial spreadsheets that allowed for the isolation of SRX

12   units used in combination with Sky ATP: (1) one identifying SRX devices for which the free version

13   of Sky ATP was enabled during the damages period, and (2) a version of the financial data produced

14   on April 23, 2018 that added information about the end customer data so that paid Sky ATP licenses

15   could be linked to SRX purchases. Curran Decl. ¶ 4. On September 10, 2018, Juniper also offered

16   to extend the deadline for Finjan to serve its damages report, but Finjan declined and opted to serve

17   its report on September 11, 2018. Ex. 4 (9/10/18 Kobialka Email). On November 1, 2018, Finjan

18   served an errata to its damages report that added revenues for SRX devices that are not compatible

19   with Sky ATP—information that was ascertainable from the financial data produced in April 2018.

20   Finjan chose not to request a deposition of any Juniper financial employees until November 8, 2018,

21   after all expert reports had been exchanged and after all expert depositions had occurred.

22       Over the course of the above-listed events, Finjan did not serve a request for production or

23   interrogatory specifically requesting financial information limited to the sales of SRX devices

24   enabled to use Sky ATP. Finjan similarly failed to request a deposition on this topic. Instead, Juniper

25   took the initiative to provide Finjan with this information within a week of the Court's order setting

26   the date for trial and thus setting the deadline for Finjan's opening damages report. Finjan therefore

27   _____

28       [6] The deadline in the original Case Management Order for fact discovery was March 29,
     2019, and the opening expert report deadline was March 29, 2019. Dkt. No. 35.

1    has no credible claim that Juniper delayed in producing information related to damages.

2        Even if Finjan could demonstrate that Juniper delayed in providing Finjan with pertinent

3    information related to damages—which it has not—Finjan cannot demonstrate any prejudice

4    sufficient to warrant a new trial. Finjan's damages expert admitted that information related to the

5    number of SRX devices which were enabled to utilize Sky ATP would ***not*** have impacted his

6    analysis. *See* Dkt. No. 292-1 (Arst Dep.) at 56:19-57:8 ("Q. You did endeavor to determine how

7    many Sky AT licenses had been enabled? A. Yes….***Q. If that information were available to you,***

8    ***would it have impacted your analysis?***…***A. I don't think so in a material way***….") (emphasis

9    added). Mr. Arst's admission is consistent with the errata to his expert report, which added sales for

10   incompatible SRX devices. Thus, Finjan has not established that it suffered any real prejudice or that

11   the presentation of its case would have been impacted in any meaningful way if it had received the

12   September 7 spreadsheet at an earlier date. Further, Finjan did not take issue with the timing of

13   Juniper's production until it served its motion *in limine* seeking the exclusion of the spreadsheets—

14   over two months after they were produced.

15           **2.      Juniper's Representations Concerning Damages Were Accurate.**

16       Finjan also claims that Juniper made misrepresentations to the Court regarding the updated

17   spreadsheet, as well as the revenue figures for the accused products. Neither allegation is true.

18           **a.      *Juniper Accurately Described The September 7 Spreadsheet.***

19       With regard to the September 2018 spreadsheet, Juniper accurately explained to the Court

20   that it added end customer data to the financial information produced in April 2018. The addition of

21   such information allowed both Juniper and Finjan to more accurately narrow the sales of SRX

22   devices to just those for which a Sky ATP license was purchased, i.e., just those SRX devices which

23   were accused of infringement under the infringement theory advanced by Finjan.[7]

24       To try to bolster its allegation that Juniper acted nefariously, Finjan claims that Juniper added

25   data on "additional sales for the accused products" to the September 2018 spreadsheet. Dkt. No. 353

26

27   ───────────────
     [7] The parties could have calculated revenues using the April spreadsheet by calculating the
     number of Sky ATP licenses and utilizing the average revenues from sales of compatible SRX
28   devices to arrive at an estimate of the pertinent SRX revenues. Juniper simply sought to reduce the
     need to estimate revenues by providing more precise information. Curran Decl. ¶ 3.

at 17. Finjan's allegation—which is easily debunked by totaling the revenues on the two spreadsheets—is false. Instead, the additional rows about which Finjan complains are simply the result of breaking down the previously-provided information at a more granular level, i.e., by end customer.[8] In the original April 2018 spreadsheet, revenues and units were grouped and reported on a quarterly basis by part number, ship to country, and end customer country. While this original level of granularity was sufficient to identify the number of units and revenue for the products originally accused by Finjan, it did not allow one to match up the Sky ATP licenses with a particular SRX device so as to parse the particular revenues at issue for Finjan's '494 Patent-specific infringement theory. The September 2018 spreadsheet reported the data quarterly by end customer, so as to allow this linkage. Obviously, if one creates a report that shows one row indicating that 1000 SRX1500 devices were sold in the U.S. in a particular quarter, it is going to contain fewer rows than a report that lists each of those 1000 SRX1500 devices as a separate row so as to allow for the identification of the end user. This additional granularity does not, however, change the underlying unit or revenue numbers. Finjan could easily have verified this by comparing the totals of each category of financial information provided on the April and September spreadsheets (achievement net, achievement quantity, and achievement cost) and noting that they remained the same between the April and September spreadsheets. Curran Decl. ¶ 5 (e.g., the sum of the "Achievement Net" from both spreadsheets is $610,844,337.2).

### b. *Juniper Accurately Represented The Accused Revenues.*

Finjan also claims that Juniper somehow misrepresented the revenues associated with the accused products. In particular, Finjan claims that Juniper should have included the following in its

---

[8] At Ms. Gupta's deposition she explained that this spreadsheet was created using Juniper's ERP system and that the spreadsheet was updated to include End Customer information. *See, e.g.*, Dkt. No. 353-13 (12/7/18 Gupta Dep.) at 87:7-22 ("Q. For Exhibit 3 [the "17,000 page" spreadsheet], the customer information you just mentioned, is that Column F of Exhibit 3 of the data tab? A. That's right….Q. And that was added to Exhibit 6? A. That seems to be the difference between the two. Q. Do you know why that change was made? A. As I talked to my counsel, again, this was before the time I took over this role, ***I believe end customer parent information was needed, so the spreadsheet was recreated including the field on end customer parent.*** As I said, ***all of this information is available in the ERP system***, and you can query it at any time with any of the fields that one might want, so --.")(emphasis added); *see also id.* at 83:24-84:3 (explaining spreadsheet was created by querying Juniper's ERP system).

calculations: "(1) SRX devices or free Sky ATP enrollments from 2015, (2) SRX devices capable of enrollment of free or premium versions of Sky ATP, and (3) instances where a customer purchased multiple SRX devices and enrolled in free or premium Sky ATP." Dkt. No. 353 at 18. Finjan's criticisms evince a fundamental misunderstanding of the underlying evidence.

As to the first category, Juniper did not include any SRX devices associated with free Sky ATP enrollments from 2015 because no SRX customers enabled a free Sky ATP license in 2015. Indeed, Juniper's Rule 30(b)(6) witness Mr. Alex Icasiano testified that his team wrote a script to identify "the number of SRX devices for which a free Sky ATP license had been enabled" … "*between Sky ATP's release* and January 2017." Dkt. No. 228-6 (Icasiano Decl.) ¶ 4. Juniper's damages expert utilized the results of this script and thus included all SRX devices for which a Sky ATP license was enabled at *any time* during the damages period. Given that Sky ATP was not available until late 2015, and given that less than 1% of SRX customers enabled a free license at any time before January 2017, it is not surprising that there were no free licenses enabled in 2015.

As to the second category—SRX devices that are compatible with Sky ATP but for which the customer chose not to enable Sky ATP—the Court already properly ruled that those devices should not be included in the damages base because they were not capable of infringing under Finjan's infringement theory. Dkt. No. 283 at 5 (ruling that Finjan's "untimely new infringement theory [that SRX devices alone infringe] … is procedurally defective"). Finjan now claims that it does not matter if an SRX customer had not enabled Sky ATP before January 29, 2017 because "customers who purchase SRX devices do not have to enroll it for Sky ATP right away" and "Juniper promotes Sky ATP in its marketing materials as being integrated with SRX." Dkt. No. 353 at 18. Finjan's argument is legally unsound. Under Finjan's own infringement theory, an SRX alone does not infringe; it only infringes if it is used in combination with Sky ATP.[9] Given that the patent

---

[9] Indeed, the undisputed evidence establishes that SRX devices do *not* include the code needed to perform the accused functionality in Sky ATP. *See* Dkt. No. 236-5 (11/14/18 Cole Dep.) at 81:5-16 ("Q.·So the code that performs the elements of (b) and (c) in your analysis resides on the cloud-based server for Sky ATP and not the SRX box itself; correct? A.·Elements (b) and (c) are performed by Sky ATP … Q.·But the code for those particular functions does not exist on the SRX box; correct? A. … Sky ATP performs elements (b) and (c) and then provides value and information to SRX.").

expired on January 29, 2017, any previously-sold SRX devices that enabled a license after January 29, 2017 would not be infringing units because one cannot infringe an expired patent. *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 230 (1964) ("[W]hen the patent expires the monopoly created by it expires, too, and the right to make the article—including the right to make it in precisely the shape it carried when patented—passes to the public."); *In re Katz Interactive Call Processing Patent Litig.*, 2009 WL 1351043, at *10 (C.D. Cal. May 1, 2009) (granting summary judgment that plaintiff could not recover damages for activities occurring after patent expiration).

As to the third category—SRX devices purchased by a customer who purchased fewer Sky ATP licenses than SRX devices—Finjan mischaracterizes the factual record. As Michael Bushong testified, the relationship between SRX devices and Sky ATP licenses is one-to-one. Thus, if a customer purchases 1000 SRX devices, but only one Sky ATP license, only one of the 1000 SRX devices can interface with Sky ATP. Trial Tr. 695:23-696:3 ("[I]f you have one license, you can work with one SRX. If you have two licenses, you can work with two SRXs. Ten licenses, ten SRXs."). Despite the evidence to the contrary, Finjan refuses to acknowledge that each SRX device must separately enable Sky ATP. Indeed, the higher figures Finjan improperly introduced at trial through the deposition of Ms. Gupta and now recites in its motion result from improper manipulation of Juniper's financial spreadsheets to include sales of SRX devices that were never used with Sky ATP. Finjan's failure to limit revenues to just those SRX devices used in conjunction with Sky ATP is apparent on the face of the exhibit Finjan introduced with Ms. Gupta's deposition, Trial Exhibit 494. In Trial Exhibit 494 the Sum of Achievement Quantity for Sky ATP licenses is 219, however, the Sum of Achievement Quantity for SRX devices totals 6,494. Given the one-to-one relationship between SRX and Sky ATP, Trial Tr. 695:23-696:3, the total revenue figures are over-inclusive.

**c.** ***Juniper Did Not Provide Conflicting Discovery On Free Sky ATP.***

Finjan's allegation that Juniper "prejudiced" Finjan by "reporting conflicting numbers regarding the number of 'free' Sky ATP enrollments" is also inaccurate. Juniper's sworn testimony and evidence concerning the number of SRX devices enabled to use the free version of Sky ATP has been at all times consistent and accurate. In Mr. Nagarajan's June 2018 declaration he explained that Juniper "does not maintain historical data on the number of SRX units configured to use Sky ATP's

1  free service," but that as of June 2018 "approximately 240 SRX units [had been] configured to use

2  Sky ATP's free service." Dkt. No. 125-8 ¶ 6. When the Court ruled that damages would be part of

3  the December trial and it became apparent that isolating SRX devices that had been used in

4  combination with Sky ATP during the '494 Patent damages period would be necessary, Juniper

5  created a script to identify SRX devices that had used Sky ATP's free service for purposes of this

6  litigation, even though—as Mr. Nagarajan had previously stated—that information was not kept in

7  the ordinary course of business. *Id.*; *see also* Dkt. No. 228-6 (Icasiano Decl.) ¶ 4. The script revealed

8  that 120 SRX units were configured to use Sky ATP's free service in the U.S. during the damages

9  period. *Id.* Finjan provides no explanation for how the results of this script for the damages period

10  that ended in January 2017—120 units—is somehow inconsistent with Mr. Nagarajan's prior

11  testimony of 240 units through June 2018, which includes an additional 17 months.[10]

12          **E.**      **Finjan Misrepresents The Court's *Daubert* Order.**

13        Finjan's final attempt to justify a new trial consists of a complete mischaracterization of the

14  Court's *Daubert* Order. Finjan claims that the Court "repeatedly capped Finjan's proposed

15  reasonable royalty to no more than the $1.8 million revenue base that Juniper identified." Dkt. No.

16  353 at 20. This is simply not true. Instead, the Court found that Finjan's damages request of $60-

17  $70 million "defied basic laws of economics" and noted that Finjan improperly included revenues

18  from non-accused products in its own revenue calculations. Dkt. No. 283 at 4. The Court did ***not***

19  find that the laws of economics require a reasonable royalty less than the accused revenues, but

20  rather that there must be some "quantification" of the alleged benefits above and beyond revenues—

21  something that Finjan wholly failed to do. *Id.* at 4-6. In spite of this ruling, the Court allowed Finjan

22  to proceed with its damages case. Finjan was permitted to introduce evidence which contemplated a

23  damages request far exceeding revenues from the accused products, i.e., damages based on a per-

24  scan or per-user basis, and the deposition testimony of Ms. Gupta, which included figures exceeding

25  $1.8 million. *See* Trial Tr. 269:17-270:13 ("[B]ecause it's the consumption of the technology, we

26

27            [10] Finjan also claims Juniper "waited until the eve of trial" to provide the results of the script.

28  This is not true. Juniper promptly provided this information on September 7—less than a week after the Court issued its order setting the trial and three months before the trial began. Curran Decl. ¶ 4.

1   will apply an $8 per user rate if we have information about the seats, and we'll use a 32 cents per

2   scan if we have information about how much the technology is being used."); *id.*, 643:10-13 (playing

3   Dkt. No. 353-13 (Gupta Dep.) at 51:11-53:08) (presenting figures higher than the accused revenue

4   base). Ultimately, however, the Court found that Finjan failed to meet its burden to apportion and

5   thus granted Juniper's Rule 50(a) motion on damages. *See* Trial Tr. 837:17-839:18.[11]

6      Finjan also rehashes its unsuccessful *Daubert* argument that Juniper's SRX devices contain

7   code for using Sky ATP and should thus alone be considered an infringing product. As explained in

8   greater detail in Juniper's *Daubert* Opposition (Dkt. No. 236-4), Finjan's theory fails on both the

9   facts and the law. Finjan's infringement expert admitted that the code to perform steps b and c of

10  Claim 10 of the '494 Patent resides within the Sky ATP code, and that the SRX products merely

11  contain code that allows them to interface with SRX. Dkt. No. 236-5 (11/14/18 Cole Dep.) at 81:15-

12  16, 91:13:21. Thus, the SRX alone is incapable of infringing.

13     Finjan cites *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1205 (Fed. Cir. 2010)

14  to support its argument. But as the Court noted at the *Daubert* hearing, *Secure Computing* is

15  distinguishable. In that case, the court found that a system claim was infringed by a product that was

16  shipped with all necessary software for implementing the accused system. The court explained that,

17  "although a user must activate the functions programmed into a piece of software," "the user is only

18  activating means that are already present in the underlying software." *Id.* Here, in contrast, SRX

19  devices are not shipped with any of the Sky ATP code on which Finjan relied for its infringement

20  case. When a user activates a Sky ATP license, the user is gaining access to the separate Sky ATP

21  product—not, as in Secure Computing, "activating means that are already present in the underlying

22  [SRX] software." Here, the Sky ATP code required for Finjan's infringement theory is not present

23  on SRX devices alone. As a result, revenues from SRX devices that were not used in combination

24  with Sky ATP cannot be included in the damages base. *See Telemac Cellular Corp. v. Topp Telecom,*

25  *Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001) ("[A] device [that] is capable of being modified to operate

26

27  [11] The case law cited by Finjan does not support its position that damages may exceed
    revenues. Instead, both *Douglas Dynamics, LLC v. Buyers Prods. Co.,* 717 F.3d 1336, 1346 (Fed.

28  Cir. 2013) and *Monsanto Co. v. Ralph,* 382 F.3d 1374, 1384 (Fed. Cir. 2004) decided the issue of
    whether damages are capped by the defendant's **profits**, not **revenues**.

1    in an infringing manner is not sufficient, by itself, to support a finding of infringement."); *see also*

2    *Nazomi Comm'cns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (affirming summary

3    judgment of non-infringement where the defendants sold hardware that included functionality to

4    perform the patented system, but required the installation of additional software to do so, ruling that

5    defendants' products "do not infringe without modification—the modification of installing the

6    required software.").

7         **F.    Finjan's Request For An Interlocutory Appeal Is Premature.**

8         Finjan's request that the Court certify for appeal the orders on (1) Finjan's post-trial motion,

9    (2) Juniper's Rule 50 motion on damages, and (3) Juniper's motion for summary judgment on Claim

10   1 of the '780 Patent is premature and would lead to piecemeal and inefficient appeals. While Juniper

11   is not opposed to allowing preliminary appeals for the '780 and '494 Patents, it would be more

12   efficient for the Court to first resolve all outstanding issues relating to these patents before certifying

13   anything for appeal. *See Medeva Pharma Suisse A.G. v. Par Pharm., Inc.*, 430 F. App'x. 878, 879-

14   80 (Fed. Cir. 2011) (no error in granting 54(b) certification on one patent while a second patent was

15   still in discovery); *HTC Corp. v. IPCom GMBH & Co., KG*, 285 F.R.D. 130, 132 (D.D.C. 2012)

16   (granting motion for certification under Rule 54(b) as "[t]here is no question that the '216 and '751

17   Patents have been finally adjudicated and that only issues regarding the '830 Patent remain").

18        Finjan's motion for certification under § 1292(b) fails to identify a single "controlling

19   question of law," much less one where there is "substantial ground for difference of opinion." *Jang*

20   *v. Bos. Sci. Corp.*, 767 F.3d 1334, 1338 (Fed. Cir. 2014). As to the '494 Patent rulings, Finjan merely

21   claims that "[r]esolving this question would control the resolution of this case because if a new trial

22   on infringement is warranted and the damages order reversed, these issues would need to be tried

23   again before a jury." Dkt. No. 353 at 22. But it is always true that if a jury verdict is overturned or if

24   a Court's ruling on a Rule 50 motion is reversed, the case would need to be tried again, and Finjan

25   fails to identify anything about the rulings that would impact Finjan's other patents or claims. To the

26   contrary, the Court's rulings on these motions are specific to the '494 Patent and as it applies to Sky

27   ATP and SRX used in combination with Sky ATP. As a result, any decision by the appellate court

28   on these issues would have no impact on Finjan's infringement claims under the remaining patents;

1    nor would it even impact Finjan's claims under the '494 Patent as to the Cyphort product. Similarly,

2    any appellate decision on Juniper's Rule 50 motion would not impact the other patents or products,

3    which are subject to different damages periods and which have different damages revenue bases.

4          Even if the '494 rulings involved a controlling question of law (which they do not), Finjan

5    does not identify any basis for concluding that "substantial grounds for a difference of opinion

6    exists." Finjan claims that the Court's damages rulings conflict with Federal Circuit and Supreme

7    Court precedent, but there is no such conflict. Rather, Finjan misconstrues the Court's rulings in

8    order to advance a strawman. No one disputes the proposition that a patentee is entitled to "no less

9    than a reasonable royalty" if there is infringement.[12] But Federal Circuit law also mandates that

10   where—as here—a plaintiff repeatedly chooses to pursue baseless damages theories, that plaintiff

11   waives its right to a damages award. *Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 666 (Fed.

12   Cir. 2017) ("a patent owner may waive its right to a damages award when it deliberately abandons

13   valid theories of recovery in a singular pursuit of an ultimately invalid damages theory.").[13]

14         Finjan's arguments concerning the '780 MSJ Order are similarly flawed. It is not clear how

15   Finjan could claim that an appeal of the '780 MSJ Order would advance the remaining issues to be

16   litigated, given that the "hashing" limitation does not appear in any of the other patents-in-suit, and

17   given that Finjan has taken the position that the Court's adverse claim construction ruling is not

18   dispositive of its remaining claims under the '780 Patent. Moreover, Finjan's argument that the

19   Court's claim construction "was at odds with the construction applied by another Court in this

20   district" (Dkt. No. 353 at 24) is factually inaccurate. The ESET court construed the claim in the same

21   manner as this Court. *See* Ex. 5 at 10-15 (Tr. of 9/26/2017 Hearing, Vol. 2 at 10-15, *Finjan, Inc. v.*

22   *ESET, LLC et al.*, No. 3:17-cv-00183 (S.D. Cal Oct. 9, 2017)). And the *Blue Coat* court did not

23   construe the "Downloadable ID" portion of the claim that was dispositive in this case. *Finjan, Inc.*

24

_____

25       [12] Because the jury found no infringement, Finjan is not even entitled to a reasonable royalty
     and its claim for damages is moot.

26       [13] Finjan also claims that "the issues that were presented to the jury regarding claim

27   construction and comparing Claim 1 with Claim 10 were inappropriate and influenced the jury's
     determination of infringement." Dkt. No. 353 at 23. As explained above, Finjan's arguments are
     meritless. Moreover, Finjan fails to explain how the Court's rejection of these arguments implicates

28   an issue on which the Federal Circuit has not spoken or a novel or difficult question. It does not.

1   *v. Blue Coat Sys., Inc.*, No. 13-cv-03999-BLF, 2014 WL 5361976, at *2 (N.D. Cal. Oct. 20, 2014).

2       Finally, Finjan presents no colorable argument that an interlocutory appeal would materially

3   speed up the termination of this case. To the contrary, allowing Finjan to appeal before the remaining

4   issues related to the '494 and '780 Patents are adjudicated would result in piecemeal litigation that

5   would delay resolution of this case. Finjan claimst that "there is strong reason to conclude that an

6   immediate appeal would ultimately advance the resolution of several other issues in this litigation."

7   Dkt. No. 353 at 23-24. But Finjan does not identify those issues, much less explain how its requested

8   appeal would resolve them.

9       **G.   Juniper Does Not Oppose Finjan's Request To Stay This Case As To The '844, '926, '154, '633 And '731 Patents.**

10

11       As Juniper has previously stated, Juniper believes that the most efficient and prudent course

12   of action would be to fully resolve all issues related to the patents selected for the first round of the

13   patent showdown before advancing to the second round. Dkt. No. 226. In view of Finjan's position

14   that the jury verdict and Court's prior ruling are not dispositive of all issues pertaining to the '780

15   and '494 Patents, Juniper requests that the Court stay any proceedings as to the five patents that were

16   not addressed during the first round of the patent showdown while the parties litigation—and the

17   court resolves—the following outstanding issues pertaining to these patents:

18   • Juniper's § 101 defense on the '494 Patent, which was presented to the Court at the December

19       trial and which may dispose of Finjan's remaining claims on the '494 Patent;

20   • Juniper's invalidity and unenforceability defenses and counterclaims for the '494 Patent,

21       which may also dispose of Finjan's remaining claims on the '494 Patent;

22   • An adjudication of whether the Court's claim construction on the "hashing" element of the

23       '780 Patent is dispositive of Finjan's remaining claims on the '780 Patent;

24   • A determination as to whether Juniper is entitled to sanctions in view of the unreasonableness

25       of Finjan's claims during the first round of the patent showdown.

26   **IV.   CONCLUSION**

27       For the foregoing reasons, Finjan's motion should be denied in its entirety.

28

1   Dated: January 24, 2018                    IRELL & MANELLA LLP

2
                                               By:  */s/ Rebecca L. Carson*
3                                                   ─────────────────────────
                                                   Rebecca L. Carson
4                                                   *Attorneys for Defendant*
                                                   JUNIPER NETWORKS, INC.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28