**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# Exhibit B

# (Redacted)

```
                                                    Page 2
 1   APPEARANCES:
 2
 3        Kramer Levin Naftalis & Frankel LLP
 4        By:  Michael H. Lee, Esq.
 5        990 Marsh Road
 6        Menlo Park, CA  94025
 7        (650) 752-1700
 8        mhlee@kramerlevin.com
 9                 for the Plaintiff and the Witness;
10
11        Irell & Manella LLP
12        By:  Rebecca Carson, Esq.
13        840 Newport Center Drive, Suite 400
14        Newport Beach, CA  92660-6324
15        (617) 760-0991
16        rcarson@irell.com
17                 for the Defendant.
18
19   Also Present:  Paul Martin, Ph.D., Harbor Labs
20                  Robert Giannini, Video Operator
21
22
23
24
25
```

```
                                                    Page 3
 1                    I N D E X
 2
 3   WITNESS:  Michael David Mitzenmacher, Ph.D.
 4
 5   EXAMINATION                                    Page
 6      By Ms. Carson                                  6
 7                  AFTERNOON SESSION
 8      By Ms. Carson                                 62
 9
10   EXHIBITS FOR IDENTIFICATION:
11   Mitzenmacher     Description                   Page
12   Exhibit 2315     Witness's 2/12/19 expert         7
13                    declaration
14   Exhibit 2316     FINJAN-JN 002025 -              13
15                    FINJAN-JN 002040
16   Exhibit 2317     JNPR-FNJN_29040_01042912 -      56
17                    JNPR-FNJN_29040_01042915
18   Exhibit 2318     JNPR-FNJN_29017_00552579 -      56
19                    JNPR-FNJN_29017_00552594
20   Exhibit 2319     Source code: pages 342-344,     62
21                    379-380, 449, 453-454, 508-510,
22                    515, 518, 586-589, 679-680,
23                    683, 701, 720-722, 728, 738
24   Exhibit 2320     Source code: pages 409-411      74
25   Exhibit 2321     Source code: pages 686-687     119
```

```
                                                    Page 4
 1   EXHIBITS FOR IDENTIFICATION:  (continued)
 2   Mitzenmacher     Description                   Page
 3   Exhibit 2322     JNPR-FNJN_29017_00552892 -     130
 4                    JNPR-FNJN_29017_00552907
 5   Exhibit 2323     FINJAN-JN 044887 -             131
 6                    FINJAN-JN 045068
 7   Exhibit 2324     Source code: pages 153-155    142
 8   Exhibit 2325     Source code: pages 126-132    142
 9   Exhibit 2326     Source code: pages 143-152    142
10   Exhibit 2327     JNPR-FNJN_29017_00552908 -    153
11                    JNPR-FNJN_29017_00552915
12
13
14
15
16
17
18
19
20
21
22
23
24   Original exhibits retained by reporter to be
25   returned to Irell & Manella
```

```
                                                    Page 5
 1        THE VIDEO OPERATOR:  Good morning.
 2   We are on the record.  This is the videographer
 3   speaking, Bob Giannini, with court reporter Kim
 4   Smith with Epiq Court Reporting.  Today's date is
 5   March 4, 2019.  The time is 11:21 a.m.
 6        We are here at the Sheraton Boston,
 7   located at 39 Dalton Street, Boston, Massachusetts,
 8   to take the videotaped deposition of Dr. Michael
 9   Mitzenmacher, in the matter of Finjan, Inc. vs.
10   Juniper Networks, Inc., Case No. 3:17-cv-05659-WHA.
11        Will counsel please introduce themselves
12   for the record.
13        MS. CARSON:  Rebecca Carson of Irell &
14   Manella on behalf of defendant Juniper Networks.
15        MR. LEE:  Michael Lee from Kramer Levin,
16   representing Finjan and the witness.
17        THE VIDEO OPERATOR:  Will the court
18   reporter please swear in the witness.
19        MICHAEL DAVID MITZENMACHER, Ph.D.,
20   having been satisfactorily identified by the
21   production of his driver's license, and
22   duly sworn by the court reporter, was deposed
23   and testified as follows:
24
25
```

Page 6

1    EXAMINATION
2    BY MS. CARSON:
3       Q.   Could you please state your name for the
4    record.
5       A.   Michael David Mitzenmacher.
6       Q.   And you're an expert for Finjan in this
7    matter; is that correct?
8       A.   Yes.
9       Q.   You understand you've just taken an oath to
10   tell the truth, correct?
11      A.   Yes.
12      Q.   Is there any reason you can't give full and
13   accurate testimony today?
14      A.   I don't believe so.
15      Q.   Did you do anything to prepare for your
16   deposition today?
17      A.   I met with counsel yesterday.
18      Q.   Did you do anything else?
19      A.   No, not really.
20      Q.   Did you review any documents?
21      A.   With counsel, we went over the -- my report
22   and the patent.
23      Q.   Any other documents?
24      A.   I think we focused on that.
25      Q.   You submitted a declaration concerning the

Page 7

1    '154 patent, correct?
2       A.   Yes.
3       Q.   How long did you spend preparing that
4    declaration?
5       A.   I would have to go back and check.  I can't
6    recall.  It was on the shorter side, so I remember
7    like 30-40 hours.  It might have been more than
8    that.  I'd have to go back and check.
9            MS. CARSON:  Could you please mark that
10   as 2315.
11           (Mitzenmacher Exhibit 2315 was
12           marked for identification.)
13   BY MS. CARSON:
14      Q.   The court reporter has handed you a
15   document that's been marked as Exhibit 2315.  Is
16   that the declaration you submitted in this matter
17   related to the '154 patent?
18      A.   It appears so.  I believe my understanding
19   is there is additional material -- or documents.  I
20   don't know if that counts as part of the declaration
21   itself or separate.
22      Q.   What do you mean by "additional material or
23   documents"?
24      A.   I remember talking with counsel that like
25   the documents that I cited within were added on, and

Page 8

1    there was some page limit for the total thing.
2       Q.   So you're just saying this was the
3    declaration that reflects your opinions, but you
4    relied on the exhibits cited therein; is that fair?
5       A.   Yes.
6       Q.   Could you take a look at paragraph 1.
7       A.   Sure.
8       Q.   In paragraph 1, you list in the last
9    sentence the documents that you relied on in forming
10   your opinions, correct?
11      A.   Yes.
12      Q.   Is there anything that you relied on in
13   forming your opinions that is not included in
14   paragraph 1 or otherwise cited in your report as an
15   exhibit?
16      A.   Not that I can recall at the moment.
17      Q.   Do you recall if you reviewed the
18   deposition transcript for Khurram Isla?  And that's
19   K-h-u-r-r-a-m, and then the last name is Isla,
20   I-s-l-a.
21      A.   I would have to go back and check.  I can't
22   recall specifically.
23      Q.   Now, you say in paragraph 1 that you relied
24   on the source code.
25           Do you see that?

Page 9

1       A.   Yes.
2       Q.   Did you go review the source code in
3    connection with forming your opinions related to the
4    '154 patent?
5       A.   Yes.
6       Q.   When did you do that?
7       A.   That was some time ago.  I recall it was
8    early on.  So it was sometime last year, as I
9    recall.  I went for, I think initially two days, and
10   then I either went back for a third day, stayed for
11   a third day.
12      Q.   And that was when you were putting together
13   your declaration on the '780 patent in the first
14   round of the patent showdown proceedings; is that
15   fair?
16      A.   Yes, that's my recollection.
17      Q.   When you reviewed the source code during
18   that time, were you specifically focused on the
19   '154 patent as well?
20      A.   I think I was focused on all the patents at
21   issue.  So I believe I knew that I was going to
22   potentially be doing the '154 patent at a later
23   time.
24      Q.   When did you start putting together your
25   declaration for the '154 patent?

Page 10

1   A.  I'd have to go back and check. A few
2   months ago, a couple . . .
3       Q.  Since you started putting together your
4   declaration for the '154 patent, you haven't gone
5   and reviewed the source code, correct?
6       A.  I haven't gone back to that site, but I
7   have reviewed the source code again.
8       Q.  In printed form?
9       A.  Yes.
10      Q.  When you reviewed the source code back in,
11  I think it was June of last year, did you print out
12  any portions of code that related to the
13  '154 patent?
14      A.  I believe so. Again, I don't -- we printed
15  out a lot of pages, some of which are cited here.
16  So those pages that I cited here that were from that
17  time are some of what I relied on.
18      Q.  Have you spoken to anyone -- Strike that.
19          Have you spoken to any Finjan attorneys
20  about the source code in connection with your
21  '154 patent analysis?
22      A.  I believe I've discussed with them, for
23  instance, to decide what would be the best citations
24  of code to go into this declaration.
25      Q.  Have you spoken to any of Finjan's other

Page 11

1   experts or consultants regarding the source code?
2       A.  So not in relation to this declaration.
3   Honestly like the '780, I can't recall. I don't
4   think I talked with them for the source code about
5   that. But if we're just talking about the '154,
6   like this declaration, not that I can recall.
7       Q.  Have you ever reviewed the source code for
8   the JATP appliance in person on the review computer?
9       A.  No, I don't believe so. The ATP appliance,
10  I believe that code was presented afterwards. And
11  so the attorneys had arranged for printouts of some
12  of that code, and I reviewed that.
13      Q.  How did you decide what to tell the
14  attorneys to print out from that code?
15      A.  I mean, I think we had gone over for the
16  '154 patent, you know, some of the issues related to
17  SRX gateway and Sky ATP. And so I think we had an
18  understanding of what sort of information or what
19  sort of content we were looking for.
20          In particular, the ATP appliance has
21  some functionalities that I would say are similar in
22  spirit, at least, to the Sky ATP.
23      Q.  Who printed out the JATP code for you to
24  review?
25      A.  I'm not sure who actually did the printout.

Page 12

1       Q.  Is it common for you to issue infringement
2   opinions on a product without having actually
3   reviewed the code in person?
4       A.  Sometimes, yeah. I've certainly done it in
5   other cases, including for other clients.
6       Q.  You've served as an expert for Finjan in
7   other matters, correct?
8       A.  Yes.
9       Q.  Have you ever offered an expert opinion on
10  infringement for the '154 patent before?
11      A.  I feel like I probably have. Like I
12  remember the patent. So I suspect I have in one or
13  more of the previous cases. But like I didn't go
14  check that again beforehand, so I can't specifically
15  recall.
16      Q.  Did you write your report yourself?
17      A.  I would say that I wrote it. I wrote it in
18  conjunction with counsel. As usual, there's, you
19  know, back-and-forth where I write things and they
20  edit and they make corrections and then I edit
21  again, and so it sort of cycles through back and
22  forth.
23      Q.  What was the general problem that the
24  '154 patent was trying to solve?
25      A.  May I ask -- Do you mind giving me a copy

Page 13

1   of the patent?
2           MS. CARSON: Sure. We can mark this as
3   2516.
4           THE COURT REPORTER: 25 or 23?
5           MS. CARSON: Oh, 2316. Sorry.
6               (Mitzenmacher Exhibit 2316 was
7               marked for identification.)
8           THE WITNESS: So it was discussed, for
9   instance, in the overview section of my declaration,
10  although I always think, you know, that the patent
11  itself is sort of the best guide.
12          At a very high level, it describes
13  various mechanisms for protecting a computer system
14  from what it refers to as dynamically generated
15  malicious content.
16  BY MS. CARSON:
17      Q.  And what was the problem with prior art
18  systems that the '154 patent identified that it was
19  trying to solve?
20      A.  Again, I'd say the patent probably speaks
21  best for it, better than perhaps I can. But the way
22  I might describe it is that at the time that the
23  patent was written was sort of a beginning of the
24  time when we were starting to see a vast increase of
25  sort of downloaded executable content.

Page 14
1  And so I'd say that prior art systems
2  generally had problems or issues dealing with that,
3  that they weren't prepared for that sort of threat.
4  And so this was coming up with new
5  methods and mechanisms to deal with that sort of
6  specific threat that had not really been a major
7  concern prior.
8  Q.  What were some of the problems that the
9  prior art systems had with dealing with that
10 particular situation?
11 MR. LEE:  Objection, form.
12 THE WITNESS:  I might have to go back
13 and look specifically at various parts of prior art.
14 I mean, since I was focused on infringement, I
15 didn't study all the prior art.
16 But my understanding of -- or my
17 recollection both at the time and my recollection
18 from reviewing the patent and some of the related
19 materials is that, again, the problem was simply
20 that this was a new attack vector that wasn't
21 prepared for.
22 So particularly with dynamically
23 generated content, most of prior work was focused on
24 a type of static analysis, so it would look for
25 certain, say, specific strings or specific

Page 15
1  structures in the code.
2  So generally for it to do a static
3  analysis, and with dynamically generated executable
4  code, there would be ways of hiding that or, you
5  know, bringing down the attack vector in ways that
6  were not previously expected.
7  That is, they might not arrive as
8  executables, .exe files or specific types of
9  executables that the computer was expecting.  That
10 might come in settings where it was executable code
11 being downloaded into a browser or other structure.
12 BY MS. CARSON:
13 Q.  What was the solution that was proposed by
14 the '154 patent?
15 A.  So I would say that there are, I guess, a
16 variety of solutions embodied by the different sorts
17 of claims.  I'd say this is outlined a bit in the
18 summary of the invention section where it discusses
19 multiple different types of solutions or embodiments
20 of the type of solution that it was thinking of.
21 You know, I would say that of specific
22 interest for my declaration was the type of solution
23 outlined in claim 1 since that was the focus of my
24 infringement analysis for this declaration, which
25 involved in some way using a security computer to,

Page 16
1  you know, potentially prevent the invoking of a
2  second function with certain inputs based on whether
3  it was found that that was secure or not, or safe or
4  not.
5  Q.  Could you take a look at paragraph 5 of
6  your declaration.
7  A.  Sure.
8  Q.  This paragraph relates to your
9  understanding of claim construction; is that fair?
10 A.  Yes.
11 Q.  Are you offering any opinions about the
12 claim construction of the terms in this case?
13 A.  I don't think I have directly in this
14 declaration that I can recall.  If I'm asked to with
15 regard to later hearings or proceedings, then I
16 would.  But I don't believe I've been asked to do
17 that yet.
18 Q.  Your opinion in this case is limited to
19 infringement, correct?
20 A.  Yes.
21 Q.  You're not offering an opinion on the
22 validity of the '154 patent, correct?
23 A.  No, I don't believe so.
24 Q.  In paragraph 5, you state that you
25 "considered both parties' proposed constructions of

Page 17
1  disputed terms and applied the plain and ordinary
2  meaning for all other terms."
3  Do you see that?
4  A.  Yes.
5  Q.  What is your understanding of the plain and
6  ordinary meaning of "function"?
7  A.  So I would typically say that function is
8  something that takes an input and produces some form
9  of output.  In the case of computer programming, you
10 know, that's a more mathematical definition.
11 When I'm talking about input and output,
12 we should understand them as, you know, perhaps
13 actions within the computer.
14 Q.  So what is the plain and ordinary meaning
15 of the term "input"?
16 A.  An input is something that, for instance,
17 you provide to a function which may or may not be
18 used to decide how the function operates or acts.
19 I'd just like to say, again, these are
20 sort of off the top of my head.  You know, if I
21 thought about them more, I might change the specific
22 wording or so on.  But these are sort of the rough
23 meanings that I would take for plain and ordinary
24 meaning off the top of my head in the answer to your
25 question.

Page 18
1   Q. What is the plain and ordinary meaning of
2  "invoking a function"?
3            MR. LEE: Objection, form.
4            THE WITNESS: Generally I'd say if
5  you're invoking a function, you are, you know,
6  calling or starting, otherwise attempting to
7  initiate execution of that function.
8  BY MS. CARSON:
9    Q. Can you invoke a function without executing
10 it?
11   A. You can certainly attempt to invoke a
12 function, right. There may be other issues or other
13 aspects that attempt to block the function or
14 prevent it from executing.
15   Q. Can you actually invoke a function without
16 executing it?
17           MR. LEE: Objection, form.
18           THE WITNESS: I think I would give sort
19 of the same answer.
20 BY MS. CARSON:
21   Q. Well, the answer before was that you could
22 attempt to invoke it without executing it. So I'm
23 trying to take the "attempt" out.
24           Can you actually invoke a function
25 without executing it?

Page 19
1            MR. LEE: Objection, form.
2            THE WITNESS: I mean, actually invoking
3  would be the attempt. So I don't think your change
4  in question changes my answer.
5  BY MS. CARSON:
6    Q. Is there a difference between invoking a
7  function and executing a function?
8    A. Again, I would say in certain
9  circumstances, one would understand that when you
10 invoke a function, you are attempting to initiate or
11 start the execution.
12           The terms are often used
13 interchangeably, depending on the context. But
14 certainly, you know, you can invoke a function, and
15 the execution might be halted or stalled by other
16 aspects of the system.
17   Q. What was your understanding of what a
18 content processor is?
19   A. I mean, I think again just from the plain
20 and ordinary meaning of the term, it's something
21 that processes content. The claim language, you
22 know, sort of gives specific aspects of, you know,
23 what the content of the processor in this case is
24 supposed to do.
25   Q. Does the content processor need to be able

Page 20
1  to execute files?
2    A. I would not think so.
3    Q. Is there a difference between a content
4  processor and a content inspector?
5            MR. LEE: Objection, form.
6            THE WITNESS: I would say a content
7  inspector, might think of as being limited to
8  inspecting. But I would say that one of the things
9  a content processor, I would expect or not be
10 surprised for it to do is inspect the content.
11 BY MS. CARSON:
12   Q. Was it your understanding that a content
13 processor is something that's included on a client
14 computer?
15           MR. LEE: Objection, form.
16           THE WITNESS: I would say that would be
17 one possible location that one could have a content
18 processor. But it would not, I think, be exclusive
19 to that.
20 BY MS. CARSON:
21   Q. So your analysis was based on an
22 understanding that the content processor could be
23 included on a device other than the client computer;
24 is that fair?
25   A. Yes.

Page 21
1    Q. What was your understanding of the term
2  "safe"?
3    A. I would say it's the plain and ordinary
4  meaning in the context of computer security. You
5  know, I would say like in the context here, "safe"
6  would be some sort of explicit or implicit
7  expectation that the corresponding invocation will
8  not lead to or cause future harm.
9            Again, I would say that, you know, in
10 the context of computer security, it's understood
11 that "safety" is sort of a relative term or an
12 expectation term. You know, you can't have
13 100 percent guarantees and have a truly functioning
14 system.
15   Q. Could you turn to paragraph 12 of your
16 report.
17   A. Yes.
18   Q. In paragraph 12, you identify the
19 infringement scenarios that you considered, and you
20 list SRX gateways by themselves, Sky ATP by itself,
21 and ATP appliance by itself.
22           Do you see that?
23   A. Yes.
24   Q. Did you perform any infringement analysis
25 regarding the combination of any of these products?

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

HIGHLY CONFIDENTIAL - SOURCE CODE
MICHAEL DAVID MITZENMACHER, PH.D. - 03/04/2019          Pages 30..33

Page 30

```
 1      A.  I don't believe it was necessary for my
 2  analysis that it be specifically as shipped; that is
 3  to say that an SRX that has the capability or setup
 4  that can be used with, say, Sky ATP or ATP appliance
 5  as described within my declaration.
 6      Q.  Did you perform any analysis to determine
 7  whether a customer who purchases an SRX device needs
 8  to download any scripts or other code in order to be
 9  able to interact with Sky ATP?
10      A.  I don't recall that specifically.  But to
11  be clear, it wouldn't surprise me one way or
12  another.  It is not unusual at all for setup with
13  new hardware devices that, you know, in setting up
14  either specific licenses or in setting up simply the
15  device to have it part of the cloud-based system
16  that one would need to download some sort of
17  additional software as part of that process.
18      Q.  But that's not something you confirmed one
19  way or another with respect to SRX and Sky ATP; is
20  that fair?
21      A.  Not that I can recall, sitting here.
22      Q.  How about with regard to the ATP appliance?
23  Do you know whether a customer -- an SRX customer
24  needs to download any scripts or other code in order
25  to be able to allow the SRX device to communicate
```

Page 31

```
 1  with the ATP appliance?
 2      A.  And I can't recall but it wouldn't
 3  specifically surprise me one way or the other.
 4      Q.  But that's not something that you
 5  specifically analyzed here?
 6      A.  I would say that's something that I cannot
 7  recall.  And I don't believe it is mentioned in my
 8  report, although the report will speak for itself.
 9      Q.  In your SRX infringement theory, what
10  component of the SRX is the content processor?
11      A.  So my discussion of the specific SRX
12  infringement theory is that the SRX itself is the
13  content processor.
14      Q.  The whole SRX?
15      A.  I would say, you can certainly split up the
16  SRX in different arbitrary ways depending on how you
17  like, but the SRX device is the content processor,
18  it includes software, in particular, that processes
19  content that it receives over the network.
20          In particular, that's mentioned or
21  discussed at paragraph 30 where -- yeah -- the SRX
22  receives network traffic such as Web pages and so on
23  and does various processing of the traffic it
24  receives.
25      Q.  And in your SRX infringement theory, what
```

Page 32

```
 1  is the security computer?
 2      A.  The security computer, I discuss multiple
 3  scenarios, but in particular I discuss scenarios
 4  where the security computer is the Sky ATP or the
 5  ATP appliance.
 6      Q.  Are there any scenarios other than Sky ATP
 7  or the ATP appliance?
 8      A.  Let me check.  I don't recall.  But -- my
 9  recollection is the scenario as I describe, it's Sky
10  ATP or ATP appliance as the security computer.
11      Q.  In your SRX infringement theory, what is
12  the first function?
13      A.  So I describe, I think, several different
14  first functions.  Starting at paragraph 31, you
15  know, the first function can be a request to simply
16  open a page such as starting with an HTTP prefix.
17  That might be a call which would include a URL or an
18  IP address.
19          The call to a first function can involve
20  some code that was embedded within an HTML or
21  JavaScript script within an HTML, for example, that
22  included terminology or commands that were used to
23  obfuscate, such as unescape or document.write.
24          In those case, those would be considered
25  the functions, although you could also consider the
```

Page 33

```
 1  corresponding calls to be functions.  There are
 2  various other related terms that appear with things
 3  like Web pages such as, you know, iframe calls or
 4  commands.
 5          Those are some examples of the first
 6  functions.  I believe I have sort of others in here
 7  as well.
 8      Q.  What other ones did you identify?
 9      A.  Give me a sec, make sure I can get through.
10          So I think I discuss any sort of calls
11  to access content from a particular URL or
12  destination which can be an IP address, where again
13  that corresponding destination or content -- it
14  could be a direct call or an obfuscated call.
15          In the case of an obfuscated call, then
16  either the call to the content or the corresponding
17  code function, which is performing the obfuscation
18  could be referred to as the first function.
19      Q.  Any others?
20      A.  Not that I can recall at the moment, but I
21  think the document speaks for itself.
22      Q.  I want to start with the first one that you
23  mentioned, which was a request to open a page in
24  HTTP?
25      A.  Um-hum.
```

Page 34

1  Q. Now, just to make sure I'm understanding
2  what you're saying, are you referring to a situation
3  where the end user types into the browser "http
4  www.google.com"? Or are you referring to a link
5  that's embedded in a sample that's retrieved?
6  A. So I think either situations would be those
7  cases where there is a call, you know, to obtain.
8  One of the ways that you suggested is that the user
9  makes a request, and that is processed through SRX.
10         But my understanding is that SRX, in
11 doing its analysis, may find other links or so on
12 that it is invoking or deobfuscating, and that may,
13 in turn, trigger the action of the request for the
14 security computer.
15  Q. So let's start in the situation where the
16 user is entering it, where the end user is either
17 entering a website or clicking on a link. Who is
18 invoking the function?
19  A. I would say the invocation -- I mean, I
20 think it gets invoked multiple times. There's an
21 invocation by the user, but then there's a further
22 invocation that we're discussing by the SRX itself.
23         So you can view the first function as
24 being the user's call. You can view the first
25 function as being the SRX call. I actually think

Page 35

1  both interpretations of the invocation meet the
2  corresponding claim language.
3  Q. When the user types an address into their
4  browser, is that content that's received over a
5  network?
6  A. I'm not clear what you mean.
7  Q. When a user sitting at their computer types
8  an address into the browser, is it your opinion that
9  that's content that's received over a network?
10  A. Yes, that itself would be considered a
11 content.
12  Q. Is it received over a network?
13  A. When they type it into a browser and then
14 send it to another device or something, then, yes,
15 it would be -- or, you know, to get -- to do
16 anything with that, it has to go out over the
17 network.
18  Q. Did they receive that over the network: the
19 content that they're typing into the address?
20 Or did they create it themselves?
21  A. I'm really not clear on your question.
22  Q. So you're saying that in one scenario,
23 you're pointing to the address that an end user
24 types into their browser as the first function;
25 is that fair?

Page 36

1  A. Yes. That is the function calling for
2  content.
3  Q. And is that function that they enter into
4  their browser something that's received over the
5  network?
6  A. I think it's received by the SRX over the
7  network if I'm -- I'm not exactly clear on your
8  question.
9  Q. Is it your position that the HTTP part of
10 the URL -- Strike that.
11        Is it your position that the HTTP is
12 part of the URL, or is it a function?
13  A. Right. So I understand in that context
14 that the HTTP, right, is sort of the invocation or
15 the function, I guess we are calling it here. That
16 it's stating what is to be done, right, that is
17 providing a command that says, Go and fetch the
18 following, where the following is given by, you
19 know, the URL that -- the rest of the URL that comes
20 after that part.
21  Q. Is the HTTP part sent to the SRX with the
22 input?
23  A. Say some form of it is, yes. I mean,
24 that's how it's -- yeah, some description or some
25 form of it is. I don't remember the statement or

Page 37

1  the context.
2         But the request is sent through the SRX,
3  which will actually handle or manage the request.
4  And as part of that, there's some specification of
5  what the protocol is that is being asked for the
6  download.
7  Q. So is HTTP a protocol or a function?
8  A. Well, I would say it depends on the context
9  or how you're using it. In some sense it's both,
10 right? It's the name of the protocol. In the
11 context of the browser, the HTTP represents a
12 function that says use the HTTP protocol to obtain
13 or collect the following item.
14  Q. Where does the function to get an HTTP
15 address reside?
16  A. I guess I'm really not clear on what that
17 means or what the statement the question is. It
18 might help if you maybe tie it back to the claim
19 language or something. But I'm just not clear on
20 what "reside" means in this context or what in
21 particular you're asking.
22  Q. So when a user is attempting to get a
23 website, to retrieve a website, is the get function
24 something that's part of the browser or the content
25 of the thing that the user is trying to get?

Page 42

1  A. The determination will be made whether to
2  allow or block it depending on the outcome of that
3  safety decision.
4  Q. **What input is used in the SRX to invoke the**
5  **function of allowing or blocking?**
6  A. I guess I'm not clear on your phrasing
7  again with the wording of the question.
8  Q. **I'll try a different question.**
9      **Does the SRX use the URL or IP address**
10 **as an input to the function of allowing or blocking?**
11 A. I would say yes, I believe so. The URL or
12 IP or the equivalent such as the data or content
13 that it's actually pointed to or a corresponding
14 hash of that.
15 Q. **Did you confirm what inputs the SRX uses to**
16 **invoke the function of allowing or blocking?**
17 A. I believe I've laid out some situations and
18 so on in the code. But generally, yes, I mean
19 that's one of the inputs again. I think I'd say
20 it's clear that in the patent, it discusses that
21 there could be other additional inputs to the sort
22 of second function as well.
23 Q. **Would you agree that the claim requires**
24 **that the input for invoking the first function be**
25 **the same as the input that's used to invoke the**

Page 43

1  second function?
2  A. I'd say yes, with the understanding of what
3  the computer thinks or interprets is the same has a
4  wider meaning, right? It doesn't have to be, I
5  guess, I'd say syntactically the same.
6      I mean, I think the patent discusses
7  that you can have additional inputs, one that
8  computers would understand like pointers to an
9  input, for instance, being equivalent to an input.
10     Indeed there are some languages that
11 sort of treat them as the same or automatically
12 shift back and forth between pointers to an object
13 and an object depending on the nature of the call.
14 Q. **So it was your understanding when you did**
15 **your analysis that the input to invoke the first**
16 **function didn't need to be exactly the same as the**
17 **input to invoke the second function?**
18     **Is that fair?**
19 A. No, I don't think I'd put it that way.
20 I mean, I think I might use the term "syntactically
21 the same." I mean, they are the same input. There
22 just might be different ways of representing that
23 input depending on how the functions are invoked.
24 Q. **Can you give me an example of what you mean**
25 **by "syntactically the same."**

Page 44

1  A. I mean so syntactically the same would be
2  like, Oh, the input is this string so I have to give
3  like this exact string in the same format, right?
4  Whereas I would say if the input is the string and
5  then in a future function call what you give is like
6  a pointer to that string, that's clearly the same
7  input. It's just represented differently in a
8  particular function call.
9  Q. **Other than a pointer to that string, would**
10 **there be any other situations that would satisfy the**
11 **claim?**
12 A. I believe so, yes.
13 Q. **Like what?**
14 A. I believe if you presented like a hash of
15 the input or the input where the hash is understood
16 to -- meant to be an identifier. In the case where
17 we're talking about things like URLs and content,
18 the URL is essentially a pointer to the content.
19 Q. **I thought you said the URL was the content**
20 **within the scope of the claim.**
21 A. I think in one scenario, at least one
22 scenario it might be. But there are other scenarios
23 where that would not be the content. There are
24 several scenarios throughout the report.
25 Q. **Yes. So in the scenario where we're**

Page 45

1  **talking about here where the user types the URL into**
2  **a browser, I just want to confirm, it's your**
3  **position that that URL is part of the content within**
4  **the scope of the claim; is that correct?**
5  A. If I understand your question, I believe
6  so. If the one piece that's gotten is the call to
7  the content, then that would be the case I discuss
8  where -- where they discuss in paragraph 31. In
9  that case, it's receiving a -- the SRX is receiving
10 a network request.
11 Q. **And the URL is part of the content?**
12 A. Yes.
13 Q. **Does the SRX hash the URL?**
14 A. So I'd have to go back through my report.
15 I recall again that sometimes there are various
16 places like on the whitelists or blacklists where it
17 uses a hash of the URL instead of the URL. And I
18 just forget right now if -- I think that's on the
19 SRX where the SRX keeps the whitelist or the
20 blacklist and it keeps a hash of the URL.
21 Q. **Does it keep a hash of the URL or a hash of**
22 **the content that's obtained from the URL?**
23 A. Again, I would have to quickly go back and
24 check. I'm just not recalling. I think it's stated
25 in the report. I can take a look if you'd like.

Page 46

1  Q. Sure.
2  A. Sorry. I think it's the hash of the file
3  associated with the URL or IP address.
4  Q. Would you agree that the hash of the file
5  obtained from the URL or IP address is different
6  than the hash of the URL or IP address itself?
7  A. And I'd say it's typically those
8  corresponding outputs would themselves be different
9  because the hash is acting on different structures.
10  But I would say that again, those are all
11  representations of the corresponding input.
12  Q. It's your position that the hash of the
13  file that is retrieved from a URL is an equivalent
14  input to the URL itself?
15  A. Yes. In many contexts, I mean, since the
16  URL gets a pointer or representation of that
17  content, yes.
18  Q. When one uses a get command to obtain a
19  file located at a URL address, what is that output
20  of that function in your theory?
21  A. So if I understand your question, I mean,
22  the output could relate to different things from the
23  end user's perspective. You know, the purpose of
24  calling that function on the URL is to obtain the
25  corresponding pointed-to content. To have it

Page 47

1  displayed or rendered on a browser, for example,
2  depends on the setting in which it's being used.
3  Q. So the file that's retrieved is the output
4  of what you're calling the HTTP function; is that
5  fair?
6  A. I think I'd say from the perspective of the
7  end user, the output that they see from typing the
8  HTTP is that content.
9  Q. So earlier you testified that it's your
10  position that in the infringement scenario where the
11  user is typing a website into the browser that the
12  URL is content within the meaning of the claim,
13  correct?
14  A. That it could be, yes.
15  Q. In that scenario, is the URL the entire
16  content?
17  A. I don't believe so. I mean, again, just
18  because -- or just that it's formatted differently
19  in terms of how the actual network request looks to
20  the SRX agent. So, you know, I believe there's
21  various formatting that I recall that goes through
22  the protocol. So what the SRX would see as the
23  content is the network request.
24  Q. So what else would be part of the content
25  in a scenario where the user is typing the Web

Page 48

1  address into a browser other than the URL?
2  A. I would have to go back and look at the
3  protocol offhand. But my recollection is that the
4  network request would contain additional information
5  such as like what the browser was, what version it
6  was, and so on.
7        It might contain various flags of
8  various capabilities of the browser. The network
9  request itself contains additional information that
10  the SRX would see.
11  Q. So in the infringement scenario that we've
12  been discussing, the content would include the URL
13  plus the network request information that you just
14  identified.
15        Would it include anything else?
16  A. I would have to go back and look and see
17  what other information might be traded back and
18  forth between the SRX and the computer. But at the
19  least that was what I was concerned with when
20  looking at my infringement scenario.
21  Q. Now, going back to the beginning when you
22  were sort of identifying the various theories that
23  you proposed for your SRX infringement with regard
24  to the first function, in addition to the situation
25  where a user is requesting to open a page, you also

Page 49

1  identified a couple of different scenarios where
2  certain code or calls are embedded within a file.
3        Do you recall that?
4  A. Yes.
5  Q. So I think you mentioned code embedded
6  within an HTML file, you mentioned iframe calls, and
7  calls to access content from a particular URL or IP
8  address that are embedded within the file.
9        Do you recall that?
10  A. Yes.
11  Q. Is it your understanding that the SRX has
12  the capability to identify code, iframe calls, or
13  calls to access content from a particular URL or IP
14  address that are embedded within a file that it's
15  processing?
16  A. Okay. Sorry. Could you go back and repeat
17  the question.
18  Q. Sure. So the question is, is it your
19  understanding that the SRX has the capability to
20  identify code, iframe calls, or calls to access
21  content from a particular URL or IP address that are
22  embedded in a file that it is processing?
23  A. I don't think I'm specifically saying that.
24  I'm saying it certainly, as a content processor,
25  receives such content containing those calls and

Page 50

1  itself will act to, for instance, transmit the
2  corresponding inputs to the security computer when
3  the corresponding functions are invoked.
4       Q.  Is it your understanding that the SRX
5  invokes code that's embedded in a file that it's
6  processing?
7       A.  I don't believe so.  But I believe that it
8  will again receive some of that corresponding
9  content and may transmit the corresponding inputs to
10 security computers when the function is invoked.
11      Q.  Who invokes the function in that scenario?
12      A.  That could be, for instance, an end user
13 browser.
14      Q.  So the SRX itself doesn't invoke functions
15 that are embedded within the samples that it
16 receives; is that fair?
17      A.  So can you just clarify again what specific
18 types of functions?  Because I think that would
19 depend on the function that we're talking about.
20 We've gone from sort of more specific back to more
21 general.
22      Q.  So just the ones that you identified.  You
23 identified, I think, three examples.  You said where
24 code is embedded in an HTML, the iframe situation,
25 or where there is a request to get a URL or IP

Page 51

1  address embedded within a sample.
2           So my question is whether the SRX
3  invokes those functions that are embedded within a
4  sample?
5       A.  If I'm recalling correctly -- and, again, I
6  want to narrow it down to those specific things and
7  not the first --
8       Q.  Sure.
9       A.  Well, again, anytime you have a function
10 call, that is invoked both at the client computer,
11 and similarly, like I said before, when it's invoked
12 at the client computer, that will cause a further
13 invocation at the SRX itself to obtain that file.
14          So if we're talking specifically about
15 things like, you know, iframes, then the SRX is
16 going to invoke the corresponding command to get
17 that file.
18          If we're talking about the de- --
19 specifically like running the deobfuscated -- or
20 sorry -- running the obfuscated code -- sorry, I
21 said that wrong -- running the obfuscated code, if I
22 recall correctly, the browser will do that, and
23 again, that will create a potential HTTP call, and
24 then the SRX will invoke that SRX call, again,
25 longer or after the user.

Page 52

1       Q.  Does the SRX invoke the command or does it
2  transmit the original request from the end user?
3       A.  I guess I'm not clear that I would
4  differentiate the two or I would say that those are
5  necessarily distinct things.
6           I mean, it has to invoke its own call or
7  construct its own or manage its own call to make
8  that process happen.  So certainly it's -- in the
9  cases that we're talking about, it's acting on the
10 behest or behalf of an end user that's using the
11 product.  But I would -- you know, I would say
12 that's also an invocation, that when it calls to get
13 the corresponding file.
14      Q.  If the end user does not invoke the command
15 for those embedded components, does the SRX invoke
16 it on its own?
17      A.  So I think in the cases that we've been
18 discussing specifically with user-initiated actions,
19 then the SRX does not do anything that's not
20 specified by the user-initiated interaction.
21          And there are other cases involving
22 things like email and so on where it's not clear
23 that it -- or, you know, that are different
24 scenarios that the user is not typing in a browser
25 or so on that I think work slightly differently.

Page 53

1       Q.  Do any of your infringement scenarios
2  pertaining to the SRX involve functions that are not
3  specified by user-initiated interaction?
4       A.  I would be careful about calling them
5  things like user-initiated interaction for things
6  like email and so on that are sort of automatic.
7       Q.  I just was using your language.  So I'm
8  trying to assess whether there are any of your SRX
9  infringement theories that would apply to situations
10 other than when the user initiates the -- the end
11 user initiates the request?
12      A.  Sorry.  I just want to be a bit careful
13 about talking about -- you know, since we've been
14 talking about end users initiating requests in terms
15 of typing in a browser and so on.  And so there are
16 certainly other scenarios involving email and email
17 attachments and so on that can run through the SRX
18 that don't fit into that model.
19      Q.  Does SRX send email to the security
20 computer?
21      A.  It may send like attachments and so on.
22      Q.  Does the SRX actively fetch any content at
23 all during its analysis?
24          MR. LEE:  Objection to form.
25          THE WITNESS:  I'm not clear on your

Page 62

1   AFTERNOON SESSION
2                            (2:06 p.m.)
3          THE VIDEO OPERATOR:  The time is 2:06.
4   We're back on the record.
5                (Mitzenmacher Exhibit 2319 was
6                 marked for identification.)
7       MICHAEL DAVID MITZENMACHER, Ph.D.,
8      the witness at the time of recess, having
9      been previously duly sworn, was further
10     deposed and testified as follows:
11            EXAMINATION (continued)
12  BY MS. CARSON:
13     Q.  I believe earlier you testified that in
14  your infringement theory for the SRX, the second
15  function that you're relying on is the decision to
16  allow or block the file; is that correct?
17     A.  In at least some cases, that would be one
18  of the possible second functions.
19     Q.  Is there any other second function that you
20  rely on in your SRX infringement theory?
21     A.  Yes.
22     Q.  What else do you rely on as the second
23  function?
24     A.  So at the very least, I think I discuss
25  around paragraphs 37 or 38 blocking future

Page 63

1   communication to a -- you know, to the location of a
2   URL or IP address.  For instance, based on the
3   threat intelligence feeds.
4      Q.  The blocking future communications to a URL
5   or IP address would only be done if the system has
6   determined that that URL or IP address is not safe,
7   correct?
8      A.  Well, it will allow communications if it is
9   safe; it will stop communications if it is not safe.
10     Q.  So the two functions you've identified are
11  allowing communications to a URL or IP address if
12  it's determined to be safe or allowing a file to
13  come through the system if it's determined to be
14  safe; is that fair?
15     A.  Sorry.  It's long again.  Can you say that
16  again.
17     Q.  Okay.  So with regard to the second
18  function in your SRX infringement theory, you've now
19  identified two possibilities.  One is allowing the
20  file?
21     A.  Yes.
22     Q.  And one is allowing communication with a
23  URL or IP address?
24     A.  Yes.
25     Q.  Are there any others that you've

Page 64

1   identified?
2      A.  So I think in the specific context of the
3   SRX, those are the two I identify.
4      Q.  So let's start with the situation where the
5   second function is allowing the file, okay?
6      A.  Um-hum.
7      Q.  And I think this is discussed at least in
8   part in paragraphs 33 to 35; is that correct?
9      A.  Yes.  I think that's at least described
10  there.
11     Q.  And is it fair to say that in paragraphs 33
12  to 35, you're identifying the source code that's
13  associated with the second function when that second
14  function is allowing the file?
15     A.  At the very least I discuss some of the
16  code, right, in 33 to 35.
17     Q.  So you have Exhibit 2319, which is the
18  source code that was submitted as an exhibit with
19  Finjan's motion.  And I want to start with
20  paragraph 33 where you cite page 344.
21             Do you see that?
22     A.  Um-hum.
23     Q.  Does page 344 of the source code have any
24  functions?
25     A.  I believe it has the results of various

Page 65

1   functions which are kept here in the form of content
2   flags.
3      Q.  So this is not any actual function; it's
4   the results of functions?  That's your testimony?
5      A.  Sorry.  I think what I would say is this
6   shows that one of the outputs or connections with
7   this module or the connection with the AAMW module
8   is that in response to, as I've described, a sort of
9   check as to whether this content would be permitted,
10  we can see a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ flag,
11  permitted based on a vertex -- permitted, sorry,
12  based on a verdict, and this shows that, to me, that
13  the content will be permitted based on the
14  response -- the verdict response obtained as
15  described in these paragraphs of the report.
16     Q.  So just to confirm, does page 344 of the
17  source code printout contain any actual functions?
18     A.  I believe specifically 344 contains a list
19  of flags which are -- you know, relate to the
20  function that I've described in the text.
21     Q.  What page of the source code has the
22  function that you're pointing to?
23     A.  So I think what I'd say is if you look at
24  both 33 and 34 in conjunction, in particular in
25  paragraph 34, I point out this is the code where the

Page 66
1  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ bit is sent.
2         This specifically relates to the claim
3  language where we're talking about after you've
4  received an indicator from the security computer, it
5  shows whether it's safe to invoke the second
6  function.
7         So here the second function is the
8  permitting the content, that is obviously sending of
9  the content.  And this shows that that function can
10 be invoked.  I don't think this actually shows the
11 sending.  What it shows specifically, these cites
12 show, is the manner in which you obtain an indicator
13 which shows that the second function will be
14 invoked.
15    Q.  Do these cites in paragraph 33 and 34
16 include the function that you're pointing to for the
17 second function?
18    A.  I mean, I think that would be whatever the
19 sending function which allows the content to go back
20 from the SRX to the main device.  I don't believe
21 this shows -- this code shows that specific
22 function.
23    Q.  Were you able to locate that code that
24 shows the second function?
25    A.  I don't know.  I'd have to go back over the

Page 67
1  code to recall.  I remember seeing, you know, at
2  various times that the SRX would send things back to
3  the main client.  But I can't remember, you know,
4  what file that function was in specifically.
5    Q.  But that function that you're pointing to
6  for the second function is not included in the
7  source code that you've cited in your report?
8    A.  What I'd say is that -- like I didn't put
9  in the sending function itself.  I think it's clear
10 that, you know, because you have the flag, that the
11 content verdict is permitted, and it's described
12 "Permitted based on a verdict" in the notes.
13        And again, if you look at the code in
14 379-380, you can see the flow of the code, that it's
15 clear that this is showing that the second function
16 that I've described and that is also described
17 throughout the report with regard to various other
18 exhibits is that, you know, that the content is
19 allowed to return to the user.  And that's made
20 clear by these flags.
21        I think this is actually, you know --
22 again, limited space -- you're trying to pick out
23 the best evidence to show.  I think this is what
24 clearly shows the second function as I've described.
25    Q.  You didn't think it was important to

Page 68
1  include the actual function that you're relying on?
2    A.  So, again, there is, as I understand it,
3  page limits and limited space on what we could
4  provide and show.
5         But in particular, since the return
6  function is simply sending the required content down
7  to the user, which I don't think is disputed that
8  SRX does, I think it's -- you know, I think this
9  shows that that second function exists and what its
10 purpose is and probably would show it more clearly
11 because it's showing that this is in response to the
12 score and verdict, is also required by the claim.
13    Q.  What are the inputs to the second function
14 that you've identified in paragraphs 33 to 35?
15    A.  So the inputs to the second function would
16 include at least, you know, the corresponding -- I
17 mean, if we're talking about, for instance, the URL
18 would be the corresponding content of the URL and
19 the URL itself.
20    Q.  Did you confirm that in the source code?
21    A.  I don't think I -- like as I recall, yes.
22 But I don't have the source code here in front of
23 me.  But I think it's also clear that that actually
24 is the input.  I mean, that is what gets sent back
25 to the user.  So that would necessarily be part of

Page 69
1  the response back.
2    Q.  Does the code that you've cited here show a
3  call to the second function?
4    A.  So I think I may need to see some of the
5  other code that is called by this to make a firm
6  determination on that as this code calls some other
7  functions, and I would need to look specifically at
8  those things to see if those, in turn, make the
9  actual call.
10        I certainly note there are various
11 logging functions which show that -- you know, that
12 the score is bigger than the verdict threshold and
13 that it is set to be permitted is logged.
14        Whether during those log calls, for
15 instance, the actual further call takes place, I'm
16 not clear.  I do notice the log itself, for
17 instance, seems to contain both the URL, as well as
18 information about the content.
19    Q.  Can you point out what line number you're
20 looking at.
21    A.  I was looking at page 380 of the code.
22 So I notice that there's a function called
23 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
24        I would need to see, like this is
25 showing the action, this function code that we're

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

HIGHLY CONFIDENTIAL - SOURCE CODE
MICHAEL DAVID MITZENMACHER, PH.D. - 03/04/2019        Pages 78..81

Page 78
```
 1       A.   Sure.
 2       Q.   Do those lines show that this function is
 3   called for both whitelisted and blacklisted items?
 4       A.   This function being the
 5   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
 6       Q.   Yes.
 7       A.   It appears to me that the function would
 8   handle potentially both of those cases.
 9       Q.   So it would be called both in situations
10   where the file was to be put on the whitelist as
11   well as the blacklist; is that fair?
12            MR. LEE:  Objection, form.
13            THE WITNESS:  The logging function would
14   record those situations where it was put on the
15   whitelist or put on the blacklist.
16   BY MS. CARSON:
17       Q.   Now, I think a few questions ago you were
18   saying that the URL and the content obtained from
19   the URL can both be the input; is that fair?
20       A.   Yes.  In particular, there's -- yeah, in
21   general, yes.  I think in the specific scenario
22   we're talking about, yes.  But also in several of
23   the other scenarios we're talking about, there are
24   cases where you send the URL or cases where you send
25   the content.
```

Page 79
```
 1       Q.   So in the function that you're relying on
 2   in your SRX infringement theory, are the input and
 3   the output the same?
 4       A.   Yes.  Or sorry.  I think I misheard the
 5   question.  I thought you meant input to the first
 6   and input to the second.  The input to the first and
 7   input to the second are the same.  Now you're
 8   asking -- sorry -- the input and the output?
 9            Let me hear that question again.  I
10   think I heard a different question than what you
11   asked so I may need to think about it.
12       Q.   So you've testified now that the URL and
13   the content obtained from the URL are the same
14   input?
15       A.   Yes.  Or they're different forms of what
16   could be the same input.
17       Q.   So my question then is, since the content
18   obtained from the URL is the output of the HTTP
19   function that you've identified to get that content,
20   are the input and the output the same?
21       A.   I'd say they represent the same.  One's a
22   pointer to the other.  In particular, they're
23   clearly syntactically different in that one's a URL
24   pointer to the object.  The other is the object
25   itself.
```

Page 80
```
 1            And also in the HTTP response, there may
 2   be other information included in the output that
 3   obviously decides the content itself, which would be
 4   the HTTP protocol.
 5       Q.   So you've also -- or Finjan has also
 6   submitted pages 342 to 343.  I don't think we've
 7   talked about those yet.  I just want to confirm, the
 8   second function that you're relying on -- Actually,
 9   strike that.
10            So you talk about these pages in
11   paragraph 26.  And in particular, you use it as a
12   citation for the statement, "SRX also receives the
13   threat intelligence data feeds (which include C&C
14   feeds and infected host feeds) from Sky ATP or ATP
15   appliance, which SRX uses to allow or block a
16   communication with an infected internal computer or
17   with an external computer that serves as a command
18   and control server."
19            Do you see that?
20       A.   Yes.
21       Q.   So this is the second option of the second
22   function that you mentioned earlier, correct?
23       A.   If I understood your question, I believe so.
24       Q.   It was kind of a bad question.  So earlier
25   we talked about how you had identified two
```

Page 81
```
 1   possibilities for the second function.  One was
 2   allowing the file and one was allowing a client to
 3   communicate with a particular URL or IP address.
 4            Do you recall that?
 5       A.   Yes.
 6       Q.   And we've been talking about the first of
 7   that:  allowing the file, correct?
 8       A.   Yes.
 9       Q.   This is referring to the second of that:
10   allowing the computer to communicate with a
11   particular URL or IP address, correct?
12       A.   Yes.  Or that's what that paragraph, I
13   think, is discussing.
14       Q.   And you cite there to paragraphs 342 to
15   344 -- or, sorry.  You cite source code pages 342 to
16   344 in support of that argument, correct?
17       A.   Yes.
18       Q.   Now, does pages 342 or 344 contain the
19   second function to allow a client to communicate
20   with a particular IP or URL address?
21       A.   Again, I don't think it contains those
22   specific functions.  It contains the information
23   relevant to those functions.
24       Q.   Did you identify in the Junos code the
25   second function that you are relying upon for the
```

Page 82

1   scenario where the second function is allowing a
2   client to communicate with a particular URL or IP
3   address?
4        A.  I would have to check through the
5   declaration, but I didn't see any other code cite
6   references within the declaration itself.
7        Q.  So just based on the code that we've
8   reviewed so far that you've cited for the SRX, none
9   of that code contains the second function as you've
10  identified it in your infringement theory, correct?
11           MR. LEE:  Objection, form.
12           THE WITNESS:  With the caveats that I've
13  said before, that some of the code is calling other
14  functions that I would have to examine to determine
15  if those were the corresponding calls in question
16  and say they don't, like, contain the entirety of
17  the code related to the allowing of the content as
18  we've described.  Again, what I'd say is that these
19  show evidence of the process by which that allowing
20  occurs and is determined.
21  BY MS. CARSON:
22       Q.  But they don't show the actual functions of
23  either allowing a file to go through or allowing a
24  client to communicate with a particular IP or URL
25  address; is that fair?

Page 83

1        A.  I would say that it is not showing the code
2   that performs those network level operations.  It is
3   showing at a higher level the structures that allow
4   or enforce those decisions or record those decisions
5   as I think we've described.
6        Q.  I'd like to turn just for a moment to the
7   SRX's interaction with the ATP appliance, which you
8   discuss in paragraphs 36 to 38 of your report.
9            And in particular, if you could turn to
10  page 36 -- or paragraph 36, sort of midway through
11  that, you state, "The ATP appliance provides a
12  verdict to the SRX appliance which is able to
13  determine whether to invoke a second function such
14  as allowing a client system to complete the download
15  or otherwise communicate with the URL, based on the
16  verdict."
17           Do you see that?
18       A.  Yes.
19       Q.  Did you see any source code that
20  specifically related to the SRX's ability to
21  interface with ATP appliance?
22       A.  I have seen various code for the ATP
23  appliance.  I would have to refresh myself on that
24  specific code to see how it related to the
25  interactions with SRX.

Page 84

1        Q.  Did you identify any Junos code that
2   reflected the SRX's communications with ATP
3   appliance?
4        A.  So I'm just looking at this paragraph.  I
5   don't see any in this paragraph.  I'd have to look
6   through the remainder of the report.
7        Q.  Were you able to identify any Junos source
8   code showing that the SRX can actively submit a URL
9   or IP address to the ATP appliance?
10       A.  So it may help me recall one way or another
11  if I could see like some of the exhibits cited to in
12  this paragraph.  It may be that they have references
13  to code or discussions of code.  Again, I don't see
14  any code line numbers in this paragraph, but I also
15  don't recall what's in these various exhibits that
16  I've cited to.
17       Q.  Do you recall whether you saw any Junos
18  code showing that SRX receives verdicts back from
19  the ATP appliance?
20       A.  Again, I would have to go back and look,
21  but I recall seeing various code for the ATP
22  appliance that, as I recall, was returning verdicts.
23  And I believe those verdicts were to go back to --
24  well, I think the code may have been written more
25  generally.  I forget what the terminology is; it's

Page 85

1   in the report here somewhere for the ATP appliance
2   somehow remembering its collectors and the SRX as
3   being one of the collectors that can send
4   information back to.
5        Q.  Let's go about it this way.  So you have
6   not reviewed the source code on the computer since
7   June of last year, correct?
8        A.  I would have to check the dates, but that
9   sounds possibly correct.
10       Q.  And the version of the Junos code that you
11  reviewed was 17.4, correct?
12           MR. LEE:  Objection, form.
13           THE WITNESS:  I would say that is at
14  least one of the versions that I reviewed.  I
15  certainly don't remember the version numbers.
16  BY MS. CARSON:
17       Q.  Do you know when Junos added -- which
18  version of Junos added support for interfacing with
19  the ATP appliance?
20       A.  I can't recall specifically.
21       Q.  You have not reviewed any source code for
22  Version 18 of Junos, correct?
23       A.  I would say I don't know.  I can't recall.
24  I received various printouts after the original
25  ones.  So I'd have to go back and look at those

HIGHLY CONFIDENTIAL - SOURCE CODE
MICHAEL DAVID MITZENMACHER, PH.D. - 03/04/2019        Pages 90..93

Page 90
1   A.  Um-hum.
2   Q.  Now, the SRX would not block a file or a
3   communication if the security computer had provided
4   an indication that it was safe; is that correct?
5   A.  Right.  Generally speaking, I use this
6   phrasing just because I think it's clear that
7   there's sort of a decision, a functional decision as
8   to whether the file is to be allowed or blocked
9   depending on the outcome of the security computer
10  indication.
11          But I would agree with you that, yeah,
12  the interpretation would be that, yeah, when a file
13  is deemed to be safe, then it is, yeah, allowed.
14  Q.  So can we agree that in situations where a
15  function is called to block a file, that would not
16  satisfy claim 1 of the '154 patent?
17          MR. LEE:  Objection, form.
18          THE WITNESS:  I mean, I don't think it
19  was my intention here to try and make that case that
20  the blocking action itself -- it's more the decision
21  of whether to block or allow.
22          So I think I agree with that, at least
23  in the context of my declaration.  But, you know,
24  what else the SRX does outside the context of my
25  declaration, I wouldn't want to say.

Page 91
1   BY MS. CARSON:
2   Q.  Do you know if the SRX only allows a file
3   if Sky ATP returns a verdict showing that the file
4   is safe?
5   A.  I think that is one of the inputs it uses
6   to determine whether to return a file.
7   Q.  Does the SRX return a file if Sky ATP
8   returns a message that says there isn't a verdict
9   available for the file?
10  A.  I can't recall.  I mean, I could look at a
11  document one way or another.
12  Q.  So sitting here right now, you're not sure
13  what the SRX does if Sky ATP returns a message
14  saying that there's no verdict available for the
15  file?
16  A.  So I would have to look at the
17  documentation again to remember the outputs of the
18  Sky ATP, the various verdict scores, and if it can
19  return a no verdict score.
20          However, if it returns a no verdict
21  score and allows the file through, that is a policy
22  decision that the file is deemed sufficiently safe
23  that it can be returned to the user.
24  Q.  So it's your opinion that if Sky ATP
25  returns a message saying that there is no verdict

Page 92
1   for the score, that that's the same thing as it
2   being safe?
3   A.  Yes, according to the policy.  So, again, I
4   cannot recall the specifics, so let me talk at the
5   level of a general system.
6   Q.  Sure.
7   A.  For a general system, if there is a return
8   that says that based on the information I have, I am
9   not stopping this file, right, or I'm not suggesting
10  that this file be stopped, but I cannot return, you
11  know, a numerical score or other information.
12          And then the system policy decision is
13  to return that file to the user, that that is, you
14  know, a policy level decision that the item being
15  returned is sufficiently safe that it can be allowed.
16  Q.  So just so that I'm sure I understand your
17  opinion, it's your opinion that when Sky ATP returns
18  a message saying that it does not have a verdict for
19  a particular file, that comprises an indication that
20  invocation of the file is safe within claim 1?
21  A.  So, again, it may help if you could show me
22  the documentation -- again, I don't have all the
23  documents with me -- about the various returns from
24  the SRX with regard to those verdicts or in
25  particular the lack of verdict.  So if you could

Page 93
1   give me a document, that might help.
2           But I would say certainly at a general
3   level that, yes, if they -- the policy level
4   decision is that, you know, if there's not enough
5   sufficient information to merit blocking a file, to
6   allow the file.  Then that is a policy level
7   decision that that is safe with regard to the
8   security policy of the system to allow that file to
9   be returned to the user.
10  Q.  And that would satisfy claim 1's
11  requirement that one invokes a second function with
12  the input only if a security computer indicates that
13  such invocation is safe?
14  A.  Yeah.
15          MS. CARSON:  Now would be a good time
16  for a break.  We've been going for about an hour,
17  and I'm about to switch topics.
18          THE VIDEO OPERATOR:  The time is 3:15.
19  We're off the record.
20              (Recess at 3:14 p.m.,
21              resumed at 3:23 p.m.)
22          THE VIDEO OPERATOR:  The time is 3:24.
23  We're back on the record.
24  BY MS. CARSON:
25  Q.  I want to turn now to your infringement

Page 110
1   To the extent that you're saying like
2   syntactically are the contents of the file input
3   when you're calling to open a link, I would say
4   that's not the expectation of the first function,
5   at least in paragraph 40.
6       Q.  Have you identified any other first
7   functions besides the one identified in paragraph 40
8   that use the file as opposed to the URL or IP
9   address as an input for the reputation adapter
10  theory?
11      A.  If I'm understanding your question, I don't
12  think so.
13      Q.  Is it your understanding that the deception
14  adapter submits the file downloaded from a URL to
15  the reputation adapter?
16      A.  So I believe it can do different things in
17  different settings.  It can submit a URL or an IP
18  address or a hash representing the file contents.
19      Q.  The hash is calculated by Sky ATP when Sky
20  ATP receives the file, correct?
21      A.  That would be my understanding.
22      Q.  The hash of the file isn't part of the
23  content that's received over the network, correct?
24      A.  So I would say I have trouble agreeing or
25  disagreeing with that statement because the hash is

Page 111
1   really just a different representation of that
2   content.  So I think we're getting into again that
3   I'd agree it's syntactically different, but it
4   represents the same thing.
5       Again, if you took data and compressed
6   it, it would be in a different format, but it would
7   still correspond to the same data.  Or if you
8   reversed it, it would look different, but it's still
9   the same data.  The hash here has the same
10  function --
11      Q.  Now, in --
12      A.  -- or same meaning.
13      Q.  -- your reputation adapter theory, the
14  second function that you identify is the addition of
15  the IP or URL to a whitelist; is that correct?
16      A.  Yes.
17      Q.  And in paragraph 41 you state, "Adding the
18  URL/IP address to a whitelist occurs only if the
19  lookup finds that the URL/IP address (or the file
20  hash) is not malicious"; is that right?
21      A.  Yes.
22      Q.  When a URL gets added to the whitelist,
23  does it include the HTTP portion of the address, or
24  is it just the URL?
25      A.  I would have to go back and look.  I don't

Page 112
1   recall.  I don't think it matters for my theories.
2       Q.  If you could take a look at the source code
3   that we were looking at earlier, you'll see in the
4   end of paragraph 41, you cite to page 683 of the
5   first source code printout.
6       Which function on this page are you
7   relying upon for the second function with regard to
8   your reputation adapter theory for Sky ATP?
9       A.  I believe it's this function
10  ███████████████████████
11      Q.  It's the one that starts on line 22?
12      A.  Yes.
13      Q.  Does this function use the URL as an input?
14      A.  I believe if I'm looking at it right, this
15  one uses the IP address associated with the URL.
16      Q.  So it does not include the URL as an input,
17  correct?
18      A.  Again, it includes the IP address from
19  which that's the -- I guess the appropriate level
20  for doing a whitelist.  It's the IP address
21  associated with the URL.  It's the host associated
22  with the URL.
23      Q.  Do you see on line 27 where it defines the
24  parameter for ███████████
25      A.  Yes.

Page 113
1       Q.  And it says ████████████████████
2       A.  Yes.
3       Q.  Is this function called whether a URL gets
4   whitelisted or blacklisted?
5       A.  I mean, I guess I'm not clear on your
6   question, like I believe you can use this function
7   to update either the whitelist or the blacklist,
8   which one you need to be updating as a parameter
9   that you send in.
10      Q.  So the same function,
11  ████████████████████ is used to add URLs to
12  the whitelist as well as the blacklist; is that
13  fair?
14          MR. LEE:  Objection, form.
15          THE WITNESS:  I definitely wouldn't put
16  it that way because it would lead to confusion.  It
17  makes it sound like you're sort of adding to both
18  the whitelist and the blacklist at the same time.
19          I'd say that this is a function with a
20  parameter.  The parameter tells you whether you're
21  supposed to be adding to the whitelist or the
22  blacklist.  That's not an unusual way for functions
23  to be described or for functions to have parameters.
24  BY MS. CARSON:
25      Q.  So even though a URL would get added only

Page 114

1  to the whitelist or the blacklist, the same function
2  is used to perform that action; is that fair?
3           MR. LEE: Objection, form.
4           THE WITNESS: So the same, you know,
5  type of code is used. But it's with the different
6  parameters, right? I think you'd have to get in an
7  argument with one of the programming language
8  logicians as to, you know, whether you would -- how
9  you would differentiate these in terms of functions
10 with the parameters.
11          I'd say it's the same code. You're
12 sending in a parameter. The parameter tells you
13 whether you're adding to the whitelist or the
14 blacklist. That's not unusual at all for how
15 functions work, but you have parameters that would
16 determine, you know, which branch or something you
17 were -- which possibility of multiple possibilities
18 the code would do.
19 BY MS. CARSON:
20     Q.  A parameter is the same thing as an input,
21 correct?
22     A.  I would have to go back and look up the
23 definitions, but that's often how I use the term in
24 this context.
25     Q.  So when you add something to either the

Page 115

1  whitelist or blacklist, you use the same function,
2  but it has different parameters, correct?
3           MR. LEE: Objection, form.
4           THE WITNESS: I would say that you're
5  using the same function call, right, the same
6  function name. But obviously what the function does
7  or how it performs will depend on the inputs or
8  parameters. And a typical way of structuring code
9  when you have similar types of structures such as
10 lists is to make it general and then instantiate
11 which list, for instance, you're going to update
12 through the use of a parameter.
13          Maybe to make it clear, because we
14 haven't been referring to claim language, and
15 function is a general term, I would say using this
16 code function with the parameter of adding to the
17 blacklist is clearly a different function than
18 adding -- using this function code with the
19 parameter of whatever the other one was. If I said
20 whitelist, then blacklist; blacklist, then
21 whitelist. Those perform two different functions.
22 One adds to a blacklist, one adds to a whitelist.
23          Even though it would use -- or it would
24 depend on the same code, that code would take
25 different paths depending on the parameter. There

Page 116

1  would be different instructions and, hence,
2  different functions in terms of the execution
3  depending on that parameter.
4  BY MS. CARSON:
5      Q.  So it's your opinion that using a different
6  input or parameter for a function causes it to be a
7  different function?
8      A.  Causes it to perform differently or perform
9  different actions. So if we're saying that the
10 underlying function here is to add to a whitelist or
11 the underlying function is to add to a blacklist,
12 then, yes, the parameter changes the function, it
13 changes the functionality depending on that
14 parameter.
15     Q.  Isn't the underlying function here to
16 update the infected host list?
17     A.  I think the point is there are different,
18 like, lists, right? There's -- there's the update
19 infected host list and there are two sub lists.
20 One is a whitelist and one is a blacklist.
21     Q.  So the output is different depending on
22 what input you put into the update infected host
23 list function?
24     A.  Well, I haven't even checked to see what,
25 if anything, that output. I would say that the

Page 117

1  actions that are being taken by the function change
2  depending on the parameter.
3      Q.  What is your understanding of what gets
4  added to the whitelist or blacklist? Is it the URL
5  that was identified during the deception adapter
6  analysis?
7      A.  Sorry. Can you repeat that.
8      Q.  What is your understanding of what URL gets
9  added to the whitelist or blacklist using this
10 function?
11          MR. LEE: Objection, form.
12          THE WITNESS: Again, I think I'm not
13 clear on the question. It's, you know, whatever --
14 I believe it's whatever the input is.
15 BY MS. CARSON:
16     Q.  So is it your understanding that when a URL
17 gets detected during dynamic analysis and then is
18 sent to the reputation adapter, that the URL that
19 gets added to the whitelist or blacklist is the URL
20 that was detected during dynamic analysis?
21     A.  If I understood your question, I mean, I
22 believe it's the same input or same file that is
23 discussed in paragraph 40, that when it opens the
24 call to a link, that later a link will be determined
25 as to whether it can be added to the whitelist or

Page 154

1    A.  Again, I think you may be using the
2  "function" term in a way that's maybe not really in
3  line with the patent, right?  So, you know, they're
4  really sort of two different states here clearly.
5          Depending on whether it's malicious or
6  benign, there's an early exit with success or with
7  safety that says we can end when this file is safe
8  or we can say early exit and, you know, bad, right,
9  and those would correspond clearly to two different
10 functions or functionalities.
11         But I would agree that this suggests
12 that it has both those functionalities available to
13 it.  It can stop the process early in either case.
14   Q.  Do you know which adapter is the last one
15 in the pipeline?
16   A.  Well, I would say it looks, from this
17 figure, like the sandbox deception one is the last.
18 Again, that's my recollection that it goes through
19 the simpler antivirus checks and static analysis
20 checks before doing the more complex sandbox
21 analysis.
22   Q.  So if the analysis ended after the
23 deception adapter completed its analysis, it
24 wouldn't be an early exit, right?
25   A.  I'm not sure.  I don't believe so because I

Page 155

1  believe even after the sandbox deception, there may
2  be other processing.  For instance, it may have to
3  go back and combine the scores or do other
4  processing before it can determine exactly whether
5  it would be -- to be considered safe or not safe, or
6  it may have to do some additional processing after
7  the fact.
8          So I think this is a simplistic picture
9  of the pipeline.  My recollection is there can be
10 more work.  And that would still be considered like
11 an early verdict.
12   Q.  So it's your understanding that there can
13 still be an early exit from the pipeline even after
14 the deception adapter is completed?
15   A.  That there may be other bypassing of
16 processing that can done -- can be done after that
17 point.
18   Q.  What's the processing that's bypassed after
19 the deception adapter?
20   A.  I would have to go back and check to see
21 what other additional processing it does after that
22 point.
23   Q.  Did you do any analysis to confirm that
24 there actually is any additional processing after
25 the deception adapter that would get bypassed based

Page 156

1  on an early exit function as you've identified it in
2  paragraph 45?
3    A.  I don't recall.
4          MS. CARSON:  I'm going to switch topics,
5  so we can take a break, please.
6          THE VIDEO OPERATOR:  The time is 6:03
7  and we're off the record.
8          (Recess at 6:03 p.m.,
9           resumed at 6:10 p.m.)
10         THE VIDEO OPERATOR:  The time is 6:10.
11 We're back on the record.
12 BY MS. CARSON:
13   Q.  So I want to turn our attention to the ATP
14 appliance.  The code for the ATP appliance was
15 produced by Juniper in git, correct?
16   A.  In what?
17   Q.  In git, g-i-t.
18   A.  I don't recall.
19   Q.  There were multiple repositories for the
20 ATP appliance code that were produced, correct?
21   A.  I'm not sure.  I don't recall.
22   Q.  How did you select what repositories to
23 cite in your report for the ATP appliance code?
24   A.  Again, given the limits in space, I just
25 tried to pick the ones that seemed to most clearly

Page 157

1  make the points I needed to make.
2    Q.  So how did you pick them since you didn't
3  go look at the code?
4    A.  Again, I picked the cites or the citations
5  based on the code that was produced to me by
6  counsel.
7    Q.  Do you know if the code that you cited was
8  actually included in products that were released?
9    A.  My understanding is that when we asked for
10 the code, we asked for code that was for products
11 that had been put out and released that we knew you
12 were providing code that wasn't for released
13 products and I'm not clear on why that would be the
14 case.
15   Q.  Do you understand that sometimes companies
16 keep their source code in a git repository that has
17 research code along with the deployed code?
18   A.  I can imagine that happens in some
19 situations.
20   Q.  Do you know whether the ATP appliance code
21 was like that?
22   A.  Given my understanding that what we had
23 asked for was the code that had been placed into
24 products, it would be an odd case or it would seem
25 unusual to me in terms of legal production if that's

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

HIGHLY CONFIDENTIAL - SOURCE CODE
MICHAEL DAVID MITZENMACHER, PH.D. - 03/04/2019                Pages 158..161

Page 158
1  how it was produced.
2      Q.  But you didn't actually review the source
3  code on the computer, so that wasn't something that
4  you confirmed personally, correct?
5      A.  So I did not review the source code on the
6  computer, so, yes, I don't believe that I checked
7  for the different -- which version would have been
8  in the code.  Indeed, I might even -- or I would
9  have to check if that information was contained
10 within the git repository itself.
11     Q.  Did you ask counsel to provide you code
12 from a particular release of the ATP appliance
13 product?
14     A.  I don't believe so.  Certainly not by like
15 a version number and so on.
16     Q.  Did you ask counsel to provide you --
17 Strike that.
18         Could you turn to paragraph 55 of your
19 report.  And do you see the citation to source code
20 in there, it's
21 [REDACTED]
22         Do you see that?
23     A.  Yes.
24     Q.  Do you know what product cyphort-labs is?
25     A.  Not offhand.

Page 159
1      Q.  And then if you look at the next paragraph,
2  that source code file is a citation to
3  [REDACTED] - I think that's a
4  typo -- [REDACTED]
5          Do you see that?
6      A.  Yes.
7      Q.  Do you know which ATP appliance release, if
8  any, that code is for?
9      A.  Not by number or release name.
10     Q.  Do you know if the citations in
11 paragraph 55 and 56 are for the same product?
12     A.  I would have to go back and look.
13     Q.  Are you familiar with the concept that a
14 git repository can have information contained within
15 it about release dates and have sort of branches
16 that relate to particular releases of a product?
17     A.  So typically a git can be organized in
18 terms of different branches or offshoots or
19 variations, typically by age.  Whether they
20 contained additional information related to
21 releases, you know, that's usually done with
22 additional information included within the git
23 repository that would provide more detailed
24 information of that sort.
25     Q.  Do you know whether that type of

Page 160
1  information was provided with the ATP appliance code
2  that was produced by Juniper?
3      A.  That I would have to go back and look.
4  Don't know offhand.
5      Q.  When you say "go back and look," you would
6  have to go look for the first time, right?
7      A.  If it wasn't included in the printouts.
8  I haven't gone to see this code in person.
9      Q.  So just to confirm, did you do anything at
10 all to confirm that the source code citations for
11 the ATP appliance product that you relied on in your
12 infringement analysis were actually included in a
13 product that was shipped?
14     A.  Actually, may I first ask, may I actually
15 see these two code files.
16     Q.  They should be included in Exhibit 16,
17 which was -- let's see --
18     A.  That one?
19     Q.  Yes.  Exhibit, what is it?  2319?
20     A.  Um-hum.
21     Q.  So the first one that I refer to was, it
22 looks like, page 728.
23     A.  All right.  Sorry.  What was the . . .
24     Q.  So the question was, did you do anything at
25 all to confirm that the source code citations for

Page 161
1  the ATP appliance product that you relied on in your
2  infringement analysis were actually included in a
3  product that was shipped?
4      A.  My assumption would be that we asked for,
5  received code that was used in products.
6      Q.  So that was just something you assumed
7  based on the fact that it was produced?
8      A.  Yes.
9      Q.  One of your infringement theories for the
10 ATP appliance involves the pipeline analysis as the
11 claimed security computer, correct?
12     A.  I believe that's the case.  Do you have a
13 particular paragraph?
14     Q.  No, I don't, but . . .
15     A.  All right.  Give me a second.
16         So what was the question again?
17     Q.  So one of your infringement theories for
18 ATP appliance identifies the pipeline analysis as
19 the claimed security computer, correct?
20     A.  I mean, I think, yes, or I refer to it as
21 the analysis pipeline or its corresponding engines.
22     Q.  And in that theory, the content processor
23 that you identified is the SmartCore component,
24 correct?
25     A.  Yes, that seems right.