**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

IRELL & MANELLA LLP
Jonathan S. Kagan (SBN 166039)
jkagan@irell.com
Alan Heinrich (SBN 212782)
aheinrich@irell.com
Joshua Glucoft (SBN 301249)
jglucoft@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone: (310) 277-1010
Facsimile: (310) 203-7199

Rebecca Carson (SBN 254105)
rcarson@irell.com
Ingrid Petersen (SBN 313927)
ipetersen@irell.com
Kevin Wang (SBN 318024)
kwang@irell.com
840 Newport Center Drive, Suite 400
Newport Beach, California 92660-6324
Telephone: (949) 760-0991
Facsimile: (949) 760-5200

*Attorneys for Defendant*
JUNIPER NETWORKS, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| FINJAN, INC., a Delaware Corporation, | Case No. 3:17-cv-05659-WHA |
| Plaintiff, | **DEFENDANT JUNIPER NETWORKS, INC.'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT REGARDING CLAIM 1 OF U.S. PATENT NO. 8,141,154** |
| vs. | |
| JUNIPER NETWORKS, INC., a Delaware Corporation, | |
| Defendant. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

10644663

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................... 1

II.    OVERVIEW OF THE '154 PATENT ................................................................... 2

III.   CLAIM CONSTRUCTION ................................................................................... 5

    A.   "Safe" ......................................................................................................... 5

    B.   "Content Processor" ................................................................................... 6

        1.   The Content Processor Is Located On The Client Computer. .................... 8

        2.   The Content Being Processed Has Been Modified. ..................... 8

IV.    JUNIPER DOES NOT INFRINGE CLAIM 1 OF THE '154 PATENT .......... 11

    A.   Legal Standard ........................................................................................ 11

    B.   Finjan's Infringement Theories Are Insufficient As A Matter Of Law Because The Accused Products Operate In A Fundamentally Different Way Than The '154 Patent Invention ..................................... 11

    C.   Finjan Has Not Established That The SRX Infringes Claim 1 As A Matter Of Law Under Any Plausible Construction Of The Claim ........................ 15

        1.   Finjan Has Not Established That The SRX Meets Claim 1(a). ................ 16

        2.   Finjan Has Not Established That The SRX Meets Claim 1(b). ........................ 22

        3.   Finjan Has Not Established That The SRX Meets Claim 1(c). ................ 26

    D.   Finjan Has Not Established That Sky ATP Infringes Claim 1 ............................ 26

        1.   Finjan Has Not Established That Sky ATP Meets Claim 1(a). ................ 27

        2.   Finjan Has Not Established That Sky ATP Meets Claim 1(b). ................ 32

    E.   Finjan Has Not Established That ATP Appliance Infringes Claim 1. ................ 33

        1.   Finjan's Motion Should Be Denied Because Its Infringement Theory Is Not Based On The Release Versions Of The Source Code ........................................ 33

        2.   Finjan Has Not Established That ATP Appliance Meets Claim 1(a). ........................ 35

        3.   Finjan Has Not Established That ATP Appliance Meets Claim 1(b). ........................ 39

    F.   The Accused Products Do Not Infringe Under The Doctrine Of Equivalents. ........................................ 40

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663

- ii -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

**Cases**

4

*Abbott Labs. v. Novopharm Ltd.*,
5
    323 F.3d 1324 (Fed. Cir. 2003) ................................................................................................5

6

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
    797 F.3d 1020 (Fed. Cir. 2015) .............................................................................................24
7

*Arthur A. Collins, Inc. v. N. Telecom, Ltd.*,
8
    216 F.3d 1042 (Fed. Cir. 2000) .............................................................................................34

9

*Aylus Networks, Inc. v. Apple Inc.*,
    856 F.3d 1353 (Fed. Cir. 2017) ...............................................................................................8
10

11

*Capon v. Eshhar*,
    418 F.3d 1349 (Fed. Cir. 2005) .............................................................................................14
12

*Centillion Data Sys. LLC v. Qwest Commc'ns Int'l, Inc.*,
13
    631 F.3d 1279 (Fed. Cir. 2011) .............................................................................................24

14

*Cephalon, Inc. v. Abraxis Bioscience, LLC*,
    618 Fed. App'x 663 (Fed. Cir. 2015) .......................................................................................8
15

16

*Edwards Lifesciences LLC v. Cook Inc.*,
    582 F.3d 1322 (Fed. Cir. 2009) ...............................................................................................5
17

*Evolutionary Intelligence, LLC v. Sprint Nextel Corp.*,
18
    2014 WL 4802426 (N.D. Cal. Sept. 26, 2014) .......................................................................8

19

*Finjan, Inc. v. Bitdefender Inc.*,
    Case No. 4:17-cv-04790-HSG (N.D. Cal. Feb. 14, 2019) .......................................................9
20

21

*Finjan, Inc. v. Cisco Systems, Inc.*,
    Case No. 5:17-cv-00072-BLF (N.D. Cal. July 23, 2018) .........................................................3

22

*Finjan, Inc. v. Proofpoint, Inc.*,
    2015 WL 7770208 (N.D. Cal. Dec. 3, 2015) ...........................................................................9
23

24

*Finjan, Inc. v. Secure Computing Corp.*,
    626 F3d. 1197 (Fed. Cir. 2010) ........................................................................................22, 23
25

26

*Finjan, Inc. v. Symantec Corp.*,
    Case No. 4:14-cv-02998-HSG (N.D. Cal. Feb. 10, 2017) .......................................................9
27

*Intellectual Ventures I LLC v. Motorola Mobility LLC*,
28
    870 F.3d 1320 (Fed. Cir. 2017) ........................................................................................23, 24

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

*L & W, Inc. v. Shertech, Inc.*,
   471 F.3d 1311 (Fed. Cir. 2006).........................................................................................19, 35

*Luminara Worldwide, LLC v. Liown Elecs. Co.*,
   814 F.3d 1343 (Fed. Cir. 2016)..................................................................................................7

*Nazomi Comm'cns, Inc. v. Nokia Corp.*,
   739 F.3d 1339 (Fed. Cir. 2014).................................................................................................22

*Palo Alto Networks, Inc. v. Finjan, Inc.*,
   2018 WL 6040843 (Fed. Cir. Nov. 19, 2018).....................................................................32, 40

*Rambus, Inc. v. Hynix Semiconductor, Inc.*,
   642 F. Supp. 2d 970 (N.D. Cal. Nov. 24, 2008)........................................................................34

*Rembrandt Wireless Techs. LP v. Samsung Elecs. Co., Ltd.*,
   853 F.3d 1370 (Fed. Cir. 2017)...................................................................................................5

*SynQor, Inc. v. Artesyn Techs., Inc.*,
   635 F' App'x 891 (Fed. Cir. 2015) ............................................................................................10

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
   247 F.3d 1316 (Fed. Cir. 2001).................................................................................................22

*Transperfect Global, Inc. v. MotionPoint Corp.*,
   2013 WL 2299621 (N.D. Cal. May 24, 2013) ..........................................................................24

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
   659 F. 3d 1376 (Fed. Cir. 2011)................................................................................................22

*Vita-Mix Corp. v. Basic Holding, Inc.*,
   581 F.3d 1317 (Fed. Cir. 2009).............................................................................................10, 23

**Statutes**

35 U.S.C. §§ 102 and 103 .......................................................................................................1, 14

35 U.S.C. § 112 ...........................................................................................................................14

**Other Authorities**

Fed. R. Evid. 402.........................................................................................................................33

Fed. R. Evid. 702.........................................................................................................................33

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  ## I.  INTRODUCTION

2      This Court should deny Finjan's motion for summary judgment.  But the Court likely knew

3  that before it even started reading this opposition.  Parties seeking summary judgment generally

4  provide a clear, concise legal theory based on a defined set of undisputed facts.  Finjan, however,

5  did not do this; its motion presented a variety of confusing and facially deficient legal theories based

6  on a convoluted (and easily disputed) set of facts.  Why?  Because Finjan knows full well that it is

7  not entitled to summary judgment on Claim 1 of the '154 Patent, and it is simply trying to again use

8  this Court's "showdown" procedure (improperly) to get claims involving Juniper's SRX products

9  before a jury on an expedited basis.  Indeed, Finjan cares so little about prevailing on this motion

10  that it did not even bother to have its infringement expert—Dr. Michael Mitzenmacher (or his

11  staff)—review the computer containing Juniper's source code while preparing his declaration on the

12  '154 Patent.  This Court should reject Finjan's abuse of the "showdown" procedure.

13      As this Court may recall, during the first round of summary judgment motions Finjan

14  advanced a clear theory of infringement (albeit one the jury ultimately rejected).  By being clear,

15  though, Finjan revealed that its infringement arguments are directed against Juniper's Sky ATP

16  product (alone or in combination with the SRX) but not the SRX alone.  This strategy thus created

17  a major issue for Finjan, as revenues for Sky ATP are minimal.  Finjan tried to overcome this

18  problem by sneaking revenue information for the SRX alone into the case through its damages

19  expert and evidence.  This Court was not fooled, however; first it struck Finjan's damages expert,

20  and later it ruled Finjan was not entitled to any damages.

21      This time, Finjan is using a different tactic to bring SRX-alone evidence into the case.  Rather

22  than presenting a clear infringement case (which would reveal that Finjan has no case against any

23  of the accused products, much less the SRX alone), Finjan has presented an infringement theory so

24  convoluted that—it hopes—the Court will simply allow it to present an SRX-alone theory to a jury.

25  This cynical strategy should fail.  Not only is it an abuse of the summary judgment process, but (as

26  discussed below) the undisputed evidence establishes that Finjan cannot establish a plausible case

27  of infringement against the SRX alone.

28      Moreover, when one is finally able to divine Finjan's infringement theories, it becomes clear

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663

- 1 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  that they are defective—including those against Sky ATP and the ATP Appliance.  All of Juniper's

2  products use a fundamentally different approach to malware analysis than the approach described

3  in the '154 Patent.  Finjan should not be allowed to proceed to trial on any of these claims.

4       This Court should issue an order denying Finjan's request for summary judgment and, at

5  least, bar Finjan from presenting its SRX-only theory to any future jury in this case.

6  **II.    OVERVIEW OF THE '154 PATENT**

7       The alleged invention of the '154 Patent involves two different concepts in computer

8  security: (1) ***where*** code should be inspected to determine if it is safe; and (2) ***how*** to avoid executing

9  unsafe functions by first using another function to check the potentially unsafe function.

10       Figure 1 illustrates the "where" issue.  Figure 1 shows that, in the prior art, code was

11  inspected either at the network gateway (entry point to a computer network) or at the client computer

12  (user's computer) or both (the "content inspector" where such analysis was performed has been

13  outlined in <span style="color:orange">orange</span>, the gateway computer in <span style="color:purple">purple</span>, and the client computer in <span style="color:blue">blue</span>):

14
15
16
17
18
19



20
21
22
23
24
25
26
27

28  According to the '154 Patent, both of these locations were inadequate because (A) hackers can easily

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663

- 2 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

obtain copies of consumer (i.e., client-side) software and reverse engineer the software to design viruses that avoid detection capabilities at the client computer ('154 Patent at 4:15-22), and (B) inspecting software at the network gateway is not secure because some viruses do not exhibit malicious behavior until they reach the client computer. '154 Patent at 3:65-4:8. Because inspecting at both locations does not necessarily solve these problems (*see* Declaration of Aviel D. Rubin ("Rubin") ¶ 17), the '154 Patent proposed a "new" solution: Inspecting potentially malicious code at an entirely different location that it dubbed a "security computer." *See* '154 Patent at 4:23-26.

The '154 Patent's "security computer" is depicted in annotated Figure 2, below. As shown in this figure, and described in the patent, the "security computer" (outlined in **red**) is connected to, but separate from, the client computer:



The second aspect of the alleged invention of the '154 Patent—verifying the safety of a particular function by examining the input to that function—leveraged a well-known set of techniques sometimes referred to as "instrumentation." This approach involves replacing the original, potentially dangerous function the code is trying to execute with a substitute function that

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663

- 3 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    instead causes the computer to inspect and verify the input to the original function.  The '154 Patent

2    illustrates its alleged invention using the example of a potentially dangerous function called

3    `document.write("<h1>hello</h1>")`, which simply displays the word "hello" on a

4    computer screen.   '154 Patent at 10:25.    The patent teaches replacing that function

5    ("`document.write()`") with the substitute function "`Substitute_document.write()`." *Id*.

6    at 10:33-35.  This "substitute" function prevents the original function from operating unless and

7    until it is determined that the original function is safe.  Specifically, when the computer attempts to

8    invoke the original function, it instead invokes the newly replaced "substitute" function,

9    `Substitute_document.write()`.  Rather than display "hello" on the screen, the substitute

10   function examines the input that the original function was going to use (in this case, the text

11   "`<h1>hello</h1>`") to make sure it looks safe.  If (and only if) the computer determines that the

12   input looks safe will it invoke the original function with that input.  *Id*. at 10:48-54.

13         Claim 1 encompasses both the alleged "where" and "how" elements of the '154 Patent.

14   Claim 1 requires the use of a first function (the substitute, security-checking function) to invoke the

15   second function (the original, document.write function) if and only if the "security computer"

16   indicates it is safe to do so.  *See* '154 Patent at 4:55-60 ("the present invention operates by replacing

17   original function calls with substitute function calls within the content, at a gateway computer, prior

18   to the content being received at the client computer.").[1]   The claim language is reproduced below

19   with colored highlighting to identify the corresponding elements from Figure 2:

20         A system for protecting a computer from dynamically generated malicious
         content, comprising:

21         a content processor (i) for processing content received over a network, the
         content including a call to a first function, and the call including an input, and (ii) for

22         invoking a second function with the input, only if a security computer indicates that
         such invocation is safe;

23

24         a transmitter for transmitting the input to the security computer for inspection,
         when the first function is invoked; and

25         a receiver for receiving an indicator from the security computer whether it is
         safe to invoke the second function with the input.

26

27

28   ───────────────
     [1] Another Court in this District has construed the claimed "first function" and "second function" as a
     "substitute function" and "original function, which is different than the first function" (respectively),
     recognizing one of the fundamental premises of the invention of the '154 Patent.  Dkt. 134 at 35-39,
     *Finjan, Inc. v. Cisco Systems, Inc.*, Case No. 5:17-cv-00072-BLF (N.D. Cal. July 23, 2018).

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663                                        - 4 -                    JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
                                                                        '154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**



## III.   CLAIM CONSTRUCTION

Juniper requests that the Court construe the terms "safe" and "content processor."[2]  The construction of these terms has already been briefed, *see* Dkt. 182 at 19-25, and Juniper will not repeat those arguments here.  Rather, the discussion below is designed to correct inaccuracies and address ambiguities that have emerged from Finjan's Motion.

### A.   "Safe"

| Juniper's Proposal | Finjan's Proposal |
|---|---|
| Security profile does not violate the client computer's security policy | Something that is not potentially harmful or malicious |

Contrary to Finjan's assertion, Juniper's construction does not "inject[] entirely new concepts into the claim" (Dkt. 369 at 8), Juniper's construction adopts verbatim the express definition of "safe" that the '154 Patent uses: "***safe, i.e., that the input's security profile does not violate the client computer's security policy***."  '154 Patent at 14:52-54[3]; *see also id.* at, *e.g.*, 11:41-

---

[2] Juniper maintains that the Court must also construe at least the term "invoking a second function with the input."  *See* Dkt. 182 at 22-23.  The parties dispute the meaning of this term and the construction of this term is dispositive, and therefore this term must be construed under *O2 Micro*.  However, for purposes of this summary judgment briefing only and without waiver or admission of any type, Juniper has limited its claim construction arguments to the terms "safe" and "content processor" in accordance with the Court's Order limiting the parties to two terms (Dkt. 219 at 2).

[3] All emphasis is added unless indicated otherwise.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663                                    - 5 -                    JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
                                                                     '154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

43 ("By comparing the input's security profile to client computer's security policy, input inspector determines whether it is safe" (figure numbers omitted)).  The Federal Circuit has made clear that the patentee's use of "i.e." to introduce a term is ***presumptively definitional***.  *Rembrandt Wireless Techs. LP v. Samsung Elecs. Co., Ltd.*, 853 F.3d 1370, 1376 (Fed. Cir. 2017); *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009) ("[U]se of 'i.e.' signals an intent to define the word to which it refers."); *Abbott Labs. v. Novopharm Ltd.*, 323 F.3d 1324, 1330 (Fed. Cir. 2003).  The only exceptions to this rule are situations "where interpreting 'i.e.' as definitional would be internally inconsistent" or "where it would read out preferred embodiments." *Rembrandt Wireless*, 853 F.3d at 1377.  Neither of these limited exceptions are applicable here.

Although Finjan alleges that the "internally inconsistent" exception applies, Finjan never explains why Juniper's construction would be internally inconsistent nor cites to any evidence in support of that argument.  Dkt. 187 (Finjan claim construction reply) at 15.  Instead, Finjan's arguments are actually directed only to the "read out preferred embodiments" exception, because Finjan argues that the '154 Patent "includes examples that do not include any mention of a 'security profile' or 'client security policy.'" *Id*.[4]  But defined terms do not need to be redefined in each embodiment—which is essentially what Finjan is arguing.  Here, Finjan defined the term once in the portion of the specification cited by Juniper, and it was not required to redefine "safe" again. *See* '154 Patent at 14:52-54.  Moreover, there is no indication that the specification's definition of "safe" was limited to the embodiment being discussed, making this case substantially similar to *Edwards Lifesciences*, 582 F.3d at 1334, where the Federal Circuit held "the specification's use of 'i.e.' signals an intent to define the word to which it refers [] and ***that definition was not limited to the embodiment being discussed***.").

    **B.**    **"Content Processor"**

| Juniper's Proposal | Finjan's Proposal |
|---|---|
| Plain and ordinary meaning, which is a processor on a client/user computer that processes modified content | Plain and ordinary meaning, which is a component that processes content |

Juniper's proposed construction of "content processor" reflects the plain and ordinary

---

[4] Finjan also argues in its claim construction reply briefing that Juniper's construction "reads out embodiments where safe is not limited to a 'yes' or 'no.'" Dkt. 187 at 15. This is incorrect, as Juniper argued in its original opposition brief. Dkt. 182 at 24-25.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663

- 6 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   meaning to one of skill in view of the specification and file history.  By contrast, Finjan's proposal

2   is redundant and disregards the patent's express description of the "present invention."

3           The '154 Patent makes crystal clear that the claimed "content processor" resides on a

4   client/user computer.[5]  In particular, the '154 Patent notes that there are numerous disadvantages to

5   prior art systems that perform malware analysis on a gateway.  *Id*. at 1:43-53, 2:31-45.  To try to

6   address these disadvantages, the '154 Patent proposes the following solution, which clarifies that

7   the "client" computer "process[es] network content" and "invokes" the functions in such content:

8           The present invention operates through a security computer that is preferably remote
            from a client computer that is being shielded while processing network content.
9           During run-time, while processing the network content, but before the client
            computer invokes a function call that may potentially dynamically generate
10          malicious code, the client computer passes the input to the function to the security
            computer for inspection, and suspends processing the network content pending a
11          reply back from the security computer.

12   *Id*. at 4:35-46.  The patent also makes clear that the "content" processed by the client computer has

13   been previously modified by the gateway (i.e., the gateway replaces the "original" function with the

14   "substitute" function):[6]  "[t]o enable the client computer to pass function inputs to the security

15   computer and suspend processing of content pending replies from the security computer, ***the present***

16   ***invention operates by replacing original function calls with substitute function calls within the***

17   ***content***, at a gateway computer, prior to the content being received at the client computer."  *Id*. at

18   4:55-60.  Thus, the patent's description of the "present invention" limits the "content processor" to

19   _____

20   [5] Juniper has clarified its construction by adding the term "user" in response to Finjan's new argument
     that the accused products—which are indisputably gateway devices and services—are actually "client
21   computers."  *See* Dkt. 182 at 20.  Specifically, Finjan proposes a meta-construction of "client" as "a
     component system that utilizes services from another component referred to as a 'server.'"  *Id*. at 23.
22   As a result of this new dispute, Juniper has clarified its original construction to make it clear that the
     "client" computer is a user computer, in accordance with the '154 Patent itself.  '154 Patent at, *e.g.*,
23   4:15-23 ("***desktop*** anti-virus protection has a disadvantage of requiring installation of ***client***
     ***software***") and 10:61-62 ("***web browser running on client computer***").  This understanding of
24   "client" computer is the plain meaning of the term to a person of ordinary skill in view of the
     specification (Rubin ¶ 24) and is also the definition provided in the IBM Dictionary of Computing,
25   which Finjan itself relied on during claim construction.  *See* Ex. C ("***client*** (1) ***A user***"); Ex. D (Finjan
     citing the IBM Dictionary); *see also* Ex. E (Newton's Telecom: "A client is a fancy name for a PC
26   on a local area network.  It used to be called a workstation.  Now it is the 'client' of the server.").

27   [6] Juniper has also clarified its construction by making clear that the "content processor" is processing
     "modified content."  This clarification is necessary to address Finjan's new infringement argument
28   that a URL and associated network request constitutes "content."  Dkt. 368-4 at 9-10.  As noted in
     Juniper's Motion to Strike, Finjan did not include this theory in its infringement contentions and thus,
     Juniper was not aware that there was a dispute about the kind of content processed by the content
     processor until Finjan disclosed this new theory in its summary judgment motion.

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663                                            - 7 -                    JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
                                                                             '154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

a processor that is (1) located on the client computer, and (2) processes content that has been modified by the gateway computer. *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016) ("When a patentee 'describes the features of the "present invention" as a whole,' he implicitly alerts the reader that 'this description limits the scope of the invention.'").

### 1.    The Content Processor Is Located On The Client Computer.

The specification repeatedly and consistently describes the "content processor" as being located on the "client computer." '154 Patent at, *e.g.*, 2:64-67 ("Client computer 110 includes a content processor 170, such as a conventional web browser, which processes Internet content and renders it for interactive viewing on a display monitor."); 3:18-24 (distinguishing between a "content inspector" located on a gateway computer and a "content processor" located on the client computer); 9:8-11 ("client computer 210 includes a content processor 270"); 10:61-62 ("Content processor may be a web browser running on client computer 210."); 15:34-37 ("Client computer 410 includes a content processor 470, such as a web browser, which processes content received from the network."). For these (and other) reasons, the PTAB has confirmed that the content processing described in the '154 Patent must occur where the client receives data from the network—i.e., on the client computer: "we conclude that the Specification of the '154 patent uses the claimed 'content' to refer broadly to the data or information, modified for processing, that ***the client*** receives from the network." Ex. P at 13; *see also id.* at 7-10 (content processor resides on a client computer).

### 2.    The Content Being Processed Has Been Modified.

The PTAB has also confirmed that the "content" being processed by the "content processor" is "modified content." In particular, the PTAB explained that "the '154 patent Specification [refers] to three categories of content. First, there is the 'original content' that is scanned and modified at the gateway computer. Second, there is the 'modified content' transmitted to, and received by, the client computer. Third is the 'dynamically generated malicious content' that is generated at runtime and, thus, is undetected by the gateway computer in the 'original content.'" Ex. P at 9. The PTAB further explained that that the "content" being processed in Claim 1 is the "modified content" received at the client/user computer:

> "Because the recited 'first function' is the substituted function whose input is verified, the *claimed* 'content,' in the context of the surrounding claim language,

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations
10644663
- 8 -
JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  must refer to the modified content received at the client computer. *See id*. at 17:39-
2  40 ('transmitting the input [of the first function call] to the security computer for
   inspection, when the first function is invoked'). The claimed content cannot refer to
3  the 'original content' that is received by the gateway computer and over the Internet
   because that content, according to the Specification, would be capable of generating
4  the undetected dynamically generated malicious content from which the client
   computer is to be protected."

5  *Id.* at 10 (emphasis and alterations in original).  Thus, the PTAB has explained that even "under the

6  ***broadest reasonable interpretation*** in the context of the Specification and the surrounding claim

7  language, we conclude that 'content' is data or information, which has been ***modified*** and is received

8  over a network." *Id.* at 14.

9       Finjan's proposal for "content processor"—"a component that processes content"—is as

10 unhelpful as it is incorrect.  Not only does this construction write out the defining features of a

11 "content processor" identified by the PTAB,[7] but it also renders the claim term superfluous:  Claim

12 1 already recites a "content processor [] for processing content," so (substituting Finjan's proposed

13 construction), this term becomes "a component that processes content [] for processing content."  A

14 "claim construction that renders claim terms superfluous is generally disfavored."  *See Cephalon,*

15 *Inc. v. Abraxis Bioscience, LLC*, 618 Fed. App'x 663, 666 (Fed. Cir. 2015).

16      Each of Finjan's arguments against Juniper's proposed construction fails.  First, Finjan

17 misleadingly claims that the term "content processor" has "already been construed to have [its] plain

18 and ordinary meaning in this District."  Dkt. 369 at 6.  But contrary to Finjan's suggestion, none of

19 the other decisions from this District regarding the term "content processor" (all of which have been

20 decided by Judge Gilliam) have adopted Finjan's argument that the plain and ordinary meaning of

21 "content processor" is "a component that processes content" that can be located anywhere in the

22 network and that processes essentially anything—including unmodified URL addresses.  Instead,

23 each of those decisions merely rejected the specific constructions proposed by the respective

24 defendants as being too narrow.  For example, in *Finjan, Inc. v. Proofpoint, Inc.*, 2015 WL 7770208,

25 at *9-11 (N.D. Cal. Dec. 3, 2015), Judge Gilliam rejected Proofpoint's attempt to construe "content

26

---

27 [7] Finjan's proposal ignores the specification's description of "the present invention" as well as the
   PTAB's description of the invention, which is part of the prosecution history.  *See Evolutionary*
28 *Intelligence, LLC v. Sprint Nextel Corp*., 2014 WL 4802426, at *4 (N.D. Cal. Sept. 26, 2014) ("The
   IPR proceedings will also add to the [patent's] prosecution history"); *Aylus Networks, Inc. v. Apple*
   *Inc.*, 856 F.3d 1353, 1361 (Fed. Cir. 2017).

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644463                                   - 9 -                    JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
                                                                    '154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

processor" as a means-plus-function term, noting that "'content processor' has a sufficiently specific structure" because "[t]he specification identifies where the component is located" as well as "its interactions with other components." *Id*. at 11.  In particular, Judge Gilliam cited to the portions of the patent identifying the "content processor" as being located on a "client computer." *Id*. (citing '154 Patent at 9:8-10, 15:33-36, and Figs. 2 and 3).  Thus, Judge Gilliam's opinion actually supports Juniper's position that the "content processor" is located on a client/user computer, not Finjan's argument that it can be located anywhere in the network, including on a gateway.**8**

Finjan's argument that Dr. Rubin took an inconsistent position in a previous IPR is also misplaced.  In fact, in the previous IPR, Dr. Rubin did not even propose a construction for the term "content processor."  Rather, he testified that this term should be given its plain and ordinary meaning.  IPR2016-00151, Ex. 1002 (prior Rubin declaration) at ¶ 29 ("I have interpreted claim terms for which the Petitioner has not proposed a BRI construction [which includes 'content processor'] by giving them the ordinary meaning they would have to the [POSITA]").  This is precisely the position he has taken in this case.  Rubin ¶ 20 ("In my opinion, a POSITA would understand that the plain and ordinary meaning of the term 'content processor' in view of the specification and file history for the '154 Patent is 'a processor on a client/user computer that processes modified content.'").

Finjan next tries to claim that the '154 Patent discloses embodiments where the "content processor" is not located on the "client computer."  Not so.  As noted above, ***every single figure and embodiment*** make clear that the claimed content processor is located on a client computer.  *See also* Dkt. 182 at 20-22.  Several of Finjan's citations refer to the portion of the specification that discuss the "content ***modifier***" that is located on the gateway, not the "content ***processor***" that processes content after it has already been modified by the gateway.  *See, e.g.*, '154 Patent at 6:27-34 (discussing the portion of the system that "replace[s] the call to the original function with a

---

**8** The other decisions that Finjan cites do not support its argument, either.  *See* Dkt. 101 at 19-21, *Finjan, Inc. v. Bitdefender Inc.*, Case No. 4:17-cv-04790-HSG (N.D. Cal. Feb. 14, 2019) (rejecting Bitdefender's similar attempt to construe "content processor" as a means-plus-function claim); Dkt. 170 at 16-19, *Finjan, Inc. v. Symantec Corp.*, Case No. 4:14-cv-02998-HSG (N.D. Cal. Feb. 10, 2017) (rejecting Symantec's attempt to narrow "content processor" to the specific implementation of "software that renders the content for interactive viewing on a display monitor").

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663

- 10 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  corresponding call to a substitute function"); 6:66-7:7 (same).  The remaining citations are simply

2  regurgitations of the claim language for Claims 1 and 4; they do not describe an embodiment where

3  the "content processor" is located somewhere other than the client computer.  *See id.* at 7:8-43.

4  **IV.    JUNIPER DOES NOT INFRINGE CLAIM 1 OF THE '154 PATENT**[9]

5      **A.    <u>Legal Standard</u>**

6      Finjan bears the burden to show that the accused products meet each element of Claim 1.

7  *SynQor, Inc. v. Artesyn Techs., Inc.*, 635 F. App'x 891, 894 (Fed. Cir. 2015) ("The burden to prove

8  infringement rests with the patentee.").  Finjan, as both the moving party and the party bearing the

9  burden of proof at trial, has the "burden of showing the absence of a genuine issue of material fact,"

10  and the "court must afford all reasonable inferences and construe the evidence in the light most

11  favorable to the non-moving party."  *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1323

12  (Fed. Cir. 2009).  If there is a genuine issue of material fact, summary judgment must be denied.

13
14      **B.    <u>Finjan's Infringement Theories Are Insufficient As A Matter Of Law Because The Accused Products Operate In A Fundamentally Different Way Than The '154 Patent Invention</u>**.

15      The accused products are fundamentally distinct from the system disclosed in the '154

16  Patent.  As background, Juniper's SRX is a secure router that can be implemented as a gateway,

17  essentially a gatekeeper located between a customer and the public Internet.  When implemented as

18  a firewall, the SRX will, among other things, look at certain data in the information being sent over

19  the Internet, such as the IP address from which it is being sent, and block data coming from IP

20  addresses that a network administrator has deemed prohibited.  The SRX does not modify any of

21  the content it receives, nor does it instrument (*i.e.*, substitute) any functions for other functions—

22  that is simply not the purpose of the SRX.  In fact, the SRX does not perform any dynamic analysis

23  or invoke any of the functions contained in the content that it receives.  Rubin ¶ 28.

24      A small percentage of SRX customers configure their SRX to interface with Juniper's Sky

25

---

26  [9] Juniper substantively addresses in this opposition only Finjan's arguments regarding infringement
    of the '154 Patent.  However, Juniper does not waive any of its counterclaims or affirmative defenses

27  regarding the '154 Patent, including without limitation, invalidity under §§ 102, 103 and 112, as well
    as unenforceability for inequitable conduct and unclean hands.  *See* Dkt. 218 at ¶¶ 140-170

28  (affirmative defenses) and 188-92, 213-60 (counterclaims).  In the event that the Court orders a trial
    on infringement of the '154 Patent, Juniper maintains that its affirmative defenses and counterclaims
    related to the '154 Patent must also be tried.

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663

- 11 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    ATP cloud-based service.  The following shows a simplified setup for such combination:



7    In Step 1, a client computer requests a file from a Web server.  In Step 2, the Web server returns the

8    file, which passes through the SRX on its way to the client computer.  In Step 3, the SRX sends the

9    file to Sky ATP for analysis.  When Sky ATP receives a file from an SRX after Step 3, Sky ATP

10   checks to see if it has previously analyzed the file.  If the file has been analyzed before, then in Step

11   4, Sky ATP returns a risk "verdict" that it previously calculated.  The SRX then compares that

12   "verdict" to a threshold set by the customer, and if the verdict is lower than the threshold, then in

13   Step 5, the file is allowed through; otherwise, if the verdict is higher than the threshold set by the

14   customer, then the file is blocked.  Rubin ¶ 29.  If Sky ATP has not previously analyzed a file, then

15   Sky ATP indicates to the SRX that it does not have a verdict in Step 4, and the file is forwarded to

16   the client in Step 5.  Meanwhile, Sky ATP proceeds through its multi-stage analysis to determine a

17   verdict for the file, which is returned to the SRX the next time the file is requested.  Like the SRX,

18   Sky ATP does not modify or instrument any of the content it receives.  Rubin ¶ 31.

19        ATP Appliance operates similarly to Sky ATP.  It is a local network appliance that attaches

20   to a router such as the SRX and copies files being downloaded.  When the ATP Appliance receives

21   a copy of a file, it checks if the file has already been analyzed and, if so, the previous analysis is

22   provided to the customer's system administrator to determine what remedial action should be

23   taken.[10]  Otherwise, if the file has not been seen before, then the ATP Appliance's "SmartCore"

24   engine performs a multi-stage analysis of the file that includes, among other things, "static analysis"

25   and "dynamic analysis" similar to those performed by Sky ATP.  Also like Sky ATP (and the SRX),

26   the ATP Appliance does not modify or instrument any of the content it receives.  Jas ¶ 3.

27

---

28   [10] Because the ATP Appliance is not "in line," it does not block files on their way to the user; rather, all files are passed along to the user (absent some other mechanism to implement blocking) and the network administrator later remedies the situation.  Jas ¶ 3.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

10644463

- 12 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

1    None of the accused products infringe the '154 patent because they are not client/user

2  computers and thus do not contain "content processors" within the meaning of Claim 1.  The SRX

3  is, as its full name "SRX Series Services *Gateways*" implies, a gateway.  *See* Ex. F; Rubin ¶ 37.

4  Indeed, Finjan even admits that the SRX is not a "client" computer but rather sits in between the

5  "client" computer and web servers.  *See* Dkt. 368-4 at 13 ("[T]he SRX gateway is *in-between the*

6  *client computer* and the server").  Sky ATP is a cloud-based service hosted by Juniper (primarily

7  on Amazon's servers), and therefore Sky ATP is also not a client/user computer.  *See* Rubin ¶ 37.

8  And the ATP Appliance is a specialized add-on to network routers for system administrators, not

9  users.  Jas ¶ 3.  Therefore, none of the accused products infringe because none of them contain

10  "content processors," which must be located on client/user computers under the proper construction.

11    The accused products also do not infringe because there is no modification of content or

12  instrumentation of functions at any point in the system, so none of the components process

13  "modified" content, as required by the plain language of Claim 1.  Rubin ¶ 38; *see also supra* (*e.g.*,

14  Ex. P at 10: "the claimed 'content,' in the context of the surrounding claim language, must refer to

15  the *modified* content received at the client computer").  Thus, the functionality of the accused

16  products is fundamentally different from that disclosed or claimed in the '154 Patent.

17    Because of the fundamental differences between the accused products and the '154 Patent,

18  Finjan was forced to assert contorted theories of infringement that are markedly different from the

19  technology of the '154 Patent.  Finjan asserts infringement theories that do not involve any function

20  substitution or any modification of the content whatsoever.  Instead, Finjan's infringement theories

21  are directed to the basic concepts of (1) URL filtering, which is the idea of checking URLs or files

22  against a list of URLs that are known to be malicious and then allowing or blocking communications

23  with the URL, or (2) malware analysis at a gateway where a file is allowed or blocked depending

24  on the results of static or dynamic analysis.  Finjan did not invent these types of malware analysis,

25  however, which were well known long before the priority date of the '154 Patent.

26    For example, U.S. Patent No. 6,721,721 ("Bates"), which was filed in June 2000 (more than

27  half a decade before the '154 Patent's priority date), disclosed technology mapping precisely to

28  Finjan's infringement theory.  In particular, Bates taught a content processor for processing content

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

10644663

- 13 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

received over a network, the content including a call to a first function, and the call including an input (under Finjan's interpretation these terms).  *See, e.g.*, Bates at 12:45-51 ("Web crawler 42 begins in block 80 by obtaining a new URL to be checked.  Typically, selection of a new URL in block 80 is made via a web crawling protocol….  For example, obtaining a new URL may be via the selection of a URL referenced in a hypertext [i.e., HTTP] link….").  Bates also taught a transmitter for transmitting the input to a security computer for inspection, when the first function is invoked, and a receiver for receiving an indicator from the security computer whether it is safe to invoke the second function with the input (again, under Finjan's interpretation of these terms).  *See, e.g.*, Bates at 15:33-36 ("URLs [are] provided to the virus checker by the virus check controller of computer 30….") and 8:40-47 ("[O]ff-loading responsibility for virus checking may be provided through other, third-party computers….  Such functionality is illustrated in FIG. 1 by virus checker 52, which performs virus checking of files accessible by computer 50, and reports virus status information back to virus check controller 44….").  Finally, Bates taught invoking a second function with the input only if a security computer indicated that such invocation is safe (again, under Finjan's interpretation of these terms).  *See id.* at 17:16-23 (If "the packet is a 'good' packet from a virus checker, [] control therefore passes to block 182 to update or create a URL record in the virus database for the URL associated with the packet, indicating that the URL has been found to be trustworthy….").  In short, Finjan's infringement theory is directed to the same technology disclosed in Bates, as well as many other pieces of prior art related to URL filtering, thus demonstrating that Finjan's interpretation of the claim cannot be correct.  *See* U.S. Patent App. No. 10/888,370 (July 2004) at, *e.g.*, ¶¶ 48-49 ("[T]he URL classifier passes the content of the message…to remote tools for determination of the confidence" that the message is unsafe. The "results of the URL processing by the URL classifier 160 is a URL score (such as a score from 1 to 10 or the like that indicates how likely it is that the URL is bad….  The URL blacklist or database 140 may [then] be updated").

Similarly, Claim 1 cannot be interpreted to encompass Finjan's alternate theory of allowing/blocking a file based on the results of malware analysis that occurs on a gateway computer because even the '154 Patent notes that this is how the prior art worked: "U.S. Patent. No. 6,092,194 …describes gateway level behavioral analysis.  Such behavioral analysis scans and parses content

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663

- 14 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

received at a gateway and generates a security profile for the content…. The derived security profile is then compared with a security policy for the computer being protected, to determine whether or not the content's security profile violates the computer's security policy." '154 Patent at 1:65-2:15; *see also* 1:43-51, 2:46-3:30, and Fig. 1 (describing prior art system that analyzes the content at a gateway and prevents it from being sent to the client if it is deemed to be malicious). And such technology is in fact found throughout the prior art. *See, e.g.*, U.S. Patent Application No. 10/360,514 (filed February 2003) at, *e.g.*, Fig. 6 and ¶ 13 (Teaching "sending content to a network server from a digital rights management (DRM) agent executing within the terminal, scanning the content at the network server to identify viruses that match virus signatures provided by a virus definition repository, and providing a scan result from the network server to the DRM agent. In one embodiment, access to the content is regulated in response to the scan result.").

Thus, Finjan's infringement theories are deficient as a matter of law. It is improper for Finjan to assert Claim 1 in a manner that is so inconsistent with the patent's specification and that clearly ensnares the prior art.[11] The Court should reject Finjan's explicit and implicit claim constructions, and deny Finjan's Motion due to its abject failure to comport with the actual technology of the '154 Patent.

**C.**   **Finjan Has Not Established That The SRX Infringes Claim 1 As A Matter Of Law Under Any Plausible Construction Of The Claim.**

Even if one accepts Finjan's twisted theory that the basic actions of URL filtering and malware analysis on a gateway could read on Claim 1—which they do not—Finjan has not established it is entitled to summary judgment that the SRX infringes. Finjan presents two theories for the SRX, both of which identify the SRX as the alleged "content processor" and either ATP Appliance or Sky ATP as the alleged "security computer." Ex. B (Mitzenmacher) at 31:9-32:10.

- **Theory 1**: Finjan alleges that the "content received over the network" is a URL address plus the network request information (e.g., information about the browser), and the "call to a first function" is a call to open a link denoted by the "http://" prefix where "the input" is the URL

---

[11] There is no written description support in the specification to show that the inventors of the '154 Patent had possession of the invention as construed and asserted by Finjan, so the claim is also invalid under § 112 when construed in accordance with Finjan's infringement theory. *See Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005). Moreover, Finjan's infringement theory renders the patent invalid over the prior art under 35 U.S.C. §§ 102 and 103, including the prior art discussed herein.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663                                        - 15 -                    JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
                                                                          '154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    address.  Ex. B at 47:15-48:20.

2    •   **Theory 2**: Finjan alleges that the "content received over the network" is a file that has

3    "embedded scripts" such as "unescape() or document.write() functions."  According to Finjan,

4    these "embedded scripts" are the "first function" and the "input" is a "URL or an IP address" or

5    "the file hosted by the URL/IP address."  Dkt. 368-4 (Motion) at 10; Ex. B at 32:11-33:21.

6    In both theories, the "second function" is either the SRX's decision to allow communication with a

7    particular URL, or its decision to allow a file to be sent through to the end user, and the verdict that

8    SRX receives from Sky ATP or ATP Appliance is the "indicat[ion] that such invocation is safe."

9    Ex. B at 63:17-64:3; Dkt. 368-4 at 11-12.  Both theories are fundamentally flawed.

10          **1.       Finjan Has Not Established That The SRX Meets Claim 1(a).**

11         The first element of Claim 1 requires "a content processor for processing content received

12    over a network, the content including a call to a first function, and the call including an input, and

13    for invoking a second function with the input, only if a security computer indicates that such

14    invocation is safe."  As noted above, the SRX is not a "content processor" within the meaning of

15    Claim 1 because it is not located on a client/user device, and it does not process modified content.

16    Even if it were a "content processor," however, Finjan has not met its burden to show that the SRX

17    indisputably meets each of the other limitations of Claim 1(a).

18              **(a)      Finjan Has Not Established That SRX "Process[es] Content Received Over A Network, The Content Including A Call To A First Function"**

19

20         Finjan argues that the content received over a network and processed by the SRX "includes

21    [1] requests for communicating with a server (e.g., to obtain a file), as well as [2] web content such

22    as web pages, which include scripts or links to malicious executables or files."  Dkt. 368-4 (Motion)

23    at 10.  Finjan has failed to meet its burden with respect to both of these options.

24         As to "requests for communicating with a server (e.g., to obtain a file)," Dr. Mitzenmacher

25    clarified that the "first function" within such content is the request that is typed into the user

26    computer's web browser.  Ex. B at 35:22-36:2 ("Q. so you're saying that in one scenario, your

27    pointing to the address that an end user types into their browser as the first function; is that fair?  A.

28    Yes.  That is the function calling for content.").  But that "request[] for communicating with a server"

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663

- 16 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   is plainly not received over a network by the content processor, rather it comes from the user

2   computer itself. Dr. Mitzenmacher even admitted that the alleged "get" function to obtain content

3   from a server resides in the code for the browser on the user's computer, not in any content received

4   over a network. *See* Ex. B at, *e.g.*, 36:5-8 ("Q: And is the get command or the get packet, is that

5   part of the code for the [web] browser? A: That would be one way that it could be instantiated.").

6   Thus, the alleged call to a function "for communicating with a server" is not part of the "content

7   received over the network" and does not satisfy the claim. Rubin ¶ 44.

8        Moreover, the user's "request[] for communicating with a server" identified by Finjan is not

9   even a "function." Finjan argues that the claimed "first function" is "a call to open a link ***denoted***

10  ***by the 'http://' prefix***," which "is a directive in the HyperText Transfer Protocol for a computer to

11  access Internet content." Dkt. 368-4 at 10. But the "'http://' prefix" is simply not a "function" that

12  can be invoked. Rubin ¶¶ 45-46. Instead, the prefix "http://" is nothing more than part of an address.

13  *Id.* "HTTP" is short for Hypertext Transfer Protocol. Ex. G at 1. HTTP is, as its name implies, a

14  protocol, which is just a set of rules used to facilitate the exchange of information. *Id.* at 7. The

15  HTTP protocol is one type of "scheme" that is incorporated into the beginning of the address used

16  to find resources on the Internet, known as a Uniform Resource Identifier (or URI),[12] as shown

17  below in the Internet Engineering Task Force's definition of URIs:

18

19

20

21

```
The generic URI syntax consists of a hierarchical sequence of
components referred to as the scheme, authority, path, query, and
fragment.

   URI         = scheme ":" hier-part [ "?" query ] [ "#" fragment ]

   hier-part   = "//" authority path-abempty
               / path-absolute
               / path-rootless
               / path-empty
```

22  Ex. H at 16. As shown above, URIs are defined such that the scheme is followed by a colon and

23  then two forward slashes, yielding the prefix "http://" (which is then followed by the rest the address,

24  such as the path). The scheme, such as HTTP, is used to understand the syntax of the remaining

25  portions of the URI address. Rubin ¶¶ 45-46. Thus, the prefix "http://" is no more than part of an

26  address, and an address is not a function. *Id.*

27        The fact that the "http://" prefix is not a function further undermines Finjan's argument that

28

---

[12] A Uniform Resource Locator (URL) is just a subset of URIs. Ex. H at 7.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663                              - 17 -                  JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
                                                                    '154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   the SRX even receives "content" within the meaning of the patent.  Dr. Mitzenmacher clarified that

2   the alleged "content" in this scenario is merely a URL address and the corresponding network

3   request information, such as the web browser's version.  Ex. B at 47:9-48:20.  But as the PTAB

4   noted, the "content" of Claim 1 must be the "modified content" that includes "a call to a first

5   function"—i.e., a call to a substitute function (*see* Ex. P at 10)—so a mere URL and associated

6   network request information does not satisfy this element.  More generally, a person of ordinary

7   skill would not understand metadata and similar network information to be within the scope of the

8   claimed "content" precisely because the claimed content must be capable of including functions

9   within it.  Rubin ¶ 47.

10         As to "web content such as web pages which include scripts or links to malicious executables

11   or files," Finjan has not established that the SRX actually contains functionality to process such

12   content.  Finjan claims that the "SRX Gateways processes the received network traffic and extracts

13   HTTP objects associated with files and HTML pages."  Dkt. 368-4 at 10.  But Finjan cites only two

14   pieces of evidence for this assertion: (1) Exhibit 4 (Dkt. 368-12); and (2) Exhibit 9 (Dkt. 368-18).

15   The problem for Finjan is that Juniper never actually implemented the extraction feature that is

16   discussed in Exhibit 4, which is a development document, partly because Juniper determined that it

17   would require too much memory.  Jas ¶ 5.  And, Exhibit 9 does not support Finjan's argument.

18   Instead, it makes clear that SRX "submits files" to Sky ATP for analysis, not that the SRX processes

19   any content within the packets it routes (where any "call[s] to a first function" would actually reside).

20         Indeed, the SRX does not process the content of any web pages (or other files) it receives

21   because that is not its purpose; the SRX merely routes packets to their intended destination or blocks

22   them as appropriate.  By way of analogy, the SRX is similar to a sophisticated toll booth responsible

23   for the flow of traffic at a border: The SRX does not ask the cars on the road what they specifically

24   plan to do at their destination, it primarily just ensures that the cars have permission to enter.  Rubin

25   ¶ 48.  The SRX does not contain functionality to dynamically analyze or otherwise execute files.

26   *Id.*  Indeed, even Finjan's own expert admitted that the SRX does not invoke code contained in the

27   files that it processes.  *See* Ex. B at 50:4-7 ("Q: Is it your understanding that the SRX invokes code

28   that's embedded in a file that it's processing?  A: I don't believe so."); *see also* Ex. I at 17:22-23

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

10644663                                      - 18 -                    JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
                                                                       '154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1 ("SRX doesn't do any file analysis on the box – on the SRX platform."). Thus, in the scenario

2 where the alleged "content" is "web content such as web pages," Finjan has not demonstrated that

3 the SRX actually processes such content as required.

4                   **(b)**       **Finjan Has Not Established That The SRX Invokes A "Second Function With The Input"**

5       Finjan argues that the SRX "invokes a second function with the URL or IP address (i.e., the

6 input) by allowing or blocking a communication with the inspected URL or IP address" or

7 alternatively that it can "invoke a second function with the file (i.e. the input) hosted at the URL or

8 IP address by forwarding or blocking the file." Dkt. 368-4 (Motion) at 11.[13] Finjan has again failed

9 to meet its burden with respect to both options.

10       With respect to allowing communication with a particular URL/IP, neither Finjan nor its

11 expert identify any SRX source code that actually contains this function. Rubin ¶¶ 53-55. As such,

12 Finjan has not met its burden to show that this alleged function meets the claim requirements.

13       Finjan's theory involving the alleged "second function" of forwarding a file fairs no better.

14 As an initial matter, Finjan never even alleges that the "forward" function is invoked with the same

15 input of a URL/IP address that Finjan identified for the alleged "first function." Rather, Finjan

16 argues that the "forward" function is invoked with the input of "the ***file***." Dkt. 368-4 at 11.[14] But

17 Finjan's has not identified any "first function" that accepts a "file" as its input; the only specific

18 "first functions" identified by Finjan are the "http://" prefix, unescape(), and document.write(), and

19 none of them are alleged to be invoked with anything other than a URL or IP address as an input.

20 Dkt. 368-4 at 10. Thus, Finjan has not even established a *prima facie* case of infringement, much

21 less established it is entitled to summary judgment. *L & W, Inc. v. Shertech, Inc.*, 471 F.3d 1311,

22 1318 (Fed. Cir. 2006) ("When a patentee with the burden of proof seeks summary judgment of

23

---

24 [13] "Blocking" a communication or file cannot comprise the claimed "second function" because blocking occurs when communications or file are ***not*** safe, and the claim requires that the second
25 function is invoked "only if a security computer indicates that such invocation is ***safe***." Dr. Mitzenmacher thus conceded at his deposition that any alleged "blocking" function would not meet
26 the claim requirements. Ex. B (Mitzenmacher) at 63:17-64:3.

27 [14] Dr. Mitzenmacher took the position that a file, the URL/IP address at which it is hosted,  and even its hash are "the same" for purposes of the claim. Ex. B at 42:23-44:18. This is nonsensical; each of
28 these components would be require different amounts of space and would require different operations to act upon them; for example, the "get" function identified by Dr. Mitzenmacher is used with a URL, not with a hash or a file. Rubin ¶ 52.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663        - 19 -        JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    infringement, it must make a prima facie showing of infringement as to each accused device before

2    the burden shifts to the accused infringer to offer contrary evidence," which includes providing

3    "evidence sufficient, if unopposed, to prevail as a matter of law").

4         In fact, Finjan failed to identify any source code that actually comprises the alleged "second

5    function" of allowing or forwarding a file.  Dr. Mitzenmacher admitted this at his deposition. Ex. B

6    at 67:5-9 ("Q. But that function that you're pointing to for the second function is not included in the

7    source code that you've cited in your report?  A. What I'd say is that – like I didn't put in the sending

8    function itself.").[15]  It is not surprising that Finjan omitted the alleged "second function" source code

9    from its submission to the Court because it demonstrates that the function that "allows"

10   communications or files does ***not*** use the URL, IP address, or even the file as an input.  Rubin ¶ 56.

11   In particular, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ function (one of the main functions in charge of allowing

12   or blocking files based on Sky ATP's verdict) does not use a URL, IP address, or file as an input, as

13   shown in the definition of the function excerpted below (Ex. J at ll. 3550):

14   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15           **(c)     Finjan Has Not Established That The "Second Function" Is
                       Invoked "Only If A Security Computer Indicates That Such
16                     Invocation Is Safe."**

17        With respect to this limitation, Finjan claims that the SRX only allows communication with

18   a URL / allows a file to be sent to a client if Sky ATP or ATP Appliance indicate that the file or

19   communication is safe via a "verdict."  Dkt. 368-4 at 11-12.  The alleged "verdict" does not satisfy

20   this limitation for at least three reasons: (1) the verdict indicates whether a ***file*** is likely to be

21   malware, not whether a ***function*** is malicious; (2) the verdict does not meet the proper construction

22   of "safe"; and (3) neither of the second functions identified by Finjan are invoked "only if" Sky

23   ATP or ATP Appliance indicates that such invocation is "safe."[16]

24        First, the verdicts returned by Sky ATP and ATP Appliance apply to entire files.  Rubin ¶ 59.

25

26   [15] Even if Finjan's source code citations did identify a "second function"—which they do not—none
     of them pertain to the ATP Appliance, *See* Dkt. 368-6 at ¶¶ 26, 33-35, 66, 84; Dkt. 368-28 at 342-44,
27   379-80.  As such, Finjan clearly has not satisfied its burden with respect to how the SRX allegedly
     invokes a second function with the input only if ATP Appliance indicates that such invocation is safe.
28   [16] Finjan vaguely alleges that Sky ATP and ATP Appliance return "threat intelligence data feeds,"
     but Finjan does not clearly articulate how this would map to the claim.  Dkt. 368-4 at 12.  All of the
     arguments in this section would apply with equal force to any such "threat intelligence data feeds."

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663                              - 20 -                    JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
                                                               '154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    But Claim 1 requires that the indication returned by the security computer be tied to the invocation

2    of the "second *function*."  Because Sky ATP and ATP Appliance do not render verdicts at the level

3    of specific functions, their verdicts cannot satisfy this element of the claim.  *Id.*

4         Second, the alleged security computers do not return an indication of whether invoking the

5    second function is "safe" as properly construed.  As discussed above, the proper construction of the

6    "safe" is the "security profile does not violate the client computer's security policy."  Neither Sky

7    ATP nor ATP Appliance determine whether a file violates the client computer's security policy, as

8    neither of these alleged security computers are even aware of the client computer's security policy.

9    Rather, the client's security policy is kept locally on the client's SRX, so only the SRX is able to

10   make a determination as to whether the verdict violates the client computer's security policy.  Rubin

11   ¶ 60.  Neither of the alleged security computers are even capable of comparing their calculated

12   verdicts against a client computer's security policy, so the alleged security computers cannot

13   transmit an indication of whether it is "safe" to invoke the second function.

14         Finally, the alleged second functions of "allowing" a communication with a URL or allowing

15   a file to be sent to the user is not invoked ***only if*** a security computer indicates that such invocation

16   is safe—even under Finjan's own proposed construction of "safe"—which is "something that is not

17   potentially harmful or malicious."  For example, when the SRX is not configured to interface with

18   Sky ATP or an ATP Appliance, the SRX will allow the file without regard to any verdicts or threat

19   intelligence data.  Rubin ¶ 61.  The SRX does have a Unified Threat Management (UTM) module

20   that is capable of filtering communications with URLs and files, but this module is independent

21   from the code on the SRX used to interface with Sky ATP or the ATP Appliance, and the UTM

22   enhanced web filtering feature would operate regardless of whether the SRX is even configured to

23   receive anything from Sky ATP or an ATP Appliance.  *Id.*  Indeed, the URL filtering functionality

24   simply does not involve querying either of the alleged "security computers" (i.e., Sky ATP or ATP

25   Appliance) for information about the URL/IP address.  *Id.*  As another example, the first time a

26   sample is seen by Sky ATP or ATP Appliance, the SRX will allow the sample regardless of whether

27   it is potentially harmful or malicious because there is no verdict for the file.  *Id.* ¶ 62.  Dr.

28   Mitzenmacher seemingly acknowledges that Sky ATP returns a "no verdict score" when there is

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663

- 21 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    "not enough sufficient information" and that a file with a "no verdict score" would be allowed

2    through.  Ex. B at 91:12-93:9.[17]

3                    **2.      Finjan Has Not Established That The SRX Meets Claim 1(b).**

4            The second limitation of Claim 1 requires "a transmitter for transmitting the input to the

5    security computer for inspection when the first function is invoked."  Finjan has not met its burden

6    on this element for two independent reasons, detailed below.

7                    **(a)      The SRX Does Not Contain A "Transmitter" For Performing
                              The Claimed Function Until A Customer Alters The SRX.**

8
            The system components recited in Claim 1 must be understood as actually capable of

9
     performing their stated function and not as merely generic computing components.  *See, e.g.*,

10
     *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F. 3d 1376, 1380-81 (Fed. Cir. 2011) (upholding a

11
     construction of "memory *for* storing" as a "memory *that must perform the recited function*").

12
     Therefore, the claimed "transmitter" must actually be capable of "transmitting the input to the

13
     security computer" in order for the SRX to be found to infringe the '154 Patent.

14
            The SRX by itself, however, has only a generic transmitter and not a transmitter capable of

15
     "transmitting the input to the security computer."  For the SRX to work with Sky ATP or ATP

16
     Appliance (Finjan's alleged "security computers"), the customer must download code onto the SRX

17
     that is not present on the SRX when shipped.  In particular, for the SRX to interface with Sky ATP,

18
     the customer must first download a Junos OS operation script that in turn downloads and installs

19
     certificate authority licenses, creates local certificates, and modifies the configuration settings on

20
     the SRX itself.  *See* Ex. K.  Likewise, in order for the SRX to interface with an ATP Appliance, the

21
     customer must first modify the device by downloading an executable (SLAX) script to complete

22
     various configuration steps.  *See* Jas ¶ 4.  Because the SRX does not have all the code necessary to

23
     interface with Sky ATP or ATP Appliance and must be materially modified to transmit anything to

24
     these alleged security computers, the SRX cannot infringe alone.  *Telemac Cellular Corp. v. Topp*

25

26

---

27   [17] Dr. Mitzenmacher contends that "a no verdict score" allegedly indicates "a policy decision that the file is deemed sufficiently safe that it can be returned to the user."  Ex. B at 91:12-93:14.  But Dr.

28   Mitzenmacher's contention is not based on any evidence of such a "policy decision" and also conflicts with Finjan's claim construction position which requires a determination that invoking the function "is not potentially harmful or malicious" (Dkt. 176 at 20).  A no verdict indication is not a determination that the file "is not potentially harmful or malicious."

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663                                      - 22 -                    JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
                                                                        '154 PATENT (Case No. 3:17-cv-05659-WHA)

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

*Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001) ("[A] device [that] is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement."); *Nazomi Comm'cns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (affirming summary judgment of non-infringement where products "do not infringe without modification").

This requirement that the SRX be materially modified by adding new code before its "transmitter" is capable of "transmitting the input to the security computer" is a key distinguishing fact between Claim 1 of the '154 Patent and the claims at issue in *Finjan, Inc. v. Secure Computing Corp.*, 626 F3d. 1197, 1204-05 (Fed. Cir. 2010), where the Federal Circuit held that "Finjan's non-method claims describe capabilities without requiring that any software components be 'active' or 'enabled.'" In that case, the Court found that the system claims could be infringed in the same way that "an automobile engine for propulsion exists in a car even when the car is turned off." *Id*. at 1205. That holding was based on the fact that the complete infringing code was found on the defendant's product as sold and all that was required to use that code was to purchase a key to unlock the module. *Id*. at 1203. By contrast, the SRX's transmitter is not capable of "transmitting the input to the security computer" unless and until new software components not present on the SRX alone are added. Therefore, at a minimum the SRX cannot be found to infringe alone, and only those SRX units that have actually been configured to interface with Sky ATP or the ATP Appliance could even theoretically be found to infringe (assuming the Court rejects all of Juniper's other arguments).

**(b)    SRX Does Not Transmit "The Input" to Sky ATP or ATP Appliance "When The First Function Is Invoked."**

As to SRX devices that have been configured to work with Sky ATP or ATP Appliance, Finjan still has not met its burden to establish that "the input" (i.e., the URL or IP address) is transmitted to Sky ATP or ATP Appliance "when the first function is invoked" under either of the theories Finjan proposes: that transmission occurs (1) when a "client computer is iteratively loading a web page"[18] or (2) "when it [the SRX] downloads a file referenced by a link or when it extracts an HTTP object through de-obfuscation." Dkt. 368-4 (Motion) at 13.

In the scenario where the client computer invokes the "first function," the SRX cannot

---

[18] Finjan has presented no evidence that any user has ever actually "iteratively load[ed] a web page," and therefore has failed to meet even its initial burden of production. *Vita-Mix*, 581 F.3d at 1323.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663                                     - 23 -                    JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
                                                                        '154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   infringe because any potential infringement would be divided between Juniper and its customers.[19]

2   "[P]roof of an infringing 'use' of the claimed system under § 271(a) requires the patentee to

3   demonstrate that the direct infringer obtained 'benefit' from *each and every element* of the claimed

4   system. In addition, the direct or indirect control required 'is the ability *to place the system as a*

5   *whole into service*.'" *Intellectual Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1329

6   (Fed. Cir. 2017) (citations omitted).  Juniper does not benefit from every element of the claimed

7   system because the user, not Juniper, invokes the "first function" and the user, not Juniper, would

8   be protected by the system in the event that the "first function" of iteratively loading a web page is

9   not safe.  Additionally, it would be the user, not Juniper, that has the ability to place the system as a

10  whole into service because no safety inspection occurs unless and until the first function is invoked

11  by the user.  *See* '154 Patent at Claim 1 ("transmitting the input to the security computer for

12  inspection, *when the first function is invoked*").  Therefore, infringement for "using" the claimed

13  system would be divided between Juniper and its customers.  *See Motorola*, 870 F.3d at 1329.

14  Likewise, infringement for "making" the claimed system would also be divided between Juniper

15  and its customers.  And, because Juniper does not "make" the claimed system, it also cannot "sell,"

16  "offer to sell," or "import" the claimed system.

17          In *Centillion Data Sys. LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1288 (Fed. Cir.

18  2011), the Federal Circuit held that, in order to "make" a system, the accused infringer "would need

19  to combine *all* of the claim elements."  It then held that infringement was divided between the

20  defendant and its customers in part because it was the defendant's customers, not the defendant, that

21  "install[ed] the client software." *Id.*  The same applies to the present situation where it would be the

22  user, not Juniper, that installed a web browser in order to invoke the alleged "first function" of

23  iteratively loading a web page.  Finjan has not presented any evidence that the acts of an unidentified

24  "user" are attributable to Juniper, so this infringement scenario fails as a matter of law because any

25  potential infringement would be divided.  *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d

26  1020, 1022-23 (Fed. Cir. 2015) ("To determine if a single entity directs or controls the acts of

27  another," the infringer must act through an agent or "condition[] participation in an activity or

28  _____

[19] Finjan cannot contend that Juniper's infringement is indirect in this scenario because Finjan's indirect infringement allegations were dismissed.  Dkt. 30 at 8.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663

- 24 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  receipt of a benefit upon performance of a step or steps of a patented method and establishes the

2  manner or timing of that performance.").

3     The SRX also does not infringe in the scenario where the client computer "iteratively load[s]

4  a web page" because the input is not transmitted to the alleged security computers ***when the first***

5  ***function is invoked***, rather it is transmitted long after.  Claim 1 requires transmitting the input

6  when—i.e., ***at which time***—the first function is invoked.  *Transperfect Global, Inc. v. MotionPoint*

7  *Corp.*, 2013 WL 2299621, at *4 (N.D. Cal. May 24, 2013) (holding that "'when' should be given

8  its temporal meaning (i.e., 'at which time')" which is "commonly recognized by many English

9  dictionaries. *See, e.g.*, Webster's 3d New Int'l Dictionary 2062 (Philip B. Gove ed., 1993).").  This

10  understanding of "when" as requiring contemporaneous transmission was relied upon by Finjan

11  during IPR, where Finjan argued that the prior art did not teach transmitting "when" the first function

12  was invoked because the transmission was "not ***as a result of*** invoking a first function."  Ex. R at

13  27.  It is further reinforced by the description of the invention in the patent itself.  The patent teaches

14  incorporating a call to transmit the input into the definition of the substitute (i.e., "first") function

15  itself, such that transmission of the input occurs at the time the "first" function is invoked:



20  '154 Patent at 9:45-53; *see also* 10:62-64 ("***When*** content processor invokes the substitute function

21  call[,] the input is passed to the security computer for inspection." (figure numbers omitted)).  By

22  contrast, when a client computer tries to "load[] a web page," the requested URL is first sent to the

23  SRX, then the SRX relays the request to the Web server, then the Web server calls a separate

24  function to return the requested web page to the SRX, the SRX checks the configuration settings to

25  see if the customer has configured the device to send that particular file type to Sky ATP or ATP

26  Appliance, and only after all of that does the SRX actually transmit anything to the alleged security

27  computer (assuming the customer has signed up for Sky ATP or ATP Appliance and downloaded

28  the relevant scripts).  Rubin ¶ 70.  The claim does not read "transmitting the input to the security

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663                                                   - 25 -                    JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

1    computer for inspection long *after* the first function *and other, distinct functions* are invoked."

2    Therefore, Finjan's theory is facially deficient.

3          Nor has Finjan established that the second scenario—where the SRX allegedly "downloads

4    a file referenced by a link or when it extracts an HTTP object through de-obfuscation"—occurs at

5    all, let alone that "the input" is transmitted when those first functions are invoked.  As an initial

6    matter, the evidence upon which Finjan relies to assert that the SRX is capable of downloading files

7    referenced by links or extracting objects is Exhibit 4 (Dkt. 368-12), which, as discussed above,

8    describes a functionality that was never actually added to the SRX.  Dkt. 368-4 at 14.  Moreover,

9    Dr. Mitzenmacher admitted that the SRX does not actually invoke any functions within the content

10   it receives.  *See* Ex. B at 46:16-19 ("Q: Is it your understanding that the SRX invokes code that's

11   embedded in a file that it's processing? A: I don't believe so."); *see also* Ex. I at 17:22-23 ("SRX

12   doesn't do any file analysis on the box -- on the SRX platform."); Dkt. 96-2 (prior Rubin declaration)

13   at ¶¶ 62, 83 (similar testimony).  Indeed, the SRX cannot invoke any functions contained in the

14   content (such as an "embedded script") because the SRX inspects packets, not file content, so the

15   SRX is unaware of whether the content even contains any "embedded script" functions.  Rubin ¶¶

16   72-74.  Additionally, this theory suffers from the same timing-related deficiency described above,

17   namely that "the input" is not transmitted at the time that first function is invoked.

18         **3.**      **Finjan Has Not Established That The SRX Meets Claim 1(c).**

19         The final limitation requires "a receiver for receiving an indicator from the security computer

20   whether it is safe to invoke the second function with the input."  Finjan has not met its burden on

21   this element, either.  As an initial matter, Finjan does not identify any SRX component in its brief

22   that allegedly constitutes a "receiver" and has thus failed to set forth a *prima facie* case of

23   infringement.  Dkt. 368-4 at 14.  Moreover, the SRX is not capable of receiving any verdicts from

24   Sky ATP or ATP Appliance unless the customer chooses to configure the device by downloading a

25   script, as described under Claim 1(b) above.  Additionally, the verdict/threat intelligence feeds

26   identified by Finjan as meeting this claim element do not constitute an "indicator" as to "whether it

27   is safe to invoke the second function with the input."  See *supra*, Claim 1(a); Rubin ¶¶ 76-79.

28         **D.**      <u>**Finjan Has Not Established That Sky ATP Infringes Claim 1.**</u>

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663

- 26 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    Finjan presents two separate infringement theories for Sky ATP.  Finjan first alleges that the

2    dynamic analysis portion of the Malware Analysis Pipeline ("content processor") processes HTTP

3    objects ("content") that contain a call to open a link denoted by the "http://" prefix ("call to a first

4    function") using a URL or IP address ("input").  Dkt. 368-4 at 16.  The Malware Analysis Pipeline

5    allegedly sends the URL/IP address to the Reputation Server ("security computer"),[20] which returns

6    a "JSON result" indicating whether the URL/IP address is safe."  *Id.*  In the second theory Finjan

7    alleges that the dynamic analysis portion of the Malware Analysis Pipeline ("content processor")

8    processes objects that include HTML/JS scripts that have unescape() or document.write() functions

9    ("call to a first function") using "a sample file or information in the file, such as features extracted

10   from the content (e.g. links, functions, scripts, or other code)" ("input").  These alleged inputs are

11   sent to the Verdict Engine ("security computer"), which returns a verdict.  *Id.* at 17.  In both theories,

12   Finjan alleges that the "second function" is either (1) adding the URL/IP address to the whitelist, or

13   (2) deciding whether to do an "early exit" from scanning, subject the file to additional scanning, or

14   mark the sample as done.  *Id.* at 16-17.  Each of Finjan's theories for Sky ATP is riddled with

15   nonsensical interpretations of the claim and false factual premises.

16          **1.      Finjan Has Not Established That Sky ATP Meets Claim 1(a).**

17          As noted above in Section IV.B., Finjan's infringement theory is facially inadequate because

18   Sky ATP is not a client/user computer, and because it does not process modified content.  As such,

19   Sky ATP does not satisfy the "content processor" limitation.  Even if Sky ATP did satisfy the

20   "content processor" limitation, however, it does not satisfy the remaining limitations of Claim 1(a).

21          **(a)      Finjan Has Not Established That "The Content" Includes "A
                      Call To A First Function"**

22

23          As to the "first function," Finjan alleges: "[t]he HTTP objects or 'content' that Deception

24   Adapters process include a call to a first function, such as a call to open a link denoted by the 'http://'

25   prefix with an input including a URL or IP address."  Dkt. 368-4 at 16.  But, as discussed above in

26   Section IV.C.1.(a), "http://" is not actually a function.  And, any alleged function to "get" a webpage

27   _____

28   [20] Finjan makes off-handed claims that Juniper's "meatascan [sic] server" qualifies as a security
     computer, but fails to detail a complete or coherent infringement theory. Dkt. 368-4 at 16. Regardless,
     Finjan's claim against the "meatascan [sic] server" fails for the same reasons that its theory against
     the Reputation Server fails.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663                                   - 27 -                    JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
                                                                     '154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1 that is located at a particular URL would be part of the browser code being used to execute the file,

2 not part of the "content" that is received over the network.  As a result, Finjan has not identified a

3 "first function" that satisfies the requirements of Claim 1 for its Reputation Server theory.

(b)  **Finjan Has Not Established That Sky ATP Invokes A "Second Function" With "The Input"**

5      With regard to both the Reputation Server and Verdict Engine theories, Finjan identifies two

6 possible "second functions": (1) "adding the URL/IP address or the file hash to the whitelist," or (2)

7 making an "early exit" from the pipeline.  Dkt. 368-4 at 16-17.  But Finjan does not identify any

8 evidence that either of these functions use "the input" that it identified for the "first function."

9      For example, the function that Finjan identifies as the alleged "whitelisting" function is the

10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ function, which is shown below:



16 Dkt. 368-28 at 683:22-30; Ex. B at 112:2-12.  This function does not take any URL as an input,

17 much less the URL for a link that is embedded within a sample.  Rubin ¶ 85.[21]  Moreover, Finjan

18 and its expert misunderstand the purpose of this function.[22]  Contrary to Finjan's contentions, this

19 function is not used to add the URL or IP address of a sample or a link referenced in a sample to the

20 whitelist.  *Id.*  Rather, it is used to update the ▮▮▮▮▮▮▮▮▮▮ which is a list of internal

21 hosts/users in a network that have downloaded malicious content.  *Id.*  Thus, while the function does

22 take an "IP address" as an input, it is the IP address of the internal host computer—not the IP address

23 of a malicious file or input.  *Id.*

24      As to the alleged "early exit" function, neither Finjan, nor its expert, identifies a single piece

---

[21] In fact, Dr. Mitzenmacher's source code citations fail to identify a single instance where a "URL" is used as a function input.

[22] Dr. Mitzenmacher's misunderstanding may stem from the fact that he did not review the source code on the review computer during this second round of the patent "showdown." Instead, he relied on print outs that Finjan's attorenys gave to him and his recollection of the code from when he came to review it back in June 2018 in connection with the declaration he submitted for the '780 Patent. Ex. B at 9:2-11:25.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

10644663
- 28 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

of source code evidencing this function, much less any code that shows that it uses the URL/IP addresses of any links detected during dynamic analysis as an input.  With regard to the Reputation Server theory, Finjan does not even cite any evidence that an "early exit" function is used.  Instead, Finjan merely cites a presentation showing how the malware analysis pipeline interacts with the *verdict engine*.  Dkt. 368-4 at 16 (citing Finjan Ex. 14); Ex. M at JNPR-FNJN_29017_00552908-09 (describing the antivirus, static analysis, and sandbox/deception adapters but making no reference to the reputation adapter or client).[23]  This is itself a failure of proof.  Nor can the "early exit" function be the "second function" under Finjan's Verdict Engine theory.  This theory is based on the premise that the dynamic analysis engine sends the verdict engine "the input."  Dkt. 368-4 at 17-18.  But dynamic analysis is the final step of the pipeline.  *See* Ex. M at JNPR-FNJN_29017_00552914 ("Sandbox + Deception (cont'd) • The sample's behavior (under duress of deception) either exposes it as malware or not. ***Either way, this is the end of the pipeline***.").  Because dynamic analysis is the final step, there can be no "early exit" after dynamic analysis, and the analysis stops regardless if the file is determined to be safe, malicious, or still unknown.

Finally, as to the Verdict Engine theory, Finjan even admits that "the input" to the first and second functions is different.  Finjan claims that the "call to a first function" is "an unescape() or document.write() function that is used to obfuscate a suspicious link or URL."  Dkt. No. 368-4 at 17.  Finjan goes on to state that "[i]n this example, the input is either a sample file or information in the file, such as features extracted from the content (e.g., links, functions, script, or other code)." *Id.*  Finjan's allegation makes no sense.  The "sample file" obviously cannot be the "input" to a function that is contained within the file.  Rubin ¶ 87.  Moreover, Finjan ignores that the input to the unescape() and document.write() functions would be the obfuscated link or URL, whereas the links, functions, scripts or other code extracted during dynamic analysis would be de-obfuscated.  *Id.*  The obfuscated input is not the same as the de-obfuscated input, and thus cannot satisfy the claim.  *Id.*

**(c)     Finjan Has Not Established that The "Second Function" Is Invoked "With The Input, Only If A Security Computer Indicates That Such Invocation Is Safe."**

---

[23] Finjan conspicuously omits the first page of Ex. 14, which illustrates the "early exit" after the antivirus, static analysis, and sandbox/deception adapters only.  *See* Ex. M at JNPR-FNJN_29017_00552908.  There is no mention of an early exit with the Reputation Server.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663                                    - 29 -                    JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   Finjan's theory also fails to meet the requirement that the "second function" be invoked

2   "with the input, only if a security computer indicates that such invocation is safe" for at least three

3   reasons: (1) Sky ATP indicates whether a ***file*** is likely to be malware, not whether a ***function*** is safe

4   or not; (2) neither of the second functions identified by Finjan are invoked "only if" Sky ATP

5   indicates that such invocation is "safe"; and (3) Sky ATP does not provide an indication as to

6   whether invoking a second function is "safe" under the proper construction.

7   First, Claim 1 is directed toward a system with a security computer that analyzes functions,

8   not a security computer that analyzes files.  This is fundamentally different from Sky ATP's

9   analysis, which is directed toward assessing the threat risk of entire files, not particular functions

10  contained within those files.  Rubin ¶ 89.  In other words, Sky ATP does not use the Reputation

11  Server or Verdict Engine to make assessments about whether it is safe to invoke a particular function

12  contained within the content of a file that it is processing.  Instead, Sky ATP uses these engines to

13  analyze information about the file as a whole.  Finjan's own evidence confirm this.  Finjan cites

14  Exhibit 11 (Dkt. 368-22), which shows that the malware analysis pipeline submits "the full RDB

15  object" to the verdict engine, which represents the whole sample. The verdict engine responds with

16  its analysis on the full RDB object—not the individual inputs. *See also* Ex. M at JNPR-

17  FNJN_29017_00552909 ("we want to decide, ***for each sample***, whether it's malicious or not.").

18  Second, even if the decision to "whitelist" or make an "early exit" related to a particular

19  function—as opposed to the file as a whole—these functions still would not satisfy Claim 1 because

20  they are not invoked "***only if*** the security computer indicates that such invocation is safe."  For

21  example, the function that Finjan identified for its "whitelist" theory—i.e., the

22  ███████████████████ function—is invoked regardless of whether the file is deemed to be

23  safe or not.  This is demonstrated by the fact that the function uses ████████ as an input and defines

24  that parameter as either ████████████ as shown below:

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████████

27  ████████████████████████████████████████████████

28  ████████████████████████████████████████████████

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663

- 30 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   Dkt. 368-28 at 683:22-30. When confronted with this discrepancy, Dr. Mitzenmacher took the

2   remarkable position that a function changes based on what parameter is used. Ex. B at 116:5-14 ("Q.

3   So it's your opinion that using a different input or parameter for a function causes it to be a different

4   function? A. Causes it to perform differently or perform different actions. So if we're saying that

5   the underlying function here is to add to a whitelist or the underlying function is to add to a blacklist,

6   then, yes, the parameter changes the function, it changes the functionality depending on that

7   parameter."). This makes no sense and defies basic mathematical logic. A function does not change

8   based on the chosen inputs or parameters. Rubin ¶ 93. Instead, a function takes different inputs and

9   parameters to generate different outputs. Here, the ███████████████ function does

10  not change—it is always invoked regardless if the Whitelist or Blacklist parameter is used. *Id.*

11       Finjan's allegations with regard to the "early exit" function suffer from the same infirmity.

12  Finjan's own evidence demonstrates that "if [Sky ATP] ha[s] enough evidence that a file is either

13  *malicious* or benign at some intermediate stage of the pipeline [Sky ATP] can 'early exit' and save

14  the cost of full analysis." Ex. M at 910 (original emphasis omitted); *see also id.* at 912; ("if a sample

15  is so obviously malicious or benign that we can stop scanning it"); 909 (Sky ATP will "stop

16  scanning" once it can classify a sample as "this is safe" or "this is malware"); 911 ("**Early exit**: If

17  a sample is identified to be malicious by the AV adapter, further processing isn't strictly

18  necessary."). Thus, the alleged "early exit" function fails to satisfy the "only if" requirement, as it

19  is called even when the file is deemed to be malicious.

20       Finally, Finjan's theory also fails because neither the Reputation Server, nor the Verdict

21  Engine provide an indication as to whether it is "safe" to invoke any alleged second function with

22  the input. As discussed above, the proper construction of "safe" is the "security profile does not

23  violate the client computer's security policy." The Reputation Server and Verdict Engine do not

24  compare anything against a client computer's security policy. Rubin ¶ 95. Instead, the Reputation

25  Server simply indicates whether a sample is listed on a pre-existing list of malicious files or

26  addresses. *Id.* And, the Verdict Engine merely assigns a threat score to the file—it does not compare

27  anything against a client computer's security policy. The client's security policy is kept locally on

28  the client's SRX. *Id.* Because the Verdict Engine is not even aware of the client computer's security

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663

- 31 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   policy, it is incapable of comparing the calculated verdict against any such security policy.[24]

2   **2.      Finjan Has Not Established That Sky ATP Meets Claim 1(b).**

3   The second limitation of Claim 1 requires "a transmitter for transmitting the input to the

4   security computer for inspection when the first function is invoked." Finjan has not met its burden

5   on this element because it has not shown that the Malware Analysis Pipeline transmits the input to

6   the Reputation Server or Verdict Engine for inspection "*when the first function is invoked*."

7   The only time the functions contained within a sample's content are invoked during Sky

8   ATP's analysis is during dynamic analysis. Rubin ¶ 98. But Sky ATP dos not transmit any results

9   of the analysis—whether it be URLs/IPs detected during dynamic analysis or the entire JSON

10  result—to the Reputation Server or Verdict Engine until *after* dynamic analysis is completed. *Id.*

11  Juniper licenses its dynamic analysis engine from third party Joe Security. To integrate Joe

12  Security's dynamic analysis into Sky ATP, Juniper sends a sample to Joe Sandbox using the

13  Deception Adapter. *Id.* Only when the dynamic analysis is over (i.e. when the functions are no

14  longer being invoked), does Joe Sandbox send a report to the Deception Adapter with the results of

15  the analysis. *Id.* Finjan's own evidentiary citations confirm this. *See* Dkt. 368-22 at JNPR-

16  FNJN_29017_0052893 (Exhibit 11 depicting the ████████████████ where the pipeline

17  manager submits ███████████████████████ In other words, any alleged

18  transmission of the results of dynamic analysis occurs well after the alleged "first function" is

19  invoked—not "when the first function is invoked" as required by the claim.

20  Outside of dynamic analysis, any calls to functions contained within the content of a sample

21  are never even invoked. Rubin ¶ 99. As a result, any processing of the content by the other adapters

22  in Sky ATP would not meet the requirement of "invoking the first function" because those

23  components do not execute or initiate calls to a function. *Palo Alto Networks, Inc. v. Finjan, Inc.*,

24  2018 WL 6040843 at *5-6 (Fed. Cir. Nov. 19, 2018) ("invoking" may refer to executing a function

25  or initiating a call to a function regardless whether the function is ultimately executed); *see also* Ex.

26  B at 18:1-7 ("Q. What is the plain and ordinary meaning of 'invoking a function'? … THE

27

28  ───────────────────────────
    [24] Finjan's theory fails even under its own construction of "safe." The verdict engine only generates
    a risk score that indicates ***how likely*** a file is to be malicious. Thus, if the verdict engine returns a low
    verdict, the file would still be "potentially harmful or malicious."

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663                                    - 32 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  WITNESS: Generally I'd say if you're invoking a function, you are, you know, calling or starting,

2  otherwise attempting to initiate execution of that function.").**25**

3     **E.     Finjan Has Not Established That ATP Appliance Infringes Claim 1.**

4         Finjan has two infringement theories for the ATP Appliance.  For both theories, Finjan

5  claims that ATP Appliance's SmartCore ("content processor") processes executables, pdfs,

6  Microsoft Office files, and emails ("content") that contain a call to open a link denoted by the

7  "http://" prefix ("call to a first function") using URLs, IP Addresses, calls to inject malicious code,

8  and files that are extracted from the content ("inputs").  Dkt. 368-4 at 20.  In the first theory, Finjan

9  alleges that the SmartCore sends URLs and files to Cyphort's Reputation Server ("security

10  computer"), which returns an indication about whether the URL or file is malicious.  *Id.*  In the

11  second theory, Finjan alleges that the SmartCore submits network traffic to the chain heuristics

12  engine ("security computer"), which returns an indication as to whether the network traffic is safe.

13  *Id.* at 20-21.  In both theories, Finjan alleges that the "second function" is either (1) a function for

14  moving an object to 'END' state, or (2) a function for marking an object as "clean."  *Id.* at 21.

15         **1.     Finjan's Motion Should Be Denied Because Its Infringement Theory Is
           Not Based On The Release Versions Of The Source Code**

16
17         Finjan failed to establish a *prima facie* infringement case for ATP Appliance for this reason

18  alone: Finjan and its expert rely on the wrong source code.  It is axiomatic that a plaintiff claiming

19  infringement by a given accused product must support that claim with evidence actually

20  corresponding to that product. This basic prerequisite is reflected, for example, in Rule 402 of the

21  Federal Rules of Evidence ("[i]rrelevant evidence is not admissible") as well as Rule 702 (expert

22  opinions must be "reliable" and "help the trier of fact").  It is Finjan, as the party asserting

23  infringement, that "bears the burden of persuasion at trial as to whether or not each of [Juniper's]

24  *accused products* infringe its claims." *Rambus, Inc. v. Hynix Semiconductor, Inc.*, 642 F. Supp. 2d

25  970, 976 (N.D. Cal. Nov. 24, 2008).  Thus, to even establish a *prima facie* case Finjan's expert

26  "must set forth the factual foundation for his opinion … in sufficient detail for the court to determine

27  ─────────────────

28  **25** Notably, neither Finjan nor Dr. Mitzenmacher cite any code that shows that any other adapter in the Malware Analysis Pipeline contains any functionality to "activate" or "de-obfuscate" code. In any event, whether Sky ATP invokes its own de-obfuscation function is irrelevant to whether a call to a first function **included in the content** is invoked.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663                                   - 33 -                    JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
                                                                     '154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   whether the factual foundation would support a finding of infringement" as to the accused products.

2   *Arthur A. Collins, Inc. v. N. Telecom, Ltd.*, 216 F.3d 1042, 1047-48 (Fed. Cir. 2000).

3          Here, Finjan and its expert rely solely on source code from the ▮▮▮▮▮▮ and ▮▮▮▮▮

4   ▮▮▮ repositories.  Dkt. 368-28 (Finjan's Ex. 16) at 508-10; 515; 518; 701; 720-22; 728; 738.  The

5   ▮▮▮▮▮▮▮ repository contains research code.  Jas ¶ 7.  Thus, any citation to this code to try to

6   show infringement is categorically improper.  The ▮▮▮▮▮▮ repository contains some code

7   for released ATP Appliances, but also contains development code that has never been released.  *Id.*

8   Finjan and its expert's citations to ▮▮▮▮▮▮▮ are improper because they correspond to a branch

9   of development code called the ▮▮▮▮▮▮▮  Finjan has not demonstrated that this branch of

10  code (or any modules of code contained in it) was ever implemented in a released product.  In fact,

11  it has not.  Rubin ¶¶ 102-103; Jas ¶ 8.  This fatal flaw was the result of Finjan's expert not even

12  bothering to go look at the source code for the ATP Appliance, and instead relying on a small set of

13  print-outs selected by Finjan's attorneys.  *See* Ex. B at 157:2-6 ("Q. So how did you pick them since

14  you didn't go look at the code?  A. Again, ***I picked the cites or the citations based on the code that***

15  ***was produced to me by counsel***.");  160:5-8 ("Q. When you say 'go back and look,' you would have

16  to go look for the first time, right?  A. If it wasn't included in the printouts.  ***I haven't gone to see***

17  ***this code in person***.").  Dr. Mitzenmacher confirmed at his deposition that he did not request that

18  counsel provide printouts for a particular release of the ATP Appliance, and that he simply assumed

19  that the code counsel provided to him was actually being used in the products.  *Id.* at 158:11-15 ("Q.

20  Did you ask counsel to provide you code from a particular release of the ATP appliance product?

21  A. I don't believe so.  Certainly not by like a version number and so on.");  160:24-161:5 ("Q. …did

22  you do anything at all to confirm that the source code citations for the ATP appliance product that

23  you relied on for your infringement analysis were included in a product that was shipped?  A. My

24  assumption would be that we asked for, received code that was used in products.  Q. So that was just

25  something you assumed based on the fact that it was produced?  A. Yes.").

26          Had Dr. Mitzenmacher taken the time to go review the ATP Appliance code, he could have

27  easily determined that the code printed by Finjan's attorneys was not part of a code branch for a

28  released version of the product. Rubin ¶ 103 (noting that the produced code repositories explicitly

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663                                    - 34 -                    JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
                                                                      '154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   identify which code branches reflect release products by denoting them as, for example, ▮▮▮▮

2   ▮▮▮▮ or ▮▮▮▮▮▮ ) as shown in this screenshot:

3

4

5

6

7   Rubin ¶ 103; Jas ¶ 9.[26]  Indeed, Dr. Mitzenmacher admitted that companies sometimes keep code in

8   git repositories that include research code along with deployed code, but he testified that did not

9   know whether that was the case here, as he did not actually go review it.  Ex. B at 157:15-19 ("Q.

10  Do you understand that sometimes companies keep their source code in a git repository that has

11  research code along with the deployed code? A. I can imagine that happens in some situations.");

12  158:2-10 ("So I did not review the source code on the computer, so, yes, I don't believe that I

13  checked for the different -- which version would have been in the code. Indeed, I might even -- or I

14  would have to check if that information was contained within the git repository itself."); 156:19-21

15  (testifying that he did not even know if there were multiple repositories for the code).

16              **2.     Finjan Has Not Established That ATP Appliance Meets Claim 1(a).**

17          Not only is Finjan's case against the ATP Appliance facially inadequate due to its

18  inappropriate reliance on the wrong source code, it also fails on the merits.  As noted above in

19  Section IV.B., the ATP Appliance does not meet the "content processor" limitation because it is not

20  a client/user computer, and because it does not process any modified content.  Nor does ATP

21  Appliance meet the other requirements of Claim 1(a), as described in detail below.

22              **(a)     Finjan Has Not Established The "Content" Includes "A Call To
                          A First Function."**

23

24  _____

    [26] Dr. Mitzenmacher implied at his deposition that it was appropriate for him to assume that all the

25  code produced pertained to a released product because that is what Finjan supposedly asked for.  Ex.
    B at 157:7-14.  But Finjan's requests for production were far broader, including "[a]ll documents

26  [defined to include source code], communications, or things relating to the design, development,
    structure, testing, research, updating or operation for each of the Accused Instrumentalities."  *See* Ex.

27  N at 7.  Juniper therefore produced the ATP Appliance code repository as it is kept in the ordinary
    course of business, which included every code repository and branch concerning ATP Appliance,

28  including all released code, inactive code, research code, and the like.  This is the holy grail of source
    code production, and Finjan has no basis to complain.  Rubin ¶ 103.  In any event, Finjan cannot shift
    its own burden by simply assuming the code it reviewed corresponds to the actual accused product
    without any legitimate basis for doing so. *See, e.g., Shertech, Inc.*, 471 F.3d at 1318.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   As to the "first function," Finjan alleges: "ATP Appliance processes content such as

2   executables, pdfs, Microsoft Office files, and emails, that include scripts having a call to a first

3   function, such as a call to open a link denoted by the 'http://' prefix." Dkt. 368-4 at 20. But, as

4   discussed above Section IV.C.1.(a), "http://" is not actually a function. And, any alleged function

5   to "get" a webpage that is located at a particular URL would be part of the browser code being used

6   to execute the file, not part of the "content" that is received over the network. As a result, Finjan

7   has not identified a "first function" that satisfies the requirements of Claim 1.

8   **(b)   Finjan Has Not Established That ATP Appliance Invokes "A Second Function With The Input."**

9   Even if "http:/" could properly be viewed as a "call to a first function"—which it cannot—

10  Finjan's theory still fails because it has not identified a "second function" that is invoked "with the

11  input." Finjan argues that the "input" for the "first function" is "URLs, IP Addresses, calls to inject

12  malicious code, and files that are extracted from the content for analysis." Dkt. 368-4 at 20. But

13  Finjan fails to identify any alleged "second function" that uses any of these things as an input. In

14  particular, Finjan's points to two alleged "second functions" that may be invoked: (1) moving an

15  object to 'END' state, and (2) marking an object as clean.

16  With respect "moving an object to 'END' state," Finjan fails to identify any actual computer

17  function in the code base. Instead, Finjan merely cites to a design document that generically

18  describes the result of some functionality in the system. Dkt. 368-4 at 21 (citing Finjan Ex. 15).

19  Nothing in Finjan's exhibit suggests an alleged second function is invoked with the inputs used in

20  the alleged first function. This is simply insufficient to meet Finjan's burden.

21  With respect to "marking an object as clean," Finjan similarly cites to a design document

22  that fails to identify any actual computer function, let alone one that was invoked using the input

23  included in the call to the first function. Dkt. 368-4 at 21 (citing Finjan Ex. 16 at 586-89) (simply

24  noting "if the object was found to be a malware, this field is the malware name, otherwise it should

25  be 'Clean'"). Moreover, the source code cited by Finjan's own expert reveal that any alleged second

26  functions in the ATP Appliance code for classifying an object as clean are not invoked using one of

27  the inputs identified by Finjan (i.e. "URLs, IP Addresses, [etc.] that are extracted from the content"),

28  but rather the URL or source of the file itself. *See* Dkt. 368-6 at ¶¶55-58 (identifying only the URL

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644463

- 36 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  of a file as the input to an alleged second function); Rubin ¶ 108.  As such, Finjan has failed to show

2  that ATP Appliance invokes a second function "with the input" that Finjan identified for the alleged

3  first function as required by Claim 1.

4  **(c)      Finjan Has Not Established that The "Second Function" Is
           Invoked "With The Input, Only If A Security Computer
5           Indicates That Such Invocation Is Safe."**

6      Finjan's theory also fails to meet the requirement that the "second function" be invoked

7  "with the input, only if a security computer indicates that such invocation is safe" for at least three

8  reasons: (1) ATP Appliance indicates whether a *file* is likely to be malware, not whether a *function*

9  is safe or not; (2) ATP Appliance does not provide an indication as to whether invoking a second

10  function is "safe" under the proper construction; and (3) neither of the second functions identified

11  by Finjan are invoked "only if" ATP Appliance indicates that such invocation is "safe."

12      First, Claim 1 is directed toward a system with a security computer that analyzes functions,

13  not a security computer that analyzes files.  This is fundamentally different from ATP Appliance's

14  analysis, which provides higher level security decisions on *the whole file* or a *chain of objects* (in

15  the case of Chain Heuristics). Rubin ¶ 110.  Once again, Finjan's own evidentiary citations confirm

16  this.  For its theory on "moving an object to 'END' state," Finjan cites Exhibit 15 to argue that

17  "[d]epending on the verdict obtained from Chain Heuristics, Cyphort decides if the suspicious *chain*

18  needs to be looked at by the Browser Behavior Analysis Engine."   Dkt. 369-16 at JNPR-

19  FNJN_045344.[27] But a "chain" is not the input Finjan identified as an input for a first function that

20  was included in the content received over a network. Rather, it is "the sequence of HTTP requests

21  and responses between a particular source and destination."  *See id.*  In other words, the alleged

22  second function of moving a file to "END" state occurs based on the chain, not based on any function

23  inputs included in the content.

24      Finjan's theory where "marking an object as 'clean'" is the second function also fails.  To

25  support its point, Finjan cites to Exhibit 16 at pp. 586-89, which is a design document that describes

26  the process for system administrators to submit content for analysis.  Dkt. 368-28 at 586-89.  Finjan

27

28  [27] This theory would only be applicable to Finjan's theory that the Chain Heuristics engine acts as the alleged security computer.  There is absolutely no evidence that Cyphort moves an object to 'END' state only if the *Reputation Server* (the other alleged security computer) indicates it is safe.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

10644663

- 37 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    has not presented any evidence that these methods are used to invoke any functions in connection

2    with the alleged security computers (Reputation Server or Chain Heuristics Engine).  Moreover, the

3    document makes clear that files/objects are submitted for analysis and "[i]f the ***object*** was found to

4    be a malware, this field is the malware name, otherwise it should be 'Clean'."  *Id.* at 589.  Nowhere

5    does the document purport to mark the ***inputs*** to function calls included in the object as clean.  As

6    such, Finjan's has failed to show that the second function is invoked with the inputs as required.

7        Second, the alleged security computers do not indicate whether invoking the second function

8    with the input is "safe."  As discussed above, the proper construction of "safe" is the "security profile

9    does not violate the client computer's security policy."  Neither the Reputation Server nor Chain

10   Heuristics Engine compare anything against a client computer's security policy. The Reputation

11   Server simply indicates whether a URL or hash is listed on a pre-existing list of malicious files or

12   addresses.  Rubin ¶ 113.  Similarly, the Chain Heuristics Engine analyzes a chain of network traffic

13   for suspicious indicators that are predetermined by researchers.  *Id.*  Neither of these determinations

14   are based on a client computer's security policy.

15        Moreover, the alleged security computers do not indicate whether it is "safe" to invoke the

16   second function with the input, even under Finjan's erroneous claim construction. Finjan argues that

17   "safe" should be construed to mean "not potentially harmful or malicious."  The effect of Finjan's

18   construction is that the security computer must determine whether it is "not potentially harmful or

19   malicious" to invoke the second function with the input.  But ATP Appliance makes no such

20   determination.  Finjan cites to Exhibit 12 to argue that ATP Appliance determines "whether an URL

21   is malicious or benign." But when ATP Appliance designates something as "benign," it means that

22   "[t]he URL is known to be clean ***or the URL is not known***."  Dkt. 368-24 at JNPR-

23   FNJN_29018_00971257.  In other words, even if ATP Appliance determines something is "benign"

24   the file is still "potentially harmful or malicious."  Rubin ¶ 114.

25        ***Finally***, Finjan's theory fails because the alleged second functions may be invoked even if

26   the Reputation Server or Chain Heuristics Engine indicate that it is not safe.  For example, Finjan

27   argues that "moving objects to 'END' state" is the second function and occurs if the objects are

28   found to safe—but so too if the objects are found to be dangerous.  Finjan's own evidence explains

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663

- 38 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

that ATP Appliance decides whether to end the analysis simply "[d]epending on the verdict obtained." *See* Dkt. 369-16 at JNPR-FNJN_045341.  Like Sky ATP, so long as the network content can be affirmatively identified as safe or unsafe, the analysis pipeline can end early.

Finjan also argues that "marking an object as 'Clean'" may be a "second function" that is invoked if the input is safe. But source code cited by Finjan's expert reveals that the actual computer functions are ███████ and ███████████ with ██████ as a possible parameter or input:

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

Dkt. 368-28 (Finjan Ex. 16) at 728:164-169. In other words, there is no function that marks an object as clean only if it is safe.  There are simply functions that update a URL's classification, which may be clean or not. Either way the ███████████ and ██████████ functions are still invoked.

### 3.    Finjan Has Not Established That ATP Appliance Meets Claim 1(b).

As explained in Section IV.C.2.(b), Claim 1 requires transmitting the input to the security computer when—i.e., ***at which time***—the first function is invoked. Neither of Finjan's theories satisfy this limitation.

***First***, Finjan's Reputation Server theory does not involve invoking a first function, let alone transmitting inputs when it is. The only time ATP Appliance "invokes" a content's call to a first function is during dynamic analysis.  Rubin ¶ 118.  But the Reputation Server has nothing to do with dynamic analysis and content is checked against the Reputation Server long before any dynamic analysis is used later in the system.  Similar to Sky ATP, Finjan does not set forth an intelligible theory as to how anything outside of dynamic analysis can be considered "invoking" a first function in the content. Finjan merely points to "activating" or "extracting" ***links*** (i.e., the inputs).  But this is not sufficient to constituting "invoking".  *See Palo Alto Networks*, 2018 WL 6040843 at *5-6 (explaining that "invoking" may refer to executing a function or initiating a call to a function regardless whether the function is ultimately executed); *see also* Ex. B at 18:1-7.  Finjan does not and cannot identify any instances of invoking ***the first function*** that is called within content received

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644463

- 39 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

over the network when files are transmitted to the Reputation Server.  No such functionality exists.[28]

*Second*, Finjan's Chain Heuristics Engine theory does not involve transmitting inputs when a first function is invoked.  Finjan argues that "[t]he chain heuristics engine, working with the Browser-Based Dynamic Analysis Environment and the Object Analysis Pipeline" is a security computer.  Because ATP Appliance only invokes functions during dynamic analysis, the effect of Finjan's theory is that inputs are first transmitted to the Chain Heuristics Engine (the alleged security computer) and then a content's functions are later invoked by a dynamic analysis engine.  But this is not what Claim 1 teaches.  To infringe, the inputs must be transmitted "when" the first functions are invoked—not before. As such, Finjan's theory fails to satisfy limitation 1(b).

**F.     The Accused Products Do Not Infringe Under The Doctrine Of Equivalents.**

Finjan sets forth a half-hearted argument that the accused products infringe under the Doctrine of Equivalents ("DOE") because the "verdict" used by Sky ATP and ATP Appliance is allegedly equivalent to the "safe" determination of Claim 1.  Dkt. 368-4 at 24-25.  But returning a verdict is not substantially equivalent to returning an indication that the security profile does not violate the client computer's security policy. Indeed, the verdicts used in the accused products are associated with *files*, not with specific *functions*, and therefore perform a substantially different function because they are not used to block individual function calls, but instead entire files.  Rubin ¶ 124.  The way the accused products perform the function is also materially different than the claimed invention.  In particular, the accused products allow clients to set security policies on the basis of files rather than individual functions.  *Id.* ¶ 125.  Finally, the result achieved by the accused products is materially different than the claimed invention.  For example, the verdict results in entire files being blocked, whereas the "safe" determination of the '154 Patent merely results in individual functions being blocked.  *Id.* ¶ 126.  In any event, even if Sky ATP or ATP Appliance's "verdict" was substantially similar to the '154 Patent's "safe" determination—which it is not—this would not solve the numerous other infirmities in Finjan's infringement theories.  *Id.* ¶ 127.

---

[28] Whether ATP Appliance invokes its own de-obfuscation function is irrelevant to whether a call to a first function *included in the content* is invoked.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663

- 40 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1    Dated:  March 14, 2019

Respectfully submitted,

2

IRELL & MANELLA LLP

3

4    By:    */s/ Rebecca L. Carson*

Rebecca L. Carson
*Attorneys for Defendant*
JUNIPER NETWORKS, INC.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10644663

- 41 -

JUNIPER'S OPPOSITION TO MSJ RE: CLAIM 1 OF THE
'154 PATENT (Case No. 3:17-cv-05659-WHA)