REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## DECLARATION OF AVIEL D. RUBIN

I, Aviel D. Rubin, declare as follows:

**I.      INTRODUCTION**

1.      Irell & Manella LLP has retained me as an independent expert on behalf of Juniper Networks, Inc. ("Juniper").

2.      I submit this Declaration in support of Juniper's Opposition to Finjan, Inc.'s ("Finjan") Motion for Summary Judgment Regarding Claim 1 of U.S. Patent No. 8,141,154 ("the '154 Patent").

3.      I understand that Finjan has accused Juniper of infringing other claims and patents, but this declaration is directed specifically to Claim 1 of the '154 Patent.  As discussed below, it is my opinion that the accused Juniper products do not infringe Claim 1.

**II.      BACKGROUND AND QUALIFICATIONS**

4.      I am receiving my customary rate of $775 per hour for time spent on this case, and I am also receiving reimbursement for reasonable and customary expenses.  My compensation does not depend on the results of the lawsuit or the substance of my testimony.

5.      I provided an overview of my background and qualifications in my previous declaration, which I incorporate by reference.  *See* Dkt. 95-10 at ¶¶ 6-17.  Additional details of my education, employment history, professional service, patents, publications, and other testimony are in my current curriculum vitae, which is in the following link:  http://avirubin.com/Avi_Rubins_home_page/Vita.html.

**III.      MATERIALS CONSIDERED**

6.      To form my opinions, I considered information from various sources.  In addition to drawing from over two decades of experience in the computer industry, I have reviewed the following documents:  (1) the '154 patent; (2) the file history (including IPRs); (3) Finjan's summary judgment filings regarding Claim 1 of the '154 Patent, including all declaration and exhibits; (4) the deposition transcripts of Juniper's engineers and Finjan's expert, Dr. Mitzenmacher; and (5) the other documents and references cited herein (not limited to the excerpts submitted with Juniper's Motion).  I also reviewed the Declaration of Frank Jas ("Jas Dec.").

## IV.    LEGAL STANDARDS

7.      I have been advised that patent claims are reviewed from the point of view of a hypothetical person of ordinary skill in the art ("POSITA") at the time of the filing of the patent.

8.      In my opinion, a POSITA for the '154 patent would be a person with a Bachelor's degree in computer science or related academic fields and three to four years of additional experience in the field of computer security or equivalent work experience.  More education can substitute for work experience, and vice versa (*e.g.*, a Ph.D. without work experience outside of the university setting).  In arriving at my opinions in this declaration, I have considered the issues from the perspective of a POSITA.  This level of skill is approximate, and my opinion would not change if a somewhat lower or higher level of skill were adopted.

9.      For construing claims, I understand that claim construction is a legal issue that the Court decides by interpreting claim terms as a POSITA would have understood them at the time of the invention.  Under this standard, I understand that courts consider the specification, the prosecution history, and any extrinsic evidence regarding how a POSITA would interpret the claims in light of the intrinsic record.  For purposes of my analysis in this case, I have interpreted the claims under this standard.  I understand that a different standard, referred to as the broadest reasonable interpretation ("BRI"), is applicable in other forums, such as in an IPR proceeding.  My opinions regarding the terms below may differ under the BRI standard.

10.     I am informed that patent infringement under 35 U.S.C. § 271(a) consists of making, using, offering to sell, or selling a patented invention within the United States, or importing a patented invention into the United States, without authorization.

11.     I further understand that determining whether there is infringement of a patent includes two steps.  First, each asserted claim must be construed to determine its proper scope and meaning to a POSITA.  Second, the construed claims are compared with the accused product or service to determine whether every limitation of the claims is found.  Unless every limitation is present in the accused product or process, there is no infringement.

12.     I also understand that if literal infringement cannot be established because one or more elements are not literally present in an accused product or process, a product or process may

nevertheless be found to infringe under the doctrine of equivalents ("DOE").  For infringement under DOE, I understand that each accused product or process must contain an element at least equivalent to each and every limitation of the asserted claim.  I also understand that one may, but is not required to, use the "function-way-result" test to determine equivalence.  Under the function-way-result test, I understand that an inquiry is made into whether the accused product or service performs substantially the same function in substantially the same way to achieve the substantially same result as the claim element.

## V.    OVERVIEW OF THE '154 PATENT

13.    The '154 patent describes a system for protecting a computer from viruses that was well-known to those skilled in the art long before the priority data of the '154 patent.  The following is a high-level summary of the '154 Patent.

14.    The '154 patent describes a system in which a piece of web content can be received over the Internet and is modified, prior to execution, so that when executed by a client computer, the input associated with a function call within the web content is routed to a security computer. The security computer determines if it is safe to execute and sends an indication to the client computer that it can process the original function in the web content.

15.    The system the '154 patent describes is illustrated in FIG. 2, reproduced here:



16.     The system that implements the above process includes three central components: (1) a content modifier, (2) a content processor, and (3) a content inspector. The content modifier (1) on the gateway computer receives web content and modifies it; the '154 patent describes this "modified content" as containing "substitute functions" that replace original function calls.  The content processor (2) on the client computer is the component that receives the modified content, processes the modified content, and only if the content inspector on the security computer indicates that it is safe, processes the original web content.  The input inspector (3) on the security computer analyzes whether it is safe to invoke the original function in the unmodified web content and sends an indication of whether it is safe back to the content processor (2) on the client computer.

17.     The '154 Patent alleged that this system was an improvement over the prior art. The '154 Patent states that inspecting for safety at a client computer is not secure because bad actors could obtain copies of client software and design around the security system by reverse

engineering the software.  '154 Patent at 4:15-22.  The '154 Patent also states that inspecting for safety at the network gateway is not secure because some viruses are difficult to catch with static analysis and do not show their malicious behavior until they actually begin executing.  '154 Patent at 3:65-4:8.  The '154 Patent further suggests that inspecting for safety at both the client computer and the network gateway would not resolve the issues applicable to inspecting for safety at either of the individual locations.  The system of the '154 Patent was therefore intended to address what the inventors believed was a "need for a new form of behavioral analysis, which can shield computers from dynamically generated malicious code without running on the computer itself that is being shielded."  '154 Patent at 4:23-26.

## VI.     PROSECUTION HISTORY

18.     The application that matured into the '154 Patent was filed on June 14, 2010.  On June 28, 2011, the Examiner issued a non-final rejection for various reasons, including that the patent was anticipated by U.S Patent Pub. No. 2001/0005889 to Mikael Albrecht ("Albrecht").  On October 5, 2011, Finjan responded to the Office Action with certain amendments and remarks.  On November 2, 2011, the Examiner issued a Notice of Allowance.

## VII.    CLAIM CONSTRUCTION

### A.     "Safe"

19.     I understand that Juniper has proposed a construction of the term "safe" as "security profile does not violate the client computer's security policy."  Finjan has proposed the alternate construction of "something that is not potentially harmful or malicious."  As noted below, it is my opinion that the accused products do not infringe under either construction of "safe."

### B.     "Content Processor"

20.     In my opinion, a POSITA would understand that the plain and ordinary meaning of the term "content processor" in view of the specification and file history for the '154 Patent is "a processor on a client/user computer that processes modified content."

21.     The '154 Patent makes clear that the claimed "content processor" resides on a client/user computer.  For example, the '154 Patent notes that there are numerous disadvantages

to prior art systems that perform malware analysis on a gateway.  *Id.* at 1:43-53, 2:31-45.  To try

to address these disadvantages, the '154 Patent proposes the following solution:

> The present invention operates through a security computer that is preferably
> remote from ***a client computer that is being shielded while processing network***
> ***content***.  ***During run-time, while processing the network content, but before the***
> ***client computer invokes a function call*** that may potentially dynamically
> generate malicious code, the client computer passes the input to the function to
> the security computer for inspection, and suspends processing the network content
> pending a reply back from the security computer.  Since the input to the function
> is being passed at run-time, it has already been dynamically generated and is thus
> readily inspected by a content inspector.

*Id.* at 4:35-46 (emphasis added).   The specification then uniformly describes the "content

processor" as being located on the "client computer."   '154 Patent at, *e.g.*, 2:64-67 ("Client

computer 110 includes a content processor 170, such as a conventional web browser, which

processes Internet content and renders it for interactive viewing on a display monitor."); 3:18-24

(distinguishing between a "content inspector" located on a gateway computer and a "content

processor" located on the client computer); 9:8-11 ("client computer 210 includes a content

processor 270"); 10:61-62 ("Content processor may be a web browser running on client computer

210."); 15:34-37 ("Client computer 410 includes a content processor 470, such as a web browser,

which processes content received from the network.").   Every single figure in the '154 Patent

illustrates the "content processor" as residing on a "client computer."   *Id.* at Figs. 1-5.   And it

therefore follows that every single reference to "content processor" in the "DETAILED

DESCRIPTION" section of the specification (which extends from column 8 through the end of

the specification) refers to a content processor on the client computer because that section walks

through the description by reference to those figures. *See, e.g.*, '154 Patent at 8:41 ("Reference is

now made to FIG. 2, which is a simplified block diagram. . . .").

      22.     In addition, I understand that the PTAB held that the claimed content processor

must be located on a client computer: "we conclude that the Specification of the '154 patent uses

the claimed 'content' to refer broadly to the data or information, modified for processing, that ***the***

***client*** receives from the network."  IPR2015-01979, Paper 62 (Final Written Decision) at 13; *see*

*also id.* at 7-10 (additional discussion of claim construction by the PTAB making clear that the

claimed content processor resides on a client computer).

23.      In a previous IPR, I testified that I adopted the "ordinary meaning" of the term

"content processor" when read "*in light of its specification.*"[1]  I did not need to specifically address

the "content processor" term because the prior art that I relied on included a content processor that

was indisputably located on a client computer.  Specifically, I relied on a script processing engine

(web browser) found in the prior art, where such script processing engine resided on a client

computer as annotated in blue):



U.S. Patent App. No. 11/281,839 ("Ross") at Fig. 2 (showing "script processing engine" 224 as

part of "client") (cropped and annotated); IPR2016-00151, Ex. 1002 (prior declaration) at ¶¶ 105-

106 (relying on Ross's script processing engine as  content processor).  Thus, my opinion in the

IPR is consistent with my position here that the plain meaning of "content processor" requires that

it be located on a client/user computer.

24.      To be clear, when the '154 Patent uses the term "client" computer, it is referring to

what computers that are used by individual users.  *See* '154 Patent at, *e.g.*, 4:15-23 ("*desktop* anti-

virus protection has a disadvantage of requiring installation of *client software*") and 10:61-62

("*web browser running on client computer*").  The '154 Patent distinguishes "client" computers

from gateway computers, as shown, for example, in the following cropped portion of the invention

as illustrated in Figure 2:

---

[1] "I have interpreted claim terms for which the Petitioner has not proposed a BRI construction by giving them the ordinary meaning they would have to the POSA reading the '154 patent with its priority date, December 12, 2005, in mind, and *in light of its specification* and file history."  IPR2016-00151, Ex. 1002 (prior declaration) at ¶ 29.



*See also* '154 Patent at, *e.g.*, 1:43-46 (distinguishing between "(i) *gateway* security applications, and (ii) *desktop* security applications"). The '154 Patent also distinguishes "client" computers from "security" computers that do not contain content processors. *See* '154 Patent at, *e.g.*, Figure 2 (distinguishing between client computers, gateway computers, and security computers). This understanding of "client" computer is the plain meaning of the term to a POSITA in view of the specification and is also the definition provided in the IBM Dictionary of Computing. *See* Ex. C (IBM Dictionary of Computing: "**client** (1) *A user*"); Ex. E (Newton's Telecom Dictionary: "A client is a fancy name for a PC on a local area network. It used to be called a workstation. Now it is the 'client' of the server.").

25. The patent also makes clear that the "content" that is processed by the client computer has been modified by the gateway: "[t]o enable the client computer to pass function inputs to the security computer and suspend processing of content pending replies from the security computer, *the present invention operates by replacing original function calls with substitute function calls within the content*, at a gateway computer, prior to the content being received at the client computer." '154 Patent at 4:55-60.

26. The PTAB confirmed that the plain language of the claim requires that the "content" that is being processed by the "content processor" is "modified content." In particular, the PTAB noted that "the '154 patent Specification [refers] to three categories of content. First, there is the 'original content' that is scanned and modified at the gateway computer. Second, there is the 'modified content' transmitted to, and received by, the client computer. Third is the 'dynamically generated malicious content' that is generated at runtime and, thus, is undetected by the gateway computer in the 'original content.'" IPR2015-01979, Paper 62 (Final Written Decision) at 9. The PTAB further explained that the "content" being processed in Claim 1 must refer to the "modified content" at the client/user computer—not the original content received at a gateway:

> "Because the recited 'first function' is the substituted function whose input is verified, the ***claimed*** 'content,' in the context of the surrounding claim language, must refer to the modified content received at the client computer. *Id.* at 17:39-40 ('transmitting the input [of the first function call to the security computer for inspection, when the first function is invoked'). The claimed content cannot refer to the 'original content' that is received by the gateway computer and over the Internet because that content, according to the Specification, would be capable of generating the undetected dynamically generated malicious content from which the client computer is to be protected."

*Id.* at 10 (emphasis and alterations in original). Thus, the PTAB has explained that even "under the ***broadest reasonable interpretation*** in the context of the Specification and the surrounding claim language, we conclude that 'content' is data or information, which has been ***modified*** and is received over a network." *Id.* at 14 (emphasis added). Indeed, it is my opinion that if the "content processor" were located away from the client/user computer as Finjan argues, then it would no longer be processing the ***claimed*** content (which is first scanned and modified at the gateway computer). Instead, the content processor would simply be processing the "original content" which the "[t]he claimed content cannot refer to." *Id.* at 10.

27.     I disagree that Finjan's proposed construction—"a component that processes content"—is the plain and ordinary meaning of the term in the context of the '154 Patent. Finjan's construction would be redundant because the claim already recites a "content processor [] for processing content." The idea that the "content processor" could be located anywhere in the network—including on a network gateway—would also be contrary to the express teachings of the patent and the way that the inventors described the "present invention" in the specification.

## VIII.   NON-INFRINGEMENT ANALYSIS

### A.     The Accused Products Vs. The Technology Of The '154 Patent

28.     The SRX is a secure router that can be used for security (i.e., firewall) (S), routing (R) and switching (X). Dkt. 338 (Trial Tr. Vol. 4) at 666:19-667:3. The SRX can act as a network gateway, which is like a gatekeeper located between a customer and the public Internet to protect users within the customer's network from the malicious parts of the Internet. When used as a firewall, the SRX will, among other things, look at certain data in the information being sent over the Internet, such as the IP address from which it is being sent, and block data coming from

prohibited IP addresses.  The SRX, like most gateways and firewalls, acts as a gatekeeper intended to control what is allowed in and out of the network.  It does not modify or "instrument" functions.

29.    Sky ATP is a cloud-based service that is sold as an add-on to the SRX.  The following diagram illustrates at a high level the configuration of the system when a Juniper customer configures its SRX to work with Sky ATP:



*See* Dkt. 96-13 at 2. In Step 1, a client requests a file from a Web server, and such request is forward from the SRX to the appropriate Web server. In Step 2, the Web server returns the requested file, which is intercepted by the SRX. In Step 3, the SRX submits the file to Sky ATP for analysis. *See generally* ████████████ *including at* ████████████ and ████████████████████████████████████████████ In Step 4, Sky ATP returns a Threat Level verdict (discussed further below). In Step 5, the SRX compares the verdict returned by Sky ATP with the user-defined security policy; if the verdict is within the range set by the customer, the file is forwarded to the user by the SRX (as illustrated above); otherwise, if the verdict exceeds the threshold set by the user-defined policy, the file is blocked.

30.    The path described above assumes Sky ATP has analyzed the file before and has already determined a Threat Level verdict for the file. If the file has not previously been analyzed,

---

[2] Citations to Junos source code are taken from the same version of Junos cited by Dr. Mitzenmacher in his declaration, which is found under the ████████████ directory on the source code review computer produced by Juniper in this matter.  My analysis would be the same for later releases, including the most recent release of Junos 18.4, because the relevant portions of the code are consistent across releases.

DECL. OF AVIEL D. RUBIN ISO
JUNIPER'S OPPOSITION TO FINJAN'S MSJ
(Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

then an indication that no verdict for the file exists is returned to the SRX, which then releases the file to the client. Sky ATP then undertakes its analysis pipeline (described below) to generate a verdict for the file that will be applied .the next time a client attempts to download the same file.

31.     The Threat Level verdict generated by Sky ATP is calculated by Sky ATP's Verdict Engine, which accepts as an input the results of various different analysis engines. The first[3] analysis engine in the pipeline is a conventional antivirus check. The next analysis engine is "static" analysis, which means analysis of the file without actually executing the code. Sky ATP has a proprietary, machine-learning-based algorithm that it calls ████████████ that analyzes various different features of files, such as its metadata and the source code, without actually executing the file. The analysis pipeline ends there for many of the files, including HTML, JavaScript, and emails. Dkt. 95-8 ¶ 5. Other types of files may be subject to an additional step of "dynamic" analysis, which means that the code is actually executed[4] in a safe, simulated environment known as a "sandbox" that tracks the results to determine what the file actually does. *See, e.g.*, Dkt. 96-13 at 3. Each step of the analysis returns results that are fed into the Verdict Engine, which calculates a Threat Level verdict assessing risk on a scale of 0 to 10. *See id.* at 4. Like the SRX though, Sky ATP is not designed to modify or "instrument" the files it analyses.

32.     Juniper's own source code does not itself perform much of the analysis that is fed into the Verdict Engine. Instead, Sky ATP uses a series of "adapters" that serve as interfaces to allow the files to be processed by third-party engines. For example, Sky ATP uses an antivirus "adapter" to send the hash of files to OPSWAT's Metadefender's antivirus product. Dkt. 95-8 ¶ 6. Similarly, Sky ATP uses a "Deception"[5] adapter to interface with third party Joe Security's Joe Sandbox product, which provides Sky ATP's "dynamic" analysis results.

---

[3] The analysis steps do not necessarily proceed in the illustrative order described herein, and the actual order of analysis is determined by Sky ATP's Pipeline Manager.

[4] Running a potentially malicious file in a sandbox is sometimes called "detonating" it.

[5] The "Deception" adapter name is not to be confused with the concept of "sandbox with deception." Some malware is programmed to avoid revealing its true nature if it detects that it is in a sanitized sandbox environment. Therefore, sandboxing products often have "deception" techniques that attempt to mimic real-world environments so that potential malware is tricked into revealing its malicious behavior. *See, e.g.*, https://www.joesecurity.org/joe-sandbox-technology (discussing the ability to "simulate user behavior" in Joe Sandbox).

DECL. OF AVIEL D. RUBIN ISO
JUNIPER'S OPPOSITION TO FINJAN'S MSJ
(Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

33.     In contrast to Sky ATP's cloud-based service, ATP Appliance operates as local network appliance that physically connects to a network to provide malware analysis. The following diagram illustrates at a high level how ATP Appliance is deployed in a network:



34.     ATP Appliance observes network traffic by setting up "collectors" to copy files being downloaded from the Internet (which is referred to as "Perimeter Detection") or across the internal network (which is referred to as "Lateral Detection"). *See* ████████████████████████████████████████████████████████████

████   and   ████████████████████████████████████████████████ For example, ATP Appliance may be deployed in "collector mode" where the collectors reside on the ATP Appliance device and copy files that pass through. *See* ████████████ ████████████████████████████████      ████████████████████████████ ████████████████████ In the alternative, collectors may be distributed across existing network switches and gateways to route copied files back to the central ATP Appliance device. This process does not interrupt a file being sent to an endpoint destination. In other words, ATP Appliance operates passively and network flow is uninterrupted. Moreover, like the SRX and Sky ATP, ATP Appliance does not modify or "instrument" the files it receives and analyzes.

35.     During collection, a file hash is generated for the copied file. *See* ████████ ████████████████████████████████████████████████   ████   The hash is then checked to determine whether the file has been analyzed before. If not, the file is sent to ATP Appliance's "SmartCore" and undergoes a multi-stage analysis pipeline. *See*

██████████████████████████████████████████   ████████

██████████████████████████████████   ██   ████████

████████████████████

36.     ATP Appliance's analysis pipeline includes, among other things: (1) a "static analysis" component that uses rules and signatures to look for known threats (*see* ████████████████████████████████████, and (2) a "dynamic analysis" component (also referred to as "payload analysis") that executes the file in a safe environment known as a sandbox to analyze file behavior (*see* ████████████████████████████████████ ████████████████████   ████████████████████ ██████████████████████████

37.     In view of the above, it is clear that the accused products embody a very different type of technology than that claimed in the '154 Patent.  Among other differences, as discussed above, the "content processor" of Claim 1 must reside on a client/user computer, but none of the accused products are client/user computers.  The SRX is a gateway "SRX Series Services ***Gateways***" implies, a gateway.  *See* Ex. F ("SRX Series Services ***Gateway***").  Sky ATP is a cloud-based anti-malware service.  And the ATP Appliance is a tool used by system administrators that can be attached to network elements such as gateways and switches to passively collect files.  None of these are client/user devices.

38.     Another key difference between the accused products and the technology claimed in the '154 Patent is that the accused products do not modify or "instrument" content; as a result, they all process unmodified content received from the web server, in contrast to the system of Claim 1 which must process "modified" content as discussed in the claim construction section above.  *See, e.g.*, IPR2015-01979, Paper 62 (Final Written Decision) at 10 ("the claimed 'content,' in the context of the surrounding claim language, must refer to the ***modified*** content received at the client computer").

**B.     SRX**

39.     At a high level, Finjan's Motion appears to present two infringement theories related to the SRX.  In both cases, Finjan points to the SRX as the "content processor" and the "security computer" is either ATP Appliance or Sky ATP.  *See* Ex. B at 31:9-32:10.

- **Theory 1**: The alleged "content received over the network" is a URL address along with associated network request information, such as the browser version.  The alleged "call to a first function" is a call to open a link denoted by the "http://" prefix, which has an "input" of a URL address.  The claimed "second function" is allowing a file to be forwarded to the end user.  The claimed "indicat[ion]" that invoking the second function "is safe" is the verdict that SRX receives from Sky ATP or ATP Appliance.  Ex. B at 47:15-48:20, 63:17-64:3; Dkt. No. 368-4 (Motion) at 10-12.

- **Theory 2**: The alleged "content received over the network" is a file that has "embedded scripts" such as "unescape() or document.write() functions."   The alleged "first function" are one of these "embedded scripts," which has an "input" of a "URL or an IP address" or "the file hosted by the URL/IP address."  The claimed "second function" is allowing a file to be forwarded to the end user.  The claimed "indicat[ion]" that invoking the second function "is safe" is the verdict that SRX receives from Sky ATP or ATP Appliance.  Ex. B at 32:11-33:21; Dkt. No. 368-4 (Motion) at 10-12.

It is my opinion that Finjan has not met its burden to show that the SRX infringes Claim 1 under either of these theories.

### 1.     Claim 1 Preamble

40.     The preamble of Claim 1 is "A system for protecting a computer from dynamically generated malicious content, comprising."  It is my opinion that Finjan has not established that the SRX is a system for protecting a computer from dynamically generated malicious content within the meaning of Claim 1 because, as discussed in further detail below, the SRX does not satisfy all of the elements of the claim.

### 2.     Claim 1(a)

41.     The first limitation of Claim 1 is "a content processor for processing content received over a network, the content including a call to a first function, and the call including an

input, and for invoking a second function with the input, only if a security computer indicates that such invocation is safe." In my opinion, Finjan has not established that the SRX meets the requirements of limitation of Claim 1(a) for multiple reasons.

42.     As an initial matter, it is my opinion that the SRX does not meet the "content processor" limitation for two independent reasons discussed above: (1) it is not located at a client/user computer, and (2) it does not process modified content. Even if the SRX could be considered a "content processor," however, it is my opinion that the SRX does not meet the other limitations of Claim 1(a), as discussed in detail below.

>               *(a)     "Processing Content Received Over A Network, The Content*
>                        *Including A Call To A First Function"*

43.     Finjan alleges that the "content received over a network" that is "process[ed]" by the SRX "includes requests for communicating with a server (e.g., to obtain a file), as well as web content such as web pages, which include scripts or links to malicious executables or files." Dkt. No. 368-4 (Motion) at 10. In my opinion, Finjan has not established that either of these options satisfies the claim language.

44.     Regarding the "requests for communicating with a server (e.g., to obtain a file)," Dr. Mitzenmacher clarified that the "first function" within such content is the request that is typed into the user computer's web browser. Ex. B at 35:22-36:2 ("Q. so you're saying that in one scenario, you're pointing to the address that an end user types into their browser as the first function; is that fair? A. Yes. That is the function calling for content."). That "request" is not, however, received "over a network" by the content processor because it is generated by the user on the user's computer. Dr. Mitzenmacher admitted that the "get" function embodying the call to communicate with a server is part of the code for the browser on the user's computer rather than in content "received over a network" by the alleged "content processor" (*i.e.*, the SRX). *See* Ex. B at, *e.g.*, 36:5-8 ("Q: And is the get command or the get packet, is that part of the code for the [web] browser? A: That would be one way that it could be instantiated.").

45.     The user's "request" as identified by Finjan is also not a "function." Finjan alleges that the claimed "function" is "a call to open a link *denoted by the 'http://' prefix*," which "is a

DECL. OF AVIEL D. RUBIN ISO
JUNIPER'S OPPOSITION TO FINJAN'S MSJ
(Case No. 3:17-cv-05659-WHA)

directive in the HyperText Transfer Protocol for a computer to access Internet content."  Dkt. No. 368-4 (Motion) at 10.  But the "'http://' prefix" is not a "function" and it cannot be invoked.

46.    "HTTP" is short for Hypertext Transfer Protocol.  Ex. G at 1.  HTTP is a protocol that provides a set of rules to facilitate information exchange.  *Id.* at 7.  The HTTP protocol is one type of "scheme" that is incorporated into the beginning of the address used to find resources on the Internet, known as a Uniform Resource Identifier (URI), as shown below in the Internet Engineering Task Force's definition of URIs:

```
The generic URI syntax consists of a hierarchical sequence of
components referred to as the scheme, authority, path, query, and
fragment.

   URI         = scheme ":" hier-part [ "?" query ] [ "#" fragment ]

   hier-part   = "//" authority path-abempty
               / path-absolute
               / path-rootless
               / path-empty
```

Ex. H at 16.  URIs are defined such that the "scheme" is followed by a colon and two forward slashes, producing the prefix "http://".  The scheme is used to understand the syntax of the URI address.  The prefix "http://" is therefore just part of an address.  By way of loose analogy, it is similar to indicating that the subsequent address for a home is stated in a traditional street address format (such as 123 Doe St.) and not in GPS coordinates; the benefits of stating that at the beginning is that the recipient knows that the data "123" received thereafter is a street number and not latitude.

47.    Dr. Mitzenmacher alleges that the claimed "content" is merely a URL[6] address and the corresponding network request information such as the web browser's version.  Ex. B at 47:9-48:20.  But the claimed "content" must include at least "a call to first function," and as discussed above, the "http://" prefix and the rest of the URI are not a function, nor is network request information such as browser version.  Accordingly, the "content" identified by Finjan does not satisfy this element of the claim.  More generally, a POSITA would not understand metadata and similar network information to be within the scope of the claimed "content" because such metadata cannot contain "a call to a first function."

---

[6] A Uniform Resource Locator (URL) is a subset of URIs.  Ex. H at 7.

DECL. OF AVIEL D. RUBIN ISO
JUNIPER'S OPPOSITION TO FINJAN'S MSJ
(Case No. 3:17-cv-05659-WHA)

48.     Regarding the "web content such as web pages which include scripts or links to malicious executables or files," it is my opinion that Finjan has not established that the SRX actually contains functionality to "process" such content.  Specifically, Finjan alleges that the "SRX Gateways processes the received network traffic and extracts HTTP objects associated with files and HTML pages."  Dkt. No. 368-4 (Motion) at 10.  Finjan cites two pieces of evidence for this assertion.  First, Finjan cites Exhibit 4, which, as I stated above, is a development document that describes a feature that was not implemented on the SRX because it would consume too much memory.  Second, Finjan cites Exhibit 9, but that document actually clarifies that SRX extracts packets from streams in order to "submit *files*" to Sky ATP, not that the SRX "process[es]" any "content" within the packets it routes to send that processed content to Sky ATP.  As described above, the SRX does not "process" the "content" of any web pages it receives, as the SRX does not invoke any functions within the packets it receives nor does it modify them nor does it perform any dynamic analysis.  Thus, in the scenario where the alleged "content" is "web content such as web pages," Finjan has not established that the SRX actually "process[es]" such "content."

*(b)      "Invoking A Second function With The Input"*

49.     Finjan contends that the SRX "invokes a second function with the URL or IP address (i.e., the input) by allowing or blocking a communication with the inspected URL or IP address" or alternatively that it can "invoke a second function with the file (i.e. the input) hosted at the URL or IP address by forwarding or blocking the file."  Dkt. No. 368-4 (Motion) at 11.  It is my opinion that Finjan has not established that the SRX invokes such "second functions" with "the input."

50.     Claim 1 requires that the "second function" is invoked "only if a security computer indicates that such invocation is *safe*."  Therefore, "blocking" cannot comprise the claimed "second function" because blocking occurs when something is ***not*** safe.  Dr. Mitzenmacher even admitted that "blocking" would not meet the claim requirements.  Ex. B at 63:4-9.

51.     With respect to the potential "second function" of "allowing" or "forwarding" a file, Finjan has not established that such "second function" is invoked with "the input" to the "first function."  Neither Finjan nor Dr. Mitzenmacher actually identify any specific "first function" that

accepts a "file" as its input; the only specific "first functions" identified by Finjan or Dr. Mitzenmacher are the "http://" prefix, unescape(), and document.write() function, but they are all alleged to be invoked with only a URL or IP address as an input, not a file.  Dkt. No. 368-4 (Motion) at 10; Dkt. No. 368-6 (Mitzenmacher Dec.) at ¶ 31.  As such, a "second function" that is invoked with an input of "the *file*" is not invoked with "the input" of the "first function" as required by the claim which, in Finjan's theory, is a URL or IP address.

52.     In order to try to bridge this connection, Dr. Mitzenmacher takes the position that a file is the same[7] as the URL/IP address at which it is hosted and even that those components are the same as the hash of the file. Ex. B at 42:23-44:18.  I disagree with Dr. Mitzenmacher's opinion for many reasons.  Clearly, these components are not actually identical, or "syntactically the same" in Dr. Mitzenmacher's terminology.  *See id*.  Dr. Mitzenmacher has therefore expanded the meaning of "same" in a way that stretches it beyond recognition.  By way of analogy, Dr. Mitzenmacher would equate me as a human being (the file) with my name, Avi Rubin, which is used to identify me (the URL/IP address) or my social security number that proves I am who I say I am (the hash).  Each of these concepts are fundamentally distinct, and those distinctions have an impact in the real world.  For example, the file, its URL/IP where it can be located, and its hash would require different amounts of storage space.  Additionally, each of these components would require different operations to act upon them; for example, the "get" method identified by Dr. Mitzenmacher is used with a URL, not with a hash or a file.  Moreover, using the "URL/IP address" as an input to any of the alleged second functions that Dr. Mitzenmacher identified  result in a different output than using the actual file or the hash of the file as an input to that exact same function.

53.     In my opinion, Finjan has also failed to establish that the alleged "second functions" of "allowing"/"forwarding" are invoked with "the input" because Finjan did not identify any source code for the alleged "second functions." Dr. Mitzenmacher admitted at his deposition that the code he cited in his declaration does not actually include the alleged "allow"/"forward"

---

[7] Dr. Mitzenmacher has previously stated that "the input" to the second function must in fact be "the *same* input" as that used in the "first function."  *See* FINJAN-JN 425365 at 425400

function that he identified as the "second function." Ex. B (Mitzenmacher) at, *e.g.*, 67:5-9 ("Q. But that function that you're pointing to for the second function is not included in the source code that you've cited in your report? A. What I'd say is that – like I didn't put in the sending function itself."); *see also id.* at 81:24-82:6 ("Q. Did you identify in the Junos code the second function that you are relying upon for the scenario where the second function is allowing a client to communicate with a particular URL or IP address? A. I would have to check through the declaration, but I didn't see any other code cite references within the declaration itself."); 82:22-83:2 ("Q. But they [*i.e.*, the source code citations reviewed during deposition] don't show the actual functions of either allowing a file to go through or allowing a client to communicate with a particular IP or URL address; is that fair? A. I would say that it is not showing the code that performs those network level operations.").

54.     I also note that all of Dr. Mitzenmacher's citations within the Junos (*i.e.*, SRX) source code relate to Sky ATP, not the ATP Appliance. *See* Dkt. No. 368-6 at ¶¶ 26, 33-35, 66, 84 (all citations by Dr. Mitzenmacher to Junos code exclusively within ███████ directories); Dkt. No. 368-28 (Finjan Ex. 16) at 342-44, 379-80 (all Junos code attached to Finjan's Motion exclusively within ███████ directories).  Therefore, Finjan has not established that the SRX contains the code associated with its "second function" in the scenario in which ATP Appliance is the security computer.

55.     With respect to the scenario in which Sky ATP is the security computer, Dr. Mitzenmacher appears to identify ████████████████████ as the "allow" function to be invoked.  Dkt. No. 368-6 at ¶ 33.  But ██████████████████████ is not a function, rather it is part of an enumeration of constants, as shown below:

---

**8** As Dr. Mitzenmacher acknowledges, Sky ATP "is part of Juniper's Advanced Anti-Malware Solution 'AAMW.'"  Dkt. No. 368-6 at ¶ 16.



added).       Dr.     Mitzenmacher      also       appears      to       point      to

Dkt. No. 368-6 at ¶

35.  But this source code file is simply used to manage log files and does not "allow" / "forward"

files or communications based on verdicts received from Sky ATP.

56.     Within Sky ATP, the source code shows that the functions that "allows" files to be

sent  to  the  client  does  not  accept  a  URL,  IP  address,  or  "file"  as  an  input.  The

and

*See*                                                                         [9]       The

---

[9] Dr. Mitzenmacher identifies this same directory, but he does not point to any specific functions therein. Dkt. No. 368-6 at ¶ 34.

███████████ function is representative of the others and does not use a URL, IP address, or file as an input as shown below in the definition of the function:

██████████████████████████████████████████████████████████████████

Ex. J at l. 3550.

57.     In sum, it is my opinion that Finjan has failed to establish that the SRX invokes a "second function" to "allow"/"forward" with "*the* [same] input" to the "first function" because (a) Finjan has not identified any specific "first function" that accepts "the file" as its input and (b) Finjan has not identified any code for a "second function" that "allows"/"forwards" using an input of a URL or IP address.

*(c)     <u>Only If A Security Computer Indicates That Such Invocation Is Safe</u>*

58.     Finjan asserts that the SRX only allows communication with a URL / forwards a file to the client if Sky ATP or ATP Appliance indicate that the file or communication is safe via a "verdict" or through (vaguely specified) "threat intelligence data feeds."   Dkt. No. 368-4 (Motion) at 11-12.   In my opinion, Finjan has not established that the "verdict" or "threat intelligence data feeds" satisfy this claim limitation.

59.     To begin, the verdicts returned by Sky ATP and ATP Appliance apply to entire files.  *See, e.g.,* Ex. Q at 3 ("Juniper Sky ATP assigns a number between 0-10 to indicate the threat level of *files* scanned for malware").   Claim 1, on the other hand, requires that the indication returned by the security computer be tied to the "invocation" of the "second *function*."  *See* '154 Patent at Claim 1 ("invoking a second function with the input, only if a security computer indicates that *such invocation* is safe").   Sky ATP and ATP Appliance do not render safety "verdicts" or "threat intelligence data feeds" at the level of specific functions, so the "indicat[ion] that such invocation is safe" identified by Finjan does not satisfy this claim element.

60.     Additionally, neither Sky ATP nor ATP Appliance return an indication of whether invoking the second function is "safe" under Juniper's proposed construction, which is  the "security profile does not violate the client computer's security policy."   The client's security policy is kept locally on the client's SRX so it is the SRX—not Sky ATP or ATP Appliance—that

compares the verdict to the client computer's security policy to determine if there is a violation using the ███████████████████ function. *See* ███████████████████████████████████████████ *see also, e.g.*, Ex. Q at 1 ("***The SRX Series device compares*** this verdict number to the policy settings and either permits or denies the session."). The client computer's security policy is not stored on Sky ATP or ATP Appliance, so Sky ATP and ATP Appliance are not able to compare their verdicts against such policy. Finjan does not appear to dispute this, and instead Finjan argues that the verdict is compared to "the security policy of the ***system***," not the security policy of the client computer. *See* Dkt No. 368-4 (Motion) at 24. Additionally, I am not aware of components in the system (including on the SRX) that compares any "threat intelligence data feeds" against a client computer's security policy.

61.     Lastly, the second function of "allowing"/"forwarding" is not invoked "only if" a security computer indicates that such invocation is safe (regardless of which construction of the term "safe" is adopted). The SRX can be sold as a standalone gateway and firewall, and, indeed, I understand that the vast majority of SRX units are never configured to interface with Sky ATP or an ATP Appliance (Dkt. No. 125-8 at ¶¶ 5-6); as such, the SRX acting alone is obviously capable of "allowing"/"forwarding" communications or file without receiving any indications at all from any type of security computer. The SRX's Unified Threat Management (UTM) module is capable of filtering (*i.e.*, allowing or blocking) URLs and files, but that module operates without regard to Sky ATP or the ATP Appliance (*i.e.*, it is an independent, distinct module). *See* ██████████████████████████████████████ This UTM feature operates without receiving anything from Sky ATP or an ATP Appliance because, again, the SRX is fully capable of operating as a standalone unit without Sky ATP or ATP Appliance.

62.     Relatedly, when a new sample is first received by Sky ATP or ATP Appliance, the SRX will allow the sample through regardless of whether it is "safe." In those situations, Sky ATP and ATP Appliance do not have a risk assessment for those files, so the file is let through in order to avoid excessive delay while Sky ATP and ATP Appliance perform their analysis, which is then used only in subsequent instances where the same sample is encountered. *See, e.g.*, Ex. Q at 2 (if

the "lookup does not return a verdict, the file is sent to the client system while the Juniper Sky ATP cloud continues to examine the file using the remaining pipeline techniques.").

63.     Dr. Mitzenmacher apparently acknowledged that SRX will allow samples the first time they are encountered regardless of whether they are malicious, but opined that "a no verdict score" indicates "a policy decision that the file is deemed sufficiently safe that it can be returned to the user."  Ex. B at 91:12-93:14.  I am not aware of any evidence to support Dr. Mitzenmacher's contention that a "no verdict score" reflects a "policy decision" that the file is "safe."  Additionally, treating a score of "no verdict" (*i.e.*, unknown) as "safe" is broader than Finjan's own construction of the team "safe," which Finjan contended "simply means something that is not potentially harmful or malicious" and is therefore an objective determination, not a subject one.  Dkt. No. 176 at 20.  Dr. Mitzenmacher's opinion that something can be "safe" when there is "no verdict" because a file is subjectively unknown to be malicious would therefore not satisfy Finjan's own proposed construction.

64.     To the extent that Finjan is permitted to set forth additional theories with respect to how the SRX allegedly meets this claim element, I reserve the right to supplement this declaration.

### 3.     Claim 1(b)

65.     The second element of Claim 1 is "a transmitter for transmitting the input to the security computer for inspection, when the first function is invoked."  It is my opinion that Finjan has not established that Juniper infringes this claim element with the SRX.

> (a)     *"A Transmitter For Transmitting The Input To The Security Computer"*

66.     A person of ordinary skill in the art would not understand the claimed "transmitter" to be any generic transmitter.  That would not be very useful or innovative, nor would it comport with the plain language of the claim.  The claimed transmitter must specifically be "for transmitting the input to the security computer," so a person of ordinary skill in the art would understand the claimed "transmitter" must actually be capable of "transmitting the input to the security computer."  *See* '154 Patent at Claim 1 ("a transmitter for transmitting the input to the security computer").

67.     When the SRX is sold to a customer as a standalone unit, the SRX's "transmitter" is not capable of "transmitting the input to the security computer"—*i.e.*, it is not capable of transmitting anything to Sky ATP or an ATP Appliance.  In order for the SRX to transmit anything to Sky ATP, the SRX must first download a Junos OS operation script that in is used to download and install certificate authority licenses, create local certificates, and modify the configuration settings on the SRX itself.  *See* Ex. K.  Similarly, in order for the SRX to transmit anything to an ATP Appliance, the SRX must first download an executable (SLAX) script in order to complete various configuration steps.  *See* Jas ¶ 4.  Thus, without adding new code to the SRX that is not present on the standalone box, the SRX does not have a "transmitter" that is actually capable of "transmitting the input to the security computer."

              *(b)*     *"When The First Function Is Invoked"*

68.     Finjan presents two theories as to how transmission of "the input" to the "security computer" allegedly occurs "when the first function is invoked": (1) when "a client computer is iteratively loading a web page," or (2) "when [the SRX] downloads a file referenced by a link or when it extracts an HTTP object through de-obfuscation."  Dkt. No. 368-4 (Motion) at 13.  In my opinion, Finjan has not established that "the input" (*i.e.*, the URL or IP address) is transmitted to Sky ATP or ATP Appliance "when the first function is invoked" under either of these scenarios.

69.     Within the context of the claim, a POSITA would understand "when" to have its plain and ordinary meaning, which means that that the input is transmitted to the security computer at the time that the first function is invoked.  Finjan appears to share the same understanding of the plain and ordinary meaning of "when," as Finjan distinguished prior art during IPR by arguing that the prior art did not teach transmitting "when" the first function was invoked because the transmission was "not *as a result of* invoking a first function."  IPR2019-00031, Paper 7 (Patent Owner's Preliminary Response) at 27.  This plain and ordinary meaning is also supported by the specification of the patent, which teaches that the call to transmit to the security computer is part of the definition of the substitute (*i.e.*, "first") function:

'154 Patent at 9:45-53 (highlighting added); *see also* 10:62-64 ("***When*** content processor invokes the substitute function call (2), the input is passed to the security computer 215 for inspection.").

70.     With respect to the scenario where the client computer "is iteratively loading a web page," "the input" is not transmitted to the alleged security computers at the time the first function is invoked.  When the client tries to load a web page, first the client sends a request packet with the desired URL to the SRX; then the SRX relays the request to the Web server; then the Web server would invoke another function to generate the reply packets with the desired web page to be sent to the SRX; then, if the SRX is actually configured to interface with Sky ATP or ATP Appliance and if the SRX is configured to send that particular file type to Sky ATP[10] or ATP Appliance, then the SRX might transmit something to one of those components.  Thus, the input identified by Finjan—i.e., the URL or IP address—is not transmitted to a security computer at the time the first function is invoked because there are a series of intervening steps between the invocation of any alleged "get" function and when the input is actually transmitted to the security computer.

71.     The same issue applies with respect to the scenario where the SRX "downloads a file referenced by a link or when it extracts an HTTP object through de-obfuscation."  As noted above, Finjan has not even established that the SRX does these things.  But even if it did, these functions would not trigger the transmission of any input to the alleged security computer.  In other words, unlike the substitute function taught in the '154 Patent and discussed above where the invocation itself triggers the transmission of the input, downloading a file or extracting HTTP objects through de-obfuscation would not transmit anything to the alleged security computers.  In

---

[10] The SRX will also check what type of file it is and confirm that the user has permission to submit such file types to Sky ATP before sending any files.

DECL. OF AVIEL D. RUBIN ISO
JUNIPER'S OPPOSITION TO FINJAN'S MSJ
(Case No. 3:17-cv-05659-WHA)

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

both situations, different functions would have to be subsequently invoked at a later time in order to transmit anything to Sky ATP or the ATP Appliance.

72.     Additionally, it is my opinion that Finjan has not established that the SRX even actually "downloads a file referenced by a link or when it extracts an HTTP object through de-obfuscation" in order to invoke those alleged "first functions." For this assertion, Finjan relies on the same Exhibit 4 discussed above that describes a functionality that was never actually added to the SRX. *See* Dkt. No. 368-4 (Motion) at 14.

73.     Dr.           Mitzenmacher           also           points           to
███████████████████████████████████████████████████████████ in support of his opinion (Dkt. No. 368-6 at ¶ 66), but the source code he cites only shows the definition of a struct (essentially a grouped set of variables); the code Dr. Mitzenmacher cites does not show where or how the struct is actually used and, more importantly, a struct is not a "function" that can be invoked.

74.     As I discussed above, the SRX does not extract and invoke any functions in the content it receives because the SRX's primary responsibility as a gateway and firewall is to inspect packets.

75.     To the extent that Finjan is permitted to set forth additional theories with respect to how the SRX allegedly meets this claim element, I reserve the right to supplement this declaration.

**4.      Claim 1(c)**

76.     The final limitation of Claim 1 is "a receiver for receiving an indicator from the security computer whether it is safe to invoke the second function with the input." It is my opinion that Finjan has not established that Juniper infringes this claim element with the SRX.

77.     As I discussed above, the SRX's "transmitter" is incapable of "transmitting the input to the security computer" until code is downloaded onto the SRX that is used to modify and configure it to interface with Sky ATP or ATP Appliance. In the same way, any "receiver" on the SRX would not be capable of "receiving an indicator from the security computer" until the same modifications have been performed.

78.    Dr.    Mitzenmacher    points    to    Source    Code    page    342    in

████████████████████████████████████████████████████    *See*

Dkt. No. 368-6 at ¶ 84.  The cited source code is just a header file containing the definition of structs, which are essentially just a set of grouped variables.  This code does not allow SRX to receive anything from Sky ATP or ATP Appliance if the SRX has not yet been properly modified to interact with Sky ATP or ATP Appliance.

79.    Also as I discussed above, the "verdicts" and any "threat intelligence data feeds" returned by Sky ATP and ATP Appliance do not constitute an "indicator" as to "whether it is safe to invoke the second function with the input" because: (a) such information relates to files, not functions, and (b) such information is not compared against the client computer's security policy by either Sky ATP or ATP Appliance.

80.    To the extent that Finjan is permitted to set forth additional theories with respect to how the SRX allegedly meets this claim element, I reserve the right to supplement this declaration.

### C.    Finjan Has Not Established That Sky ATP Infringes Claim 1.

81.    Finjan presents two separate infringement theories for Sky ATP.  In its first theory, Finjan alleges that the dynamic analysis portion of the Malware Analysis Pipeline ("content processor") processes HTTP objects ("content") that contain a call to open a link denoted by the "http://" prefix ("call to a first function") using a URL or IP address ("input").  Dkt. No. 368-4 at 16.  The Malware Analysis Pipeline allegedly sends the URL/IP address to the Reputation Server ("security computer"),[11] which returns a "JSON result" indicating whether the URL/IP address is safe. *Id*. In the second theory Finjan alleges that the dynamic analysis portion of the Malware Analysis Pipeline ("content processor") processes objects that include HTML/JS scripts that have unescape() or document.write() functions ("call to a first function") using  "a sample file or information in the file, such as features extracted from the content (e.g. links, functions, scripts, or other code)" ("input"). These alleged inputs are sent to the Verdict Engine ("security computer"),

---

[11] I understand that Finjan makes fleeting references to a "meatascan [sic] server" that allegedly serves as a security computer. Dkt. No. 368-4 at 16.  It is my opinion that Finjan fails to detail a complete or coherent infringement theory. Regardless, I believe that Finjan's claim against the "meatascan [sic] server" suffer from the same flaws as its theory against the Reputation Server.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

which returns a verdict. *Id.* at 17. In both theories, Finjan alleges that the "second function" is either (1) a function to add the URL/IP address to the whitelist, or (2) a function that decides whether to do an "early exit" from scanning, subject the file to additional scanning, or mark the sample as done. *Id.* at 16-17. It is my opinion that Finjan's theories are based on untenable interpretations of the claim and false factual premises regarding how Sky ATP operates.

### 1. Claim 1(a)

82.      As I explain above in Section VIII.A., Finjan's infringement theory fails because Sky ATP is not a client/user computer, and because it does not process modified content. As such, it is my opinion that Sky ATP does not satisfy the "content processor" limitation.

*(a)      "Processing Content Received Over A Network, The Content Including A Call To A First Function"*

83.      As to the "first function," Finjan alleges: "[t]he HTTP objects or 'content' that Deception Adapters process include a call to a first function, such as a call to open a link denoted by the 'http://' prefix with an input including a URL or IP address." Dkt. No. 368-4 at 16. But, as I explain in Section VIII.B.2.(a), "http://" is not actually a function. And, any alleged function to "get" a webpage that is located at a particular URL would be part of the browser code being used to execute the file, not part of the "content" that is received over the network. As a result, it is my opinion that this is not a "first function" that satisfies the requirements of Claim 1.

*(b)      "Invoking A Second function With The Input"*

84.      With regard to both the Reputation Server and Verdict Engine theories, Finjan identifies two possible "second functions": (1) "adding the URL/IP address or the file hash to the whitelist," or (2) "stop the analysis on the input without going further" which it also refers to as an "early exit." Dkt. No. 368-4 at 16-17. Finjan does not identify any evidence that either of these functions use "the input" that it identified for the "first function"—i.e., the URL or IP address of a link that is embedded within a sample—as required by the claim.

85.      For example, the function that Finjan identifies as the alleged "whitelisting" function is the ███████████████ function, which is shown below:

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Dkt. 368-28 (Finjan Ex. 16) at 683:22-30; Ex. B (Mitzenmacher Dep.) at 112:2-12.  As shown, this function does not take any URL as an input, much less the URL for a link that is embedded within a sample.[12]  Moreover, Finjan and its expert appear to misunderstand the purpose of this function. This function is not used to add the URL or IP address of a sample or link referenced in a sample to the whitelist.  Rather, it is used to update the ▮▮▮▮▮▮▮▮▮▮ which is a list of internal hosts/users in a network that have downloaded malicious content.  While the function does take an "IP address" as an input (*see, e.g.*, *supra* line 29), it is the IP address of the internal host computer—not the IP address of where a malicious file or input came from. *Id*.

86.     As to the alleged "early exit" function, neither Finjan, nor its expert, identifies a single piece of source code evidencing this alleged function, much less any code that shows a function that uses the URL/IP addresses of any links detected during dynamic analysis as an input. With regard to the Reputation Server theory, Finjan does not cite any evidence that an "early exit" function is used.  Instead, Finjan cites a slideshow presentation on how the malware analysis pipeline interacts with the ***verdict engine***. *See* Dkt. No. 368-4 at 16 (citing Finjan Ex. 14).  *See* Ex. M (Finjan Ex. 14) at JNPR-FNJN_29017_00552908-09 (describing the antivirus, static analysis, and sandbox/deception adapters but making no reference to the reputation adapter or client). Moreover, Finjan's Verdict Engine theory is based on the premise that the dynamic analysis engine sends the verdict engine "the input."  Dkt No. 368-4 at 17-18.  The "early exit" cannot be the "second function" under this theory because dynamic analysis is the final step of the pipeline. Indeed, portions of Exhibit 14 illustrate this. *See* Ex. M (Finjan Ex. 14) at JNPR-

---

[12] In fact, Dr. Mitzenmacher's source code citations fail to identify a single instance where a "URL" is used as a function input, despite the fact that Finjan identifies the URL as the input to the first function.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

FNJN_29017_00552914 ("Sandbox + Deception (cont'd) • The sample's behavior (under duress of deception) either exposes it as malware or not. ***Either way, this is the end of the pipeline***."). In other words, because dynamic analysis is the final step, there is no "early" exit and the analysis stops regardless if it is safe, malicious, or still unknown.

87.     As to the Verdict Engine theory, Finjan admits that "the input" to the first and second functions is different.  Finjan claims that the "call to a first function" is "an unescape() or document.write() function that is used to obfuscate a suspicious link or URL."  Finjan goes on to state that "[i]n this example, the input is either a sample file or information in the file, such as features extracted from the content (e.g., links, functions, script, or other code)."  However, the "sample file" obviously cannot be the "input" to a function that is contained within the file.  Moreover, Finjan seems to ignore that the input to the unescape() and document.write() functions that it identifies would be the obfuscated link or URL, whereas the links, functions, scripts or other code extracted during dynamic analysis would be de-obfuscated.  The obfuscated input is not the same as the de-obfuscated input.

> *(c)      "Invoking A Second Function With The Input, Only If A Security Computer Indicates That Such Invocation Is Safe."*

88.     It is my opinion that Finjan's theory also fails to meet the requirement that the "second function" be invoked "with the input, only if a security computer indicates that such invocation is safe" for at least three reasons: (1) Sky ATP indicates whether a ***file*** is likely to be malware, not whether a ***function*** is safe or not; (2) neither of the second functions identified by Finjan are invoked "only if" Sky ATP indicates that such invocation is "safe"; and (3) Sky ATP does not provide an indication as to whether invoking a second function is "safe" under the proper construction.

89.     Claim 1 is directed toward a system with a security computer that analyzes functions, not a security computer that analyzes files.  This is fundamentally different from Sky ATP's analysis, which is directed toward assessing the threat risk of entire files, not particular functions contained within those files.  In other words, Sky ATP does not use the Reputation Server or Verdict Engine to make assessments about whether it is safe to invoke a particular function

contained within the content of a file that it is processing.  Instead, Sky ATP uses these engines to analyze information about the file as a whole, and make a determination.  Finjan's own evidentiary citations confirm this. For example, Finjan cites Exhibit 11 (Dkt. No. 368-22), which shows that the malware analysis pipeline submits "the full RDB object" to the verdict engine, which is representative of the whole sample received over the network. The verdict engine responds with its analysis on the full RBD object—not the individual inputs.  Finjan's Exhibit 14 further shows that it is the **sample itself** that is used as an input to the second function—not any input to a first function in the content. *See* Ex. M (Finjan Ex. 14) at JNPR-FNJN_29017_00552909 ("Essentially we want to decide, **for each sample**, whether it's malicious or not.") (emphasis added); *id.* ("we build ML models which can try to classify **a sample** at each stage where new metadata is available. At each stage, the VERDICT ENGINE will basically say, 'this is safe; stop scanning', 'this is malware; stop scanning and block it'") (emphasis added).  Nowhere in Finjan's Exhibit 14 does it purport to use function inputs (such as the URLs, IP addresses, or file hashes Finjan identifies) referenced within a sample received over a network as the input to "early exit."

90.     Finjan also claims that Sky ATP's deception adapters (another part of the analysis pipeline) supposedly work in concert with the Reputation Server to make security determinations on function inputs during dynamic analysis. Finjan's factual premise is incorrect: the deception adapters do not work with the reputation server to provide security analysis. Juniper's engineers have explained that the Reputation Server is **not** configured to work with the deception adapters to make security determinations, and the exhibit Finjan cites is actually just a design document that was never implemented into Sky ATP. *See* Ex. O (Islah) at 119:20-120:24 (discussing Finjan Ex. 10). As a result, any information that the deception adapters query from the Reputation Server is actually just "dummy data" that is not used. Thus, a second function is never invoked with "the inputs" included in a content's function calls and any function that is invoked is not even based off a security computer's analysis (i.e. "only if the security computer indicates that such invocation is safe").

91.     Moreover, it is my opinion that even if the decision to "whitelist" or a decision to make an "early exit" related to a particular function—as opposed to the file as a whole—these

functions still would not satisfy Claim 1 because they are not invoked "only if the security computer indicates that such invocation is safe."

92.      For example, the ███████████████ function that Finjan identified for its "whitelist" theory is invoked regardless of whether the file is deemed to be safe or not.  This is demonstrated by the fact that the function uses ███████ as an input and defines that parameter as either ████████████ as shown below:



Dkt. 368-28 (Finjan Ex. 16) at 683:22-30.

93.      I understand that at deposition, Dr. Mitzenmacher took the position that a function changes based on what parameter is used. *See* Ex. B (Mitzenmacher) at 116:5-14 (Q. So it's your opinion that using a different input or parameter for a function causes it to be a different function? A. Causes it to perform differently or perform different actions. So if we're saying that the underlying function here is to add to a whitelist or the underlying function is to add to a blacklist, then, yes, the parameter changes the function, it changes the functionality depending on that parameter."). I disagree with Dr. Mitzenmacher. A function does not change based on the chosen inputs or parameters. Instead, a function takes different inputs and parameters to generate different outputs. Here, the ███████████████ function does not change—it is invoked regardless if the Whitelist or Blacklist parameter is used—i.e., regardless of whether the URL or hash is determined to be safe or malicious.

94.      Finjan's allegations with regard to the alleged "early exit" function also do not show that it is invoked "only if the security computer indicates that such invocation is safe."  Finjan's own evidence demonstrates that "if [Sky ATP] ha[s] enough evidence that a file is either ***malicious*** or benign at some intermediate stage of the pipeline [Sky ATP] can 'early exit' and save the cost of full analysis." Ex. M (Finjan's Ex. 14) at JNPR-FNJN_29017_00552910 (emphasis added)

### REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

(original emphasis omitted); *see also id.* at 912; ("The results of the analyses are evaluated by ML models to determine (1) if a sample is so obviously malicious or benign that we can stop scanning it"); 909 (explaining that Sky ATP will "stop scanning" once it can classify a sample by saying "this is safe" or "this is malware"); 911 (**Early exit**: If a sample is identified to be malicious by the AV adapter, further processing isn't strictly necessary.").[13] Thus, Finjan's theory involving the alleged "early exit" function does not meet the "only if" requirement, as that function is called even when the file is deemed to be malicious.

95.   Moreover, it is my opinion that Finjan's theories against Sky ATP do not satisfy claim 1 because ATP Appliance does not provide an indication as to whether it is "safe" to invoke any alleged second function with the input under Juniper's proposed construction of "safe," which is the "security profile does not violate the client computer's security policy." The Reputation Server and Verdict Engine do not compare anything against a client computer's security policy. Instead, the Reputation Server simply indicates whether a sample is listed on a pre-existing list of malicious files or addresses. And, the Verdict Engine merely assigns a threat score to the file—it does not compare anything against a client computer's security policy. Instead, the client's security policy is kept locally on the client's SRX. Because the Verdict Engine is not even aware of the client computer's security policy, it is incapable of comparing the calculated verdict against any such security policy.

96.   It is also my opinion that Finjan's theory fails even under its own construction of "safe" as meaning anything that is "not potentially harmful or malicious." The verdict engine only generates a risk score that indicates how likely a file is to be malicious. If the verdict engine returns a low verdict, the file would still be "potentially harmful or malicious." Thus, the verdict engine never indicates "whether it is safe to invoke the second function with the input" even under Finjan's construction.

   **2.   Claim 1(b)**

---

[13] Notably, Exhibit 14—the only document Finjan or its expert relies on for its "early exit" theory—does not even purport to apply to the Reputation Server/adapter. The first page to the produced document illustrates the "early exit" functionality for the antivirus, static analysis, and sandbox/deception adapters only. *See* Ex. M (Finjan Ex. 14) at JNPR-FNJN_29017_00552908.

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

97.    I understand that the second limitation of Claim 1 requires "a transmitter for transmitting the input to the security computer for inspection when the first function is invoked." It is my opinion that Finjan has not shown that the Malware Analysis Pipeline transmits the input to the Reputation Server or Verdict Engine (the alleged security computer) for inspection "when the first function is invoked."

98.    Based on my review of the evidence, the only time the functions contained within a sample's content are invoked during Sky ATP's analysis is during dynamic analysis.  But Sky ATP dos not transmit any results of the analysis—whether it be URLs/IPs detected during dynamic analysis or the entire JSON result—to the Reputation Server or Verdict Engine until after the dynamic analysis is completed.  Indeed, Juniper licenses its dynamic analysis engine from third party Joe Security. To integrate Joe Security's dynamic analysis into the Malware Analysis Pipeline, Juniper sends a sample to Joe Sandbox using the Deception Adapter. Only when the dynamic analysis is over (i.e. when the functions are no longer invoked), Joe Sandbox sends a JSON report back to the Deception Adapter with the results of the analysis. Finjan's own evidentiary citations are consistent with this. Finjan Exhibit 11 depicts the ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ where the pipeline manager submits ▮▮▮▮▮▮▮▮▮▮▮ Dkt. No. 368-22 at JNPR-FNJN_29017_0052893. In other words, the pipeline manager only submits files to the verdict engine when the dynamic analysis is over (i.e. when the functions are no longer invoked).  Thus, any alleged transmission of the results of the analysis to the Reputation Server or Verdict Engine occurs well after the alleged "first function" is invoked—not "when the first function is invoked" as required by the claim.

99.    Based on my review of the evidence, outside of dynamic analysis, any calls to functions contained within the content of a sample are never even invoked. As a result, any processing of the content by the other adapters in the Malware Analysis Pipeline would not meet the requirement of "invoking the first function" because those components do not execute or initiate calls to a function. *See Palo Alto Networks, Inc. v. Finjan, Inc.*, 2018 WL 6040843 at *5-6 (Fed. Cir. November 19, 2018) (explaining that "invoking" may refer to executing a function or initiating a call to a function regardless whether the function is ultimately executed); *see also* Ex.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

B (Mitzenmacher) at 18:1-7 ("Q. What is the plain and ordinary meaning of 'invoking a function'? … THE WITNESS: Generally I'd say if you're invoking a function, you are, you know, calling or starting, otherwise attempting to initiate execution of that function.").[14]

### 3.     Claim 1(c)

100.     It is my opinion that Finjan's theories against Sky ATP also fail to satisfy limitation 1(c). As explained in Section VIII.C.1.(c), nothing in Sky ATP provides an indicator as to "whether it is safe to invoke the second function with the input."

### D.     Finjan Has Not Established That ATP Appliance Infringes Claim 1.

101.     Finjan has two theories for infringement against ATP Appliance.  For both theories, Finjan claims that ATP Appliance's SmartCore ("content processor") processes executables, pdfs, Microsoft Office files, and emails ("content") that contain a call to open a link denoted by the "http://" prefix ("call to a first function") using URLs, IP Addresses, calls to inject malicious code, and files that are extracted from the content ("inputs").  Dkt. No. 368-4 at 20.  In the first theory, Finjan alleges that the SmartCore sends URLs and files to Cyphort's Reputation Server ("security computer"), which returns an indication about whether the URL or file is malicious. *Id.* In the second theory, Finjan alleges that the SmartCore submits network traffic to the chain heuristics engine ("security computer"), which returns an indication as to whether the network traffic is safe. *Id.* at 20-21. In both theories, Finjan alleges that the "second function" is either (1) a function for moving an object to 'END' state, or (2) a function for marking an object as "clean." *Id.* at 21.  As an initial matter, Finjan does not cite to source code that exists in the accused product to support its theories. In addition, it is my opinion that the evidence Finjan cites does not establish that ATP Appliance meets the limitations of Claim 1.

### 1.     Finjan Does Not Cite The Release Versions Of The Source Code

102.     I have reviewed Finjan's motion and Dr. Mitzenmacher's declaration. It is my opinion that Finjan and its expert rely on the wrong source code. Finjan and its expert rely solely

---

[14] Notably, neither Finjan nor Dr. Mitzenmacher cite any code that shows that any other adapter in the Malware Analysis Pipeline contains any functionality to "activate" or "de-obfuscate" code. In any event, whether Sky ATP invokes its own de-obfuscation function is irrelevant to whether a call to a first function *included in the content* is invoked.

DECL. OF AVIEL D. RUBIN ISO
JUNIPER'S OPPOSITION TO FINJAN'S MSJ
(Case No. 3:17-cv-05659-WHA)

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

on source code from the █████████ and █████████ repositories.  *See* Dkt. No. 368-28
(Finjan's Ex. 16).  The █████████ repository contains research code that is not actually used
in any shipped products.  Jas ¶ 7.  The █████████ repository contains some modules of code
that may be incorporated to the released versions of the ATP Appliance, but it also contains
additional development code that has never been released.  *Id* at ¶ 8.  I have not seen any evidence
that Finjan or Dr. Mitzenmacher attempted to confirm that the █████████ code that they rely
on was actually incorporated into a released product.

103.    By reviewing the ATP Appliance code, one of ordinary skill in the art can easily
determine that the code Finjan and Dr. Mitzenmacher cite was not part of a released version of the
product. For example, by running a command it is possible to view a list of all branches in the
ATP Appliance code.  Based on my review, Finjan and Dr. Mitzenmacher's source code citations
correspond to a branch of development code called the █████████ which does not have any
indication that it (or any modules of code contained in it) was ever implemented in a release
product.  *See also* Jas ¶¶ 8-9.  In fact it does not.  *Id.*  Indeed, the produced code repositories
explicitly identify which code branches reflect release products by denoting them as, for example,
█████████ or █████████ as shown in this screenshot:



*See also* Jas ¶¶ 8-9.  It is not uncommon for companies keep code in git repositories that include
research code along with deployed code.  In this case, I understand that Juniper produced the ATP
Appliance code as it is kept in the ordinary course of business, which included every code
repository and branch concerning ATP Appliance, including all released code, inactive code,
research code, and the like. One skilled in the art, including myself, would describe this as a
complete production.   Because Juniper produced complete code repositories, developer logs
detailing how the code may have changed over time were also included.

DECL. OF AVIEL D. RUBIN ISO
JUNIPER'S OPPOSITION TO FINJAN'S MSJ
(Case No. 3:17-cv-05659-WHA)

### 2.    Claim 1(a)

104.    As I explain above in Section VIII.A., it is my opinion that ATP Appliance does not meet the "content processor" limitation because it is not a client/user computer, and because it does not process any modified content.

> (a)    *"Processing Content Received Over A Network, The Content Including A Call To A First Function"*

105.    As to the "first function," I understand that Finjan alleges: "ATP Appliance processes content such as executables, pdfs, Microsoft Office files, and emails, that include scripts having a call to a first function, such as a call to open a link denoted by the 'http://' prefix." Dkt. No. 368-4 at 20. But, as I discuss in Section VIII.B.2.(a), "http://" is not actually a function. And, any alleged function to "get" a webpage that is located at a particular URL would be part of the browser code being used to execute the file, not part of the "content" that is received over the network. As a result, it is my opinion that Finjan has not identified a "first function" that satisfies the requirements of Claim 1.

> (b)    *"Invoking A Second function With The Input"*

106.    Even if "http://" could properly be viewed as a "call to a first function"—which it cannot—Finjan's theory does not identified a "second function" that is invoked "with the input." I understand that Finjan argues that the "input" for the "first function" is "URLs, IP Addresses, calls to inject malicious code, and files that are extracted from the content for analysis." Dkt. No. 368-4 at 20. But it is my opinion that Finjan fails to identify any alleged "second function" that uses any of these things as an input. In particular, Finjan points to two alleged "second functions" that may be invoked: (1) moving an object to 'END' state, and (2) marking an object as clean.

107.    With respect to the alleged "moving an object to 'END' state" function, Finjan fails to identify any actual computer function in the code base. Instead, Finjan cites a design document that generically describes the result of some functionality in the system. Dkt. No. 368-4 at 21 (citing Finjan Ex. 15). Nothing in Finjan's exhibit suggests an alleged second function is invoked with the inputs used in the alleged first function.

DECL. OF AVIEL D. RUBIN ISO
JUNIPER'S OPPOSITION TO FINJAN'S MSJ
(Case No. 3:17-cv-05659-WHA)

108.     With respect to the alleged "marking an object as clean" function, Finjan similarly cites to a design document that fails to identify any actual computer function, let alone one that was invoked using the input included in the call to the first function.  See Dkt. No. 368-4 at 21 (citing Finjan Ex. 16 at 586-89) (simply noting "if the object was found to be a malware, this field is the malware name, otherwise it should be 'Clean'").  Moreover, the source code citations provided by Dr. Mitzenmacher reveal that any alleged second functions in the ATP Appliance code for classifying an object as clean are not invoked using one of the inputs identified by Finjan (i.e. "URLs, IP Addresses, [etc.] that are extracted from the content"), but rather the URL or source of the file itself.  *See* Dkt. No. 368-6 (Mitzenmacher Decl.) at ¶¶55-58 (identifying only the URL/source of an object/email (i.e. the "content") as the input to an alleged second function).  As such, it is my opinion that Finjan has failed to show that ATP Appliance invokes a second function "with the input" that Finjan identified for the alleged first function as required by Claim 1.

*(c)*     *"Invoking A Second Function With The Input, Only If A Security Computer Indicates That Such Invocation Is Safe."*

109.     It is my opinion that Finjan's theory also fails to meet the requirement that the "second function" be invoked "with the input, only if a security computer indicates that such invocation is safe" for at least three reasons: (1) ATP Appliance indicates whether a file is likely to be malware, not whether a function is safe or not; (2) ATP Appliance does not provide an indication as to whether invoking a second function is "safe" under the proper construction; and (3) neither of the second functions identified by Finjan are invoked "only if" ATP Appliance indicates that such invocation is "safe."

110.     First, Claim 1 is directed toward a system with a security computer that analyzes functions, not a security computer that analyzes files.  This is fundamentally different from ATP Appliance's analysis, which provides higher level security decisions on ***the whole file*** or a ***chain of objects*** (in the case of Chain Heuristics).  Once again, Finjan's own evidentiary citations confirm this.

111.     For its theory on "moving an object to 'END' state" as the alleged second function, Finjan cites Exhibit 15 to argue that "[d]epending on the verdict obtained from Chain Heuristics,

Cyphort decides if the suspicious **chain** needs to be looked at by the Browser Behavior Analysis Engine." Dkt. No. 369-16 (Finjan Ex. 15) at JNPR-FNJN_045344 (emphasis added).[15] But a "chain" is not the input used in a call to a first function that was included in the content received over a network. It is "the sequence of HTTP requests and responses between a particular source and destination." *See id.* In other words, the second function is invoked based on the chain, not with any inputs included in the content.

112.     It is my opinion that Finjan's theory where "marking an object as 'clean'" is the second function also fails. Finjan cites to Exhibit 16 at pp. 586-89, which is a design document that describes the process for system administrators to submit content for analysis. *See* Dkt. No. 368-28 (Finjan Ex. 16) at 586. Finjan has not presented any evidence that these methods are used to invoke any functions in connection with the alleged security computers (the Reputation Server or Chain Heuristics Engine). Moreover, the document makes clear that objects (i.e. the content) are submitted for analysis and "[i]f the **object** was found to be a malware, this field is the malware name, otherwise it should be 'Clean'." *Id.* at 589 (emphasis added). Nowhere does the document purport to mark the **inputs** to function calls included in the object as clean. As such, it is my opinion that Finjan's has failed to show that the second function is invoked with the inputs as required by the claim.

113.     Second, the alleged security computers do not indicate whether invoking the second function with the input is "safe" under Juniper's proposed construction. Neither the Reputation Server nor Chain Heuristics Engine compare anything against a client computer's security policy. The Reputation Server simply indicates whether a URL or hash is listed on a pre-existing list of malicious files or addresses.  Similarly, the Chain Heuristics Engine analyzes a chain of network traffic for suspicious indicators that are predetermined by researchers.  Thus, neither alleged security computer transmits an indication of whether it is "safe" to invoke the second function with the input.

---

[15] This theory would only be applicable to Finjan's theory that the Chain Heuristics engine acts as the alleged security computer. Finjan has provided absolutely no evidence that Cyphort moves an object to 'END' state only if the **Reputation Server** (the other alleged security computer) indicates it is safe.

114.    Moreover, it is my opinion that the alleged security computers do not indicate whether it is "safe" to invoke the second function with the input, even under Finjan's construction. Finjan argues that "safe" should be construed to mean "not potentially harmful or malicious." The effect of Finjan's construction is that the security computer must determine whether it is "not potentially harmful or malicious" to invoke the second function with the input.  But ATP Appliance makes no such determination. Finjan cites to Exhibit 12 to argue that ATP Appliance determines "whether an URL is malicious or benign." But what ATP Appliance determines as "benign" is actually a determination that "[t]he URL is known to be clean *or the URL is not known*." Dkt. No. 368-24 (Finjan Ex. 12) at JNPR-FNJN_29018_00971257 (emphasis added). In other words, even if ATP Appliance determines something is "benign" the file is still "potentially harmful or malicious."  Thus, ATP Appliance never indicates "whether it is safe to invoke the second function with the input" even under Finjan's construction.

115.    Finally, it is my opinion that Finjan's infringement theory fails because the alleged second functions may be invoked even if the Reputation Server or Chain Heuristics Engine indicate that it is not safe, contrary to limitation 1(a)(ii). For example, Finjan argues that "moving objects to 'END' state" is the second function and occurs if the objects are found to be safe—but so too if the objects are found to be dangerous. Finjan's own evidence explains that ATP Appliance decides whether to end the analysis simply "[d]epending on the verdict obtained." *See* Dkt. No. 369-16 (Finjan Ex. 15) at JNPR-FNJN_045341. Like Sky ATP, so long as the network content can be affirmatively identified as safe or unsafe, the analysis pipeline can end early.

116.    Finjan also argues that "marking an object as 'Clean'" may be a "second function" that is invoked if the input is safe. But the source code that Finjan's expert cites reveals that the actual computer functions are ███████ and ███████████ with ██████ as a possible parameter or input:

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

Dkt. No. 368-28 (Finjan Ex. 16) at 728:164-169. In other words, there is no function that marks an object as clean only if it is safe. There are simply functions that update a URL's classification, which may be clean or may not be. Either way the ███████ and ████████ functions are still invoked. Thus, it is my opinion that Finjan's theories fail to satisfy limitation 1(a)(ii).

### 3.    Claim 1(b)

117.    As explained in Section VIII.B.3.(b), Claim 1 requires transmitting the input to the security computer when—*i.e.*, *at which time*—the first function is invoked. But it is my opinion that neither of Finjan's theories—either using the Reputation Server or the Chain Heuristics Engine as the alleged security computer—satisfy this limitation.

118.    First, it is my opinion that Finjan's theory accusing the Reputation Server as the security computer does not involve invoking a first function, let alone transmitting inputs when it is invoked. The only time ATP Appliance "invokes" a content's call to a first function is during dynamic analysis. But the Reputation Server has nothing to do with dynamic analysis and content is checked against the Reputation Server long before any dynamic analysis is used later in the system. Similar to Sky ATP, Finjan does not set forth an intelligible theory as to how anything outside of dynamic analysis can be considered "invoking" a first function in the content. Indeed, the plain and ordinary meaning of "invoking" is executing or at the very least initiating the call to a function. *See Palo Alto Networks*, 2018 WL 6040843 at *5-6 (explaining that "invoking" may refer to executing a function or initiating a call to a function regardless whether the function is ultimately executed); *see also* Ex. B (Mitzenmacher) at 18:1-7 ("Q. What is the plain and ordinary meaning of 'invoking a function'? … THE WITNESS: Generally I'd say if you're invoking a function, you are, you know, calling or starting, otherwise attempting to initiate execution of that function."). Finjan merely points to "activating" or "extracting" *links* (i.e. the inputs). Finjan does not and cannot identify any instances of invoking *the first function* that is called within content received over the network when files are transmitted to the Reputation Server. Based on my review of the evidence, no such functionality exists.[16]

---

[16] Whether ATP Appliance invokes its own de-obfuscation function is irrelevant to whether a call to a first function *included in the content* is invoked.

DECL. OF AVIEL D. RUBIN ISO
JUNIPER'S OPPOSITION TO FINJAN'S MSJ
(Case No. 3:17-cv-05659-WHA)

119.    Second, it is my opinion that Finjan's theory accusing the Chain Heuristics Engine as the security computer does not involve transmitting inputs when a first function is invoked. Finjan argues that "[t]he chain heuristics engine, working with the Browser-Based Dynamic Analysis Environment and the Object Analysis Pipeline" is a security computer. Because ATP Appliance only invokes functions during dynamic analysis, the effect of Finjan's theory is that inputs are first transmitted to the Chain Heuristics Engine (the alleged security computer) and then a content's functions are later invoked by a dynamic analysis engine. But this is not what Claim 1 teaches. To infringe, the inputs must be transmitted "when" the first functions are invoked—not before. As such, it is my opinion that Finjan's theory fails to satisfy limitation 1(b).

### 4.    Claim 1(c)

120.    It is my opinion that Finjan's theories against ATP Appliance also fail to satisfy limitation 1(c). As explained in Section VIII.D.2.(c), nothing in ATP Appliance provides an indicator as to "whether it is safe to invoke the second function with the input."

### E.    The Accused Products Do Not Infringe Under The Doctrine Of Equivalents.

121.    I understand that Finjan alternatively alleges that the accused products infringe under the Doctrine of Equivalents ("DOE").  In my opinion, the accused products do not comprise a substantially equivalent system to that recited in Claim 1 because they do not perform substantially the same function in substantially the same way to achieve substantially the same result.

122.    Finjan's theory under the DOE alleges that the "verdict" and "threat intelligence data feeds" provided by Sky ATP and ATP Appliance to SRX constitute an equivalent indication of whether it is "safe" to invoke the second function.  *See* Dkt. No. 368-4 (Motion) at 24-25.  As explained below, I disagree.

123.    As a preliminary matter, Finjan's sole evidence for its position is paragraph 95 of Dr. Mitzenmacher's declaration.  *See* Dkt. No. 368-4 (Motion) at 24-25.  Dr. Mitzenmacher's declaration does not have 95 paragraphs.  As a result, I assume Finjan intended to cite to paragraph 94 of Dr. Mitzenmacher's declaration.  I note that paragraph 94 of Dr. Mitzenmacher's declaration

does not cite any evidence at all, neither documentation nor source code.  *See* Dkt. No. 368-6 (Mitzenmacher Dec.) at ¶ 94.

124.    In my opinion, the accused products do not perform substantially the same function as this element of Claim 1 because, as discussed above, Sky ATP's and ATP Appliance's verdict scores are associated with *files*, not with specific *functions*.  *See, e.g.*, Ex. Q at 3 ("Juniper Sky ATP assigns a number between 0-10 to indicate the threat level of *files* scanned for malware"). These verdict scores are in turned used to block *files*, not *functions*.  This distinction is importance because Claim 1 of the '154 Patent permits "safe" functions within otherwise malicious files to be invoked; by contrast, no functions within malicious files are allowed to be invoked at all in the system of the accused products.  The result is that the accused products are likely to be safer because even what might appear to be "safe" functions in a virus are never allowed to run; in other words, more malicious files are blocked in the system of the accused products than in the '154 system.

125.    The accused products also do not perform this function in substantially the same way.  As I mentioned above, the accused products make determinations of risk at the level of entire files, not at the level of specific functions.  As a result, the user need only specify what their risk threshold is on a scale of 0-10 of riskiness, which is fairly simple.  By contrast, the system of Claim 1 requires users to set security policies for each function, which could be a huge amount of work due to the sheer volume of different functions that could be considered not "safe."  Moreover, Juniper's customers that are not in the security field would expectedly depend on Juniper to determine which specific functions are "safe."  Thus, the accused products are substantially less burdensome on Juniper's customers relative to the system of Claim 1.  Juniper also benefits from its arrangement because Juniper does not host in the cloud its customers' security policies. Offloading the storage to Juniper's customers saves storage costs for Juniper.

126.    And the accused products also do not achieve substantially the same result.  The system of Claim 1 would actually be quite slow because each function in a file is checked by a security computer for "safety"; this would be a time-consuming process that slowed the execution of a file and requires a continuous network connection to the security computer.  By contrast, the

10654083

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

accused products permit files to run substantially more efficiently because "safe" files would not repeatedly ping the security computer while they execute. Moreover, once a file was passed through to the user because it is "safe," the user would not need an ongoing network connection to the security computer in order to execute the file.

127. Even if the Court did understand the accused products to transmit an indication of what is "safe" under the doctrine of equivalents, none of the rest of the claim would be satisfied under the doctrine of equivalents because the accused products perform different functions in a different way to achieve a different result than the system of Claim 1 for at least all of the reasons described above. Among other key reasons regarding why the accused products are not substantially equivalent to the claimed system: (i) the accused products do not modify content or perform any instrumentation, which makes them substantially faster and easier to implement than the system of Claim 1 which does require such modification; and (ii) none of the accused products are client/user computers, rather they are complex networking and security tools, which means they are purchased and used by different, more sophisticated network administrators to perform substantially different tasks.

128. To the extent that Finjan is permitted to set forth additional theories with respect to how the accused products allegedly meet the elements of Claim 1 under the doctrine of equivalents, I reserve the right to supplement this declaration.

//

Executed this 14th day of March, 2019 in Maryland.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____

Aviel D. Rubin