1  IRELL & MANELLA LLP
   Jonathan S. Kagan (SBN 166039)
2  jkagan@irell.com
   Alan Heinrich (SBN 212782)
3  aheinrich@irell.com
   Joshua Glucoft (SBN 301249)
4  jglucoft@irell.com
   1800 Avenue of the Stars, Suite 900
5  Los Angeles, California 90067-4276
   Telephone: (310) 277-1010
6  Facsimile: (310) 203-7199

7  Rebecca Carson (SBN 254105)
   rcarson@irell.com
8  Ingrid M. H. Petersen (SBN 313927)
   ipetersen@irell.com
9  Kevin Wang (SBN 318024)
   kwang@irell.com
10 840 Newport Center Drive, Suite 400
   Newport Beach, California 92660-6324
11 Telephone: (949) 760-0991
   Facsimile: (949) 760-5200

12
   *Attorneys for Defendant*
13 JUNIPER NETWORKS, INC.

14

15             **UNITED STATES DISTRICT COURT**

16            **NORTHERN DISTRICT OF CALIFORNIA**

17               **SAN FRANCISCO DIVISION**

18 FINJAN, INC., a Delaware Corporation,        ) Case No. 3:17-cv-05659-WHA
                                                )
19            Plaintiff,                        ) **JUNIPER NETWORKS, INC.'S**
                                                ) **NOTICE OF MOTION AND MOTION**
20       vs.                                    ) **FOR SANCTIONS**
                                                )
21 JUNIPER NETWORKS, INC., a Delaware           )
                                                ) Date: May 2, 2019
22 Corporation,                                 ) Time: 8:00 AM
                                                ) Courtroom: 12, 19th Floor
23            Defendant.                        ) Before: Hon. William Alsup
                                                )
24

25

26

27

28

## **NOTICE OF MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 2, 2019, at 8:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 12, 19th Floor, of the San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, California 94102, before the Honorable William Alsup, Defendant Juniper Networks, Inc. ("Juniper") will and hereby does move for an order sanctioning Finjan, Inc. ("Finjan").   This motion is based on: this Notice of Motion; the Memorandum of Points and Authorities below; the Declaration of Rebecca Carson and exhibits attached thereto; and such other written or oral argument as may be presented at or before the time this motion is heard by the Court.

## **STATEMENT OF RELIEF REQUESTED**

Juniper seeks an order sanctioning Finjan based on its conduct during and as a result of the first round of early motions for summary judgment.   Juniper believes that the amount of such sanction should be commensurate with the amount of resources Juniper and the Court were required to waste defending against improper infringement, validity, and damages positions, and it is prepared to submit a proposal to the Court if the Court believes such a proposal would be appropriate and useful.

# TABLE OF CONTENTS

Page

I.      INTRODUCTION..................................................................................................1

II.     LEGAL STANDARDS..........................................................................................2

III.    FINJAN'S "STRONGEST CLAIM"—CLAIM 10 OF THE '494

        PATENT—WAS MOOT FROM THE OUTSET ...............................................3

        A.      Finjan's Misstatements Of Law And Fact Concerning 35 U.S.C.

                § 287 Warrant Sanctions. .......................................................................3

                1.      Finjan Argued In Bad Faith That It Provided Constructive

                        Notice Of Its Infringement Claim Under 35 U.S.C. § 287(a). ...................4

                2.      Finjan Made False Statements Regarding Alleged Actual

                        Notice. ...................................................................................7

        B.      Finjan's Unsupported Damages Theories Warrant Sanctions................................9

IV.     FINJAN'S ALLEGATIONS ON CLAIM 1 OF THE '780 PATENT WERE

        BOGUS ..............................................................................................12

                1.      Finjan Did Not Even Oppose Juniper's Motion As To the

                        SRX. ...................................................................................13

                2.      Finjan's Infringement Theory For Sky ATP Was Based On

                        An Unreasonable Interpretation Of The Claims. .....................................14

                3.      Finjan Had No Legitimate Response To Juniper's Section

                        101 Defense. ...........................................................................16

V.      FINJAN'S OTHER FALSE STATEMENTS & UNREASONABLE

        LITIGATION CONDUCT DURING THE PATENT SHOWDOWN...........................17

        A.      Finjan Filed A § 282 Objection Based On False Statements. ..............................17

        B.      Finjan Made Frivolous Privilege Claims During Discovery................................18

VI.     CONCLUSION .............................................................................................19

1

## **<u>TABLE OF AUTHORITIES</u>**

2

**Page(s)**

3

**Cases**

4

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*,

5

    24 F.3d 178 (Fed. Cir. 1994) ................................................................................................5

6

*Anderson v. Asset Acceptance, LLC*,

7

    2010 WL 1752609 (N.D. Cal. Apr. 29, 2010) ....................................................................2, 7

*Arctic Cat, Inc. v. Bombardier Recreational Prods. Inc.*,

8

    876 F.3d 1350 (Fed. Cir. 2017) .........................................................................................3, 4

9

*B.K.B. v. Maui Police Dep't*,

10

    276 F.3d 1091 (9th Cir. 2002), *as amended* (Feb. 20, 2002) .....................................................2

11

*Chambers v. NASCO, Inc.*,

    501 U.S. 32 (1991) ...............................................................................................................2

12

*F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*,

13

    244 F.3d 1128 (9th Cir. 2001) ...............................................................................................2

14

*Finjan v. Blue Coat*,

15

    879 F.3d 1299 (Fed. Cir. 2018) ......................................................................................10, 11

16

*Finjan, Inc. v. Blue Coat Sys., Inc.*,

    No. CV-13-03999-BLF (N.D. Cal.) ....................................................................................15

17

*Funai Elec. Co., Ltd. v. Daewoo Elecs.*,

18

    616 F. 3d 1357 (Fed. Cir. 2010) ...........................................................................................8

19

*Homkow v. Musika Rs., Inc.*,

20

    2009 WL 721732 (S.D.N.Y. Mar. 18, 2009) .....................................................................16

21

*Intellectual Ventures I LLC v. Erie Indem. Co.*,

    200 F. Supp. 3d 565 (W.D. Penn. 2016) ............................................................................16

22

*Intellectual Ventures I LLC v. Symantec Corp.*,

23

    100 F. Supp. 3d 371 (D. Del. 2015), *aff'd in relevant part, rev'd on other*

    *grounds*, 838 F.3d 1307 (Fed. Cir. 2016) .........................................................................16

24

*LaFarge Corp. v. No. 1 Contracting Corp.*,

25

    2008 WL 2120518 (M.D. Pa. May 19, 2008), *modified in part*, 2008 WL

26

    3910673 (M.D. Pa. Aug. 20, 2008) ...........................................................................13, 14, 15

27

*Lans v. Dig. Equip. Corp.*,

    252 F.3d 1320 (Fed. Cir. 2001) .........................................................................................3, 4

28

*Mark Indus., Ltd. v. Sea Captain's Choice, Inc.*,
    50 F.3d 730 (9th Cir. 1995)..................................................................................................2

*Maxwell v. J. Baker, Inc.*,
    86 F.3d 1098 (Fed. Cir. 1996)............................................................................................4

*Nike, Inc. v. Wal-Mart Stores, Inc.*,
    138 F.3d 1437 (Fed. Cir. 1998)..........................................................................................4

*Phonometrics, Inc. v. Westin Hotel Co.*,
    350 F.3d 1242 (Fed. Cir. 2003)..........................................................................................3

*Raniere v. Microsoft Corp.*,
    2016 WL 4626584 (N.D. Tex. Sept 2, 2016), *aff'd*, 887 F.3d 1298 (Fed. Cir.
    2018)................................................................................................................................2, 7

*Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*,
    589 F. Supp. 2d 331 (S.D.N.Y. 2008)..............................................................................15

*Symantec Corp. v. Finjan, Inc.*,
    IPR2015-01892..............................................................................................................6, 12

*Symantec Corp. v. Zscaler, Inc.*,
    2018 WL 1456678 (N.D. Cal. Mar. 23, 2018)..................................................................16

*U.S. Ethernet Innovations, LLC v. Acer, Inc.*,
    2013 WL 4456161 (N.D. Cal. Aug. 16, 2013)....................................................................3

*Viola Sportswear, Inc. v. Mimun*,
    574 F. Supp. 619 (E.D.N.Y. 1983)...................................................................................13

**Statutes**

28 U.S.C. § 1927 ....................................................................................................................3, 12

35 U.S.C. § 101 ...............................................................................................................2, 13, 16

35 U.S.C. § 282 ......................................................................................................................2, 17

35 U.S.C. § 287 ...................................................................................................................1, 3, 4

35 U.S.C. § 287(a) ....................................................................................................................3, 4

**Other Authorities**

Rule 30(b)(6) ...............................................................................................................................18

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

This Court set forth the process for evaluating the first set of patent claims in this case during the Initial Case Management Conference.  At that time, the Court instructed Finjan to pick its "strongest claim" and Juniper to select Finjan's "weakest claim" for early summary judgment and, (if either party failed to obtain summary judgment) an expedited trial.  Dkt. 44 (2/22/18 Hr'g Tr. at 4-7).  The Court later explained that, depending on which side prevailed on each claim, the outcome could "warrant an injunction or sanctions" and that "[t]he potential remedies [of an injunction or sanctions] will be litigated soon after the early motions for summary judgment are decided." Dkt. 35 (Order at 4).  Litigation on the first round of claims in this Court is now complete, and Juniper prevailed on both Finjan's strongest and weakest claims.  In accordance with the procedure outlined by this Court, Juniper now brings this motion for sanctions on the first set of claims.

Juniper brings this motion not merely because it prevailed on both Finjan's strongest and weakest claims, but because Finjan was aware of the defects in its claims, yet continued to force Juniper to spend money defending them.  For example:

- Finjan's claim on the '494 Patent was dead on arrival because Finjan (a) filed suit *after* the '494 Patent expired, but (b) had no good faith basis to seek pre-suit damages under 35 U.S.C. § 287.  At trial, Finjan's arguments regarding constructive notice were directly contradicted by Finjan's own prior representations to the USPTO, and the testimony Finjan put forward regarding actual notice was refuted by the recording of the call between Finjan and Juniper that Finjan attempted to misrepresent.  Thus, Finjan's "strongest" claim was moot from the outset.

- Finjan repeatedly failed to set forth a factually and legally cognizable damages claim against Juniper.  The Court gave Finjan multiple chances, but Finjan squandered each one by putting forward overreaching damages theories that violated controlling law.

- In its infringement contentions, Finjan asserted that Juniper's SRX device alone infringed Claim 1 of the '780 Patent.  But after Juniper moved for summary judgment of non-

infringement, Finjan could not even muster an opposition to Juniper's motion with respect to the SRX alone.

- Finjan's infringement case on Claim 1 of the '780 Patent was grounded on a claim-construction position that was squarely at odds with what it told the United States Patent and Trademark Office ("USPTO") in order to get the patent in the first place.  It was also inherently inconsistent with the position that Finjan took to try to save the patent from Juniper's validity challenge under 35 U.S.C. § 101.

- Finjan made numerous misrepresentations to Juniper and the Court on multiple occasions, resulting in an unnecessary multiplication of the proceedings.  For example, Finjan made false statements regarding a number of "privilege" redactions to its documents and made additional false statements in its 35 U.S.C. § 282 motion during trial.

## II.    LEGAL STANDARDS

"Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, decorum, in their presence, and submission to their lawful mandates." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991).  The purpose of these inherent powers is to allow the federal courts to "manage their cases and courtroom effectively and to ensure obedience to their orders." *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1136 (9th Cir. 2001).  As such, district courts can order sanctions pursuant to their inherent powers to punish "willful abuse of the judicial process or bad faith conduct." *Mark Indus., Ltd. v. Sea Captain's Choice, Inc.*, 50 F.3d 730, 732 (9th Cir. 1995).  "Sanctions are available for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose." *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1108 (9th Cir. 2002), *as amended* (Feb. 20, 2002).  Under this standard, "misstatements of law and fact, coupled with an improper purpose, can be sanctioned under the inherent power of the court." *Anderson v. Asset Acceptance, LLC*, 2010 WL 1752609, at *4 (N.D. Cal. Apr. 29, 2010).  Parties that engage "in a pattern of obfuscation, offering inconsistent theories and arguments and promising to produce evidence that never materialized," and that fail to seize on multiple opportunities to correct deficient claims, are also subject to sanctions under the Court's inherent powers. *Raniere v.*

1   *Microsoft Corp.*, 2016 WL 4626584, at *5 (N.D. Tex. Sept 2, 2016), *aff'd*, 887 F.3d 1298, 1302

2   (Fed. Cir. 2018).

3         Alternatively, under 28 U.S.C. § 1927, "[a]ny attorney or other person admitted to conduct

4   cases in any court of the United States or any Territory thereof who so multiplies the proceedings

5   in any case unreasonably and vexatiously may be required by the court to satisfy personally the

6   excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  The

7   Federal Circuit has held that sanctions are warranted when a patentee "continues to litigate [its]

8   case" despite "knowing that its claim could not meet the standard for infringement." *Phonometrics,*

9   *Inc. v. Westin Hotel Co.*, 350 F.3d 1242, 1248 (Fed. Cir. 2003).

10  **III.    FINJAN'S "STRONGEST CLAIM"—CLAIM 10 OF THE '494 PATENT—WAS**

11  **MOOT FROM THE OUTSET**

12        Finjan selected Claim 10 of the '494 Patent as its strongest claim in this lawsuit.  However,

13  the '494 Patent expired eight months before Finjan filed its complaint against Juniper.  As a result,

14  this claim was moot unless Finjan proved both (a) compliance with 35 U.S.C. § 287, which would

15  entitle it to pre-suit damages; and (b) a cognizable damages theory.  *See Lans v. Dig. Equip. Corp.*,

16  252 F.3d 1320, 1328 (Fed. Cir. 2001) (affirming dismissal of patentee's infringement claim because

17  patentee failed to satisfy § 287 prior to expiration of the patent-in-suit).  Finjan never provided

18  evidence of either (much less both) of these requirements, and instead offered misstatements of law

19  and fact in an attempt to manufacture a false damages claim.  Finjan's conduct warrants sanctions.

20        **A.    Finjan's Misstatements Of Law And Fact Concerning 35 U.S.C. § 287**

21        **Warrant Sanctions.**

22        Under 35 U.S.C. § 287(a), "a patentee who makes or sells a patented article must mark his

23  articles or notify infringers of his patent in order to recover damages."  *Arctic Cat, Inc. v.*

24  *Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1365 (Fed. Cir. 2017).  A patentee may only

25  recover damages "from the time when it either began marking its product in compliance with section

26  287(a) [, constructive notice,] or when it actually notified [the accused infringer] of its infringement

27  . . . ." *U.S. Ethernet Innovations, LLC v. Acer, Inc.*, 2013 WL 4456161, at *5 (N.D. Cal. Aug. 16,

28  2013) (quoting *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996)).  "A patentee's

licensees must also comply with § 287, because the statute extends to 'persons making or selling any patented article for or under [the patentee].'" *Arctic Cat*, 876 F.3d at 1366.  Once Juniper put Finjan on notice that Finjan had not complied with this necessary element of its claim, Dkt. 96-11 at 2-3 (Unredacted Version at Dkt. 95-15), Finjan was required to establish that it satisfied § 287 prior to expiration of the '494 Patent, which occurred eight months before Finjan filed its Complaint. *Arctic Cat*, 876 F.3d at 1365; *Lans*, 252 F.3d at 1328 (affirming ruling that patentee had not stated an infringement claim because it failed to satisfy § 287 prior to expiration of the patent-in-suit). Finjan's response demonstrated it lacked a good-faith basis to assert the '494 Patent against Juniper.

**1.** **Finjan Argued In Bad Faith That It Provided Constructive Notice Of Its Infringement Claim Under 35 U.S.C. § 287(a).**

At trial, Finjan argued that it provided constructive notice to Juniper.  *See* Dkt. 339 (Trial Tr. at 918:13-19, 924:1-18, 925:24-926:7).  "In order to satisfy the constructive notice provision of the marking statute, [Finjan] must [show] that ***substantially all*** of the [embodying products] being distributed were marked, and that once marking began, the marking was substantially consistent and continuous." *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998) (emphasis added).  Further, with respect to its third-party licensees who sell products embodying the '494 Patent, Finjan had to show that it "made reasonable efforts to ensure compliance with the marking requirements." *Maxwell*, 86 F.3d at 1111-12.

It was undisputed that many of Finjan's licensees sell products embodying the '494 Patent. Indeed, Finjan identified at least four licensees that practice the '494 Patent in proceedings before the PTAB, as shown in the following chart (*see* Trial Ex. 1760 (emphasis added)):

| Product | Finjan Admission |
|---------|------------------|
| Websense (*id.* at 57-58) | "On March 18, 2014, Finjan asserted patent infringement of the '494 Patent against Websense, Inc. ('Websense'). . . . In September of 2014, Websense, Inc. took a license to Finjan's patent portfolio, including the '494 Patent. . . . ***Websense uses the inventions disclosed in the '494 Patent***." |
| Avast (*id.* at 56) | "Avast's Endpoint Protection and its connection with Avast Research Labs to identify new malicious threats ***utilize the inventions disclosed in the '494 Patent*** . . . [t]he majority of [Avast's] sales are related to the Endpoint Protection products and ***attributable to the invention of the '494 Patent***." |

| Product | Finjan Admission |
|---|---|
| F-Secure (*id.* at 57) | "F-Secure's multi-layered approach to security is comprised of five modules, each designed to address a particular aspect of the threat landscape and work together to provide a complete solution using the technology of the '494 Patent . . . Three of these modules are ***tied to the inventions disclosed in the '494 Patent.***" |
| Proofpoint (*id.* at 58-60) | "[I]n June of 2016, after the '494 Patent issued, Proofpoint and Finjan entered into a license agreement which included the '494 Patent and dismissed the litigation. . . . Proofpoint revenues for 2015 were $265.4 million. . . . The ***Proofpoint products practice the inventions disclosed in the '494 Patent*** and Proofpoint has obtained significant revenues from the sales of those products." |

And more generally, Finjan represented to the PTAB that "[a]fter the '494 issued, several licensees entered into license agreements, which included a license to the '494 Patent, to avoid litigation and to obtain a license to continue to make, use, offer to sell, and sell ***products that embodied the inventions disclosed in the '494 Patent***," and that "***[w]ithout a license to the '494 Patent***, the licensees would have lost business and revenues for its ***infringing products***." *Id.* at 55-56 (emphasis added).

It is also undisputed that Finjan's licensees do not mark their products with the '494 Patent, and that ***Finjan makes no effort to ensure that its licensees who use the '494 Patent mark their products with the '494 Patent***:

> [THE COURT:] As you sit here right now, can you identify a single product by any of those licensees that bears the marking of the '494 patent? You can answer that yes or no.
>
> THE WITNESS: As I sit here, no.
>
> . . .
>
> BY MS. CARSON:
>
> Q. You don't believe that any of Finjan's licenses have marking provisions; correct?
>
> A. That is my understanding, that our agreements do not.
>
> Q. And, in fact, you're not aware of any efforts by Finjan to monitor whether its licensees are marking their products with Finjan's patents; correct?
>
> A. That is correct.

Dkt. 336 (Trial Tr. at 318:24-319:11).

Because Finjan's licensees using the '494 Patent did not mark their products, Finjan has no viable constructive notice argument. *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 184-88 (Fed. Cir. 1994) (patentee did not provide constructive notice because its licensees failed to

mark).   Yet at trial, Finjan disputed this straightforward issue and attempted to disown its prior representations to the USPTO.  Finjan insisted that there was no evidence that its licensees, from which it extracted millions of dollars in license payments, in fact practiced the '494 Patent.  Dkt. 339 (Trial Tr. at 924:7-11) ("[ANDRE:] There's no evidence in this case that other than [Finjan's Mobile Vital Security] product, no other product practices '494 other than Juniper's infringing product.  That's the only evidence you have in this case.  The only evidence you heard in this case, there's two products that practice the '494.").

Finjan's counsel went so far as to argue in closing that Finjan's statements to the USPTO were not evidence because they were made by a member of Finjan's trial team, earning a rebuke from the Court:

> [ANDRE:] [Juniper] Counsel just showed you an allegation made by Mr. Hannah, my buddy James over here.
>
> . . .
>
> What Mr. Hannah says is not evidence.
>
> . . .
>
> THE COURT: Mr. Andre, I think you might want to correct something.  It's true, not a word that's said by the lawyers in this courtroom is evidence. But that document that was submitted in the PTO by Mr. Hannah is evidence. It was submitted on behalf of your client as a – and it serves as what we call a party admission. So I think your statement that that is not evidence is incorrect.

Dkt. 339 (Trial Tr. at 958:16-17, 959:5-11).

Over the past decade, Finjan has sued at least 20 companies for patent infringement while the '494 Patent has been the subject of eight *inter partes* review proceedings.  In its proceedings before the USPTO, Finjan expressly relied on it licensees' sales as evidence of the "commercial success" of products embodying the '494 Patent (including, specifically, Claim 10).  Trial Ex. 1760 at 60.  In those proceedings, Finjan admitted that its licensees' products "embodied the inventions disclosed in the '494 Patent."  *Id.* at 55-56; *see also* Dkt. 126-16 (*Symantec Corp. v. Finjan, Inc.*, IPR2015-01892, Patent Owner's Resp.).  Before this Court, however, Finjan tried to take the exact opposite position—because that was the only way it could argue that its "marking obligation was complete."  Dkt. 339 (Trial Tr. at 924:14).

1    Finjan's practice of taking starkly conflicting positions from one proceeding to the next is

2    deliberate and carefully calculated to serve its imminent interests.  Finjan should be sanctioned for

3    its attempts to game the legal system.  *See Raniere*, 2016 WL 4626584, at \*5; *Anderson*, 2010 WL

4    1752609, at \*4.

5              **2.     Finjan Made False Statements Regarding Alleged Actual Notice.**

6    Finjan also made false statements about the actual notice it allegedly provided Juniper

7    concerning its infringement claim for the '494 Patent.  For actual notice, Finjan relies on a November

8    2015 call between John Garland of Finjan and Scott Coonan of Juniper.  Finjan misrepresented the

9    content of that call on a number of occasions before Finjan learned that Mr. Coonan had actually

10   (and legally) recorded that call.

11             In Finjan's initial interrogatory responses, Finjan stated that Mr. Garland identified Juniper's

12   Sky ATP product as infringing Finjan's patents during his November 2015 call with Mr. Coonan.

13   Dkt. 113-2 (Finjan's Second Suppl. Resp. to Interrog. No. 6 at 5) (Unsealed Version at Dkt. 120-1).

14   Mr. Garland also testified in his May 2018 deposition that he identified Sky ATP on his call with

15   Mr. Coonan, either as it relates to the '494 Patent or the '154 Patent.  Ex. A (5/24/18 Garland Dep.

16   at 217:9-17).

17             The recording of this call demonstrated that these sworn interrogatory responses and

18   testimony are false.  The recording provides concrete evidence that Mr. Garland did not mention

19   Sky ATP at all during the call.  *See* Trial Exs. 256, 257.  Indeed, after learning that the call was

20   recorded, Mr. Garland changed his testimony and admitted that he never mentioned Sky ATP on

21   the call.  Ex. B (11/2/2018 Garland Dep. at 315:19-22) ("Q: You never mentioned Sky ATP on the

22   call.  Is that correct? . . . THE WITNESS: I don't mention Sky ATP."); *see also* Dkt. 337 (Trial Tr.

23   at 588:13-16) ("Q. And you now know that you're mistaken and that you did not mention Sky ATP;

24   is that right?  A. I only know I'm mistaken because the call -- yeah, the call is recorded and taped

25   and transcribed").  Remarkably, Mr. Garland further admitted on cross-examination at trial that, if

26   it weren't for the recording, he would ***still*** be testifying that he identified Sky ATP on the call:

27         [Q.] I'm asking you about whether you mentioned Sky ATP, and you swore and you
           took an oath and you said you had.  That's correct isn't it?

28
           A. I believe --  I believed I had, yes.

- 7 -

Q. That's right.  And if we did not have that transcript, that is still the testimony you would be giving today; isn't that right?

A. That's correct.

Dkt. 337 (Trial Tr. at 588:23-589:5).

Mr. Garland attempted to justify this inconsistency by explaining that in his mind, the "advanced malware module" is Sky ATP.  *Id.* at 589:9-10 ("Again, I think advanced malware module in my mind is Sky ATP.").  According to Finjan, if Mr. Garland **thought** about Sky ATP in his mind when speaking with Mr. Coonan by phone, the call was sufficient to provide actual notice to Juniper that its Sky ATP product was being accused of infringement.  But this is nonsense; there is no legal or logical support for Finjan's "telepathic notice" theory.  In fact, the Federal Circuit has explained that "[t]o serve as actual notice, a letter must be sufficiently specific to support **an objective understanding** that the recipient may be an infringer."  *Funai Elec. Co., Ltd. v. Daewoo Elecs.*, 616 F. 3d 1357, 1373 (Fed. Cir. 2010) (emphasis added).  Here, where "advanced malware modules" are references to on-box features of the SRX product, there was no semblance of merit to Finjan's position that Mr. Garland's reference to "advanced malware modules" indicates Juniper's Sky ATP product.  *See* Trial Ex. 345 at 2 (SRX data sheet identifying "advanced malware" as an on-box feature of the SRX product).

Additional evidence further belies Mr. Garland's assertion that he was somehow implicitly identifying Sky ATP on the call.  In Mr. Garland's follow-up email to Juniper after his November 2015 call with Mr. Coonan, Mr. Garland states that Finjan sought to discuss in the call "the current and ongoing use of Finjan's patents by Juniper's SRX series services gateways next generation anti-threat firewall."  Dkt. 337 (Trial Tr. at 598:24-599:12) (quoting Trial Ex. 343).  As Mr. Garland admits, the follow-up email makes no mention of Juniper's Sky ATP product.  *Id.* at 598:24-599:15.

In sum, Finjan never had a good faith basis to contend that it provided either constructive or actual notice of its infringement claim under the '494 Patent, yet it advanced these theories throughout the case, up to and including in closing argument.  Its constructive notice argument directly contradicted representations it made to the USPTO in defending the validity of Claim 10, and its actual notice argument was based on demonstrably false testimony from its employee.

1   Finjan's misstatements of fact and law demonstrate that it was not entitled to pre-suit damages, and

2   hence its infringement claim under the '494 Patent was moot from the outset.   Finjan should be

3   sanctioned for ever asserting that claim—particularly after Juniper exposed the false basis for the

4   claim.

5          **B.        Finjan's Unsupported Damages Theories Warrant Sanctions**

6          Finjan's repeated failure to set forth a legally cognizable damages theory for the '494 Patent

7   similarly warrants sanctions.  At Summary Judgment, Finjan accused "(1) Juniper's SRX Gateways

8   used in combination with Sky ATP and (2) Sky ATP alone ('Accused Products')" of infringing

9   Claim 10 of the '494 Patent.  Dkt. 98 (Mot. at 1).  Unfortunately for Finjan, the Accused Products'

10  unapportioned revenues for the 14-month period from the release of Sky ATP to the expiration of

11  the '494 Patent totaled less than $1.8 million.  Had Finjan sought damages that complied with

12  controlling legal precedent, its damages claim would have been far less than litigation costs.

13  Dissatisfied with the accused revenues reasonably at issue, Finjan chose, instead, to spin out

14  damages theories that were legally and factually unsupportable.  Each of Finjan's ill-fated attempts

15  consumed judicial resources and required Juniper to incur unnecessary litigation expenses.  Indeed,

16  Finjan's failure to ever come up with a cognizable damages theory caused the whole trial to be a

17  waste of time for the parties, the Court, and the jury.  *See* Dkt. 339 (Trial Tr. at 839:6-8) (noting

18  when entering judgment as a matter of law that Finjan's case regarding damages was "woefully

19  inadequate").

20         Despite the extremely low royalty base in this case, Finjan submitted a damages expert report

21  seeking as much as $70 million in "reasonable royalty" damages.  *See* Dkt. 228-7 (Arst Rpt.).  To

22  justify this exorbitant amount, Finjan attempted to change the scope of its infringement claim to

23  include SRX products alone.  *See, e.g.*, Dkt. 238-4 (Finjan's Opp'n to Juniper *Daubert* at 3)

24  ("accused SRX products"), *id.* at 11 ("accused SRX gateways").  Mr. Arst even ***added*** sales for

25  additional non-infringing SRXs into his damages formula in a later-served errata at the behest of

26  Finjan's in-house counsel.  *See* Dkt. 228-11 (Arst Dep. at 58:5-60:7).  As detailed in Juniper's

27  *Daubert* Motion (Dkt. 230), Finjan had no reasonable basis to contend that Mr. Arst's damages

28  theories complied with controlling legal precedent.   Juniper incurred significant expenses in

1  responding to Finjan's precedent-defying damages report, including by submitting a responsive

2  damages report and filing a *Daubert* Motion.  Ultimately, this Court deemed Mr. Arst's report

3  "preposterous" and contrary to "basic laws of economics" and excluded Mr. Arst's testimony.  Dkt.

4  283 (Order re *Daubert* Mots. at 4, 6).

5        Next, in spite of the Court's *Daubert* ruling, Finjan took the untenable position that Mr. Arst

6  should still be permitted to testify.  Finjan pointed to a number of sections of his report that, when

7  pieced together, still failed to set forth a coherent damages theory.  Finjan's position was again

8  unreasonable and required Juniper to submit a responsive brief on this issue (Dkt. 292).  The Court

9  again excluded Mr. Arst and required Finjan to submit an Offer of Proof for its damages case.

10        On the last business day before trial, Finjan filed an Offer of Proof.  However, Finjan's Offer

11  of Proof failed to identify an intelligible and admissible damages theory, or to even identify the

12  amount of damages Finjan was seeking.  Juniper raised these and other deficiencies with Finjan's

13  Offer of Proof in a responsive brief (Dkt. 305).

14        At trial, Finjan attempted to cobble together a damages case via the testimony of its President

15  and CEO, Mr. Hartstein.  However, Mr. Hartstein presented damages theories that were legally

16  improper; indeed, some had already been expressly rejected by the Federal Circuit.  For example:

17  • **$20 Million Request**: Mr. Hartstein testified that prior to filing suit, Finjan would have

18      sought $20 million from Juniper during licensing negotiations.  Dkt 336 (Trial Tr. at 277:19-

19      278:6).  The Court properly struck this testimony as irrelevant and provided a limiting

20      instruction.  *Id.* at 292:3-294:12.

21  • **$8 Per User Rate**: Mr. Hartstein testified that Finjan employs an $8 per user rate in licensing

22      negotiations.  However, earlier in 2018, the Federal Circuit rejected this exact rate and

23      overturned a damages jury verdict in Finjan's favor.  *Finjan v. Blue Coat*, 879 F.3d 1299,

24      1311-12 (Fed. Cir. 2018) ("the $8 per user fee appears to have been plucked form thin air,

25      and, as such, cannot be the basis for a reasonable royalty calculation.").  Mr. Hartstein

26      confirmed that no licensee accepted an $8 per user rate.  Dkt. 336 (Trial Tr. at 315:24-316:5)

27      ("Q. You don't have any licensees who have actually paid Finjan a per-user rate, correct?

28      A. It does not show up in the license agreements, no.  Q. So you don't have any licensees

who have actually agreed to pay $8 per user for a license agreement; correct?  A. I think that's correct.").  Accordingly, Finjan lacked a good-faith basis to recycle this already-rejected theory.

- **$0.32 Cents Per Scan Rate**: Mr. Hartstein also testified that Finjan employs a $0.32 cents per scan rate in licensing negotiations.  However, Finjan's proposed $0.32 per scan rate was devoid of any evidentiary support and thus similarly "plucked from thin air."  *See Finjan*, 879 F.3d at 1312.  Not only was this $0.32 per scan figure unsupported, here, it would have led to absurd results.  Assuming 10 million scans per month (a number that was suggested by Finjan at trial), a $0.32 per scan royalty would result in damages of $44.8 million over the course of the damages period (10 million scans x 14 months in damages period x $0.32).  Finjan did not introduce any evidence that Juniper would have agreed to such an economically preposterous rate, which vastly exceeds Finjan's consistent starting point of 8% on hardware and 16% on software.  *See* Dkt. 336 (Trial Tr. at 314:3-6) ("Q. You're not aware of any instance where Finjan proposed a royalty that exceeded 16 percent of revenues for the accused products; correct?  A. As a proposal? No, I don't think so.").  Finjan thus lacked a good faith basis to introduce this per-scan rate.

- **8% on Hardware/16% on Software**: Lastly, Mr. Hartstein testified that Finjan's 8%/16% royalty rates are merely a starting point for negotiations.  Dkt. 336 (Trial Tr. at 332:11–15) ("Q. Now, during the negotiation, what happens?  What can happen with those rates?  A. Uhm, so I mentioned that each negotiation is unique.  So every company is its own situation. We use 8 and 16 percent as the starting point; right?").  However, Finjan introduced no evidence on the rate the reasonable parties in this case would actually reach.  Consequently, Finjan failed to provide evidence of a royalty rate that the jury could reasonably have adopted.  *See Finjan*, 879 F.3d at 1312 ("[T]estimony that an 8-16% royalty rate would be the current starting point in licensing negotiations says little about what the parties would have proposed or agreed to in a hypothetical arm's length negotiation [at the time of the hypothetical negotiation].").  Thus, Finjan also lacked a good faith basis to introduce these rates.

Notably absent from Mr. Hartstein's testimony and from Finjan's entire case was any evidence concerning apportionment. Juniper repeatedly raised the issue of apportionment as a major obstacle for Finjan's damages case (*see, e.g.*, Dkts. 292, 305). Ultimately, Finjan made no good faith effort to comply with the law on apportionment. Instead, Finjan made a half-hearted and last-minute attempt to put forth an apportionment theory in its Opposition to Juniper's Rule 50(a) Motion. Dkt. 325. However, Finjan's theory failed to meaningfully account for the many non-accused features of Sky ATP and of SRX. This failure ultimately led the Court to grant Juniper's motion for judgment as a matter of law on Finjan's damages claim.

Finjan had multiple opportunities to present a cognizable damages theory, beginning with the opportunity to submit a damages expert report. After the exclusion of Finjan's expert, the Court gave Finjan an opportunity to submit an Offer of Proof for a fact-based damages case at trial. But Finjan's Offer of Proof similarly failed to articulate a colorable damages theory—or even the amount of damages Finjan would seek. Instead, Finjan attempted to hide the ball and refused to comply with this Court's rules, the Rules of Civil Procedure, and binding precedent. Bad faith infected Finjan's damages case from beginning to end, all resulting from its dissatisfaction with the Accused Products' low revenues. Finjan should be sanctioned under the Court's inherent power as well as under 28 U.S.C. § 1927 for unreasonably multiplying damages-related proceedings in this case.

## IV.    FINJAN'S ALLEGATIONS ON CLAIM 1 OF THE '780 PATENT WERE BOGUS

At the Case Management Conference, the Court described the patent showdown as follows:

> Pick the weakest [patent claim] [Finjan is] asserting against you. And ***if it turns out you're crystal clear on that one***, even if you might lose on the other one, ***you're going to get sanctions against them if it warrants sanctions***. And ***[Finjan] will have to pay that right off the bat***. Could be hundreds of thousands of dollars for having brought a bogus claim against Juniper.

Dkt. 44 at 6:12-18 (emphasis added). The Court thereafter granted in full Juniper's motion for summary judgment of non-infringement on Claim 1 of the '780 Patent. *See* Dkt. 180.

Finjan's assertion of Claim 1 of the '780 Patent against Juniper's SRX and Sky ATP products was doomed from the outset. *See* Dkts. 44, 180. Indeed, Finjan did not even bother to oppose Juniper's motion for summary judgement on its SRX-alone infringement theory. As to Sky ATP,

Finjan's infringement theory was squarely at odds with the intrinsic record, its own arguments in previous litigation, and the positions it took in this litigation to try to save the patent from Juniper's § 101 challenge.  Because it is "crystal clear" that Finjan's assertion of Claim 1 of the '780 Patent against Juniper was baseless, the Court should award Juniper sanctions.

### 1. Finjan Did Not Even Oppose Juniper's Motion As To the SRX.

Finjan provided three separate infringement charts for Claim 1 of the '780 Patent for the following products: (1) SRX, (2) Sky ATP, and (3) ATP Appliance.  *See* Ex. C (Finjan's Initial Infringement Contentions at 2) (referencing attached claim charts in Appendices B-1 through B-3).  Juniper moved for summary judgment of no infringement on both SRX and Sky ATP.[1]  Finjan did not oppose Juniper's motion on the SRX alone, presumably because it had no colorable basis for advancing such a theory in the first instance.  If Finjan did not intend to pursue its claim against SRX alone, it should not have wasted Juniper and the Court's time by serving (and not withdrawing prior to summary judgement) infringement contentions for the SRX alone and forcing Juniper to file a motion for summary judgment.[2]  Finjan's decision to advance this meritless theory was unreasonable and warrants sanctions.  *See Viola Sportswear, Inc. v. Mimun*, 574 F. Supp. 619, 620 (E.D.N.Y. 1983) (awarding attorneys' fees to defendants on the basis that plaintiff's case was without merit where plaintiff compelled defendants to file a motion for summary judgment which plaintiff did not oppose and which was granted); *LaFarge Corp. v. No. 1 Contracting Corp.*, 2008 WL 2120518, at *5-6 (M.D. Pa. May 19, 2008) (granting plaintiff's motion for sanctions where defendants did not have a meritorious defense to plaintiff's claim and did not oppose the summary judgment motion), *modified in part*, 2008 WL 3910673 (M.D. Pa. Aug. 20, 2008).

---

[1] The Court excluded the ATP Appliance from the first round of the patent showdown proceedings because Finjan did not add it to the case until May 18, 2018.  *See* Dkt. 85 at 5.

[2] Finjan's practice of refusing to drop frivolous claims and then not opposing Juniper's motion for summary judgment continues.  Before round two of the patent "showdown," Juniper asked Finjan to drop Claim 9 of the '780 Patent in view of the Court's adverse claim construction on Claim 1.  Finjan refused.  *See* Ex. D (Emails Between Counsel).  Juniper thus spent time and resources preparing a motion for summary judgement on all of the accused products.  Dkt. 371 (Mot.).  When Finjan filed its opposition, it only addressed the ATP Appliance, and did not oppose Juniper's motion as to SRX or Sky ATP.  Dkt. 393 (Opp'n).

1          **2.      Finjan's Infringement Theory For Sky ATP Was Based On An**

2                   **Unreasonable Interpretation Of The Claims.**

3          As to Sky ATP, the Court's decision granting Juniper's motion for summary judgement of

4   non-infringement hinged on the fact that Juniper's products do not "perform[] a hashing function

5   on the Downloadable and the fetched software components to generate a Downloadable ID."

6   Dkt. 180 at 10.  Finjan should have known that its position to the contrary was baseless from start,

7   as it was grounded on a claim construction position squarely contradicted by the file history, and

8   which conflicted with the positions Finjan advanced in other litigations against other defendants.

9          The Court summarized Finjan's infringement theory as follows:

10         [W]hen the SRX with Sky ATP dynamically analyzes an incoming Downloadable,
            Sky ATP creates subhashes for the incoming Downloadable and its 'dropped' files
11         (fetched components).  These hashes are then stored together, constituting a single,
            global Downloadable ID (*see* Opp. 20; Mitz. Decl ¶ 91, 98).
12

13  Dkt. 180 at 10.  Finjan's theory was based on a claim construction position that the Court also

14  summarized as follows:

15         Finjan seems to argue that Sky ATP meets this limitation because 'together with' can
            mean a myriad of things.  It asserts that 'together with' can mean 'together in time,'
16         i.e., the downloadable and the fetched components are hashed simultaneously but
            separately (see Reply Exhi. 1 at 125:10-15).  Finjan also assert that 'together with'
17         can occur at different times (Dkt. No. 151-6 at 125:3-5).  Nothing matters, Finjan
            seemingly argues, so long as at the end, all separate hashes get collected together and
18         stored someplace as one 'larger global' Downloadable ID (see Reply Exh. 1 at
            129:10-130:16).
19

20  *Id.* at 6.

21         These arguments were unreasonable in view of the positions that Finjan took during

22  prosecution of the patent.  In particular, Finjan explained to the USPTO that the whole point of the

23  '780 invention is that it has the capability of producing the same hash value (Downloadable ID)

24  regardless of which particular software components are actually included in the Downloadable and

25  which are merely referenced:

26         An advantage of the present invention is that it produces **the same ID** for a
            Downloadable, ***regardless of which software components are included with the***
27         ***Downloadable and which software components are only referenced*** (original
            specification / page 9, lines 18-20; page 20, lines 5 and 6).  The same Downloadable
28         may be delivered **with some required software components included and others**

*missing, and in each case the generated Downloadable ID will be the same*.  Thus the same Downloadable is recognized through many equivalent guises.

Dkt. 96-2 at 3.

As the Court correctly noted, Finjan's proposed claim construction would "evade the point of the invention" because "Finjan's theory of separately hashing and collectively storing multiple hashes together as a Downloadable ID could [] potentially yield multiple IDs for the same Downloadable."  Dkt. 180 at 9.  Given that Finjan's claim construction theory was contrary to the whole point of the invention, Finjan should have known it was unreasonable.[3]

Finjan's infringement position was also in conflict with the positions it has taken in previous litigations.  In particular, Finjan took the position in this case that the claimed "Downloadable ID" is not limited to a single hash value, but could instead encompass *separate* hash values computed at *different* times, so long as they are later combined.  As noted above, the Court rejected this position as being contrary to the stated purpose of the invention.  Dkt. 180 at 7-8.  This rejection could not have come as a surprise to Finjan, given that Finjan's argument was contrary to its own position in prior litigations.  For example, in *Finjan, Inc. v. Blue Coat Sys., Inc.*, No. CV-13-03999-BLF (N.D. Cal.), Finjan's expert explained that "together with" meant that "things were to be done together and particularly **together in time**."  Dkt. 152-4 at 851:13-15 (emphasis added).  But in this case, because Juniper's products did not meet that requirement, Finjan's expert changed his position on the issue.  Dkt. 152-1 at 125:3-7.  Finjan's practice of taking inconsistent positions across its various proceedings to serve its changing interests is inappropriate and warrants sanctions.  *See Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, 589 F. Supp. 2d 331, 343 (S.D.N.Y. 2008) (sanctioning defendants and their attorneys for taking positions in the case and making affirmative representations to the court that were "utterly inconsistent" with their positions taken in other proceedings).

---

[3] Finjan has argued that the Court's claim construction is inconsistent with the orders of prior Courts.  But, contrary to Finjan's argument, no other courts have specifically construed the term "Downloadable ID" portion of the claim.  Rather, the only tribunal to address the "Downloadable ID" is the PTAB, which unequivocally found that there is "no persuasive support in the specification or the language of the claims for construing a Downloadable ID as 'one or more' hash values, that 'collectively' identify a Downloadable."  Dkt. 152-3 (IPR Decision at 9).

**3.     Finjan Had No Legitimate Response To Juniper's Section 101 Defense.**

The Court did not reach the issue of whether Claim 1 of the '780 Patent was unpatentable under 35 U.S.C. § 101 because it determined that Juniper did not infringe.  Nevertheless, Finjan's arguments on this issue justify sanctions because they illustrate that Finjan took inherently inconsistent infringement and validity positions.

As an initial matter, there can be no real dispute as to Step 1 of the two-part *Alice* test: Claim 1 is most certainly directed to an abstract idea.  Finjan itself has described the purported invention as concerning "generation of an ID for mobile code downloaded to a client computer, referred to as a Downloadable," Dkt. 96-6 (Prosecution History at 3), and courts have routinely found that claims directed toward creating an ID for a file are abstract.  *Symantec Corp. v. Zscaler, Inc.*, 2018 WL 1456678, at *5-6 (N.D. Cal. Mar. 23, 2018) (method for receiving chunks of computer files and generating a hash is abstract); *Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371, 375, 381 (D. Del. 2015), ("classifying content of *received files* by *creating a content identifier* and then comparing that content identifier to a database of other identifiers" where identifier was "created using a mathematical algorithm unique to the message content," i.e., "hashing," is abstract), *aff'd in relevant part, rev'd on other grounds*, 838 F.3d 1307, 1313 (Fed. Cir. 2016); *Intellectual Ventures I LLC v. Erie Indem. Co.*, 200 F. Supp. 3d 565, 568, 575 (W.D. Penn. 2016) ("selecting a file" and "generating a unique value corresponding to the file" is abstract).

As to Step 2 of the *Alice* test, Finjan acknowledged that the individual elements of Claim 1—fetching and hashing—"do not encapsulate the invention of the '780 [sic] Patent, nor provide the inventive concept by themselves."  Dkt. 129 at 32.  Instead, Finjan's sole argument was that "the ordered combination" provides the "inventive concept" in that the claim requires "fetch[ing] references to software components **before** hashing."  *Id.* at 31-32 (emphasis added).  The problem for Finjan is that this argument is contrary to its infringement theory.  Indeed, as noted above, Finjan argued that Claim 1 would include situations where the fetching step is performed ***after*** the hashing step.  Finjan's attempt to have it both ways is inappropriate and grounds for sanctions.  *See Homkow v. Musika Rs., Inc.*, 2009 WL 721732, at *24-25 (S.D.N.Y. Mar. 18, 2009) (awarding sanctions against defendants for defendants' contradictory and "mutually exclusive" statements to the Court).

1  **V.   FINJAN'S OTHER FALSE STATEMENTS & UNREASONABLE LITIGATION**

2  **CONDUCT DURING THE PATENT SHOWDOWN**

3      Since the beginning of this case, Finjan has also engaged in a pattern of unreasonable

4  litigation conduct that has unreasonably and vexatiously multiplied the proceedings in this matter.

5  Some of the most egregious examples are identified below:

6      **A.   Finjan Filed A § 282 Objection Based On False Statements.**

7      Finjan filed a baseless 35 U.S.C. § 282 objection during the December trial, seeking to

8  exclude several key prior art references. Dkt. 317. In its request, Finjan falsely claimed that Juniper

9  had failed to "affirmatively state the asserted publication date regarding certain printed publications"

10  prior to trial. Dkt. 317 at 2. Finjan identified Trial Exhibit 1070 (referred to as "Swimmer") as an

11  example of a reference for which Juniper had not asserted the date of publication during discovery.

12  *Id.* As the Court recognized at the hearing on this issue, Finjan's factual representations were false,

13  as Juniper had timely served invalidity contentions explicitly asserting "Swimmer was published in

14  September 1995." Dkt. 337 (Trial Tr. at 407:9 -409:3). The Court rightly denied Finjan's motion,

15  but not without having its time unduly wasted. *See id.* at 408:3-13 ([**THE COURT:**] "Well, when

16  I got to that absolutely false statement by Mr. Andre -- Mr. Andre -- I said this motion is denied.

17  We don't have time to go through every one of these items. Whenever there is a false statement

18  that bad, I'm going to deny the motion. So the 282 motion is history, is denied. And, Mr. Andre,

19  you should not have done that to me. **MR. ANDRE:** Your Honor, I apologize if that was -- **THE**

20  **COURT:** What do you mean "if"? How did you expect me to -- because I took it that maybe there

21  was a problem here. I spent some time on this. And it turns out it was just BS. It was just big firm

22  BS.").

23      It defies credulity to think that Finjan could mistakenly believe Juniper did not disclose

24  Swimmer as prior art as of September 1995. Swimmer is the prior art reference that invalidated

25  Claim 1 of the '494 Patent before the PTAB. *See* IPR2016-00159, Paper 50 at 45 ("In summary,

26  we are persuaded, for the foregoing reasons, that Petitioner has carried its burden to demonstrate

27  that all limitations of claim 1 are taught or suggested by Swimmer."). The parties debated Swimmer

28  at length in the summary judgment briefing as a precursor to trial. *See* Dkt. 126 at 39 (Juniper's

'494 Summary Judgment Opposition discussing the import of Swimmer); Dkt. 126-9 (Swimmer Reference); Dkt. 154 at 13 (Finjan's Reply Brief responding Juniper's argument on the PTAB decision and PTAB).   Juniper disclosed Dr. Rubin's expert report asserting that the '494 Patent lacked any inventiveness in part due to the disclosures found in Swimmer.  *See* Ex. E (9/11/2018 Rubin Rep. ¶¶ 29, 30, 32, 36, 37, 42, 47, 56, 57, 64); Ex. F (Rubin Report Ex. 3, Swimmer Reference).  ***Finjan itself*** disclosed Dr. Orso's expert report discussing Swimmer.  *See* Ex. G (10/11/2018 Orso Report ¶¶ 79-81).  Through all this, it is patently absurd for Finjan to contend that it genuinely believed that Swimmer's asserted publication date was not provided—it is literally on the face of the article, let alone being asserted in Juniper's invalidity contentions.

### B.   Finjan Made Frivolous Privilege Claims During Discovery.

As another example of Finjan's improper conduct, Finjan maintained unsupported privilege claims during discovery that caused Juniper to expend time and money to move to compel.  In particular, Finjan refused to produce notes from the November 2015 call between Mr. Garland and Mr. Coonan, even though Mr. Garland explicitly testified that he had used the notes to refresh his recollection before his Rule 30(b)(6) deposition.  *See* Dkt. 160; Dkt. 136-5 (Garland Dep. at 221:16-224:14) ("Q. Did reviewing your notes from the call refresh your recollection as to what occurred on the call? . . . THE WITNESS:  Yes.  Given it's November of 2015, yes.").  The Court raised this issue at a hearing on July 5, 2018, on an unrelated matter, before Finjan had filed its response to Juniper's motion to compel, and the Court warned Finjan that any alleged privilege was waived because Mr. Garland used the notes to refresh his recollection.  *See* Dkt. 144 (7/5/18 Hr'g Tr. at 3:15-4:19).

Instead of heeding the Court's warning and producing Mr. Garland's notes, Finjan filed a responsive letter brief asserting the work product privilege (Dkt. 155) and producing a redacted copy of the document (Dkt. 155-4).   Given Finjan's failure to produce a complete version of Mr. Garland's notes Juniper was forced to participate in the ordered meet and confer on July 18, 2018.   During the parties' meet and confer Juniper repeatedly requested that Finjan's counsel provide an explanation as to why the redacted portions of the notes were privileged, however, Finjan's counsel refused to provide explanation.  At the hearing counsel for Finjan claimed that the

redacted portions were "mental impressions" and that the redacted portions were "clearly . . . work product." Dkt. 164 (7/18/18 Hr'g Tr. at 4:10-11; 5:16-18). Ultimately the Court rejected Finjan's argument and ordered Finjan to produce an unredacted copy. The unredacted version was baffling. It demonstrated that Finjan had made misrepresentations to the Court and Juniper about the redacted portions being work product. In particular, the redactions consisted of a mean comment Mr. Garland made about Mr. Coonan, along with the word "sidebar" and some asterisks, as shown below:

I had my 30 minute call with Scott Coonan & I need to type it now because of how poor I think it went.  he's not a charmer

. . . .

** sidebar: at some point Scot did go through the meetings w/Finjan at Finjan where he was willing to share information re: one defendant.  I stated I was aware of that just not the meetings. & Julie rejected it.  So, I said, are you hurt ?  Is that the only acceptable solution.you  trade information and "it let's Juniper was-away" as you put it?  How did you value that offer?

S: It's up to you to value it.

J: So, Okay, Julie valued it and was not interested. So, does that event carryover to your attitude toward Finjan now/today?  Why do you think that was a fair trade?  How can you assume that addresses your potential royalties?  You nee dot assess that information & place a price on it.

***

Ex. H (Unredacted Copy).  There is no colorable basis for claiming these portions were work product, thus demonstrating Finjan's positions at the hearing were in bad faith.

Every action taken by Finjan concerning this dispute was unreasonable. First, Finjan failed to follow the Court's standing order requiring it to turn over Mr. Garland's notes before the deposition. Second, Finjan failed to satisfy Juniper's request that Finjan produce Mr. Garland's notes after the deposition. Third, Finjan failed to heed the Court's warning and produce a complete version of Mr. Garland's notes, instead opting to redact vague criticism of Mr. Coonan and asterisks. Fourth, Finjan misled the Court at the July 18, 2018, hearing by arguing that the redacted portions specifically constituted work product and mental impressions. Finjan's behavior cannot be justified by any rational explanation and is precisely the type of conduct that warrants sanctions.

## VI.    CONCLUSION

Juniper respectfully requests that the Court sanction Finjan based on its conduct during and as a result of the first round of early motions for summary judgment.  Juniper believes that the amount of such sanction should be commensurate with the amount of resources Juniper and the Court were required to waste defending against improper infringement, validity, and damages

1  positions, and it is prepared to submit a proposal to the Court if the Court believes such a proposal

2  would be appropriate and useful.

3

4  Dated:  March 28, 2019                             IRELL & MANELLA LLP

5

6                                                     By:  */s/ Rebecca Carson*

7                                                           Rebecca Carson
                                                           *Attorneys for Defendant*
                                                           JUNIPER NETWORKS, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28