REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT 1
# (REDACTED)

Page 18

```
 1        (The Reporter rebooted the attorneys'
 2   realtime-display iPads, which had lost Internet
 3   connectivity.)
 4            THE VIDEOGRAPHER:  9:16, back on the
 5   record.
 6   BY MS. CARSON:
 7       Q.   Let's turn to paragraph 43 of your
 8   declaration, please.  This paragraph talks about the
 9   language in the patent embodied in.  Do you see
10   that?
11       A.   Yes.
12       Q.   Is embodied in synonymous with
13   referenced?
14            MS. HEDVAT:  Objection, form.
15       A.   I don't think I would consider those
16   terms generally synonyms.
17       Q.   Would you consider embedded to be a
18   synonym with referenced?
19            MS. HEDVAT:  Objection, form.
20       A.   Embedded to be a synonym with
21   referenced?  Like generally I wouldn't consider
22   those two terms to be synonyms.  There may be some
23   context where they have a similar meaning, but I
24   think it would depend a lot on the context.  If we
25   have a thesaurus, we could....
```

Page 19

```
 1       Q.   Okay, I want to turn now to your
 2   infringement analysis.  Okay?  Did you perform any
 3   infringement analysis regarding whether the SRX
 4   infringes claim 9 of the '780 patent?
 5            MS. HEDVAT:  Objection, form.
 6       A.   So I'd say in the context of the
 7   declaration for summary judgment, my recollection is
 8   the SRX Gateway comes in as one of the possible
 9   collectors of the ATP appliance.  I believe I
10   mentioned that, for instance, at paragraph 51.
11   I would have to look to see if there were other
12   aspects of the SRX but that's one of the places
13   I remember it coming into play in this analysis.
14       Q.   Did you perform any analysis to
15   determine whether the SRX alone infringes claim 9 of
16   the '780 patent?
17       A.   So my recollection is for the purpose of
18   this declaration that the SRX was again one of the
19   collectors.  Just to be clear, my understanding was
20   that this was for the summary judgment and that
21   depending on the outcome of this and the various
22   legal issues that are associated with it, that I
23   would have the ability later, again, depending on
24   the outcome of this, to have a more detailed
25   infringement report that could cover additional
```

Page 20

```
 1   scenarios as well.
 2       Q.   So as of today, do you have an opinion
 3   one way or another whether the SRX alone infringes
 4   claim 9 of the '780 patent?
 5       A.   The SRX alone?  So I'd have to go back
 6   and look, but I can't recall that in the
 7   declaration.  Again, I have some understanding or
 8   thoughts outside the declaration but they haven't
 9   been fully formed or put into the report because my
10   understanding is, you know, the full report will
11   have to come later after the summary judgment issues
12   are decided.
13       Q.   Okay.  So I'm just trying to get a
14   sense, I just want to confirm:  At least insofar as
15   your declaration in connection with the summary
16   judgment motion, you are not offering an opinion
17   that the SRX loan infringes claim 9 of the '780
18   patent.  Is that fair?
19            MS. HEDVAT:  Objection, form.
20       A.   My recollection is that here I'm focused
21   on the SRX as it connects or interfaces with the ATP
22   appliance for the purpose of this declaration.
23       Q.   Do you know when the SRX first supported
24   interfacing with the ATP appliance?
25            MS. HEDVAT:  Objection, form.
```

Page 21

```
 1       A.   Today I can't recall.  I'd have to go
 2   back and check.
 3       Q.   That's not something that you analyzed
 4   in connection with your infringement analysis?
 5            MS. HEDVAT:  Objection, form.
 6       A.   I would say I probably did.  I just
 7   can't remember it offhand.
 8       Q.   Do you know if it was before or after
 9   November of 2017?
10       A.   Again, I can't recall a specific date,
11   so I'd have to go back and look.  I just can't
12   recall.
13       Q.   Did you perform any analysis to
14   determine whether Sky ATP infringes claim 9 of the
15   '780 patent?
16       A.   I don't believe I'm discussing Sky ATP
17   in this declaration is my recollection.  Again, I
18   understand that I may have a chance later to discuss
19   Sky ATP depending on the outcomes of this part of
20   the case.
21       Q.   When did the '780 patent expire?
22       A.   Can you provide me the '780 patent?
23            (Deposition Exhibit 2329 marked for
24   identification.)
25   BY MS. CARSON:
```

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY SOURCE CODE
MICHAEL D. MITZENMACHER, PH.D. - 03/28/2019   Pages 22..25

Page 22

1  Q.    So the court reporter has handed you
2  Exhibit 2329, which is a copy of the '780 patent.
3  Does that refresh your recollection as to when the
4  '780 patent expired?
5       A.    No.  I was checking, but I don't recall
6  the expiration date.
7       Q.    When performing your infringement
8  analysis, did you limit your review to versions of
9  the ATP appliance product that were released before
10 the '780 patent expired?
11            MS. HEDVAT:  Objection, form.
12      A.    That's my recollection, that the
13 functionalities I'm talking about existed I guess
14 both before and after the expiration date.
15      Q.    And what did you do to confirm that the
16 functionalities that you're relying upon existed in
17 the ATP appliance before the '780 patent expired?
18            MS. HEDVAT:  Objection, form.
19      A.    I think I'd say generally speaking
20 that's based on the material I had, the
21 documentation, deposition testimony and so on.
22      Q.    Did you confirm it in the source code?
23            MS. HEDVAT:  Objection, form.
24      A.    One sec.  (Pause)  Again, my
25 recollection is that there was sufficient

Page 23

1  information in the additional documentation and so
2  on.  I can't recall specifically dates associated
3  with the printed source code, so I'd have to go back
4  and check the dates, but I believe my recollection
5  from Rubin's report is that the source code is
6  consistent with everything I've described here.
7       Q.    Did you endeavor to rely on
8  documentation for the ATP appliance that predated
9  the expiration date of the patent?
10            MS. HEDVAT:  Objection, form.
11      A.    I would say in general I've relied on
12 all of the documentation.  I certainly relied on,
13 tried to rely on things that would have been before
14 as well as things that came after, with the
15 understanding that there had been a change in this
16 functionality, again, through the various
17 documentation, which I think is pretty consistent on
18 this point.
19      Q.    Would you agree that a development
20 document that postdates the expiration date of the
21 '780 patent might not reflect the functionality of
22 the ATP appliance during the relevant time period?
23            MS. HEDVAT:  Objection, form.
24      A.    I would say again in such situations,
25 you look for consistency across the range of

Page 24

1  documents, the deposition testimony, source code,
2  and all the materials.  But typically such documents
3  provide insight into the functioning of the system.
4  But as is the case for all documentation and
5  testimony and so on, you need to examine for
6  consistency.
7       Q.    Is there any documentation or deposition
8  testimony that you relied on to form your
9  infringement opinion that you didn't specifically
10 cite in your declaration?
11      A.    I would say that's certainly not the
12 intention.  I can't recall any as I sit here now.
13      Q.    Would you agree as a general matter that
14 a product's source code shows how the product
15 actually works?
16            MS. HEDVAT:  Objection, form.
17      A.    Generally that is one of the places
18 I would look to understand how a product functions,
19 yes.
20      Q.    Would you agree as a general matter that
21 it's important to review the source code when you
22 perform an infringement analysis?
23            MS. HEDVAT:  Objection, form.
24      A.    I would say that can be one of the
25 useful materials to examine.  It's certainly not the

Page 25

1  only one that can be examined, depends on the
2  context, but generally it's useful to look at the
3  source code.
4       Q.    I think we went over this at your last
5  deposition, but you haven't actually reviewed the
6  ATP appliance source code on the review computer.
7  Correct?
8       A.    Yes, my recollection is because of
9  scheduling reasons, I wasn't able to get out to see
10 it, although we've tried recently.  But, again, in
11 this declaration I'm responding in large part to
12 points raised by Dr. Rubin, and Dr. Rubin's report
13 laid out a useful framework or, you know, base, so
14 I was able to respond, I think, effectively based on
15 the printouts, the documentation, and so on.
16      Q.    And just to be clear, you didn't attempt
17 to go review the source code while you were
18 preparing your declaration for claim 9 of the '780
19 patent.  Correct?
20            MS. HEDVAT:  Objection, form.
21      A.    I think I would state it differently
22 that for various scheduling reasons, I don't think
23 it worked out.
24      Q.    You don't cite any source code in your
25 declaration.  Correct?

Page 26

```
 1      A.    I'd have to go back through and check
 2  but that I believe may be correct.
 3      Q.    Did you identify any hashing function in
 4  the ATP appliance code?
 5            MS. HEDVAT:  Objection, form.
 6      A.    I mean, I think I identified it by way
 7  of documentation and so on, that being in the code.
 8  There's discussion of in fact multiple hash
 9  functions that are used in conjunction with the ATP
10  appliance.
11      Q.    You haven't actually identified the
12  source code module that performs those hashing
13  functions in the ATP appliance code.  Correct?
14            MS. HEDVAT:  Objection, form.
15      A.    I mean, if you're stating did I like
16  cite them by line number, I don't believe I have.
17  But, on the other hand, the hash functions that are
18  being used as I discuss in my report are sort of the
19  standard hash functions, including things such as
20  sha1, and there are references to them within the
21  various documentation and so on.
22      Q.    Do you know which component of the ATP
23  appliance performs those hashing functions?
24      A.    I would have to go back and check, but
25  my recollection from one of the depositions is it's
```

Page 27

```
 1  one of, at least in some cases it's sort of the
 2  entry point for the ATP appliance.  Again, I'd have
 3  to go back and check.  I think it may be referred to
 4  as Kuchabara in some cases.
 5      Q.    Your understanding is that there's a
 6  Kuchabara module on the ATP appliance?
 7            MS. HEDVAT:  Objection, form.
 8      A.    I would have to go back and recall if
 9  that's what it was called in the deposition
10  testimony.  It referred to it as, you know, sort
11  of -- I recall the testimony discussing it as sort
12  of being the entry point or the sort of first stage
13  in the ATP appliance before further analysis is
14  done.
15      Q.    And what deposition are you referring
16  to?
17      A.    I'd have to go back and check.  I don't
18  remember the names related to depositions.
19      Q.    Is it cited in your declaration?
20      A.    I don't know.  I can look through and
21  check.
22      Q.    And just I'm honestly confused because
23  there haven't been any depositions of any fact
24  witnesses on ATP appliance.  I'm just trying to
25  figure out who you're referring to.
```

Page 28

```
 1      A.    Well, so my recollection is there was
 2  discussion of a hashing module related to Kuchabara
 3  and that some form of that was included or ported
 4  over or, you know, added to the ATP appliance.
 5  Again, I would have to go back and look over the
 6  depositions.  Again, I think what I cite is the
 7  documentation which discusses at various places the
 8  use of sha1 and other hash functions in like the ATP
 9  appliance guide, I believe some other documents, and
10  my recollection also -- perhaps you could pass me
11  the Rubin report -- is that it was -- Yeah, if you'd
12  pass me the Rubin report, I don't recall it being a
13  point of distinction or the suggestion that the
14  appliance itself did not hash the objects, so....
15      Q.    Have you ever seen the source code
16  whether on a computer or in a printout form from the
17  ATP appliance that's responsible for performing the
18  hash functions that you talk about in your report?
19            MS. HEDVAT:  Objection, form.
20      A.    I don't recall specifically.
21      Q.    Now, did you identify any function in
22  the ATP appliance source code that fetches software
23  components?
24      A.    (Pause)  So I don't believe I specify
25  like filenames and line numbers in the declaration,
```

Page 29

```
 1  and the source code would correspond to the pieces
 2  that relate to the various documentation that I cite
 3  describing the fetching functionalities starting at,
 4  for example, paragraph 59.
 5      Q.    Have you ever seen the source code,
 6  whether on a computer or in printout form, from the
 7  ATP appliance that is responsible for the alleged
 8  fetching function that you identify in your report?
 9            MS. HEDVAT:  Objection, form.
10      A.    I can't recall specific code aspects as
11  I sit here.  If I had the printouts, I could again
12  look through them and see if I can find specific
13  references.
14      Q.    But you definitely didn't cite them in
15  your report.  Correct?
16            MS. HEDVAT:  Objection, form.
17      A.    I don't recall code citations in the
18  report.  Again, I think that the documentation and
19  so on speaks for itself with regard to responding to
20  aspects of Dr. Rubin's report.
21      Q.    I want to step back a moment and just
22  make sure that I fully understand your infringement
23  theory.  So in your infringement theory, the
24  communications engine is the collector.  Correct?
25            MS. HEDVAT:  Objection, form.
```

Page 30

```
 1      A.    Yes, I would say the collectors
 2  correspond to the communication engines that obtain
 3  downloadables.
 4      Q.    And in your infringement theory, you've
 5  identified the SmartCore as the ID generator.
 6  Correct?
 7            MS. HEDVAT:  Objection, form.
 8      A.    Yes, I would say it's typically referred
 9  to as the SmartCore.  That is what I refer to in the
10  report.  You know, it's meant to correspond to that
11  part of the component that does the ID generation.
12      Q.    Sorry.  I'm just not sure I understand
13  your answer.  You said it's meant to correspond to
14  that part of the component that does the ID
15  generation.  Do you mean that part of the SmartCore
16  that does the ID generation?
17            MS. HEDVAT:  Objection, form.
18      A.    So I think what I would say is what
19  I've found in general in coding documentation is
20  that people are sometimes fuzzy on, you know, what
21  they say corresponds exactly to one component or
22  another.  So I believe in the references typically
23  it says that these actions take place in the
24  SmartCore, but I wouldn't want to somehow limit
25  myself if someone said, aha, it's actually like this
```

Page 31

```
 1  little piece over here which we've named something
 2  that looks different than the SmartCore.  My
 3  understanding is it's typically referred to as the
 4  SmartCore.
 5      Q.    Now, in paragraph 54 you provide some
 6  examples of downloadables that would satisfy claim
 7  element 9(a).  Correct?
 8      A.    That appears correct.
 9      Q.    One of the examples you point to is an
10  HTML file that includes a tag to a script.  Correct?
11            MS. HEDVAT:  Objection, form.
12      A.    That would be one possible example, yes.
13      Q.    Now, in your HTML example, are the tags
14  embedded within the HTML or are they just
15  referenced?
16            MS. HEDVAT:  Objection, form.
17      A.    I think I'm not clear on your question.
18      Q.    So you understand that in an HTML file,
19  a script could be embedded in the HTML file or there
20  could be a reference to a script that's external to
21  the HTML file.  Correct?
22      A.    Yes, I understand that.
23            MS. HEDVAT:  Objection, form.  Sorry.
24            THE WITNESS:  Sorry.
25      A.    Yes, I understand that.  That's slightly
```

Page 32

```
 1  different than your previous question.
 2      Q.    Okay.  So I'm trying to figure out
 3  whether your infringement opinion covers both of
 4  those situations or just one of them and, if just
 5  one of them, which one?
 6      A.    So if I recall, my understanding is that
 7  -- Well, with respect to this claim element, it's
 8  possible that both of those would correspond to the
 9  claim element.  But when we're looking at other
10  claim elements, I'm focused on the case where the
11  script code is within the document or within the
12  HTML.
13      Q.    Okay.  So your opinion on the HTML
14  example is that an HTML file that has a script
15  that's embedded in the file meets the limitation of
16  a downloadable that includes one or more references
17  to software components required to be executed by
18  the downloadable?
19            MS. HEDVAT:  Objection, form.
20      A.    I think if I understood your question
21  correctly, I think that's correct.  But, yes, if you
22  had an HTML that had one or more script components,
23  the script included that would correspond to a
24  downloadable, I guess that meets the claim language,
25  heh heh, that I think you were reciting.
```

Page 33

```
 1      Q.    Yeah, so I'm just trying to confirm that
 2  it was your understanding that when the script is
 3  actually embedded in the HTML file, that meets the
 4  requirement that the downloadable include one or
 5  more references to software components required to
 6  be executed by the downloadable?
 7            MS. HEDVAT:  Objection, form.
 8      A.    So, as I discussed, the reference then
 9  is given for instance by the tags that denote or
10  describe or give reference to that what follows will
11  be a code component.
12      Q.    When the reference -- Strike that.
13            When the script is embedded in the HTML
14  file, how does it get fetched?
15      A.    So I believe that's discussed for
16  instance in paragraph 59, that there are various
17  ways that can be fetched depending on how things are
18  transmitted from the collector to the ATP appliance.
19      Q.    Okay, so let's maybe just walk through
20  this example.  So the ATP appliance receives an HTML
21  file that has a script embedded within the file.
22  Are you with me?
23            MS. HEDVAT:  Objection, form.
24      A.    At some point in the process, sure.
25      Q.    Okay.  When does the fetching of that
```

Page 38

1   Q.   And PDF documents also can have either a
2  software component or script embedded within the
3  document or contain a link to that component.
4  Correct?
5        MS. HEDVAT:  Objection, form.
6   A.   I think that's correct.  I have to
7  remember if PDF specifically, if I count that as
8  linking, but I think that's correct.
9   Q.   And does your infringement opinion apply
10 only to situations where the PDF has the software
11 component embedded within the document or does it
12 also encompass situations where the PDF document
13 might contain a link to the software component?
14       MS. HEDVAT:  Objection, form.
15  A.   Again, so I think in this declaration
16 I'm focused on the first case, where the script code
17 is included within.  I do think that it is another
18 infringing scenario when it has a link, but if I
19 recall, that was something that came up in some of
20 the claim 1 discussion that the judge had a
21 different interpretation of some of the issues with
22 the claim construction.  So I think here I'm
23 limiting myself solely to the one case where the
24 code is included within the PDF, but like I wouldn't
25 want to say that I don't think the other case is not

Page 39

1  an infringing scenario.
2   Q.   I understand.
3   A.   Right, so....
4   Q.   For purposes of --
5        MS. HEDVAT:  Counsel, please let him
6  finish his answer.
7   A.   So for the purposes of the declaration,
8  I believe I've focused specifically on that, the
9  case where the code is included.  But again I think,
10 just as I was saying, I believe other cases also
11 could be an infringing scenario.
12  Q.   The third example you identify is a JAR
13 file.  Correct?
14  A.   Yes, although there are sort of subcases
15 with respect to the JAR file.
16  Q.   So in the JAR file example, is the JAR
17 file itself considered the downloadable or is the
18 main class file contained within the JAR file, the
19 downloadable?
20  A.   So each of those situations would
21 correspond to infringing scenarios.
22  Q.   Okay, so let's start with the scenario
23 where the JAR file itself is considered the
24 downloadable.  Okay?
25  A.   Okay.

Page 40

1   Q.   How do you execute a JAR file?
2   A.   It depends on the context.  In some
3  cases JAR files can be executed by clicking on them
4  after they've been downloaded.  In some cases a
5  component such as a browser could invoke the JAR
6  file depending on the setup or setting.
7   Q.   Could you provide me with an example of
8  how a JAR file would contain a reference to a
9  software component that's required to execute the
10 JAR file?
11  A.   So the way I would describe it is that
12 in a JAR file you can have multiple class files,
13 including the main class file that sort of starts or
14 is the starting point for the code, and one class
15 file can call upon functionality that appears in
16 another class file.  And if it does so, then that
17 additional class file I guess is a component or a
18 referenced component that would need to be there for
19 the program to run.
20  Q.   It would need to be there for the main
21 class file to run?
22  A.   For the main --
23       MS. HEDVAT:  Objection, form.
24  A.   To run successfully, yes.  I mean,
25 otherwise, if it can't find the necessary function,

Page 41

1  that would cause a break or a halt or a crash or
2  some other sort of problem, depending on the
3  context.
4   Q.   So that makes sense to me for the
5  scenario where the class file is the downloadable,
6  but I'm trying to figure out for the scenario where
7  the JAR file itself you're considering the
8  downloadable.  I'm trying to figure out for that how
9  that JAR file contains a reference to a software
10 component that's required to execute the JAR file as
11 opposed to execute the class file contained within
12 the JAR file.
13       MS. HEDVAT:  Objection, form.
14  A.   I think I'm really not clear on your
15 question, but I would say to the extent that I
16 understand the question, it's just that the JAR file
17 is the downloadable that contains multiple software
18 components that are required in order for that
19 downloadable to run or execute that'd have to be
20 obtained and fetched as required by the claim
21 elements.
22  Q.   What is the function of a JAR file?
23       MS. HEDVAT:  Objection, form.
24  A.   I'm really not clear on that question or
25 what the meaning of that question is.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY SOURCE CODE
MICHAEL D. MITZENMACHER, PH.D. - 03/28/2019    Pages 42..45

Page 42

```
 1      Q.    So what is a JAR file?
 2      A.    A JAR file is generally a Java applet or
 3  application or a program of some form in a
 4  particular format.  It uses sort of what's referred
 5  to as a zip format to collect, I guess, necessary
 6  files and information.
 7      Q.    Sorry.  So is it fair to say that a JAR
 8  file is sort of like a zip file that is specific to
 9  Java?
10            MS. HEDVAT:  Objection, form.
11      A.    I would say that's typically how it's
12  used.  I mean, I imagine it could be used in other
13  ways or in other settings, but that would be a
14  typical way in which it's used.
15      Q.    So the JAR file often contains an applet
16  along with the classes that are required to execute
17  the applet?
18            MS. HEDVAT:  Objection, form.
19      A.    I would say generally, yes, though it
20  may contain other necessary information as well or
21  other additional resources and so on besides the
22  code itself.
23      Q.    And it's your position that one would
24  execute both the JAR file itself as well as the Java
25  applet that is contained within the JAR file?  Those
```

Page 43

```
 1  are two separate things?
 2            MS. HEDVAT:  Objection, form.
 3      A.    I think I'm not clear on your question.
 4      Q.    I'm just trying to -- Strike that.
 5            Can you explain for me the difference
 6  between executing the JAR file and executing the
 7  applet or class files that are contained within the
 8  JAR file?  Is there any distinction?
 9            MS. HEDVAT:  Objection, form.
10      A.    So I think with reference to the claim
11  here or claim language, one would consider in this
12  scenario that we're talking about the JAR file to be
13  the downloadable.  The downloadable includes
14  references to software components which would
15  include class files contained or associated with
16  that downloadable.
17      Q.    With regard to the JAR example, is it
18  your opinion that the software components are
19  fetched when the class files are exposed or
20  extracted from the JAR file?
21      A.    So sorry.  Again, which scenario now are
22  we talking about?  Are we still on this scenario?
23      Q.    The JAR scenario.
24      A.    So I think as I said, there are two
25  scenarios in the JAR scenario and I just want to
```

Page 44

```
 1  figure out which one or ones we were talking about.
 2      Q.    So I want the answer for both, but we
 3  can start with:  In the example where the JAR file
 4  itself is the downloadable, is it your opinion that
 5  the software components are fetched when the class
 6  files are exposed or extracted from the JAR file?
 7            MS. HEDVAT:  Objection, form.
 8      A.    So I think there again I would say
 9  they're fetched.  You can think of it in two ways.
10  One is simply the fetching, I think, as described in
11  paragraph 59 where the SmartCore retrieves the
12  downloadables from the collectors, but also one
13  could also view the fetching, I think you used the
14  term exposes -- right? -- that when one is doing the
15  hash, obtaining that information in order to perform
16  the hashing.
17      Q.    Is it your understanding that the JAR
18  file is exposed or extracted before it's hashed in
19  the ATP appliance?
20            MS. HEDVAT:  Objection, form.
21      A.    I mean, I think I would say it's
22  exposed.  I don't believe that all the files are
23  necessarily decompressed before the hashing.  That's
24  not my recollection, but....  I don't think that was
25  a factor in my infringement scenario.
```

Page 45

```
 1            MS. HEDVAT:  Counsel, we've been going a
 2  little over an hour, so whenever --
 3            MS. CARSON:  Sure.  I'll finish up this
 4  line of questioning, then we can take a break.
 5  BY MS. CARSON:
 6      Q.    What is the difference between exposing
 7  the files and I think you use decompressing them?
 8      A.    So I understood exposing.  I sort of
 9  didn't -- I think that was the term you used, just
10  generally having the information available.  Whether
11  that would be in decompressed or compressed form I
12  don't think matters or I wasn't distinguishing those
13  when you were using the term "exposing."
14      Q.    I think you used the term "exposing" in
15  your report, which is where I got that.
16      A.    Oh, okay.  If you could point me to
17  that, that would be helpful.
18            MS. CARSON:  Why don't we actually take
19  a break and then when we come back, I'll have it.
20  Okay?
21            THE VIDEOGRAPHER:  Ten minutes after
22  10:00, going off the record, end of disk number 1.
23            (Short recess taken.)
24            THE VIDEOGRAPHER:  10:23, back on the
25  record with disk number 2.
```

Page 46

```
 1  BY MS. CARSON:
 2      Q.   Before the break we were talking about
 3  JAR files and I want to point you to paragraph 54
 4  towards the end.  And in that paragraph starting
 5  around line 14, you state "The JAR file includes
 6  multiple class files which when retrieved can cause
 7  multiple class files to be exposed from a single
 8  file so that they can be retrieved to build the Java
 9  applet."  Do you see that?
10      A.   Yes.
11      Q.   Okay.  So I was trying to get
12  clarification about whether you're saying here that
13  the retrieval or fetching of these components occurs
14  when it's exposed?
15           MS. HEDVAT:  Objection, form.
16      A.   No, I don't believe that that is --
17  I think this is just a description of the
18  functionality of how Java files look or, sorry, JAR
19  files look or behave.  In particular, this at least
20  discussion is in reference to 9(a), which is even
21  before, if I'm remembering right, the fetching step,
22  so this is just discussing that there are multiple
23  components.
24      Q.   Okay.  So in your opinion the fetching
25  step is satisfied when the compressed JAR file is
```

Page 47

```
 1  sent or transmitted from the collector to the
 2  SmartCore.  Is that fair?
 3           MS. HEDVAT:  Objection, form.
 4      A.   I would say that that is one of the ways
 5  in which the fetching occurs.  As discussed in
 6  paragraph 59, that corresponds to when the SmartCore
 7  I would say retrieves the corresponding applet.
 8      Q.   The corresponding applet or the JAR?
 9      A.   Sorry, JAR file.
10      Q.   Okay.  So when the SmartCore receives or
11  in your words retrieves the JAR file from the
12  collector, that's what you're pointing to as the
13  fetching?
14           MS. HEDVAT:  Objection, form.
15      A.   If I understand your question, yes, I
16  believe that's the case.  And that is again as
17  discussed, for example, at paragraph 59.
18      Q.   Is it fair to say that your opinion does
19  not rely on any sort of decompression or extraction
20  of the files from the JAR file in order to satisfy
21  the fetching step?
22           MS. HEDVAT:  Objection, form.
23      A.   So I would say I don't believe
24  decompression is a necessary part of fetching.  I
25  mean, I would want to say I could imagine there are
```

Page 48

```
 1  hypothetical or other scenarios where one could put
 2  decompression as part of the fetching step, but I
 3  don't think it's necessary for the fetching step.
 4      Q.   And you're not relying on that in your
 5  infringement opinion to satisfy the fetching step?
 6           MS. HEDVAT:  Objection, form.
 7      A.   I don't recall discussing decompression
 8  as being part of the requirement and I don't believe
 9  it's required for part of the fetching step.
10      Q.   When you use the word decompression, is
11  there any difference between decompressing a JAR
12  file and extracting the files contained within a JAR
13  file?
14      A.   I would say that would depend on the
15  scenario or the context.
16      Q.   Could you provide an example of how that
17  would depend on the scenario or the context?
18      A.   I mean, hypothetically it would just
19  depend on what you're doing, you could decompress
20  the JAR file itself without necessarily extracting
21  individual components.  I think that could depend on
22  the setting.
23      Q.   Are you relying on the extraction of any
24  of the components from the JAR file to satisfy the
25  fetching function in your infringement theory?
```

Page 49

```
 1           MS. HEDVAT:  Objection, form.
 2      A.   Sorry.  Can you repeat the question?
 3      Q.   Are you relying on the extraction of any
 4  of the components from the JAR file to satisfy the
 5  fetching function in your infringement theory?
 6           MS. HEDVAT:  Same objection.
 7      A.   I would say in general I don't think
 8  that extraction is required, so I don't think I
 9  considered that in this path or substantiation for
10  the theory.  So I don't think I included that here.
11  Again, I may, if that becomes an issue, include that
12  in a future report but I don't think that extraction
13  is part of the requirement for fetching.  Again, as
14  we've discussed, fetching corresponds to retrieving.
15      Q.   Okay.  So just to be clear, it's your
16  opinion that when the collector transmits a JAR file
17  to the SmartCore and the JAR file gets hashed
18  without being decompressed or extracting anything
19  from it, that that would satisfy the claim language?
20           MS. HEDVAT:  Objection, form.
21      A.   So when the SmartCore retrieves or
22  fetches the corresponding JAR file and hashes the
23  JAR file as a collection, I believe that meets the
24  claim element of fetching the software component
25  identified by the one or more references and for
```

Page 54

```
 1   the hash ID generated for the JAR file to identify
 2   the main class file?
 3            MS. HEDVAT:  Objection, form.
 4      A.    So, for instance, if that main class
 5   file came again particularly in the form of the same
 6   or similar JAR file, it could obtain the same hash.
 7   Again, I'm not sure what claim element issue as such
 8   you're referring to in particular.  As I've
 9   described, this performs a hashing function on the
10   downloadable and the fetch software components.
11      Q.    Were you able to identify any evidence
12   in the source code that the SmartCore proactively
13   retrieves files as opposed to passively receiving
14   them?
15            MS. HEDVAT:  Objection, form.
16      A.    So I'd say again this is -- I don't have
17   line number references in the declaration, but this
18   is discussed at paragraph 59 with the various
19   methods that SmartCore uses to retrieve
20   downloadables, and I think there may be other
21   associated paragraphs within that section.
22      Q.    Okay, so let's take a little closer look
23   at paragraph 59.  One of the documents you cite to
24   is Exhibit 16.  Correct?
25      A.    Yes.
```

Page 55

```
 1      Q.    And you cite to that exhibit to state
 2   that the ATP appliance uses the HTTP REST API to
 3   submit files from the collectors to the SmartCore.
 4   Correct?
 5            MS. HEDVAT:  Objection, form.
 6      A.    I think could you pass me the exhibit?
 7      Q.    I have it, yeah.
 8            (Pause)
 9            MS. CARSON:  This will be 2330.
10            (Deposition Exhibit 2330 marked for
11   identification.)
12   BY MS. CARSON:
13      Q.    Is the document that the court reporter
14   has handed you that is marked as Exhibit 2330 the
15   Exhibit 16 that you referred to?
16      A.    I would say it appears to be based on
17   Bates number.  I don't see it labeled as 16, but....
18      Q.    And my question was about the HTTP REST
19   API.  But before we get there, just by way of
20   background, this document is entitled SRX Advance
21   Integration with JATP.  Correct?
22      A.    Yes.
23      Q.    And I think we went over this before,
24   but do you know the time frame in which the SRX was
25   integrated with JATP?
```

Page 56

```
 1      A.    I don't recall details of dates.
 2      Q.    Okay.  Do you know when this document is
 3   from?
 4      A.    I would say currently looking through,
 5   I don't see a date on the document and I can't
 6   recall what date is associated with it.
 7      Q.    Do you recall -- Sorry.  Do you know
 8   whether this document was created before or after
 9   the '780 patent expired?
10            MS. HEDVAT:  Objection, form.
11      A.    I can't recall the details of the dates,
12   so I would have to go back and examine dates.
13      Q.    Okay.  And I think if you'd turn to the
14   page that ends in the Bates number with 88, you'll
15   see under the Design Details section it says
16   "Currently the JATP core only has support for HTTPS
17   REST API, but to communicate with SRX we will need
18   to support the use of websockets on the JATP core."
19   Do you see that?
20      A.    Yes.
21      Q.    Is that what you were relying on when
22   you cited Exhibit 16 for stating that the JATP core
23   supports HTTP REST API?
24      A.    Yes, I believe it states there that the
25   JATP core has support for the HTTP REST API.
```

Page 57

```
 1      Q.    How does the HTTP REST API work?
 2      A.    I mean, HTTP generally, there are
 3   various handshakes and communication so that two
 4   parties can communicate over the Internet to pass
 5   back and forth information.  The S stands for
 6   secure, so it's the secure version, which includes
 7   some extra cryptographic structure over the basic
 8   HTTP protocol.
 9      Q.    Did you review the source code for the
10   HTTP REST API?
11      A.    You mean specifically the source code
12   used by this product?
13      Q.    Yes.
14      A.    I can't recall specifically.  I would
15   have to go back and look at the code printouts.
16      Q.    It's not cited in your declaration.
17   Correct?
18      A.    I don't believe so.
19      Q.    Do you know if the code for this HTTP
20   REST API is located on the collector or the
21   SmartCore?
22            MS. HEDVAT:  Objection, form.
23      A.    Well, it calls out here that currently
24   the JATP core only has support for the HTTP REST
25   API, which I'm assuming is referring to the JATP
```

Page 82

1  standard implementations, so it's hard to remember.
2       MS. CARSON:  Can I mark this as 2333,
3  please.
4       (Deposition Exhibit 2333 marked for
5  identification.)
6       MS. CARSON:  If you'd look on the
7  exhibit that's been marked 2333, which is a source
8  code file -- And if we could designate the
9  transcript as Highly Confidential - Outside
10 Attorneys' Eyes Only - Source Code Material.  I'm
11 not sure what the exact designation is, but the
12 highest.
13      MS. HEDVAT:  Counsel, does this have any
14 Bates?  Has this been -- ?
15      MS. CARSON:  This is a source code
16 printout.
17      MS. HEDVAT:  Okay.
18 BY MS. CARSON:
19      Q.  **If you could take a look at, let's see,**
20 [REDACTED]
21 [REDACTED]
22      A.  Yes.
23      Q.  **Is this the hashing function that you**
24 **refer to in your report that does the sha256, sha1**
25 **and md5?**

Page 83

1       MS. HEDVAT:  Objection, form.
2       A.  So I would say this doesn't have again
3  the Bates numbers listed.  I can't recall offhand if
4  this was one of the specific files I've looked at
5  before.  I note that looking at it, my
6  interpretation is that this is a place where the
7  hashing is done, that those get hashes are calling
8  functions that would compute hashes.  I would have
9  to refresh myself as to sort of the provenance of
10 the file to say if this was the specific one.  But
11 it's certainly possible that it could be and that I
12 do interpret it as setting up or performing hashes
13 at this point.
14 [REDACTED]
15 [REDACTED]
16 [REDACTED]
17 [REDACTED]
18 [REDACTED]
19      MS. HEDVAT:  Objection, form.
20      A.  So just sitting here to verify that
21 completely, I may have to check other related code
22 files or I might have to take some time to read
23 through this because it's calling other
24 subfunctions.  But I would say that appears to be
25 the case, that it is computing these hashes at this

Page 84

1  point.
2       Q.  **And the sha256, sha1 and the md5 are the**
3  **hashes that you rely on in your infringement**
4  **analysis.  Correct?**
5       MS. HEDVAT:  Objection, form.
6       A.  They are hashes that I utilize or I
7  guess rely on if that's the right legal terminology
8  in regard to my infringement argument.
9       Q.  **Could you look at paragraph 62 of your**
10 **report, please.  In paragraph 62 you state the ATP**
11 **appliance also interfaces with SRX where SRX**
12 **functions as a collector.  Do you see that?**
13      A.  Yes.
14      Q.  **In implementations where the SRX**
15 **interfaces with ATP and acts as a collector, does**
16 **the SRX hash the file before it's sent to the ATP**
17 **appliance?**
18      MS. HEDVAT:  Objection, form.
19      A.  I would have to look at the additional
20 documentation to recollect, but my recollection is
21 that in these cases I think SRX may hash the file,
22 but then the ATP appliance also hashes the file as
23 well.  It can be hashed multiple times at various
24 points in the system.  But because that wasn't a
25 focus on the infringement argument, I would have to

Page 85

1  check back to the SRX documentation to see if it
2  hashes.
3       Q.  **What led you to believe that the hashing**
4  **function is performed by the SmartCore as opposed to**
5  **the collector?**
6       MS. HEDVAT:  Objection, form.
7       Q.  **And in particular I'm referring to**
8  **paragraph 61 where you state the SmartCore performs**
9  **a hashing function.**
10      A.  (Pause)  So as an example, one of the
11 reasons we'd been talking previously about the file
12 submit function in that API and I note that the file
13 submit function, for instance, has inputs that it
14 gives when doing a submission, just provides the
15 path of the file to be submitted for analysis and
16 then --
17      Q.  **Could you tell me what you're looking**
18 **at?**
19      A.  Sorry.  So I'm trying to -- Seems like
20 these things are about the same, HTTP API Guide,
21 there's Exhibit 2332.  I think you also handed me at
22 some point but didn't put in the reference for later
23 version, looks like release 5.0.  But they appear to
24 be very similar or the same.
25      Q.  **That's the one dated March 2018?**

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY SOURCE CODE
MICHAEL D. MITZENMACHER, PH.D. - 03/28/2019   Pages 90..93

Page 90

1   page 83.
2   Q.   This is in the 2018 document?
3   A.   No, it's in the 2013 to 2017 document.
4   Q.   And what page are you at?
5   A.   83; where similarly we have here the
6   various sorts of potential exploits that include
7   downloadables or possible downloadables but also
8   files that may be obtained through email attachments
9   and so on, and again we see that if you ask
10  regarding the event details on page 84 and 85, you
11  see these hashes which again matches my
12  understanding and recollection that the appliance
13  will gain materials potentially from a variety of
14  different sources and for all of them it hashes them
15  to check their hash value.
16  Q.   So that event details is the function
17  that an administrator would use in order to retrieve
18  event details for a file that was analyzed by the
19  ATP appliance.  Correct?
20       MS. HEDVAT:  Objection, form.
21  A.   That would -- That could be one of its
22  uses.
23  Q.   So this function is used after the
24  analysis is completed.  Correct?
25       MS. HEDVAT:  Objection, form.

Page 91

1   A.   Yes, it would be used after it's
2   completed, but it shows at some point that it
3   computes or produces these various hash strings.
4   Q.   This doesn't indicate what component of
5   the ATP appliance computed the hash, correct, this
6   event detail?
7   A.   My understanding is all the core
8   functionality is in what we've referred to as the
9   SmartCore.  But, to be clear, the separation in
10  terms of the claim language is that there be a
11  communication engine which in this case would be the
12  collectors and ID generator coupled to the
13  communication engine, which is the ATP appliance.
14  To the extent that one might argue that I have
15  somehow mislabeled that the hashing is in a
16  different component or subcomponent of the ATP
17  appliance, that would not really change my
18  infringement theory in that that would still
19  correspond to an ID generator coupled to the
20  communications engine regardless of where someone
21  might say, oh, it's actually this piece of the ATP
22  appliance.
23  Q.   If the hashing function is performed by
24  the collector, would that still constitute
25  infringement of claim 9 in your opinion?

Page 92

1        MS. HEDVAT:  Objection, form.
2   A.   I would have to examine that
3   hypothetical to understand exactly what the
4   situation is you're referring to.  But certainly
5   just because there would be hashing on the
6   collector, that would not mean that, for example,
7   that you would not also have the hashing on the ATP
8   appliance.  Indeed, typically in a security setting
9   even if it was hashed on the collector, you would
10  also have it hashed again on the ATP appliance in
11  order to check that you were receiving a consistent
12  hash and that there wasn't some sort of error or,
13  worse yet, someone had compromised one of the
14  collectors in some way and was presenting false
15  hashes into the system.
16  Q.   Does it matter to your analysis whether
17  the hashing function is performed before the
18  fetching?
19       MS. HEDVAT:  Objection, form.
20  A.   I think I would say at a general level
21  there's no timing requirement that I'm aware of in
22  the claim language.  If there's a specific, I'm not
23  sure that comes into play in my infringement
24  argument specifically, so I'd say that's like a
25  hypothetical I'd have think about just because I

Page 93

1   don't recall that aspect coming up in the
2   infringement arguments.  But I don't recall any
3   specific timing constraint.
4   Q.   So it was your understanding in your
5   infringement analysis that the hashing function was
6   performed after the SmartCore received or retrieved
7   the file from the collector.  Correct?
8        MS. HEDVAT:  Objection, form.
9   A.   I believe that's the case in some form
10  or another, yes.
11  Q.   And if it were instead the case that the
12  hashing function was performed by the collector
13  before the collector transmits the file to the
14  SmartCore, you would need to analyze that to see if
15  it still infringes, because you didn't perform that
16  analysis.  Is that fair?
17       MS. HEDVAT:  Objection, form.
18  A.   I would have to understand what the
19  statement was and understand one way or another if
20  I needed to modify my theory or my understanding and
21  infringement scenarios accordingly.  But I'm -- Give
22  me a sec.  (Pause)  Again, I would have to look at
23  the specific scenario or what's suggested was
24  incorrect in my analysis, but it certainly appears
25  that even if the hashing step was moved somewhere,

Page 94

1  as long as it corresponded to an ID generator
2  coupled to the communications engine, that there
3  could still be an argument for infringement.
4      Q.   In your analysis, though, you've
5  identified the SmartCore as the ID generator.
6  Correct?
7      A.   The SmartCore is part of the ATP
8  appliance, yes.
9      Q.   You have not performed an analysis to
10 see whether the collector would satisfy the ID
11 generator component of claim 9.  Correct?
12          MS. HEDVAT:  Objection, form.
13     A.   (Pause) I don't recall any argument
14 based on the collector in this declaration.  But,
15 again, my understanding or assumption was that if
16 things continue forward, I would have the
17 opportunity to make a full report covering my full
18 range of opinions at a later time.
19     Q.   Earlier we talked about JAR files.  JAR
20 files are a type of archive file.  Correct?
21     A.   Yes, that's one way they're referred to.
22     Q.   Other types of archive files might
23 include a zip or a TAR file.  Correct?
24     A.   Those I think could also be referred to
25 as archive files.

Page 95

1      Q.   Would you agree that the hash ID of an
2  archive file could change based on how the archive
3  file is compressed?
4           MS. HEDVAT:  Objection, form.
5      A.   So I think then the point is you'd be
6  getting different files, so I guess the compressed
7  forms would be different, so you could get different
8  hashes.  But that is as it should be because I guess
9  they're different content.
10     Q.   So, for example, a JAR file could be
11 compressed or -- A JAR file that contains the same
12 files within it could be compressed a normal amount
13 or could be highly compressed.  Correct?
14          MS. HEDVAT:  Objection, form.
15     A.   In general that's true for zip files.
16 I guess it's been a while since I looked at the JAR
17 specification, so I can't recall if the
18 parameterization you can use to compress at
19 different levels for zip files also carries over to
20 JAR files.  If you had a reference, you have the JAR
21 semantics, I could check that.  I mean, it's at
22 least possible.
23     Q.   Sure.  So we can stick to zip files just
24 to discuss this.  So if you have a zip file that
25 contains three different files, we'll say A, B, and

Page 96

1  C, and they're compressed, you have two versions of
2  it that are compressed at different levels, they
3  would result in different hashes.  Correct?
4           MS. HEDVAT:  Objection, form.
5      A.   I would say it's possible that they
6  could.  It would depend on how you've implemented
7  the hashing and what it is that the hashing function
8  does, but it's possible.
9      Q.   Okay.  So if you have a zip file that
10 contains three different files, A, B, and C, and you
11 create two versions of that zip file compressed at
12 different levels and then you perform a sha1 hashing
13 function on those two files, the resulting sha1 is
14 going to be different.  Is that fair?
15          MS. HEDVAT:  Objection, form.
16     A.   I would think that that's true, and
17 that's because the zip files themselves will contain
18 additional information related to the compression
19 that's formed, for instance, and so on.  So one
20 would expect them to be different.
21     Q.   The hash of an archive file would be
22 different than the hash that would result from
23 extracting the contents from the archive file,
24 combining them, and then hashing them.  Correct?
25          MS. HEDVAT:  Objection, form.

Page 97

1      A.   That would depend, I think, on the
2  implementation.
3      Q.   How would it depend on the
4  implementation?
5      A.   It would depend on how you chose to
6  implement the hash function.
7      Q.   So the hash -- Strike that.  The sha1
8  hash of an archive file would be different than the
9  hash that would result from extracting the contents
10 from the archive file, combining them, and then
11 hashing them using the sha1 function.  Correct?
12          MS. HEDVAT:  Objection, form.
13     A.   I'm afraid the question is vague.  I
14 guess I'm not sure what you mean by hashing,
15 combining, and so on.
16     Q.   Okay.  So a hashing function takes an
17 input and creates an output.  Correct?
18     A.   Yes.
19     Q.   So if you use the archive file as the
20 input to a sha1 function, that's going to result in
21 a different output than if you use the extracted
22 files from the archive file as the input.  Correct?
23          MS. HEDVAT:  Objection, form.
24     A.   I'm not clear what you mean by the
25 second part of that statement.