REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# DKT. 127-6

## (REDACTED)

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE**

PAUL ANDRE (State Bar No. 196585)
pandre@kramerlevin.com
LISA KOBIALKA (State Bar No. 191404)
lkobialka@kramerlevin.com
JAMES HANNAH (State Bar No. 237978)
jhannah@kramerlevin.com
KRISTOPHER KASTENS (State Bar No. 254797)
kkastens@kramerlevin.com
KRAMER LEVIN NAFTALIS & FRANKEL LLP
990 Marsh Road
Menlo Park, CA  94025
Telephone: (650) 752-1700
Facsimile: (650) 752-1800

*Attorneys for Plaintiff*
FINJAN, INC.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| FINJAN, INC., a Delaware Corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>JUNIPER NETWORKS, INC., a Delaware Corporation,<br><br>        Defendant. | Case No.: 3:17-cv-05659-WHA<br><br>**DECLARATION OF DR. MICHAEL MITZENMACHER IN SUPPORT OF PLAINTIFF FINJAN, INC.'S OPPOSITION TO DEFENDANT JUNIPER NETWORKS, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          July 26, 2018<br>Time:          8:00 a.m.<br>Courtroom:  Courtroom 12, 19th Floor<br>Before:        Hon. William Alsup |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE**

**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

I, Michael Mitzenmacher, hereby declare that:

1.      I have been asked by Plaintiff Finjan, Inc. ("Finjan") to testify as an expert witness in the above referenced action.  As part of my work in this action, I have been asked by Finjan to provide a declaration as to if Defendant Juniper Networks, Inc. ("Juniper" or "Defendant") infringes Claim 1 of U.S. Patent No. 6,804,780 (the "'780 Patent").  I expect to testify at trial in these actions regarding the opinions set forth in this report (the "Report"), as well as on any other issues for which I have submitted or will submit an expert report in this action.  I relied on the documents cited herein, including the '780 Patent, the file history of the '780 Patent, the source code review computer, source code printouts, the deposition transcripts of Tenorio, Manthena, Nagarajan, and Manocha, as well as exhibits thereto, Finjan's Infringement Contentions, and Juniper's Discovery Responses.

## I.      BACKGROUND, EXPERIENCE AND QUALIFICATIONS

2.      I am currently employed as a Professor of Computer Science at Harvard University. Specifically, I am the Thomas J. Watson, Sr. Professor of Computer Science in the School of Engineering and Applied Sciences. I joined the faculty of Harvard as an Assistant Professor in January 1999.  I was promoted to Associate Professor in 2002 and to Professor in 2005.  In 2010, I began a three-year term as Area Dean, which is essentially equivalent to what other schools call Department Chair, of Computer Science, and held that position through June 2013.

3.      I received my undergraduate degree in Mathematics and Computer Science from Harvard College in 1991. I received a Certificate of Advanced Study in Mathematics from Cambridge University in 1992. I received a Ph.D. in Computer Science from the University of California at Berkeley in 1996. From August 1996 to January 1999, I was employed as a Research Scientist at Digital Systems Research Center.

4.      I have published over 200 research papers in computer science conferences and journals, many of which have explored algorithms and data structures for communication networks and data transmission. I am listed as an inventor or co-inventor on 19 issued patents, and am the co-author of a textbook entitled "Probability and Computing" published by Cambridge University Press.

5.      The field of endeavor at issue in this case is networking security — in particular, the design and operation of systems to protect clients from malware from sources on the Internet.  Much of

MITZENMACHER DECL. ISO OPP. TO DEFENDANT'S MSJ      CASE NO. 3:17-cv-05659-WHA

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

my work involves issues relating to networking and/or network security. I regularly serve on program committees for conferences in networking, algorithms, and communication. For example, I have served on the program committee multiple times for the SIGCOMM conference, which is described on the conference homepage as follows: "SIGCOMM is the flagship annual conference of the ACM Special Interest Group on Data Communication (SIGCOMM) on the applications, technologies, architectures, and protocols for computer communication." Similarly, I have served several times on the Program Committee for NSDI, the USENIX Symposium on Networked Systems Design and Implementation. I have written papers on networking that have been published in the IEEE/ACM Transactions on Computer Networking, the SIGCOMM conference, the INFOCOM conference, and other major venues for networking research. My graduate course entitled "Algorithms at the end of the wire" covers many subjects at the intersection of networking and algorithms.

## A.   Compensation

6.     My rate of compensation for my work in this case is $750 per hour plus any direct expenses incurred.  My compensation is based solely on the amount of time that I devote to activity related to this case and is in no way affected by any opinions that I render.  I receive no other compensation from work on this action.  My compensation is not dependent on the outcome of this matter.

## II.   LEGAL STANDARDS

7.     Counsel for Finjan has informed me of the following legal standards that I have used as a framework in forming my opinions contained herein.

## B.   Infringement

8.     I have been informed that claim construction is a legal issue for the Court to decide.  I also understand that the Court has not issued a claim construction order in this case.  As such, I have applied the plain and ordinary meaning of all terms, unless specifically identified below.

9.     I have been informed that infringement is determined on a claim by claim basis.  I have been further informed that literal infringement is found if an accused product, system or method meets each and every element of a single claim.  I have been informed that direct infringement is found if a party or its agents make, use, sell, or offer to sell a product or system that contains all elements of a

2

claimed system or perform all of the steps of a claimed method.

10.     I have been informed that in the case of direct infringement of a system claim, a party can be found to use a patented system even if the party does not exercise physical or direct control over every element of the system.  For elements that are not subject to the physical or direct control of the party, I have been informed that the party is still deemed to be using that component or part of the patented system when (1) it puts the component into service, i.e., causes it to work for its intended purpose and (2) receives the benefit of that purpose. For example, if a company queries a third-party's database, thereby causing the database to run a query and return a result to the company, the company is deemed to have used the database for infringement purposes by putting it into service (causing it to run the query) and receiving the benefit of that operation (the result of the query), even though the company does not own or control the database.

11.     I have been informed that infringement under the doctrine of equivalents is found if an accused product, system or process contains parts or steps that are identical or equivalent to each and every element of a single claim.  A part or step is equivalent if a person of ordinary skill in the art would conclude that the differences between the product or method step and the claim element were not substantial at the time of infringement. I have been further informed that one common test to determine if the difference between a component or method step and a claim element is not substantial is asking if the component or step performs substantially the same function, in substantially the same way, to achieve substantially the same result.

12.     I have been informed that in the case of direct infringement of a multinational system claim where elements of such system are located in multiple countries, a party can be found to use the patented system in the United States if the place where control of the accused system is exercised and where beneficial use of the system is obtained are both within the United States. For example, if the accused system is controlled by a device in the United States that generates requests sent to the accused system and the benefit of the accused system is obtained by the company or person using the device in the United States, the company is deemed to have used the accused system for infringement purposes in the United States even though the accused system has some elements located outside the United States.

### A.  Person of Ordinary Skill in the Art ("POSITA")

13.  Based on review of the '780 Patent and consideration of the abovementioned factors, it is my opinion that a POSITA at the time of the invention of the '780 Patent would be a person with a Bachelor's degree in computer science or a related academic field, and either (1) two or more years of industry experience and/or (2) an advanced degree in computer science or a related academic field.  In forming my opinions in this declaration, I have considered the issues from the perspective of a hypothetical POSITA.  My opinion would not change if a somewhat lower or higher level of skill were adopted.  In particular, while it appears that Dr. Rubin has suggested slightly more experience and/or education for a POSITA in his declaration (¶ 20), I believe my opinions herein would be the same under either definition.

### III.  SUMMARY OF DECLARATION

14.  I have been asked by counsel for Finjan to consider if Juniper infringes Claim 1 of the '780 Patent and to consider the opinions set forth by Juniper's expert, Dr. Aviel Rubin, in support of Juniper's Motion for Summary Judgment (Dkt. 95-10, "Rubin Decl.").  In particular, I have been asked by counsel for Finjan to consider whether the SRX Gateway with Sky ATP infringe Claim 1 of the '780 Patent.  I assumed that Claim 1 of the '780 Patent is valid and enforceable.  I have not considered any issues related to damages associated with this infringement.

15.  The language of Claim 1 of the '780 Patent is set forth below.

> A computer-based method for generating a Downloadable ID to identify a Downloadable, comprising:
>
> obtaining a Downloadable that includes one or more references to software components required to be executed by the Downloadable;
>
> fetching at least one software component identified by the one or more references; and
>
> performing a hashing function on the Downloadable and the fetched software components to generate a Downloadable ID.

### IV.  RESPONSE TO DR. RUBIN'S DECLARATION

16.  While I provide more detailed descriptions below regarding why I disagree with Dr. Rubin's opinions, I discuss here certain aspects of Dr. Rubin's Declaration that are incorrect and/or

MITZENMACHER DECL. ISO OPP. TO DEFENDANT'S MSJ       CASE NO. 3:17-cv-05659-WHA

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

require clarification.  First, I note that Dr. Rubin explained that various members of his "team" assisted in writing his Declaration and in fact, in certain instances, he disagrees with the statements provided.  *See e.g.*, Rubin Tr. at 8:2-9:7, 20:4-14, 61:8-10.  While it remains unclear, therefore, whether all of the opinions in his declaration are his, I assume, for purposes of this Declaration, they are.  Second, while Dr. Rubin repeatedly references the "source code" of the products, in most instances he fails to provide any specific citations to the code.  *E.g.*, Rubin Decl., ¶¶ 67, 71, 81, 91, 100, 113, 114, 125, 127.  In fact, I have reviewed the source code citations provided by Dr. Rubin, and in some cases, they are incorrect.  For example, in paragraph 128 of Rubin's declaration he says that a hash is created when the "_on_complete()" function is called "by calling content_path, sample_sha256 = self._write_content(sid, sample_data, current_ts)", but it seems he has misread the source code, because the line he describes appears in the "_process_sample" function.  Ex. 7[1], Juniper Source Code at 456.

## V.    OVERVIEW OF THE '780 PATENT

17.     The '780 Patent describes methods for protecting computer systems against a class of executable programs that would typically be downloaded to be run by a process such as an Internet browser.  The patent refers to such programs as "Downloadables."  *See e.g.* Dkt. 98-5, Ex. 2, "'780 Patent, Col. 1, ll. 47-61 ("However, these security systems are not configured to recognize computer viruses which have been attached to or configured as Downloadable application programs, commonly referred to as 'Downloadables.' A Downloadable is an executable application program downloaded from a source computer and run on the destination computer.  Downloadables are typically requested by an ongoing process such as by an Internet browser or web engine. Examples of Downloadables include Java applets…JavaScript scripts … ActiveX controls …, and Visual Basic …. Therefore, a system and method are needed to protect a network from hostile Downloadables.").  Downloadables, therefore, include HTMLs and PDFs as I further explain below.

18.     The '780 Patent specifies the use of a "Downloadable ID" as an identifier for a Downloadable and the associated software components.  Benefits of the Downloadable ID are also specified in the patent description, and include allowing the network security system to avoid expensive

---

[1] Unless otherwise noted, all "Ex." citations are to the Declaration of Kristopher Kastens in Support of Opposition to Motion for Summary Judgment.

MITZENMACHER DECL. ISO OPP. TO DEFENDANT'S MSJ      CASE NO. 3:17-cv-05659-WHA

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

analysis operations for Downloadables that have been seen previously.  It may also allow the security

system to allow or block the Downloadable without further reanalysis.  The use of a Downloadable ID

can yield significant performance improvements in the Web environment.  *See, e.g.*, '780 Patent, Col.

8, ll. 7-20 ("The first comparator 320 in step 608 examines the lists of Downloadables to allow or to

block per administrative override 425 against the Downloadable ID of the incoming Downloadable to

determine whether to allow the Downloadable automatically.  If so, then in step 612 the first

comparator 320 sends the results to the logical engine 333.  If not, then the method 600 proceeds to step

610. In step 610, the first comparator 620 examines the lists of Downloadables to block per

administrative override 425 against the Downloadable ID of the incoming Downloadable for

determining whether to block the Downloadable automatically.  If so, then the first comparator 420 in

step 612 sends the results to the logical engine 333. Otherwise, method 600 proceeds to step 614.").

19.     A Downloadable may identify various software components that are called for during its

execution. '780 Patent, Abstract.  As stated in the '780 Patent and Claim 1 of the '780 Patent, a

Downloadable ID should be generated for the Downloadable itself and its other components.

Otherwise, there is risk that a required software component could be modified without the security

system recognizing that a change had occurred, leaving the system vulnerable to attack based on the

software component.  '780 Patent, Col. 4, ll. 64-66.  The '780 Patent, including Claim 1, further

discloses how a Downloadable ID will "hash" all or part of the Downloadable to create this

Downloadable ID.  '780 Patent, Claims 1 ("at least one software component") and 8 ("fetching all

software components").

A.     State of the Art

20.     A hashing function is applied to data such as a computer file.  Hashing functions have

many uses, one of which, as described in the '780 Patent, is the ability to create an identifier (or "ID")

for a Downloadable.  This "ID" can then be used to quickly determine information about the

Downloadable because the function can be applied again to the data and used to determine if it is the

same as a Downloadable that has already been seen.

21.     I have reviewed the portion of Dr. Rubin's declaration entitled "State of the Art" (¶¶ 24-

33).  I provide herein a discussion of certain aspects of Dr. Rubin's Declaration with which I disagree.

6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

22.     In paragraph 24 of his declaration, Dr. Rubin discusses "hashing functions" but there are inaccuracies in his description.  For example, Dr. Rubin states, "[t]ypically, hashing functions are designed to minimize 'collisions,' meaning that each input hashes to a unique output."  However, while he states that "each input hashes to a unique output," that is not possible under any circumstance where the number of inputs is larger than the number outputs.  I understand that Dr. Rubin also testified to the inaccuracy of his statement.  Rubin Tr. at 18:24-20:9.

23.     Dr. Rubin also states, in paragraph 24 of his declaration, that "Additionally, in computer science applications, hash functions are expected to be non-invertible, meaning that it is computationally impractical to determine an input given only the corresponding hash."  This is not correct; the non-invertible hash functions he describes are typically referred to as "cryptographic hash functions" (*see e.g.*, https://en.wikipedia.org/wiki/Cryptographic_hash_function), and the requirement of non-invertibility is only expected or desired in specific computer science applications.  While this requirement does often appear in security applications, it is not a general property of hash functions, as Dr. Rubin suggests.  Indeed, Exhibit 13 to the Declaration of Rebecca Carson in support of Juniper's Motion for Summary Judgment ("Carson Decl.") at page 508, citing Knuth, discusses two non-invertible hash functions ("let $h(K)$ be three digits chosen from somewhere near the middle of the 20-digit product of $K \times K$"  and "we simply use the remainder module $M$: $h(K) = K \bmod M$.")."  Moreover, Dr. Rubin acknowledged in his testimony that hash functions do not have to be non-invertible.  Rubin Tr. at 18:24-20:9.

24.     In paragraph 26, Dr. Rubin provides hash values for "Example" and "example" using the MD5 hash function shown below:

| Input | MD5 Hash |
|---|---|
| Example | 02fb126282cb0d596a9052bc21948326 |
| example | ddce269a1e3d054cae349621c198dd52 |

I disagree with the values that he provides.  For example, the correct MD5 hash value should be **0a52730597fb4ffa01fc117d9e71e3a9**.  The value that Dr. Rubin has provided appears to be for the string "Example\n," that is, the string "Example" followed by a carriage return.

7

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

25.     In paragraph 32 of his declaration, Dr. Rubin acknowledges that "fetching" means to retrieve: "In the context of the '780 Patent, fetching is used to retrieve the software components identified by references in a Downloadable." Dr. Rubin's discussion appears to be related to his proposed claim constructions. As I discuss more below with respect to claim construction, "retrieving" is the same as "fetching" when used in the '780 Patent. Dr. Rubin's additional discussion in paragraph 32 suggesting that somehow this refers to "Information retrieval" over the Internet, is out of place and not suggested by the '780 Patent itself.

B.     **Benefits of the '780 Patent**

26.     The '780 Patent describes systems and method for implementing a new solution that was part of Finjan's pioneering technology. The '780 Patent provided benefits to this system because it specifically addressed Downloadables, which, at the time of the filing of the '780 Patent, represented a novel concept and collection of threats based on the growth of executable content downloaded on the Internet.

27.     In addition, at the filing of the '780 Patent, virus scanning was focused on "signature matching" where a set of signatures was scanned over a file. In this case, the signatures would be used to scan a file every time, and it was counterintuitive to make a separate ID for a file because the signature itself may identify the file. The '780 Patent, thus, provided a benefit, particularly for Finjan's new behavioral based technology, because Finjan's technology protected against Downloadables and generated IDs for the Downloadable and software components. For Downloadables, they could execute on a computer without a user's knowledge. This was a shift in thinking from the conventional thinking at the time, as there were no technologies for analyzing Downloadables to generate a Downloadable ID that could be used to prevent harmful Downloadables from infecting a computer. A Downloadable ID achieves this efficiency by enabling the security system to allow or block the Downloadable without reanalyzing the Downloadable because the Downloadable ID can be used to determine if that Downloadable has already been seen by the security system, so that it does not need to be analyzed again, but its prior analysis can be used. As a result, these Downloadable IDs allowed Downloadables to be identified without needing to rescan them.

MITZENMACHER DECL. ISO OPP. TO DEFENDANT'S MSJ       CASE NO. 3:17-cv-05659-WHA

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

## VI.  CLAIM CONSTRUCTION FOR CLAIM 1 OF THE '780 PATENT

28.     I understand that the Court has not yet entered a claim construction order for the '780 Patent.  Claim 1 of the '780 Patent recites the following, with the terms that Juniper requests construction on identified in bold:

1. A computer-based method for generating a Downloadable ID to identify a Downloadable, comprising:

1(a). obtaining a **Downloadable**[A] that includes one or more references to **software components required to be executed by the Downloadable**[B];

1(b). **fetching at least one software component identified by the one or more references**[C]; and

1(c). **performing a hashing function on the Downloadable and the fetched software components to generate a Downloadable ID**[D].

29.     I note that Dr. Rubin advocates for construction of nearly the entire claim.  I have reviewed the declaration of Dr. Rubin submitted in support of Juniper's requested claim construction of several of these terms and address his arguments below.  However, as I explain more below, most of these terms do not need construction and the plain and ordinary meaning should apply.  To the extent "plain and ordinary meaning" benefits from explanation, I have provided it below.

### A.     "Downloadable"

30.     I understand that Dr. Rubin agrees that the construction of "Downloadable" should be "an executable application program, which is downloaded from a source computer and run on the destination computer."  I agree that this construction is correct, as this is how the term is defined in the '780 Patent, and therefore I understand that its construction is not in dispute.

### B.     "software components required to be executed by the Downloadable"

31.     I understand that Dr. Rubin believes that this term should be construed as "software components that are needed to execute the Downloadable."  This term does not require construction beyond its plain and ordinary meaning.  Generally, this plain and ordinary meaning is "software components referenced by a Downloadable for execution."  Dr. Rubin's rewording adds confusion to the term and its scope and he provides no support for the wording of his construction—namely, he

9

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

identifies nothing in the record for the term "needed to execute the Downloadable." In fact, his language results in a misinterpretation of the plain meaning of the term – that is, his construction appears to change the meaning from software components that are executed by the Downloadable to software components that are executing the Downloadable. As such, I found no support for his position that this is how a POSITA would understand the term. Instead, I understand it the term based on its plain and ordinary meaning.

32.     To the extent Dr. Rubin argues that the Downloadable cannot execute <u>at all</u> without all of the referenced the software components, this is incorrect and contrary to the intrinsic record and the knowledge of a POSITA. As stated, the components are required to be executed by the Downloadable so it can operate an intended, not that the Downloadable needs these components to be executed. This is the plain reading of the claim language. Dr. Rubin even testified that the '780 Patent discloses software components that are not required to be executed. Rubin Tr. at 20:15-28:20. Dr. Rubin's argument also makes no sense in the context of the claims. Specifically, dependent Claims 5 and 13 of the '780 Patent states that the Downloadable includes "HTML code." As known to a POSITA, HTML code can be executed without all of its referenced software components (such as JavaScript), but may instead execute based on the components that are present. For example, if an HTML file includes referenced JavaScript or VBScript components, it may still execute according to those JavaScript components that it can access. While the Downloadable may not execute as intended, it may still execute according to the components that it can access. This is the plain reading of the claim language. This plain reading is consistent with the claim being applied to "dropper" Downloadables, where the Downloadable can run without its fetched components, but will not operate as intended.

33.     My understanding of the claim language is consistent with the prosecution history of the '780 Patent that was cited by Dr. Rubin as well. For example, I have reviewed the prosecution history of the patent, and both Finjan and the patent office refer to "software components required to be executed by the Downloadable." Ex. 8, Notice of Allowability at 3. At no point was the language described as software components that are "needed to execute the Downloadable." I also found that Dr. Rubin ignores different types of disclosed Downloadables that refute his conclusion that the software components are "needed to execute the Downloadable." The '780 Patent specifically sets forth that

10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

1  HTML can be part of a Downloadable, and that JavaScript and VBScript can be included as well. '780

2  Patent, Claim 5 and Col. 2, ll. 4-6 ("Downloadable may include ... a JavaScript$^{TM}$ script, or a Visual

3  Basic script."). As was known to a POSITA at the time of the invention, HTML files can include

4  scripts (like JavaScript and VBScript) as internal code blocks or via reference to separate software

5  components. Ex. 9, JavaScript for Dummies at FINJAN-JN 398436-37 ("You can use <SCRIPT> and

6  </SCRIPT> tags to include JavaScript code directly into an HTML file … [or] to include a separate

7  external JavaScript file …"). As would be known to a POSITA, these script software components are

8  not required to execute the rest of the page.

9      **C.    "fetching at least one software component identified by the one or more references"**

10      34.    I understand that Dr. Rubin believes that this term should be construed as "<u>retrieving at</u>

11  <u>least one software component that is referenced but not included in the content of the Downloadable</u>."

12  First, I agree that "fetching" generally means the same thing as "retrieving." However, as the plain and

13  ordinary meaning of the terms is already known, there is no need to simply replace one word with

14  another without purpose. Second, I disagree with Dr. Rubin's conclusion that the claim language must

15  be limited to "at least one software computer that is referenced but not included in the content of the

16  Downloadable." The '780 Patent discloses that "fetching" can be performed both internally and

17  externally to Downloadable, and does not require that one component always be external. '780 Patent,

18  Col. 4, ll. 56-58.

19      35.    In fact, one of the examples provided in the '780 Patent explicitly describes an example

20  "Downloadable" as a "Java Applet." '780 Patent at Col. 1, ll. 55-56. As is known to those of skill in

21  the art, Java Applets are distributed as a single JAR file (Java Archive) with referenced software

22  components included in the single JAR file. Ex. 10, Java in a Nutshell at FINJAN-JN 358557 ("all (or

23  many) of the files an applet needs can be combined into a single JAR file, which an applet viewer or

24  Web browser can download with a single HTTP requests"). For this JAR file, multiple classes are

25  aggregated into one file for distribution. This understanding is consistent with Claim 1 of the '780

26  Patent, because when a JAR file is first used it is "extracted," thereby causing multiple class files to be

27  exposed from a single file so that they can be retrieved to build the Java Applet. *Id.* at FINJAN-JN

28  358556-57. Therefore, the '780 Patent includes a specific example where "fetching" refers to

MITZENMACHER DECL. ISO OPP. TO DEFENDANT'S MSJ      CASE NO. 3:17-cv-05659-WHA

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

1  retrieving software components from within a single distributed file, where the individual components

2  are "fetched" from this JAR file that was downloaded.

3      36.     I disagree with Dr. Rubin, in paragraph 51 of his declaration, that a "POSITA would

4  understand that one would only 'include' components 'in' the code if they were part of the same file,

5  not disparate files."  However, this conclusion does not make sense, because, as Dr. Rubin

6  acknowledges, code often consists of and can consist of multiple files.  Rubin Tr. at 36:20-39:7.

7      37.     I also disagree with Dr. Rubin that components of the "runtime environment" would be

8  considered part of the fetched components.  This is equivalent to the operating system used for the Java

9  Applet, and would not be considered one of the "software components."

10     38.     My understanding is supported by the specification, where "fetching" is performed on

11 the components that are "embodied in" the file, which is also set forth in the specification of the '780

12 Patent.  Dr. Rubin misinterprets the '780 Patent as stating that there is a distinction between fetching

13 components that are "embodied in" a Downloadable versus those that are "identified by" a

14 Downloadable.  However, the sections that he identified do not support his position.  Using a Java

15 Applet again as an example, the file would include a manifest that "identifies" the class files that it

16 would incorporate within the JAR file, but which were all still included within the single distributed

17 JAR file.  Ex. 10, Java in a Nutshell at FINJAN-JN 358557.  Furthermore, the '780 Patent never

18 equates "identified by" as requiring the component to be external, and Dr. Rubin cites nothing in the

19 specification that support this.  In fact, a Java Applet identifies all of its software components in the

20 same manner, and all of which are "identified by the one or more referenced."  As such, a POSITA

21 would not read "fetching" in the '780 Patent as excluding components that are internal to the file.  Dr.

22 Rubin even did not dispute this during his testimony.  Rubin Tr. at 36:15-19, 40:21-41:5.

23     D.    **"performing a hashing function on the Downloadable and the fetched software
24           components to generate a Downloadable ID"**

25     39.     I understand that Dr. Rubin believes that this term should be construed as "performing a

26 hashing function on the Downloadable together with its fetched components to generate a single hash

27 value that identifies the contents of both the Downloadable and the fetched components."  First, I

28 generally agree that the plain reading of this term is that the hashing function should be performed on

12

the Downloadable "together with" its fetched components.  The construction of "performing a hashing function on the Downloadable together with its fetched software components to generate a Downloadable ID" has been adopted by multiple courts.  In fact, I understand that Judge Freeman in the case of *Finjan v. Blue Coat*, held that a "hash function" does not mean that a single hash must be used for the Downloadable ID.  Specifically, the court held "[f]irst, as the Court already stated, the '780 Patent is not so limited that 'a hashing function' means a single hash – the overall function of hashing an object or combination of objects could potentially be accomplished by a sequence of several hashes or computations."  *Finjan, Inc. v. Blue Coat Systems, Inc.*, No. 13-cv-03999-BLF, 2015 WL 3630000, at *7 (N.D. Cal. June 2, 2015).  I agree with Judge Freeman's assessment as technically accurate—a Downloadable ID can be accomplished using a sequence of hashes, as would be known to a person of ordinary skill in the art.  I also note that Dr. Rubin admitted that while he cites to the *Blue Coat* litigation in his declaration, he did not address this Order regarding a "hash function."  Rubin Tr. at 43:6-44:23.  He also explained that the entirety of his declaration relies on his proposed construction and he did not address the construction that Finjan proposes.  *Id.* at 65:13-17.

40.     Dr. Rubin's argument also ignores that a POSITA would know that using multiple hash functions on individual components to create a single Downloadable ID would be both more efficient and effective.  In terms of efficiency, it would allow a system to hash components that were present if waiting was required to obtain other fetched components.  In terms of effectiveness, a Downloadable ID based on combining hashes from each component could allow one to more readily determine if a single component had been modified and therefore potentially be a threat.

41.     Dr. Rubin argues that this term should be limited to a "single hash value that identifies the contents of both the Downloadable and the fetched components."  Rubin Decl., ¶ 60.  As such, Dr. Rubin appears to be asking to construe the term "Downloadable ID."  Specifically, Dr. Rubin requires that a Downloadable ID must be a single "hash."  In fact, there is nothing in the specification that would require narrowing this claim to limit a Downloadable ID to a single hash value.  The only support Dr. Rubin provides is a statement made during an IPR for the '780 Patent.  Dr. Rubin's citation to the Palo Alto Networks IPR is misleading, because there, Finjan opposed the construction as narrowing the claim, and the Board agreed with Finjan that there that the petitioner did not provide

support for its narrowing of the claim limitation as stated.  IPR2016-00165, Paper 7 at 8 (P.T.A.B. Apr. 21, 2016)(rejecting construction because "Petitioner does not provide any supporting citations to the '780 Patent.").  Here, the plain language of the claim should apply and Dr. Rubin provides no support for his conclusion, and identifies nothing in the intrinsic or extrinsic record that supports his position that the term should be narrowed as he requests.  I've reviewed the patent specification, and determined that a Downloadable ID was not limited to a single hash value, and can include additional information. For example, the '780 Patent states that a "Downloadable ID" may "include" a digital hash, indicating that additional information can be present.  '780 Patent, Col. 4, ll. 54-56.  Furthermore, the '780 Patent states that the Downloadable ID can be created using the "complete Downloadable code" and a person of ordinary skill in the art would understand that such a Downloadable ID could be achieved by using the hash function on the separate components of the code to create a Downloadable ID, which is a common manner of utilizing a hash function.  '780 Patent, Col. 4, ll. 54-56.

## VII.    OVERVIEW OF THE ACCUSED PRODUCTS

42.    The following description of the products is undisputed based on Juniper's products and testimony.

### A.    SRX Gateways

SRX Gateways are network appliances and software that operate to protect computer on a network from receiving malicious content.  Ex. 1, FINJAN-JN005221.  For example, a company can have an SRX Gateway in its network and when an employee of that company uses its computer to try and download a file, that SRX Gateway performs a security checks on the file.  *Id*.  As part of this process, the SRX Gateway can create an identifier for the files that are being downloaded to perform security checks on that file.  Ex. 2, JNPR-FNJN_29017_00552580.  The SRX Gateway will perform an analysis on the Downloadable to determine if it is of a type that the system cares about (like HTML, Word Docs, or portable executables).  *See, for example*, Ex. 7, Juniper Source Code at 456-457, and ████████████  generally.  The SRX Gateways can send the entire file received for analysis in Sky ATP.  To do this, the SRX Gateways "extract[] potentially malicious objects and files and send[] them to the cloud [Sky ATP] for analysis."  Ex. 3 at FINJAN-JN005265.  As described in more detail below, the SRX Gateways will also send files to Sky ATP for analysis that are determined to be of a type that

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE**

can perform malicious operations.  *Id*.



Ex. 15 at JNPR-FNJN_29008_00505456.

**B.      Sky ATP**

43.     Sky ATP scans files with its "Malware Analysis Pipeline" to create a Downloadable security profile for the Downloadable. Dkt. 98-12, Ex. 9 at FINJAN-JN005438-39 (describing the Sky ATP "pipeline analysis"); Dkt. 97-18, Ex. 10 at JNPR-FNJN_29017_00552807 (describing sample malware analysis processing pipeline).  The SRX Gateway extracts content from an incoming stream of a Downloadable and submits the file to Sky ATP for analysis.  Ex. 3 at FINJAN-JN005266.  Juniper's Sky ATP is a cloud-based malware analytics system.  Sky ATP is integrated with SRX Gateways to provide advanced malware scanning and protection for detecting unknown threats to a trusted network. Dkt. 98-12, Ex. 9 at FINJAN-JN005438.  Sky ATP obtains files from the SRX Gateways via the SRX API (which Juniper refers to internally as "Kookaburra").  Ex. 12, Tenorio Tr. at 13:3-5. Sky ATP's Malware Analysis Pipeline also provides malware analysis on files through an inspection pipeline component known as the "pipeline manager."  *Id.* at 28:1-13; Dkt. 98-14, Ex. 11 at FINJAN-JN 044762.  The pipeline manager includes multiple software modules called adapters which examine various aspects of the file. Dkt. 97-18, Ex. 10, JNPR-FNJN_29017_00552807; Ex. 15, JNPR-FNJN_29008_00505441 at 456 (demonstrating Malware Analysis Pipeline).

44.     The Malware Analysis Pipeline scans the Downloadable using dynamic analysis, which runs the Downloadable in a sandbox and scans the file to see if the file performs any suspicious

15

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

activity.  The Malware Analysis Pipeline uses "dynamic analysis," which is "often called sandboxing," which studies a file "as it is executed in a secure environment."  Dkt. 98-14, Ex. 11, FINJAN-JN 044744 at 63.  This type of dynamic analysis is called sandboxing because, as a sandbox can limit children to a specific protected location, dynamic analysis limits a Downloadable to running in a protected environment to scan for the operations it performs.  In doing so, Sky ATP will actually run the file in a "virtual" system or "sandbox" (a fake system that mimics a real computer system) that is meant to be infected.  *Id.,* FINJAN-JN 044763-64; *see also* Ex. 14, JNPR-FNJN_29033_00858887 (diagram depicting a suspect file that goes through an "analysis chain in the cloud" that includes "dynamic analysis" which occurs "in a custom sandbox [that] leverages deception and provocation techniques to identify evasive malware"); Dkt. 98-12, Ex. 9, FINJAN-JN 005438.

45.    Juniper created a customer sandbox environment using its own code and also integrating an off the shelf sandbox, which Juniper modified to improve its analysis.  Juniper uses a sandbox that spools up a live desktop and hooks into the OS to record everything.



Ex. 20, FINJAN-JN 044847.

46.    Sky ATP watches the Downloadable run in this sandbox, fetches and records software components that it downloads, and determines if the Downloadable is malicious.  Dkt. 98-14, Ex. 11, FINJAN-JN 044763-64.  In this way, Sky ATP uses the dynamic analysis in a sandbox to determine "[w]hat happens when we execute the file in a real environment."  Dkt. 98-15, Ex. 12, FINJAN-JN 005387 at 87.  Part of executing a file in a real environment is determining what external software components the Downloadable references and fetching those components to be part of a generated

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

Downloadable ID, as shown in the Juniper source code where this Downloadable ID information can be extracted as a list.  Ex. 7, Juniper Source Code at 144 ████████████████████████████

████████████████████████████████████████████ *see also id.,* at 449-455.

47.     An additional example is provided below, which is a sample report created by Joe Sandbox, which shows that dropped files are fetched while it executed a Downloadable.  This shows that Sky ATP's dynamic analysis will fetch these components, including components that are executed, like .exe files, and then create a Downloadable ID including the hash values.

**Created / dropped Files**

| File Path | Hashes |
|---|---|
| C:\Documents and Settings\All Users\svchost.exe | • MD5: CC9FAB2465A279B9424DA3A09DF7C8D5<br>• SHA: DE0FCA6F868D48CCF6B5580301D73A44EBE07669<br>• SHA-256: 45C0598E3DB3B7A0A194BF6DE78C8454BCA2B5895A1BC511665D0E22243397E4<br>• SHA-512:<br>FDC478B37449AD98609FE311A86053AC107D1C76BE6F2062386F0BED2696FFF38675C80773693AAC846E138D29238BD01F79D0D189AE |

Ex. 18, Report-cc9fab2465a279b9224.pdf at 2.

48.     Another example:

**Created / dropped Files**

| File Path | MD5 |
|---|---|
| C:\Documents and Settings\NetworkService\Local Settings\Application Data\sLT.exf | D5AB441BD47EDE42EF7FBDB58D6DA541 |
| C:\WINDOWS\mssys.dll | 879631FB71EEF07DB32A97E8DAD372EA |
| C:\WINDOWS\svchst.exe | 6B16C4526A013E744B3D91CD7A091C36 |
| C:\autorun.inf | 22E7E2047F46662384F91EAC7EFCC806 |
| \ROUTER | C485FFBBCB652D92B63F1BF3301D6609 |
| \net\NtControlPipe20 | 8E48D13549E3A7D91FFA1925918CBEDD |

Dkt. 98-22, Ex. 19, FINJAN-JN 304955-5022 at 56.

49.     While the Downloadable is analyzed in the Malware Analysis Pipeline, the results of the analysis, including hashes of the downloaded software components, are stored in a database of results. Dkt. 98-14, Ex. 11, FINJAN-JN 0044763 ("When a file is analyzed [with Sky ATP] . . . the results of the analysis are stored in a database."); *see also* Ex. 7, Juniper Source Code at 144-145 (showing that the hashes of the dropped files are stored as a list in the results) and at 449-450 (retrieving dropped hashes from Joe Sandbox to create Downloadable ID).  Sky ATP correlates these results into a combined results database, which keeps track of the profiles that include IDs for each Downloadable and its referenced software components and adding these to the "known list of malware."  Ex. 3, FINJAN-JN005246 at 265.

**VIII.   JUNIPER'S INFRINGEMENT OF CLAIM 1 OF THE '780 PATENT**

50.     As I describe more below, SRX Gateway with Sky ATP infringe Claim 1 of the '780 Patent through the process of obtaining and analyzing executable application programs and identifying

17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

potential malware based on the hashing of these files and their software components.

51.    The SRX Gateway with Sky ATP infringes because they obtain Downloadables with references to "dropped" software; performs dynamic analysis on the Downloadable where it fetches referenced dropped components; and creates a Downloadable ID in the security profile generated for the Downloadable, which includes a hash of the Downloadable together with its dropped software components.

**A.    Preamble of Claim 1 of the '780 Patent – "A computer-based method for generating a Downloadable ID to identify a Downloadable, comprising"**

52.    While I understand that a preamble is only limiting on a claim in certain specific circumstances, I find that the preamble of Claim 1 is met. Sky ATP in combination with the SRX Gateways meet the preamble of and infringe Claim 1 of the '780 Patent because they perform a computer-based method for generating a Downloadable ID for a Downloadable. I incorporate by reference my summary of the products above.

53.    The SRX Gateways obtain a Downloadable when a computer, located in a computer network protected by the SRX Gateway, requests the Downloadable from a server on the Internet. When the computer issues a request for the Downloadable, the SRX Gateway forwards that request to the appropriate server. Ex. 13, FINJAN-JN 045225. The SRX Gateway will thereby obtain Downloadables from the Internet, typically because a computer on an internal network has requested the Downloadable. Dkt. 98-10, Ex. 7 at FINJAN-JN 005385 (figure showing file being downloaded by SRX Gateway). The SRX Gateway will extract out of a stream of data from a Downloadable that is likely to include executable code. Ex. 46, Manthena Tr. at 20:25-21:14; 23:25-24:9.

54.    The SRX Gateway will send certain Downloadables to Sky ATP for malware analysis processing in the course of intercepting Downloadables before they reach the requesting computer. Ex. 13, FINJAN-JN 045225 ("The downloaded file type is on the list of files that must be inspected and is sent to the cloud for analysis."). The types of files that Sky ATP analyzes includes ".exe" (also known as Portable Executables or PE files). Ex. 47 at FINJAN-JN 044854. Sky ATP also obtains Microsoft Office Documents, such as "Word" documents, that include executable content in the form of a "macro." Word documents can be a very dangerous vector for executable code, and in fact, were the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

source of the recent "Locky" malware, which was a Word document that "dropped" another file to perform malicious actions. *See, for example*, Ex. 19, JNPR-FNJN_29033_00635680-90 (describing Locky, which is a Word document with embedded executable content that will cause the system to fetch and "drop" another harmful file).  As such, Microsoft Office documents are Downloadables because they are capable of carrying executable content through macros, and, in fact, are a common vector for transmitting malware.  Juniper acknowledges this, as it dynamically analyzes these file types.

55.    If Sky ATP has not previously seen the Downloadable, and is unable to determine if the file is malicious, then it will run the Downloadable in a sandbox environment. *See e.g.*, Ex. 14, JNPR-FNJN_29033_00858887 (diagram depicting a suspect file that goes through an "analysis chain in the cloud" that includes "dynamic analysis" which occurs "in a custom sandbox [that] leverages deception and provocation techniques to identify evasive malware").  This is shown in the images below:



Ex. 15, JNPR-FNJN_29008_00505441 at 454.

### 1.  Comments on Dr. Rubin's Analysis

56.    I note that while Dr. Rubin discusses the preamble of Claim 1, he does not dispute that SRX Gateways or Sky ATP perform a computer-based method for generating a Downloadable ID to identify a Downloadable, and in fact relies on other claim elements in making his conclusory statements that the preamble is not met.  Rubin Decl., ¶¶ 70-71, 99-101.

MITZENMACHER DECL. ISO OPP. TO DEFENDANT'S MSJ        CASE NO. 3:17-cv-05659-WHA

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

**B.** **Element 1(a) of the '780 Patent – "obtaining a Downloadable that includes one or more references to software components required to be executed by the Downloadable"**

57.     The SRX Gateway with Sky ATP infringe Claim 1 of the '780 Patent because they perform the step of obtaining a Downloadable that includes one or more references to software components required to be executed by the Downloadable.  I incorporate by reference my summary of the products above.

58.     The SRX Gateway obtains Downloadables when a computer, located in a computer network protected by the SRX Gateway, requests the Downloadable from a server on the Internet. When the computer issues a request for the Downloadable, the SRX Gateway forwards that request to the appropriate server.  Ex. 13, FINJAN-JN 045225.  The SRX Gateway thereby obtains a Downloadable from the Internet when a computer on the internal network has requested the Downloadable.  Dkt. 98-10, Ex. 7, FINJAN-JN 005382 at 85 (figure showing file being downloaded by SRX Gateway).  The SRX Gateway extracts the Downloadables from the stream to send to Sky ATP, which obtains the Downloadable through its submission component.  Ex. 7, Juniper Source Code at 456-458 (describing ████████.  In one example, the SRX Gateway may send ".exe" and "Word" files for analysis because these are likely to include dangerous malicious executable content.  SRX Gateways include the ability to analyze potential Downloadables and determine if they are a file type that may include executable code.  *See, for example*, Ex. 16, JNPR-FNJN_29003_00163740 (showing file types detected on SRX Gateway).

59.     The SRX Gateway sends certain executable files to Sky ATP for malware analysis processing by intercepting certain of the Downloadables before they reach the requesting computer. Ex. 13, FINJAN-JN 045225 ("The downloaded file type is on the list of files that must be inspected and is sent to the cloud for analysis.").  The types of files include, as described in Exhibit 48, FINJAN-JN 044854, "Table 1: File Category Contents", both ".exe" and Word documents, which are analyzed by Sky ATP.  Ex. 17, JNPR-FNJN_29008_00514106 at 123.

*60.*     In this manner, Sky ATP obtains Downloadables that include embedded content and/or referenced content, and in particular, references to "dropped" software components, that are submitted to it from SRX Gateways through a web portal.  For example, Sky ATP obtains Downloadables that are

20

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

then sent through the Malware Pipeline Analysis: "Pipeline managers listen to Results DB and ElasticSearch.  If sample already exists, source information and last modification time stamp will be updated.  Pipeline manager listen to Results db ADD and UPDATE event.  When any of those events get triggered, it runs a list of defined route expressions."  Dkt. 97-18, Ex. 10, JNPR-FNJN_29017_00552807.  This pipeline includes the deception adaptor/sandboxing which, as described in my overview of the products above, perform dynamic analysis.  *Id.*

61.     In one example, Sky ATP downloads a Word document that includes executable content in the form of a "macro," which includes a reference so that it downloads or extracts other executable content so that this software component can be "dropped" to perform malicious actions.  *See, for example*, Ex. 19, JNPR-FNJN_29033_00635680-90.  These dropped files are software components identified by the Downloadable because they are software, such as EXE files, and are components related to the operation of the Downloadable that identified those files.  Thus, Sky ATP's analysis looks for potential dropper infections ("DROP PE") which are references to software components required to be executed by the Downloadable which is demonstrated in image of the Table of File Category Contents above.  This is seen below, where the dynamic analysis (sandboxing) portion in particular will identify if the Downloadable will "Drop PE," which refers to the Downloadable dropping a portable executable file.



Carlson Decl., Ex. 3 at 4.

62.     Juniper's dynamic analysis uses a sandbox that spools up a live desktop and hooks into the OS to record if files are dropped.

21

MITZENMACHER DECL. ISO OPP. TO DEFENDANT'S MSJ      CASE NO. 3:17-cv-05659-WHA

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE



Ex. 20, FINJAN-JN 044847.

63.    Sky ATP watches the Downloadable run in this sandbox, fetches software components, and determines if the Downloadable is malicious.  Dkt. 98-14, Ex. 11, FINJAN-JN 044763-64.  In this way, Sky ATP uses the dynamic analysis in a sandbox to determine "[w]hat happens when we execute the file in a real environment."  Dkt. 98-15, Ex. 12, FINJAN-JN 005387.  Part of executing a file in a real environment is determining what external software components the Downloadable references and fetching those components to construct a generated Downloadable ID.  Ex. 7, Juniper Source Code at 144 ███████████████████████████████████████████████████████████████████████

████████████████  *see also id.* at 449-455.

64.    An additional example is provided below, which is a sample report created by Joe Sandbox, which shows that dropped files are fetched while it executed a Downloadable.  This shows that Sky ATP's dynamic analysis will fetch these components, including components that are executed, like .exe files, and then create a Downloadable ID including the MD5 hash values.

**Created / dropped Files**

| File Path | MD5 |
| --- | --- |
| C:\Documents and Settings\NetworkService\Local Settings\Application Data\sLT.exf | D5AB441BD47EDE42EF7FBDB58D6DA541 |
| C:\WINDOWS\mssys.dll | 879631FB71EEF07DB32A97E8DAD372EA |
| C:\WINDOWS\svchst.exe | 6B16C4526A013E744B3D91CD7A091C36 |
| C:\autorun.inf | 22E7E2047F46662384F91EAC7EFCC806 |
| \ROUTER | C485FFBBCB652D92B63F1BF3301D6609 |
| \net\NtControlPipe20 | 8E48D13549E3A7D91FFA1925918CBEDD |

Dkt. 98-22, Ex. 19, FINJAN-JN 304955-5022 at 56.

65.    Another example is provided below:

MITZENMACHER DECL. ISO OPP. TO DEFENDANT'S MSJ          CASE NO. 3:17-cv-05659-WHA

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

**Created / dropped Files**

| File Path | Hashes |
|---|---|
| C:\Documents and Settings\All Users\svchost.exe | • MD5: CC9FAB2465A279B9424DA3A09DF7C8D5<br>• SHA: DE0FCA6F868D48CCF6B5580301D73A44EBE07669<br>• SHA-256: 45C0598E3DB3B7A0A194BF6DE78C8454BCA2B5895A1BC511665D0E22243397E4<br>• SHA-512: FDC478B37449AD98609FE311A86053AC107D1C76BE6F2062386F0BED2696FFF38675C80773693AAC846E138D29238BD01F79D0D189AE |

Ex. 18, Report-cc9fab2465a279b9224.pdf at 2.

66.      While the Downloadable is analyzed in the Malware Analysis Pipeline, the results of the analysis, including hashes of the downloaded software components, are stored in a database of results. Ex. 98-14, Ex. 11 at FINJAN-JN 0044763 ("When a file is analyzed [with Sky ATP] . . . the results of the analysis are stored in a database."); *see also* Ex. 7, Juniper Source Code at 144-145 (showing that the hashes of the dropped files are stored as a list in the results) and 449-450 (retrieving dropped hashes from Joe Sandbox to create Downloadable ID).  Sky ATP correlates these results into a combined results database, which keeps track of the profiles that include IDs for each Downloadable and its referenced software components and adding these to the "known list of malware."  Ex. 3, FINJAN-JN005246 at 265.

### 1.   Comments on Dr. Rubin's Analysis

67.      I note that Dr. Rubin provides an overview and diagram depicting the flow of Downloadables through the SRX Gateways and Sky ATP (¶ 64) and even explains how "Sky ATP has the capability to receive files forwarded to it from the SRX" (¶ 103).  I disagree with Dr. Rubin that Finjan only identifies "two file types" of Downloadables.  Rubin Decl., ¶ 75.  In fact, Finjan has explained that Sky ATP and the SRX Gateways obtain downloadables that include web pages and their content such as HTML, PDFs, JavaScript, drive-by-downloads, obfuscated code, or other blended web malware.  Dkt. 96-7 at 3-4.  These Downloadables include web pages that include references to JavaScript, visual basic script, Active X, injected iframes; and a PDF that includes references to JavaScript, swf file, or other executables.  *Id.*  In addition, the SRX Gateway and Sky ATP obtain executable files such as .bin, .com, dat, .exe, .msi, .msm, .mst, PDF files, Java (e.g., .class, .ear, .jar, .war), MS Office file types, and script files through an application programming interface (API).  *Id.*

68.      I disagree with Dr. Rubin's discussion in paragraph 75 of his declaration regarding "disabl[ing] JavaScript" in a web browser or PDF.  Disabling embedded content, such as JavaScript,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

does not impact whether a Downloadable is an executable application program.  In fact, many files, including HTML or PDF files, include dynamic content designed to improve user experience when viewing such files and components such as embedded scripts (e.g., JavaScript or Visual Basic Script). Dkt. 96-7 at 3.  However, such dynamic content, or the ability to disable any embedded content, does not affect the status of the files as executable application programs.  Moreover, Dr. Rubin's discussion of how Sky ATP distinguishes the types of files analyzed under the different Sky ATP licenses is a red herring and is of no import to how Sky ATP and the SRX Gateways meet this claim element.  In particular, the existence of different licenses for the products does not affect that Sky ATP and the SRX Gateways are capable of, have been tested for, and provide for obtaining a Downloadable that includes one or more references to software components required to be executed by the Downloadable where the Downloadable is analyzed for potential malware.

69.     I disagree with Dr. Rubin's discussion of "droppers" in paragraph 76 of his declaration and in particular that "any references to droppers in a Downloadable are to software components that are executed as a result of the execution of the dropper, not something that is required to execute the dropper in the first instance."  In particular, Sky ATP includes components, which fetch software components identified by the one or more references (e.g., dropped files).  Sky ATP includes components, which fetch software components identified by the one or more references. SHA-256 hashes are generated together for the parent (dropper) and target (dropped) files.  I also disagree that the dropped software components are not needed to execute the Downloadable.  Juniper's Exhibit 16, entitled "Trojan.Dropper" shows that this element is met by Sky ATP even under Juniper's own construction.  In the "Trojan.Dropper" document, it describes how "[a] dropper is a means to an end rather than the end itself … the dropper is usually used at the start or in the early stages of a malware attack."  As described, the purpose of a dropper is therefore to execute the dropped file, without which the Downloadable does not fully execute.  Therefore, the software component is needed so that the Downloadable can execute in the intended manner.

70.     Furthermore, the description given in Wikipedia for a dropper is as follows:  "A dropper is a kind of Trojan that has been designed to 'install' some sort of malware (virus, backdoor, etc.) to a target system.  The malware code can be contained within the dropper (single-stage) in such a way as to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

avoid detection by virus scanner scanners or the dropper may download the malware to the target

machine once activated (two stage)." Ex. 48, https://en.wikipedia.org/wiki/Dropper_(malware).  This

description shows that droppers fetch software components (either embedded or external), and as the

purpose of these Downloadables is to install malware, the software components are required to be

executed for the Downloadable to function as intended.

### C.   Element 1(b) of the '780 Patent – "fetching at least one software component identified by the one or more references"

71.     The SRX Gateway with Sky ATP in infringe Claim 1 of the '780 Patent because they

perform the step of fetching at least one software component identified by the one or more references.  I

incorporate by reference my summary of the products above.  As discussed above, the SRX Gateways

can also send the Downloadable to Sky ATP if it has not seen the file before and it is of a type that

includes executable content.  In this case, certain files, like Word documents with macros and portable

executables, can be run using dynamic analysis.  In this case, the dynamic analysis will run the

Downloadable so that the dynamic analysis component will fetch the referenced software components

so that they can be catalogued as part of the analysis.

72.     As described above, if Sky ATP has not seen a Downloadable submitted by an SRX

Gateway before, and is unable to determine if it is malicious based on its included components, Sky

ATP will run the Downloadable using dynamic analysis, which includes using a sandbox and fetching

components that are referenced by the Downloadable to detect the presence of malware.

Downloadables provided by a SRX Gateway undergo several types of analysis as part of its pipeline

analysis, which includes dynamic analysis that is performed by the deception adapter in the sandbox

environment (Joe Sandbox).  *See, e.g.*, Ex. 14, JNPR-FNJN_29033_00858887; Ex. 49, JNPR-

FNJN_29033_00858888.  As part of its dynamic analysis within the sandbox, Sky ATP allows the

Downloadable to execute in an uninhibited environment.  Ex. 20, FINJAN-JN 044847.

73.     Juniper's dynamic analysis uses a sandbox that spools up a live desktop and hooks into

the OS to record if files are dropped.  To obtain these dropped files using a real desktop environment,

the desktop is required to executed the Downloadable and fetch the software components that are

identified in the Downloadable to be fetched and dropped during analysis.

25

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE**



Ex. 20, FINJAN-JN 044847.

74.     Sky ATP analyzes the Downloadable as it is run in this sandbox. The sandbox acts as an operating system for the Downloadable, which allows it to fetch software components. The sandbox records software components that are retrieved, and determines if the Downloadable is malicious. Ex. 5, Nagarajan Tr. at 169:1-24 ("So sometimes when a file -- file runs, it -- its fetch -- it gets a secondary file, and then typically that might be the malware …"); Dkt. 98-14, Ex. 11, FINJAN-JN 044744 at 63-64; Dkt. 98-15, Ex. 12, FINJAN-JN 005387 at 87. Part of executing a file in a real environment is determining what external software components the Downloadable references and fetching those components to be part of a generated Downloadable ID. Ex. 7, Juniper Source Code at 144

*see also id.* at 449-455.

75.     An additional example is provided below, which is a sample report created by Joe Sandbox, which show that dropped files (software components) are fetched while the Downloadable is executed by the sandbox. This shows that Sky ATP's dynamic analysis will fetch these components, including components that are executed, like .exe files, and then create a Downloadable ID including the MD5 hash values.



Dkt. 98-22, Ex. 19, FINJAN-JN 304955-5022 at 56.

76.     Another example is provided below:

26

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

**Created / dropped Files**

| File Path | Hashes |
|---|---|
| C:\Documents and Settings\All Users\svchost.exe | • MD5: CC9FAB2465A279B9424DA3A09DF7C8D5<br>• SHA: DE0FCA6F868D48CCF6B5580301D73A44EBE07669<br>• SHA-256: 45C0598E3DB3B7A0A194BF6DE78C8454BCA2B5895A1BC511665D0E22243397E4<br>• SHA-512: FDC478B37449AD98609FE311A86053AC107D1C76BE6F2062386F0BED2696FFF38675C80773693AAC846E138D29238BD01F79D0D189AE |

Ex. 18, Report-cc9fab2465a279b9224.pdf at 2.

77.     Sky ATP also identifies "Behaviors Seen" when analyzing Downloadables in the sandbox environment which utilizes deception adapters.  The "Behaviors Seen" log identifies activities performed by a dropper file using descriptions such as "may drop file containing decryption instructions" and "drops a file containing file decryption instructions."  *See, e.g.*, Ex.22, JNPR-FNJN_29030_00553947-58 at 51.

78.     The "Behavior Details" log also demonstrates how a "lockey.exe" file executes a "svchost.exe" file which then performs functions that contact multiple remote computers and/or servers in order to fetch the "evil.exe" file used in infecting a host computer.  Juniper includes a graphical representation of the information that is available in the stored Downloadable ID can be seen, which includes a sequence of hash files that includes the Downloadable and its dropped components.  Ex. 22, JNPR-FNJN_29030_00553947 at 54.

79.     These references to fetching functions in the "Behavior Details" are confirmed in Juniper's source code.  For instance, the ▮▮▮▮▮▮▮▮▮▮ file includes canned descriptions that suggest the performance of fetching in the claimed fashion such as "downloads executable code via HTTP," "Downloads files from webservers via HTTP," "uses FTP," and/or similar descriptions.  *See* ▮▮▮▮▮▮▮▮ file; *see also* Ex. 45, FINJAN-JN 005415 (HTTP Downloads).

**1. Comments on Dr. Rubin's Analysis**

80.     I note that while Dr. Rubin generally references his "review[] [of] relevant SRX source code" in his discussion of this claim element (e.g., ¶¶ 81, 113), he has neither cited to nor provided any identification of the alleged source code that supports his conclusory opinion. Furthermore, Dr. Rubin states that nothing in the Juniper code includes fetching. Rubin Decl., ¶ 115. However, Dr. Rubin makes an artificial distinction in an attempt to carve out the dynamic analysis that is performed and controlled by Juniper because the "Joe Sandbox" is used as a custom component that performs the dynamic analysis that includes fetching software components. I find Dr. Rubin's analysis faulty in that

MITZENMACHER DECL. ISO OPP. TO DEFENDANT'S MSJ        CASE NO. 3:17-cv-05659-WHA

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

he ignores these components because he does not believe they are Juniper's code, even though it is integrated into Juniper's system and indisputably fetches dropped software components. *See* Ex. 7, Juniper Source Code at 449-450 (describing function to "get_dropped_files").  Rubin also incorrectly states that Finjan did not identify anything beyond "HTML" for software components that can be fetched.  Rubin Decl., ¶ 117.  This is incorrect, Finjan's infringement contentions show that fetching is performed by retrieving a dropped "PE" file.  Carson Decl., Ex. 4 at 5 ("Sky ATP analyzes a Downloadable and fetches the software components identified by the one or more references (e.g. 'Drop PE').").

### 2. Doctrine of Equivalents

81.  At a minimum, Sky ATP in combination with SRX Gateways infringe this claim element under the Doctrine of Equivalents.  Specifically, Sky ATP and SRX Gateways perform substantially the same function because, as I have described, they receive Downloadables that contain reference components that are also dropped for use and create identifications for the Downloadable and these dropped software components.  Ex. 5, Nagarajan Tr. 169:1-24 ("So sometimes when a file -- file runs, it -- its fetch -- it gets a secondary file, and then typically that might by the malware …"); Dkt. 98-14, Ex. 11, FINJAN-JN 044763-64; Dkt. 98-15, Ex. 12, FINJAN-JN 005387.  Sky ATP and SRX Gateways perform this function in substantially the same way because they retrieve the dropped content – including the referenced components – to create an identifier that can be used, for example, to later identify if the same content is retrieved by the system for analysis.  *Id*; *see also* Dkt. 98-22, Ex. 19, FINJAN-JN 304956.  Substantially the same result is also achieved because the components of the dropped content are retrieved with the downloaded content and used to generate the Downloadable ID.  Ex. 5, Nagarajan Depo. Tr. at 169:1-24 and 169:25-170:3 ("Dropped files also get hashed."); Dkt. 98-14, Ex. 11, FINJAN-JN 044763-64; Dkt. 98-15, Ex. 12, FINJAN-JN 005387.

82.  I disagree with Dr. Rubin's discussion of the doctrine of equivalents for this claim element in paragraphs 84 and 119 of his declaration.  In particular, I disagree with Dr. Rubin's opinion that "the whole point of 'fetching' in the patent is so that the original Downloadable and its referenced components can form a complete package prior to the applying the hashing function."  Rubin Decl., ¶ 84.  I incorporate here also my overview discussion above of the '780 Patent.  In addition, Dr. Rubin

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

later explained that his statement is based on his opinion that "all of the components are needed and have to be hashed together in order to create a downloadable ID" but this again relies on a construction that is not supported by the '780 Patent as I discussed above.  Rubin Tr. at 55:13-23.  Dr. Rubin even admitted that the '780 Patent discloses, contrary to the opinions in his declaration, that software components that are fetched can be within the Downloadable.  *Id*. at 39:20-41:5.  Dr. Rubin's opinion is therefore based on an incorrect construction of the claims as I described above with respect to Juniper's proposed claim constructions.

> D.   **Element 1(c) of the '780 Patent – "performing a hashing function on the Downloadable and the fetched software components to generate a Downloadable ID"**

83.   The SRX Gateway with Sky ATP infringe Claim 1 of the '780 Patent because they perform the step of performing a hashing function on the Downloadable and the fetched software components to generate a Downloadable ID.  My understanding of "performing a hashing function on the Downloadable and the fetched software components to generate a Downloadable ID" is "performing a hashing function on the Downloadable together with the fetched software components to generate a Downloadable ID."  I incorporate by reference my summary of the products above.

84.   Sky ATP creates a Downloadable ID in the profile of information that is generated, and this Downloadable ID is a list of aggregate dropped files that can be used to identify the Downloadable.  Ex. 5, Nagarajan Tr. at 169:1-24 ("So sometimes when a file -- file runs, it -- its fetch -- it gets a secondary file, and then typically that might by the malware …"); *id.* at 169:25-170:3 ("Dropped files also get hashed."); Ex. 7, Juniper Source Code at 144 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see also* Ex. 7,  Juniper Source Code at 449-455.  Sky ATP performs a hashing function on the Downloadable and the fetched software components to generate a Downloadable ID.  I note that Dr. Rubin acknowledges that "Sky ATP provides for the generation of a hash for the particular file that is received."  Rubin Decl., ¶ 129.  I disagree with his further statement, however, that it is done "without fetching (or even waiting for) any software components that may be referenced therein" for the reasons I provide herein and for the reason that his statements are based on his construction of the terms (*see also* Rubin Decl., ¶ 132) which, as I discussed above, are incorrect.  Moreover, even under his construction of the terms, as I explain here,

29

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE

1  this claim element is met.

2      85.    Sky ATP "uses a series of analysis engines to determine whether a file object is

3  malicious or not" through performing a hashing function.  Ex. 19, JNPR-FNJN_29033_00635680-90.

4      86.    In addition, the "Behavior Details" provided by Sky ATP, that I have described further

5  above, demonstrate the hashing that takes place as they identify hashes for the "evil.exe" file dropped

6  by "svchost.exe."  This hash is separate from the hash computed for "lockey.exe" which is depicted at

7  the top of the display.

8      87.    In addition, the deception adaptor will create a Downloadable ID for the Downloadable

9  based on running a hash function on the file, as well as through running a hash function on fetched

10  software components that are used by the Downloadable during processing.  This is shown below:



21  Ex. 22, JNPR-FNJN_29030_00553947 at 54.

22      88.    As shown in this example, hashing is used to create a Downloadable ID that includes the

23  dropped components.

| Created / dropped Files | |
|---|---|
| **File Path** | **Hashes** |
| C:\Documents and Settings\All Users\svchost.exe | • MD5: CC9FAB2465A279B9424DA3A09DF7C8D5<br>• SHA: DE0FCA6F868D48CCF6B5580301D73A44EBE07669<br>• SHA-256: 45C0598E3DB3B7A0A194BF6DE78C8454BCA2B5895A1BC511665D0E22243397E4<br>• SHA-512: FDC478B37449AD98609FE311A86053AC107D1C76BE6F2062386F0BED2696FFF38675C80773693AAC846E138D29238BD01F79D0D189AE |

Ex. 18, Report-cc9fab2465a279b9224.pdf at 2.

28      89.    The following shows the "dropped files" and hash IDs are generated after the

30

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE**

1    Downloadables are analyzed in the Sky ATP sandbox:

2

3    **Created / dropped Files**

| File Path | MD5 |
|---|---|
| C:\Documents and Settings\NetworkService\Local Settings\Application Data\sLT.exf | D5AB441BD47EDE42EF7FBDB58D6DA541 |
| C:\WINDOWS\mssy s.dll | 879631FB71EEF07DB32A97E8DAD372EA |
| C:\WINDOWS\svchst.exe | 6B16C4526A013E744B3D91CD7A091C36 |
| C:\autorun.inf | 22E7E2047F46662384F91EAC7EFCC806 |
| \ROUTER | C485FFBBCB652D92B63F1BF3301D6609 |
| \ncf\NtControlPipe20 | 8E48D13549E3A7D91FFA1925918CBEDD |

7    Dkt. 98-22, Ex. 19, at FINJAN-JN 304956; Ex. 6, FINJAN-JN 304963.

8         90.    The dropped files are collected into a data structure so that they can be identified as part

9    of the Downloadable ID.  This can be seen in the source code file

10   ███████████████████████████████████████ This file includes a

11   ████████████████████████████ that creates a Downloadable ID for the downloadable and its

12   dropped components that includes the SHA-256 of the Downloadable and all of the dropped

13   components that it references.  Ex. 7, Juniper Source Code at 129 (showing a property of the dropped

14   file object schema the property of "SHA-256" of the dropped file).

15        91.    The source code also shows that Sky ATP will collect the hashes of dropped files into a

16   group.  In the file █████████████████████████████████████" it is shown that a

17   Download ID is created for both the Downloadable and its dropped components.  This shows that Sky

18   ATP includes the functionality for ███████████████████████████████ The

19   function █████████████████████████████████ shows that this

20   Downloadable ID has been created, showing that Sky ATP will "Process dropped hashes" as noted,

21   these dropped hashes are grouped together into a "dict" data structure.  Ex. 7, Juniper Source Code at

22   144.  Furthermore, the source code describes how the "dict" data structure includes fields that have

23   grouped together the hashes of the dropped files, which can be extracted.  *Id.*  Furthermore, the source

24   code will group the dropped files, including through a ████████████ data structure that combines the

25   files together.  *Id.*, Juniper Source Code at 145.  The hashes of the dropped software components are

26   stored together and form a unique hash that identifies that file and the dropped component.  *Id.*

27        92.    Juniper understands how dropped files are created with Sky ATP, and has a process in

28   place for handling them.  Ex. 21, JNPR-FNJN_29017_00552710 ("Deception adapter can 'drop' new

31

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE**

1    samples while scanning a malware."). Juniper will keep a list of the dropped files in Sky ATP to

2    identify the associated malware.

3                    **1.    Comments on Dr. Rubin's Analysis**

4          93.    Dr. Rubin's entire opinion relies on the incorrect construction of the '780 Patent and

5    Claim 1. Specifically, he assumes that the claimed "Downloadable ID" can be created by performing

6    only a single hash on one file. Rubin Tr. at 37-39; Rubin Decl., ¶¶ 86-98, 121-135. I disagree for the

7    reasons I discussed above in connection with claim construction.

8          94.    I further note that Dr. Rubin's discussion of Joe Sandbox is based on his *not* having

9    "seen the Joe Sandbox source code." Rubin Decl., ¶ 131. He notes that Joe Sandbox "may provide as a

10   result a list of hashes associated with each file referenced by a sample that it analyses." Rubin Decl.,

11   ¶ 131. I have reviewed the documents related to Joe Sandbox and Juniper's code that runs and

12   monitors this sandbox and determined that it does create an ID for a Downloadable that includes

13   "dropped" files. *See* Ex. 5, Nagarajan Tr. at 172:3-6 (Sky ATP will identify a "dropped file").

14         95.    I also disagree that files that are dropped are not "required to be executed" by the

15   Downloadable. First, Dr. Rubin often attempts to limit his analysis to PDF and HTML files, which

16   Finjan has identified at least ".exe" files and "MS Office file types" (Word) in its infringement

17   contentions as explicit examples of Downloadables that meet the claim language. *See, for example*,

18   Rubin Decl., ¶ 103; *see also* Carson Decl., Ex. 3 at 4. Juniper's own Exhibit 16 shows the fault in this

19   line of thinking, because it shows that the Downloadable will not operate as intended without its

20   referenced components (the dropped file). Carson Decl., Ex. 16. Exhibit 16 describes how a dropper

21   download is "a type of Trojan whose purpose is to deliver an enclosed payload onto a destination host

22   computer. A dropper is a means to an end rather that the end itself." *Id.* at 1. This describes how the

23   dropper file is required to execute the referenced file that it drops to perform the purpose of the dropper,

24   which in this case is to infect the system.

25         96.    I also disagree with Dr. Rubin's contention that a Downloadable ID consisting of a

26   single hash value could not be constructed by combining results of hashes of smaller components. *See*

27   *e.g.*, Rubin Decl., ¶ 56. A POSITA would know that hashes of components or parts of a file or other

28   data objects can be combined to create a single hash value. In particular, a list of "sub-hashes" can be

32

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SOURCE CODE**

combined to create a single hash value.  A simple example of this is to consider a hash function which takes a file, represented in bits, and creates a 32-bit hash as follows: the first 100 bits are XORed (exclusive-ored) together to create the first bit, the second 100 bits are XORed together to create the second bit, and so on.  Each of the single bits generated is a 1-bit hash of the file; the combined list of 32 bits would be a single 32-bit hash of the file.  Variations of such schemes are commonly known hash functions, showing that single hash values can arise by combining hashes of components or sub-parts of the file.  Indeed, similar approaches, such as bit sampling and creating a vector from min-wise independent hash functions, are commonly used in locality-sensitive hashing schemes.

97.     Juniper does not dispute that the hashes of dropped files in Sky ATP are generated, nor does Juniper dispute that the hashes of dropped files are listed together during sandboxing in dynamic analysis.  The resulting combination serves as a downloadable ID, corresponding to a single hash value consisting of the list of hash values.  In fact, Juniper's expert concedes that Sky ATP includes source code that "defines ███████ variable that is a list of hashes".  Rubin Decl. ¶ 131.  Here the claim is still met under Juniper's construction because the single hash is formed using the combined list of sub-hashes of components, which would be compared against another Downloadable ID consisting as a combined hash.

98.     In conclusion, I found that the SRX Gateways when combined with Sky ATP, infringe Claim 1 of the '780 Patent.  I found that SRX Gateways with Sky ATP, obtain Downloadables with references to "dropped" software; perform dynamic analysis on the Downloadable where it fetches referenced dropped components; and create a Downloadable ID in the security profile generated for the Downloadable, which includes a hash of the Downloadable together with its dropped software components.  Furthermore, Juniper operates Sky ATP in the U.S., and tests SRX Gateways with Sky ATP the U.S. before they are released, showing that Juniper performed all of the steps required.  *See*, Dkt. 97-10, Ex. 3, Manthena Tr. at 104:4-14.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on June 28, 2018, at Lexington, Massachusetts.



Michael Mitzenmacher, Ph.D.

MITZENMACHER DECL. ISO OPP. TO DEFENDANT'S MSJ          CASE NO. 3:17-cv-05659-WHA