Pages 1 - 49

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

| | | |
|---|---|---|
| FINJAN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **No. C 17-5659 WHA** |
| | ) | |
| JUNIPER NETWORKS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | San Francisco, California |
| | | Thursday, May 9, 2019 |

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiff:          KRAMER, LEVIN, NAFTALIS & FRANKEL LLP
                        990 Marsh Road
                        Menlo Park, California 94025
                  BY: **PAUL J. ANDRE, ESQ.**
                        **LISA KOBIALKA, ESQ.**
                        **KRIS KASTENS, ESQ.**
                        **MISSY G. BRENNER, ESQ.**

For Defendant:          IRELL & MANELLA LLP
                        1800 Avenue of the Stars, Suite 900
                        Los Angeles, California 90067-4276
                  BY: **JONATHAN S. KAGAN, ESQ.**

                        IRELL & MANELLA LLP
                        840 Newport Center Drive, Suite 400
                        Newport Beach, California 92660
                  BY: **REBECCA CARSON, ESQ.**

**Reported By:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR**
              **Official Reporter**

<u>**Thursday - May 9, 2019**</u>                      **7:59 a.m.**

**P R O C E E D I N G S**

**---oOo---**

THE CLERK:  Calling civil action 17-5659, Finjan, Inc. versus June, Inc.

Counsel, please step forward and state your appearances for the record.

MR. ANDRE:  Good morning, Your Honor.  Paul Andre, Lisa Kobialka, Kris Kastens, and Missy Brenner for plaintiff Finjan.

MS. KOBIALKA:  Hello.

THE COURT:  Welcome to you.

MR. ANDRE:  Thank you.

MR. KAGAN:  Good morning, Your Honor.  Jonathan Kagan, of Irell & Manella.  With me is Rebecca Carson.

THE COURT:  Welcome to you.

MR. KAGAN:  Thank you.

THE COURT:  We have two motions.  We'll start with the motion by Finjan.  Please, go ahead.

MS. KOBIALKA:  Your Honor, Lisa Kobialka on behalf of Finjan.

So Finjan brought this Rule 60 motion under two different grounds, one under 60(b)(2) and then one under 60(b)(3), because there were incredibly misleading omissions that were made throughout discovery with respect to Sky ATP.

1      And the first thing I can point to was an interrogatory

2   that specifically asked about the databases in Sky ATP.  That

3   was in April of 2018, which would have given us plenty of time

4   if they had been honest in their response about what those

5   databases were.

6      And what they did was they indicated what databases there

7   were, that they're willing to tell us about, whether or not --

8          **THE COURT:**  Wait.  See, you got a false start, and

9   then I got confused.

10         **MS. KOBIALKA:**  Sorry.

11         **THE COURT:**  Give me the question and the answer again,

12   but be clear-cut instead of false start.

13         **MS. KOBIALKA:**  Fair enough.

14   Interrogatory No. 12 explicitly asked:

15      "Identify and describe all databases that are

16   incorporated or used by the accused products."

17   They responded:

18      "Based on an investigation to date, Sky ATP" -- so

19   we're specifically talking about the product at issue that

20   was at trial -- "does not store results from the

21   adapter" -- and it gives the claim construction -- "in a

22   collection of interrelated data organized according to a

23   database schema to serve one or more applications."

24      But it goes on, and this is where it's really misleading,

25   because of the omission.

1          **THE COURT:**  Now, read slowly then.

2          **MS. KOBIALKA:**  It goes on to say:

3          "To the extent Sky ATP uses any other database that

4     may or may not have had schema, such databases are

5     irrelevant to this matter.  Such as, for example, Customer

6     Database, which is used to track information.  Dynamo DB

7     and Amazon RDS, which do store adapter results, are

8     schema-less and, thus, do not fall within Finjan's

9     definition of database, which is, quote, a collection of

10     interrelated data organized according to a database schema

11     to serve one or more applications."

12     Nowhere is there any mention of the Joe Sandbox file

13 database, which we discovered and were able to confirm, in

14 February of this year, months after the trial, on this very

15 issue, that, in fact, Joe Sandbox file database stores the

16 results, and it has a database.  And that's part of Sky ATP.

17 They omitted it explicitly from their interrogatory response.

18     Several months prior to this interrogatory request, we

19 specifically asked for documents regarding Sky ATP, the

20 operation of Sky ATP.  And we were told throughout discovery,

21 You have everything.

22     They explicitly wrote in their interrogatory response --

23          **THE COURT:**  Is this the same one?

24          **MS. KOBIALKA:**  Oh, excuse me, document response.

25          **THE COURT:**  All right.  Okay.  Hold that thought.

1     I just want to hear on the interrogatory answer.  What is

2  your response on the interrogatory answer?

3     **MR. KAGAN:**  So the first -- the thing that the Court

4  may recall but I will remind the Court of is that Sky ATP is a

5  program that was written by Juniper Networks.

6     What that program does is it licenses certain components

7  or features that it uses from other companies, but it does not

8  have the source code for those.  They're not a part of Sky ATP.

9  They're licensed third-party components.  One of those is Joe

10 Sandbox.

11     So what Juniper knows is what Juniper's product does.  It

12 knows where Sky ATP stores information.  What Joe Sandbox does

13 internally, which is now something that Finjan is focusing on,

14 is not something that Juniper knows.

15     Juniper does not have the source code for Joe Sandbox.

16 Juniper does not -- Juniper's prohibited from doing any reverse

17 engineering to try to figure out what Joe Sandbox does

18 internally.

19     And, also, this -- we can get more complex on this.  Sky

20 ATP doesn't store anything in Joe Sandbox.  So Joe Sandbox does

21 an analysis and it sends information to Sky ATP, but it's a

22 one-way connection.

23     Sky ATP then takes that data, analyzes it, and stores it

24 in precisely the locations that were described in the

25 interrogatory.  Sky ATP never goes back and stores anything in

1    Joe Sandbox.

2        What they're talking about is two different things,

3    talking about apples and oranges.  They're talking about what

4    Joe Sandbox does internally, in terms of its analysis, which is

5    something that Juniper explained numerous times, in numerous

6    depositions, that it's what we call a black box.  We really

7    don't know what Joe Sandbox does internally.

8            THE COURT:  Okay.  Hold that thought.

9        What do you say to that?

10           MS. KOBIALKA:  It doesn't excuse them for not

11   searching the server with the documents regarding Joe Sandbox,

12   which we received in February of this year, that actually

13   detail about the Joe Sandbox file database that stores the

14   results.

15           THE COURT:  What server are you talking about?

16           MS. KOBIALKA:  It is the server that they referred to

17   as their iWeb server.

18           THE COURT:  Their what?

19           MS. KOBIALKA:  The iWeb server that they refer to in

20   their briefing.

21           THE COURT:  Is that one that's owned by Juniper?

22           MS. KOBIALKA:  It has all of Juniper's content on it.

23           THE COURT:  Is it like the cloud?

24           MS. KOBIALKA:  Yes.  So if I have a Google Docs

25   account, and I have documents I create and put them up on

1   Google, I'm able to say that's my content.  I'm able to

2   download it.

3        That's what they were able to do in this instance.  They

4   have information that gets put on the server that serves them.

5            THE COURT:  Go over there, Ms. Kobi- -- sorry.

6            MS. KOBIALKA:  Kobialka.

7            THE COURT:  Kobialka.  Go get the -- draw me a cartoon

8   so that I can understand your argument on why they should have

9   been able to turn these documents over.

10       He says it's a black box and they didn't have the

11  materials.  And you say they did have the material.  So

12  somebody is lying to me.

13       Go over there.

14           MS. KOBIALKA:  Okay.  I don't know if I have --

15           THE COURT:  What?  Just draw it for me.  I can't

16  understand your argument.  It's too complicated.

17       Bring it over here so that I can see it better.

18           MS. KOBIALKA:  Okay.

19           THE COURT:  Thank you.

20       Pull it in a little closer.

21       What does that say there, "JPR"?

22           MS. KOBIALKA:  Juniper, it stands for Juniper.

23           THE COURT:  What's that?

24           MS. KOBIALKA:  That's their server that they were able

25  to download information from to produce in this case once we

1    pointed out that they hadn't gotten that information.  This is

2    a server with information --

3              THE COURT:  Give me -- all right.  Give me one example

4    of the information that is so earth shattering now.

5              MS. KOBIALKA:  The user guide and the interface guide,

6    that was produced in February of 2019, that actually describes

7    the database, the file database in Joe Sandbox.

8              THE COURT:  And that was --

9              MS. KOBIALKA:  And they never searched --

10             THE COURT:  That was resident there all along?

11             MS. KOBIALKA:  Yes.

12       So they have their declarations that they testified they

13   didn't search for it until late 2018, early 2019.  That's

14   Mr. Aquino's declaration and Mr. Islah's declaration.

15             They said they weren't even asked to look for this

16   particular information.  We had specific requests asking for

17   manuals, guides.  They represented to us in fact discovery that

18   everything, all technical production, has been done for Sky

19   ATP.  You have everything.

20             That turned out not to be true.  And the information that

21   they provided wasn't in any other documentation that had been

22   provided.

23             THE COURT:  Read to me where they said you have

24   everything.

25             See, now, it's got to say that.  If you're putting a spin

1  on it then I start losing faith in what you're saying.  Read to

2  me where they said you have everything.

3         MS. KOBIALKA:  Okay.  So for Request 89,

4  specifically -- so I'll just use that one.  There's a couple

5  others, but I'll use 89.

6         THE COURT:  Yes.

7         MS. KOBIALKA:  (Reading)

8         "All documents, manuals, guides or other documents

9      provided by Joe Security to Juniper, including document

10     description, the operation, use or API of any Joe Security

11     product, including its Joe Sandbox and Joe Static

12     product."

13        THE COURT:  Somebody is clicking a notebook.  Who is

14  doing that?

15        MR. KASTENS:  Sorry.

16        THE COURT:  It's like a thunderstorm going on over

17  there.  Meanwhile your partner is trying to explain something

18  to me and you're destroying the effectiveness of it.

19        MR. KASTENS:  Sorry.

20        THE COURT:  Please stop and let her have my undivided

21  attention.

22      All right.  Continue, please.

23        MS. KOBIALKA:  The response that they provided to that

24  specific request asking for all documents, manuals, guides that

25  Joe Security provided to Juniper was:

1              "Subject to the specific objections and general

2         objections incorporated herein, Juniper responds that it

3         has already completed its technical production detailing

4         the operation of Sky ATP, which includes both the complete

5         Sky ATP source code as well as many thousands of pages of

6         technical specifications, design and development documents

7         and administration guides."

8         It goes on:

9              "Juniper further responds, subject to its objections,

10        that it has also produced licenses with Joe Security" --

11            **THE COURT:**  Wait.  Say that again.  It has already

12   produced what?

13            **MS. KOBIALKA:**  "Licenses with Joe Security for

14   products used by Sky ATP."

15            **THE COURT:**  Uh-huh.

16            **MS. KOBIALKA:**  This response does not say, as

17   required --

18            **THE COURT:**  Well, you said it said, "We have given you

19   everything."  Where does it say that?

20            **MS. KOBIALKA:**  Juniper responds that it has already

21   completed its technical production detailing the operation of

22   Sky ATP.

23            **THE COURT:**  That's not the same words.  That doesn't

24   say we have given you everything.  It says we have completed

25   something.

1          **MS. KOBIALKA:**  They said they gave us everything about

2     Sky ATP in response to a specific request about Sky ATP

3     relating to Joe Security documents to Juniper.

4          **THE COURT:**  See, when you put spin on it then I don't

5     know how much I can trust a word you say.

6          **MS. KOBIALKA:**  Your Honor, there's no dispute that Joe

7     Security Sandbox is part of Sky ATP.  They're not disputing

8     that.  They didn't dispute it in their briefing.  That's not at

9     issue here.  It is one of the databases of Sky ATP, which was

10    the key focus of our December trial.

11         There are pictures in their brief.  On page 13 of their

12    brief they show how Joe Security, which has the database that

13    we're talking about, is part of Sky ATP.  That's what this

14    cloud is (indicating).

15         **THE COURT:**  Let me see that document.

16         Which one of these is Joe Security?

17         **MS. KOBIALKA:**  There are two boxes on that, that says

18    "Joe Security."  If you look in the upper left-hand corner, the

19    second --

20         **THE COURT:**  I see one that says --

21         **MS. KOBIALKA:**  Second and fourth.

22         **MR. KAGAN:**  It's the second one in from the left, and

23    the fourth one in.

24         **THE COURT:**  All right.  Go back and read that

25    interrogatory and the answer again.

```
 1              MS. KOBIALKA:  The interrogatory versus the request

 2     for documents?

 3              THE COURT:  Yeah.  Start with the interrogatory.

 4              MS. KOBIALKA:  The Interrogatory No. 12:

 5              "For each accused instrumentality identify and

 6          describe all databases that are incorporated or used

 7          either directly or indirectly by the accused

 8          instrumentalities."

 9          There's more to it about identifying and describing the

10     type of database, et cetera, but the key to that interrogatory

11     is:  Identify all databases that are used directly or

12     indirectly by the accused instrumentalities.

13              THE COURT:  Okay.  What was the answer?

14              MS. KOBIALKA:  (Reading)

15              "Based on investigation to date, Sky ATP does not

16          store results from the adapters in, quote, a collection of

17          interrelated data organized according to a database schema

18          to serve one or more applications, closed quote.  To the

19          extent Sky ATP uses any other database that may or may not

20          have schema, such databases are irrelevant to this matter,

21          such as, for example, Customer Database, which is used to

22          track customer information.  Dynamo DB and Amazon RDS,

23          which do store adapter results are schema-less and, thus,

24          do not fall within Finjan's definition of, quote,

25          database, end quote, which is, quote, a collection of
```

1          interrelated data organized according to a database schema

2          to serve one or more applications, closed quote.

3      And they cite a number of Amazon Web pages.

4          **THE COURT:**  All right.  So, now, in the material that

5      you got in February, explain to me in one or two sentences why

6      that was such earthshaking information.

7          **MS. KOBIALKA:**  Because for the first time in the

8      material that they provided, which is the user guide and the

9      installation guide, it identified databases that had a schema

10     that stored the results.  The very issue that we had talked

11     about in the December trial.

12     And at no point did Juniper say "We omitted this

13     information."  At no point.  We figured it out because we had

14     seen a document, after they had told us they didn't have any

15     further documents, that was attached.  Looked like some sort of

16     installation guide from Joe Security.  And we said, Wait a

17     minute, it looks like you do, in fact, have Joe Security

18     documents.  They haven't been produced.

19     That was provided to us among 36,000 pages of documents in

20     November, right before trial.  So we followed up with them as

21     soon as we reasonably could in this case and said, It looks

22     like you've got more information.

23     In February they suddenly produce the user guide and the

24     interface.  And I can give you specific pages.  We cited to it

25     explicitly in our brief.

1    It talks about the file database format and this strict

2  structure, the very structure that was the basis of their

3  non-infringement case.  Right?  They couldn't have made this

4  non-infringement argument that they did in the December trial

5  if they had produced these documents.

6         **THE COURT:**  Why is that?

7         **MS. KOBIALKA:**  Because their whole basis was it's a

8  schema-less -- right? -- it's a schema-less database; it's a

9  database without this structure.

10    But it turns out, in fact, no, they had a database within

11  Sky ATP that they failed to identify to us that, in fact, has a

12  strict structure.

13    It follows the very definition that Dr. Rubin used and

14  applied throughout trial.  So it absolutely is a material issue

15  that occurred.  And we didn't get these documents, which were

16  in their possession and control, because they didn't search for

17  it, according to their own declarations that they submitted,

18  until after trial.

19    And these documents detail where these databases are, how

20  they are structured.

21         **THE COURT:**  All right.

22         **MS. KOBIALKA:**  And they don't dispute it.  It's not

23  disputed in their briefing.

24         **THE COURT:**  What's not disputed?

25         **MS. KOBIALKA:**  That, in fact, these databases meet the

 1   definition of Dr. Rubin.

 2             THE COURT:  Is that not true, Mr. Kagan?

 3             MR. KAGAN:  We do not address it because we don't have

 4   enough information to know.  We still don't have the source

 5   code for those databases.  These are just user guides and

 6   manuals.

 7             THE COURT:  Wait.  She just got through reading

 8   something to me that said "databases."

 9             MR. KAGAN:  Your Honor, there is no dispute that there

10   are databases located within the Joe Sandbox.  We do not

11   dispute that.

12             THE COURT:  Well, then what-- wouldn't this be

13   relevant to the trial?

14             MR. KAGAN:  Well, it wouldn't for a number of reasons.

15   But one fact that may make this whole issue moot is we

16   disclosed in July of 2018 that there was, in fact, a database

17   in Joe Sandbox.

18        We gave a document, the license agreement, that

19   specifically says that there is a database, that the Joe

20   Sandbox includes a database.  It's called an H2 Database.  And

21   it provides a link.

22        And we cited this in our brief, describing what the H2

23   Database is.  And if you just bothered to click on that link,

24   it says this is a SQL database.  That's capital S-Q-L database.

25   So this is the same type of database that existed in what's

1    been referred to in trial as the Results Database.

2        So as of July, Finjan was absolutely aware that this

3    database existed.

4        In May of 2018, we informed Finjan -- they deposed

5    numerous of our witnesses, and they asked them:  Tell us about

6    the operation of Joe Sandbox.

7        And each of the witnesses said:  We don't know.  We do not

8    have access to the source code.  We don't know exactly what is

9    done.

10        **THE COURT:**  What was it that was up in that box up in

11    the sky there?

12        **MR. KAGAN:**  Well, this diagram is not exactly

13    accurate.

14        May I?

15        **THE COURT:**  Yeah.

16        **MR. KAGAN:**  Okay.  So these three boxes on the bottom

17    represent Juniper's technical repositories.

18        So all of Juniper's technical information for Sky ATP is

19    maintained on three separate servers.  One is called

20    Confluence; one is called Jira; and one is called Gnat.  So

21    this is where Juniper stores its technical information about

22    Sky ATP.

23        You have to remember that Sky ATP is the product that

24    Juniper designed.  We license product from third parties such

25    as Joe Sandbox.

1    When we get -- we just get the object code.  It's like

2 buying the Microsoft Word program or something.  We just get

3 it, install it.  That is not on a Juniper network.  We don't

4 put that in our system.

5         **THE COURT:**  Which program?

6         **MR. KAGAN:**  That's Joe Sandbox.

7    So we go to Joe Sandbox, and we say we want a program --

8 they say, we have a program that it will do a dynamic analysis

9 for you.  We say, Oh, that's great.  We'll license it from you.

10    So they say, okay, here's -- if you want the information,

11 you pay us some money, you can use our program.  You don't get

12 the source code.  You don't really get to know what's going on

13 under the hood, but you can use it so you can send an input,

14 send a file, and we'll tell you what the file is doing.

15    So that's what our engineers call a black box.  They don't

16 really know how it works, they don't know how it operates.

17 They know they send a file and get back a result.  That's

18 consistent.  All the engineers said that.  Cited in Finjan's

19 moving papers, in fact.

20    When they sent the program for Juniper to load onto the

21 server, they did send some other files.  Those were these user

22 guides and installation guides.  But they stayed up here

23 (indicating).  Juniper never put them in its technical

24 repositories.

25         **THE COURT:**  What do you mean they stayed up there?

1          **MR. KAGAN:**  So all of -- these are computer servers

2      (indicating).

3          **THE COURT:**  Yeah.

4          **MR. KAGAN:**  So all the information about Sky ATP

5      Juniper stores here, okay.  So when it writes source code, when

6      it has bug reports, all that information is stored and tracked

7      within Juniper.

8          When we get third party -- when we license product from a

9      third party, that's over here (indicating).  It's outside of

10     Juniper's network.

11         So there was some other information that came with the

12     program, like a user guide, but Juniper never moved that data

13     from this database, which is outside of Juniper, into its

14     network.

15         **THE COURT:**  Where is it resident?

16         **MR. KAGAN:**  It's resident up here on this Web server

17     that's outside of Juniper's network.

18         **THE COURT:**  Who owned that web server?

19         **MR. KAGAN:**  It's a third party.  Juniper just rents

20     space on it.

21         **THE COURT:**  But Juniper rented the space where that

22     information was?

23         **MR. KAGAN:**  Yes.  So we rented a little corner of this

24     Web server up here.  And we did have -- that's where we hosted

25     Joe Sandbox.  And that's where these documents were located.

1          In other words, Juniper did have the user guide, the

2     installation guide for Joe Security.  We did have it.  It was

3     located on the Web server.

4          **THE COURT:**  All right.  So you could have produced it.

5          **MR. KAGAN:**  We could have.  But here's what happened:

6          Remember in this case, Your Honor, things are happening in

7     parallel.  We were doing discovery on the issues for the '494

8     patent, which is going to trial, but we're simultaneously doing

9     discovery for all the other patents that are not going to trial

10    immediately.  So we were prioritizing, and Finjan is

11    prioritizing discovery.

12         What happened here, the way we found these documents is

13    actually an example of how discovery should work.  Discovery

14    worked -- there's discussions of omissions and withdrawals and

15    delays.  None of that is true.  These documents were discovered

16    in the way that documents should be discovered in discovery.

17         What happened was Finjan served us a document request,

18    massive document request for all the Sky ATP documents.

19         We searched.  We gave them everything.  We gave them the

20    source code.  We gave them a computer to review that had all

21    the files on it.  Every single thing.  And we gave them the

22    license with Joe Security, and we told them we don't actually

23    have the source code for Joe Security.  And this was true.

24         And we told them that -- about our search.  We said we're

25    going to search our network drives, which is what these are.

1    These are not a Juniper network drive.

2         So we had our internal technical paralegal work with a

3    digital forensics team.  They searched everything.  And we

4    produced everything we had, including the Joe Security license.

5         Then there was another phase of discovery which related to

6    ESI.  That's the electronically stored information.  And in

7    October -- so this gets emails and electronic files.

8         In October, Finjan gave us the terms that they wanted for

9    us to do a search for that ESI.  I think it was October 16th.

10   So we did that search.

11            **THE COURT:**  On which servers?

12            **MR. KAGAN:**  On everything.

13            **THE COURT:**  Including the one up there?

14            **MR. KAGAN:**  Well, this really is internal for Juniper.

15   So -- but if it goes outside or inside, it will pick it up.  In

16   other words, anything going in or out of Juniper will get

17   picked up by that search.

18        So in that search, and under this court's order and what

19   we agreed to, we have 21 days to provide that information.  And

20   we told Finjan that the search terms they were using were too

21   broad and they were going to generate too many results.  And we

22   actually told them how many documents they were going to get if

23   they didn't narrow their search terms.

24        And we strongly advised them to narrow their search terms.

25   But they didn't.  At a certain point they said, no, we

1   understand we're going to get 36,000 documents, but that's what

2   we want.  We are said okay.  And we then ran a search and gave

3   them the documents.

4           **THE COURT:**  But was the universe searched?  Did it --

5   was it just down there on the bottom, or did it also include

6   the iWeb?

7           **MR. KAGAN:**  It would include everything.  Because this

8   includes emails.  So anything coming -- if there were emails

9   bouncing back and forth with information, anything would be

10  covered.  Anything coming in and out of Juniper.

11          **THE COURT:**  Including those manuals?

12          **MR. KAGAN:**  Well, ESI, just emails.

13          **THE COURT:**  What?  Oh, it's just the emails.

14          **MR. KAGAN:**  It just does emails.

15          **THE COURT:**  Oh, all right.

16          **MR. KAGAN:**  So in the emails some documents were found

17  that referred to these documents.

18          **THE COURT:**  The manuals.

19          **MR. KAGAN:**  So there was a -- there was an

20  installation guide, but it's just an earlier version of one of

21  these documents.

22      And then Finjan came to us.  We produced this in November,

23  before the trial and within the deadline, exactly where we were

24  supposed to.  Finjan came to us on December 17th, after the

25  trial, and they said, You know, you refer to these other

1    documents that weren't produced.  Can you do an additional

2    search to find these documents, to see if you have them, and

3    produce them by January 28th?  And we said, Sure, we'll do it.

4        We didn't produce by January 28th.  It took us until

5    February 4th, but that's when we produced these documents.

6        So what we did was we said, okay, maybe even though our

7    initial search was reasonable, given everything in the case,

8    seemed like it was going to catch everything, we missed a

9    couple of documents.  A handful of documents.

10       Those are documents that were sitting up there in a zipped

11   file, so they were compressed.  People hadn't used them, but

12   they were there.  We identified them and we gave them to

13   Finjan.  Finjan had them by February 4th.

14       Now, this is not -- there are no discovery motions filed.

15   There were no claims of improper behavior.  There was nothing

16   until after Finjan lost their Rule 59 motion.  And that

17   happened on March 11th, okay.  That was when this court issued

18   the order.

19       Finjan had all the documents, including these documents,

20   by February 4th.  The hearing on the Rule 59 motion was not

21   until February 21st.

22       If these documents were the smoking gun documents that

23   Finjan claims, if they blew the whole case open and they had

24   those documents on February 4th, they're required, under Rule

25   60, to raise them before the Rule 59 hearing.

1          **THE COURT:**  Read that part of the rule to me.

2          **MR. KAGAN:**  Your Honor, I do not have the rule in

3   front of me.  I'm sorry.  I can get that to the Court.

4          **THE COURT:**  Here.  I'll hand it to you.

5          **MR. KAGAN:**  Okay.  So under Rule 60(b)(2) -- this is a

6   listing of some of the reasons:

7          "Newly discovered evidence that with reasonable

8      diligence could not have been discovered in time to move

9      for a new trial under Rule 59(b)."

10  And there is a case.

11         **THE COURT:**  Can you hand that up to me?

12         **MR. KAGAN:**  Yeah.

13  And there is a case which I would direct Your Honor to,

14  that we cited in our brief, called *Devera*, D-e-v-e-r-a, *vs.*

15  *Japan Airlines*.

16  Well, let me back up.

17  Your Honor, they were actually aware that Joe Security had

18  some type of a database by at least as early as July of 2018,

19  when we -- when we disclosed the license agreement which

20  expressly says Joe Sandbox includes this H2 Database.  And it

21  has a link.  All they had to do was click on that link.  They

22  didn't do that.  They never contacted --

23         **THE COURT:**  What do you mean click on a link?  Are you

24  saying Finjan could have clicked on a link?

25         **MR. KAGAN:**  Yes.

1          So if you look on page 5 of our brief, it says, for the

2     Joe Sandbox:

3               "This software contains unmodified binary

4          redistributions for H2 Database engine.

5          (Http://www.H2database.com/)."

6          So they are aware that there is a database within the Joe

7     Sandbox software as of July of 2018.  They are further aware,

8     even before this, in May of 2018, that Juniper does not have

9     the source code for this product and does not know how it

10    operates.

11         Rule 60 requires reasonable diligence.

12         **THE COURT:**  Is this where the source code is, at that

13    link?

14         **MR. KAGAN:**  No.  That link -- so two different points,

15    Your Honor.  I'm sorry.

16         That link shows that there is a SQL database that is a

17    part of the Joe Sandbox software.  If they had bothered to

18    click on that single link -- which there is no evidence they

19    even did that -- it says this supports SQL, this is a database

20    that supports SQL.  SQL.  They could have done that.  They

21    didn't.

22         **THE COURT:**  So anybody, including me, I could put that

23    into the computer, and that site would come up on my screen?

24         **MR. KAGAN:**  Yes, it will, Your Honor.  You can do it

25    right now, if you like.

1        **THE COURT:**  I don't have my --

2        **MR. KAGAN:**  Earlier this week I did it, just

3   thinking --

4        **THE COURT:**   Let me just say, is that true, you could

5   have clicked on that?  You could have clicked on that link and

6   got to that site?

7        **MS. KOBIALKA:**  That's not the database we're talking

8   about.  That's a completely different database.  We're talking

9   about the Joe Sandbox file database.

10        **THE COURT:**  They didn't have the source code for --

11   he's saying they don't have the source code from Joe data box

12   or whatever it is.  Security.

13        **MS. KOBIALKA:**  We're not talking about source code.

14        **THE COURT:**  Well, you keep talking about different

15   things.  Every time I ask you about it, it's like jelly on the

16   wall.

17        **MS. KOBIALKA:**  Your Honor, I can make this very --

18        **THE COURT:**  He's pointing to something where you could

19   have clicked on it but didn't.  You failed to click on it.

20        **MS. KOBIALKA:**  Because it --

21        **THE COURT:**  And it would have revealed at least a

22   little bit more, wouldn't it?

23        **MS. KOBIALKA:**  It would not have revealed that they

24   had -- that Joe Sandbox had a file database that stored the

25   result according to a strict schema.  And the H2 Database --

1          **THE COURT:**  Well, he says even that, we don't know

2    that yet.  He says you have to look at the source code to

3    figure that out.

4          **MS. KOBIALKA:**  We completely disagree.  We cited to

5    you, and we gave you specific pages --

6          **THE COURT:**  Hand up to me the best document you got in

7    February, the best document you got in February that you would

8    have won the case on.

9          **MS. KOBIALKA:**  Your Honor, it's Exhibit 1 and 2 to the

10   declaration of Mr. Kastens in our opening brief.

11         **THE COURT:**  My law clerk is going to have to come find

12   that.

13         **MS. KOBIALKA:**  I will hand it to you, but I am going

14   to explain to you --

15         **THE COURT:**  Bring that up.

16      What I would like for you -- I've got the exhibits here.

17   Now, what exhibit?

18         **MS. KOBIALKA:**  Exhibit 1 --

19         **THE COURT:**  Yeah.

20         **MS. KOBIALKA:**  -- to the declaration of Kris Kastens

21   with our opening brief.  It's document number 412.

22         **THE COURT:**  All right.  User Guide.

23         **MS. KOBIALKA:**  Yes.

24         **THE COURT:**  What is it in this one document that would

25   have caused you to win the case?

1      **MS. KOBIALKA:**  If you turn to page 3 of the document,

2   there is numbered paragraphs starting on page 3, going on to

3   page 4.

4      Paragraph 4 is entitled "File Database Format."  This is

5   not the H2.  This is the Joe Sandbox file database.  It says:

6         "Joe Sandbox stores all analysis data in a simple

7         directory structure.  The top directory structure is

8         outlined below."

9      And it continues on.  If you get to the middle of page 4,

10  it says:

11        "For each analysis, Joe Sandbox creates a new unique

12        ID and a container directory with the ID as the name."

13     And it continues to describe how they store in this

14  database the results.  This is one clean example.  If I clicked

15  on the H2 link, it doesn't give me information regarding the

16  file database.  It doesn't give me information about how Joe

17  Sandbox stores the results.  And it doesn't tell me how that

18  database is, in fact, structured.

19     **THE COURT:**  Hang on.  If you click on that link,

20  Mr. Kagan, do you come up with Exhibit 1?

21     **MR. KAGAN:**  No.

22     **THE COURT:**  Well, then, what is your point then?

23     **MR. KAGAN:**  My point is -- well, that database, the H2

24  Database is the database that, according to Joe Sandbox, it

25  uses.  Now, we don't know because we do not have the source

1    code.  But what that shows is that there is some type of

2    database that supports SQL.

3          And here's the question, Your Honor.  We don't have the

4    source code.  What Finjan needs to show is they could not have

5    obtained this information before you ruled on the Rule 59

6    motions, by the exercise of due diligence.

7          So we know, as of July they know there's a database there.

8    They don't know the details, but they know there's a database

9    within Joe Sandbox with 100 percent certainty.

10         If they bothered to click on the link, they would further

11   know that it's a SQL database.  An SQL database.  This is in

12   July.

13         The question is, would it have been impossible for Finjan

14   to have learned whatever other information they needed through

15   the exercise of reasonable diligence before February 21st?

16         And here is what I would propose to the Court, and this is

17   a question that is never answered:

18         Why wouldn't Finjan reach out to Joe Sandbox, serve a

19   subpoena on them, ask for their source code?  They have U.S.

20   operations.  Issue a U.S. subpoena.  They are based in

21   Switzerland.  Maybe even go through the Hague.  Why would they

22   take no action to obtain this information from Joe Security?

23         We told them repeatedly, Juniper does not have the

24   detailed information.

25         This information here, by itself, is not sufficient to

1  determine actually whether the database uses a schema, first of

2  all.  This looks like it's a directory structure.  We just

3  don't know the answer to these questions.

4      But Finjan's burden, coming now on a Rule 60 motion, is to

5  say that they could not have obtained the necessary information

6  through reasonably diligent discovery efforts.

7      And what is ironic about this is they did not even try.

8  There is no evidence that they even sent a letter to Joe

9  Sandbox.  They certainly did not issue a subpoena to Joe

10 Sandbox.

11     So what you have, essentially, is them sitting on their

12 hands, waiting to see how the ruling comes out on the

13 post-trial motions on the Rule 59 motions.

14     Because even this information, Your Honor, that they --

15 that they're pointing at here, they had more than two weeks

16 before the hearing on the Rule 59 motion.  And if it was that

17 earth shattering, they could have sent a letter to this court

18 saying, We want supplemental briefing on this.

19     They were aware of this information in November, before

20 the trial, that these guides existed.  They didn't say to the

21 Court, Oh, listen, we may have some new theory, or we think

22 Juniper is guilty of misconduct.

23     And there are reasons for that I'll get into.  Right now

24 we're just talking about the existence of the database.  This

25 actually doesn't map to the claims.

1    But just taking them at their word, they didn't do any of

2  the steps that they would need to do under Rule 60 to entitle

3  themselves to relief, even if this supported their theory,

4  which it doesn't.  And they have no explanation for it.

5    Do you want to know what investigation they claim they

6  did?  I'll give you the sum total of the investigation they

7  claim they did.  This is in Mr. Kastens's declaration.  It's

8  paragraph 2 of his declaration.  What he says is, Oh, we looked

9  for the user guides.

10    What they did was a Google search.  They did a Google

11  search for "Joe Sandbox" and "User Guide."

12    It came up with 16,000 results.  If we assume that there

13  are 10 results per page, that's about 1,600 pages that they --

14  for looking for user guide.

15    You know what Mr. Kastens said how many of those 1,600

16  pages they looked at?  They should look at 1,600, if it's that

17  earth shattering; right?  Maybe they looked through 15, 50.

18    Paragraph 2 of his declaration, they looked through 5

19  pages.  Through 5 pages of a 1600-page search, is what they

20  claimed is a reasonable diligence, with no excuse or

21  explanation why they didn't contact Joe Security, who we told

22  Finjan is the one that has the technical information necessary

23  to examine this issue.

24    **THE COURT:**  But maybe I'm missing something, but they

25  had asked for these manuals; right?

1            **MS. KOBIALKA:**  Yes.

2        **THE COURT:**  And you didn't produce them.

3        **MR. KAGAN:**  Right.

4        **THE COURT:**  So you're blaming them for not going to

5   Joe Security to get something that you should have produced.

6            **MR. KAGAN:**  I'm not blaming them for that, Your Honor.

7     This was produced -- this production occurred in the

8   normal course.  As I said, this is how discovery --

9            **THE COURT:**  They got it in February.

10           **MR. KAGAN:**  They did get it in February.  But this --

11   remember, there was discovery that was proceeding on two

12   different tracks.

13       So this discovery was really relating not to the '494

14   patent.  This was discovery that was relevant to the other

15   patents.  That's why when we get the letter -- we perused the

16   information in November that shows that there may be other

17   manuals.  They don't get back to us before the trial and say,

18   Gee, you have to give us this information immediately, or this

19   is a big deal.

20       They come to us on December 17th, and they say, Hey, looks

21   like you may have something else.  Produce it by January 28th.

22           And we did.  We produced it by February 4th, as I said.

23           But, Your Honor, that's how discovery works.

24           **THE COURT:**  Wait.  Was this manual, Exhibit 1, about

25   Joe Security, was that requested prior to the trial?

1          **MS. KOBIALKA:**  Yes.

2          **MR. KAGAN:**  It was in the -- the initial document

3     request was served prior to the trial.

4          **THE COURT:**  And then you did not produce it prior to

5     the trial?

6          **MR. KAGAN:**  We did not find it prior to the trial.

7     But what we did was we told them -- we told them exactly -- we

8     were not withholding this.  And the declarations from our --

9     sorry, the declarations from our -- the witnesses show exactly

10    what happened.  We are being completely transparent.

11         We didn't locate it because we searched our technical

12    repositories looking for it.  And we told Finjan that's what we

13    were doing.  We never said -- it's not just Web server.

14    There's a lot of these other drives.

15         We said, We'll look here, we'll look at all of our

16    technical documents for them.  And we told them that.  We said,

17    We're not going to look at our non-network drives.  And we'll

18    give you everything.

19         **THE COURT:**  Did someone on your side realize during

20    this process that the manual would be up there in the -- I

21    can't read that.

22         **MR. KAGAN:**  IWeb.

23         **THE COURT:**  IWeb.

24         **MR. KAGAN:**  Not until -- not initially, Your Honor.

25    So, in other words, what we did was we thought -- it's

1    Juniper's practice to have all technical documents here.   So

2    our people said all technical documents were here.

3       Then what happened was, after the request came in from

4    Finjan, we then went back and we said, Is there any possibility

5    that anything could be anyplace else?

6       And that's when our people started looking around.   And

7    what Mr. Islah said was he had to manually look through the

8    directories to find this file.

9          **THE COURT:**   When did he discover that?   When was he

10   hot on the trail of the manual?

11         **MR. KAGAN:**   After Finjan said, Do you have anything

12   else?   It looks like there may be some other documents.

13      So we went back to our people and we said, Is there

14   anyplace else this could be?

15         **THE COURT:**   When was that?

16         **MR. KAGAN:**   This was in -- this was after

17   December 17th, which is when we received the request from

18   Finjan to do -- to do additional searching.

19      So between -- I don't know the exact date.

20         **THE COURT:**   When was our trial?

21         **MR. KAGAN:**   The trial was December, earlier in

22   December.   December 4.

23      We had produced the documents in November that referenced

24   these other documents.   But these did not relate to -- and I

25   can get into why, Your Honor.

 1          This is a more technical argument.  But this argument,

 2     actually none of this relates to the theories at trial.

 3     Because Finjan's -- Finjan is now talking about the internal

 4     structure of what is going on within Joe Security.  That has

 5     nothing to do with the patent and the theory of infringement.

 6          Their theory of infringement was set forth on essentially

 7     this page, which is in our brief, because what the patent

 8     actually requires is that a database manager store the data in

 9     a particular place.  The database manager is the ResultsDB API.

10     Okay.  This only stores information here, in Juniper's Sky ATP.

11     This does not sort any information in Joe Security.

12          So this whole theory that they're coming up with now has

13     nothing to do with the infringement theory that they've

14     advanced for this entire case.

15          **THE COURT:**  But would it have been useful for them to

16     have that information to rebut your theory?

17          **MR. KAGAN:**  No.  It's irrelevant, because our theory

18     all along has been there may be databases that have schemas.

19          And if you look at the portion of my closing that they

20     quoted in their brief, I acknowledge that.  I say they have a

21     mix-and-match problem.  Because the places that ResultsDB

22     stores the security profile data, there's only two places.  It

23     stores it in DynamoDB and Amazon S3.

24          And that's true.  If you look at the software -- this is a

25     part of Juniper's Sky ATP product.  So you can look at

```
 1    Juniper's software and see exactly where ResultsDB stores its

 2    data.

 3         ResultsDB -- they kind of go together, Your Honor.

 4    Information comes out of Joe Sandbox into ResultsDB, what's

 5    called the ResultsDB API.  And then the ResultsDB API stores

 6    that information somewhere.  It doesn't go backwards.

 7         That's why it's irrelevant to the trial.  That's why

 8    Finjan, when they learned that there was a database in Joe

 9    Sandbox in July of 2018, didn't go to Joe Sandbox and say, Give

10    us all this information.

11         Because they had looked at the code and they knew that

12    ResultsDB stores the information here in the S3 and the

13    DynamoDB.  It doesn't go backwards.  It does not store

14    information in Joe Sandbox.  That's all internal operations

15    within Joe Sandbox and has nothing to did with Finjan's

16    infringement theory in this case.

17              THE COURT:  How about Juniper's infringement theory?

18              MR. KAGAN:  No, it doesn't, because Juniper's

19    infringement theory is -- or non-infringement theory, which the

20    jury accepted, is if you look at the places where the data is

21    actually stored, which is the DynamoDB and the S3, those do not

22    have a schema.  Those are not databases within the court

23    definition.

24         And you have to look at where the ResultsDB API stores

25    that information.  I can read it, if Your Honor would like.
```

1   But you have to go to the claim language.  This claim is not

2   about whether anywhere in the patent there's a database or

3   whether any data is ever stored anywhere.  It's very specific.

4   It's a database manager, which is the ResultsDB API, and where

5   that database manager stores the security profile.

6         THE COURT:  All right.  Hold that thought.

7         What do you say to that, that the database and whether

8   there's a schema, that was all within the Sky ATP system; and

9   you did have access to that; and even if Joe Sandbox has some

10  kind of schema, that's irrelevant because it always precedes

11  the DB manager?

12        MS. KOBIALKA:  I can draw you a picture to absolutely

13  refute that, that, in fact, you have this database within Sky

14  ATP.  Because the Joe Sandbox database feeds those results into

15  this DynamoDB that he's been pointing to.  It's all part of Sky

16  ATP.  And what was accused at trial was Sky ATP.

17        The question asked to the jury was whether or not Sky ATP

18  infringes, did it have a database --

19        THE COURT:  Draw the diagram for me.

20        Teresa, give her a better Magic Marker so it will be

21  darker.

22        Draw me the diagram that refutes what Mr. Kagan just said.

23        (Counsel complies.)

24        MS. KOBIALKA:  So what we have here, Your Honor, is

25  all of Sky ATP.

1    They keep trying to show you just this little portion on

2    the left-hand side relating to the DynamoDB.  Right?  This is

3    all they're trying to show you because that's what we proceeded

4    with at trial because those were the databases they identified

5    to us in discovery.  Those are the ones that are in their

6    interrogatory response.

7        What they completely left out and omitted, and they failed

8    to actually search what they call their Joe Sandbox customer

9    portal, I believe it is, where they have their Joe Sandbox

10   documentation, they completely failed to tell us about the

11   database here that stores these results that's fed into

12   DynamoDB.

13       This was the entire issue --

14       **THE COURT:**  Wait.  Earlier you handed me this

15   document; right?

16       **MS. KOBIALKA:**  Right.

17       **THE COURT:**  You handed it to me, and it's different

18   from the one that you drew up there.

19       This one has ResultsDB API, and then it has three prongs

20   going down to Amazon DynamoDB and Amazon S3 and MySQL.  But

21   then coming into ResultsDB is a Joe Security box among others.

22       **MS. KOBIALKA:**  So that --

23       **THE COURT:**  So why did you draw that one differently?

24   This was the one you were relying on a minute ago.

25       **MS. KOBIALKA:**  This is their picture.

1          THE COURT:  But you handed this up to me saying this

2     proves your case.

3          MS. KOBIALKA:  I handed it up to you to say that they

4     don't dispute that Joe Sandbox is part of Sky ATP.  Because you

5     asked me specifically the question whether or not this

6     database --

7          THE COURT:  Is this diagram, the one you gave me

8     earlier, is that correct?

9          See, this diagram does seem to say that Joe Sandbox, Joe

10    Security comes earlier, before you get to ResultsDB API.  And

11    that gets fed into ResultsDB API, but what matters is whether

12    ResultsDB stores -- what kind of database it stores in, whether

13    those databases have a schema.

14         MS. KOBIALKA:  So I would add, then, to this picture

15    the databases that are sitting in Joe Security.

16         THE COURT:  But how would that help you?

17         MS. KOBIALKA:  Because those are the databases that

18    store the results.  They have those results that are then fed

19    into DynamoDB.  That's what this picture shows.

20         THE COURT:  Then you would have to have a database

21    manager up there in Joe Security; right?

22         MS. KOBIALKA:  If you have a database, you're going to

23    have it with a strict structure, you're going to have the

24    database manager.

25         I mean, and now we are getting so far afield of the

1    issues, and I don't even know where to go with this.

2        They don't dispute that they have a database that stores

3    the results, as part of Sky ATP, that they didn't identify.

4        I mean, that's really what this issue comes down to.  And

5    they're saying, Well, it's Finjan's fault because we had this

6    impossible -- he said, literally, "the impossible standard,"

7    right, in which we were supposed to somehow know all of this

8    and somehow then go to Joe Sandbox and get this discovery.

9        They're placing everything on us.  We asked a very

10   specific document request well before trial, in July, about

11   manuals.  They did not search what Mr. Islah calls his Joe

12   Security customer portal where he got these documents.

13       I mean, they -- and the statement that their engineers

14   don't know, that's contrary to what their brief says.  Their

15   brief -- I actually have the page.  Page 10.

16           "Of course, if Finjan had been interested in the

17           technical details of Joe Sandbox, it could have and should

18           have taken the deposition of an engineer who worked with

19           this product, or pursued the 30(b)(6) notice relating to

20           Joe Sandbox before trial."

21       They have witnesses that know about Joe Sandbox.  And they

22   didn't include it in their interrogatory response.  And at no

23   point did they come to us and say, Sorry, you know, we made an

24   omission, we just realized this.

25       But they did identify these other databases, which is

1    DynamoDB and the other ones in the interrogatory response.

2        So what we were left with is finding out this information

3    that they had all along.  It was under their custody and

4    control going to a key issue.

5        And this idea of the closing statements, you don't mix and

6    match, they specifically said throughout trial, and their

7    expert witness sat up there and said, it's a schema-less

8    database; there is no strict structure; it doesn't exist;

9    that's why we don't have infringement.

10       And we have shown you with these documents, without even

11   taking further depositions, that, in fact, they had a database

12   all along in Sky ATP.  They had these documents that said this

13   database had the strict structure.

14       **THE COURT:**  Look, all right.  I'm going to take a

15   short break.  And then we may have some argument on your other

16   motion.

17       Thank you.

18                    (Recess taken at 8:56 a.m.)

19                    (Proceedings resumed at 9:20 a.m.)

20       **THE COURT:**  All right.  Be seated, please.

21       Okay.  Let's hear -- let's turn to the motion for

22   sanctions for a moment.  Let's hear what you have to say on

23   that subject.

24       **MS. CARSON:**  Good morning, Your Honor.

25       When Your Honor first instituted the patent showdown

proceedings, it was made clear that the end result could be either an injunction for Juniper or a sanction for Finjan.

      **THE COURT:**  Or none of the above.  It doesn't have to be.  It could be.

      **MS. CARSON:**  Correct.

      **THE COURT:**  All right.

      **MS. CARSON:**  Now that those proceedings have concluded and Juniper has won on both Finjan's strongest claims as well as its weakest claims, we believe that sanctions are appropriate.  Not just because we won but also because Finjan engaged in unreasonable conduct during that first patent showdown that unnecessarily multiplied the proceedings and drove up Juniper's costs.

One of the best examples of this relates to the '780 patent.  So on the '780 patent, which was the claim that Juniper selected, Finjan originally served infringement contentions against the SRX, Sky ATP, and ATP Appliance.

Juniper moved on all three of those products.  And Finjan didn't even oppose Juniper's motion on the SRX.

This happened again in the second round, where we explicitly asked them to drop Claim 9 of the '780 patent, given Your Honor's claim construction ruling before that round of summary judgment.  And Finjan told us, No, we're not going to drop it; that order doesn't apply to Claim 9.

We moved on all three products.  And, once again, they

didn't even oppose on those products, the Sky ATP and SRX.

This practice of forcing Juniper to expend resources and time preparing summary judgment motions on claims that they don't even intend to proceed with is inappropriate and has cost Juniper a lot of money.  We think that that's sanctionable.

We also think that Finjan's conduct with respect to the '494 patent, and in particular damages, is sanctionable.

Your Honor gave Finjan multiple attempts to put forth a viable damages theory.  And in each instance Finjan put forth theories that were squarely contradicted by Federal Circuit precedent on reasonableness and apportionment.

And as a result of that, Your Honor granted Juniper's judgment as a matter of law on damages, thus making the whole trial a waste of resources and time.

We think, given the totality of their conduct, that sanctions are appropriate.

**THE COURT:**  Okay.  Let's hear from the other side.

**MR. ANDRE:**  Thank you, Your Honor.  Paul Andre for Finjan.

First, with respect to the '780 patent, the '780 patent summary judgment was decided on a claim construction issue. Finjan came up with one claim construction.  Juniper came up with another.  Your Honor sided with Juniper.

Finjan's claim construction was reasonable.  We've had that construction by five different judges in three different

1    districts.  So it wasn't like we went to the flier on our claim

2    construction.

3         Your Honor disagreed with our proposal so, therefore, you

4    gave them a summary judgment on the '780 patent.

5         Counsel talks about we accused SRX alone.  And that's

6    true, we did.  We found out after we accused SRX alone that the

7    hashing aspect of the SRX was put in after the patent expired.

8    It was there, but we didn't know when it was put in there.

9         When we discovered it was put in after our patent expired,

10   we didn't go forward with the SRX alone theory.

11        Their summary judgment dedicated all of one page to the

12   SRX alone theory.  It was not the focus of the summary

13   judgment, and it was not the subject of the post-trial motions.

14   So I don't know what they're talking about when they say they

15   put so much effort into the SRX alone.

16        The '780 patent, she brought up the order we just got this

17   morning, which we haven't fully had a chance to read yet.  But

18   even that, with the '780, we told the Court that essentially if

19   the post-trial motion wasn't going to be overturned of the

20   '780, we would live with Your Honor's claim construction.  And

21   we preserved our objections.  We focused on the APT Appliance

22   in our summary judgment opposition on the '780.

23        There's nothing that -- about Finjan's behavior was

24   willful abuse of judicial process or bad-faith conduct, which

25   the Ninth Circuit, that's the standard they put forward toward

these type of sanctions.  It was not willful abuse of judicial process, and it was not in bad faith.  We proposed a claim construction, like I say, that has been adopted.

We also did not continue to litigate the case despite knowing claims could not meet the standard of infringement. Based on instruction, I think Your Honor would even -- could have found infringement of the '780 if you had adopted the claim construction that Finjan proposed.

In fact, we've tried the '780 patent three times.  In all three instances, with the claim construction we proposed, there was a finding of infringement.  And one of those findings was affirmed by the Federal Circuit.

So I don't think we continued to litigate cases despite knowing the claims could not meet the standard for infringement.

With respect to the '494, we -- Counsel talks about we did put forward a cognizant damages proposal.

We put forward both an expert witness, which Your Honor precluded under the *Daubert* standard, and we also put forward a fact-based case.  Both cases were in good faith and could have resulted in damages had there been a finding of infringement. But the jury did not get to that point.

So there was never a finding by this court or a jury, with respect to notice, actual or constructive, on the '494 patent, or damages.  So to come in and say that we didn't have a

 1   good-faith basis for damages is a stretch to say the least.

 2        What they are not saying here, regarding the '494, was

 3   that our case of infringement was brought in bad faith or waste

 4   of judicial processes.  It was a hard-fought battle with

 5   differing experts and a trial that went forward.  And I think

 6   it was a close call.  So -- even given how the trial of this

 7   went in.

 8        So there's nothing that Juniper can point to that would

 9   rise to the very onerous standard set forth by the Ninth

10   Circuit or the Federal Circuit to award sanctions in this case.

11        **THE COURT:**  All right.  Under submission.

12        The clerk told me that you -- well, first, I sent out an

13   order.  In all of my other cases the showdown procedure has

14   succeeded.  But for reasons I cannot understand, it has failed

15   in this case because you all are so obstinate.  Both sides.

16        So I'm just going to go back to the normal thing and give

17   you a trial where you get a limited amount of time.  It may be

18   10 hours per side.  I don't know what it will be.  Could be 15.

19   I'll have to see.

20        But you're going to have to pick and choose which claims

21   you want to litigate, because you can't litigate everything,

22   and no one is -- that would be absurd.  So you have to pick

23   your best thing, best claims, best defenses.  And that's going

24   to be on October 29th.

25        Now, she says you want a different date.  I can't give you

 1   a different date.  My law clerk, who is so familiar with this

 2   case, is going to be leaving in November.

 3        I'm going to be in Korea giving a patent speech.  I

 4   actually may think about canceling it because these patent

 5   cases are driving me crazy.  And as soon as I'm eligible to

 6   stop taking patent cases -- I'm serious.  Cases like yours have

 7   ruined me on this system because of the BS that goes on in

 8   these cases.

 9        But I -- you have four lawyers over there.  You don't --

10   you have a gigantic team on the Finjan side.  Somebody can try

11   this case.  It doesn't have to be you.

12        **MR. ANDRE:**  Well, I agree, Your Honor.

13        **THE COURT:**  So you're going to try it on October 29th.

14   And it's going to be every single issue left in the case is

15   going to go to trial.

16        But you're not going to get 50 hours of time per side.

17   It's going to be what you would get in a normal patent case,

18   which with some judges it's 10 hours.  Maybe you'll get more

19   than that.  I have to wait until the final pretrial conference.

20        Then it would be over.  O-v-e-r.  And it will be the

21   Federal Circuit's problem.

22        What did you want to say?

23        **MR. ANDRE:**  Your Honor, if it was just me having a

24   conflict, I wouldn't raise it for the Court.  But Finjan has a

25   trial set for October 29th, in Judge Bencivengo's court in the

 1  Southern District of California.

 2          **THE COURT:**  You have plenty of lawyers here.

 3          **MR. ANDRE:**  I know, but we don't have the witnesses.

 4  Mr. Hartstein, who is Finjan's CEO, he is here today.

 5          **THE COURT:**  Too bad.

 6          **MR. ANDRE:**  He can't be here and there.

 7          **THE COURT:**  Videotape it.  Maybe I'll let you do it by

 8  videotape.

 9      I have a law clerk who is going to be leaving.  I'm not

10  going to -- you have multiple lawyers.  You've got multiple

11  witnesses.  You can preserve the testimony.

12      And that other case will settle anyway.  I know how it

13  works.  My law clerk, though, is not going to extend just so

14  Mr. Andre can have a stand around the water cooler.

15      No.  You're going to go to trial on October 29th.

16          **MR. ANDRE:**  Your Honor, we want to go to trial.  I

17  have experts who are overlapping.

18          **THE COURT:**  No.  I cannot -- my law clerk is leaving

19  in November.  I have to get the case done by then.

20          **MR. ANDRE:**  Could I ask for, maybe, the Court's

21  assistance if I were to ask Judge Bencivengo to move our trial

22  date there so our witnesses could actually show up at trial?

23          **THE COURT:**  Go ahead.  You can blame me.  Blame me and

24  blame my law clerk.  But you -- I am not going to change it,

25  because you can always just videotape the testimony.

1          **MR. ANDRE:**  Okay.  So right now we're scheduled for

2    October 21st in this case --

3          **THE COURT:**  In my case?

4          **MR. ANDRE:**  -- and October 29th in one in San Diego.

5    So I'll talk to Judge Bencivengo.

6          **THE COURT:**  October 21 in my case.

7          **MR. ANDRE:**  Yeah.  So --

8          **THE COURT:**  I said 29.  I meant 21.

9          **MR. ANDRE:**  We'll talk to Judge Bencivengo.  We'll --

10          **THE COURT:**  I'm not asking -- don't say that

11    Judge Alsup is ordering.  No.  You can videotape the testimony

12    in my case, and I would allow you to present it by videotape.

13    That would be fine.  Or just a regular deposition.

14      But she is leaving, and it would be a huge, huge problem

15    for me if I have to bring a new law clerk up to speed on

16    Finjan, or Juniper for that matter.  She understands this

17    technology, and I need her on this case.

18          **MR. ANDRE:**  And, Your Honor, with that in mind, is

19    there any -- I know there are some rules that if -- can counsel

20    leave and come back?

21          **THE COURT:**  You can leave and come back.

22          **MR. ANDRE:**  Okay.

23          **THE COURT:**  I'll give you flexibility.

24      I'll explain to the jury that Finjan is suing so many

25    people in so many parts of the country that you have to be in

1   two or three different courts at once.  And it's okay, yeah.

2   You have my permission.

3          **MR. ANDRE:**  We prefer you not give that explanation to

4   the jury.

5          **THE COURT:**  Come up with a better one then.

6          **MR. ANDRE:**  Okay.

7          **THE COURT:**  All right.  So the 21st.

8       I don't know the answer on your present motions, but I am

9   working on it.

10      All right.  Thank you.

11         **MR. ANDRE:**  Thank you, Your Honor.

12         **MR. KAGAN:**  Thank you.

13         **MS. CARSON:**  Thank you, Your Honor.

14         (At 9:33 a.m. the proceedings were adjourned.)

15                        - - - - -

16

17                **CERTIFICATE OF REPORTER**

18         I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter.

20   DATE: Friday, May 10, 2019

21

22

23                        *Katherine Sullivan*

24   _____

25       Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter