1   PAUL J. ANDRE (State Bar No. 196585)
    pandre@kramerlevin.com
2   LISA KOBIALKA (State Bar No. 191404)
    lkobialka@kramerlevin.com
3   JAMES HANNAH (State Bar No. 237978)
    jhannah@kramerlevin.com
4   KRISTOPHER KASTENS (State Bar No. 254797)
    kkastens@kramerlevin.com
5   KRAMER LEVIN NAFTALIS
      & FRANKEL LLP
6   990 Marsh Road
7   Menlo Park, CA  94025
    Telephone:  (650) 752-1700
8   Facsimile:   (650) 752-1800
9
    Attorneys for Plaintiff
10  FINJAN, INC.

11

12

13                 IN THE UNITED STATES DISTRICT COURT

14               FOR THE NORTHERN DISTRICT OF CALIFORNIA

15                       SAN FRANCISCO DIVISION

16

17  FINJAN, INC., a Delaware Corporation,        Case No.: 3:17-cv-05659-WHA

18                 Plaintiff,                     **PLAINTIFF FINJAN, INC.'S OPPOSITION
                                                  TO DEFENDANT JUNIPER NETWORKS,
19          v.                                    INC.'S MOTION FOR SANCTIONS**

20  JUNIPER NETWORKS, INC., a Delaware           Date:       May 2, 2019
21  Corporation,                                 Time:       8:00 a.m.
                                                 Judge:      Hon. William Alsup
22                 Defendant.                    Courtroom:  12, 19th Floor

23

24

25

26

27

28

---

PLAINTIFF FINJAN'S OPPOSITION TO DEFENDANT              CASE NO. 3:17-cv-05659-WHA
JUNIPER NETWORK'S MOTION FOR SANCTIONS

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

ARGUMENT ..............................................................................................................1

I.      SANCTIONS ARE NOT APPROPRIATE ....................................................1

II.     CLAIM 10 OF THE '494 PATENT PROPERLY WENT TO TRIAL .........................2

        A.      Finjan Presented Good Faith Evidence of Notice ..............................3

                1.      Finjan Presented Substantial Evidence of Actual Notice, Which
                        Juniper Failed to Rebut. ....................................................3

                2.      Finjan Presented Substantial Evidence of Constructive Notice,
                        Which Juniper Failed to Rebut. ............................................8

                3.      Juniper Has No Basis to Seek Sanctions on the Issue of Notice .........10

        B.      Finjan Presented Well-Supported Damages Claims ...........................11

III.    FINJAN HAD A GOOD FAITH BASIS FOR ASSERTING INFRINGEMENT
        OF CLAIM 1 OF THE '780 PATENT ........................................................17

        A.      Finjan's Claim Construction Positions Are Consistent with its Prosecution
                and Prior Litigation of the '780 Patent. ..............................................17

        B.      The '780 Patent is Valid and Directed to Patentable Subject Matter under
                35 U.S.C. § 101 .............................................................................20

        C.      Finjan Properly Presented Multiple Claims Regarding How Juniper
                Infringes in its Infringement Contentions. ..........................................21

IV.     FINJAN HAS ACTED REASONABLY AND MADE NO FALSE
        STATEMENTS ..........................................................................................22

        A.      Finjan Preserved Its § 282 Objection to Juniper's Failure to Serve a § 282
                Disclosure. ..................................................................................22

        B.      Finjan Reasonably Claimed Work Product Protection over Mr. Garland's
                Impressions of the Call with Mr. Coonan. .........................................24

CONCLUSION ..........................................................................................................25

i

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*24/7 Customer, Inc. v. LivePerson, Inc.*,

5

No. 15-cv-02897-JST, 2017 WL 2311272 (N.D. Cal. May 25, 2017) ........................................... 20

6

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*,

24 F.3d 178 (Fed. Cir. 1994).......................................................................................................... 4

7

*Arctic Cat, Inc. v. Bombardier Recreational Prods. Inc.*,

8

876 F.3d 1350 (Fed. Cir. 2017)................................................................................................. 9, 10

9

*Estate of Blas ex. rel. Chargualaf v. Winkler*,

10

792 F.2d 858 (9th Cir. 1986) ........................................................................................................ 2

11

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,

717 F.3d 1336 (Fed. Cir. 2013)..................................................................................................... 11

12

*Ericsson, Inc. v. D-Link Sys., Inc.*,

13

773 F.3d 1201 (Fed. Cir. 2014)..................................................................................................... 12

14

*Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega systems, LLC*,

15

350 F.3d 1327 (Fed. Cir. 2003)..................................................................................................... 23

16

*Finjan, Inc. v. BitDefender, Inc.*,

No. 4:17-cv-04790-HSG, 2019 WL 634985 (N.D. Cal. Feb. 14, 2019).................................. 17, 18

17

*Finjan, Inc. v. Blue Coat Sys., Inc.*,

18

879 F.3d 1299 (Fed. Cir. 2018)..................................................................................................... 15

19

*Finjan, Inc. v. Blue Coat Sys., Inc.*,

20

No. 13-cv-03999-BLF, 2014 WL 5361976 (N.D. Cal. Oct. 20, 2014)........................................... 17

21

*Finjan, Inc. v. Blue Coat Sys., Inc.*,

No. 13-cv-03999-BLF, 2015 WL 3630000 (N.D. Cal. June 2, 2015) ...................................... 17, 18

22

*Finjan, Inc. v. Cisco, Inc.*,

23

No. 5:17-cv-00072-BLF, 2018 WL 3537142 (N.D. Cal. July 23, 2018)........................................ 17

24

*Finjan, Inc. v. ESET, LLC*,

No. 17-cv-00183-CAB-(BGS), 2017 WL 5501338 (S.D. Cal. Nov. 14, 2017) ............................. 17

25

*Finjan, Inc. v. Secure Computing Corp.*,

26

626 F.3d 1197 (Fed. Cir. 2010)..................................................................................................... 11

27

*Finjan, Inc. v. Sophos, Inc.*,

28

244 F. Supp. 3d 1016 (N.D. Cal. 2017) ........................................................................................ 17

ii

*Fink v. Gomez*,
    239 F.3d 989 (9th Cir. 2001) ........................................................................................ 2

*Funai Elec. Co. v. Daewoo Elecs. Corp.*,
    616 F.3d 1357 (Fed. Cir. 2010) .................................................................................... 4

*Intellectual Ventures I LLC v. Erie Indemnity Co.*,
    200 F. Supp. 3d 565 (W.D. Penn. 2016) ..................................................................... 20

*Intellectual Ventures I LLC v. Symantec Corp.*,
    100 F. Supp. 3d 371 (D. Del. 2015) ............................................................................ 21

*Kearney v. Salomon Smith Barney, Inc.*,
    39 Cal. 4th 95 (2006) ................................................................................................... 7

*In re Keegan Management Co., Sec. Litig.*,
    78 F.3d 431 (9th Cir.1996) ........................................................................................... 2

*LaFarge Corp. v. No. 1 Contracting Corp.*,
    No. 3:CV-06-2315, 2008 WL 2120518 (M.D. Pa. May 19, 2008) ............................... 22

*Lans v. Digital Equip. Corp.*,
    252 F.3d 1320 (Fed. Cir. 2001) .................................................................................... 3

*Maxwell v. J. Baker, Inc.*,
    86 F.3d 1098 (Fed. Cir. 1996) .................................................................................. 3, 8

*Minks v. Polaris Indus., Inc.*,
    546 F.3d 1364 (Fed. Cir. 2008) .................................................................................... 4

*Monsanto Co. v. Ralph*,
    382 F.3d 1374 (Fed. Cir. 2004) .................................................................................. 11

*Palo Alto Networks, Inc. v. Finjan, Inc.*,
    Case IPR2016-00165, Paper No. 7 (P.T.A.B. April 21, 2016) ...................................... 17

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
    849 F.3d 1360 (Fed. Cir. 2017) .................................................................................. 11

*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*,
    853 F.3d 1370 (Fed. Cir. 2017) ............................................................................... 3, 8

*SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*,
    127 F.3d 1462 (Fed. Cir. 1997) ............................................................................... 3, 4

*Symantec Corp. v. Zscaler, Inc.*
    No. 17-cv-04426-JST, 2018 WL 1456678 (N.D. Cal. Mar. 23, 2018) ......................... 20

*Uniboard Aktiebolag v. Acer Am. Corp.*,
    118 F. Supp. 2d 19 (D.D.C. 2000) ........................................................................... 4, 9

iii

*Versata Software, Inc. v. SAP Am., Inc.*,
   717 F.3d 1255 (Fed. Cir. 2013)............................................................................................ 12

*Viola Sportswear, Inc. v. Mimun*,
   574 F. Supp. 619 (E.D.N.Y. 1983) ...................................................................................... 22

**Federal Statutes**

28 U.S.C. § 1927................................................................................................................ 1, 2, 25

35 U.S.C. § 101................................................................................................................... 20, 23

35 U.S.C. § 271......................................................................................................................... 3

35 U.S.C. § 282....................................................................................................... 22, 23, 24

35 U.S.C. § 284......................................................................................................................... 3

35 U.S.C. § 287...................................................................................................................... 3, 9

35 U.S.C. § 287(a)................................................................................................................. 3, 4

**State Statutes**

Cal. Bus. & Prof. Code § 17200 *et seq.* ...................................................................................... 7

Cal. Pen. Code § 632................................................................................................................... 7

**Rules**

Federal Rules of Civil Procedure 50 ............................................................................................ 2

Federal Rules of Civil Procedure 60 ............................................................................................ 1

# INTRODUCTION

Juniper's Motion for Sanctions ("Motion") should be denied because Finjan had a reasonable basis grounded in fact and law for its positions during this litigation.  Juniper offers no evidence to the contrary and cannot meet its heavy burden that is required for such a Motion.  Instead, Juniper cobbles together a variety of complaints that simply evidence a hard-fought litigation between the parties.  Additionally, Juniper's Motion is also improper as it moves for sanctions on issues that this Court has not even issued final rulings, such that its Motion should be disregarded.

Finally, what Juniper points to as alleged "misconduct" is nothing compared to Juniper's actual misconduct, as set forth in Finjan's pending Motion for Relief from Judgment Pursuant to Fed. R. Civ. P. Rule 60(B) (Dkt. No. 411-4) (Finjan's Motion for Relief from Judgment Pursuant to Fed. R. Civ. P. 60(b) ("Finjan's Rule 60 Motion"), with respect to Juniper's concealment of key evidence of its infringement for Claim 10 of U.S. Patent No. 8,677,494 ("the '494 Patent").  Specifically, Juniper produced for the first time in February 2019, nearly a year after discovery requests seeking such information were served, evidence that Sky ATP uses a database within "Joe Sandbox," a dynamic analysis component in Sky ATP which Juniper licenses from Swiss computer security company, Joe Security, LLC.  Dkt. No. 411-4 at 3-4; Dkt. No. 412-7 (Finjan's Request for Production ("RFP") Nos. 87-89) at 6.  Because whether Sky ATP had a database was the central infringement issue at the December 2018 trial regarding Claim 10 of the '494 Patent, Juniper had no excuse for failing to produce this information so it could be used at trial.  Given that Finjan has not engaged in any "bad faith" or litigation misconduct, Juniper's Motion should be denied.

# ARGUMENT

## I. SANCTIONS ARE NOT APPROPRIATE

Juniper cannot meet its heavy burden, which is required to seek sanctions under the Court's inherent powers and 28 U.S.C. § 1927 ("Section 1927").  *See* Mot. at 2-3.  Finjan has acted with a good faith basis as to each of the issues Juniper identifies in its motion.  Because Juniper has no evidence that Finjan acted in bad faith, vexatiously, wantonly, or for oppressive reasons, or otherwise acted for an improper purpose, there are no grounds to seek sanctions under the Court's inherent

1  powers. *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001).  Thus, Juniper cannot meet its burden of

2  demonstrating bad faith, which requires some willful and improper conduct.  *Id.* at 994.

3         Likewise, for Section 1927, Juniper cannot meet its requisite burden of proving bad faith or

4  reckless conduct that is coupled with something more egregious, such as an improper purpose.  *Id.* at

5  993.  For example, there is no evidence that a frivolous argument was "knowingly or recklessly"

6  raised or arguments made purely "for the purpose of harassing an opponent."  *Estate of Blas ex. rel.*

7  *Chargualaf v. Winkler*, 792 F.2d 858, 860 (9th Cir. 1986) (internal citation omitted); *In re Keegan*

8  *Management Co., Sec. Litig.,* 78 F.3d 431, 436 (9th Cir. 1996) ("For sanctions to apply, if a filing is

9  submitted recklessly, it must be frivolous, while if it is not frivolous, it must be intended to harass.").

10         In all cases, the only evidence Juniper has is of a hard-fought litigation.  Because Juniper

11  cannot meet the stringent burden before it on this Motion, and especially in light of its own misdeeds

12  as outlined in Finjan's Rule 60 Motion, Juniper attempts to manufacture issues by cobbling together

13  unrelated issues and mischaracterizing Finjan's litigation positions, witness testimony, and even the

14  Court's discussion of the very issues that Juniper raises, as described below.  Indeed, Juniper's tactics

15  in its Motion, including use of incomplete citations, point to Juniper as the party who has committed

16  misconduct.  For these reasons, Juniper's Motion should be denied.

17  **II.**    **CLAIM 10 OF THE '494 PATENT PROPERLY WENT TO TRIAL**

18         Finjan had substantial evidence of both constructive and actual notice of the '494 Patent, and

19  Finjan properly presented these questions to the jury, thereby establishing that it had a good faith basis

20  for trial for Claim 10 of the '494 Patent.  *See* Fed. R. Civ. P. 50(a)(1) (courts may grant judgment as a

21  matter of law to keep an issue from the jury only "[i]f a party has been fully heard on an issue during a

22  jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis

23  to find for the party on that issue"); Ex. 1[1], Trial Tr. at 843:24-844:9 (sending notice to the jury).

24  Indeed, because there was substantial evidence that created material facts, this issue could not be

25  summarily decided at the summary judgment stage and was to be decided by the jury. Dkt. No. 189 at

26  20.  Further, the jury ultimately did not reach this issue due to its decision regarding infringement,

27

28  [1] Unless otherwise noted, all exhibits are attached to Declaration of Kristopher Kastens, filed herewith.

PLAINTIFF FINJAN'S OPPOSITION TO DEFENDANT      CASE NO. 3:17-cv-05659-WHA
JUNIPER NETWORK'S MOTION FOR SANCTIONS

which was, at least partially based upon Juniper's own concealment of dispositive evidence from Joe Security regarding the presence of a database within the meaning of the claim.  *See generally* Dkt. No. 411-4 (Finjan's Motion for Relief from Judgment).  That aside, Juniper seeks sanctions on an issue that (i) had ***no*** bearing on the outcome of the trial, (ii) for which it cannot prove any bad faith or improper purpose, and (iii) for which it has already filed a Renewed Motion for Judgment as a Matter of Law ("Renewed JMOL") which the Court has held the issue in abeyance.  *See* Dkt. No. 352 (Juniper's Renewed JMOL); Dkt. No. 387 at 5.  Thus, it is not an appropriate issue for sanctions.

### A.   Finjan Presented Good Faith Evidence of Notice.

#### 1.   Finjan Presented Substantial Evidence of Actual Notice, Which Juniper Failed to Rebut.

Finjan provided ample evidence of compliance with the notice obligations of 35 U.S.C. § 287(a), including by presenting evidence of both actual and constructive notice even though proving actual notice obviates the need to prove constructive notice.[2]  *See Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.,* 853 F.3d 1370, 1383 (Fed. Cir. 2017) ("Marking under the statute is permissive, not mandatory.").  Where actual notice is at issue, there is no need to address constructive notice.  *See Maxwell v. J. Baker, Inc.,* 86 F.3d 1098, 1111 (Fed. Cir. 1996) ("Thus, the statute defines that '[a patentee] is entitled to damages from the time when it either began marking its product in compliance with section 287(a)[,constructive notice,] *or* when it actually notified [the accused infringer] of its

---

[2] Juniper attempted to invent a new notice standard to suit its arguments of mootness.  *See* Mot. at 3 ("As a result, this claim was moot unless Finjan proved ***both*** (a) compliance with 35 U.S.C. § 287, which would entitle it to pre-suit damages; and ***(b) a cognizable damages theory***.") (emphasis added).  There is no indication of from where Juniper has imported part (b).  *See id.* (citing *Lans v. Digital Equip. Corp.*, 252 F.3d 1320, 1328 (Fed. Cir. 2001) (affirming denial of summary judgment of infringement for simple failure to comply with 35 U.S.C. § 287).  By the plain language of the statute, compliance with 35 U.S.C. § 287(a) entitles a patentee to damages for proven infringement, and damages shall be sufficient to compensate for the infringement and in no event less than a reasonable royalty pursuant to 35 U.S.C. § 284.  Finjan presented substantial evidence to support notice under either 35 U.S.C. § 287(a) actual or constructive provisions.  Although the amount of Finjan's damages is a separate issue, Finjan also presented substantial evidence and case precedent to support its damages claim.  That the Court excluded its theories is not grounds for sanctions, and moreover this issue has no bearing on any alleged mootness of the claim.  This is not the first time Juniper has misrepresented the plain language of the law with respect to the issue of notice.  It repeated a misstatement of law in its proposed jury instructions and again in its Renewed JMOL that actual notice must be given in writing, which is contrary to 35 U.S.C. § 271.  *See, e.g.*, Dkt. No. 352 at 8; *see* Dkt. No. 357, at 9-10 (citing *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.,* 127 F.3d 1462, 1470 (Fed. Cir. 1997)).

---

PLAINTIFF FINJAN'S OPPOSITION TO DEFENDANT            CASE NO. 3:17-cv-05659-WHA
JUNIPER NETWORK'S MOTION FOR SANCTIONS

infringement, whichever was earlier.'")(citation omitted); *see also Uniboard Aktiebolag v. Acer Am. Corp.,* 118 F. Supp. 2d 19, 22 (D.D.C. 2000) (in finding constructive notice was not relevant to the dispute, "the Court focuses its inquiry on if and when Uniboard provided the defendants actual notice of the alleged infringement.").

Actual notice does not require a formulaic recitation; rather the Federal Circuit has noted that "[a]lthough there are numerous possible variations in form and content, the purpose of the actual notice requirement is met when the recipient is notified, ***with sufficient specificity***, that the patent holder believes that the recipient of the notice may be an infringer." *SRI Int'l,* 127 F.3d at 1470 (emphasis added). A patentee can even identify a group of products or relevant technology. *Funai Elec. Co. v. Daewoo Elecs. Corp.,* 616 F.3d 1357, 1373 (Fed. Cir. 2010)(citing *Amsted Indus. Inc. v. Buckeye Steel Castings Co.,* 24 F.3d 178, 187 (Fed. Cir. 1994))(group of products sufficient); *Minks v. Polaris Indus., Inc.,* 546 F.3d 1364, 1376-77 (Fed. Cir. 2008) (holding that a communication of the patentee's "belief that reverse speed limiters sensing engine speed and a DC input infringe" the patent may have sufficed the notice requirement); *SRI Int'l,* 127 F.3d at 1470 ("the actual notice requirement of § 287(a) is satisfied when the recipient is informed of the identity of the patent and the ***activity*** that is believed to be an infringement") (emphasis added).

Here, Finjan provided Juniper with actual notice because it identified the '494 Patent and the products that infringed the '494 Patent, which is all that is required. *Amsted Indus.,* 24 F.3d at 187 ("Actual notice requires the affirmative communication of a specific charge of infringement by a specific accused product or device."). Mr. Garland, Finjan's Director of Business Development (Ex. 1, Trial Tr. 547:21-22), reviewed a Juniper press release which had been recently issued in September 2015 announcing its new products, including its "Advanced Anti-Malware Cloud Service" and new firewall technology, as part of his due diligence in continuing the licensing negotiations with Juniper. Ex. 1, Trial Tr. 551:10-553:19 (explaining Mr. Garland's review of Juniper's press release); Ex. 2 (Trial Ex. 91); *see also* Ex. 1, Trial Tr. 555:8-13. Thereafter, Mr. Garland arranged a call with Mr. Coonan, Juniper's Senior Director of IP Litigation and Strategy (Ex. 3 (Coonan Trial Testimony) 7:9-7:15), in November 2015 to discuss licensing, during which Mr. Garland identified the '494 Patent and

Juniper's SRX, advanced malware module, and Next Generation Firewall products.  *See, e.g.*, Ex. 1, Trial Tr. at 554:2-555:5 (describing identification of products and patents on the call); *id.*, 547:21-548:2, 549:21-550:18, 604:9-11 (describing licensing practices and that purpose of call with Juniper was to identify need for a patent license); *id.*, 566:4-12 (Mr. Coonan never asked what was meant by "advanced malware"); *id.,* Ex. 3 (Coonan Trial Testimony) at 145:1-147:23, 167:7-12; *id.,* Ex. 4 (Trial Ex. 256) at 10:53-11:21 (transcript of phone call: "Mr. Garland: And there's a newer one, one you haven't seen before. 8677494. Mr. Coonan: Okay. All right. And that's significant, because it's – is it – is it a continuation? Mr. Garland: I don't know. I don't know. It's [sic] reads on your advanced malware modules."); Ex. 4 at 25:48 (Mr. Coonan stating that "I thought it was in the context of a litigation discussion, negotiation, and you rejected it, so we're back to square one."); *see also* (Trial Ex. 257)(Coonan transcript recording).

It is undisputed that Juniper has presented ***no*** evidence from the 2015 timeframe to demonstrate that Mr. Garland's identification of the "advanced malware module" in relation to the SRX during the call was anything other than a specific reference to Sky ATP.  Ex. 1, Trial Tr. at 554:2-555:10; *id.,* Ex. 4 (Trial Ex. 256) at 10:53-11:21; *see also* (Trial Ex. 257).  Conversely, there is substantial evidence that this name was not Mr. Garland's subjective understanding of Sky ATP, but rather references Juniper's own marketing material referring to Sky ATP as being for "advanced malware."  Ex. 1, Trial Tr. 551:10-553:19; Ex. 2 (Trial Ex. 91); Ex. 1, Trial Tr. 555:8-13 ("advanced malware" came from press release).  Juniper's characterization of a "telepathic notice" claim is a distortion of Mr. Garland's testimony, who testified that he referred to Sky ATP as the "advanced malware module" because Juniper's press release announcing the release of Sky ATP called Sky ATP its "advanced anti-malware cloud service."  *Compare* Mot. at 8 *with* Ex. 1, Trial Tr. 589:9-10 ("Again, I think advanced malware module in my mind is Sky ATP."); *id.*, Trial Tr. 589:11-17 (Mr. Garland confirming that "[i]n preparation for that call, that was my understanding, advanced malware module is Sky ATP"); *id.* Trial Tr. 555:8-13 (phrase "advanced malware" came from Mr. Garland's review of press release); Ex. 2 (Trial Ex. 91).  Significantly, there was no confusion on Mr. Coonan's part about what was being discussed.  Indeed, Mr. Coonan never asked what was meant by "advanced malware"

PLAINTIFF FINJAN'S OPPOSITION TO DEFENDANT
JUNIPER NETWORK'S MOTION FOR SANCTIONS                    CASE NO. 3:17-cv-05659-WHA

or what recently released product Mr. Garland was referring to—nor should he, given (i) his position at Juniper, (ii) that he is an engineer, and (iii) that Mr. Garland, also an engineer, sufficiently identified Sky ATP by a descriptive name.  *See* Ex. 1, Trial Tr. 566:4-12 (Mr. Coonan never asked what was meant by "advanced malware").  Moreover, there is no dispute that Mr. Garland referred to "advanced malware" as a recently released product, which is consistent with the September 2015 press release that he reviewed prior to the call.  Ex. 4 (Trial Ex. 256) at 10:53 to 11:21 (transcript of phone call: "Mr. Garland: And there's a newer one, one you haven't seen before. 8677494. Mr. Coonan: Okay. All right. And that's significant, because it's – is it – is it a continuation? Mr. Garland: I don't know. I don't know. It's [sic] reads on your advanced malware modules."); Ex. 2 (Trial Ex. 91).

Mr. Garland also specifically referenced Juniper's Next Generation Firewall as relevant to the '494 Patent.  Ex. 1, Trial Tr. at 554:2-555:3; Ex. 4, Trial Ex. 256 at 5:01–5:12.  Juniper's senior management acknowledged that the SRX was not considered a Next Generation Firewall before it had Sky ATP's functionality, as the Sky ATP functionality was developed to fill the need for the SRX to be able to detect previously-unknown malware to compete as a Next Generation Firewall in the marketplace.  Ex. 5 (Nagarajan Trial Testimony) at 36:02-37:08 (describing that Sky ATP was developed to provide the SRX with threat prevention functionality, because next generation firewalls need threat prevention); *see also* Ex. 6, Nagarajan Dep. Tr., 63:4-64:23.  There is no dispute that Finjan identified the SRX product on the call, that the SRX included Sky ATP free of charge, and that Sky ATP only worked with SRX.  Ex. 1, Trial Tr. 554:23-555:3; Ex. 4, Trial Ex. 256 at 5:01–5:12; Ex. 7 (Sky ATP included on SRX).  Therefore, there was objective evidence that Mr. Garland identified Sky ATP and SRX using the same terms that Juniper used, including "advanced malware module" and "Next Generation Firewall."  There was also objective evidence that Juniper released Sky ATP just before Mr. Garland's call with Mr. Coonan, and that during the call Mr. Garland discussed Juniper's new products and obtaining a license to Finjan's patents, including the '494 Patent.

Juniper misleadingly proffers ***for the third time*** a cherry-picked SRX datasheet dated ***two years*** after the parties' call to suggest that "advanced malware module" does not refer to "Sky ATP." Ex. 8, Trial Ex. 345.  During trial, the Court ordered Juniper to cease showing this document to the

PLAINTIFF FINJAN'S OPPOSITION TO DEFENDANT                    CASE NO. 3:17-cv-05659-WHA
JUNIPER NETWORK'S MOTION FOR SANCTIONS

1   jury with respect to this issue.  *See* Mot. at 8 (citing Trial Ex. 345); Ex. 1, Trial Tr. at 592:18-22, Ex. 8,

2   Trial Ex. 345 ("Ms. Kobialka: Objection, Your Honor. He's showing a document that came into

3   existence two years or three years after the call and he's tying it to the call.  The Court: I think that's a

4   problem. So let's take that down off the screen."); *see also* Ex. 1, Trial Tr. 591:4-24.  Not only does

5   this 2017 document have no bearing on how Juniper referred to Sky ATP in 2015, but Juniper has no

6   evidence that the 2017 reference to "advance malware" in this datasheet for the SRX is anything other

7   than another reference to the SRX integrating with Sky ATP.  *See* Ex. 8, Trial Ex. 345; *see also* Ex. 5,

8   (Nagarajan Trial Testimony) at 36:02-37:08 (Sky ATP provides SRX with its threat prevention

9   functionality).  In any case, Juniper does not dispute that the testimony and evidence at trial was

10  accurate, namely that (i) Mr. Garland reviewed Juniper's September 29, 2015 press release (Ex. 2,

11  Trial Ex. 91) just before Mr. Garland's November 2015 call with Mr. Coonan, (ii) that Juniper just

12  announced for the first time the release of Sky ATP, which would be integrated with Sky ATP, and

13  called referred to Sky ATP as its "Advanced Anti-Malware" service, and (iii) and that Mr. Garland

14  informed Juniper that its new product offering of "advanced malware" infringed the '494 Patent.

15          Juniper's other purported basis for sanctions—that Mr. Garland's memory of a phone call from

16  3 years earlier was not as impeccable as a secretly recorded transcript—is not supported by any

17  evidence of bad faith.[3]  Mr. Garland honestly admitted that he did not say the precise words "Sky

18  ATP" on the call and explained that he was reminded that he referenced Sky ATP using "advanced

19  malware" which was consistent with how Juniper identified Sky ATP in its September 2015 press

20  release announcing the product offering.  Ex. 1, Trial Tr. 587:6-589:17.  Juniper makes much out of

21  what Mr. Garland's testimony regarding what was covered during the call might be if Mr. Coonan had

22  not secretly recorded the call.  Mot. at 7-8 (citing Trial Tr. 588:23-589:5).  However, that does not

---

[3] As Finjan has noted before, Mr. Coonan's surreptitious recording was not legal. *See* Dkt. No. 156-4
at 3 n.4 (citing Cal. Pen. Code § 632 (forbidding the intentional recording of a confidential
communication without the consent of all parties); *Kearney v. Salomon Smith Barney, Inc.,* 39 Cal. 4th
95, 128 (2006) (holding that California privacy laws apply when a party in a one-party consent state
records a conversation with a party in California, where all parties must consent to recording); Cal.
Bus. & Prof. Code § 17200 *et seq.* (prohibiting any "unlawful, unfair, or fraudulent business act"));
*see also* Ex. 1, Trial Tr. at 557:19-558:20 (Mr. Garland testifying that he did not consent to the
recording, felt shocked and betrayed upon learning of the recording, and he has never previously had
another company record a licensing discussion).

PLAINTIFF FINJAN'S OPPOSITION TO DEFENDANT            CASE NO. 3:17-cv-05659-WHA
JUNIPER NETWORK'S MOTION FOR SANCTIONS

1  demonstrate bad faith because Mr. Garland was steadfast that he identified Sky ATP as "advanced

2  malware" during the call, which was 100% accurate according to Mr. Coonan's transcript as explained

3  above.  Juniper has no evidence of bad faith or an improper purpose behind Mr. Garland's testimony,

4  or Finjan's interrogatory responses based on Mr. Garland's phone call, which consistently stated that,

5  as shown above, Finjan identified Sky ATP during the 2015 call.

6              2.      **Finjan Presented Substantial Evidence of Constructive Notice, Which
                      Juniper Failed to Rebut.**
7

8              Although not required given Finjan's evidence regarding actual notice, Finjan also presented

9  substantial evidence of constructive notice at trial, which Juniper failed to rebut.  *See* Dkt. No. 357

10 (Finjan Opp. Renewed JMOL) at 12-17.  Namely, Finjan presented evidence that Finjan properly

11 marked its own product, the Gen3 Vital Security mobile application, with the '494 Patent starting from

12 its 2016 release.  *Id.* at 12-13 (citing Ex. 1, Trial Tr. 259:3-261:11, 260:5-8, 263:25-264:4, 265:10-

13 266:2, 324:3-15; Ex. 10, Trial Ex. 372 at 46255; Ex. 1, Trial Tr. 261:4-11, 260:20-266:2).  Contrary to

14 Juniper's assertion, it is disputed what products, if any, are licensed that third parties sold and that also

15 embody the '494 Patent during the life of the patent (March 18, 2014 until January 29, 2017).  *Id.* at 12

16 (citing Ex. 9 (Trial Ex. 1); Dkt. No. 262 at 7).  Furthermore, Juniper never identified any such alleged

17 products during trial.

18             Juniper's argument that it was improper for Finjan to raise constructive notice at trial is

19 particularly ironic, as Finjan originally sought to drop this theory by removing it from the pretrial

20 order so that Finjan would only present actual notice during trial.  It was Juniper who argued that

21 Finjan *must* present both theories, and would not consent to Finjan dropping constructive notice to

22 streamline issues for trial.  Ex. 11 at 1-4.  In fact, Juniper argued that Finjan had to address

23 constructive notice first and then actual notice, which is not the law, as Finjan set forth in its post trial

24 briefing.  *Id.*; *see also* Dkt. No. 352 at 7 (asserting that because Finjan allegedly failed to prove

25 constructive notice, it must prove actual notice); *compare with* Dkt. No. 357 at 2-3 (citing *Rembrandt,*

26 853 F.3d at 1383 ("Marking under the statute is permissive, not mandatory.")); *Maxwell,* 86 F.3d at

27 1111; *see also Uniboard,* 118 F. Supp. 2d at 22.  It is the height of bad faith for Juniper to demand that

28 Finjan present a claim at trial, and, at the same time argue here that it was improper for Finjan to

1    present such claim at trial.

2         Finjan proved at trial that it marked its own product with the '494 Patent, which Juniper did not

3    dispute.  Juniper never produced or identified at trial any other products allegedly sold that should

4    have been marked with the '494 Patent during the life of the patent.  Juniper did not identify a ***single***

5    product which was (1) licensed under the '494 Patent; (2) practiced the '494 Patent during patent's

6    pendency; and (3) were not marked with the '494 Patent.  *Arctic Cat, Inc. v. Bombardier Recreational*

7    *Prods. Inc.,* 876 F.3d 1350, 1366 (Fed. Cir. 2017) ("[a] patentee's licensees must also comply with §

8    287, because the statute extends to 'persons making or selling any patented article for or under [the]

9    patentee.'")(citation omitted); *see also* Dkt. No. 357 (Finjan Opp. Renewed JMOL) at 13-16.  Juniper

10   is attempting to use its failure to meet its burden of production as a basis to claim bad faith on Finjan's

11   part, which does not serve as a basis for its Motion.

12        Juniper misleadingly relies on sections of the 77-page Trial Exhibit 1760 as sufficient to

13   establish its position, but these sections were never presented to the jury during trial (only during

14   closing argument, which is not evidence), were never supported with other evidence, and were never

15   discussed in testimony.  Mot. at 4-5; *see also* Dkt. No. 357 at 14-15.  Juniper never even attempted to

16   use Trial Exhibit 1760 at trial to meet its burden, but now has attempted twice to retroactively

17   introduce cherry-picked partial statements from this document into the case.  *See* Dkt. No. 357 (Finjan

18   Opp. Renewed JMOL) at 14-15; *see also* Mot. at 5-6.

19        Further, Juniper omits significant parts of Mr. Andre's closing argument and discussion with

20   the Court regarding Trial Exhibit 1760.   In the portion of Mr. Andre's statement that Juniper deleted,

21   he states—before the Court requested that Mr. Andre clarify—that "But what I say is not evidence.

22   What Mr. Hannah says is not evidence.  ***They didn't identify a single product, Juniper didn't identify***

23   ***a single product.  No one has shown a single bit of evidence in this court that says another product***

24   ***is covered by the '494 patent***."  Ex. 1, Trial Tr. at 958:21-25 (emphasis added).  At the Court's

25   request, in the discussion that immediately follows Juniper's misleadingly selective quotation, Mr.

26   Andre clarified that Mr. Hannah's statements in Trial Exhibit 1760 do not constitute evidence that

27   demonstrates any specific products that must be marked, such that Trial Exhibit 1760 does not satisfy

28

9

Juniper's burden.  Ex. 1, Trial Tr. at 959:12-960:6.  In fact, Mr. Andre's statements were 100%

accurate, because Juniper never identified at trial any evidence showing that Finjan's licensees were

required to mark with the '494 Patent, but instead brought up a section of Trial Exhibit 1760 that was

only mentioned in their closing statement and referenced a portion of the document for which there

was never any testimony at trial.

A further problem with Juniper's reliance on Trial Exhibit 1760 is that Finjan's licensees have

not agreed to licenses containing a marking requirement, which raises a fact issue as to whether their

products actually infringe.  *See* Ex. 1, Trial Tr. 319:5-7 (Mr. Hartstein testifying that none of Finjan's

licenses contain a marking requirement).  Settlements or licenses with no admission of wrongdoing are

commonplace and conducive to resolving disputes informally.  Juniper has not established that the

mere existence of licensees demonstrates that the licensees sold products that practice the patents

during the life of the patent.  If Juniper could meet its burden by pointing to the mere existence of

licensees to the '494 Patent, there would be no purpose for the *Arctic Cat* burden of production to

demonstrate that specific products are sold that should be marked.  Juniper also cannot make an end-

run around its burden to identify specific products that it contends should be marked by claiming that

Finjan should somehow periodically re-evaluate its licensees' technology, even where licensees have

not agreed that they are infringing and the parties had agreed to a "no admissions of liability"

provision in the license.

### 3.    Juniper Has No Basis to Seek Sanctions on the Issue of Notice.

Juniper has no basis for seeking sanctions based on Finjan's good faith assertion that Juniper

had notice of Finjan's '494 Patent.  Before the case went to the jury, the Court determined that Juniper

had not presented sufficient evidence to rebut Finjan's evidence of constructive notice.  *See* Ex. 1,

Trial Tr. 839:19-843:23 (hearing argument from the parties regarding the paucity of Juniper's

evidence of licensee marking requirements); *id.* at 843:24-844:9 (stating that notice would go the

jury).  Juniper later again argued lack of notice in its Renewed JMOL relating to notice.  *See generally*

Dkt. No. 323 and 352.  The Court held in abeyance Juniper's Renewed JMOL on March 11, 2018,

stating that it was premature.  Dkt. No. 387 at 5.  ***Nothing*** has changed on this issue, such that Juniper

PLAINTIFF FINJAN'S OPPOSITION TO DEFENDANT                    CASE NO. 3:17-cv-05659-WHA
JUNIPER NETWORK'S MOTION FOR SANCTIONS

1   has no support for its Motion.

2          **B.     Finjan Presented Well-Supported Damages Claims**

3          Finjan presented damages claims that were supported by law and fact, contrary to Juniper's

4   numerous mischaracterizations in its Motion.  Finjan's expert properly evaluated damages pursuant to

5   a cost savings analysis.  *See generally* Dkt. No. 238-4 (Finjan Opp. Mot. to Exclude Arst); Dkt. No.

6   228-7 (Arst Report) at 23-27 (specific benefits to Juniper obtained at a reduced cost); *id.* at 30-31

7   (explaining basis for use of cost savings approach); *id.*, at 45-51 (explaining relevance of cost savings

8   to reasonable royalty analysis and hypothetical negotiation).  Evaluating the cost savings achieved

9   through infringement is an accepted method of quantifying a patentee's damages.  *Prism Techs. LLC*

10  *v. Sprint Spectrum L.P.,* 849 F.3d 1360, 1376 (Fed. Cir. 2017).

11         Finjan set forth detailed support for the calculations by its damages expert based on the benefit

12  of the patented technology to Juniper, including the non-monetary benefits which Juniper derived from

13  releasing the technology ***for free***.  *See* Dkt. No. 238-4 (Finjan Opp. Mot. to Exclude Arst) at 2-5

14  (explaining Mr. Arst's methodology and calculating Juniper's speed gained from use of infringing

15  database); *see also* Dkt. No. 228-7 (Arst Report) at 31-32; Dkt. No. 238-6 (Cole Report) at ¶¶ 30-37,

16  43.  Revenues are not a cap on the amount of a reasonable royalty based on cost savings.  *See* Dkt. No.

17  238-4 at 5 (citing *Monsanto Co. v. Ralph,* 382 F.3d 1374, 1384 (Fed. Cir. 2004) ("the law does not

18  require that an infringer be permitted to make a profit")); *Douglas Dynamics, LLC v. Buyers Prods.*

19  *Co.,* 717 F.3d 1336, 1346 (Fed. Cir. 2013) (finding district court committed clear error by "limiting the

20  ongoing royalty rate based on [defendant's] profit margin.").

21         Finjan also properly included in its calculations the SRX Gateways with Sky ATP code,

22  because these were not a separate infringement theory—because regardless of whether a feature is

23  activated on a product is a separate question from whether the SRX Gateway with Sky ATP infringes

24  based on the inclusion of program code that forms the accused system when the product is sold.

25  *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1205 (Fed. Cir. 2010) (holding that infringing

26  was present in the accused products when sold, and that it was immaterial that customers must

27  purchase a key to unlock the infringing software module because the claimed structure already existed

28

1   in the accused software); *see also Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1262–63

2   (Fed. Cir. 2013) (affirming infringement because system would operate in an infringing manner if user

3   followed the accused infringer's instructions, and "[w]hile a device does not infringe simply because it

4   is possible to alter it in a way that would satisfy all the limitations of a patent claim, ... an accused

5   product may be found to infringe if it is reasonably capable of satisfying the claim limitation" (citation

6   and internal quotations omitted); *Ericsson, Inc. v. D-Link Sys., Inc.,* 773 F.3d 1201, 1217 (Fed. Cir.

7   2014) (a device may be properly found to infringe when there's "evidence that the accused device is

8   actually used in an infringing manner and can be so used without significant alterations.").

9           Juniper also intentionally omits **pages** of testimony underlying Finjan's factual damages case at

10   trial in an effort to claim Finjan's damages case was unsupported.  *See* Mot. at 10-11.  Finjan provided

11   substantial testimony regarding its licensing practices, its approach to licensing, considerations for

12   licensing, the benefits of the technology, among other things, with Mr. Hartstein (Finjan's CEO), Mr.

13   Garland, and its technical experts, Drs. Cole and Bims.  For example, Mr. Hartstein explained Finjan's

14   licensing practices and its position within the computer security market. Ex. 1, Trial Tr. 266:4-267:23,

15   268:10-277:2, 329:24-333:22 (Mr. Hartstein describing Finjan's licensing practices); 278:8-281:21,

16   Ex. 12, Trial Ex. 342 (Mr. Hartstein describing initial analysis of Juniper and market conditions at the

17   time of an initial communication with Juniper); Ex. 1, 281:22-284:8, Ex. 2, Trial Ex. 91 (Mr. Hartstein

18   identifying relevant products for licensing based on Juniper's public information); Ex. 1, Trial Tr.

19   325:19-327:19 (Finjan's patent portfolio and key relationships with M86 and Trustwave).  Mr.

20   Hartstein provided additional information about Finjan's current market position in light of its new

21   product. Ex. 1, Trial Tr. 324:16-325:18.  Mr. Garland testified about actual negotiations with Juniper

22   and issues relating to notice, as described above in Part I(A)(1).  Dr. Bims, during his technology

23   tutorial, explained the importance of the Finjan technology.  Ex. 1, Trial Tr. at 225:19-239:5.  Dr. Cole

24   testified about the benefits of the technology to Juniper and even pointed to an internal Juniper

25   document stating that such technology was necessary otherwise Juniper's technology would be

26   commoditized.  Ex. 1, Trial Tr. at 375:15-383:18, 384:14-386:22, 388:2-391:9; *see also* Trial Exs. 57,

27   382.

28

In addition, Finjan presented factual evidence of apportionment, including a conservative measurement of the rate of Juniper's use of the actual infringing technology. For example, Mr. Icasiano confirmed that 40% of new samples submitted by customer devices to Sky ATP are sent to dynamic analysis, through the patent expiration date of January 2017. Ex. 13 (Icasiano Trial Testimony) at 31:10-33:19 (also noting that total number of files received by Sky ATP is not tracked); *see also* Ex. 14, Trial Ex. 88 at 514137, 514169 (Juniper presentation showing over 500,000 files scanned in one week, 31% of those files processed are attributed to the infringing technology, and the components of SkyATP are Cache Lookup, Anti-Virus Scanning, Static Analysis, and Dynamic Analysis). Mr. Icasiano also testified regarding Juniper's tracking of free Sky ATP licenses, explaining that a user must enroll its SRX in Sky ATP even if it is only using the free service, that there are 120 such licenses enabled, and that there is a one-to-one matching between an SRX device and its Sky ATP license. Ex. 13 at 42:18-113:20. Additionally, Dr. Cole testified and identified the specific infringing functionality in SkyATP as static and dynamic analysis. *See* Ex. 1, Trial Tr. at 428:11-429:25. All files are sent through a malware inspection pipeline which analyzes each file. *Id.* This sending and scanning of files is the "key component of Sky ATP" according to the senior management of Juniper's Sky ATP team. Ex. 5 (Nagarajan Trial Testimony) at 12:24-13:19. Thus, throughout Finjan's damages presentation, Finjan sought to apportion the revenues (which the Court limited Finjan to) by various methods. *See, e.g.*, Dkt. No. 325 at 2-5 (explaining in detail the apportionment presented at trial based on testimony of Mr. Icasiano, Mr. Nagarajan, Ms. Gupta, Mr. Hartstein, Juniper documents, and the analyses of Drs. Cole and Bims).

Juniper's sole complaint with Finjan's apportionment at trial is the unsupported statement that it does not account for non-infringing features of Juniper's products. This is inaccurate, however, because as explained above Finjan only calculated its damages based on the files that are sent to Sky ATP and which Sky ATP scans. Ex. 13 (Icasiano Trial Testimony) at 31:10-33:19. These files are thus processed using infringing dynamic analysis technology as identified by Dr. Cole. Ex. 1, Trial Tr. at 428:11-429:25. This accounting thus excludes non-infringing functionality as well as a substantial amount of *infringing* functionality, such as static analysis. *Id.* (due to the exclusion of

13

1    samples sent to static analysis from Mr. Icasiano's rate). Thus, Finjan presented in good faith a

2    damages case that included apportionment. Juniper's wholly unexplained contention that this is

3    somehow not "meaningful" thus rings hollow. *See* Mot. at 12.

4            Finjan also presented substantial evidence of the appropriate royalty base, including, *inter alia*,

5    revenue information and the number of units, licenses, or enrollments relating to the infringing sales.

6    *See* Exs. 14, 15, 16 (Trial Exs. 88, 490, 494); Ex. 17 (Gupta trial testimony) at 23:14-53:08 (Ms. Gupta

7    describing revenues associated with SRX and SkyATP and number of infringing units/enrollments),

8    Ex. 5 at 53:17-61:10 (Mr. Nagarajan citing 10 million scans analyzed by SkyATP per month, and 300

9    to 500 Sky ATP customers), Ex. 18 (Trial Ex. 58) at 116-117 (Sky Advanced Threat Prevention

10   Administration Guide showing between 200-100,000 files processed per day for Premium Licenses

11   and 25-5000 files processed per day with free enrollment), Ex. 13 at 53:09-53:16 (Mr. Icasiano

12   testifying to 120 SRX devices with free enrollments); Ex. 1, Trial Tr. at 471:19-473:9, 525:9-527:5

13   (Dr. Cole's testimony regarding 535,000 files processed in seven days). Notably, Juniper sandbagged

14   Finjan with alleged revenue numbers, such that Finjan only obtained deposition testimony from

15   Juniper's corporate designee Ms. Gupta on these spreadsheets on the eve of trial. Such testimony

16   contradicted Juniper's representations regarding the revenues, which had been the basis for striking

17   Finjan's damages expert opinion.[4] Ex. 17 (Gupta Trial Testimony) at 51:11-53:08 (confirming

18   revenues of $7.2 million); *id.* at 69:4-71:22 (confirming revenues of $15.9 million); Ex. 15 (Trial Ex.

19   490 – Gupta Depo Ex. 12); Ex. 16 (Trial Ex. 494 – Gupta Depo Ex. 16); *see also* Dkt. No. 283 (Order

20   on Daubert Motions) at 4-5 (reflecting prejudice to Finjan, as the Court ordered that "Finjan will thus

21   be stuck with the $1.8 million base."); Dkt. 412-22 (12/4/18 Hearing Tr.) at 16:3-5 (same).

22           Of the other items that Juniper complains about now, Juniper ignores the substantial evidence

23   _____

24   [4] Juniper committed misconduct with respect to the belated production of revenues and representations
     to the Court regarding the revenues at issue. Juniper sought to limit Finjan's damages based on
25   artificially-depressed revenue information, producing the actual revenue information reflecting
     substantially higher revenues in a 17,000 page document days before Finjan's expert report were due
26   and after the completion of relevant depositions. Dkt. No. 412-22 (12/4/18 Pretrial Hearing Tr.) at
     76:1-17 (noting Juniper's troubling production of 17,000 page document with damages-related
     information); *see also* Dkt. No. 411-4 (Finjan's Mot. for Relief from Judgment) at 17-18. Its repeated
27   reliance on its factually inaccurate $1.8 million anchor is thus misleading, as that number does not
     even reflect the full amount of Juniper's revenues from the infringing technology in the United States.

28
                                                    14

1  supporting such testimony presented at trial.  For example, with respect to the $8 per user rate, Juniper

2  conveniently omitted the citations to where Mr. Hartstein described in detail the basis for Finjan's

3  application of the rate. Ex. 1, Trial Tr. at 269:6-273:18.  Specifically, Mr. Hartstein testified that

4  Finjan reached this $8 per user rate based on its experience and research of the security software

5  market.  This included evidence regarding the average selling price for most security software, and

6  that based on the average market churn rate, a customer stays with the same software for about two

7  and a half years.  *Id.*  Based on this, a given user pays $50 on average for its security software.  Finjan

8  apportions the price of that software by 16%, down to $8 per user.  *Id.*  Finjan traditionally apportions

9  by 16% of software revenues as its starting point for licensing discussions, which Juniper does not

10  take issue with.  *Id.*; *see also* Mot. at 11.  Finjan employed this research specifically in determining its

11  pricing its own Gen3 Vital Security product. Ex. 1, Trial Tr. at 271:11-19.

12       Finjan thus presented detailed evidence that far exceeds what was in the record in the *Blue*

13  *Coat* case that Juniper attempts to rely on.  *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1311-

14  12 (Fed. Cir. 2018).  In *Blue Coat*, the $8 per user rate was only mentioned and never explained, in

15  stark contrast to the detail that Finjan presented at trial with Juniper.  *Id.*  It is illogical to contend, as

16  Juniper does, that the Federal Circuit somehow outlawed use of an $8 per user rate.  Indeed, the Court

17  stated only that there was insufficient evidence to support use of that rate in the *Blue Coat* case based

18  on the record that had been developed in that case.  *Id.* at 1312.  Here, Finjan explained its basis for

19  using the rate, including that it uses this rate for its own product, even if no license has yet

20  incorporated it.

21       With respect to the $0.32 per scan rate, Juniper again excludes Finjan's detailed discussion of

22  its basis for the $0.32 per scan rate. Ex. 1, Trial Tr. at 269:6-273:18.  Specifically, Mr. Hartstein

23  testified that Finjan was paying $0.32 per scan for the use of same scanning technology in its own

24  Finjan Mobile product, and that was the cost at which it became more beneficial to perform its own

25  scanning in-house.  *Id.*  Indeed, Mr. Hartstein confirmed that bulk scanning generally results in a

26  discount, which negates Juniper's contention that the per-scan model is too rigid to accommodate

27  large numbers of scans.  *Id.* (testifying that a lot of scanning reduced the per-scan cost to closer to

28

$0.20, while fewer scans could raise the cost to closer to $0.60); *compare* Mot. at 11.  Thus, as with the $8 per user rate, Juniper's claims that these arguments were unsupported are demonstrably false. Juniper intentionally omitted the citations to the trial transcript that demonstrated otherwise.

Juniper presents no issue with respect to Finjan's introduction of evidence regarding its application of an 8% royalty rate on hardware and 16% royalty rate on software on total revenues of products that it uses in licensing.  It only complains that Finjan did not present evidence about the appropriate ending point.  Mot. at 11.  This generalized complaint has nothing to do with the issue of sanctions and frankly, is a question for the jury to decide after hearing all the evidence, including Juniper's rebuttal evidence.  Contrary to Juniper's assertion, Mr. Hartstein provided the jury with ample information to consider in crafting a reasonable royalty, including considerations that a licensee like Juniper would have had.  He described many of the provisions of the licenses, such as paying additional royalties when acquisitions are made and how licenses are structured, so the jury would have a basis for what Juniper would agree to during the hypothetical negotiation.[5]

Juniper's remaining arguments with respect to Finjan's damages case are devoid of law or any specific alleged violation of law, despite its naked claims that Finjan was supposedly contrary to "controlling legal precedent" (twice mentioned in Mot. at 9), "precedent-defying" (Mot. at 10) and "refused to comply with this Court's rules, the Rules of Civil Procedure, and binding precedent" (Mot. at 12).  Interestingly, Juniper does not identify these allegedly dispositive damages cases, other than its reliance on the factually distinct *Blue Coat*, which does not address the numerous other places that Juniper claims Finjan failed to follow precedent.  Juniper's passing references to Finjan's Offer of Proof are insufficient to support its Motion.  *See id*. at 10, 12.  Faced with the substantial evidence supporting Finjan's damages claims, including apportionment as cited above, Juniper's basis for sanctions is no more than a generalized complaint that it believes Finjan should have somehow given up, rather than set forth the factual evidence that contradicted Juniper's misrepresented revenue information.  Simply put, Juniper does not have any support to claim bad faith to support its Motion.

---

[5] Juniper's other complaint about testimony as how Finjan assessed Juniper as a licensee in the $20 million range does not present grounds for sanctions and there was no prejudice to Juniper, as the jury was not required to consider the issue of damages and Juniper won the issue of infringement.

PLAINTIFF FINJAN'S OPPOSITION TO DEFENDANT                    CASE NO. 3:17-cv-05659-WHA
JUNIPER NETWORK'S MOTION FOR SANCTIONS

### III.   FINJAN HAD A GOOD FAITH BASIS FOR ASSERTING INFRINGEMENT OF CLAIM 1 OF THE '780 PATENT

### A.   Finjan's Claim Construction Positions Are Consistent with its Prosecution and Prior Litigation of the '780 Patent.

Finjan reasonably set forth claim construction positions based on the '780 Patent's intrinsic evidence and past claim constructions to support its infringement case.  That the Court declined to follow this precedent does not make out a claim for sanctions.  Specifically, Finjan has consistently asserted that the plain and ordinary meaning of the claim term "performing a hashing function on the Downloadable and the fetched software components" is "performing a hashing function on the Downloadable together with its fetched software components."  *See Finjan, Inc. v. Blue Coat Sys., Inc.,* No. 13-cv-03999-BLF, 2014 WL 5361976, at *2 (N.D. Cal. Oct. 20, 2014); *see also Finjan, Inc. v. ESET, LLC,* No. 17-cv-00183-CAB-(BGS), 2017 WL 5501338, at *2 (S.D. Cal. Nov. 14, 2017); Dkt. No. 129-13 (*Finjan, Inc. v. Secure Computing Corp.,* No. 06-369 (GMS), Dkt. No. 142 at *2 (D. Del. Dec. 11, 2007)); *Palo Alto Networks, Inc. v. Finjan, Inc.,* Case IPR2016-00165, Paper No. 7 at *7-8 (P.T.A.B. April 21, 2016); *see also Finjan, Inc. v. Sophos, Inc.,* 244 F. Supp. 3d 1016, 1050 (N.D. Cal. 2017) (allowing for multiple hashes).  Previous constructions have noted that "the '780 Patent is not so limited that 'a hashing function' means a single hash—the overall function of hashing an object or combination of objects could potentially be accomplished by a sequence of several hashes or computations."  *Finjan, Inc. v. Blue Coat Sys., Inc.,* No. 13-cv-03999-BLF, 2015 WL 3630000, at *5-7 (N.D. Cal. June 2, 2015); *see also Finjan, Inc. v. Cisco, Inc.,* No. 5:17-cv-00072-BLF, 2018 WL 3537142, at *14 (N.D. Cal. July 23, 2018) (recently confirming that multiple individual hashes may still yield one unique and reproducible Downloadable ID); *Finjan, Inc. v. BitDefender, Inc.,* No. 4:17-cv-04790-HSG, 2019 WL 634985, at *8-9 (N.D. Cal. Feb. 14, 2019) (adopting a construction that required a reproducible and unique Downloadable ID but noting that there may be "a hash or hashes" such that a reproducible ID may be generated by "a computation or combination of computations").  This previous construction also contemplates that accomplishing the hashing in sequence on the Downloadable and fetched components can still mean that the Downloadable is hashed "together with" the components.

Nonetheless, this Court construed the "Downloadable ID" as requiring a single hash value that

17

identifies the contents of the Downloadable and fetch components.  The Court noted that it "perhaps

disagrees" with Judge Freeman on this point.  Dkt. No. 180 at 8-9.  This disagreement does not prove,

as Juniper wrongly contends, that Finjan set forth any inconsistent or unreasonable positions, nor is it

evidence of bad faith.  This Court's disagreement with the decision of another judge in this district is

not evidence of bad faith.

Juniper also misrepresents the technology in arguing that Finjan's proposed construction is

inconsistent with an advantage of the '780 Patent being that it creates a reproducible Downloadable

ID.  Dkt. No. 96-6 (excerpted '780 Prosecution History) at 3.[6]  Finjan's position is that performing a

hashing function on a Downloadable and its fetched components in sequence does create a

reproducible Downloadable ID.  *See* Ex. 19, Mitzenmacher 7/3/18 Dep. Tr. at 124:21-130:1

(describing different ways to hash Downloadable together with components); Dkt. No. 127-6

(Mitzenmacher Decl.), ¶ 39 ("a Downloadable ID can be accomplished using a sequence of hashes, as

would be known to a person of ordinary skill in the art") (citing also to *Blue Coat Sys..,* No. 13-cv-

03999-BLF, 2015 WL 3630000, at *7); Dkt. No. 127-6 (Mitzenmacher Decl.) at ¶¶ 40-41 (explaining

intrinsic support for and benefits of hashing using a sequence of hashes on the Downloadable and

components).  In fact, every time a Downloadable and its fetched components are hashed in sequence

it will result in the ***exact same Downloadable ID***.  *See* Dkt. No. 127-6, ¶¶ 26-27 (benefits of the '780

Patent include ability to not reanalyze Downloadables each time it is seen); *id.*, ¶ 40 (combining

hashes from each component can improve ability to determine if one component was modified and

potentially threatening).  The reproducibility of the Downloadable ID is not contingent on whether the

hashing function is performed over all the data in the Downloadable and its fetched components, or

whether it is performed in sequence on the Downloadable and on its fetched components and then

combined into a list.[7]

---

[6] Juniper mistakenly attributes this statement to a declaration submitted by its expert Dr. Rubin.  Mot. at 14-15 (citing Dkt. No. 96-2 at 3).  Finjan corrected the citation here.

[7] For example, say that Downloadable A references Component B and Component C.  When the hashing function is performed on Downloadable A, Component B, and Component C, it creates a Downloadable ID which is a concatenated list of the hash value for each of A, B, and C: say, D (the hash of A), E (the hash of B), and F (the hash of C).  Thus, the Downloadable ID contains hash values DEF.  Should Downloadable A arrive again, any missing component may again be fetched, the

1   Finally, Juniper cannot establish bad faith because Finjan's proposed construction is consistent

2   with past litigations.  Juniper (again) quotes misleadingly from Finjan's expert testimony in the *Blue*

3   *Coat* case.  Mot. at 15 (citing Dkt. No. 152-4 (excerpted *Blue Coat* Trial Tr.)).  Immediately preceding

4   the cherry-picked and truncated statement that Juniper cites, Finjan's expert explained that "each of

5   those pieces [(meaning webpage software components)] is hashed, as we've talked about, using the

6   MD5 function, and then what we'll be talking about is the ***I.D. is the combination of those hashes***

7   ***together***."  Ex. 23, *Blue Coat I* Trial Tr. 848:1-3 (emphasis added); *see also id.*, 847:1-25 (explaining

8   further context of fetching components).  Nothing in these descriptions by Finjan's expert precludes

9   the '780 Patent covering a process where individual hashes are combined to create a Downloadable

10  ID.

11  Immediately after Juniper's cherry-picked statement, Finjan's expert explains once software

12  components are fetched, a hashing function will be performed each, and the combination of these is

13  considered the Downloadable I.D.  Ex. 23, *Blue Coat I* Trial Tr. 853:1-5 ("So we've been talking

14  about hashing and fingerprints.  And as we can see here, ProxyAV will take types of objects and use

15  the hash function to create a fingerprint, and ***the combination of these fingerprints for a specific***

16  ***downloadable will correspond to the I.D.*** that I've been discussing.") (emphasis added); *see also id.* at

17  854:12-17 ("Yeah.  So, again, what we see here is when you have downloadable consisting of multiple

18  components or concluding multiple components, ***these components will come in to the ProxyAV***

19  ***product and be given a hash corresponding fingerprint, and the combination of these fingerprints***

20  ***forming the I.D.*** that I discussed."); *id.* at 857:1-13 ("There's a certain ***I.D. for the downloadable***

21  ***which consists of the combination, the various MD5 applications to the individual***

22  ***components***.")(emphasis added).  As shown, this is the same process that Finjan described for

23  Juniper's infringement of the '780 Patent.

24  Finjan's infringement position and related claim construction was thus based on a reasonable

25

26  Downloadable A and Components B and C will be hashed, and result will again be DEF.  *See e.g.*, Ex.
    19, Mitzenmacher 7/3/18 Dep. Tr. at 130:2-132:18.  This is how the '780 Patent avoids the problem of
27  differing hash inputs that the Court was concerned with in its order regarding summary judgment of
    the '780 Patent.  *See* Dkt. No. 180 at 9.

28

PLAINTIFF FINJAN'S OPPOSITION TO DEFENDANT          CASE NO. 3:17-cv-05659-WHA
JUNIPER NETWORK'S MOTION FOR SANCTIONS

interpretation of the claims—indeed, the same interpretation that Finjan has previously set forth in numerous forums and has been upheld in post-trial motions.  As such, Juniper cannot establish that Finjan acted in bad faith.

**B.    The '780 Patent is Valid and Directed to Patentable Subject Matter under 35 U.S.C. § 101.**

Claim 1 of the '780 Patent is directed toward patent-eligible subject matter.  Juniper does not even consider whether Claim 1 is patent-eligible; instead, it raises a description from within the prosecution history which does not recite the language of the claim, and evaluates *that*.  *See, e.g.*, Dkt. No. 127-4 at 24-31 (analyzing *Alice* Step 1 in detail) (citing, *inter alia*, *24/7 Customer, Inc. v. LivePerson, Inc.,* No. 15-cv-02897-JST, 2017 WL 2311272, at *15 (N.D. Cal. May 25, 2017) (but "[v]irtually every invention could be described at a high level in a few words," and thus Courts addressing patentability under *Alice* "must scrutinize reductive descriptions with great care.") (citation omitted).  Juniper offers no analysis of Claim 1 whatsoever in its Motion.  Mot. at 16.

Further, Juniper's cited case law is inapposite because the '780 is not directed to simply hashing or fetching, but rather to an improvement to computer functionality by creating a unique ID for downloadables, such that Juniper's cases regarding the abstractness of hashing, fetching, or mathematical algorithms do not apply to Claim 1 of the '780 Patent.  *See* Dkt. No. 127-4 at 28-29; *compare with* Mot. at 16 (citing *Intellectual Ventures I LLC v. Erie Indemnity Co.,* 200 F. Supp. 3d 565, 568, 574-75 (W.D. Penn. 2016) (holding the claims were directed to identifying illicit files such as pornography and pirated music, and unlike the '780 Patent, "the '298 Patent does not solve a computer-centric problem or a problem that is unique to computers"); *Intellectual Ventures I LLC v. Symantec Corp.,* 100 F. Supp. 3d 371, 383 (D. Del. 2015) (holding the patent merely "covers the steps of collecting, recognizing, and storing data" and did not solve a problem "necessarily rooted in computer technology") (citation omitted).

Similarly, Juniper's citation of *Symantec Corp. v. Zscaler, Inc.* does not support its arguments because in that case, Finjan's '844 Patent (which manages Downloadables like the '780 Patent) "address[ed] virus scanning for downloadables . . . By contrast, the [patent at issue] addresse[d] only generic files."  No. 17-cv-04426-JST, 2018 WL 1456678, at *7 (N.D. Cal. Mar. 23, 2018) (finding a

generic hashing patent ineligible).

Although Finjan need not reach Step 2 of the *Alice* test because the '780 is eligible under Step 1, Juniper's reiteration of its Step 2 arguments also fail.  It is unclear what Juniper is arguing regarding the order of fetching and hashing in the claims.  *See* Mot. at 16 (stating that this was "noted above," without pointing to any citation).  Finjan's infringement theories for Claim 1 of the '780 Patent describe fetching and then hashing of the software components, so it is unclear what Juniper alleges has changed.

### C. Finjan Properly Presented Multiple Claims Regarding How Juniper Infringes in its Infringement Contentions.

Juniper's complaint that Finjan should have dropped products before Juniper filed its Motion for Summary Judgment on Claim 1 of the '780 Patent is without basis.  Finjan properly set forth its infringement allegations in its infringement contentions, which, at that time, were based on Juniper's public documents.  Juniper cites no law, and no law exists, that says a party must move forward with every contention included within its infringement contentions.  Finjan did what has happened in nearly every patent case ever—based on the discovery it had taken and the space that it was allotted in response, it chose which of its contentions to argue in its opposition.  Juniper's argument that Finjan was somehow obligated to move forward with every claim in its infringement contentions is simply without basis in the law.

Additionally, Juniper never requested that Finjan withdraw any accused products from the case, before moving for summary judgment on what it viewed as the weakest infringement positions, and now complains that Finjan did not further prosecute a claim that Juniper asserts was defective.  Specifically, on February 23, 2018, the Court ordered the parties that they would select claims for competing summary judgment motions to be filed on June 7, 2018.  Dkt. No. 35 at 4.  Finjan served infringement contentions which included a claim based on the SRX Gateways alone on March 8, 2018 based on publicly available information.  Dkt. No. 410-3 at 2.  The parties engaged in discovery during the three months between Finjan's infringement contentions and the deadline to file motions for summary judgment.  Juniper never approached Finjan with a request to drop the SRX Gateway from its contentions with respect to Claim 1 of the '780 Patent, although the parties were preparing to file

PLAINTIFF FINJAN'S OPPOSITION TO DEFENDANT                    CASE NO. 3:17-cv-05659-WHA
JUNIPER NETWORK'S MOTION FOR SANCTIONS

for summary judgment and might have agreed about ways to narrow the issues.  At any rate, Juniper chose to move instead, and Finjan did not press its claim with respect to the SRX Gateways given the discovery it had reviewed in the short three months between serving its contentions and filing, and given the space limitations involved in going to summary judgment.  Nor did Finjan affirmatively "advance" this claim after it was able to review confidential information pertaining to the SRX Gateways.

Juniper's case law does not support its claim for sanctions.  For example, Juniper cites a case in which the plaintiff invented a nationwide "trademark conspiracy" case based on a single purchase of a $10 pair of jeans, with no investigation into the facts underlying the complaint.  *Viola Sportswear, Inc. v. Mimun*, 574 F. Supp. 619, 620 (E.D.N.Y. 1983).  Indeed, the plaintiff admitted having never reviewed the complaint.  *Id.*  This case does not compare to Finjan's detailed complaint and infringement contentions, in which it accused the SRX of infringement of Claim 1 of the '780 based on publicly available information, and only ceased pursuing the claim after a review of confidential technical information.  Similarly, Juniper's other case involves defendants who filed without good faith a motion to vacate a default, in order to plead a defense that was actually unsupported by any evidence (unlike Finjan's infringement claim).  *LaFarge Corp. v. No. 1 Contracting Corp.*, No. 3:CV-06-2315, 2008 WL 2120518, at *6 (M.D. Pa. May 19, 2008).  Then, when the plaintiff filed a motion for summary judgment because the default was lifted, the defendants simply did not file any opposition whatsoever.  *Id.*  Finjan's factually supported early infringement claims are easily distinguished.

## IV.   FINJAN HAS ACTED REASONABLY AND MADE NO FALSE STATEMENTS

### A.   Finjan Preserved Its § 282 Objection to Juniper's Failure to Serve a § 282 Disclosure.

Finjan filed in good faith an objection to the prior art that Juniper intended to raise at trial because Juniper had not served a separate disclosure of prior art pursuant to 35 U.S.C. § 282(c) ("Section 282"), and Finjan properly moved to preserve its objections.  Section 282 requires, in relevant part:

In an action involving the validity or infringement of a patent the party asserting

invalidity or noninfringement shall give notice in the pleadings or otherwise in writing to the adverse party at least thirty days before the trial, of the country, number, date, and name of the patentee of any patent, the title, date, and page numbers of any publication to be relied upon as anticipation of the patent in suit or, except in actions in the United States Court of Federal Claims, as showing the state of the art, and the name and address of any person who may be relied upon as the prior inventor or as having prior knowledge of or as having previously used or offered for sale the invention of the patent in suit. In the absence of such notice proof of the said matters may not be made at the trial except on such terms as the court requires.

35 U.S.C. § 282(c).  While the alleged Swimmer reference indicates September 1995 on the document, Juniper had not provided evidence that September 1995 was in fact the date of publication that it was seeking to assert at trial, as required by such Section 282 disclosure, such that Juniper had not asserted the publication date in a disclosure within the meaning of Section 282.  *See* Dkt. No. 317 at 1.

Further, given that validity was not an issue to be decided at trial, Juniper's contention that it disclosed the reference far earlier in the case is disingenuous.  *See* Dkt. No. 262 (Joint Submission for Pretrial Order) at 6 (listing Juniper's proposal for issues to be decided at trial); Dkt. No. 301 (Pretrial Order) at 1 (adopting Juniper's list of issues to be decided, except for section 101 invalidity which was not to be tried to the jury).  Finjan did not file its objection under Section 282 because it did not understand the date of the Swimmer reference specifically; Finjan filed its objection because Juniper surprised Finjan at trial with a list of prior art references that had no relevance to the issues that were to be tried and which Juniper had not disclosed for use at trial, which is the purpose of Section 282, which is different from the disclosure requirements for invalidity contentions.  *See also* Ex. 1, Trial Tr. 207:18-210:6 (Mr. Andre and Mr. Kagan discussing Finjan's issues with respect to Juniper's lack of a section 282 disclosure with the Court); Ex. 20 (Letter from Mr. Andre to the Court regarding the reason for Finjan's objection).  Moreover, participation in discovery which identifies prior art in writing is not necessarily enough to comply with Section 282—particularly where, as here, there was no reason for Finjan to expect that Juniper would be bringing this art to trial.  *See Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega systems, LLC*, 350 F.3d 1327, 1347 (Fed. Cir. 2003) (affirming exclusion of prior art based on failure to disclose it under section 282, even though the art was allegedly disclosed multiple times in discovery, including at deposition and in interrogatories).

Finally, the Court focused on the statement that Juniper had not asserted the date of the

PLAINTIFF FINJAN'S OPPOSITION TO DEFENDANT                CASE NO. 3:17-cv-05659-WHA
JUNIPER NETWORK'S MOTION FOR SANCTIONS

reference and took a broader view of the disclosure requirements to include Juniper's invalidity contentions.  Additionally, Finjan apologized to the extent that its statement regarding Swimmer, considered in isolation, caused confusion by suggesting that Finjan did not understand the date of the reference and by causing the Court to further investigate the date for itself.  *See* Ex. 1, Trial Tr. 408:14-409:3.  This is not a ground for sanctions, however, as Juniper has no basis to allege that Finjan submitted its objection for an improper purpose or in bad faith; as explained, Finjan appropriately filed in order to preserve its objection to Juniper's failure to make an appropriate disclosure under Section 282.

### B.  Finjan Reasonably Claimed Work Product Protection over Mr. Garland's Impressions of the Call with Mr. Coonan.

Juniper takes issue with respect to Finjan's reasonable claim of work product protection for the very limited information that Mr. Garland conveyed to Finjan's only in-house counsel, Ms. Mar-Spinola, regarding his call with Mr. Coonan at Juniper.  At deposition, Mr. Garland testified at length about his discussion with Mr. Coonan, and his subsequent email communication with Ms. Mar-Spinola.  Ex. 21, Garland Dep. Tr. 192:23-197:22, 211:19-220:23 (discussing the call); *id.*, at 221:16-224:10 (discussing the email with Ms. Mar-Spinola).  Finjan thereafter produced the email communication with fewer than two dozen words redacted, which reflected Mr. Garland's overall impression of how the call went and with which he called Ms. Mar-Spinola's attention to certain statements from the call because he believed it was likely to lead to litigation.  *See* Mot. at 19 (citing Ex. H thereto).  Finjan had a good faith basis for asserting that this information was protected as work product due to the nature of the call, and to ensure that there was no waiver, given that based on Juniper's response to Finjan's efforts to discuss a license, it seemed that the parties would be heading to litigation.

The Court read Mr. Garland's testimony that he had a "bright" memory of the call to mean that Mr. Garland had a bright memory because of his review of the email.  Ex. 22, 7/18/18 Hearing Tr. at 8:6-13; *see also* Ex. 21, 255:16-256:7 (Mr. Garland did not need notes to refresh his recollection); *id.*, Ex. 21 at 194:1-196:8; 211:19-219:20; 252:4-12; 252:15-253:15; 212:6-215:4 (Mr. Garland had a bright memory of the call) .  The Court further wrongly asserted that Mr. Garland had been coached

during a break, contrary to Mr. Garland's express testimony under oath and with no evidence that any such thing had occurred.  *Compare* Ex. 22, 7/18/18 Hearing Tr. at 8:14-23 *with* Ex. 21, Garland Dep. Tr. 256:21-23.  Finally, the Court stated that the document should be produced under "the Rule of Completeness."  Ex. 22, 7/18/18 Hearing Tr. at 9:3-5.  The Court ultimately required Finjan to produce the email without the very limited redactions, which Finjan did.  No part of the ruling addressed Finjan's proper assertion of work product, and in fact the Court noted that for purposes of its ruling, it assumed for the sake of argument that the document was privileged, such that the Court did not need to reach a ruling on the basis of privilege.  *See id.*, at 9:6-10 ("So this whole document is going to be produced. I might get into whether or not -- I'm assuming for the sake of argument that it was privileged to begin with and I'm not ruling on the lateness of the log. That's a fair point, but I don't know whether you did the same thing. Maybe you got a late log yourself. So I don't want to go down that path without knowing a lot more than I know now. But it's sufficient for me to make the ruling based on the points that I have laid out.").

Finjan's reasonable assertion of work product protection over a handful of information communicated from Mr. Garland to Ms. Mar-Spinola as in-house counsel—on which the Court did not even base its ruling—hardly raises to the level of bad faith.

## CONCLUSION

In light of the foregoing, Finjan, Inc. respectfully requests the Court to deny Juniper's motion for sanctions under both 28 U.S.C. Section 1927 and the Court's inherent powers.

///

///

///

PLAINTIFF FINJAN'S OPPOSITION TO DEFENDANT
JUNIPER NETWORK'S MOTION FOR SANCTIONS

CASE NO. 3:17-cv-05659-WHA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

Dated:  April 11, 2019                          By:  */s/ Kristopher Kastens*
                                                      Paul J. Andre (SBN 196585)
                                                      Lisa Kobialka (SBN 191404)
                                                      James Hannah (SBN 237978)
                                                      Kristopher Kastens (SBN 254797)
                                                      KRAMER LEVIN NAFTALIS
                                                       & FRANKEL LLP
                                                      990 Marsh Road
                                                      Menlo Park, CA  94025
                                                      Telephone:  (650) 752-1700
                                                      Facsimile:   (650) 752-1800
                                                      pandre@kramerlevin.com
                                                      lkobialka@kramerlevin.com
                                                      jhannah@kramerlevin.com
                                                      kkastens@kramerlevin.com

                                                      Attorneys for Plaintiff
                                                      FINJAN, INC.

PLAINTIFF FINJAN'S OPPOSITION TO DEFENDANT          CASE NO. 3:17-cv-05659-WHA
JUNIPER NETWORK'S MOTION FOR SANCTIONS