**Pages 1 - 28**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

```
FINJAN, INC.,                    )
                                 )
            Plaintiff,           )
                                 )
  VS.                            )      NO. C 17-05659 WHA
                                 )
JUNIPER NETWORK, INC.,           )
                                 )
            Defendant.           )
_____ )
```

San Francisco, California
Thursday, January 7, 2021


**TRANSCRIPT OF TELEPHONIC PROCEEDINGS**


**APPEARANCES BY TELEPHONE:**

For Plaintiff:
                    FISH & RICHARDSON PC
                    12860 El Camino Real - Suite 400
                    San Diego, California  92130
              BY:   **JUANITA R. BROOKS, ATTORNEY AT LAW**


For Defendant:
                    IRELL & MANELLA LLP
                    1800 Avenue of the Stars - Suite 900
                    Los Angeles, California  90067
              BY:   **JONATHAN S. KAGAN, ATTORNEY AT LAW**




Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

<u>**Thursday - January 7, 2021**</u>                          <u>**10:13 a.m.**</u>

P R O C E E D I N G S

---oOo---

**THE CLERK:**  Calling Civil matter 17-5659, Finjan,
Incorporated, vs. Juniper Network, Incorporated.

Starting with plaintiffs, will counsel please state your
appearances.

**MS. BROOKS:**  Good morning, Your Honor.  Juanita Brooks
from Fish & Richardson on behalf of Finjan.

**THE COURT:**  Welcome.

**MR. KAGAN:**  Good morning, Your Honor.  Jonathan Kagan
of Irell & Manella on behalf of Juniper Networks.

**THE COURT:**  Welcome.

This is a motion for attorneys fees by Juniper.  So I'm
familiar with everything in here, but take up to ten minutes to
make your argument.  Juniper goes first.

**MR. KAGAN:**  Okay.  So, Your Honor, the standard for
attorneys' fees that we're dealing with, I just want to make
clear because there was a lot of cases cited, comes from the
2014 *Octane Fitness* case; and the test is does this case stand
out from others with respect to the strength of the case and
was it litigated in an unreasonable manner.  These are not --
you do not need to meet both of these standards.  It can be
under either of these standards is how a case can be
extraordinary, and in this case we feel there's evidence to

1   support both.

2        The other just legal issue to put on the table is the

3   Court does not need to conduct an issue-by-issue analysis of

4   the extraordinary nature of the case.  It's an overall

5   evaluation that the Court does to determine whether it's

6   extraordinary.  So it doesn't need to say "This patent is

7   extraordinary.  This patent is not."

8        There's two exceptions to that rule, neither of which

9   applies here, which is, one, if there is a partial victory, so

10  if we won on -- if we prevailed on some patents but not others,

11  it could allocate; or if the extraordinary nature of the case

12  is based solely on misconduct, which is not what -- we have a

13  lot of evidence showing that this case stands out from others

14  for reasons other than misconduct.

15       So the question is:  Does this case stand out or not?

16  That's the threshold question.  So this was a patent case

17  involving nine patents that Finjan asserted.  Only one of those

18  patents was able to make it to trial.  So eight of the nine

19  patents did not even make it to trial; and for the one patent

20  that made it to trial, by the time it got to the jury, there

21  was no possibility of any remedy for Finjan because the patents

22  had expired so there's no injunction possible and the Court had

23  ruled that Finjan was not entitled to damages even if they got

24  a jury verdict.  Obviously the jury verdict went in Juniper's

25  favor.

1    So of the nine patents that Finjan asserted, they were

2 unable to get relief on any one of them even before reaching a

3 jury.  So the question is:  Does that stand out from other

4 cases?

5    It's difficult to imagine how you can argue it doesn't

6 stand out.  Finjan is a professional plaintiff in patent cases.

7 Virtually all of their revenue comes from licensing patents and

8 litigating.  If you look at their brief, they list all of their

9 accomplishments they've had in litigation.  They've had

10 wonderful results.

11    This case has to stand out because if this case is the

12 norm for them, they cannot exist as a professional patent

13 plaintiff.  If when they assert nine patents, they're not --

14 they can't get relief on even one even before getting to a

15 jury, they're out of business.  So this is clearly a case that

16 stands out with regard to their litigation and, frankly, I

17 think most likely the litigation that this Court sees.

18         **THE COURT:**  May I ask a question?

19         **MR. KAGAN:**  Yes.

20         **THE COURT:**  You say they were zero for nine.  Were the

21 other -- how many of those were actually litigated and what

22 became of the ones that were not litigated?  I remember the

23 ones that were litigated, but I know it wasn't all nine so tell

24 me what happened to the lineup of the patents.

25         **MR. KAGAN:**  So there were several -- there were two

1    that were the subject of a summary judgment motion.  Well,

2    there were two claims that were the subject of a summary

3    judgment motion.  There was the '154 patent and the '780 patent

4    where Juniper prevailed on summary judgment.  There was the

5    '494 patent that went to trial that was the subject of a trial;

6    and then Finjan in order to focus its appeal, voluntarily

7    dismissed with prejudice all of the other patents in order to

8    pursue its appeal on the patents that were litigated:  The

9    '154, the '780, and the '494.

10            **THE COURT:**  Okay.  That comes back to me now.  So

11    there were three that were litigated before me and that I made

12    rulings on, and then the other six were dismissed with

13    prejudice.

14            **MR. KAGAN:**  Yes.

15            **THE COURT:**  All right.

16            **MR. KAGAN:**  And this was --

17            **THE COURT:**  You know, I have this question for you,

18    though.  In every case there's going to be a loser and a

19    winner, and are you saying that, "Okay.  So Finjan gave it its

20    best college try and they lost"?  But surely that can't be

21    enough to -- just because you lost doesn't mean that you --

22    it's an extraordinary case and you should pay the other side's

23    fees.

24            So help me -- and also I've got a related question.  What

25    if I think there's only one aspect of the whole case that

1    troubles me and is extraordinary but the rest of it was just

2    routine patent shenanigans, patent lawyer shenanigans, and that

3    if forced to, I could find examples on the Juniper side where

4    you were unreasonable too?  So what if I think it's only this

5    one thing that deserves, am I able to carve that out and say

6    "You've got to pay fees on that one bad chapter" or do I have

7    to give fees to the entire case?

8          **MR. KAGAN:**  So what I would say, the way -- so I think

9    there's two conflicting -- let me answer the second question

10   first.

11         So I think there's two conflicting principles here.  One

12   is that you're really supposed to just look at the whole case.

13   You're under no obligation to parse out individual parts of the

14   case, and that's fair.  However, this is a discretionary

15   decision for the Court, and I do believe that it can be a

16   proper exercise of your discretion to award fees as you see

17   fit; and if you see unreasonable behavior on both sides or you

18   believe that Juniper took unreasonable positions, you know,

19   that's something that I think in your discretion you're allowed

20   to consider.

21         The case law is not so clear on this other than saying

22   it's a discretionary decision; but as an Article III judge, I

23   think those are the types of things that you would routinely

24   use to exercise discretion.  So I think you have great latitude

25   on that.

1          **THE COURT:**  All right.  What is -- what if you --

2     looking at this entire record, what would you say -- just give

3     me one or two examples of where you think Finjan went way over

4     the line and it just spans out as a terrible abusive thing that

5     Finjan did.

6          **MR. KAGAN:**  So one easy example is the damages case

7     for the '494 patent, which went to trial.  What happened here,

8     as you may recall -- this is covered in the briefs, but I'll

9     just summarize it quickly -- what Finjan did was they had a

10    damages -- we moved for -- they moved for summary judgment on

11    the '494 patent.  That was their strongest patent they said.

12    They accused certain products.  We pointed out that they had

13    not -- they were not seeking damage on the SRX product as sold

14    by itself.  It was only the SRX product when used in

15    combination with -- and this is their words -- the SRX used in

16    combination with Sky ATP and the Sky ATP product.  That's what

17    the trial was supposed to be on.

18         Then when they submit their damages report -- and, by the

19    way, the total revenue for that was $1.8 million.  That was the

20    total revenue.

21         When they submit their damages report, though, they

22    claim $142 million as a damages base because they now have a

23    theory, they've come up with an infringement theory where the

24    SRX when it's not used in combination with Sky ATP is an

25    infringing product.

1        So this is a brand new infringement theory.  It's not even

2    advanced by their infringement expert.  Their infringement

3    expert actually disavowed that theory.  When we questioned him,

4    we said, "Are you -- have you looked at the SRX product by

5    itself?"  He said, "No."  This became the subject of a *Daubert*

6    motion and Your Honor excluded the theory.

7        And Finjan in their brief goes into a lot of -- they spent

8    a lot of time talking about why they believe that this theory

9    was meritorious.  It doesn't matter whether or not this theory

10   was meritorious.  It was an undisclosed theory, and on that

11   basis Your Honor issued a *Daubert* order and excluded the

12   expert's opinion.

13        **THE COURT:**  Was that litigated in the Federal Circuit?

14        **MR. KAGAN:**  Yes, it was.

15        **THE COURT:**  What did the Federal Circuit say on that

16   *Daubert* ruling?

17        **MR. KAGAN:**  The Federal Circuit -- it was a summary

18   affirmance.  There was no opinion.  It didn't even merit an

19   opinion but it was affirmed.

20        **THE COURT:**  Hmm.  Okay.

21        **MR. KAGAN:**  So then what Finjan does is they don't

22   say -- so now they have no -- they have essentially no damages

23   case.  So what they tell Your Honor is, "Well, we want the

24   opportunity to present a fact-based damages case.  So you've

25   excluded our expert but allow us still to try to present a

fact-based damages case," and Your Honor allowed them to at trial.

So they come to trial and they have their CEO testify, and the CEO testifies -- when he testifies, he includes in his royalty base the exact same information that Your Honor excluded in the *Daubert*.  He starts trying to talk about numbers and damages that include this product by itself that Your Honor said was out.

Then in addition what he does, is he talks about numbers that he wants for a negotiation.  He said, "Well, in a negotiation with Juniper, this is what I want.  This is what I'm asking for."  And, Your Honor, ultimately we objected. Ultimately Your Honor excluded that testimony as well as improper.

Some of his testimony in terms of what he was seeking had actually been excluded in another case by the Federal Circuit. The Federal Circuit -- he had this theory that they were entitled to $8 per stand.  That was just the number they came up with.  And he tried using the same number in another case against another defendant.  The Federal Circuit actually reviewed that and said, "This number is pulled out of thin air. You can't use that."

So Your Honor ultimately in the middle of the trial removed the issue of damages and struck his testimony, took damages away from the jury.

 1          So, I mean, I think if you're looking for a single example

 2     of the types of sort of shenanigans that were going on, that's

 3     what's going on here.  So we have this changing infringement

 4     theory just to try to artificially boost damages, an

 5     undisclosed theory that Your Honor strikes, and then they try

 6     to end-run the ruling by sneaking it in a different way at

 7     trial forcing Your Honor to again strike it and take the issue

 8     from the jury.

 9          So we had an entire trial on a patent where there was no

10     possibility of damages because of essentially the litigation

11     conduct of Finjan.  Had they not tried to change their theory,

12     they could have tried to get the one -- whatever percentage of

13     the $1.8 million of damages they wanted, but that's not what

14     they did.

15          Another example relates to the '780 patent which has to do

16     with notice.  The question was:  Did they provide actual or

17     constructive notice to Juniper about this patent?  They

18     actually had their head of licensing lie.  They signed a false

19     interrogatory response where they said in a phone conversation

20     they had expressly talked about this with a representative from

21     Juniper.  We deposed the guy.  That's what he said.

22          Then we were ultimately able to go find a recording of the

23     conversation; and when we played the recording of the

24     conversation, there's absolutely no reference to this

25     whatsoever.  It was made up.  That was on actual notice for

1   that patent.

2       Then they also -- then there was an instance, and we cite

3   some of this in the briefing, where they said they'd given a

4   presentation to Juniper or to Cyphort, the predecessor of

5   Juniper, where they said they provided notice.  And we had a

6   hearing on this, and Your Honor said, "Okay.  Show me the

7   presentation.  Show me where it says this product infringes the

8   '780 patent."

9       And they kept pointing to different pages, but every time

10  they could not come up with a single reference to that.  They

11  talked about this patent being asserted against other people.

12  They talked about products.  Not once was there any reference

13  to an accusation of infringement by Cyphort of the '780 patent.

14  We had a big hearing on that.

15      Then again on notice, they admitted -- Finjan admitted in

16  open court that notice.  It was their burden under the

17  *Arctic Cat* case.  Then they tried to recant that.  They tried

18  to say, "Well, actually it's not our burden," again just trying

19  to walk back -- they're constantly trying to change their

20  position to suit, you know, the prevailing winds of the day.

21  Whatever the challenge is, they just take a different position

22  and it was not supported by the record.

23      And, again, I mean, Ms. Brooks -- you know, when I'm

24  talking about Finjan counsel, Ms. Brooks was not trial counsel.

25  I just want to make clear.  They got rid of the counsel that

1    was trial so none of this is against her, but this is the

2    behavior that they engaged in at trial and before.

3            **THE COURT:**  Okay.

4        All right.  Let's hear from Ms. Brooks.

5            **MS. BROOKS:**  Thank you very much, Your Honor.  Juanita

6    Brooks on behalf of Finjan.

7        I'd like to start actually where counsel just left off

8    about the fact that we were not trial counsel, and that is

9    true, but in some ways I think that puts us in somewhat of an

10   advantage in that we weren't in the fray.

11       And as Your Honor pointed out, the nature of litigation is

12   it's adversarial.  There's always a winner and there's always a

13   loser; and of course if you end up on the losing side, that

14   automatically means that you have to pay attorneys' fees, that

15   would be the end of the adversarial system that we have.

16       So we at Fish & Richardson were sort of not in the fray,

17   but we do have the record and so we can look at it and we can

18   look at it sort of in a very cold fashion rather than in a

19   passionate, heated fashion and see what is there.

20       And I'd like to start by also addressing we did,

21   Fish & Richardson, handled the appeal and counsel mentioned

22   that the appeal, quote, "didn't even merit an opinion."

23       I'd like to point Your Honor to a case that just came out

24   of the Federal Circuit two days ago, and it is the -- so we

25   don't have an actual Fed. Circuit cite yet, but it's

1    *Innovation Sciences LLC -- Virginia Innovation Sciences, Inc.,*

2    *vs. Amazon*, and the number is 2020-1639 decided on January 5th,

3    2021.  Now, it is nonprecedential but it is very informative of

4    this issue as to the merits of the appeal.

5        This was an attorney fee issue, and what the court -- the

6    Federal Circuit went out of its way to say is that, and I'm

7    quoting now from page 6 of the opinion (reading):

8            "To the extent that the argument attempts to tie the

9        fact of an earlier Rule 36 affirmance without opinion to

10       the later imposition of sanctions by the district court,

11       we hasten to urge caution.  We categorically reject the

12       implication of Amazon's argument that an affirmance by

13       this court under Federal Circuit Rule 36 provides any

14       information about whether a case was close, frivolous, or

15       noncontroversial."

16       So in saying that the appeal didn't even merit an opinion,

17   this court just two days ago, the Federal Circuit, cautioned

18   that that says nothing as to the merits of the case or the

19   opinion.

20       So now let's go back and talk about what happened in

21   district court.  Your Honor asked if you believe that there is

22   a part of the case that is above and beyond I think what you

23   characterized as the shenanigans that go on in patent cases,

24   which what is it, and counsel first went to the damages.  So

25   I'd like to address that first, Your Honor.

 1         And, again, I think we are at an advantage -- "we,"

 2    Fish -- of not having been involved in the lower court case in

 3    that -- or the district court case in that I think what

 4    happened here is, to quote the movie that I like quite a bit,

 5    we had a failure to communicate.

 6         What Juniper counsel keeps saying is that Finjan changed

 7    its damages model after realizing there was only going to be

 8    $1.8 million in damages if they stuck with their original

 9    model.  Unfortunately, Finjan failed to adequately articulate

10    to Your Honor that, no, there had been no change.  The model

11    was the model from the beginning.

12         From the beginning the technical expert, Dr. Cole, at

13    Docket 238-6, specifically said that he was only looking at SRX

14    models that are, quote, "capable of interacting with Sky ATP,"

15    unquote.  So this whole idea that somehow Finjan reverted to an

16    SRX-only damages theory, never happened.  It was always only

17    the SRX models capable of interacting with Sky ATP.  So that

18    was the technical expert.

19              **THE COURT:**  Wait a minute.

20              **MS. BROOKS:**  Yes, Your Honor.

21              **THE COURT:**  I've got to interrupt you here.

22         I remember -- I don't remember every detail now, but I do

23    remember this much, and that is when it came time for the

24    damages analysis, it turned out that the revenue -- I believe

25    you misspoke a minute ago.  You said that the damages would

1   have been 1.8.  I think it was the revenue on which you would

2   have calculated a smaller amount for damages.  It turned out to

3   be vastly smaller than Finjan had hoped for, and that was when

4   we got a brand new infringement theory.

5        Now, you'll never convince me that it was -- it was not

6   disclosed, it was new, and that's why I threw it out.  So

7   you'll never convince me that Finjan didn't make a -- what's

8   the word on the football field when you completely go in the

9   opposite direction?  And that's what I believed then, that's

10  what I believe now, and you're just arguing against something

11  that I lived through.  So I believe you're wrong on that.  I

12  believe that Finjan did flip-flop and come up with a different

13  theory so that it could take advantage of a bigger revenue

14  base.

15       Okay.  Go ahead.  I interrupted you, but go ahead.

16       **MS. BROOKS:**  Oh, no.  Thank you, Your Honor.  And of

17  course I welcome the Court's input.

18       And so certainly I'm not here trying to persuade

19  Your Honor that Your Honor was wrong.  I am simply, though,

20  trying to cite to the record as we got it on appeal and what we

21  saw in there, and what we saw in there was Dr. Cole's expert

22  report where he talked about only SRX models that were capable

23  of interacting with Sky ATP, that that's all he considered.

24  And then the damages expert, Mr. Arst, took that opinion and

25  applied it only then to models that were capable of interacting

with Sky ATP, and that's at Docket 228-7 and specifically his supplemental Exhibit 1.5.

     Now, I know that I -- I know when I'm fighting an uphill battle and this is not a hill that I want to die on so let me just also answer Your Honor's other question, which is if you find, for example, that you cannot be persuaded, that you believe that Finjan absolutely changed its damages theory and you think that that fact would cause this case to stand out on that issue, you do have the discretion to simply carve out that issue and ask Juniper to supply the Court with the numbers that -- the fees that they ran up to defend on that particular issue stand-alone.  And so Your Honor certainly has the discretion to do that.

     I would submit, however, Your Honor, that, once again, because Finjan had a good faith belief that it wasn't changing its damages theory, it was relying on Dr. Cole's report that had always said what it said about Sky ATP -- SRX plus Sky ATP and Mr. Arst's report that it always said SRX plus Sky ATP; and, therefore, that doesn't make this case exceptional or even that issue exceptional.

     And I'll stop, Your Honor, and see if you have any questions.

          THE COURT:  Well, I'm going to come back.  I want you to continue, but I want Mr. Kagan to respond to what I just heard because it's important to me.  I want to make sure I got

1   the record correctly on whether or not there was a flip-flop.

2        Okay.  You continue, Ms. Brooks.

3        **MS. BROOKS:**  Thank you, Your Honor.

4        Going next to the argument by Mr. Kagan regarding whether

5   there was actual or constructive notice on the '780 patent, I

6   would refer Your Honor to page 20 of our brief that contains a

7   figure that was also submitted in our Blue brief to the

8   Federal Circuit, and what that figure is is what Finjan relied

9   on to show what it believed to be actual notice of the '780

10  patent to Juniper's predecessor Cyphort.

11       And if you look at the figure highlighted in yellow is the

12  '780 under Finjan patents.  Yes, the party in that case was

13  Blue Coat and you see, again, below that another party called

14  Secure and again the '780; but underneath that, what Finjan has

15  written is (reading):

16            "Finjan has been awarded over $67 million in patent

17            enforcement while establishing royalty rates and that the

18            PTAB has denied 12 IPR petitions against Finjan."

19       The purpose of this presentation of Cyphort was a

20  discussion about licensing the portfolio of Finjan, and it was

21  Finjan's position that any patent that was listed in this

22  presentation put Cyphort on notice as to that patent and it's

23  Finjan's belief that Cyphort was infringing.

24       Now, Your Honor disagreed with that and said it has to be

25  more and Your Honor specifically actually said, "I want to see

claim charts."  Again, does that make Finjan's position
objectively unreasonable simply because, you know, Your Honor
had a different view?  I would certainly hope not.

     And the standard -- we agree that *Octane Fitness* applies
but *Octane Fitness* just doesn't simply use the word "stand
out."  It talks about is the case objectively baseless and the
claims in an unreasonable manner, is it frivolous, was there
bad motivation.  So there has to be something more than, "Oh,
this stands out for me."  There has to be something more than
that the Court disagreed with Finjan or that a jury disagreed
with Finjan, and there is nothing more here.

     And, in fact, I argued the appeal at the Federal Circuit
and they were very interested in this issue about where's the
line from not enough notice to enough notice.  Is it claim
charts?  And I believe they all agreed, no, it doesn't have to
go that far.  But is it listing a patent the way we did here in
a presentation?  Is that enough?  And I had a very spirited
discussion on that.

     And so clearly it's a good faith belief -- Finjan's belief
that it's enough.  Your Honor felt it wasn't.  The
Federal Circuit didn't speak to it one way or another because
they simply did a Rule 36 affirmance.  But, again, is that
issue enough to have it stand out -- this case stand out and
make it an exceptional case where that issue in and of itself
is exceptional?  I would say it isn't, Your Honor.

1       And the remaining issue --

2               **THE COURT:**  Wait a minute.

3               **MS. BROOKS:**  Yes, Your Honor, I'll stop.

4               **THE COURT:**  Two points I want to ask you about on

5       that.  One is that -- I'm vaguely remembering this part.

6       Blue Coat was not our defendant.  Our defendant was Juniper.

7       So how can something that Blue Coat is infringing possibly put

8       Juniper on notice that it infringes?

9           I recognize I think somewhere along the line Juniper

10      acquired Blue Coat.  Am I right about that?  But that's still a

11      different company.  So let me just pause there.  What is your

12      answer to that?

13              **MS. BROOKS:**  My answer is, Your Honor, that that's

14      absolutely right, Blue Coat was a different company.  What

15      Finjan's position was, is that they marshaled the patents that

16      Finjan believed Cyphort, Juniper's predecessor -- so I'll just

17      call it Juniper -- that Finjan believed Juniper was infringing.

18      So they put them on a flyer, and this was in June of 2016, and

19      they showed Cyphort or Juniper it's history -- the history of

20      these particular patents and how they had successfully asserted

21      them against other companies in the past and had actually

22      obtained a significant amount of money from the enforcement of

23      those patents.

24          Finjan's position was that was sufficient to put Juniper

25      on notice of these particular patents that were listed:  The

1   '194, the '780, the '822, and then three others.  Juniper said,

2   "No, it wasn't."

3        **THE COURT:**  Of what?  Did they refer to a Juniper

4   product and say, "Here's how the Juniper product infringes"?

5   What was the notice supposed -- is it just notice of the patent

6   and notice of the patent alone would be enough?

7        **MS. BROOKS:**  No.  They actually identified a product,

8   the Advanced Threat Defense Platform or the ATP.  And, again,

9   this is all part of the large slide deck and Your Honor can see

10  it's at Docket 392-16, but it's also laid out on page 20 of our

11  brief.

12       And so is this one where reasonable minds can differ?

13  Absolutely.  Your Honor clearly disagreed with Finjan's

14  position.

15       But that's not the question for fees.  The question for

16  fees is was this objective -- was Finjan's position objectively

17  unreasonable such that this becomes an exceptional case, and I

18  would submit the fact that I could stand up there before three

19  Federal Circuit judges and we could have a very robust debate

20  about it and have questions about it shows that reasonable

21  minds can differ on this issue.  And Finjan has every right to

22  try to make law in this area and get some clarification.  Does

23  it have to be claim charts or is a presentation like this

24  enough?

25       And so the issue is were we objectively unreasonable or

1   somehow proceeding in bad faith, and clearly we were not.

2          **THE COURT:**  Let me -- I've got one other question, and

3   then --

4          **MS. BROOKS:**  Yes, Your Honor.

5          **THE COURT:**  -- in 15 minutes I have another calendar

6   that I've got to go get ready for, but I had this question.

7          I do have a distinct memory of a declaration that your

8   side put in, somebody in the Finjan company, that said flat out

9   that particular patent had been discussed verbally with someone

10  from Juniper.  And I don't remember if I actually made a ruling

11  at the time, but I remember thinking, "Okay.  That's probably

12  enough to go to the jury that there was -- somebody's willing

13  to say under oath that they had that conversation."

14         And then it turned out a bit later in the case that there

15  was a recording made, I believe by somebody at Juniper, of that

16  very conversation and they transcribed it and it was not true.

17  It was not true that that patent was mentioned.

18         So I was very disturbed by that.  I've got to tell you, I

19  came close to referring that to the U.S. Attorney but I did

20  not.  But I want you to know this is the kind of stuff that

21  goes on in your patent cases -- in all patent cases where

22  somebody just says, "Oh, by the way, oh, yeah, I can say that.

23  That's the ticket.  I told them about that.  Yeah, it's verbal.

24  I told them."  And it really does burn me up that that

25  happened.  So I want to give you a fair chance to respond to

1  that point.

2        **MS. BROOKS:**  Thank you, Your Honor.

3        So, again, in this instance I'm at a bit of a disadvantage

4  not having been trial counsel; and if Your Honor wants to pose

5  that question directly to trial counsel, Your Honor did

6  maintain jurisdiction over trial counsel when allowing them to

7  substitute out.  You maintained jurisdiction over them for the

8  purpose of this type of a hearing.

9        But I would point out that my understanding is that the

10 witness who is an attorney and is still in good standing

11 apparently had a faulty memory truly believed that -- I

12 guess -- I think he was at the meeting.

13        And I don't want to -- I have to be careful what I say

14 here because, again, this situation I'm at a disadvantage

15 because this was not brought up as a reason for sanctions in

16 the fees motion; but my understanding is that the witness had a

17 good faith memory that the patent was specifically called out,

18 the '780, wasn't aware of the recording, the recording wasn't

19 played at his deposition to give him an opportunity apparently

20 to say, "Oh, whoa.  Now that I hear that, I guess I was wrong."

21 And so my understanding is that's how it happened, and

22 certainly that was not given to the jury.  The witness did not

23 decide "I'm going to ignore the recording and still go with my

24 apparently faulty memory and claim that the '780 was

25 specifically discussed."

1        **THE COURT:**  Well, you know, if he had done that, he

2   would have been soundly impeached.

3        But let's -- I just want to step back and give you patent

4   lawyers a sense of why I think the patent law, even though I'm

5   sworn to uphold it and I do, I feel like I've got -- I'm way

6   down at the district court, but I see enough.

7        Here's a law that says you've got to give notice.  Well,

8   most people think that means in writing and it is so easy to

9   give it in writing.  You just send a letter and you see it and

10  it's done.  It's done.  Once it's in writing, they send you a

11  letter.  It can even be by e-mail.  It's so easy to do.

12       And then when it's not done, somewhere along the line

13  somebody convinced a judge to say, "Well, verbal is enough.

14  Verbal is enough.  You don't have to do it in writing."  And

15  maybe there's a compelling case where verbal was enough.  So

16  then somebody then takes that and says, like in your case,

17  "Well, it's not in writing.  It was a long conversation.  We

18  discussed different patents, and I'm positive we discussed the

19  '780 patent," or whatever the patent number was.

20       So it has gone now from something that could be easily

21  done, should be done, and somebody who's in the business of

22  suing other people on patents ought to have done it, send a

23  letter so it would be on notice.  Instead of doing that, they

24  rely on, oh, the verbal thing.

25       So, now, why did they do it?  I know the reason.  Because

1    if they had sent such a letter under the Federal Circuit law,

2    that would have allowed Juniper to go in and sue for

3    declaratory relief, and your side didn't want to do that.  Your

4    side didn't want to give them that ammunition to go in and ask

5    for declaratory relief.  So that's why you on purpose backed up

6    to verbal, you went to the verbal route instead of doing the

7    written route.

8        I must say this is why a lot of judges cannot stand these

9    patent cases, and I can't stand this aspect of it.  I think

10   patent law is extremely important and innovation is extremely

11   important and we should protect innovation, but it has come to

12   messes like this where tens of thousands of dollars are spent

13   litigating issues of verbal notice when it ought to be a simple

14   letter.

15       Anyway, all right, I said I was going to give the other

16   side a brief opportunity to respond to something that I've

17   already forgotten about, and then I've got to go to my

18   11:00 o'clock calendar.

19       Mr. Kagan, there was something that I wanted you to reply

20   to.  Please go ahead.

21       **MR. KAGAN:**  So there are a couple things, Your Honor.

22   The first thing I just want to say is that the issue that

23   you're referring to which is where the Finjan witness lied

24   about what he told Juniper, that actually is briefed in the

25   sanctions motion which we had filed and was fully briefed and

Your Honor had deferred ruling on that.  So you can look for --
the briefing on that is in the sanctions motion.

    We think that the issues relating to damages could be
subsumed within the fees motion because we didn't carve that
out.  It's all included within the fees motion.

        **THE COURT:**  All right.  What was the point I wanted
you to raise?  It was something about the change of damages
theory.

        **MR. KAGAN:**  Yeah.  So the change of damages theory.
So what I will tell you is the statement that Ms. Brooks made,
and she wasn't in trial, it is just false.  What their
damage -- the SRX units -- there were certain SRX units that
the hardware was so old that they could not operate with
Sky ATP.  It was physically impossible for them to operate with
Sky ATP.  Okay.  There were other ones that could but they
needed to have a software patch, some software that was
downloaded and Juniper could track that.

    When Mr. Arst -- when they did their damages report, he
included all of the SRX units in that.  So he included units
that were incapable of being operated with Sky ATP.  No matter
what you did, you could not use those units with Sky ATP, and
they included those in the royalty base.

    Okay.  This is -- so her statement, with all due respect
because she wasn't there, it's just false.

    Secondly, he also included units that could not be

1    operated because there was no software patch that was

2    downloaded.  And because the patent had expired by the time of

3    trial, there's nothing that -- you can't go back in time.  So

4    this was -- the new damages theory was not something that

5    had -- it's not consistent with what she's saying.

6        As Your Honor pointed out, it was absolutely brand new

7    damages theory designed to inflate the damages.  Not a

8    misunderstanding.  And then when you get to trial -- so let's

9    assume there was some really horrible misunderstanding and

10   miscommunication.  At trial Finjan's CEO puts forward the same

11   royalty-based analysis and the Court has to exclude it again.

12       So certainly if there was some miscommunication, which I

13   don't believe there was, certainly by the time you get to trial

14   and they're presenting their fact-based theory based on the

15   exact same royalty base, there's no miscommunication there.

16   This is the exact type of shifting-sands approach that the

17   courts have held justifies a finding of an extraordinary case.

18       So I believe that addresses the question Your Honor

19   raised.

20           **THE COURT:**  All right.  I've got to go but since you

21   said something was false that she said, I'm going to give

22   Ms. Brooks a minute to respond.

23       Ms. Brooks, go ahead.

24           **MS. BROOKS:**  Thank you very much, Your Honor.  I

25   appreciate that.

1    My statement was this:  I was simply citing the record.

2  Eric Cole in his expert report at Docket 238-6 at Note 1 says

3  he only includes those products, quote, "capable of interacting

4  with Sky ATP," unquote, and he's talking about SRX models.  So

5  he put that in his expert report.

6    Mr. Arst, the damages expert, at Docket Number 228-7 says

7  he uses only those models, the ones that Dr. Cole talks about

8  in his expert report, which are, quote, "capable of interacting

9  with Sky ATP," that he only uses those models in his

10  supplemental Exhibit 1.5.

11    All I was doing was record citations, Your Honor.  They're

12  in black and white and Your Honor can see what they are.

13    **THE COURT:**  Well, look, Ms. Brooks, I trust you're

14  reading it exactly right, but I also lived through this and

15  what you're not quoting to me is the arguments that went on

16  that led up to the *Daubert* exclusions; and I am positive as I

17  sit here right now that even though what you -- you know, those

18  bought-and-paid-for experts will say anything, they will say

19  anything on both sides.  I don't trust a word of that.

20    What I would like to see -- I'm not going to go back and

21  look at it.  I remember this.  It is absolutely true that

22  Finjan changed its damages model and its infringement theory

23  whenever it learned that it was not going to get much money out

24  of the first one.  I remember that.  I was convinced of it at

25  the time.  I'm convinced of it now.  And even though the

1  experts larded the record with statements like that, that's

2  just standard patent BS by a bought-and-paid-for expert.  Sorry

3  I have to be so blunt, but that's right.

4      Counsel, I've got to go.  I don't have a ruling for you.

5  I've got an 11:00 o'clock calendar, and I've only got five

6  minutes to get ready.

7      So good luck to both sides and good to hear from you

8  again, and I'll see you soon.  Bye-bye.

9          **MS. BROOKS:**  Thank you, Your Honor.

10              (Proceedings adjourned at 10:55 a.m.)

11                      ---oOo---

12

13

14              **CERTIFICATE OF REPORTER**

15      I certify that the foregoing is a correct transcript

16  from the record of proceedings in the above-entitled matter.

17

18  DATE:   Wednesday, January 20, 2021

19

20

21

22  _____

23      Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                  U.S. Court Reporter

24

25