Matthew Borden, Esq. (SBN: 214323)
borden@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, 10th Floor
San Francisco, CA 94104
Telephone:  (415) 599-0210
Facsimile:  (415) 276-1808

SPECIAL MASTER

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

FINJAN, INC.,

    Plaintiff,

v.

JUNIPER NETWORK, INC., et al.,

    Defendants.

Case No. 3:17-cv-05659-WHA

**REPORT AND RECOMMENDATION RE ATTORNEY'S FEES AND EXPENSES**

Below is the Special Master's report and recommendation regarding the attorney's fees and expenses that Plaintiff Finjan, Inc. should pay to Defendant Juniper Network, Inc.

**SUMMARY OF RECOMMENDATIONS**

This dispute over attorney's fees arises from the Court's finding that Plaintiff Finjan's assertion of United States Patent Nos. 6,804,780 (the '780 Patent) and 8,677,494 (the '494 Patent) was exceptional (Dkt. No. 648). Defendant Juniper seeks $6,228,266.43 in legal fees for work that culminated in winning two summary judgment motions, defeating a summary judgment motion, and prevailing in a five-day jury trial. It is recommended that Juniper recover $5,914,156.

Pursuant to the Court's Order re Attorney's Fees and Costs and Appointment of a Special Master (Dkt. No. 649), Juniper wrote off over $2.4 million in fees and organized its billing into 133 separate projects. Finjan raises objections to virtually every one. It disputes whether Juniper should recover attorney's fees for all of its work on the '484 and '780 Patents, asserts that Juniper's senior attorneys spent too much time on the case, contests how much of Juniper's fees should be allocated to work on the two patents at issue as opposed to the other patents-in-suit, and claims that Juniper's billing was otherwise excessive. Most of these objections lack merit.

Like the Battle of Verdun, high-stakes patent litigation can become a costly fight over inches and yards. When engaging in such combat, each side can expect that its adversary will respond in kind. Finjan deployed more than 15 timekeepers on this matter. From a review of both sides' billing records, it appears that Juniper's defense was proportional to the intensity with which Finjan prosecuted the case. It does not appear that Juniper overreached on its claimed fees, such that any penalty should be assessed against it. Certain deductions from the amounts sought are recommended for the reasons below.

**PROCEDURAL HISTORY**

On February 25, 2021, a status conference was held to establish procedures and deadlines for resolving the parties' dispute. Pursuant to Finjan's request, it was allowed to submit a brief addressing whether all work related to the '780 and '494 Patents was recoverable. On March 11, 2021, Juniper submitted its responsive brief. On March 25, 2021, the parties argued their positions.

REPORT AND RECOMMENDATION

On March 22, 2021, Juniper submitted a Declaration, reducing the $8,656,971 in attorney's fees it was seeking (Dkt. No. 634 at 23) to $6,228,226 (Declaration of Jonathan Kagan ¶ 13). Juniper's declaration divided its billing in 133 discrete projects and attached time entries for each biller for each project. On April 12, 2021, Finjan submitted a responsive brief along with time notes for its timekeepers (Brief re Juniper's Submission on Fees). Finjan organized its fees into only nine projects, which made comparison to Juniper's 133 projects difficult (*Ibid*.).

Another conference was held on April 15, 2021 to address the parties' dispute over the billing rates in Finjan's submission and Juniper's request that Finjan produce its engagement letter with counsel.[1] Juniper's request was denied. On April 21, 2021, a conference was held to discuss the parties' positions regarding the billing rates that Finjan was using to calculate its fees, and it was requested that Finjan select 10 of Juniper's projects that it thought were excessive, and break out Finjan's time records for comparable projects. On April 22, 2021, Finjan provided rate sheets for Kramer, Levin, and the parties jointly submitted summaries of nine Juniper projects that Finjan had selected.

On April 23, 2021, a hearing was conducted regarding the nine contested projects. On April 27, 2021, Juniper submitted a reply brief responding to Finjan's proposed apportionment of time to the '780 and '494 Patents. On April 29, 2021, the parties jointly submitted a spreadsheet on five additional projects that Finjan disputed. A hearing was held on April 30, 2021 to discuss the five projects and the parties' competing proposals for time allocation. On May 5, 2021, the parties submitted supplemental briefing on their proposed time allocations, and spreadsheets on two additional projects that Finjan contested. Juniper submitted a reply to Finjan's May 5th brief on May 6, 2021, and Finjan submitted a reply to Juniper's May 5th brief on May 7, 2021.  On May 14, 2021, a final hearing was held to cover all remaining issues. Juniper submitted a reply regarding costs on May 17, 2021, and Finjan submitted a summary of its objections on May 18, 2021.

---

[1] Finjan was represented by Kramer, Levin Naftalis & Frankel LLP ("Kramer, Levin") during the proceedings at issue. Apparently, Finjan's agreement with Kramer, Levin was at least a partial contingency fee agreement, which led to a dispute over what rates to apply to Kramer, Levin's lawyers. Kramer, Levin also block billed and did not record all its time, which made comparisons more difficult.

1

## RECOMMENDATIONS

2      Juniper is entitled to recover its reasonable fees except those "bearing little or no relation"

3   to the '494 and '780 Patents (Dkt. No. 649 ¶ 11). Juniper appears to have staffed its case

4   reasonably and, with a few exceptions, spent a reasonable amount of time on its 133 projects. It

5   also appears that Juniper's apportionment of fees to account for its work on patents other than the

6   '494 and '780 Patents is fair and accurate. Some deductions have been recommended for Juniper's

7   claimed time for the reasons stated below.

8   **I.      SCOPE OF RECOVERABLE FEES**

9      Finjan asserts that Juniper is entitled to fees for only a portion of the work that it did

10   defending against the '494 and '780 patents. This argument appears to be inconsistent with the

11   Court's Order re Request for Fees ("Order"), which states: "This order holds as exceptional

12   Finjan's assertion of the '494 and '780 patents" (Dkt. No. 648 at 5).

13      Finjan argues that the reasoning behind the Order was that Finjan should not have continued

14   to litigate the case after two "case-dooming" rulings in 2018 (Finjan Supp. Br. at 1). Such a reading

15   of the Order, however, appears to be incomplete. The Order's finding of exceptionality is not

16   limited to the conduct after the Court's legal rulings, but rather based on the totality of the

17   circumstances.

18      The Order holds that asserting the '494 Patent was exceptional because there was no viable

19   damages case and ultimately no infringement (Order at 3). It further states that Finjan asserted

20   shifting litigation positions (*ibid.*) and put improper and prejudicial evidence before the jury in its

21   efforts to obtain a different result (*Ibid.*). That Finjan proved that all the claim limitations but one

22   were met (Finjan Supp. Br. at 5), which shows that Finjan came close (but failed) to establish an

23   infringement case without any damages, does not change this calculus.

24      The'780 Patent is similar. The Order's findings include that Finjan should have withdrawn

25   its claims after the Court rendered its construction of "performing a hashing function" (Order at 3-

26   4), that Finjan lost on notice grounds as well (*id.* at 4), that Finjan misrepresented authority to the

27   Court (*ibid.*) and attempted to relitigate its own concessions to salvage its claims related to the '780

28

1   Patent (*Ibid*.). The Order expressly held that "Finjan's assertion of the '780 patent stands out as

2   exceptional as well" (*Ibid*.).

3        Under these circumstances, there is no basis for deviating from the Court's holding that

4   "Finjan's assertion of '494 and '780 patents" was exceptional.

5   **II.   JUNIPER'S REASONABLE LEGAL FEES**

6        The purpose of an award of attorney's fees under 35 U.S.C. § 285 is to make whole a party

7   injured by its adversary's "exceptional" conduct. *Rembrandt Techs. LP Patent Litig*., 899 F.3d

8   1254, 1278 (Fed. Cir. 2018). The Federal Circuit has determined that, while courts have broad

9   discretion in determining what attorney's fees are compensatory, those fees must relate to the

10  exceptional conduct. *Id*. at 1278-79.

11       Juniper seeks recovery of its lodestar: the reasonable hours its counsel spent, multiplied by

12  a reasonable rate. Rate is not an issue here. Finjan has stipulated that the rates claimed by Juniper's

13  counsel at Irell & Manella, LLP are reasonable. These rates apparently are lower than the firm's

14  actual rates, and are based on rates that have been approved by other courts in the Northern District

15  of California and are commensurate with what lawyers charge for patent litigation in this District.

16       Finjan makes three main arguments regarding the amount of Juniper's claimed fees.

17  Finjan's first two arguments are that Juniper's bills are "top heavy" because Juniper overused

18  timekeepers with high rates and that Juniper spent too much time on various projects. Finjan seeks

19  to establish these points by comparing its own billing to Juniper's, and performing various

20  aggregate calculations (Finjan Brief re: Juniper's Submission on Fees at 8-17). Comparisons of the

21  parties' billing on 16 similar projects selected by Finjan, however, generally shows that Juniper

22  matched Finjan's prosecution of the case with proportionate force.

23       Finjan's third contention is that Juniper is seeking fees for work it did on patents other than

24  the '494 and '780 patents. Finjan's methodology of generally applying a 28.6% apportionment,

25  which is based on two of the seven patents-in-suit being found exceptional,[2] is not a reasonable or

26

27  [2] There were nine patents asserted in total because Finjan added and subtracted patents in the
    course of the proceedings. However, Finjan asserts that a 2/7 ratio is most reflective of how many
28  patents were actually litigated.

1  fair allocation of fees. Juniper's proposed methodology, which varies depending on the nature of

2  the work, appears to be substantially more fair and accurate.

3    **A.    Juniper's Staffing and Billing**

4    Finjan claims that Juniper overused lawyers with high billing rates and generally spent too

5  much time on the case. Finjan identified 16 projects where it contends these forms of overbilling

6  occurred. A comparison between Juniper's and Finjan's billing for the 16 projects shows the

7  Juniper's staffing was generally reasonable and proportional to the staffing used by Finjan. Each of

8  those projects is discussed below.

9    **1.    The Summary Judgment Motions in the First Patent Showdown**

10   Juniper's staffing for the summary judgment motions on the '780 and '494 Patents was

11  similar to, if not more efficient than, Finjan's. Juniper had at least three less timekeepers and spent

12  less time overall (644.8 hours vs. 696.5 hours).[3]

13   Finjan's first argument is that Juniper's senior lawyers spent too much time on these

14  motions. The record does not bear this out. In preparing Juniper's summary judgment motion on

15  the '780 patent, Juniper's junior partner (a 2007 graduate) billed 109.7 hours. Its senior partner

16  billed 48.5 hours, for a total of 158.2 hours by senior lawyers. In preparing Finjan's summary

17  judgment motion on the '494 patent, Finjan's senior associate (also a 2007 graduate) billed 152.1

18  hours, one senior partner billed 19.2 hours, and a third senior partner billed 3.5 hours, for a total of

19  174.8 hours by Finjan's comparably senior lawyers. In addition, Finjan used two senior associates

20  (both 2011 graduates), who billed another 58.1 hours. Juniper did not use any senior associates.

21  Thus, as between the two summary judgment motions, Finjan relied on significantly more senior

22  lawyer time than Juniper used.

23   The opposition briefs on summary judgment tell a similar story. Juniper used 127.9 hours of

24  senior lawyer time, whereas Finjan used slightly less: 115.3 hours. However, unlike Juniper, Finjan

25  used 152.9 hours of senior associate time; whereas Juniper had 0 hours of senior associate time and

26  used junior lawyers instead. Still, Finjan spent over 100 hours more than Juniper. Thus, while the

---

27  [3] Finjan's time may be understated because it did not submit records for timekeepers who spent less

28  than 100 hours on the case. As noted in Section 11 below, some of its timekeepers also did not
   report all their time.

1    parties' division of labor was slightly different, Finjan relied on much more senior lawyer time than

2    Juniper in performing similar tasks.

3        Finjan argues that the 2007 graduate it employed was not comparable to the 2007 graduate

4    Juniper used because Juniper's lawyer was a junior partner, whereas Finjan's lawyer had not been

5    named a partner at the time the motions were briefed in 2018. Lawyers obviously are not fungible.

6    But for purposes of comparing the time spent by lawyers from elite firms, as opposed to relying on

7    the vagaries of who makes partner at which firms, and when, comparing lawyers of similar vintage

8    is a fair proxy for assessing whether one side is over-lawyering the case.

9        While Finjan stipulated that the rates claimed by Juniper are reasonable, it separately

10   contends that the high billing rates of Juniper's partners renders it unreasonable for them to spend

11   as much time as they did. In its strongest form, Finjan's argument appears to be that Juniper could

12   only reasonably defend the case by employing a model where its lead counsel only parachuted in

13   for hearings and trial. That is not the only way to reasonably staff a case, or even necessarily

14   advisable given the benefits that experienced counsel can bring to a case.

15       Finjan also asserts that its lawyers at Kramer, Levin charged less than the stipulated rates

16   for Juniper's counsel. Kramer, Levin, however, was working on at least a partial contingency basis,

17   the details of which Finjan did not disclose. The rates that Finjan used to calculate its fees do not

18   appear to be consistent with the rates that an international law firm of Kramer, Levin's stature

19   would actually charge. For example, Finjan asserts that Kramer Levin's purported rate for a ninth-

20   year associate is less than the rate the parties stipulated was reasonable for Irell & Manella's third-

21   year associate (April 29, 2021 Joint Submission at Row 5). This report, therefore, gives little

22   weight to Finjan's claimed rates and relies, instead, on the seniority of the lawyers for purposes of

23   gauging the proportionality and reasonableness of Juniper's fees.

24       Juniper's time entries on these two summary-judgment-motion projects reveal a logical and

25   efficient structure. A fourth-year associate was primarily responsible for arguments as to claim

26   construction and non-infringement. A first-year associate was mainly charged with researching the

27   35 U.S.C. § 101 arguments. A third-year associate researched the marking arguments. The junior

28   partner helped develop strategy and took primary responsibility for the drafting. And lead counsel

1   mainly evaluated and outlined the arguments and revised the final papers. This was a sensible and
2   efficient division of labor.

3       Finjan's final argument is that Juniper's billing was excessive. However, Finjan spent 37.1
4   hours more than Juniper on the '780 Patent summary judgment motion. Although Finjan spent 14.6
5   hours less than Juniper on the'494 Patent motion, Finjan was much less leveraged than Juniper.
6   Applying Juniper's rates for Finjan's attorneys, Finjan's briefing would cost approximately
7   $24,000 more than Juniper's.

8       In sum, Juniper's staffing and billing on these two projects was at least proportionate to
9   Finjan's. Juniper may have staffed the case differently than Finjan by using a senior lawyer who
10  was more involved in the case than senior counsel for Finjan, but in doing so, it was able to avoid
11  using substantial amounts of senior associate time. In light of the resources Finjan used, Juniper's
12  fees on these projects were reasonable.

13              **2.     Prepare for and Defend Coonan Deposition**

14      Juniper spent 26.8 hours on this project; whereas Finjan spent 43.9 hours on preparing Mr.
15  Hartenstein, which the parties submit is a comparable project. Finjan used no junior associate time.
16  Juniper used seven hours of junior associate time. Nothing stands out as inappropriate or
17  disproportionate about this project.

18              **3.     Prepare for Daubert Hearing**

19      Juniper spent 43.5 hours on this project, which is a lot for preparation for a hearing – even
20  one that proved to be dispositive. Finjan, however, spent 52.6 hours on this project. Further, Finjan
21  used no junior associates on this project; whereas, Juniper used 12.6 hours of junior associate time.
22  In light of these facts, Juniper's effort was reasonable and proportionate.

23

24              **4.     Opposition to Daubert Motion for K. Ugone**

25      The time spent by the parties on their respective oppositions to Daubert motions on their
26  damages experts (Dr. Keith Ugone for Juniper and Dr. Kevin Arst for Finjan) was similar: 109
27  hours for Juniper and 103.8 for Finjan. For Juniper, 68.3 hours of its time was billed by junior

28

associates. Finjan, in contrast, had no junior associate bill on this project. Juniper's billing on this project was thus more efficient than Finjan's.

### 5.      Prepare Report and Demonstratives for K. Ugone

Juniper billed more time than Finjan in preparing the report for its damages experts: 198.3 hours, compared to 159.2 hours. However, 124.3 of Juniper's hours was junior associate time, whereas Finjan had only 22.5 hours of junior associate time. Juniper's effort was still more expensive by roughly $30,000, even applying Juniper's rates to Finjan's timekeepers. A review of Juniper's time notes on this project does not show much vagueness or gross inefficiencies. At argument, Juniper asserted that its counsel prepared the slides and demonstratives for its expert; whereas Finjan's expert prepared his own slides and demonstratives. Juniper's time notes that make reference to preparing demonstratives do not differentiate between time spent on the report versus time spent on the demonstratives (e.g., 11/4/18 ["drafted Ugone Report and demonstratives"]), so it is impossible to determine how much time was spent on demonstratives. While this is a close call because no two projects are exactly comparable, a 5% reduction ($8,173) on this project is recommended to account for any inefficiency.

### 6.      Respond to Judge Alsup's Written Questions on MSJs

Juniper spent 45.1 hours on this project. Even under its own calculations, the legal fees it incurred we almost three times those of Finjan, even though the Court's Questions re Oral Argument (Dkt. No. 166) were equally directed to both sides. Juniper's effort thus appears disproportionate. A reduction of 50% ($18,298) is recommended.

### 7.      The Expert Depositions of Drs. Eric Cole, Alessandro Orso, Aviel Rubin and Michael Mitzenmacher

These five projects are grouped together because they all concern expert depositions: Prepare for and Depose Cole, Prepare for and Depose Orso, Prepare for and Defend Rubin ('494 Patent), Prepare for and Depose Mitzenmacher, and Prepare for and Defend Rubin ('780 Patent). The parties compared their billing for each witness. The parties' staffing and billing on these projects is generally comparable.

For taking Dr. Cole's deposition, Juniper spent 34.8 hours, and Finjan spent 38.8 hours, 3.8 of which was junior associate time. Juniper's billing was proportionate to Finjan's.

For taking Dr. Mizenmacher's deposition on the '780 Patent, Juniper spent 64.7 hours, 21.9 of which was junior associate time. Finjan spent 109.1 hours defending the deposition, 79.3 hours was junior associate time. Although Finjan was more leveraged, it was also less efficient. Juniper's billing was proportionate to Finjan's.

For preparing Dr. Rubin for his deposition on the '780 Patent, Juniper billed 52 hours, whereas Finjan spent 32.2 hours this project. Juniper, however, reduced its request by 26.7 hours ($21,427) in footnote 3 of the joint spreadsheet submitted on April 22, 2021. No further deductions are recommended.

For the liability experts on the '494 Patent both sides spent considerably more time taking the depositions than defending them. In preparing Dr. Rubin for his deposition on the '494 Patent, Juniper spent 37.4 hours, and Finjan spent 97.2 hours taking the deposition. Conversely, in taking the deposition of Dr. Orso, Juniper spent 79 hours, and Finjan spent 27.5 hours defending it. Juniper's efforts seem at least proportional to Finjan's. It spent 18.2 hours less than Finjan in taking the depositions and 8.9 hours more defending them. For Juniper, 44.3 of the 79 hours it spent taking the deposition of Dr. Orso were junior associate time. For Finjan, 56.5 of the 97.2 hours it spent taking the deposition of Dr. Rubin ('494 Patent) were junior associate time, 2% more than Juniper. For Dr. Rubin's deposition, Juniper used 1.2 hours of junior associate time, and Finjan used 0 hours. These efforts are comparable.

### 8.      Prepare for and Depose Hartenstein

Juniper spent 119.1 hours, 77.2 of which was junior associate time, preparing for the deposition of Finjan's CEO, Phil Hartenstein. Finjan spent 43.9 hours preparing Mr. Hartenstein, and 50.2 hours preparing to take the deposition of Scott Coonan, which Finjan asserts was a comparable project. Finjan spent no junior associate time on any of these tasks.

According to Juniper, it spent so much time on this project because Mr. Hartenstein had testified in many other depositions and proceedings, and his testimony needed to be reviewed. Regardless, it took Finjan half the time to prepare the witness, presumably with the same

transcripts. The billing entries on this project are repetitive and vague and do not help clarify why

so much time was expended (*See*, *e.g.*, 9/6, 9/7, 9/10, 9/11, 9/21, 9/26, 9/27, 10/1, 10/2, 10/3 time

entries). Because the party seeking fees bears the burden of proof, courts have disallowed time

when the entries do not permit meaningful review. *See*, *e.g.*, *Banas v. Volcano Corp.*, 47 F. Supp.

3d 957, 967 (N.D. Cal. 2014); *Shame on You Prods., Inc. v. Banks*, 2016 WL 5929245, *16 (C.D.

Cal. Aug. 15, 2016) ("Although cognizant of Defendants' desire to maintain confidentiality and

protect privileges, the Court finds that some of the billing entries have been so heavily redacted that

it cannot assess the reasonableness of the time expended."). Accordingly, a 25% reduction

($24,378) is recommended for this project.

### 9. Prepare Daubert Motion and Reply to Exclude Arst

Juniper spent 203.4 hours on this project, 109.9 of which was junior associate time. Finjan

spent 164.1 hours on a comparable project, its motion to exclude Juniper's damages expert, Dr.

Ugone. Finjan used 3.8 hours of junior associate time. Even applying Juniper's rates to Finjan's

counsel of comparable vintage, Juniper spent $36,070 more than Finjan. While Juniper attributes

the difference to the importance of the motion (which ultimately proved dispositive) and its use of

more junior lawyer time, a 10% reduction ($17,225) is recommended in light of that differential

and a number of vague and repetitive billing entries that could be inefficient (*See*, e.g., 10/28,

10/29, 10/30, 10/31, 11/2, 11/8 and 11/9 entries).

### 10. Daubert Hearing

Juniper spent 9.1 hours less than Finjan on this project. Finjan did not use any junior

lawyers on this project. Juniper's billing was at least proportional to Finjan's.

### 11. Prepare for and Argue MSJs on '494 and '780 Patents

Juniper spent 198.6 hours preparing for the hearings. Finjan's records show that it spent

76.2 hours on this project. Both parties, however, acknowledge that the lawyer who argued the

motion on the '780 Patent for Finjan recorded 0 hours of time on this project. The attorney who

argued the '494 Patent for Finjan recorded only four hours, which seems to underestimate the

actual amount of time he spent – especially considering that he did not bill significant amounts of

time preparing any of the briefing on the '494 Patent. But even assuming that Finjan's two partners

1    billed as many hours as Juniper's partners, Juniper spent significantly more time on this project.

2    Juniper also points out that Finjan's time entries do not include much time for preparation of slides,

3    but it is unclear from Finjan's time notes whether such activities were subsumed within other

4    generic entries, such as "prepare for hearing."

5         In reviewing Juniper's time entries on this project, it is difficult to determine why it spent as

6    much time as it did. Several of the entries are vague and repetitive (e.g., 7/23/18 ["Preparation for

7    summary judgment hearing"], 7/24 ["Preparation for summary judgment hearing"], 7/25/18

8    ["Preparation for summary judgment argument"].) A reduction of 20% ($32,625) is recommended

9    on this project.

10              **12.    Prepare Rubin Technical and Damages Rebuttal Reports**

11        The parties dispute which project(s) are comparable to Juniper's preparation of Dr. Rubin's

12   reports on technical issues and damages. Finjan compares this project to its preparation of the

13   expert reports of Dr. Harry Bims and Dr. Eric Cole, which it claims took 99.1 hours. Juniper asserts

14   that Finjan used Dr. Bims on technical issues, Dr. Cole on infringement and damages, Dr. Orso on

15   invalidity and Dr. Arst on damages, and that Dr. Rubin addressed all these issues, except for some

16   damages issues, which were addressed by Dr. Ugone. In its May 6, 2021 submission, Juniper seeks

17   to break its own project into three subprojects and divide up Finjan's records into corresponding

18   projects to create what it contends is a more accurate comparison. Juniper also notes that Dr. Bims

19   had provided similar opinions in other cases Finjan had prosecuted, lessening the amount of work

20   Finjan needed to do.

21        Given the incongruity of the projects, the inexact and competing comparisons by the parties

22   are not a good basis for judging reasonableness. Juniper apparently could have broken this project

23   into multiple projects in the first instance, but regardless of how the time records are characterized,

24   Juniper spent a substantial amount of time. Juniper spent 231.7 hours on the project, 41.2 hours of

25   which were junior associate time. From a review of the records, it appears that duplication may

26   exist, and it is difficult to discern whether there was billing efficiency (see, e.g., JGLC entries of

27   10/4, 10/5, 10/6, 10/7, 10/8, 10/9). Accordingly, a reduction of 10% ($19,280) is recommended on

28   this project.

### B.     Apportionment

The Court has held that Juniper may not recover fees bearing little or no relation to the '780 and '494 Patents. A few of the projects, *e.g.*, Prepare First MSJ Motion and Reply on '780 Patent, are plainly 100% related to the exceptional conduct. Other projects are not. While Juniper culled its billing records to remove time entries directed at patents other than the '494 and '780 Patents, much of the work on the case, *e.g.*, depositions, is not attributable to any specific patent on its face.

Finjan proposes applying a 28.6% (2 of 7) apportionment to all fact discovery, except the deposition of David Kroll, for which it allocated 33% (Finjan Submission at 19-20). It proposes the same 28.6% apportionment for all activities related to case administration and pleadings, except for Juniper's allocations of 100% for the motion to add ATP Appliance to the case, and 50% for the motion to dismiss counterclaims and defenses (*Id.* at 20). During argument, Finjan agreed to the following allocations proposed by Juniper: (1) Research and Draft Answer and Counterclaims 33%, (2) Prepare Case Management Statement 33%, (3) Case Management Conference 33%, (4) Prepare and Argue Motion to Dismiss Willfulness and Inducement Claims 33%, (5) Draft Answer to First Amended Complaint 33%, (6) Prepared Amended Answer/Counter-Claims, and Motion for Leave to File Same (in response to Order dismissing/striking inequitable conduct/prosecution laches) 50%, and (7) Respond to Finjan Motion to Dismiss and Strike Counterclaims/Affirmative Defenses to FAC (Inequitable Conduct) 50%. No deductions are made for these entries.

Finjan disputes Juniper's apportionment of time for over 100 other projects. Those projects generally involve patent contentions and case analysis, and depositions and discovery. Finjan asserts that the parties were generally using all this discovery for all seven patents-in-suit. Juniper claims that while some of the discovery was going to be useful for other patents, the parties' efforts were focused on the '494 and '780 Patents because those were the ones subject to the highly compressed schedule for the Patent Showdown and trial on the '494 Patent.

A flat 28.6% allocation does not fairly account for the work Juniper did on the '494 and '780 Patents. As discussed below, this holds true for the patent contentions and case analysis, as well as for depositions and discovery.

### 1.   Patent Contentions and Case Analysis

Juniper has grouped the following projects as Patent Contentions and Initial Case Analysis: Initial Analysis of Asserted Patents, Evaluate Strength of Claims for Summary Judgment, Review Infringement Contentions, Research Potential Experts, Prepare and Revise Invalidity Contentions and Charts, Narrowing Prior Art and Claims, and Damages Discovery and Contentions. Juniper proposes different allocations on each project, ranging from 50% to 90%. Finjan proposes a flat rate of 28.6% for each.

Juniper's proposals appear to be more accurate than Finjan's methodology. For example, Juniper seeks to recover 90% of its fees for the project entitled, "Evaluate Strength of Claims for Summary Judgment." This project would not have been necessary but for the exceptional conduct. And as seen in the time notes, Juniper performed some initial evaluation of other patents, but then shifted 100% of its focus to the '780 and '494 Patents. While some of its work may have related to other patents and could have benefited Juniper later in the case, a 90% allocation is more than fair in light of the nature of the project. A 28.6% apportionment is not.

Similarly, Juniper seeks recovery for 50% of its time on the project entitled "Initial Analysis of Asserted Patents to the '494 and '780 Patents." To check the accuracy of this request, each of Juniper's time entries was reviewed for its relationship to the '494 and '780 Patents. If a time entry exclusively related to one of the two patents (*e.g.*, 11/13/17 "Reviewed prior art for '780 patent"), 100% of that time was allocated. If an entry involved two patents, but only one of them was one of the patents at issue (*e.g.*, 1/12/18 "Review and analysis re: '494 and '633 patents re: invalidity issues"), 50% of the time was allocated. If an entry was ambiguous (*e.g.*, 12/6/17 "Research and analyze prior art and prosecution history"), a 28.6% allocation was used. A worksheet reflecting this analysis is attached as Appendix 1 to this report. As seen therein, this methodology yielded a 47% apportionment on this project.

While this technique does not reveal with mathematical precision exactly how much time Juniper spent related to the exceptional conduct, it does show that Juniper's 50% estimation is relatively accurate. In contrast, Finjan's methodology of adopting a flat rate of 28.6% does not

correlate with Juniper's time records or what the parties were actually doing, and thus appears to be designed to depress the amount of recovery, rather than fairly apportion the work.

In light of these facts, it is recommended that Juniper's allocations for these projects be used in calculating Juniper's reasonable fees.

### 2. Depositions and Discovery

Perhaps the largest area of disagreement concerns the allocation of attorney's fees incurred during discovery. In Juniper's Response to Finjan's Arguments re: Allocation at 16 n.8, Juniper agreed to Finjan's allocation of 28.6% for the depositions of Frank Jas and Jay LePara. This reduces its claimed amount by $30,459 for Mr. Jas and $14,003 for Mr. LePara. All the other depositions and discovery issues are in dispute.

### a. Depositions

For each deposition, Juniper proposed an allocation of between 85-100% based on its estimate of how much of the work related to the two patents. Finjan, on the other hand, maintains that discovery was generally proceeding on all the patents-in-suit and that a 28.6% apportionment should apply to all fact discovery projects but two.[4]

Because apportionment of fees in a "mixed" case is an inexact science, "trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Fox v. Vice*, 563 U.S. 826, 838 (2011).

To resolve the parties' disputes on depositions, each side picked one deposition it took and one it defended, and submitted briefing on why it believed the depositions it picked supported its proposed apportionment. Juniper chose the deposition of Michael Kim, which it took, and the deposition of Alex Icasiano, which it defended. Juniper sought an allocation of 100% for each witness; whereas Finjan asserted an apportionment of 28.6%. Finjan picked the deposition of Yuly

---

[4] In its Submission on Fees at 19-20, Finjan proposed a 33.3% apportionment for the deposition of David Kroll and an 85% apportionment for the deposition of John Garland. At argument, Finjan explained that it seeks a 28.6% apportionment for Mr. Garland's deposition, but agreed to a 100% apportionment for the motion to compel the production of his notes.

1  Tenorio, which it took, and the deposition of Phil Hartenstein, which it defended. Finjan allocated

2  28.6% for both witnesses. Juniper sought recover for 85% for Ms. Tenorio and 90% for Mr.

3  Hartenstein.

4        **Mr. Icasiano**. Mr. Icasiano was the manager of a team that developed Juniper's accused

5  Sky ATP product. According to Juniper, his only involvement in the case was to get information

6  about Juniper's processes from his team and provide it to Juniper's damages expert in order to

7  rebut Finjan's damages analysis at the trial on the '494 Patent.

8        Finjan submitted two briefs arguing for a 28.6% allocation for this deposition (Finjan Brief

9  re Juniper's Submission on Fees at 19-20; Finjan Submission on Depositions – Response at 1). At

10  oral argument, however, Finjan agreed to Juniper's 100% allocation.

11        **Mr. Kim**. Juniper took the deposition of Mr. Kim 24 days before trial on the '494 Patent.

12  According to Juniper, it took his deposition because he had submitted a declaration in an *inter*

13  *partes* review proceeding in which he stated that licensees practiced the claims of the '494 Patent,

14  which was relevant to Juniper's marking defense for the '494 Patent. Mr. Kim also provided

15  testimony related to Juniper's notice defense for the '780 Patent. Juniper further claims that only

16  one series of questions in the deposition expressly concerned patents-in-suit other than the '494 and

17  '780 Patents (Juniper Submission on Depositions at 5).[5] The entire line of questioning, however,

18  generally related to the issue of notice (Deposition of Mr. Kim ("Kim Dep.") at 112:18-122:7).

19        Finjan asserts that "most of his deposition did not relate to any particular patent" and should

20  be allocated to all seven patents-in-suit (Finjan Submission on Depositions – Response at 1). It also

21  points to the general background section of the deposition and portions related to Finjan's history

22  (*Ibid.*). But it does not offer any proof, or argument, that Mr. Kim's testimony went to anything

23  other than Juniper's marking and notice defenses. As to asking the witness about his background,

24  such questioning is common in depositions. That Juniper asked a witness testifying about the '494

25  and '780 Patents about his education, experience or Finjan's business is not a reason to reduce the

26  fees that Juniper would not have incurred but for the exceptional conduct.

27  

28  [5] These questions concerned a letter Finjan sent to a company that Juniper acquired concerning a
number of patents, including the '494 Patent (Kim Dep. at 112:18-114:4).

1    As to Mr. Kim, Juniper's apportionment of 100% is far more accurate than Finjan's

2 proposal of 28.6% given that nothing suggests the witness was testifying on issues other than

3 marking and notice.

4    **Ms. Tenorio**. Finjan contends that Ms. Tenorio's deposition was exploratory. It argues that

5 only 53 pages of her deposition (17.6%) were devoted to the '494 and '780 Patents, whereas 89

6 pages (~30%) were cited by Finjan's expert on the '731 Patent, and that her deposition "related far

7 more, in the end, to the '731 and '633 Patents" (Finjan Submission on Depositions at 1). It also

8 presents detailed charts allocating portions of her deposition to various patents (*Id*. at 2-4). These

9 arguments have several difficulties.

10    First, Finjan took Ms. Tenorio's deposition on May 9, 2018. But it did not assert the '731

11 Patent until July 27, 2018—more than six weeks *after* her deposition (Dkt. No. 171). Thus, it does

12 not appear fair to attribute any, much less 30%, of this deposition to the '731 Patent.

13    Second, much of the testimony that Finjan claims to be unrelated to the '494 and '780

14 Patents or which it asserts was cited by experts in relation to other patents (including the '731

15 Patent) appears to be directed to claim limitations in the'494 and '780 Patents. For example, Finjan

16 argues that pages 6-31 of the deposition were "background on the accused Sky ATP product" and

17 that "no patent claims were discussed" (Finjan Submission on Depositions at 2). But after two

18 pages of background, Finjan's questions almost exclusively focused on whether the product

19 practiced the "performing a hashing function" limitation in Claim 1 of the '780 Patent. Finjan's

20 examination on Pages 11-16 of Ms. Tenorio's deposition—in which every question is aimed at the

21 performing-a-hashing-function limitation in the '780 Patent— is merely illustrative (Deposition of

22 Ms. Tenorio ("Tenorio Dep.") at 11:9-12 ["Q. You mentioned hash lookup adapter. Do you recall

23 that? A. Uh-huh, yes. Q. What is the hash lookup adapter?"], 11:22-23, 12:14-15 ["Q. Can you

24 provide an example of the type of contents that you perform a SHA-256 hash on?"], 11:24-25 ["Q.

25 What is the name of the component that performs the SHA-256 hash on the files?"], 13:14-15 ["Q.

26 So is Kookaburra the component that the SRX uses to perform a hash of files for lookups at

27 SkyATP?"], 13:24-25, 14:12-15 ["Q. Well, previously, you said that there's a SHA-256 hash

28 performed on contents for the file. I was wondering if you could elaborate what you mean by

'contents of the file'?"], 14:22-24 ["Q. All right. How about using an example as a Web page. What would be the contents of the file that gets hashed?"], 15:6-8 ["If the Web page that's downloaded has HTML, JavaScript, and maybe some epaulets, all that would be hashed using a SHA-256?"], 15:20-22 ["Q. So if there's a PDF file with JavaScript, then the PDF file and the JavaScript would be hashed using a SHA-256 function?"], 16:9-10 ["Q. But if there was JavaScript in the PDF file, would that be hashed as well?"], 16:20-22 ["Q. So using the example of a Web page, again, if the Web page has HTML, JavaScript, and SW flash, would the HTML, JavaScript, and SWF all be hashed?"].) This questioning continues for another 10 pages in a similar manner.

Finjan attributes 0% of this testimony above to the '780 Patent, even though the '780 Patent is the only patent in this case that had any limitation related to hashing.

The remainder of Finjan's claims about the nature of the testimony similarly appear to be contrary to the questioning in the deposition. For example, Finjan similarly barely attributes any of the testimony on pages 56-71 of the deposition to the '434 Patent, and argues that "[n]o patent claims [were] discussed, and testimony [was] not limited to specific patents" (Finjan Submission on Depositions at 3). However, this module of questioning centered on whether Sky ATP met the element of the '494 Patent requiring storage of security profile data in a database.

Third, whether experts cited various testimony is not necessarily indicative of the purpose of the testimony.

In sum, although Finjan took this deposition, its characterizations of its purpose are inconsistent with the testimony and other objective facts. Thus, Juniper's 85% allocation appears to be more accurate than Finjan's 28.6% allocation.[6]

**Mr. Hartenstein**. Juniper took Mr. Hartenstein's deposition on October 23, 2018, less than two months before trial. Mr. Hartenstein was Finjan's CEO and thus had knowledge beyond the two patents at issue. He was also Finjan's client representative at the trial on the '494 Patent. Finjan argues that none of his testimony was specific to the '494 and '780 Patents. Juniper contends that it

---

[6] In its spreadsheet on fees, Juniper states "Allocation: 80%" (Kagan Decl., Ex. C at 20). However, it lists the apportionment as 85% and applies an 85% allocation (*Ibid.*). The same holds true for the Manocha Deposition, the Garland Deposition on Notice, the Manthena Deposition, and the Nagarajan Deposition.

was deposing Mr. Hartenstein for trial, and that it deposed Mr. Hartenstein again, after the trial, on other issues, for which it is not seeking compensation.

Mr. Hartenstein was Finjan's client representative at trial. He came to court every day. The jury saw him, and he eventually testified for Finjan. Juniper appears to have taken his deposition for trial. It makes no sense that a party would put its CEO up for iterative depositions other than if Mr. Hartenstein's deposition was for the impending trial. Juniper would not have had to depose him twice, but for the trial. That Juniper obtained background information or general explanations of Finjan's business may also have been helpful to other aspects of the case is no reason to deny Juniper its fees. Thus, it appears that Juniper's allocation of 90% is more accurate than Finjan's allocation of 28.6%.

In sum, for each of the depositions that parties selected, Juniper's allocation of fees appears to be more reasonable than Finjan's. The same appears to hold true for depositions the parties did not select. For example, Finjan proposes a 28.6% allocation for the deposition of David Kroll, one of the named inventors of the '494 Patent, who Juniper deposed less than a month before trial. Finjan's allocation does not account for why the witness was deposed and would deprive Juniper of recovery for time spent on the '494 Patent. Because Juniper's apportionment attempts to fairly and accurately capture the time Juniper expended, and because Finjan's does not appear to be accurate, it is recommended that Juniper's allocations on depositions should be awarded.

No deductions for depositions are made based on Finjan's allocation arguments. In applying the allocations proposed by Juniper in its Response to Finjan's Arguments re: Allocation, the Vered deposition project should be reduced by $3,188.

### b.     Other Allocations

Similar issues to those noted above recur in Finjan's challenges to the other apportionments Juniper proposes. For example, Finjan seeks to allocate only 28.6% for motion practice related to the deposition of Shlomo Touboul. Mr. Touboul is one of the named inventors of the '494 Patent. Finjan offers no explanation for why this project would relate to anything beside the '494 Patent.

As between the parties, Juniper's allocation of 85% for pre-trial discovery and 10-15% for post-trial discovery and other projects (*e.g.*, Develop Case Schedule and Scope), is fairer and more

accurate than Finjan's and therefore should generally be used. However, the following additional adjustments are recommended:

Motion Practice re: Protective Order. Juniper seeks 75% for this project. Since a protective order applies to all the patents, a 28.6% allocation is more appropriate. This reduces Juniper's claimed amount by $10,572.

Draft Negotiate and Revise Protective Order. Juniper seeks 75% for this request. A 28.6% allocation is recommended for the reasons above. This reduces Juniper's claimed amount by $14,206.

Prepare Discovery Orders. Juniper seeks 75% for this request. A 28.6% allocation is recommended because this related to the whole case. This reduces Juniper's claimed amount by $8,371.

Respond to Finjan's Motion to Amend Complaint to Add ATP Appliance. Juniper seeks 100% for this project. However, Finjan sought to assert all the patents-in-suit against this product and to restore is willfulness contentions as for all of them. A 33% allocation is recommended because there were six patents in the case at this time. This reduces Juniper's claimed amount by $41,475.

Pre-Trial Collection, Review and Production of Documents to Finjan. Juniper seeks 85% for this project. While Juniper asserts that "the focus of discovery prior to June 18, 2018 was on the early MSJ patents" (Juniper Response to Finjan Arguments re: Allocation at 13), Finjan's discovery requests were not so limited (*See* Dkt. No. 48-1), and as the plaintiff, it obviously had motive to cast its net broadly. This project spans more than a year, much of which was devoted to the two patents at issue. A 50% allocation is recommended on this project, which reduces Juniper's amount by $46,429.

## C.    Fees on Fees

A litigant that is entitled to recover its attorney's fees is also generally entitled to recover fees on fees. *Minor v. Christie's, Inc.*, No. C 08-5445 WHA, 2011 WL 902235, *6 (N.D. Cal. Jan. 29, 2011), *report and recommendation adopted*, No. C 08-5445 WHA, 2011 WL 902033 (N.D. Cal. Mar. 14, 2011) ("The Ninth Circuit has repeatedly held that time spent by counsel establishing

1    the right to a fee award is compensable. Specifically, when attorney's fees are authorized by

2    contract, courts allow parties to recover the reasonable expenses of preparing the fee application.")

3    (collecting cases). Here, Juniper has charged a flat rate of $150,000 for all the work it has done and

4    will do up through a final award by the Court. This includes past and future fee-related proceedings

5    before the Court, and the work that it did before the Special Master, which involved breaking

6    Juniper's bills into 133 projects, submitting briefing and conducting multiple hearings. Such fees

7    are reasonable given the amount of work involved, and Finjan does not object.

8    **III.**    **EXPENSES**

9       The parties acknowledge that expert fees and travel expenses are non-compensable under

10    35 U.S.C. § 285. *Amsted Industries, Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 377 (Fed. Cir.

11    1994) ("an award under section 285 encompasses only attorney's fees; expert witness fees fall

12    under 28 U.S.C. § 1920, subject to the 28 U.S.C. § 1821(b) limitation [limiting witness fees to

13    $40/day].").

14       Before awarding sanctions pursuant to its inherent power, "the court must make an express

15    finding that the sanctioned party's behavior 'constituted or was tantamount to bad faith.'" *Leon v.*

16    *IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006). Juniper argues that the Court did contemplate

17    and award expenses by referencing them in its Order referring the matter to the Special Master

18    (Juniper Reply at 2). The Court's Order, however, does not have an express finding of bad faith,

19    and absent such a finding, it would be premature to evaluate the reasonableness of Juniper's

20    expenses.

21    **IV.**    **SPECIAL MASTER'S FEES**

22       The undersigned spent 53.2 efficient billable hours reviewing the parties' written and oral

23    submissions and preparing this report and recommendation. It is recommended that those fees be

24    equally borne by the parties.

25

26    Dated:  May 20, 2021

27                                                   Matthew Borden

28                                                   SPECIAL MASTER